1   TIMOTHY S. LEIMAN, Ill. Bar No. 6270153
    Email: leimant@sec.gov
2   PAUL M. G. HELMS, Ill. Bar No. 6291623
    Email: helmsp@sec.gov
3
    Attorneys for Plaintiff
4   United States Securities and Exchange Commission
    175 West Jackson Boulevard, Suite 900
5   Chicago, Illinois 60604
    Telephone:  (312) 353-7390
6   Facsimile:  (312) 353-7398

7   LOCAL COUNSEL
    Lynn M. Dean, Cal. Bar No. 205562
8   Email: deanl@sec.gov
    United States Securities and Exchange Commission
9   444 S. Flower Street, Suite 900
    Los Angeles, California 90071
10  Telephone: (323) 965-3998
    Facsimile: (213) 443-1904

11

12              **UNITED STATES DISTRICT COURT**

13             **CENTRAL DISTRICT OF CALIFORNIA**

14                  **WESTERN DIVISION**

15

16  SECURITIES AND EXCHANGE            Case No.
    COMMISSION,
17                                     **COMPLAINT**
18                Plaintiff,

19        vs.

20  JAMMIN' JAVA CORP., dba MARLEY
    COFFEE, SHANE G. WHITTLE,
21  WAYNE S. P. WEAVER, MICHAEL K.
    SUN, RENE BERLINGER, STEPHEN B.
22  WHEATLEY, KEVIN P. MILLER,
    MOHAMMED A. AL-BARWANI,
23  ALEXANDER J. HUNTER, and
    THOMAS E. HUNTER,
24
25                Defendants.

26

27

28

Plaintiff, the United States Securities and Exchange Commission ("SEC"), alleges as follows:

## JURISDICTION AND VENUE

1.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

2.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

3.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Central District of California and elsewhere.  Moreover, certain defendants resided or transacted business in this district.  Venue also is appropriate pursuant to 28 U.S.C. § 1391.  A substantial part of the events or omissions giving rise to the claims occurred within this district.  [28 U.S.C. § 1391(b)(2).]  In addition, any defendant not resident in the United States may be sued in any judicial district.  [28 U.S.C. § 1391(c)(3).]

4.     Defendants, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the alleged acts, practices, and courses of business.

## SUMMARY

5.     This matter concerns a pump-and-dump scheme involving the securities of Jammin' Java Corp. ("Jammin' Java" or the "Company") that generated at least $78 million in illicit profits.  Operated under the name "Marley Coffee," Defendant Jammin' Java owns a license to use trademarks of the late reggae artist Bob Marley

1

for licensed coffee products.  The Company was formed by one of Bob Marley's sons, Rohan Marley ("Marley").

6.     Jammin' Java's stock has been publicly traded and quoted on the over-the-counter market since 2008, when former CEO Defendant Shane Whittle ("Whittle") orchestrated the Company's reverse merger into a publicly traded shell company that was purportedly in the waste management business.  Ahead of this reverse merger, Whittle secretly gained control of millions of shares that previously had been issued to foreign nominees.  Whittle controlled this stock for years, during which time he served as the Company's executive officer and director.

7.     In 2010, Whittle exploited his position by coordinating an illegal offering and fraudulent promotion of Jammin' Java's stock.  In preparation for this offering, Whittle distributed a portion of the nominee stock through a complex network of offshore entities controlled by, among others, Defendants Wayne Weaver ("Weaver"), Michael Sun ("Sun"), and Rene Berlinger ("Berlinger").  To boost the stock price, Whittle introduced to Jammin' Java a sham financing arrangement orchestrated by Weaver, Sun, and Berlinger.  Whittle also arranged for the fraudulent promotion of Jammin' Java stock by Defendants Alexander and Thomas Hunter (collectively, the "Hunters"), two close associates of Whittle who since have been charged by the Commission for fraudulent promotions in other pump-and-dump schemes.

8.     Jammin' Java's public announcement of the financing arrangement and other company announcements—in concert with coordinated trades—prompted an increase in Jammin' Java's share price and volume.  In March 2011, this price increase intensified when the Hunters began disseminating fraudulent newsletters promoting Marley Coffee and Jammin' Java stock.  Consequently, over a six-month period from late 2010 to mid-2011, Jammin' Java's share price and volume increased dramatically, rising from $0.17 per share and no volume in December 2010 to an intraday high of $6.35 and volume of 20 million shares on May 12, 2011.

2

9.      As the stock price rose, Whittle illegally distributed another large block of Jammin' Java stock through Weaver, Sun, and Berlinger's network of offshore intermediaries, which included Defendants Stephen Wheatley ("Wheatley"), Kevin Miller ("Miller"), and Mohammed Al-Barwani ("Al-Barwani"), and others.

10.     By selling over 45 million shares into the artificially inflated market, entities controlled by or coordinating with the Defendants generated at least $78 million in illicit trading profits from February to May 2011.  The 45 million shares amounted to approximately two thirds of Jammin' Java's outstanding stock at the time and nearly its entire public float.  The Defendants then transferred $2.5 million of their profits to Jammin' Java under the guise of the sham financing agreement announced at the outset of the promotion.

11.     Jammin' Java's share price and volume began to collapse a few days after the Company disclosed on May 9, 2011 that it had become aware of an unauthorized and unaffiliated internet stock promotion.  On May 17, 2011, its share price fell further after Jammin' Java released disappointing results in its Form 10-K.  As a result of Defendants' illegal distribution and fraudulent promotion, investors in Jammin' Java stock lost millions of dollars.

## DEFENDANTS

12.     **Jammin' Java Corp.** ("Jammin' Java" or the "Company"), a Nevada corporation, was headquartered in Beverly Hills, California at the time of the misconduct.  Currently, Jammin' Java is headquartered in Denver, Colorado.  Operated under the name "Marley Coffee," Jammin' Java owns a license to use trademarks of the late reggae artist Bob Marley for licensed coffee products.  Jammin' Java was formed through a reverse merger with Global Electronic Recovery Corp. ("GERC"), a purported waste management company and a publicly traded shell company located in Los Angeles, California.  On August 2, 2006, GERC registered securities with the Commission pursuant to Section 12(g) of the Exchange Act.  In February 2008, GERC merged with a newly formed entity, Marley Coffee, Inc., and

3

changed its name to Marley Coffee.  GERC's stock was quoted on the Over-the-Counter Bulletin Board ("OTCBB") under the symbol GERV, until after the reverse merger with Marley Coffee—at which point it began trading under the symbol MYCF.  In July 2009, Marley Coffee changed its name to Jammin' Java and its ticker symbol to JAMN.  From its inception until at least September 2011, Jammin' Java was a shell company, without any significant operations or assets.  Jammin' Java has failed to earn positive operational cash flow or an accounting profit, and consistently disclosed going-concern risks in its SEC filings.  As of January 31, 2015, Jammin' Java had accumulated a deficit of $24 million in operating losses.

13.   **Shane G. Whittle** ("Whittle"), age 39, a Canadian citizen, maintained a residence in Los Angeles, California from at least 2009 to 2011, and another in Vancouver, British Columbia in Canada.  Currently, Whittle resides in or near Kelowna, British Columbia in Canada or in Bridgetown, Barbados in the West Indies.  From at least August 2008 to May 2010, Whittle served as the CEO, Treasurer, Secretary, and director of Jammin' Java.  In April and May 2010, Whittle formally resigned his board and his executive officer positions.  However, after he resigned, Whittle continued to direct the affairs of Jammin' Java as a *de facto* officer until he was retained as a consultant on August 1, 2011, when the Company hired a new CEO.  Whittle's association with Jammin' Java ended with the termination of his consulting agreement in 2012.  From the time of the reverse merger until at least December 2010, Whittle also held a significant ownership stake in Jammin' Java.

14.   **Wayne S. P. Weaver** ("Weaver"), age 48, resides on Nevis or in the Bailiwick of Jersey, and is a citizen of the United Kingdom and Canada.

15.   **Michael K. Sun** ("Sun"), age 59, resides in St. Brelade, Jersey and is a citizen of India.

16.   **Rene Berlinger** ("Berlinger"), age 58, resides in Trimbach, Switzerland and is a citizen of Switzerland.

17.    **Stephen B. Wheatley** ("Wheatley"), age 52, resides in or near London, in the UK, and is a citizen of the UK.

