Edward J. Loya, Jr. (State Bar No. 257346)
　*eloya@venable.com*
VENABLE LLP
2049 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:　(310) 229-9900
Facsimile:　 (310) 229-9901

Jessie F. Beeber (Admitted *Pro Hac Vice*)
　*jbeeber@venable.com*
Patrick J. Boyle (Admitted *Pro Hac Vice*)
　*pboyle@venable.com*
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
Telephone:　(212) 307-5500
Facsimile:　 (212) 307-5598

Attorneys for Defendant Mohammed A. Al-Barwani

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>JAMMIN' JAVA CORP., dba MARLEY COFFEE, SHANE G. WHITTLE, WAYNE S. P. WEAVER, MICHAEL K. SUN, RENE BERLINGER, STEPHEN B. WHEATLEY, KEVIN P. MILLER, MOHAMMED A. AL-BARWANI, ALEXANDER J. HUNTER, and THOMAS E. HUNTER,<br><br>　　　　　　Defendants. | Case No. 2:15-CV-08921-SVW-MRW<br><br>Hon. Stephen V. Wilson<br><br>**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT MOHAMMED A. AL-BARWANI'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6) AND 12(B)(2)**<br><br>Hearing:　　　July 11, 2016<br>Time:　　　　1:30 p.m.<br>Courtroom:　 No. 6<br><br>Action filed:　November 17, 2015<br>Trial date:　　October 25, 2016 |

# TABLE OF CONTENTS

| | Page |
|---|---|
| I. PRELIMINARY STATEMENT | 1 |
| II. THE COMPLAINT LACKS ANY ALLEGATIONS OF AL-BARWANI'S PERSONAL INVOLVEMENT IN JAMMIN' JAVA TRANSACTIONS | 2 |
| III. THE SEC RELIES ON IMPROPER SPECULATION AND INNUENDO THAT MUST BE DISREGARDED IN DECIDING THE MOTION | 4 |
| IV. AL-BARWANI'S ALLEGED OWNERSHIP OF RENAVIAL IS INSUFFICIENT TO STATE A CLAIM AGAINST HIM UNDER SECTION 5 OF THE SECURITIES ACT | 6 |
| V. BOTH PARTIES' CASES SUPPORT DISMISSAL FOR LACK OF PERSONAL JURISDICTION | 8 |
| VI. FURTHER DISCOVERY IS UNWARRANTED | 11 |
| VII. THE COURT SHOULD DISMISS WITH PREJUDICE | 12 |

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA 90067
310-229-9900

# TABLE OF AUTHORITIES

**Page**

**CASES**

Alki Partners, L.P. v. Vatas Holding GmbH,
  769 F. Supp. 2d 478 (S.D.N.Y. 2011) ................................................................. 9

Alki Partners, L.P. v. Windhorst,
  472 F. App'x 7 (2d. Cir. 2012) ............................................................................ 9

Baxter v. A.R. Baron & Co.,
  No. 94 CIV 3913(JGK), 1995 WL 600720 (S.D.N.Y. Oct. 12, 1995) ................ 6

Car Carriers, Inc. v. Ford Motor Co.,
  745 F.2d 1101 (7th Cir. 1984) ............................................................................ 4

Cox. v. Sherman Capital LLC,
  No. 1:12-CV-01654-TWP, 2013 WL 2897884 (S.D. Ind. June 13,
  2013) .................................................................................................................. 9

Davis v. Metro Prods., Inc.,
  885 F.2d 515, 522–23 (9th Cir.1989) ................................................................. 9

Dole Food Co. v. Patrickson,
  538 U.S. 468 (2003) ..................................................................................... 6, 10

Dole Food Co. v. Watts,
  303 F.3d 1104 (9th Cir. 2002) .......................................................................... 11

Forte v. Cty. of Merced,
  No. 1:11-CV-0318 AWI SKO, 2012 WL 94332 (E.D. Cal. Jan. 11,
  2012) .................................................................................................................. 6