18.    **Kevin P. Miller** ("Miller"), age 46, resides in St. Brelade, Jersey, and is a citizen of the UK.

19.    **Mohammed A. Al-Barwani** ("Al-Barwani"), age 72, resides in Muscat, Oman and is a citizen of Oman.

20.    **Alexander J. Hunter** ("A. Hunter") and his twin brother, **Thomas E. Hunter** ("T. Hunter"), age 25, reside in or near Manchester, in the UK, and are citizens of the UK.  At the time of the misconduct, T. Hunter resided in Vancouver, British Columbia in Canada.

## FACTS

## General Background on Pump-and-Dump Schemes

21.    "Pump and dump" schemes typically have two parts.  In the first, promoters try to boost the price of a stock with false or misleading statements about the company.  Once the stock price has been pumped up, fraudsters move on to the second part, where they seek to profit by selling their own holdings of the stock, dumping shares into the market.  After these fraudsters dump their shares and stop hyping the stock, the price typically falls, and investors lose their money.

22.    These schemes often involve violations of several provisions of the federal securities laws.  When the participants in a scheme sell large blocks of stock to the investing public without registering the transaction, the offer or sale of that stock can violate the registration provisions of the Securities Act.  The Securities Act has two basic objectives: (a) to require that investors receive financial and other significant information concerning securities being offered for public sale; and (b) to prohibit deceit, misrepresentations, and other fraud in the sale of securities.  The SEC accomplishes these goals primarily by requiring that companies disclose important financial information through the registration of securities. This information enables

investors to make informed judgments about whether to purchase a company's securities.

23.     In addition, the fraudulent promotion or manipulative trading used to pump the company's stock price can violate the antifraud provisions of the Securities Act and the Exchange Act.  For example, fraudsters may use online newsletters, bulletin boards, or social media to disseminate false and misleading statements to the public in order to sell the stock at inflated prices.  Fraudulent promoters may claim to offer independent, unbiased recommendations in newsletters and other touts when they stand to profit from convincing others to buy or sell certain stocks—often, but not always, penny stocks.  Fraudsters frequently use this ploy with small, thinly traded companies because it is easier to manipulate a stock when there is little or no information available about the company.

24.     Participants in the scheme who attempt to conceal their individual or collective control of the stock also may violate the reporting requirements of the Exchange Act.  As a general matter, when a person or group of persons acquires beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Exchange Act, they are required to file a Schedule 13D with the SEC.  Should they beneficially own more than 5% of a voting class of an equity security registered under Section 12 of the Exchange Act, such persons must disclose, among other things, the identity and background of the persons required to file, the source and amount of funds used in making the purchases, the number of shares beneficially owned, the purpose of the acquisition of the securities, and a description of any contracts, loans, arrangements, understandings, or relationships that the person has with respect to any securities of the issuer.  Any material changes in the facts contained in the schedule require a prompt amendment.

25.     Similarly, as a general matter, corporate insiders—meaning a company's officers and directors, and any beneficial owners of more than ten percent of a class

1   of the company's equity securities registered under Section 12 of the Exchange Act—

2   must file with the SEC a statement of ownership regarding those securities.  Initial

3   statements of beneficial ownership are to be filed on Form 3; statements of changes

4   are to be filed on Form 4; and annual statements are to be filed on Form 5.

5   **Whittle Meets Marley**

6       26.    In 2005, stock promoter Whittle befriended Rohan Marley, the son of

7   Bob Marley, in Los Angeles, California.  After learning of Marley's purchase of a

8   small Jamaican coffee farm, Whittle proposed the creation of a large-scale coffee

9   distribution business built on the Marley name.  At the time, Whittle informed Marley

10  that "what he did or does is build shell companies and sell them to other entities."

11  **Whittle Acquires Publicly Traded Shell**

12      27.    To raise capital for the Marley venture, Whittle identified a shell

13  company with publicly traded securities, GERC, a purported waste management

14  business located in Los Angeles, California.  GERC had been incorporated on

15  September 27, 2004 by an individual named David P. O'Neill ("O'Neill"), a former

16  Vancouver car salesman.  O'Neill served as CEO and board member and controlled

17  82% of GERC's shares.  On August 22, 2007, Whittle was appointed to GERC's

18  Board of Directors.

19      28.    In February 2008, Whittle and O'Neill approved a merger between

20  GERC and a newly formed entity, Marley Coffee.  The reverse merger gave Marley

21  Coffee access to GERC's publicly traded shares.  After the merger, GERC announced

22  that it was transitioning from the waste management business to the premium roasted

23  coffee business and changed its name to Marley Coffee.

24  **Whittle Gains Control of Nominee Shares**

25      29.    After the reverse merger, Whittle maintained his membership on the

26  Company's Board and assumed the positions of Treasurer, Secretary, and CEO.

27  During this time and for years afterward, Whittle actively, if not exclusively,

28

managed and directed Marley Coffee's business.  Rohan Marley's involvement in the management of the business was minimal.

30.     Whittle also held a significant ownership interest in the new entity.  On April 28, 2008, around the time of the reverse merger, O'Neill transferred control of the company to Marley and Whittle and retired approximately 55 million shares to treasury.  Following the reverse merger, Whittle directly held 9.1% of Marley Coffee in his own name and another 0.5% through an entity he controlled, SJ Investments Holdings, Inc. ("SJ Investments").  Other than Marley, no individual held more of Marley Coffee's stock than Whittle.

31.     Whittle expanded his holdings by secretly acquiring millions of shares from nominee shareholders in the months before the reverse merger of GERC.  In connection with the reverse merger, Whittle acquired a significant portion of this nominee stock through several Panamanian entities that he controlled, including El Tololo Investment Corp. ("Tololo"), Tyrone Investments, Inc. ("Tyrone"), and Nemo Development, S.A. ("Nemo"), and another entity that ultimately would transfer its shares to an entity that Whittle controlled, Luminus Real Estate, Inc. ("Luminus").  Through this acquisition, Whittle gained control of an additional 17% of Marley Coffee's stock.  Figure 1 summarizes these transfers.

**Figure 1. Acquisitions by Whittle in Connection with the Reverse Merger**

| Entity | Jurisdiction | Date Formed | Shares Acquired | Date Acquired | Percentage (as of April 2008) |
|---|---|---|---|---|---|
| **Nemo** | Panama | June 15, 2007 | 1,596,615 | Jan. 11, 2008 | 4.9% |
| **Tyrone** | Panama | Sept. 10, 2007 | 1,613,220 | Jan. 17, 2008 | 5.0% |
| **Tololo** | Panama | Oct. 3, 2007 | 824,874 | Mar. 3, 2008 | 2.5% |
| **Luminus** | Panama | Nov. 19, 2007 | 1,613,220 | Feb. 20, 2008 Mar. 17, 2008 | 5.0% |

32.     Whittle was able to obtain control of this nominee stock through a prior sham offering of GERC's stock.  In October 2006, pursuant to a registration statement that went effective in February 2006, GERC issued stock certificates to O'Neill and multiple individuals with addresses in Canada and Mexico ("GERC

8

Nominees").  However, many of these shareholders were unaware of the issuances or were issued shares that were actually controlled or subsequently acquired by O'Neill or others working with him.

### Whittle Continues to Exercise Control

33.    Based on his managerial control of the Company and his stock ownership, Whittle was a control person and affiliate of Jammin' Java from at least February 2008 through August 2011.

34.    From the time of the reverse merger in February 2008 through 2010, Whittle continued to control Marley Coffee, which was renamed Jammin' Java in July 2009.  Until May 20, 2010, Whittle continued to hold the positions of CEO, Treasurer, and Secretary, and was Jammin' Java's only true executive.

35.    On May 13 and 14, 2010, the *Vancouver Sun* published articles linking Whittle to various penny stock promotions.  The articles put pressure on Marley to reduce Whittle's public association with the Company.

36.    On May 20, 2010, Whittle formally resigned his board and his executive officer positions with Jammin' Java, which were nominally filled by Anh Tran ("Tran").  Tran, whose prior experience included managing an online adult film business, had been introduced to Jammin' Java by Whittle.

37.    After May 2010, Whittle acted as a *de facto* officer of the Company and continued to be significantly involved in the management of Jammin' Java.  Among other things, he negotiated contracts with prospective vendors of Jammin' Java (including coffee vendors, brokers, and retailers), assisted in securing new board members, conferred with Jammin' Java employees and counsel concerning periodic filings of the company and related matters, drafted press releases, coordinated with the company's public relations consultants, advanced funds on behalf of Jammin' Java, and handled business strategy.  Whittle's role did not change appreciably until August 2011, when Jammin' Java hired a new CEO and entered a consulting agreement with Whittle.