Gerritsen v. Warner Bros. Entm't Inc.,
  116 F. Supp. 3d 1104, 1133 (C.D. Cal. 2015) .................................................... 6

Houston v. Bank of Am., N.A.,
  No. CV 14-02786 MMM AJWX, 2014 WL 2958216 (C.D. Cal. June
  25, 2014) ..................................................................................................... 11, 12

Howard v. Everex Sys., Inc.,
  228 F.3d 1057 (9th Cir. 2000) ............................................................................ 9

Morongo Band of Mission Indians v. Rose,
  893 F.2d 1074 (9th Cir. 1990) ................................................................................ 12

S.E.C. v. Alexander,
  2003 WL 21196852 (S.D.N.Y. May 20, 2003) ................................................. 10, 11

S.E.C. v. Blackburn,
  2015 WL 9459976 (E.D. La. Dec. 28, 2015) ........................................................... 7

S.E.C. v. Duclaud Gonzalez de Castilla,
  184 F. Supp. 2d 365 (S.D.N.Y. 2002) ...................................................................... 5

S.E.C. v. Rosen,
  No. 01-0369-CIV, 2002 WL 34421029 (S.D. Fla Feb. 22, 2002) ........................... 7

Schneider v. California Dep't of Corr.,
  151 F.3d 1194 (9th Cir. 1998) .................................................................................. 4

Time, Inc. v. Simpson,
  No. 02 CIV 4917 (MBM), 2003 WL 23018890 (S.D.N.Y. Dec. 22. 2003) ........................................................................................................................ 9, 10

United States v. $1,399,313.74 in U.S. Currency,
  591 F. Supp. 2d 365 (S.D.N.Y. 2008) ...................................................................... 6

United States v. Bestfoods,
  524 U.S. 51 (1998) ......................................................................................... 4, 6, 10

**STATUTES**

Securities Act Section 5 ............................................................................................... *passim*

**OTHER AUTHORITIES**

Rule 12(b)(6) ..................................................................................................................... 6

Defendant Mohammed A. Al-Barwani ("Al-Barwani"), through his undersigned counsel, respectfully submits this Reply Memorandum of Law in Further Support of Defendant Al-Barwani's Motion to Dismiss (Docket No. 78).

## I.  PRELIMINARY STATEMENT

Mohammed Al-Barwani is one of nine individual defendants named in the SEC Complaint. Only one claim is alleged against him: that he personally offered or sold unregistered securities. But what is missing from the 132-paragraph Complaint (which barely mentions his name) is any allegation of his personal involvement in that sale, or for that matter, any of the other activities alleged in the Complaint.

For example, the SEC boldly states in its Opposition Brief that Al-Barwani himself formed the entity, Renavial Ltd. ("Renavial"), that he then allegedly used to transact in Jammin' Java securities (see, e.g., Opp. Br. at 4:2-3). The SEC cites to paragraph 52(b) of its Complaint to support that statement, but 52(b) actually says that another defendant, René Berlinger, "formed" Renavial, and that it was Berlinger, not Al-Barwani, who "opened accounts" in Renavial's name (Compl. ¶ 52(b)).

Moreover, the SEC states in its Brief that Shane Whittle "sent shares to Defendants—including . . . Al-Barwani—through nominees under his control" (Opp. Br. at 6:13-14). But the Complaint actually alleges that "Whittle or other individuals working with him" arranged for the GERC Nominees to transfer shares to Renavial, among other entities (Compl. ¶ 78). The Complaint does not allege that Whittle sent shares to Al-Barwani, that Whittle had any communications whatsoever with Al-Barwani, or that Al-Barwani himself acknowledged the transfer or paid for the shares.