38.     In addition to controlling Jammin' Java's operations, Whittle also continued to hold or control a substantial portion of Jammin' Java's stock through 2010.  Moreover, he increased his 2008 holdings further on April 22, 2010 through a secret transfer of approximately 3 million shares (amounting to an additional 3.1% of Jammin' Java's outstanding stock at the time) from GERC Nominees to Nemo.

39.     In recognition of Whittle's affiliate status, when Jammin' Java shares were issued to him in September and November 2010, the share certificates bore a restrictive control legend.  The legend designated that the shares were issued to and held by a control person or affiliate.

### Whittle and Others Coordinate the Pump-and-Dump Scheme

40.     Using Whittle's control of and access to Jammin' Java and its stock, Whittle, Weaver, Sun, and Berlinger coordinated a pump-and-dump scheme that culminated in the middle of 2011.  As discussed below in more detail, this scheme involved the following steps:

(a)     In late 2010, Whittle, Weaver, Sun, and Berlinger orchestrated a sham financing arrangement designed to create the false appearance of legitimate third-party interest and investment in the Company.

(b)     In anticipation of the public announcement of this arrangement and other promotional activity, Whittle and others working with him illegally distributed large blocks of Jammin' Java stock to intermediaries and took other steps to prepare for an illegal offering of Jammin' Java stock.

(c)     In December 2010, Jammin' Java announced the financing agreement, and entities connected to the scheme began to coordinate trades of Jammin' Java stock at elevated prices.  As the share price began to increase, Jammin' Java made a series of additional corporate announcements and took other steps to promote the company.

(d)     To further the scheme, Whittle made material misstatements and misleading omissions in beneficial ownership reports filed with the Commission.

(e)     Whittle then distributed additional blocks of Jammin' Java stock to multiple intermediary entities, many of which had received shares through Whittle's initial distribution.  To conceal their interests, Whittle, Weaver, Sun, and Berlinger failed to disclose their beneficial ownership of Jammin' Java stock.

(f)     The Hunters, who had been engaged by Whittle, then published false stock newsletters and took other steps to hype the stock, sending the share price sharply upward.

(g)     With Jammin' Java's share price artificially inflated, the intermediary entities under Defendants' control dumped millions of shares on the public market without registering the transactions, making millions of dollars in the process.

(h)     Weaver and Berlinger then funneled a portion of these profits to Jammin' Java, under the guise of the sham financing arrangement that launched the promotion.

### The Sham "Straight Path" Financing Arrangement

41.     Beginning in April 2010, Whittle, Weaver, Sun, and Berlinger orchestrated a sham financing arrangement to set the stage for the promotion and distribution of Jammin' Java stock.  The arrangement created the illusion that Jammin' Java had obtained financing from a legitimate third-party investor, and it served as the kickoff for the pump-and-dump scheme.  In reality, the purported investor did not exist.  Moreover, the purported "financing" was supplied by Weaver and Berlinger, who would sell shares of Jammin' Java stock that were acquired from Whittle the day after the financing agreement was executed.

42.     From April 15 to 18, 2010, Jammin' Java's management attended a coffee exposition in Anaheim, California.  During the conference, individuals claiming to be representatives of a purported investment firm, Straight Path Capital Ltd. ("Straight Path"), approached Marley, Tran, and Whittle about a potential investment in Jammin' Java.

43.    Straight Path did not exist.  Straight Path would not be established until May 2011, when Berlinger changed the name of a preexisting defunct shell entity to Straight Path in order to create the appearance of a real entity.  Straight Path was one of many entities formed by Berlinger to facilitate stock and fund transfers in connection with the illegal, unregistered offering of Jammin' Java stock.

44.    Later, on November 3, 2010, a purported representative of Straight Path using the name Raymond Hall ("Hall") emailed Tran to communicate Straight Path's willingness to provide financing in the range of $1 to $2 million.  In reality, "Hall" appears to be a pseudonym used by Berlinger.  Notwithstanding the lack of any information about Straight Path's operating history, and Hall's use of a generic email address, Tran agreed to discuss a potential agreement.  Within an hour of Tran's response on November 4, 2010, the fictitious "Hall" emailed a draft agreement valuing Jammin' Java stock at $0.40 per share—a substantial premium to Jammin' Java's share price at the time.  "Hall" also asked if it would be possible to reduce the number of outstanding shares of Jammin' Java in connection with the agreement.

45.    Tran and Marley conducted almost no due diligence on the potential financing partner or the proposed transaction.  Over the next several weeks, Tran and "Hall" exchanged two brief phone calls and a single email string, most of which focused on the share reduction.  During one of these exchanges, Tran observed that Straight Path had no website or internet presence.  Other than a brief conversation at the conference, Marley had no communications with "Hall" or any other purported representative of Straight Path.  Contrary to a typical financing transaction, "Hall" conducted no due diligence on Jammin' Java and did not request any formal information rights or a position on the Board.

46.    Whittle helped negotiate the financing agreement with Straight Path and, to effectuate the agreement, retired some of his shares to the corporate treasury for no consideration.  In furtherance of the scheme, Whittle failed to inform others at Jammin' Java of the true identity of the individuals and entities offering to provide

financing.  He also did not mention that Straight Path would be financing Jammin'
Java with the sale of shares that Whittle would provide for that purpose.

47.     Jammin' Java executed the financing agreement with Straight Path on
December 22, 2010.  Pursuant to the agreement, Jammin' Java had the right to
request that Straight Path purchase shares at a price of $0.40 per share, up to a total of
$2.5 million, subject to certain conditions.  The agreement contained numerous
restrictions on Straight Path's ability to resell the shares to public investors in the
United States.  Jammin' Java publicly disclosed the Straight Path agreement through
a press release issued on December 23, 2010 and filed with the Commission on Form
8-K on January 5, 2011.

48.     Although Jammin' Java's announcement reflected that Straight Path was
an independent, third-party investor, in reality the payments under the Straight Path
agreement ultimately were funded with the profits of sales of Jammin' Java stock.
That stock would be supplied by entities controlled by Whittle to entities controlled
by Weaver and Berlinger.

49.     In substance, Whittle, Weaver, Sun, and Berlinger used the Straight Path
agreement to boost Jammin' Java's financial prospects and then funded the
agreement through their own illegal resale of the stock to the public without the
protections afforded by a registration statement.  Tran and Marley performed almost
no due diligence, and ignored multiple red flags, and Jammin' Java then profited
from the unregistered sale of its stock to the public.

**Whittle and Others Prepare for the Distribution by Transferring Shares**

50.     In anticipation of the announcement of the sham financing arrangement,
Whittle, Weaver, Sun, Berlinger, and others took additional steps toward the
distribution of Jammin' Java stock.

51.     On August 12, 2010, Whittle signed a purported share agreement to
transfer 3.2 million shares of Jammin' Java from Nemo to Petersham Enterprises,
Ltd. ("Petersham"), a British Virgins Islands entity controlled by Weaver.

52.     From August to September 2010, Berlinger and others formed at least six offshore entities and opened accounts that ultimately would receive and sell large blocks of Jammin' Java stock and serve as intermediaries for the "dump" in the pump-and-dump scheme.  Many of these accounts were opened at the same foreign private bank located in Switzerland and Liechtenstein.

(a)     **Las Colinas and Westpark.**  On August 27, 2010, Berlinger established Las Colinas Ltd. ("Las Colinas") and Westpark Ltd. ("Westpark") in the Marshall Islands and opened accounts in the names of these entities.  Miller, who was working in concert with Weaver and Sun, owned Las Colinas, while Sun owned Westpark.

(b)     **Renavial and Calgon.**  On September 14, 2010 and November 18, 2010, Berlinger formed two additional Marshall Islands entities, Renavial Ltd. ("Renavial") and Calgon Invest, S.A. ("Calgon").  Berlinger then opened accounts in the name of Renavial and Calgon.  Al-Barwani, a business associate of Weaver and Sun, owned Renavial.  Weaver owned Calgon, and he controlled some trading in the Calgon account.