As for the sale of the securities, while the Opposition Brief asserts that Al-Barwani personally "used [Renavial] to sell Jammin Java shares to the public without registration" (Opp. Br. at 4:5-6), the Complaint contains no such allegation concerning Al-Barwani's personal involvement in the sale of Jammin' Java stock. Nor does the Complaint allege that Al-Barwani acknowledged, or even was aware of, the sale. While the Opposition Brief asserts that "Al-Barwani . . . [together with Defendant

Kevin Miller] realized over $24 million in combined illicit profits" (<u>id.</u> at 2:24-3:2), the Complaint does not allege that Al-Barwani personally received any illicit profits whatsoever. Rather, it alleges that Berlinger controlled the company's proceeds from the sale of Jammin' Java stock (<u>see</u>, <u>e.g.</u>, Compl. ¶ 53 ("Berlinger also directed the proceeds from the subsequent sale of Jammin' Java stock by [Renavial].")).

The SEC tries to get around Al-Barwani's lack of personal involvement by asking this Court to take a substantial leap in logic. Although the Complaint does not allege any acts by Al-Barwani, the SEC argues that we should infer they occurred because he is the owner of Renavial, and Renavial was formed in the Marshall Islands, a "jurisdiction[ ] known for financial privacy." (<u>id.</u> ¶ 76). But mere corporate ownership of an offshore organization cannot stand in for allegations of personal involvement in the sale of securities. In sum, the SEC has not alleged (nor could it) that Al-Barwani himself was a "direct seller" of Jammin' Java stock, nor that he was a "necessary participant" and "substantial factor" in the sale of such stock. Therefore the Section 5 violation claim against him cannot stand, and this Court lacks personal jurisdiction over him. The Complaint should thus be dismissed.

## II. THE COMPLAINT LACKS ANY ALLEGATIONS OF AL-BARWANI'S PERSONAL INVOLVEMENT IN JAMMIN' JAVA TRANSACTIONS

The SEC seeks to hold Al-Barwani strictly liable for an alleged sale of Jammin' Java securities without the filing of a registration statement. But the Complaint lacks any allegations of his personal involvement in such transactions, and thus must fail.

In its Opposition Brief, the SEC now attempts to equate Al-Barwani with the company it alleges he owns, Renavial, by mischaracterizing the allegations in its own Complaint. For example, the Opposition Brief states that:

- "Al-Barwani formed [a company] in the Marshall Islands" (Opp. Br. at 4:2-3), but the Complaint states that it was Berlinger—<u>not</u> Al-Barwani—who formed Renavial in the Marshall Islands (<u>see</u> Compl. ¶ 52(b)), and opened accounts in its name (<u>id.</u>);

- "[Al-Barwani's] entit[y] had no other owners and retained only one officer (Berlinger)" (Opp. Br. at 1:18-19), but nowhere in the Complaint does the SEC actually allege that Al-Barwani was Renavial's sole owner or that Berlinger was the sole officer;
- Renavial "had no operations other than trading U.S. penny stock" (Opp. Br. at 1:19-20), but nowhere in the Complaint does the SEC allege that;
- "Whittle sent shares to Defendants—including . . . Al-Barwani—through nominees under his control" (Opp. Br. at 6:13-14), but the Complaint actually alleges that "Whittle or other individuals working with him" had the GERC Nominees transfer shares to Renavial, among other entities (Compl. ¶ 78) and it does not allege that Whittle sent shares to Al-Barwani or had any communications whatsoever with Al-Barwani;
- Renavial "sold all of [its] stock to the public" (Opp. Br. at 1:22-23), but nowhere does the Complaint allege that Renavial sold all of its Jammin' Java stock, or that Renavial did not hold any other stocks at any other time;
- "[Al-Barwani] used [Renavial] to sell Jammin Java shares to the public" (id. at 4:5-6) but the Complaint does not allege that Al-Barwani personally sold any such shares, the very basis for Al-Barwani's motion to dismiss; and
- "Al-Barwani . . . [together with Defendant Kevin Miller] realized over $24 million in combined illicit profits" (id. at 2:24-3:2), but the Complaint does not allege that Al-Barwani personally received any profits whatsoever—rather, it indicates that Berlinger "directed the proceeds from the subsequent sale of Jammin' Java stock by [Renavial]." (Compl. ¶ 53).