(c)     **Timotei and Rahela.**  In addition, on September 3 and 14, 2010, two other entities, Timotei Overseas, Inc. ("Timotei") and Rahela International, Inc. ("Rahela"), that later sold or transferred large blocks of Jammin' Java shares were created in Panama.  In May 2011, Rahela would transfer its shares to Renavial, which sold them within weeks.

53.     Berlinger played a critical role in creating and controlling several of the intermediary entities that funneled Jammin' Java stock to the public.  Berlinger served as the sole officer or one of the officers for Las Colinas, Westpark, Renavial, Calgon, Rahela, and other entities.  He opened brokerage accounts in the names of these entities over which he had sole dispositive power, directing activity in the accounts.  He also signed resolutions, exchanged correspondence, and handled other aspects in connection with the transfer of shares involving these entities.  In several

instances, Berlinger also directed the proceeds from the subsequent sale of Jammin' Java stock by these entities.

54.    Similarly, Weaver and Sun also controlled various entities involved in the scheme.  By October 4, 2010, if not before, Weaver learned that the Jersey Financial Services Commission had barred Sun from engaging in any financial services business without prior commission approval.  The Jersey Financial Services Commission had publicly announced the bar on March 1, 2010.  As a result, at the time of the Jammin' Java scheme, Weaver understood that his business partner had been barred for his conduct in the financial services industry and the necessity of concealing Sun's role in the scheme.

55.    In November and December 2010, around the time that the Straight Path agreement was being negotiated, and before the fraudulent promotion designed to increase Jammin' Java's share price began, Whittle transferred shares to several offshore entities, many of which were formed or controlled by Weaver, Sun, and Berlinger.  By spreading the shares among several entities, Defendants sought to avoid exceeding a 5% ownership threshold for any single entity—a threshold that would have triggered SEC disclosure requirements.

(a)    **Nemo to Petersham and Others.**  On November 19, 2010, Whittle's Nemo entity delivered 3.2 million shares to Petersham.  By this point in time, Weaver, who originally formed and controlled Petersham, had transferred control of Petersham to Wheatley to operate on Weaver's behalf pursuant to an agreement between the two of them.  Whittle and Wheatley signed the purported share purchase agreement on behalf of their respective entities.  Also on November 19, 2010, Nemo transferred another 1,560,000 shares to an unidentified account at a Panamanian brokerage firm that would sell the shares in the public market from December 2010 to February 2011.  On December 13, 2010, Nemo delivered its remaining 3,110,941 shares to Torino Invest, S.R.L. ("Torino"), a Nevis entity formed on January 22, 2010.

(b)   **Monolosa to Cilitz.**  On November 23, 2010, Monolosa Real Estate, Inc. ("Monolosa") transferred 2,036,100 shares to Cilitz and Trade, S.A. ("Cilitz"), a Panamanian entity controlled by Sun or others working with him.  (An additional 36,300 shares had been previously transferred from Monolosa to Cilitz on July 29, 2010.)  Monolosa, a Panamanian entity formed on May 16, 2007 and controlled by Whittle, had received these 2,072,400 shares from Whittle's Tololo entity immediately following the coffee exposition on April 19, 2010.  In March 2011, Cilitz's shares were transferred to another offshore entity that would sell them into the public market from March to April 2011.

(c)   **Luminus to Donnolis.**  At some time in 2010, Luminus transferred 3,198,000 shares to Donnolis Invest Corp. ("Donnolis"), a Panamanian entity controlled by Weaver or others working with him.  In March 2011, Donnolis would transfer or sell these shares to Westpark, an entity owned by Sun, which would sell them into the public market that same month.  Berlinger signed the purchase agreement on behalf of Westpark.

(d)   **Tyrone to Las Colinas.**  On December 23, 2010, the day following execution of the Straight Path agreement, Whittle "sold" 3.2 million shares held by Tyrone to Las Colinas.  Berlinger signed the purchase agreement on behalf of Las Colinas.

56.   Figure 2 summarizes the share transfers that occurred in late 2010.  The percentages are based on the number of shares outstanding at the time of the transfer.

### Figure 2. Movement of Stock from in Late 2010

| Source | Date | Shares | Acquiring Entity | Jurisdiction | Formation |
|--------|------|--------|------------------|--------------|-----------|
| **Nemo** | Nov. 19, 2010 | 3,200,000 (3.2%) | **Petersham** | British VI | Sept. 25, 2009 |
| **Nemo** | Nov. 19, 2010 | 1,560,000 (1.6%) | **Unknown** | Panama | Sept. 10, 2007 |
| **Monolosa** | Nov. 23, 2010 | 2,036,100 (2.1%) | **Cilitz** | Panama | Nov. 24, 2009 |
| **Luminus** | Feb.-Nov. 2010 | 3,198,000 (3.2%) | **Donnolis** | Panama | Feb. 20, 2009 |
| **Nemo** | Dec. 13, 2010 | 3,110,941 (4.1%) | **Torino** | Nevis | Jan. 22, 2010 |
| **Tyrone** | Dec. 23, 2010 | 3,200,000 (4.6%) | **Las Colinas** | Marshall Islands | Aug. 27, 2010 |

57.     In total, approximately 16 million shares, amounting to 19% of Jammin'
Java's outstanding stock, was transferred in late 2010 by Whittle's entities to entities
controlled by Weaver, Sun, Berlinger, Wheatley, and others.

58.     By May 2011, each of the entities that received shares in late 2010
would either sell all of their shares to the public or, in the case of Cilitz and Donnolis,
transfer them to another entity that would.

59.     No registration statement was filed in connection with any of these
offers or sales, or the subsequent offers or sales to the public.

**False Disclosures by Whittle**

60.     To further the pump-and-dump scheme, Whittle made material
misstatements and misleading omissions in public beneficial ownership reports that
he filed with the Commission.

61.     Through a Schedule 13D filed on November 23, 2010 and an amended
Schedule 13D filed on January 13, 2011, Whittle disclosed his ownership or
beneficial control of Jammin' Java stock held directly in his name and through SJ
Investments.  However, Whittle did not disclose that, from April 2008 through
November 2010, he beneficially owned or controlled at least another 17% of Jammin'
Java through Tololo, Nemo, Tyrone, and Luminus, the offshore entities that
originally acquired stock in 2008, and Monolosa, which received shares from Tyrone
in April 2010.  He also did not disclose the various changes in his position that
occurred in late 2010, as he transferred shares to other offshore entities, as described
in Paragraphs 55 and 56.  Moreover, as described below, from at least April 2010
through May 2011, Whittle participated in a group that collectively consolidated and
controlled nearly all of Jammin' Java's outstanding shares, as evidenced by, among
other things, the coordinated acquisitions and dispositions of the stock and the
consolidation of shares in common accounts or at the same institutions.

62.     In addition, Whittle misleadingly omitted the purpose of his acquisition
of Jammin' Java stock, falsely stating that he had "acquired the securities for

investment purposes" and other generic disclosures.  In reality, he had acquired securities for the purpose of gaining and exercising control and conducting an illegal offering and pump-and-dump scheme.

63.   Whittle also misleadingly omitted from his Schedules 13D a required description of any contracts, loans, arrangements, understandings, or relationships that he had with respect to any securities of Jammin' Java, including his contracts, arrangements, understandings, and relationships with Weaver, Sun, Berlinger, and others involved in the scheme.  In the portion of the form calling for the holder to identify such contracts, arrangements, understanding, or relationships, Whittle falsely disclosed "none."  Finally, he failed to disclose material changes in the facts set forth in the Schedule 13D.

64.   The omitted holdings, as well as the extent of Whittle's control, were material.  This information would have been material to a reasonable investor, particularly given that public news articles previously had identified Whittle's role in other pump-and-dump schemes.  Whittle's omissions of the purpose of his acquisitions and his arrangements with others involved in the scheme also would have been significant to a reasonable investor.

65.   Whittle also acted with scienter.  He knew, or recklessly disregarded, that he beneficially owned more Jammin' Java stock than he reported.  Moreover, Whittle's structuring of several of transfers just below 5% reflects his understanding that the 5% threshold triggered these reporting obligations.  For example, on December 23, 2010, the day following execution of the Straight Path agreement, Whittle signed a purchase agreement "selling" 3.2 million shares to Las Colinas, which amounted to approximately 4.6% of Jammin' Java's outstanding stock.  Three months later, after Las Colinas sold these shares, it received another 4.8% of Jammin' Java's stock.  Whittle also took other steps to conceal his ownership and control of Jammin' Java stock.  Thus, Whittle understood that staying below the 5% threshold,

1  and the concealment of his true ownership and intentions, was important to the
2  success of the scheme.