In other instances where it seeks to hold Al-Barwani personally responsible for Renavial's conduct, the Opposition Brief merely adds Al-Barwani's name in parentheses next to Renavial—for example, "Renavial (Al-Barwani) sold all of those shares to the public without registration" (Opp. Br. 7:2-3) as if that makes them one and the same. But statements in a brief are not sufficient to defeat this motion, in fact

3

1  "it is axiomatic that the complaint may not be amended by the brief[] in opposition to
2  a motion to dismiss." Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th
3  Cir. 1984); see also Schneider v. California Dep't of Corr., 151 F.3d 1194, 1197 n.1
4  (9th Cir. 1998).  Nor can the SEC make Al-Barwani and Renavial one and the same
5  merely by writing their names side-by-side.  The allegations in the Complaint do not
6  establish any personal involvement by Al-Barwani whatsoever in the transactions at
7  issue.  This makes the exercise of personal jurisdiction over him impossible, and the
8  Section 5 claim against him untenable.  The Complaint should be dismissed.

### III. THE SEC RELIES ON IMPROPER SPECULATION AND INNUENDO THAT MUST BE DISREGARDED IN DECIDING THE MOTION

Lacking allegations of Al-Barwani's personal involvement in any Jammin' Java transactions, the SEC offers up a poor substitute.  It argues that Al-Barwani is personally responsible for Renavial's conduct merely because (1) he is the owner of that entity; and (2) that entity was formed in the Marshall Islands, a "jurisdiction[] known for financial privacy." (Compl. ¶ 76).  As shown in Al-Barwani's Opening Brief (and discussed further below), Al-Barwani's ownership of Renavial on paper is insufficient to attach liability to him personally. See, e.g., United States v. Bestfoods, 524 U.S. 51, 61-62 (1998) ("A corporation and its stockholders are generally to be treated as separate entities.  Thus it is hornbook law that the exercise of the control which stock ownership gives to the stockholders will not create liability beyond the assets of the [corporation]." (internal quotation marks, ellipses and citations omitted)).

Nor, for that matter, is the fact that Renavial was organized in an offshore jurisdiction sufficient.  While the SEC makes much of that fact, stating for example in the Opposition Brief that the "Marshall Islands was selected for its reputation for secrecy" (Opp. Br. at 1:17-18); that Al-Barwani "ask[s] the Court to indulge the artifice of [his] entit[y]" (id. at 5:7); that "the entities were incorporated in secretive jurisdictions" (id. at 10:23-24); and even that Al-Barwani and others "set up their trading operation using offshore entities designed to hide their respective roles" (id. at

4

11589858                                                     DEFENDANT AL-BARWANI'S REPLY

12:9-10), this is nothing more than speculation and innuendo.  See also id. at 1:28-2:1; 2:1-2; 2:2-3; 2:6; 2:11-13; 3:4-5; 3:6-7; 6:15; and 12:13-14.

    The problem with the SEC's U.S.-centric view of "secretive" locations becomes immediately apparent when the Court considers these assertions in light of the other allegations in the Complaint.  As the Complaint alleges, Al-Barwani is a 72-year-old Omani citizen who resides in Muscat, Oman (Compl. ¶ 19) and eight of the nine individual defendants were citizens and residents of foreign countries at the time of the alleged securities violations.  The SEC does not even attempt to explain why it is unusual for an Omani to own a company formed outside of the United States.  Perhaps it would be even more odd for him to own one in Kansas City, Missouri, or Bangor, Maine.

    The SEC may very well argue that Bangor, Maine is not known for providing privacy for business owners, while the Marshall Islands is, but even assuming arguendo that Renavial was formed in the Marshall Islands for privacy reasons, that is insufficient to establish Al-Barwani's involvement in these transactions, much less his "evasiveness" or "secrecy" for purposes of securities liability, because offshore entities provide perfectly lawful avenues for security and tax protection. See, e.g., S.E.C. v. Duclaud Gonzalez de Castilla, 184 F. Supp. 2d 365, 379 (S.D.N.Y. 2002) (rejecting SEC's contention that defendants' creation of offshore trusts and corporations "demonstrated evasiveness," and finding that offshore trusts and corporations are a "means for providing security and tax protection.").