3  ### Coordinated Trading Activity

4  66.    For most of 2009 and 2010, the trading activity in Jammin' Java's stock
5  was almost nonexistent.  However, immediately following the execution of the
6  Straight Path agreement, various individuals and entities began coordinating
7  purchases and sales of Jammin' Java stock at increasingly elevated prices.  Many of
8  these individuals and entities had received large blocks of Jammin' Java shares from
9  Whittle's entities and the GERC Nominees.  For example, two entities involved in
10 this coordinated trading activity, Donnolis and Petersham, were controlled by Weaver
11 or others working with him.  These trades accounted for nearly all of the volume from
12 December 21 to 31, 2010.

13 ### Company Announcements

14 67.    Jammin' Java's announcement of the Straight Path financing agreement
15 and the coordinated trading in December 2010 were followed by a series of
16 promotional efforts by Jammin' Java.

17 68.    In late 2010, Jammin' Java actively sought to retain an investor relations
18 firm.  Many of the potential candidates were identified by an attorney who had been
19 introduced to Jammin' Java by Whittle.  The attorney, who previously had been
20 charged by the Commission for registration violations, served as Jammin' Java's
21 outside securities counsel.  Jammin' Java retained the services of an investor relations
22 firm in January 2011.

23 69.    From January to May 2011, Jammin' Java made a series of additional
24 corporate announcements and took other steps to promote the company.  During this
25 period, Jammin' Java issued several press releases concerning, among other things,
26 distribution and sales relationships and the appointment of various officers and
27 directors.  For example, on March 31, 2011, Jammin' Java issued a press release
28 announcing that it was selling its coffee on a major retail website.  However, Jammin'

Java had only a limited number of products and inventory available on the website, given its limited production and sales to that point in time.  Similarly, Jammin' Java announced distribution agreements with large grocery chains.  In reality, sales under those agreements were limited, and prospects of future sales were uncertain.

70.    Whittle was involved in the drafting of press releases and discussions with the public relations consultant.

71.    By at least April 13, 2011, Jammin' Java's investor relations consultant had raised significant concerns to management about a stock promotion that was taking place.  The consultant forwarded management newsletters that they had identified and expressed reservations about continuing to do work for Jammin' Java. That same month, Whittle, Tran, and Marley discussed the increase in transfer requests in connection with the increase in stock activity more broadly.  Shortly thereafter, in late April and early May 2011, Jammin' Java's auditors questioned management about the stock promotion.

72.    Rather than investigate the concerns, Tran and Marley encouraged the rapid ascent of its share price.  On April 29, 2011 Jammin' Java issued a press release announcing an investment report on MicroStockProfit.com that featured Jammin' Java.  On May 6, 2011, Jammin Java filed a report on Form 8-K stating that Straight Path had agreed to fund the remaining $2.38 million available under the previously disclosed agreement.

**Whittle Arranges Second Wave of Nominee Stock Transfers**

73.    In the wake of Jammin' Java's announcement of the Straight Path financing agreement, Whittle began a second wave of distributions to the offshore network of intermediary entities coordinated by Weaver, Sun, and Berlinger.

74.    From February to May 2011, and primarily in March 2011, a massive amount of Jammin' Java stock was moved from the GERC Nominees to a small number of offshore entities.  Some of these transfers were purportedly received directly from the GERC Nominees, while other transfers came from Luminus, Cilitz,

Donnolis, and Rahela, entities that had previously received their shares from the GERC Nominees and Whittle.  The original acquisition of shares by Luminus, Cilitz, and Donnolis is discussed above in Paragraphs 31 and 55.  Rahela, discussed above in Paragraph 52, acquired the shares that it transferred to Renavial from GERC Nominees on March 4, 2011.  The acquiring offshore entities included Renavial, Timotei, Westpark, Calgon, and Las Colinas, discussed above in Paragraph 52; Torino and Petersham, discussed above in Paragraph 55; and Prospera Capital Corp. ("Prospera"), Manitou, S.A. ("Manitou"), and Arcis Assets, S.A. ("Arcis").  Figure 3 presents these share transfers and other information.

**Figure 3. The Second Wave of Transfers: Movement of Stock in Early 2011**

| Source | Date | Shares | Acquiring Entity | Jurisdiction | Formation |
|---|---|---|---|---|---|
| GERC Nominees | Feb. 28, 2011 | 2,668,930 (3.9%) | **Prospera** | US (Wyoming) | Aug. 26, 2009 |
| GERC Nominees | Mar. 1, 2011 | 3,000,000 (4.3%) | **Renavial** | Marshall Islands | Sept. 14, 2010 |
| Rahela | May 6, 2011 | 3,156,698 (4.6%) | | | |
| GERC Nominees | Mar. 1, 2011 | 1,033,052 (1.5%) | **Timotei** | Panama | Sept. 3, 2010 |
| Cilitz | Mar. 8, 2011 | 2,072,400 (3.0%) | | | |
| Donnolis | Mar. 2, 2011 | 2,898,317 (4.2%) | **Westpark** | Marshall Islands | Aug. 27, 2010 |
| GERC Nominees | Mar. 8, 2011 | 2,751,964 (4.0%) | **Manitou** | Marshall Islands | Feb. 17, 2011 |
| Luminus | Mar. 9, 2011 | 1,400,000 (2.0%) | **Torino** | Nevis | Jan. 22, 2010 |
| GERC Nominees | Mar. 14, 2011 | 3,361,371 (4.9%) | **Calgon** | Marshall Islands | Nov. 18, 2010 |
| Luminus | Mar. 9, 2011 | 237,160 (0.3%) | **Arcis** | Marshall Islands | Aug. 20, 2009 |
| GERC Nominees | Mar. 14, 2011 | 3,143,408 (4.5%) | | | |
| GERC Nominees | Mar. 25, 2011 | 3,321,336 (4.8%) | **Las Colinas** | Marshall Islands | Aug. 27, 2010 |
| GERC Nominees | Apr. 20, 2011 | 3,156,198 (4.5%) | **Petersham** | British Virgin Islands | Sept. 25, 2009 |

75.     In total, the approximately 32 million shares that were transferred during this time amounted to almost *half* of Jammin' Java's total outstanding stock.  Again, no one entity received more than 5% of Jammin' Java's outstanding shares—a threshold that would have triggered SEC disclosure requirements.

76.     These transfers were linked to Defendants' pump-and-dump scheme.  As reflected in Figure 3, many of these entities were formed in the same jurisdiction on dates that were close in time, and shared common officers, directors, and owners.  For example, both Westpark and Las Colinas were formed in the Marshall Islands on the same day.  They also were formed in the Marshall Islands and Panama, offshore

jurisdictions known for financial privacy.  These entities later sold shares close in time to one another, and the sources of those shares overlapped with the selling entities and each other.  In addition, several of the share transfers were made to entities that previously had received large blocks of shares from Whittle's entities.

77.   Several of the entities that received stock were controlled by Weaver, Sun, and Berlinger.  Based on their substantial control of Jammin' Java stock and coordinated actions, Weaver, Sun, and Berlinger qualified as control persons or a control group and, consequently, affiliates of Jammin' Java.

78.   Although several of these entities purportedly received their shares from the GERC Nominees, the transactions were, in reality, arranged by Whittle or other individuals working with him.  Among other things:

(a)   Physical certificates for the initial share issuances and subsequent stock splits were mailed not to the GERC Nominees, but to associates of Whittle.

(e)   Several GERC Nominees purportedly sold or transferred shares to multiple, supposedly unrelated offshore entities.  For example, one GERC Nominee transferred his shares to Las Colinas, Renavial, and Timotei.  Another GERC Nominee transferred his shares to Calgon, Manitou, and Westpark.

(f)   Many of the shares acquired from the GERC Nominees were deposited in and sold from accounts maintained at common broker-dealers or banks.

(g)   There was no actual interaction between the GERC Nominees and other individuals or entities that purportedly purchased shares from them.  For example, Wheatley never communicated with the three GERC Nominees who supposedly sold their shares to Petersham.