    At the core of the SEC's case against Al-Barwani is the SEC's speculation that, because Renavial is an offshore entity, the company must have been formed for an illicit purpose—and Al-Barwani, as Renavial's alleged owner, must have endorsed that purpose.  But again, the Complaint does not allege that Al-Barwani was aware of his co-defendants' alleged activities or that he authorized or otherwise supported Berlinger's alleged activities on behalf of Renavial.

    The Court must disregard the SEC's improper speculation and innuendo, and

instead rely solely on the Complaint's factual allegations in deciding Al-Barwani's motion.  See Gerritsen v. Warner Bros. Entm't Inc., 116 F. Supp. 3d 1104, 1133 (C.D. Cal. 2015) ("In ruling on a Rule 12(b)(6) motion, the court considers only the facts plaintiff pleads in the complaint; it cannot speculate regarding facts that are not alleged."); Forte v. Cty. of Merced, No. 1:11-CV-0318 AWI SKO, 2012 WL 94332, at *6 (E.D. Cal. Jan. 11, 2012) (dismissing allegations "based on nothing more than innuendo and rank speculation.").  See also United States v. $1,399,313.74 in U.S. Currency, 591 F. Supp. 2d 365, 374 (S.D.N.Y. 2008) ("[a] complaint devoid of any facts to support its bare allegations and consisting solely of speculative assertions and innuendo cannot stand."); Baxter v. A.R. Baron & Co., No. 94 CIV 3913(JGK), 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995) (dismissing securities fraud claim that was "long on innuendo but lacking in factual assertions or specificity").  The Complaint's allegations are patently insufficient, and no inference can or should be drawn from Renavial's offshore formation by someone other than Al-Barwani.

## IV. AL-BARWANI'S ALLEGED OWNERSHIP OF RENAVIAL IS INSUFFICIENT TO STATE A CLAIM AGAINST HIM UNDER SECTION 5 OF THE SECURITIES ACT

The SEC contends that its Section 5 claim against Al-Barwani is premised on a "reasonable" and "unremarkable" inference—namely, "that an individual who owns an offshore entity of this type, controls it" (Opp. Br. at 14:4-5).  Again, that inference is based solely on the fact that Renavial was formed in the Marshall Islands, what the SEC considers to be a secretive and inherently suspicious jurisdiction.  Moreover, the SEC's inference is indeed a remarkable one because it contradicts a "basic tenet of American corporate law" that "[c]ontrol and ownership . . . are distinct concepts." Dole Food Co. v. Patrickson, 538 U.S. 468, 474-77 (2003); see also Bestfoods, 524 U.S. at 61-62.  The SEC does not present any legal authority that would support a decision to deviate from these well-established legal principles.