(h)   In connection with each of these subsequent transfers, the GERC Nominees never communicated personally with the transfer agent, endorsed the stock certificates, or signed a power of attorney.  Instead, Berlinger and the other individuals who acquired the shares sent the shares to the transfer agent without the involvement of the GERC Nominees.  Moreover, many of the shares were sent from

identical or related return addresses, several of which were connected to the Defendants.   For example, a letter from Berlinger to the transfer agent dated March 17, 2011 regarding the transfer of shares into the name of Las Colinas originated from St. Saviour, Jersey.   A letter dated January 14, 2011 asking for the transfer of shares into the name of Renavial originated from the same address.

(i)      In a few instances, the offshore entities who acquired the shares from the GERC Nominees submitted to the transfer agent purported share purchase agreements that had incomplete, vague, and questionable terms.  For example, the March 2, 2011 share purchase agreement purporting to document Westpark's purchase of 2,898,317 shares from Donnolis called for the payment of $1,159,327 to be paid "at a future date as determined by the parties."  (Westpark did not make this payment to Donnolis until September 23, 2011, using the proceeds from the sale of the stock to do so.)  Westpark's implied price per share was $0.40 on a day that the market price for Jammin' Java's shares was approximately $0.93.  As another example, share purchase agreements purporting to document purchases by Las Colinas were undated.  Another Las Colinas share purchase agreement was dated, but reflected that 3.2 million shares had been purchased at a share price of $0.001, even though the shares closed at $0.96 that day.

79.   Given the lack of endorsement or other evidence of a legitimate transfer from the GERC Nominees, the Company's transfer agent required indemnification from Jammin' Java prior to transferring shares.  As a result, for multiple transfers from February to April 2011, Tran submitted on behalf of Jammin' Java a board resolution acknowledging the share transfer and indemnifying the transfer agent.  The resolutions identified each transfer and represented that the indemnification had been approved at a board meeting.

80.   Consequently, Tran and Marley understood that, within a period of months, millions of shares had been transferred from individuals that they did not know to a handful of offshore entities with which they claimed not to be familiar.

23

Because the transfer agent or the requesting shareholder forwarded the documentation purporting to support the transfer requests, Tran and Marley also understood the manner in which these entities acquired their shares was similar, and that many of the shares were deposited in and sold from accounts maintained at common broker-dealers or banks.  Despite these and other red flags, Jammin' Java facilitated the transactions by, among other things, providing the resolutions necessary to consummate the transfers and paying transfer fees on behalf of the acquiring investors.

### **Failure to Report Beneficial Ownership**

81.   In a transparent effort to evade SEC regulators and public scrutiny, the transfers described above—i.e., the first wave of transfers described in Paragraphs 55 and 56 and the second wave described in Paragraph 74—were just below 5%.  Given that each of the various acquisitions in the first and second wave of transfers resulted in a percentage of ownership for each entity just below 5%, and other facts, the share transfers were designed to conceal beneficial ownership of certain individuals or the control group and to avoid the disclosures triggered by such ownership.

82.   Whittle, Weaver, Sun, and Berlinger failed to report their beneficial ownership of Jammin' Java stock, or changes in that position, as well as other information required under the federal securities laws.

(a)   **Whittle.**  As described above in Paragraph 61, Whittle filed a Schedule 13D on November 23, 2010 and an amended Schedule 13D on January 13, 2011.  Although he disclosed certain holdings, Whittle failed to disclose the totality of stock beneficially held by him.  Specifically, Whittle failed to disclose holdings through offshore entities controlled by him and his control of the stock nominally held by the GERC Nominees, as well as changes in those holdings.  Whittle also misrepresented or failed to disclose other information required to be filed in connection with these reports, such as the purpose of the acquisitions and the relationships or arrangements with others.  Similarly, through Forms 3 and 4 filed

24

with the Commission on May 7, 2008, November 23, 2010, and January 13, 2011,
Whittle disclosed only the stock held directly in his name and through SJ
Investments, as well as the disposition of that stock in October and December 2010.
However, he failed to disclose his other holdings through offshore entities and his
control of the stock nominally held by the GERC Nominees and changes in those
holdings.

(b)     **Weaver and Sun.**  As described above, Weaver and Sun acted as
part of a group that collectively controlled over 5% of Jammin' Java's stock through
the share acquisitions and transfers from late 2010 through May 2011.  Weaver and
Sun coordinated with each other regarding transfers and trading between, among
others, Petersham, Calgon, Donnolis, Westpark, and Cilitz.  Weaver controlled or
shared control of, at a minimum, Petersham, Calgon, and Donnolis.  Sun controlled or
shared control of, at a minimum, Westpark and Cilitz.  When the holdings of
Petersham, Calgon, Donnolis, Westpark, and Cilitz from late 2010 through May 2011
are combined, these entities collectively controlled over 5% of Jammin' Java's stock.
As members of a control group, Weaver and Sun were required to, but did not, file
beneficial ownership reports with the Commission disclosing this ownership position,
or material changes in their ownership, and other required information.

(c)     **Berlinger.**  From December 2010 to March 2011, Las Colinas,
Westpark, Rahela, and Renavial acquired tranches of shares that, collectively,
acquired more than 15 million shares, or over 22% of Jammin' Java's outstanding
stock.  As described above, Berlinger controlled or shared control of these entities.
Even though the shares controlled by these entities were acquired or disposed at
different times, collectively these entities held more than 5% from March to April
2011.  However, Berlinger never filed a Schedule 13D disclosing his beneficial
ownership of the shares.

**Fraudulent Newsletters**

83.   As early as November 2009 and January 2010, Whittle consulted the Hunters about a potential promotion of Jammin' Java.

84.   In early 2011, the Hunters began to prepare and distribute various stock newsletters touting Jammin' Java's stock.

85.   From March 2011 to May 2011, the Hunters used two websites that they controlled, www.hackthestockmarket.com and www.thelautnerletter.com, to publish information regarding Jammin' Java stock, sent repeated blast emails, and made numerous posts on investor message boards.  To conceal their identity, the Hunters used the false names Marc Lautner and John Bell and fictitious business and email addresses.

86.   In addition, the Hunters posted the newsletters on Yahoo Finance to generate interest in Jammin' Java stock.

87.   The newsletters and postings were broadly distributed.

88.   The Hunters authorized and controlled these promotional efforts.

89.   In addition to the misrepresentations about their own identities—at a time that the Hunters knew that they were being investigated for securities fraud—the newsletters and posts distributed to the public from March to May 2011:

(a)   stated that Jammin' Java farmed its own blue mountain coffee beans, when, in reality, Jammin' Java did not grow its own beans or offer blue mountain beans beyond small amounts used for tasting profiles;

(b)   claimed that Rohan Marley founded Jammin' Java and was involved in its day-to-day operations when, in reality, he did not become involved in the company until a few years after it was founded and, at the time the newsletters were disseminated, only participated in company operations at a high level;

(c)   asserted that Jammin' Java was engaged in a "rollout of Jammin' Java coffee across North America" that would lead to sales and an "initial explosion

1    in revenue" when, in reality, Jammin' Java was not engaged in a wide-scale rollout

2    and the distribution agreements did not guarantee that sales would be made;

3           (d)    used company images and likenesses that provided the false

4    impression that Jammin' Java authorized the Hunters' reports and implied that the

5    product was endorsed by entertainer Jay Leno;

6           (e)    asserted that "Jammin' Java is no longer a development stage

7    company" when SEC filings stated the opposite; and

8           (f)    predicted a share price of $10.00 when the Hunters had no

9    reasonable basis for such a prediction.

10          90.    These statements were material.  In making an investment decision, a

11   reasonable investor would have found these representations important because

12   Jammin' Java's value was connected in significant part to its branding efforts and its

13   connections to the Marley name.  The representations provided the illusion that

14   Marley Coffee was an operating business, when it fact it was not.  The $10.00 share

15   price prediction appeared to reflect an actual analysis of the Company when, in

16   reality, there was no basis for the price prediction.  In addition, a reasonable investor

17   would have found it important that the purported recommendations were being issued

18   by promoters operating under fake names—apparently to conceal involvement with

19   other pump-and-dump activity or to facilitate the Hunters' ability to conduct other

20   pump-and-dump schemes.

21          91.    The newsletters also misrepresented the source, nature, and amount of

22   their compensation.  The newsletters represented that a purported third-party

23   shareholder, Centurion Ventures, had paid for the marketing campaign when, in

24   reality, there was no shareholder by that name.  Moreover, the Hunters had been

25   engaged by Whittle or others working with him to promote Jammin' Java stock in

26   connection with a pump-and-dump scheme.  Investors would have considered this

27   fact important to their investment decision.