As explained in Al-Barwani's Opening Brief, he cannot be held liable as a

1  "direct seller" under Section 5 for merely being an owner of Renavial.  See S.E.C. v.
2  Rosen, No. 01-0369-CIV, 2002 WL 34421029, at *4 (S.D. Fla Feb. 22, 2002) (finding
3  that where an entity sells shares held in its own brokerage account, the entity is
4  deemed the direct seller; the owner of the entity may only be held personally liable
5  under Section 5 if he is a "necessary participant" and "substantial factor" in the
6  transaction).  Put simply, owning an entity is not equivalent to executing transactions
7  on that entity's behalf.  To hold Al-Barwani individually liable as a direct seller, the
8  Complaint would have had to allege that Al-Barwani himself directly engaged in the
9  sale of Jammin' Java shares—a fact that not only is missing from the Complaint, but
10 if alleged, would be contradicted by other allegations in the Complaint (see, e.g.,
11 Compl. ¶ 53 ("[Berlinger] opened brokerage accounts in the names of these entities
12 over which he had sole dispositive power, directing activity in the accounts.")).
13         Nevertheless, relying on S.E.C. v. Blackburn, 2015 WL 9459976, *12 (E.D. La.
14 Dec. 28, 2015), the SEC contends that it need not meet the test for "participant
15 liability" because it has alleged that Al-Barwani is liable as a "direct seller" (see Opp.
16 Br. at 16:5-10).  The SEC's reliance on Blackburn is misplaced.  The Blackburn court
17 did not apply the "necessary participant" and "substantial factor" test because the
18 SEC's complaint in that case specifically alleged that the defendant himself
19 "transferred th[e] purportedly unrestricted shares. . ." and "purchased 20,000,000
20 shares . . . with money he borrowed from his mother.  Later, [the defendant] sold the
21 shares for a net profit of $188,668."  First Amended Complaint ¶¶ 64, 86, S.E.C. v.
22 Blackburn, 2015 WL 9459976 (E.D. La. Dec. 28, 2015) (No. 2:15-CV-02451)
23 (attached hereto as Exhibit A).  Here, unlike in Blackburn, the Complaint does not
24 allege that Al-Barwani was a direct seller.  Rather, the Complaint attributes all of the
25 securities transactions at issue to Renavial—not Al-Barwani—and all of Renavial's
26 conduct is attributed to Berlinger.  Thus, Blackburn is unavailing to the SEC.
27         Because the SEC has failed to establish Al-Barwani's liability as a direct seller,
28 it must satisfy the test for "participant liability."  As the SEC relies solely on Al-

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA 90067
310-229-9900

7

Barwani's alleged ownership of Renavial to satisfy the "participant liability" test—and does not attribute any specific conduct to Al-Barwani, such as opening and managing the brokerage account, selling or instructing others to sell securities, negotiating or executing share purchase agreements or other sale documents, or receiving and managing the proceeds of the sales—the SEC has not shown that Al-Barwani was a "necessary participant" and "substantial factor" in the purchase or sale of Renavial's Jammin' Java stock (see Opening Br. 6:23-9:5).

For all these reasons, the SEC has failed to state a claim for relief against Al-Barwani under Section 5 of the Securities Act.

## V. BOTH PARTIES' CASES SUPPORT DISMISSAL FOR LACK OF PERSONAL JURISDICTION

In its Complaint, the SEC does not allege that Al-Barwani, a citizen and resident of Oman, has any contacts with the United States. The SEC alleges no facts demonstrating that Al-Barwani purposefully availed himself of the benefits of United States law, or that he otherwise purposefully directed activities towards the United States. As with its Section 5 claim, the SEC asserts that Al-Barwani is subject to personal jurisdiction solely because he owned Renavial, a foreign entity that was formed and controlled by Berlinger and allegedly used by Berlinger to buy and sell Jammin' Java stock. That is insufficient, and the Complaint should be dismissed.

The SEC states that Al-Barwani does not cite "any case where a court has found personal jurisdiction lacking as to a foreign defendant accused of placing illegal trades on a U.S. market" (Opp. Br. at 10:19-21). But this is a red herring, because the SEC does not allege that Al-Barwani "placed illegal trades on a U.S. market"—that is the very basis of Al-Barwani's motion to dismiss. Indeed, all of the cases cited by the SEC to support the exercise of personal jurisdiction (see Opp. Br. at 9:20-10:14) are easily distinguishable, because all of those cases concern individual defendants who were alleged to have personally participated in trading activities involving (or directed at) the U.S. market, not mere owners (like Al-Barwani) of a foreign entity through

1   which another individual allegedly directed the purchase and sale of U.S. securities.

2           Even <u>Cox. v. Sherman Capital LLC</u>, which the SEC cites repeatedly, holds that
3   in order for there to be personal jurisdiction over the owner of an entity based on the
4   alleged actions of that entity, the individual owner must not only have "<u>controlling
5   ownership of the company</u>," he must also "<u>simultaneously run the company, such as
6   [an] officer[] or director[]</u>." No. 1:12-CV-01654-TWP, 2013 WL 2897884, at *2
7   (S.D. Ind. June 13, 2013) (emphasis added) (citing <u>Davis v. Metro Prods., Inc.</u>, 885
8   F.2d 515, 522–23 (9th Cir.1989)).  Here, there is no allegation that Al-Barwani was
9   anything but a passive owner of Renavial; the Complaint does not specify whether Al-
10  Barwani held a controlling ownership interest in Renavial, and it does not allege that
11  Al-Barwani was a director or officer of Renavial, much less that he ran the company.
12  Instead, Berlinger was Renavial's officer who directed and facilitated its alleged
13  trades in Jammin' Java securities (see Compl. ¶¶ 52(b), 53, 78(h), 82(c)).