28

92.     At the time the newsletters and posts were published, the Hunters knew or recklessly disregarded that the representations were false.  The Hunters issued these statements in connection with a promotional campaign designed to inflate the price of Jammin' Java's stock artificially so that participants in the scheme could dump shares following the price increase.

93.     The Hunters also knew at the time of the newsletters that they had been charged in the UK and were being investigated by the SEC for their involvement in separate penny stock schemes.  In July 2010, the Crown Prosecution Services charged the Hunters with conspiracy and violation of Section 2 of the United Kingdom Fraud Act (fraud by false representation), as well as with regulatory offenses under the United Kingdom Financial Services and Markets Act.  Subsequently, in November 2011, Alexander Hunter pled guilty to carrying out regulated activity when not authorized to do so by the Financial Services and Markets Act.  The UK charges were dropped against Thomas Hunter.  On April 12, 2012, the SEC charged the Hunters with defrauding investors through an internet-based pump-and-dump scheme in which they touted a fake "stock picking robot" that purportedly identified penny stocks set to double in price.  Instead, the brothers were merely touting stock that they were being paid separately to promote.  Without admitting or denying the allegations, the Hunters settled the action on March 12, 2013, consenting to an order permanently enjoining them from future violations of the antifraud provisions of the federal securities laws and imposing a $100,000 penalty on Alexander Hunter and a $75,000 penalty on Thomas Hunter.

**Stock Price Movement**

94.     The effort to pump the price of Jammin' Java stock worked as intended.  The announcement of the Straight Path Agreement, the coordinated trading activity, company announcements, and misleading touting activity led to a dramatic increase in Jammin' Java's share price and volume from December 2010 to May 2011.

95.     In December 2010, Jammin' Java common stock was trading at $0.17 per share.  Over the next six months, Jammin' Java's share price rose to an intraday high of $6.35 on May 12, 2011.  During this same time period, Jammin' Java's trading volume rose from no shares during most of December 2010 and January 2011 to 20 million shares on May 12, 2011, the peak of the promotion, when Jammin' Java shares traded between $4.15 and $6.35.

## Dumping of Shares on the Public Market

96.     During this period of heightened price and volume activity, a small number of foreign individuals and entities generated approximately $78 million in trading profits by selling shares of Jammin' Java received from Whittle or others working with him less than six months earlier.  During a six-month period, these entities, and the individuals who controlled them, sold over 45 million shares.  In the aggregate, the shares that were sold amounted to approximately two thirds of Jammin' Java's outstanding stock and nearly its entire public float.

97.     The shares acquired by these offshore entities were consolidated with a small number of foreign broker-dealers and sold without registration into the U.S. public market through various domestic broker-dealers.  These sales were made primarily to investors in the public over-the-counter market in the United States.

98.     No registration statement was filed in connection with any of these offers or sales of Jammin' Java stock to the public.

### *Sales Coordinated by Weaver, Sun, and Berlinger*

99.     A majority of the unregistered sales of 45 million shares can be attributed to entities controlled by Weaver, Sun, and Berlinger and owned by Miller, Al-Barwani, Sun, Weaver, and Wheatley.  Within six months of acquiring 25 million shares of Jammin' Java through their entities, these individuals collectively sold the shares for approximately $47 million.  At the time, these shares amounted to approximately 37% of Jammin' Java's outstanding stock.

100.   The extraordinary profits generated by these individuals did not correspond to any true investment value.  Jammin' Java's public filings at the time reflected no sales revenue for the Company up to that point in time.  The filings also showed no employees or cash and only nominal operations.

101.   The shares and resulting trading profits were consolidated in the accounts of five entities: Las Colinas (Miller), Renavial (Al-Barwani), Westpark (Sun), Petersham (Weaver and Wheatley), and Calgon (Weaver).  In addition to benefiting from Petersham and Calgon, Weaver received transfers of trading profits from Las Colinas and Renavial.

102.   As summarized in Figure 4, the acquisition and resale of Jammin' Java stock was almost immediate.  These entities acquired the shares from December 2010 through May 2011, predominantly in March 2011.  Nearly all the sales were completed from February to May 2011, within six months of their respective acquisitions.

**Figure 4. Entities Coordinated by Weaver, Sun, and Berlinger**

| Entity | Owner | Date Acquired | Shares Acquired (% Outstanding) | Date of Sales | Trading Profits |
|---|---|---|---|---|---|
| **Las Colinas** | Miller | Dec. 23, 2010 | 3,200,000 (4.6%) | Feb. 8, 2011-Mar. 10, 2011 | $2,840,600 |
| | | Mar. 25, 2011 | 3,321,336 (4.8%) | Apr. 7, 2011-Apr. 15, 2011 | $5,999,468 |
| **Renavial** | Al-Barwani | Mar. 1, 2011 | 3,000,000 (4.3%) | Mar. 31, 2011-Apr. 7, 2011 | $4,918,520 |
| | | May 6, 2011 | 3,156,698 (4.6%) | May 6, 2011- May 12, 2011 | $10,259,614 |
| **Westpark** | Sun | Mar. 2, 2011 | 2,898,317 (4.2%) | Mar. 10, 2011- Mar. 31, 2011 | $3,610,071 |
| | | May 13, 2011 | | | |
| **Petersham** | Weaver & Wheatley | Nov. 18, 2010 | 3,200,000 (4.6%) | Feb. 11, 2011-Mar. 3, 2011 | $2,613,280 |
| | | Apr. 20, 2011 | 3,321,336 (4.8%) | May 2, 2011-May 11, 2011 | $10,889,240 |
| **Calgon** | Weaver | Mar. 14, 2011 | 3,361,371 (4.9%) | Mar. 29, 2011-Apr. 25, 2011 | $5,807,227 |

*Related Sales by Other Entities*

103.   In addition, these individuals and entities coordinated with other entities that sold 20 million shares for approximately $31 million from February to May 2011.  These 20 million shares amounted to approximately 28% of Jammin' Java's outstanding stock.  Figure 5 summarizes these sales.

**Figure 5. Other Entities**

| Entity | Date Acquired | Shares Acquired (% Outstanding) | Date of Sales | Trading Profits |
|---|---|---|---|---|
| Unknown | Jan. 3, 2008<br>Nov. 19, 2010 | 1,639,660 (2.4%)<br>1,560,000 (2.3%) | Feb. 23, 2011-Mar. 2, 2011<br>Dec. 23, 2010-Feb. 18, 2011 | $2,794,378 |
| Torino | Dec. 13, 2010<br>Mar. 9, 2011 | 3,110,941 (4.5%)<br>1,400,000 (2.0%) | Jan. 17, 2011- Mar. 30, 2011 | $4,594,843 |
| Prospera | Feb. 28, 2011 | 2,668,930 (3.9%) | May 3, 2011-May 10, 2011 | $6,275,677 |
| Timotei | Mar. 1, 2011<br>Mar. 8, 2011 | 1,033,052 (1.5%)<br>2,072,400 (3.0%) | Mar. 9, 2011-Apr. 27, 2011 | $4,853,329 |
| Manitou | Mar. 8, 2011 | 2,751,964 (4.0%) | Apr. 29, 2011-May 3, 2011 | $5,855,175 |
| Arcis | Mar. 9, 2011<br>Mar. 14, 2011 | 237,160 (0.3%)<br>3,143,408 (4.5%) | Mar. 18, 2011-Mar. 23, 2011<br>Apr. 15, 2011-May 3, 2011 | $6,306,924 |

## Transfer of Trading Profits to Jammin' Java

104.    A portion of the trading proceeds generated from the unregistered public sale of Jammin' Java stock by Las Colinas and Renavial ultimately was used to make the payments to Jammin' Java under the Straight Path agreement.

105.    On three dates from January to March 2011, Jammin' Java received three $40,000 payments that were purportedly installments of funding under the Straight Path Agreement.  These payments did not come from Straight Path, which did not exist at the time, but from Blue Leaf Capital Ltd. ("Blue Leaf"), an entity controlled by Weaver.   Blue Leaf received substantial cash inflows from several entities that had sold Jammin' Java stock during the promotional period, including Las Colinas, Renavial, and Arcis.