14          In contrast, there is ample legal support for Al-Barwani's position that mere
15  ownership of a foreign entity, even one subject to personal jurisdiction, is insufficient
16  to confer personal jurisdiction over the nonresident owner.  <u>See</u>, <u>e.g.</u>, <u>Howard v.
17  Everex Sys., Inc.</u>, 228 F.3d 1057, 1069 (9th Cir. 2000) (noting that only stockholders
18  who were directly involved in the allegedly illegal [insider trading] would have the
19  necessary contacts for personal jurisdiction); <u>Alki Partners, L.P. v. Vatas Holding
20  GmbH</u>, 769 F. Supp. 2d 478, 490-91 (S.D.N.Y. 2011) ("An owner of stock is not
21  automatically liable for the actions of the company whose stock it owns."), <u>aff'd sub
22  nom. Alki Partners, L.P. v. Windhorst</u>, 472 F. App'x 7 (2d. Cir. 2012); <u>Time, Inc. v.
23  Simpson</u>, No. 02 CIV 4917 (MBM), 2003 WL 23018890, at *4-8 (S.D.N.Y. Dec. 22.
24  2003) (holding that "control cannot be shown based merely upon a defendant's title or
25  position with the corporation" and sole shareholder was not subject to personal
26  jurisdiction where complaint failed to demonstrate his individual control, knowledge,
27  and consent over the specific actions forming alleged basis for personal jurisdiction).

28          The SEC attempts to distinguish these cases by arguing that "they involve

1  entities with multiple owners, public companies with hundreds of shareholders, *bona*
2  *fide* business enterprises with hundreds of employees or even relief defendants who
3  are not accused of misconduct" (Opp. Br. at 11:7-11).  However, none of these cases
4  suggest that the number of owners, shareholders, or employees—or the size of the
5  company—is dispositive of whether the court may exercise personal jurisdiction over
6  that foreign entity's owner.  Indeed, the court in Time, Inc. found that it lacked
7  personal jurisdiction over the "sole shareholder" of a corporation with "no
8  employees."  2003 WL 23018890, at *3.  Instead, all of the cases cited by both parties
9  turn on whether the owner personally engaged in the actions directed at the forum
10  jurisdiction, not on the size of the company or the complexity of its operations.

11        The SEC's efforts to distinguish S.E.C. v. Alexander, 2003 WL 21196852, at
12  *3 (S.D.N.Y. May 20, 2003), are similarly weak.  In Alexander, the court held that it
13  lacked jurisdiction over a foreign defendant where the co-defendant traded in U.S.
14  securities through an account held in the defendant's name and there were no
15  allegations that the defendant personally engaged in insider trading or executed any
16  trades using the account.  The SEC tries to distinguish that fact pattern from the
17  instant case on the grounds that the defendant who obtained dismissal was a "nominal
18  account holder," "a relief defendant," and "not charged with any misconduct" (Opp.
19  Br. at 11:11, n.4).  But like in Alexander, here it has not been alleged that Al-Barwani
20  personally engaged in any illegal securities transactions.  And Al-Barwani is even less
21  culpable than the defendant in Alexander, because Al-Barwani is not even alleged to
22  have maintained a brokerage account in his name through which a third party
23  executed illegal securities transactions.  Rather, Al-Barwani is merely alleged to have
24  owned a company that Berlinger used to open a brokerage account and trade in
25  Jammin' Java securities.  See Patrickson, 538 U.S. at 477 ("[c]ontrol and ownership...
26  are distinct concepts."); Bestfoods, 524 U.S. at 61 ("A corporation and its
27  stockholders are generally to be treated as separate entities." (internal quotation marks
28  and citation omitted)).  Moreover, unlike in Alexander, Al-Barwani is not alleged to

have personally received any of the alleged profits from the transactions at issue. See Alexander, 2003 WL 21196852 at *3 ("Plaintiff seeks only to have defendant . . . disgorge any alleged illegal profits earned through trading in the brokerage account maintained in her name.").