106.    Similarly, on May 18, 2011, $2.38 million of the trading profits generated by Las Colinas was transferred to Jammin' Java under the guise of the Straight Path agreement.  Again, the funds did not come from Straight Path, but from another entity, Chilli Capital Ltd. ("Chilli Capital").  Berlinger created Chilli Capital on May 3, 2011, apparently for the sole purpose of transferring funds to Jammin' Java.  The entity received the $2.38 million that it transferred to Jammin' Java from Las Colinas, which had obtained the funds by selling Jammin' Java stock supplied by Whittle.

107.   The flow of shares from Jammin' Java and the return of trading profits to the company are depicted in Figure 6.

**Figure 6. Flow of Shares and Trading Profits (December 2010 to May 2011)**



<u>**Price Collapse**</u>

108.   Beginning on May 13, 2011, Jammin' Java's share price began to fall following Jammin' Java's disclosure of an unauthorized stock promotion.

109.   More specifically, in a Form 8-K filed on May 9, 2011, the Company stated that it had become aware of various unauthorized and unaffiliated internet stock promoters who were promoting short-term investments in its common stock in their "stock reports" and on their websites.  After an initial rise, Jammin' Java's closing share price fell from a high of $5.42 on May 12, 2011 to $2.30 on May 17, 2011.

110.   On May 17, 2011, Jammin' Java filed an annual report on Form 10-K disclosing negative information about the company, including the following:

(a) Jammin' Java had revenues of only $1,037 for the fiscal year ending January 31,

2011; (b) between February 1, 2011 and May 17, 2011, Jammin' Java had generated only $42,000 in sales; (c) Jammin' Java's auditor raised substantial doubt about Jammin' Java's ability to continue as a going concern; and (d) Jammin' Java continued to be a developmental stage, shell company.  Following the release of the Form 10-K, the share price dropped further and settled at a price between $0.40 and $0.50 per share.

111.    In days, investors who had purchased at the height of the promotion together lost millions of dollars.

## FIRST CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and (c) of the Securities Act**

**[15 U.S.C. § 77e(a) and (c)]**

**(Against Defendants Jammin' Java, Whittle, Weaver, Sun, Berlinger, Wheatley, Miller, and Al-Barwani)**

112.    Paragraphs 1 through 111 are realleged and incorporated herein by reference.

113.    By their conduct, Defendants Jammin' Java, Whittle, Weaver, Sun, Berlinger, Wheatley, Miller, and Al-Barwani directly or indirectly:

(a)    made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect;

(d)    for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and

(e)    made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy,

through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

114. By reason of the foregoing, Defendants Jammin' Java, Whittle, Weaver, Sun, Berlinger, Wheatley, Miller, and Al-Barwani violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

## SECOND CLAIM FOR RELIEF

### Failure to File Beneficial Ownership Reports

### Violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 Thereunder (17 C.F.R. § 240.13d-1, 13d-2)

### (Against Defendants Whittle, Weaver, Sun, and Berlinger)

115. Paragraphs 1 through 111 are realleged and incorporated herein by reference.

116. Defendants Whittle, Weaver, Sun, and Berlinger, after acquiring directly or indirectly the beneficial ownership of more than 5% of a class of equity securities registered pursuant to Section 12 of the Exchange Act (15 U.S.C. § 78l), failed to file with the Commission a statement on Schedule 13D (17 C.F.R. § 240.13d-101) or, after a material increase or decrease in the percentage of the class beneficially owned, failed to file with the Commission an amendment disclosing this material change, in accordance with the requirements of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 (17 C.F.R. §§ 240.13d-1 and 240.13d-2).

117. By reason of the foregoing, Defendants Whittle, Weaver, Sun, and Berlinger violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 (17 C.F.R. §§ 240.13d-1 and 240.13d-2).

### THIRD CLAIM FOR RELIEF

**Failure to File Beneficial Ownership Reports**

**Violations of Section 16(a) of the Exchange Act (15 U.S.C. § 78p) and**

**Rule 16a-3 Thereunder (17 C.F.R. § 240.16a-3)**

**(Against Defendant Whittle)**

118. Paragraphs 1 through 111 are realleged and incorporated herein by reference.

119. Defendant Whittle, as a person who was directly or indirectly the beneficial owner of more than 10% of any class of any equity security which was registered pursuant to Section 12 of the Exchange Act, or as a director or an officer of the issuer of such security, failed to report his beneficial ownership of such securities, or changes in his beneficial ownership, on filings with the Commission on Forms 4 or 5 in accordance with the requirements of Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3].

120. By reason of the foregoing, Defendant Whittle violated Section 16(a) of the Exchange Act (15 U.S.C. § 78p) and Rule 16a-3 Thereunder (17 C.F.R. § 240.16a-3).

### FOURTH CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]**

**and Rules 10b-5(a) and 10b-5(c) Thereunder [17 C.F.R. § 240.10b-5(a), (c)]**

**(Against Defendants Whittle, Weaver, Sun, and Berlinger)**

121. Paragraphs 1 through 111 are realleged and incorporated herein by reference.

122. By their conduct, Defendants Whittle, Weaver, Sun, and Berlinger, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly,

(a)     employed devices, schemes, and artifices to defraud, and

(b)     engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

123.   Defendants Whittle, Weaver, Sun, and Berlinger intentionally or recklessly engaged in the fraudulent conduct described above.

124.   By reason of the foregoing, Defendants Whittle, Weaver, Sun, and Berlinger violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5(a), (c)].

## FIFTH CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) Thereunder [17 C.F.R. § 240.10b-5(b)]**

**(Against Defendants Whittle, A. Hunter, and T. Hunter)**

125.   Paragraphs 1 through 111 are realleged and incorporated herein by reference.

126.   By their conduct, Defendants Whittle, A. Hunter, and T. Hunter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

127.   Defendants Whittle, A. Hunter, and T. Hunter made the untrue statements and omissions of material fact.

128.   Defendants Whittle, A. Hunter, and T. Hunter intentionally or recklessly engaged in the fraudulent conduct described above.

129.   By reason of the foregoing, Defendants Whittle, A. Hunter, and T. Hunter violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

36

## SIXTH CLAIM FOR RELIEF

### Touting Securities for Compensation Without Disclosure

### Violations of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]

### (Against Defendants A. Hunter and T. Hunter)

130.   Paragraphs 1 through 111 are realleged and incorporated herein by reference.

131.   By their conduct, Defendants A. Hunter and T. Hunter used the means or instruments of interstate transportation, or communication in interstate commerce, or the mails, to publish or circulate communications which described securities for a consideration received or to be received, directly or indirectly from the issuers, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

132.   By reason of the foregoing, Defendants A. Hunter and T. Hunter violated Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## PRAYER FOR RELIEF

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Find that Defendants committed the violations alleged herein.

### II.

Issue orders of permanent injunction restraining and enjoining Defendants Jammin' Java, Whittle, Weaver, Sun, Berlinger, Wheatley, Miller, and Al-Barwani, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 5 of the Securities Act (15 U.S.C. § 77e).

### III.

Issue orders of permanent injunction restraining and enjoining Defendants Whittle, Weaver, Sun, and Berlinger, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 13(d)

of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 (17 C.F.R. §§ 240.13d-1 and 240.13d-2).

## IV.

Issue orders of permanent injunction restraining and enjoining Defendant Whittle, his agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 16(a) of the Exchange Act (15 U.S.C. § 78p) and Rule 16a-3 Thereunder (17 C.F.R. § 240.16a-3).

## V.

Issue orders of permanent injunction restraining and enjoining Defendants Whittle, Weaver, Sun, Berlinger, A. Hunter, and T. Hunter, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5).

## VI.

Issue orders of permanent injunction restraining and enjoining Defendants A. Hunter and T. Hunter, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## VII.

Order Defendants to pay disgorgement of ill-gotten gains, derived directly or indirectly from the misconduct alleged, together with prejudgment interest thereon.

## VIII.

Order Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IX.

Pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], bar Defendants Whittle,

Weaver, Sun, Berlinger, Wheatley, Miller, Al-Barwani, A. Hunter, and T. Hunter, from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

## X.

Pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibit Defendant Whittle from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act (15 U.S.C. § 78*l*) or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## XI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## XII.

Grant such other and further relief as the Court may determine to be just and necessary.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable pursuant to the Federal Rules of Civil Procedure.


Dated:  November 17, 2015

                              */s/ Lynn M. Dean*
                              Lynn M. Dean
                              Attorney for Plaintiff
                              Securities and Exchange Commission

39