Finally, the SEC concedes that "it would be difficult to infer that the conduct of the entity is attributable to an individual who happens to own a portion of it" but argues that "such an inference is reasonable [here] given the nature of the entity: solely-owned, incorporated with secrecy in mind, only one employee, and no alleged operations save illegal penny stock trading" (Opp. Br. 11:11-15). Again, as explained above in Section II (see pp. 2-4), the SEC is totally mischaracterizing its own Complaint. The Complaint does not in fact allege that Al-Barwani is Renavial's sole owner, that Al-Barwani (or anyone) was the sole employee or officer, or that Renavial had no other operations except "illegal penny stock trading." The Court should not allow the SEC to distort its own Complaint—nor should the Court exercise personal jurisdiction over Al-Barwani based on facts that are not alleged in the Complaint and for which the SEC has no factual predicate. See Dole Food Co. v. Watts, 303 F.3d 1104, 1108 (9th Cir. 2002) (in making a prima facie showing of personal jurisdiction, plaintiff bears the burden of demonstrating "jurisdictional facts").

Since the SEC does not allege that Al-Barwani personally participated in the purchase or sale of U.S. securities, nor even that he knew and approved of such transactions, the Court cannot exercise personal jurisdiction over him.

## VI. FURTHER DISCOVERY IS UNWARRANTED

The Court should deny the SEC's request for additional discovery. In order to qualify for jurisdictional discovery the SEC "must make at least a colorable showing that jurisdiction exists." Houston v. Bank of Am., N.A., No. CV 14-02786 MMM AJWX, 2014 WL 2958216, at *5 (C.D. Cal. June 25, 2014) (internal quotation marks and citation omitted). "Jurisdictional discovery need not be allowed, however, if the request amounts merely to a fishing expedition." Id. (internal quotation marks and

citation omitted). Here, the SEC's five-year investigation has yielded nothing beyond Al-Barwani's alleged ownership of Renavial to tie him to the elaborate pump-and-dump scheme charged in the Complaint. The SEC has failed to make a "colorable showing" of jurisdiction with respect to Al-Barwani, and there is no basis to subject him to significant discovery costs attendant to the SEC's ongoing "fishing expedition" concerning his purported involvement. See Houston, 2014 WL 2958216, at *5.

## VII. THE COURT SHOULD DISMISS WITH PREJUDICE

For the reasons explained above and in Al-Barwani's Opening Brief, the other allegations in the SEC's Complaint foreclose any allegation that Al-Barwani controlled Renavial's sale of Jammin' Java stock. The SEC has already alleged that Berlinger directed those transactions and maintained sole dispositive power over Renavial's brokerage account, and its reliance on speculation and innuendo after five years of investigation demonstrates that the SEC has no additional facts to support its claim for relief under Section 5. Thus, leave to amend would be futile here. Moreover, Al-Barwani would incur undue and extreme prejudice by having to incur additional expenses to litigate this matter on the other side of the globe. For all these reasons, the Complaint should be dismissed with prejudice. See Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990) (affirming denial of leave to amend complaint on the basis of factors including "prejudice to the defendants" and "the potential futility of the claims").

Dated:  June 16, 2016            Respectfully submitted,

                                 VENABLE LLP

                                 By:  /s/ Edward J. Loya, Jr.
                                      Edward J. Loya, Jr.
                                      Jessie F. Beeber (Admitted *Pro Hac Vice*)
                                      Patrick J. Boyle (Admitted *Pro Hac Vice*)
                                 Attorneys for Defendant Mohammed A. Al-Barwani