TIMOTHY S. LEIMAN, Ill. Bar No. 6270153
Email: leimant@sec.gov
PAUL M. G. HELMS, Ill. Bar No. 6291623
Email: helmsp@sec.gov
PETER SENECHALLE, Ill. Bar No. 6300822
Email: senechallep@sec.gov

Attorneys for Plaintiff
United States Securities and Exchange Commission
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Facsimile:  (312) 353-7398

LOCAL COUNSEL
Lynn M. Dean, Cal. Bar No. 205562
Email: deanl@sec.gov
United States Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:15-CV-08921 |
| Plaintiff, | **AMENDED COMPLAINT** |
| vs. | |
| JAMMIN' JAVA CORP., dba MARLEY COFFEE, SHANE G. WHITTLE, WAYNE S. P. WEAVER, MICHAEL K. SUN, RENE BERLINGER, STEPHEN B. WHEATLEY, KEVIN P. MILLER, MOHAMMED A. AL-BARWANI, ALEXANDER J. HUNTER, and THOMAS E. HUNTER, | Hon. Stephen V. Wilson |
| Defendants. | |

Plaintiff, the United States Securities and Exchange Commission ("SEC"), alleges as follows:

## JURISDICTION AND VENUE

1.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

2.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

3.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Central District of California and elsewhere.  Moreover, certain defendants resided or transacted business in this district.  Venue also is appropriate pursuant to 28 U.S.C. § 1391.  A substantial part of the events or omissions giving rise to the claims occurred within this district.  [28 U.S.C. § 1391(b)(2).]  In addition, any defendant not resident in the United States may be sued in any judicial district.  [28 U.S.C. § 1391(c)(3).]

4.     Defendants, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the alleged acts, practices, and courses of business.

## SUMMARY

5.     This matter concerns a pump-and-dump scheme and an unregistered offering involving the securities of Jammin' Java Corp. ("Jammin' Java" or the "Company") that generated approximately $78 million in illicit profits.  Operated

under the name "Marley Coffee," Jammin' Java owned a license to use trademarks of the late reggae artist Bob Marley for licensed coffee products.  The Company was formed by one of Bob Marley's sons, Rohan Marley ("Marley").

6.      Jammin' Java's stock has been publicly traded and quoted on the over-the-counter market since 2008, when former CEO Defendant Shane Whittle ("Whittle") orchestrated the Company's reverse merger into a publicly traded shell company that was purportedly in the waste management business.  Ahead of this reverse merger, Whittle secretly gained control of millions of shares that previously had been issued to foreign nominees.  Whittle controlled this stock for years, during which time he served as the Company's executive officer and director.

7.      In 2010, Whittle exploited his position by coordinating an illegal offering and fraudulent promotion of Jammin' Java's stock.  In preparation for this offering, Whittle distributed 16 million shares of nominee stock through a complex network of offshore shell entities controlled by, among others, Defendants Wayne Weaver ("Weaver"), Michael Sun ("Sun"), Kevin Miller ("Miller"), Stephen Wheatley ("Wheatley"), and Rene Berlinger ("Berlinger").  Collectively, these transfers amounted to approximately 19% of Jammin' Java's outstanding stock.

8.      To boost the stock price, Whittle introduced to Jammin' Java a sham financing arrangement orchestrated by Weaver and others.  Whittle also arranged for the fraudulent promotion of Jammin' Java stock by Defendants Alexander and Thomas Hunter (collectively, the "Hunters"), two close associates of Whittle who since have been charged by the Commission for fraudulent promotions in other pump-and-dump schemes.

9.      Jammin' Java's public announcement of the financing arrangement and other company announcements—in concert with coordinated trades—prompted an increase in Jammin' Java's share price and volume.  In March 2011, this price increase intensified when the Hunters began disseminating fraudulent newsletters promoting Marley Coffee and Jammin' Java stock.  Consequently, over a six-month

1   period from late 2010 to mid-2011, Jammin' Java's share price and volume increased

2   dramatically, rising from $0.17 per share and no volume in December 2010 to an

3   intraday high of $6.35 and volume of 20 million shares on May 12, 2011.

4         10.    As the stock price rose, Whittle illegally distributed another large block

5   of Jammin' Java stock through the network of offshore intermediaries, which

6   included Weaver, Sun, Wheatley, Miller, Defendant Mohammed Al-Barwani

7   ("Al-Barwani"), and Berlinger.  In the aggregate, over 34 million shares, or nearly

8   49% of Jammin' Java's outstanding stock, were distributed through these transfers.

9   Rather than trade in their own name, these Defendants used proxy shell entities

10   designed to conceal their ownership and control of Jammin' Java stock.

11         11.    By selling over 45 million shares into the artificially inflated market,

12   entities controlled by or coordinating with the Defendants generated approximately

13   $78 million in illicit trading profits from February to May 2011.  The 45 million

14   shares amounted to approximately two thirds of Jammin' Java's outstanding stock at

15   the time and nearly its entire public float.  Defendants Weaver, Miller, Al-Barwani,

16   and Berlinger then transferred $2.5 million of the illicit profits to Jammin' Java under

17   the guise of the sham financing agreement announced at the outset of the promotion.

18   Multiple Defendants also took a portion of the trading profits for themselves and

19   transferred proceeds to other foreign jurisdictions to obscure the beneficiaries of the

20   scheme.

21         12.    Jammin' Java's share price and volume began to collapse a few days

22   after the Company disclosed on May 9, 2011 that it had become aware of an

23   unauthorized and unaffiliated internet stock promotion.  On May 17, 2011, its share

24   price fell further after Jammin' Java released disappointing results in its Form 10-K.

25   As a result of Defendants' illegal distribution and fraudulent promotion, investors in

26   Jammin' Java stock lost millions of dollars.

27

28

## SETTLED DEFENDANTS[1]

13. **Jammin' Java Corp.** ("Jammin' Java" or the "Company"), a Nevada corporation, was headquartered in Beverly Hills, California at the time of the misconduct.  Currently, Jammin' Java is headquartered in Denver, Colorado. Operated under the name "Marley Coffee," Jammin' Java owned a license to use trademarks of the late reggae artist Bob Marley for licensed coffee products. Jammin' Java was formed through a reverse merger with Global Electronic Recovery Corp. ("GERC"), a purported waste management company and a publicly traded shell company located in Los Angeles, California.  On August 2, 2006,[2] GERC registered securities with the Commission pursuant to Section 12(g) of the Exchange Act.  In February 2008, GERC merged with a newly formed entity, Marley Coffee, Inc., and changed its name to Marley Coffee.  GERC's stock was quoted on the Over-the-Counter Bulletin Board ("OTCBB") under the symbol GERV, until after the reverse merger with Marley Coffee—at which point it began trading under the symbol MYCF.  In July 2009, Marley Coffee changed its name to Jammin' Java and its ticker symbol to JAMN.  From its inception until at least September 2011, Jammin' Java was a shell company, without any significant operations or assets.  Jammin' Java has failed to earn positive operational cash flow or an accounting profit, and consistently disclosed going-concern risks in its SEC filings.  As of January 31, 2016, Jammin' Java had accumulated a deficit of $29 million in operating losses.

14. **Stephen B. Wheatley** ("Wheatley"), age 53, resides in or near London, in the UK, and is a citizen of the UK.

---

[1] The Commission settled its claims against Defendants Jammin' Java and Wheatley. The Court approved the settlements and entered judgments on the Commission's claims.  The Commission does not intend for the amended Complaint to disturb or affect the settlements or the judgments.

[2] Dates cited in this Complaint are approximate and intended to be read as equivalent to "on or about" or "in or around" the particular date in question.

4

**DEFENDANTS**

15. **Shane G. Whittle** ("Whittle"), age 40, a Canadian citizen, maintained a residence in Los Angeles, California from at least 2009 to 2011, and another in or around Vancouver, British Columbia in Canada. Currently, Whittle resides in or near Kelowna, British Columbia in Canada or in Bridgetown, Barbados in the West Indies. From at least August 2008 to May 2010, Whittle served as the CEO, Treasurer, Secretary, and a director of Jammin' Java. In April and May 2010, Whittle formally resigned his board and his executive officer positions. However, after he resigned, Whittle continued to direct the affairs of Jammin' Java as a *de facto* officer until he was retained as a consultant on August 1, 2011, when the Company hired a new CEO. Whittle's association with Jammin' Java ended with the termination of his consulting agreement in 2012. From the time of the reverse merger until at least December 2010, Whittle also held a significant ownership stake in Jammin' Java. In response to discovery requests in this case, Whittle invoked his Fifth Amendment privilege against self-incrimination.

16. **Wayne S. P. Weaver** ("Weaver"), age 49, resides on Nevis or in the Bailiwick of Jersey, and is a citizen of the United Kingdom and Canada. In response to discovery requests in this case, Weaver invoked his Fifth Amendment privilege against self-incrimination.

17. **Michael K. Sun** ("Sun"), age 60, resides in St. Brelade, Jersey and is a citizen of India. Until at least 2009, Sun managed Centurion Management Services, Ltd., an offshore trust management business headquartered in Jersey. On March 1, 2010, the Jersey Financial Services Commission issued an order preventing Sun from engaging in any employment with any registered person or performing any function or service within the financial services business without the approval of the Jersey Financial Services Commission. Following the issuance of this order, Sun became Weaver's business partner.

18.   **Rene Berlinger** ("Berlinger"), age 59, resides in Trimbach, Switzerland and is a citizen of Switzerland.  Berlinger operated in part through the Swiss entities Volante Advisory, A.G. ("Volante") and Grivo A.G. ("Grivo"), which he controls or shares control.  Through these businesses, and in his own name, Berlinger formed and managed offshore entities at the direction of individuals seeking to conduct financial transactions anonymously.

19.   **Kevin P. Miller** ("Miller"), age 47, resides in St. Brelade, Jersey, and is a citizen of the UK.  In response to discovery requests in this case, Miller invoked his Fifth Amendment privilege against self-incrimination and declined to answer.  In doing so, Miller purported to reserve the right to "supplement [his] response as appropriate."

20.   **Mohammed A. Al-Barwani** ("Al-Barwani"), age 73, resides in Muscat, Oman and is a citizen of Oman.

21.   **Alexander J. Hunter** ("A. Hunter") and his twin brother, **Thomas E. Hunter** ("T. Hunter"), age 26, reside in or near Manchester, in the UK, and are citizens of the UK.  A. Hunter recently changed his name and is now known as John Alexander.  At the time of the misconduct, T. Hunter resided in Vancouver, British Columbia in Canada.   In response to discovery requests in this case, A. Hunter and T. Hunter each invoked his Fifth Amendment privilege against self-incrimination

## RELATED ENTITIES

### Whittle's Entities

22.   **Tyrone Investments, Inc.** ("Tyrone") was established in Panama on September 10, 2007.  Whittle was the sole beneficial owner of Tyrone and directed the activity in its name.  Tyrone was formed by Gray & Co. ("Gray"), a Panamanian law firm, and its nominee officers and directors included Lourdes Arauz ("Arauz"), Jeniffer Gonzalez ("Gonzalez"), and Yodalis Murillo ("Murillo").  Whittle approved the opening of an account for Tyrone at Verdmont Capital, S.A. ("Verdmont"), a Panamanian brokerage firm, on September 18, 2007.  From the time of its formation

through at least May 2011, or its termination, Tyrone was a shell entity without any operations—beyond trading stock and transferring funds—or employees.

23.   **Monolosa Real Estate, Inc.** ("Monolosa") was established in Panama on May 16, 2007.  Whittle was the sole beneficial owner of Monolosa and directed the activity in its name.  Monolosa was formed by Morgan & Morgan ("Morgan"), a Panamanian law firm, and its nominee officers and directors included José Silva ("Silva"), Dianeth De Ospino ("De Ospino"), and Marta De Saavedra ("De Saavedra").  Whittle approved the opening of an account for Monolosa at VP Bank (Switzerland) Ltd. ("VP Bank"), a Swiss bank, on October 17, 2007.  The account was managed by EH&P Investments, A.G. ("EH&P"), a subsidiary of Bank Gutenberg, A.G. ("Bank Gutenberg"), formerly Cat Group, A.G.  From the time of its formation through at least May 2011, or its termination, Monolosa was a shell entity without any operations—beyond trading stock and transferring funds—or employees.

24.   **Nemo Development, S.A.** ("Nemo") was established in Panama on June 15, 2007.  Whittle was the sole beneficial owner of Nemo and directed the activity in its name.  Nemo was formed by Morgan, with the involvement of Silva and De Ospino, and its nominee officers and directors included Carlo Civelli, De Saavedra, and De Ospino.  From the time of its formation through at least May 2011, or its termination, Nemo was a shell entity without any operations— beyond trading stock and transferring funds—or employees.

25.   **El Tololo Investment Corp.** ("Tololo") was established in Panama on October 3, 2007.  Whittle was the sole beneficial owner of Tololo and directed the activity in its name.  Tololo was formed by Morgan, with the involvement of Silva, and its nominee officers and directors included Stephen Mazenauer ("Mazenauer"), De Saavedra, and Kessler.  Whittle approved the opening of an account for Tololo at Bank Sarasin & Cie, A.G., a Swiss bank, on October 9, 2007 by Mazanauer.  From the time of its formation through at least May 2011, or its termination, Tololo was a

1    shell entity without any operations—beyond trading stock and transferring funds—or

2    employees.

3         26.    **Luminus Real Estate, Inc.** ("Luminus") was established in Panama on

4    November 22, 2007. Whittle was the sole beneficial owner of Luminus and directed

5    the activity in its name. Luminus was formed by Morgan, and its nominee officers

6    and directors included Silva, De Ospino, and De Saavedra. Whittle approved the

7    opening of an account for Luminus at Finter Bank Zurich A.G. ("Finter Bank"), a

8    Swiss bank, on February 6, 2008. The account was managed by EH&P. From the

9    time of its formation through at least May 2011, or its termination, Luminus was a

10   shell entity without any operations—beyond trading stock and transferring funds—or

11   employees.

12                       **<u>Weaver's Entities</u>**

13         27.    **Donnolis Invest Corp.** ("Donnolis") was established in Panama on

14   February 20, 2009. Weaver was the sole beneficial owner of Donnolis and directed

15   the activity in its name. Donnolis was formed by Morgan, and its nominee officers

16   and directors included Silva, De Ospino, and De Saavedra. These individuals also

17   were designated as the officers and directors for several of Whittle's entities. Weaver

18   approved the opening of an account for Donnolis at Finter Bank, a Swiss bank, on

19   March 8, 2010. The account was managed by EH&P. From the time of its formation

20   through at least May 2011, or its termination, Donnolis was a shell entity without any

21   operations—beyond trading stock and transferring funds—or employees. As detailed

22   below, Donnolis received a portion of the proceeds from the sale of Jammin' Java

23   stock by another offshore entity, Westpark Ltd. (owned and controlled by Sun).

24         28.    **Calgon Invest, S.A.** ("Calgon") was formed in the Marshall Islands by

25   Berlinger on November 18, 2010. On November 24, 2010, Berlinger also opened the

26   Calgon account that would receive Jammin' Java stock. The Calgon account was

27   opened at B&C Capital, Inc. ("Bateman"), an affiliate of Bateman & Company. The

28   Calgon account was managed by an account representative, Andrew Golding

("Golding").  Berlinger, who was retained as the sole officer and a director of the entity, formed Calgon and opened the accounts for Calgon at Weaver's direction. Weaver was the sole beneficial owner of Calgon, and he directed the trading in the Calgon account.  From the time of its formation through at least May 2011, Calgon was a shell entity without any operations—beyond trading stock and transferring funds—or employees.  From the account opening in November 2010 through May 2011, nearly all of the activity in the relevant account consisted of (a) the acquisition and sale of Jammin' Java stock or (b) the movement of related sale proceeds.  The exception was Calgon's receipt and transfer (but not sale) of the stock of another penny stock issuer traded on U.S. over-the-counter market, Lucky Boy Silver Corp. (ticker: LUCB) ("Lucky Boy"), later National Graphite Corp. (ticker: NGRC).

29.  **Timotei Overseas, Inc.** ("Timotei") was created on September 3, 2010 in Panama, with the assistance of Gray.  Weaver was the sole beneficial owner of Timotei.  The Timotei account that ultimately would receive Jammin' Java stock was opened on September 28, 2010 at Verdmont by Gray.  Timotei's nominee officers and directors were Marisela Simmons ("Simmons"), Eyda De Freitas, Murillo, and Cesar Degracia ("Degracia"), each of whom was employed by Gray.  Weaver authorized the account opening for Timotei and transactions in the account.  From the time of its formation through at least May 2011, Timotei was a shell entity without any operations—beyond trading stock and transferring funds—or employees.  From the account opening in September 2010 through May 2011, nearly all of the activity in the relevant account consisted of (a) the acquisition and sale of Jammin' Java stock or (b) the movement of related sale proceeds.  The only other activity related to the deposit and transfer—but not sale—of a stock of a penny stock issuer traded on the U.S. over-the-counter market, Lucky Boy.  As detailed below, Timotei transferred a portion of the proceeds from its sale of Jammin' Java stock to Sun's Cilitz and to Weaver.

9

30.   **Arcis Assets, S.A.** ("Arcis") was formed in the Marshall Islands on August 20, 2009 by Roger Knox ("Knox").  Weaver was the sole beneficial owner of Arcis.  On September 17, 2010, an account was opened at CBH Compagnie Bancaire Helvétique, S.A. ("CBH") for Arcis.  David Craven ("Craven") and Stephen Drayton ("Drayton") with Eurohelvetia TrustCo S.A. ("Eurohelvetia") served as the officers of Arcis and had authority from Weaver to act on its behalf.  The Arcis account was opened and managed by Eurohelvetia.  Weaver authorized the opening of the account in the name of Arcis, as well as transactions conducted in the account.  From the time of its formation through at least May 2011, Arcis was a shell entity without any operations—beyond trading stock and transferring funds—or employees.  From September 2010 through May 2011, nearly all of the activity in the relevant account consisted of (a) the acquisition and sale of Jammin' Java stock or (b) the movement of related sale proceeds.  The only other activity related to a single other stock of a penny stock issuer, Jetblack Corp. (ticker: JTBK), traded on the U.S. over-the-counter market.  As detailed below, Arcis transferred a portion of the proceeds from its sale of Jammin' Java stock to Weaver.

31.   **Manitou S.A.** ("Manitou") was formed in the Marshall Islands on February 17, 2011.  Weaver was the sole beneficial owner of Manitou.  Anthony Killarney, Kenneth Ciapala, and Knox of Blacklight S.A. were designated as Manitou's officers and directors and acted on its behalf.  Weaver approved the opening of the Manitou account at Bank Gutenberg, and he directed or approved transactions in the account.  Bank Gutenberg was affiliated with EH&P, which managed accounts for Whittle, Weaver, and Sun.  Manitou had no employees.  Other than the acquisition and sale of stock, Manitou had no other operations.  From the account opening in February 2011 through May 2011, nearly all of the activity in the relevant account consisted of (a) the acquisition and sale of Jammin' Java stock or (b) the movement of related sale proceeds.  The account only acquired a single other stock—a penny stock traded on the U.S. over-the-counter market, Northumberland

Resources, Inc. (ticker: NHUR) ("Northumberland").  In 2011 and 2012, Northumberland stock also was handled by accounts in the name of Donnolis (Weaver), Las Colinas (Miller), and Timotei (Weaver).  As detailed below, Manitou transferred a portion of the proceeds from its sale of Jammin' Java stock to Weaver.

### Sun's Entities

32.  **Cilitz and Trade, S.A.** ("Cilitz") was established in Panama on November 30, 2009.  Sun was the sole beneficial owner of Cilitz and directed the activity in its name.  Cilitz was formed by Morgan, and its nominee officers and directors included Silva, De Ospino, and De Saavedra.  As described above, these individuals also were involved in the formation and management of entities owned and controlled by Whittle and Weaver.  Sun approved the opening of an account for Cilitz at Finter Bank, a Swiss bank, on February 11, 2010.  The account was managed by EH&P, which also managed accounts established for Whittle and Weaver.  From the time of its formation through at least May 2011, or its termination, Cilitz was a shell entity without any operations—beyond trading stock and transferring funds—or employees.  As detailed below, Cilitz received a portion of the proceeds from the sale of Jammin' Java stock from another offshore entity, Timotei (owned and controlled by Weaver).

33.  **Westpark Ltd.** ("Westpark") was established by Berlinger on August 27, 2010 in the Marshall Islands.   Sun was the sole beneficial owner of Westpark.  Berlinger was retained as the sole officer and director of Westpark.  On August 30, 2010, Westpark opened an account at VP Bank.  Sun authorized Berlinger to open and manage the Westpark account on his behalf.  In exercising his authority over transactions in the account, Berlinger acted at the direction of Sun.  Berlinger apprised Sun of trading and fund transfer activity in the Westpark account.  From the time of its formation through at least May 2011, Westpark was a shell entity without any operations—beyond trading stock and transferring funds—or employees.  From the account opening in August 2010 through May 2011, all or nearly all of the

11

activity in the relevant account consisted of (a) the acquisition and sale of Jammin'
Java stock or (b) the movement of related sale proceeds.  As detailed below,
Westpark transferred a portion of the proceeds from its sale of Jammin' Java stock to
Weaver's Donnolis and to Sun.

34.    **Torino Invest, S.R.L.** ("Torino") was formed on Nevis by Conrad
Smithen and Craven on January 22, 2010.  Sun was the sole beneficial owner of
Torino.  Craven and Drayton served as the officers of Torino and had authority from
Sun to act on its behalf.  Craven and Drayton also opened and managed accounts for
Arcis (Weaver).  On October 1, 2010, an account was opened at CBH in the name of
Torino.  Sun authorized the account opening for Torino and transactions in the
account.  From the time of its formation through at least May 2011, Torino was a
shell entity without any operations—beyond trading stock and transferring funds—or
employees.  From October 2010 through May 2011, nearly all of the activity in the
relevant account consisted of (a) the acquisition and sale of Jammin' Java stock or
(b) the movement of related sale proceeds.  The only other activity related to small
sales of Lucky Boy, which also was traded by other Defendants' entities.  As detailed
below, Torino transferred a portion of the proceeds from its sale of Jammin' Java
stock to Weaver's Arcis.

### Miller's Entities

35.    **Las Colinas Ltd.** ("Las Colinas") was formed in the Marshall Islands on
August 27, 2010 by Berlinger with the approval of Miller.  Miller was the sole
beneficial owner of Las Colinas.  Berlinger was retained as the sole officer and
director of Las Colinas.  On August 30, 2010, Berlinger opened an account for Las
Colinas at VP Bank.  Miller authorized Berlinger to open and manage the Las Colinas
account on his behalf.  In exercising his authority over transactions in the account,
Berlinger acted at the direction of Miller.  Berlinger apprised Miller of trading and
fund transfer activity in the Las Colinas account.  From the time of its formation
through at least May 2011, Las Colinas was a shell entity without any operations—

12

beyond trading stock and transferring funds—or employees.  From the account opening in August 2010 through May 2011, the only activity in the relevant account consisted of (a) the acquisition and sale of Jammin' Java stock or (b) the movement of related sale proceeds.  As detailed below, Las Colinas transferred a portion of the proceeds from its sale of Jammin' Java stock to Jammin' Java, to one of Weaver's entities, and to Miller's personal bank account.

36.    **Rahela International, Inc.** ("Rahela") was created on September 17, 2010 in Panama with the assistance of Gray.  Miller was the sole beneficial owner of Rahela.  Three individuals, Alicia de Gonzalez, Ruben Barnett, and Brigida Quintana, were appointed as nominee officers and directors of Rahela.  In addition, Simmons, Degracia, and Murillo signed corporate resolutions on behalf of Rahela to effectuate the transfer of Jammin' Java stock.  Gray also helped form Tyrone (Whittle) and Timotei (Weaver), and Simmons, DeGracia, and Murillo also served as nominee officers of Timotei.  On September 28, 2010—the same day that the Timotei account was opened—Gray opened an account for Rahela at Verdmont, which also maintained accounts for Tyrone and Timotei.  Miller authorized Gray to open and manage the Rahela account on his behalf.  In exercising its authority over transactions in the account, Gray acted at the direction of Miller, as the sole beneficial owner of Rahela, and Weaver, who had some trading authority over the account.  Shortly after Miller opened an earlier account at Verdmont in November 2007, traveling to Panama to do so, Weaver wrote a referral letter to Verdmont on behalf of Miller.  From the time of its formation through at least May 2011, Rahela was a shell entity without any operations—beyond trading stock and transferring funds—or employees.  From the account opening in August 2010 through May 2011, nearly all of the activity in the relevant account consisted of (a) the acquisition and sale of Jammin' Java stock or (b) the movement of related sale proceeds.  The only other activity involved the receipt of shares of Lucky Boy—the same penny stock owned by

Timotei (Weaver), Torino (Sun), and Petersham (Wheatley).  Those shares ultimately were delivered out of the account without having been sold by Rahela.

**Al-Barwani's Entity**

37.     **Renavial Ltd.** ("Renavial") was formed in the Marshall Islands on September 14, 2010 by Berlinger, with the assistance of Sun and Weaver. Al-Barwani was the sole beneficial owner of Renavial.  Berlinger was retained as the sole officer and director of Renavial.  With the approval of Al-Barwani, Berlinger opened an account at VP Bank in the name of Renavial on September 21, 2010. Al-Barwani authorized Berlinger to open and manage the Renavial account on his behalf.  In exercising his authority over transactions in the account, Berlinger acted at the direction of Al-Barwani.  Berlinger apprised Al-Barwani of trading and fund transfer activity in the Renavial account.  From the time of its formation through at least May 2011, Renavial was a shell entity without any operations—beyond trading stock and transferring funds—or employees.  From the account opening in September 2010 through May 2011, the only activity in the relevant account consisted of (a) the acquisition and sale of Jammin' Java stock or (b) the movement of related sale proceeds.  As detailed below, Renavial transferred a portion of the proceeds from its sale of Jammin' Java stock to one of Weaver's entities and to Al-Barwani.

**Wheatley's Entity**

38.     **Petersham Enterprises, Ltd.** ("Petersham"), which was formed in the British Virgin Islands on September 25, 2009, originally was owned and controlled by Weaver.  Petersham was formed with the assistance of Mossack Fonseca & Co., a Panamanian law firm.  On September 21, 2010, an account was opened for Petersham at Bateman.  At that time, Wheatley was designated as the sole director and Michael Holt as the sole officer, although Wheatley sometimes represented himself as the sole officer.  The Bateman account representative for the Petersham account was Golding, who also managed the Bateman account for Weaver's Calgon.  Prior to the Bateman

14

account opening, Sun also exercised some control over Petersham.  On April 16, 2010, Sun had signed an agreement on behalf of Petersham, through which it purchased shares of another penny stock issuer from an entity controlled by Whittle, Big Bear Mining Corp. (ticker: BGBR).  Weaver subsequently transferred control of Petersham to Wheatley.  In October 2010, both Weaver and Wheatley entered into fee sharing and trust agreements governing the ownership of Petersham and providing for the sharing of proceeds from the sale of stock by Petersham.  In connection with their arrangement, Wheatley provided Weaver trading authority over the Petersham account and permitted Weaver to direct trades in the account.  From the time of its formation through at least May 2011, Petersham was a shell entity without any operations—beyond trading stock and transferring funds—or employees. From the account opening in September 2010 through May 2011, nearly all of the activity in the relevant account consisted of (a) the acquisition and sale of Jammin' Java stock or (b) the movement of related sale proceeds.  The only other activity related to the transfer in and out of Petersham's account—but not sale—of two stocks of penny stock issuers traded on the U.S. over-the-counter market, Lucky Boy and another penny stock.  As detailed below, Petersham transferred a portion of the proceeds from its sale of Jammin' Java stock to Wheatley.

### Other Entities

39.    **Prospera Capital Corp.** ("Prospera") was formed in Belize.  The beneficial owner is currently unknown.  Andrew Godfrey ("Godfrey") and Bob Bandfield ("Bandfield") were designated as the sole officers and directors of Prospera.  Prospera's account was established at Legacy Global Markets, S.A. in Belize.

40.    **Straight Path Capital Ltd.** ("Straight Path") was converted from an existing Marshall Islands defunct shelf entity that originally had been formed on October 21, 2008.  The conversion, which occurred in May 2011, gave Straight Path the appearance of having been existence for a longer period of time.  Straight Path

was converted by Berlinger at Weaver's direction.  Straight Path had no operations, assets, or employees and served only as a front company to effectuate a financing agreement with Jammin' Java in December 2010.

# FACTS

## General Background on Pump-and-Dump Schemes

41.   "Pump and dump" schemes typically have two parts.  In the first, promoters try to boost the price of a stock with false or misleading statements about the company.  Once the stock price has been pumped up, fraudsters move on to the second part, where they seek to profit by dumping their own holdings of the stock, which they accumulated beforehand at little or no cost, into the public market.  After these fraudsters dump their shares and stop hyping the stock, the price typically falls, and investors lose their money.

42.   When the participants in a scheme sell large blocks of stock to the investing public without registering the transaction, the offer or sale of that stock can violate the registration provisions of the Securities Act.  The Securities Act has two basic objectives: (a) to require that investors receive financial and other significant information concerning securities being offered for public sale; and (b) to prohibit deceit, misrepresentations, and other fraud in the sale of securities.  The SEC requires that companies disclose important financial information through the registration of securities, which enables investors to make informed judgments about whether to purchase a company's securities.

43.   Fraudulent promotion or manipulative trading used to pump the company's stock price can violate the antifraud provisions of the Securities Act and the Exchange Act.  For example, fraudsters may use online newsletters, bulletin boards, or social media to disseminate false and misleading statements to the public in order to sell the stock at inflated prices.  Promoters may claim to offer independent, unbiased recommendations in newsletters and other touts when they stand to profit from convincing others to buy or sell certain stocks—often, but not

16

1  always, penny stocks.  Fraudsters frequently use this ploy with small, thinly traded

2  companies because it is easier to manipulate a stock when there is little or no

3  information available about the company.

4      44.    Participants who attempt to conceal their individual or collective control

5  of the stock also may violate the reporting requirements of the Exchange Act.  As a

6  general matter, when a person or group of persons acquires beneficial ownership of

7  more than 5% of a voting class of a company's equity securities registered under

8  Section 12 of the Exchange Act, they are required to file a Schedule 13D with the

9  SEC.  Should they beneficially own more than 5% of a voting class of an equity

10  security registered under Section 12 of the Exchange Act, such persons must disclose,

11  among other things, the identity and background of the persons required to file, the

12  source and amount of funds used in making the purchases, the number of shares

13  beneficially owned, the purpose of the acquisition of the securities, and a description

14  of any contracts, loans, arrangements, understandings, or relationships that the person

15  has with respect to any securities of the issuer.  Any material changes in the facts

16  contained in the schedule require a prompt amendment.

17      45.    Similarly, a company's officers and directors, and any beneficial owners

18  of more than ten percent of a class of the company's equity securities registered under

19  Section 12 of the Exchange Act generally must file with the SEC a statement of

20  ownership regarding those securities.  Initial statements of beneficial ownership are to

21  be filed on Form 3; statements of changes are to be filed on Form 4; and annual

22  statements are to be filed on Form 5.

23  **Whittle Meets Marley**

24      46.    In 2005, stock promoter Whittle befriended Rohan Marley, the son of

25  Bob Marley, in Los Angeles, California.  After learning of Marley's purchase of a

26  small Jamaican coffee farm, Whittle proposed the creation of a large-scale coffee

27  distribution business built on the Marley name.  At the time, Whittle informed Marley

28  that "what he did or does is build shell companies and sell them to other entities."

**Whittle Acquires Publicly Traded Shell**

47.     To raise capital for the Marley venture, Whittle identified a shell company with publicly traded securities, GERC, a purported waste management business located in Los Angeles, California.  GERC had been incorporated on September 27, 2004 by an individual named David P. O'Neill ("O'Neill"), a former Vancouver car salesman.  O'Neill served as CEO and board member and controlled 82% of GERC's shares.  On August 22, 2007, Whittle was appointed to GERC's Board of Directors.

48.     In February 2008, Whittle and O'Neill approved a merger between GERC and a newly formed entity, Marley Coffee.  The reverse merger gave Marley Coffee access to GERC's publicly traded shares.  After the merger, GERC announced that it was transitioning from the waste management business to the premium roasted coffee business and changed its name to Marley Coffee.

**Whittle Gains Control of Nominee Shares**

49.     After the reverse merger, Whittle maintained his membership on the Company's Board and assumed the positions of Treasurer, Secretary, and CEO.  During this time and for years afterward, Whittle actively, if not exclusively, managed and directed Marley Coffee's business.  Rohan Marley's involvement in the management of the business was minimal.

50.     Whittle also held a significant ownership interest in the new entity.  On April 28, 2008, around the time of the reverse merger, O'Neill transferred control of the company to Marley and Whittle and retired approximately 55 million shares to treasury.  Following the reverse merger, Whittle directly held 9.1% of Marley Coffee in his own name and another 0.5% through an entity he controlled, SJ Investments Holdings, Inc. ("SJ Investments").  Other than Marley, no individual held more of Marley Coffee's stock than Whittle.

51.     Whittle expanded his holdings by secretly acquiring millions of shares from nominee shareholders in the months before the reverse merger of GERC.

Whittle acquired a significant portion of this nominee stock through several Panamanian entities that he controlled, including Tololo, Tyrone, and Nemo, and another entity that ultimately would transfer its shares to an entity that Whittle controlled, Luminus.  Through this acquisition, Whittle gained control of an additional 17% of Marley Coffee's stock.  Figure 1 summarizes these transfers.  The percentage identified in Figure 1 is based on the amount of outstanding stock as of April 2008.

**Figure 1. Acquisitions by Whittle in Connection with the Reverse Merger**

| Entity | Jurisdiction | Date Formed | Shares | Date Acquired | Percentage |
|--------|-------------|-------------|--------|--------------|-----------|
| Nemo | Panama | June 15, 2007 | 1,596,615 | Jan. 11, 2008 | 4.8% |
| Tyrone | Panama | Sept. 10, 2007 | 1,613,220 | Jan. 17, 2008 | 4.9% |
| Tololo | Panama | Oct. 3, 2007 | 824,874 | Mar. 3, 2008 | 2.5% |
| Luminus | Panama | Nov. 22, 2007 | 1,613,220 | Feb. 20, 2008 Mar. 17, 2008 | 4.9% |

52.     Whittle was able to obtain control of this nominee stock through a prior sham offering of GERC's stock.  In October 2006, pursuant to a registration statement that went effective in February 2006, GERC issued stock certificates to O'Neill and multiple individuals with addresses in Canada and Mexico ("GERC Nominees").  However, many of these shareholders were unaware of the issuances or were issued shares that were actually controlled or subsequently acquired by O'Neill or others working with him.

**Whittle Continues to Exercise Control**

53.     Based on his managerial control of the Company and his stock ownership, Whittle was a control person and affiliate of Jammin' Java from at least February 2008 through August 2011.

54.     From the time of the reverse merger in February 2008 through 2010, Whittle continued to control Marley Coffee, which was renamed Jammin' Java in July 2009.  Until May 20, 2010, Whittle continued to hold the positions of CEO, Treasurer, and Secretary, and was Jammin' Java's principal executive.

55.     On May 13 and 14, 2010, the *Vancouver Sun* published articles linking Whittle to various penny stock promotions.  The articles put pressure on Marley to reduce Whittle's public association with the Company.

56.     By May 20, 2010, Whittle formally resigned his board and his executive officer positions with Jammin' Java, which were nominally filled by Anh Tran ("Tran").  Tran had no experience in the coffee business or in the management of a publicly traded company.  Whittle introduced Tran to Jammin' Java, and Tran relied on Whittle for guidance concerning management of the Company's stock and other issues.

57.     After May 2010, Whittle acted as a *de facto* officer of the Company and continued to be significantly involved in the management of Jammin' Java.  Among other things, he negotiated contracts with prospective vendors of Jammin' Java (including coffee vendors, brokers, and retailers), assisted in securing new board members, conferred with Jammin' Java employees and counsel concerning periodic filings of the company and related matters, drafted press releases, coordinated with the company's public relations consultants, advanced funds on behalf of Jammin' Java, and handled business strategy.  Whittle's role did not change appreciably until August 2011, when Jammin' Java hired a new CEO and entered a consulting agreement with Whittle.

58.     In addition to controlling Jammin' Java's operations, Whittle also continued to hold or control a substantial portion of Jammin' Java's stock through 2010.  Moreover, he increased his 2008 holdings on April 22, 2010 through a secret transfer of approximately 3 million shares (amounting to an additional 3.1% of Jammin' Java's outstanding stock at the time) from GERC Nominees to Nemo.  From April 22, 2010 until October 1, 2010, Whittle held 29% of Jammin' Java's stock in his own name and through entities that he controlled.  After he sold shares on October 1, 2010, he held approximately 27% of Jammin' Java's outstanding stock. He held this stock until he began transferring additional blocks of shares in late

November 2010, as described below.  In addition, he controlled the stock issued in the name of GERC Nominees that had not been distributed by him at this point.

59.     In recognition of Whittle's affiliate status, when Jammin' Java shares were issued to him in September and November 2010, the share certificates bore a restrictive control legend (restricting the resale of the shares).  The legend designated that the shares were issued to and held by a control person or affiliate.

## Whittle and Others Coordinate the Pump-and-Dump Scheme

60.     Using Whittle's control of and access to Jammin' Java and its stock, the Defendants coordinated a pump-and-dump scheme that culminated in the middle of 2011.  As discussed below in more detail, this scheme involved the following steps:

(a)     In late 2010, Whittle, Weaver, and others orchestrated a sham financing arrangement (the "Straight Path Agreement") designed to create the false appearance of legitimate third-party interest and investment in the Company.

(b)     In anticipation of the public announcement of this arrangement and other promotional activity, Whittle and others working with him illegally distributed a first wave of Jammin' Java stock to intermediary shell entities controlled by Weaver, Sun, Miller, Wheatley, and Berlinger and took other steps to prepare for an illegal offering of Jammin' Java stock.

(c)     In December 2010, Jammin' Java announced the financing agreement, and entities connected to the scheme began to coordinate trades of Jammin' Java stock at elevated prices.  As the share price began to increase, Jammin' Java made a series of additional corporate announcements and took other steps to promote the company that were prompted or conducted by Whittle.

(d)     Whittle and others then distributed a second wave of Jammin' Java stock to multiple intermediary shell entities controlled by Weaver, Sun, Miller, Wheatley, Al-Barwani, and Berlinger, many of which had received shares through Whittle's initial distribution.

(e)     To conceal their interests further, Whittle misrepresented, and Whittle, Weaver, Sun, Miller, Al-Barwani, and Berlinger failed to disclose, their beneficial ownership of Jammin' Java stock as required by the securities laws.

(f)     The Hunters, who had been engaged by Whittle, then distributed promotional email, published false stock newsletters, and took other steps to hype the stock, sending the share price sharply upward.

(g)     With Jammin' Java's share price artificially inflated, the intermediary shell entities under Defendants' control illegally dumped millions of shares on the public market without registering the transactions, making millions of dollars in the process.

(h)     Weaver, Al-Barwani, Miller, and Berlinger then funneled a portion of these profits to Jammin' Java, under the guise of the sham financing arrangement that launched the promotion.

(i)     Weaver, Sun, Miller, Al-Barwani, Wheatley, and Berlinger profited from the trading activity, by receiving proceeds, transferring proceeds to other Defendants, routing proceeds to foreign jurisdictions, or retaining proceeds in accounts held for their sole benefit.

### The Sham "Straight Path" Financing Arrangement

61.     Beginning in April 2010, Whittle, Weaver, and others orchestrated a sham financing arrangement to set the stage for the promotion and distribution of Jammin' Java stock.  As described in more detail below, Al-Barwani and Miller participated by funneling proceeds to Jammin' Java to complete the scheme. Berlinger participated by establishing a sham Straight Path entity and taking other steps to facilitate the movement and sale of stock and trading profits.

62.     The arrangement created the illusion that Jammin' Java had obtained financing from a legitimate third-party investor, and it served as the kickoff for the pump-and-dump scheme.  In reality, the purported investor did not exist.  Moreover, the purported "financing" was supplied by Weaver, Al-Barwani, Miller, and

Berlinger, who would sell shares of Jammin' Java stock that were acquired from Whittle after the financing agreement was executed.

63.     From April 15 to 18, 2010, Jammin' Java's management attended a coffee exposition in Anaheim, California.  During the conference, an individual claiming to be a representative of a purported investment firm, Straight Path, approached Marley, Tran, and Whittle about a potential investment in Jammin' Java.

64.     Straight Path did not exist.  Straight Path would not be established until May 23, 2011, when Berlinger changed the name of a preexisting defunct shell entity to Straight Path in order to create the appearance of a real entity.  Straight Path was one of several entities formed by Berlinger to facilitate stock and fund transfers in connection with the illegal, unregistered offering of Jammin' Java stock.  Rather than creating a new entity, as he did with every other shell entity in connection with the Jammin' Java scheme, Berlinger formed Straight Path by converting a preexisting shell entity that had been formed on October 21, 2008.  Berlinger did so, at Weaver's direction, so that Straight Path would appear older than it actually was and to conceal the conduct with respect to the Straight Path financing agreement.

65.     On November 3, 2010, a purported representative of Straight Path using the name Raymond Hall ("Hall") emailed Tran to communicate Straight Path's willingness to provide financing in the range of $1 to $2 million.  In reality, "Hall" appears to be a pseudonym used by one of the Defendants, or someone working with them.  Notwithstanding the lack of any information about Straight Path's operating history, and Hall's use of a generic email address, Tran agreed to discuss a potential agreement.  Within an hour of Tran's response on November 4, 2010, the fictitious "Hall" emailed a draft agreement valuing Jammin' Java stock at $0.40 per share—a substantial premium to Jammin' Java's share price at the time.  "Hall" also asked if it would be possible to reduce the number of outstanding shares of Jammin' Java in connection with the agreement.

66.     Jammin' Java conducted almost no due diligence on the potential financing partner or the proposed transaction.  Over the next several weeks, Tran and "Hall" exchanged one or two brief phone calls and a limited number of emails, most of which focused on the share reduction.  During one of these exchanges, Tran observed that Straight Path had no website or internet presence.  Other than a brief conversation at the conference, Marley had no communications with "Hall" or any other purported representative of Straight Path.  Contrary to a typical financing transaction, "Hall" conducted no due diligence on Jammin' Java and did not request any formal information rights or a position on the Board.

67.     Whittle helped negotiate the financing agreement with Straight Path and, to effectuate the agreement, agreed to retire some of his shares to the corporate treasury for no consideration.  In furtherance of the scheme, Whittle failed to inform others at Jammin' Java of the true identity of the individuals and entities offering to provide financing.  He also did not mention that Straight Path would be financing Jammin' Java with the sale of shares that Whittle would provide for that purpose.

68.     Jammin' Java executed the financing agreement with Straight Path on December 22, 2010.  Pursuant to the agreement, Jammin' Java had the right to request that Straight Path purchase shares at a price of $0.40 per share, up to a total of $2.5 million, subject to certain conditions.  The agreement contained numerous restrictions on Straight Path's ability to resell the shares to public investors in the United States.  Jammin' Java publicly disclosed the Straight Path Agreement through a press release issued on December 23, 2010 and filed with the Commission on Form 8-K on January 5, 2011.

69.     Although Jammin' Java's announcement reflected that Straight Path was an independent, third-party investor, in reality the payments under the Straight Path Agreement ultimately were funded with the profits of sales of Jammin' Java stock.  That stock would be supplied by entities controlled by Whittle to entities controlled by Weaver, Miller, Al-Barwani, and Berlinger.  The proceeds returned to Jammin'

Java were supplied by entities controlled by Weaver, Miller, Al-Barwani, and Berlinger.

70.     In substance, Whittle, Weaver, and others used the Straight Path Agreement to boost Jammin' Java's financial prospects and then funded the agreement through their own illegal resale of the stock to the public without the protections afforded by a registration statement.  The Company performed almost no due diligence, and ignored multiple red flags, and Jammin' Java then profited from the unregistered sale of its stock to the public.

### Defendants Prepare for the Distribution of Stock

71.     In anticipation of the announcement of the sham financing arrangement, Whittle, Weaver, Sun, Berlinger, Wheatley, Miller, and Al-Barwani took additional steps toward the distribution of Jammin' Java stock.

72.     To obscure their role in the scheme, and to avoid trading in their own name, multiple Defendants formed offshore entities in jurisdictions that would limit the ability of others, including U.S. regulators, to identify the true beneficial owners of the accounts and the movement of cash proceeds.  The Defendants retained account advisors, including Berlinger, to operate the shell companies at their direction or with their approval.  Instead of dealing directly with a U.S. brokerage firm, Defendants further obscured their activity by opening accounts at foreign banks and brokerage firms that would trade through a U.S. brokerage firm.

73.     From August to November 2010, multiple Defendants formed offshore entities and opened accounts that ultimately would receive and sell large blocks of Jammin' Java stock and serve as intermediaries for the "dump" in the pump-and-dump scheme.

(a)     **Las Colinas (Miller).**  On August 27, 2010, Berlinger formed Las Colinas in the Marshall Islands with Miller's approval.  Miller was the sole beneficial owner of Las Colinas.  Days later, on August 30, 2010, Berlinger opened an account

1  for Las Colinas at VP Bank.  Miller authorized Berlinger to open and manage the Las
2  Colinas account on his behalf.

3         (b)  **Westpark (Sun).**  On August 27, 2010, Berlinger established
4  Westpark in the Marshall Islands.   Sun was the sole beneficial owner of Westpark.
5  Shortly thereafter, on August 30, 2010, Westpark opened an account at VP Bank.
6  Sun authorized Berlinger to open and manage the Westpark account on his behalf.

7         (c)  **Renavial (Al-Barwani).**  On September 14, 2010, Berlinger
8  formed Renavial in the Marshall Islands.  Al-Barwani was the sole beneficial owner
9  of Renavial.  Berlinger was retained as the sole officer and director of Renavial.
10  Weaver and Sun facilitated the opening of the account, communicating with each
11  other about the account opening and coordinating with Al-Barwani.  In October 2010,
12  Weaver and Sun travelled to Switzerland to meet with Al-Barwani about Jammin'
13  Java and its stock.  With the approval of Al-Barwani, Berlinger opened an account at
14  VP Bank in the name of Renavial on September 21, 2010.

15         (d)  **Timotei (Weaver).**  On September 3, 2010, Timotei was created
16  in Panama.  Weaver was the sole beneficial owner of Timotei.  The Timotei account
17  that would receive Jammin' Java stock was opened on September 28, 2010 at
18  Verdmont by the Panamanian law firm Gray, at the direction of Weaver.

19         (e)  **Rahela (Miller).**  On September 17, 2010, Rahela was created in
20  Panama with the assistance of Gray.  Miller was the sole beneficial owner of Rahela.
21  On September 28, 2010—the same day that the Timotei account was opened—Gray
22  opened an account for Rahela at Verdmont.

23         (f)  **Arcis (Weaver).**  On September 17, 2010, an account was opened
24  at CBH for Arcis, a Marshall Islands entity formed on August 20, 2009 by Knox.
25  Weaver was the sole beneficial owner of Arcis.  He authorized the opening of the
26  account in the name of Arcis.

27         (g)  **Torino (Sun).**  On October 1, 2010, an account was opened at
28  CBH in the name of Torino, a Nevis entity formed on January 22, 2010.  Through

another trust entity, Sun was the sole beneficial owner of Torino.  Sun authorized the account opening for Torino and transactions in the account.

(h)   **Petersham (Wheatley).**  On September 23, 2010, an account was opened for Petersham at Bateman.  Petersham, which had been formed in the British Virgin Islands on September 25, 2009, originally was owned and controlled by Weaver.  Prior to the Bateman account opening, Sun also exercised some control over Petersham.  Weaver then transferred control of Petersham to Wheatley.  In October 2010, immediately prior to Petersham's receipt of Jammin' Java stock in November 2010, both Weaver and Wheatley entered into fee sharing and trust agreements governing the ownership of Petersham and providing for the sharing of proceeds from the sale of stock by Petersham.

(i)   **Calgon (Weaver).**  On November 18, 2010, Berlinger formed Calgon in the Marshall Islands.  Within days, on November 24, 2010, Berlinger also opened the Calgon account that would receive Jammin' Java stock.  The Calgon account was opened at Bateman, the same brokerage firm that held an account for Petersham.  The Calgon account also was managed by the same account representative, Golding.  Berlinger formed Calgon and opened the accounts for Calgon at Weaver's direction.  Weaver was the sole beneficial owner of Calgon, and he directed the trading in the Calgon account.

74.   These accounts were opened at a small number of foreign private bank or brokerage firms located in Switzerland and Panama, on behalf of offshore entities formed on the Marshall Islands, Panama, Nevis, and the British Virgin Islands.  Defendants chose these jurisdictions to exploit their financial privacy protections and, in particular, for the ability to limit or restrict access to beneficial ownership records, communications with account advisors, and use of cash proceeds from the sale of stock.  Several accounts also were opened with common advisors and close-in-time to one another.  By spreading the shares among several entities, Defendants sought to avoid exceeding a 5% ownership threshold for any single entity—a threshold that

27

1   would have triggered SEC disclosure requirements.  Distributing the shares in this

2   manner required the coordination of the Defendants.

3          75.    By October 4, 2010, Weaver learned that the Jersey Financial Services

4   Commission had barred Sun from engaging in any financial services business without

5   prior commission approval.  The Jersey Financial Services Commission had publicly

6   announced the bar on March 1, 2010.  As a result, at the time of the Jammin' Java

7   scheme, Weaver understood that his business partner had been barred for his conduct

8   in the financial services industry and the necessity of concealing Sun's role in the

9   scheme.

10         76.    Figure 2 below summarizes information regarding the ownership,

11  formation, and account opening of the entities discussed above.

12  **Figure 2. Formation of Entities and Opening of Accounts in Late 2010**

13

| Entity | Benfecial Owner | Jurisdiction | Formation | Account Open | Broker or Bank |
|--------|-----------------|--------------|-----------|--------------|----------------|
| Las Colinas | Miller | Marshall Islands | Aug. 27, 2010 | Aug. 30, 2010 | VP Bank |
| Westpark | Sun | Marshall Islands | Aug. 27, 2010 | Aug. 30, 2010 | VP Bank |
| Renavial | Al-Barwani | Marshall Islands | Sept. 14, 2010 | Sept. 21, 2010 | VP Bank |
| Timotei | Weaver | Panama | Sept. 3, 2010 | Sept. 28, 2010 | Verdmont |
| Rahela | Miller | Panama | Sept. 17, 2010 | Sept. 28, 2010 | Verdmont |
| Arcis | Weaver | Marshall Islands | Aug. 20, 2009 | Sept. 17, 2010 | CBH |
| Torino | Sun | Nevis | Jan. 22, 2010 | Oct. 1, 2010 | CBH |
| Petersham | Wheatley | British VI | Sept. 25, 2009 | Sept. 23, 2010 | Bateman |
| Calgon | Weaver | Marshall Islands | Nov. 18, 2010 | Nov. 24, 2010 | Bateman |

20         77.    From August 2010 through at least May 2011, Berlinger played a critical

21  (but not exclusive) role in creating and managing several of the intermediary entities

22  that funneled Jammin' Java stock to the public.  Berlinger was retained as the sole

23  officer for Las Colinas, Westpark, Renavial, and Calgon and engaged in several

24  actions to implement the objectives of the beneficial owners.  He opened brokerage

25  accounts in the names of these entities over which he had formal dispositive power,

26  managing activity in the accounts.  Berlinger communicated and met with the account

27  owners and account representatives concerning share movements, sales of stock, and

28  the use of proceeds.  He also signed resolutions, exchanged correspondence, and

1   handled other aspects in connection with the transfer of shares involving these

2   entities.  In connection with this activity, Berlinger directed correspondence and

3   resolutions to Jammin' Java's transfer agent in the U.S.  In several instances, with the

4   approval of Weaver, Sun, Miller, and Al-Barwani, Berlinger also directed the

5   proceeds from the subsequent sale of Jammin' Java stock by these entities.

6   Berlinger's actions on behalf of the shell entities concealed the true beneficial owner

7   of the accounts and the coordination of the Defendants.

8       78.   After May 2011, in response to regulatory requests concerning the

9   involvement of Las Colinas, Westpark, Renavial, and Calgon in the sale of Jammin'

10   Java stock during 2011, Berlinger communicated or met with each respective

11   owner— Weaver, Miller, Sun, and Al-Barwani—to coordinate the response to those

12   requests.

13   ### Whittle Distributes the First Wave of Stock to Defendants' Network

14       79.   In November and December 2010, around the time that the Straight Path

15   Agreement was being negotiated, and before the fraudulent promotion designed to

16   increase Jammin' Java's share price began, Whittle transferred shares to several

17   offshore entities that were formed for, and owned and controlled by, Weaver, Sun,

18   Miller, Wheatley, and Berlinger.  By spreading the shares among several entities,

19   Defendants avoided exceeding a 5% ownership threshold for any single entity—a

20   threshold that would have triggered SEC disclosure requirements.

21       (a)   **Nemo to Petersham (Wheatley).**  On November 19, 2010,

22   Whittle's Nemo delivered 3.2 million shares to Wheatley's Petersham.  By this point

23   in time, Weaver, who originally formed and controlled Petersham, had formally

24   transferred control of Petersham to Wheatley to operate on Weaver's behalf.  On

25   behalf of their respective entities, Whittle and Wheatley signed the purported share

26   purchase agreement consummating the transaction, and Wheatley facilitated the

27   transaction by forwarding an executed purchase agreement to Weaver.  Weaver also

28   negotiated the transaction with Whittle and arranged the share transfer.  The purchase

agreement provided that the agreement was governed by Nevada state law and subjected any dispute to the exclusive jurisdiction of Nevada courts.

(b)     **Nemo to Rahela (Miller).**  Also on November 19, 2010, Whittle's Nemo transferred 1,560,000 shares to Miller's Rahela, which would sell these shares in the public market in February 2011.  Whittle approved the transfer of shares from Nemo to Rahela.  As described below, Rahela later would be involved in other acquisitions and sales of Jammin' Java stock, acquiring additional shares from Tyrone in February 2011 and acquiring and transferring GERC Nominees shares to Al-Barwani's Renavial in May 2011.

(c)     **Nemo to Torino (Sun).**  On December 13, 2010, Whittle's Nemo delivered 3,110,941 shares to Sun's Torino—the third transfer from Nemo to the Defendants in less than a month.  Whittle approved this transfer on behalf of Nemo.

(d)     **Luminus to Donnolis (Weaver).**  On November 22, 2010, Whittle's Luminus transferred 3,198,000 shares to Weaver's Donnolis.  From December 23, 2010 to December 31, 2010, Donnolis sold 299,683 of these shares, generating proceeds of $159,691.  As described below, these sales were associated with other transactions that significantly increased in the share price in late December 2010.  In March 2011, Donnolis would transfer the remaining shares to Westpark, a shell entity owned and controlled by Sun, which would sell them into the public market that same month.

(e)     **Monolosa to Cilitz (Sun).**  On November 24, 2010, Whittle's Monolosa transferred 2,036,100 shares to Sun's Cilitz.  On December 27, 2010, Monolosa transferred another 36,300 shares to Cilitz.  Whittle approved the transfers of stock on behalf of Monolosa.  (Monolosa received these 2,072,400 shares from Whittle's Tololo immediately following the coffee exposition on April 19, 2010.)  At the time of the transfer, Sun knew that Whittle controlled Monolosa; on behalf of Petersham—an entity later controlled by Weaver and Wheatley—Sun had entered into a share purchase agreement with Monolosa involving 3,400,000 shares of

another penny stock issuer on April 16, 2010—the same day as the SCAA conference.  Whittle signed the April 2010 purchase agreement on behalf of Monolosa.  In March 2011, with Sun's approval, Cilitz's shares were transferred to Weaver's Timotei, which would sell them into the public market between March and April 2011.

(f)     **Tyrone to Las Colinas (Miller).**  On November 16, 2010, Whittle instructed an account manager for Tyrone to transfer 3.2 million shares to Miller's Las Colinas.  On December 23, 2010, the day following execution of the Straight Path Agreement, Tyrone transferred 3.2 million shares to Las Colinas.  The "sale" from Tyrone to Las Colinas was documented through a share purchase agreement that was formalized on March 15, 2011.  Whittle executed the share purchase agreement on behalf of Tyrone.  With Miller's approval, Berlinger signed the purchase agreement on behalf of Las Colinas and facilitated the transfer of shares to the Las Colinas account.  The purchase agreement provided that the agreement was governed by Nevada state law and subjected any dispute to the exclusive jurisdiction of Nevada courts.  Shortly after this purchase agreement was entered, on March 25, 2011, Miller authorized or approved the transfer of $1 million from Miller's Las Colinas to Blue Leaf Capital Ltd. ("Blue Leaf"), an entity controlled by Weaver.

80.     Figure 3 summarizes the first wave of share transfers that occurred in late 2010.  The percentages are calculated based on the outstanding stock as of the date of the relevant transfer.

### Figure 3. First Wave of Transfers (Late 2010)

| Date | Source | Owner | Shares | Percentage | Recipient | Beneficial Owner |
|------|--------|-------|--------|------------|-----------|------------------|
| Nov. 19, 2010 | **Nemo** | Whittle | 3,200,000 | 3.2% | **Petersham** | Wheatley |
| Nov. 19, 2010 | **Nemo** | Whittle | 1,560,000 | 1.6% | **Rahela** | Miller |
| Dec. 13, 2010 | **Nemo** | Whittle | 3,110,941 | 4.1% | **Torino** | Sun |
| Nov. 23, 2010 | **Luminus** | Whittle | 3,198,000 | 3.2% | **Donnolis** | Weaver |
| Nov. 23, 2010 | **Monolosa** | Whittle | 2,036,100 | 2.1% | **Cilitz** | Sun |
| Dec. 23, 2010 | **Tyrone** | Whittle | 3,200,000 | 4.6% | **Las Colinas** | Miller |
| **Total** | | | **16,305,041** | **18.8%** | | |

81.     In total, approximately 16 million shares, amounting to 19% of Jammin' Java's outstanding stock, was transferred in late 2010 by Whittle's entities to offshore shell entities owned and controlled by Weaver, Sun, Miller, Wheatley, and Berlinger.

82.     By May 2011, each of the entities that received shares in late 2010 either sold all of their shares to the public or, in the case of Sun's Cilitz and Weaver's Donnolis, transferred them to another entity that would.   As described below, Donnolis also directly sold a portion of its shares in December 2010.

83.     No registration statement was filed in connection with any of these offers or sales, or the subsequent offers or sales to the public.

## **Coordinated Trading Activity**

84.     For most of 2009 and 2010, the trading activity in Jammin' Java's stock was almost nonexistent.  However, immediately following the execution of the Straight Path Agreement, various individuals and entities began coordinating purchases and sales of Jammin' Java stock at increasingly elevated prices.  Many of these individuals and entities had received large blocks of Jammin' Java shares from Whittle's entities and the GERC Nominees.

85.     For example, Weaver authorized Donnolis to sell 299,683 shares from December 23, 2010 to December 31, 2010 at an average price of $0.53, when the prevailing closing share price from July 28, 2010 to December 22, 2010 had been $0.17 per share (a 194% increase).  After placing these sales, Donnolis did not sell any Jammin' Java stock until March 3, 2011, when Weaver transferred its remaining stock to Sun's Westpark.

86.     Similarly, Weaver directed Wheatley to sell 15,000 shares from Petersham's account on December 23, 2010.  Wheatley asked that the shares be sold at $0.40 per share or higher, when the prior day's closing price was $0.17 per share.  The 15,000 shares were sold for $0.43 per share.  After this single sale, Petersham did not sell any Jammin' Java stock until February 11, 2011.

32

87.     Another account sold 100,000 shares on December 23, 2010 at a share price of $0.46 and another 9,350 on December 27, 2010 on at a share price of $0.50. That account also did not sell any additional shares until much later, in March 2011.

88.     A roughly equivalent number of shares was purchased by accounts held at Verdmont, the same brokerage firm used by Tyrone (Whittle), Timotei (Weaver), and Rahela (Miller).  Specifically, from December 23, 2010 to December 31, 2010, these Verdmont accounts purchased 341,950 shares at an average price of $0.52.

89.     The trades described above accounted for nearly all of the volume from December 21 to 31, 2010.

**Company Announcements**

90.     Jammin' Java's announcement of the Straight Path financing agreement and the coordinated trading in December 2010 were followed by a series of promotional efforts by Jammin' Java that were directed or coordinated by Whittle.

91.     In late 2010, Jammin' Java actively sought to retain an investor relations firm.  Many of the potential candidates were identified by an attorney who had been introduced to Jammin' Java by Whittle.  The attorney, who previously had been charged by the Commission for registration violations, served as Jammin' Java's outside securities counsel.  Jammin' Java retained the services of an investor relations firm in January 2011.

92.     From January to May 2011, Jammin' Java made a series of additional corporate announcements and took other steps to promote the company.  During this period, Jammin' Java issued several press releases concerning, among other things, distribution and sales relationships and the appointment of various officers and directors.  For example, on March 31, 2011, Jammin' Java issued a press release announcing that it was selling its coffee on a major retail website.  However, Jammin' Java had only a limited number of products and inventory available on the website, given its limited production and sales to that point in time.  Similarly, Jammin' Java

announced distribution agreements with large grocery chains.  In reality, sales under those agreements were limited, and prospects of future sales were uncertain.

93.     Whittle was involved in the drafting of press releases and discussions with the public relations consultant.

94.     By April 13, 2011, Jammin' Java's investor relations consultant had raised significant concerns to management about a stock promotion that was taking place.  The consultant forwarded management newsletters that they had identified and expressed reservations about continuing to work for Jammin' Java.  That same month, Whittle, Tran, and Marley discussed the increase in transfer requests in connection with the increase in stock activity more broadly.  Shortly thereafter, in late April and early May 2011, Jammin' Java's auditors questioned management about the stock promotion.

95.     Rather than investigate the concerns, at Whittle's urging, Jammin' Java encouraged the rapid ascent of its share price.  On April 29, 2011 Jammin' Java issued a press release announcing an investment report on MicroStockProfit.com that featured Jammin' Java.  On May 6, 2011, Jammin Java filed a report on Form 8-K stating that Straight Path had agreed to fund the remaining $2.38 million available under the previously disclosed agreement.

**Whittle and Others Distribute the Second Wave of Stock to Defendants**

96.     In the wake of Jammin' Java's announcement of the Straight Path financing agreement, Whittle began a second wave of distributions to the offshore network of intermediary entities owned and controlled by Weaver, Sun, Miller, Al-Barwani, Wheatley, and Berlinger.

97.     From February to May 2011, and primarily in March 2011, a massive amount of Jammin' Java stock was moved from the GERC Nominees to a small number of offshore entities.  Some of these transfers were purportedly received directly from the GERC Nominees, while other transfers came from entities that had previously received their shares from the GERC Nominees and Whittle's entities.

34

Defendants designed this complex distribution of stock to make the transactions more difficult to trace and to ensure that no one entity crossed the 5% ownership threshold for public SEC reporting.

        (a)    **Rahela (Miller).**  On February 22, 2011, after selling the 1,560,000 shares that had been acquired from Whittle's Nemo on November 23, 2010, Miller's Rahela acquired another 1,639,660 shares from Whittle's Tyrone. Whittle approved these transfers.  Later, on May 6, 2011, Rahela acquired 3,156,698 shares held in the name of GERC Nominees.  Rather than sell these shares, Rahela would transfer them to Renavial, an entity owned and controlled by Al-Barwani. Based on his ownership and control of Rahela, his role in comparable transactions by Las Colinas—an entity with a different officer—and the coordination described above, Miller approved the acquisition of these shares by Rahela.

        (b)    **Timotei (Weaver).**  On March 4, 2011, Weaver's Timotei acquired 1,033,052 shares of stock that had been held in the name of a GERC Nominee.  At the same time as this transfer to Timotei, 3 million other shares held by the same nominee were delivered to Renavial.  A letter to the transfer agent requesting these simultaneous transfers stated that the nominee's shares had been acquired by business partners.  The author of the letter asked that the certificates be split into two and sent to account managers for Timotei and Renavial.  Whittle directed the transfer of the GERC Nominee's shares to Timotei and Renavial, and Weaver approved the acquisition of shares on behalf of Timotei.  Days later, on March 8, 2011, Timotei acquired 2,072,400 shares from Sun's Cilitz.  On March 2, 2011, Sun received emails from Weaver regarding the transfer, and, on behalf of Cilitz, Sun authorized a share purchase agreement documenting the transfer from Timotei to Cilitz.  The purchase agreement provided that the agreement was governed by Nevada state law and subjected any dispute to the exclusive jurisdiction of Nevada courts.  The sum of these two transfers maintained Timotei's collective holdings just below the 5% threshold for SEC reporting.

(c)  **Prospera (Unknown).**  On February 28, 2011, Prospera received 2,668,930 shares that had been previously held in the name of GERC Nominees. Whittle directed the transfer of nominee stock.  Godfrey and Bandfield facilitated the clearance of these shares, the certificates for which were sent from an address in Kelowna, British Columbia, where Whittle resided.

(d)  **Arcis (Weaver).**  On March 8, 2011, Weaver's Arcis acquired 1,637,160 shares from Luminus, which was owned by Whittle.  Whittle directed the transfer of shares from Luminus to Arcis, and Weaver approved the acquisition of the shares by Arcis.  Upon receipt, Weaver immediately transferred 1,400,000 of these shares to Sun's Torino.  On March 17, 2011, Arcis received another 3,143,408 shares that had been held in the name of GERC Nominees.  Whittle directed the transfer of nominee stock.  Weaver had to transfer the 1,400,000 shares from Arcis to Torino because, before the transfer from the account, the sum of the two deposits— 1,637,160 shares from Luminus and 3,143,408 shares from the GERC Nominees— would have elevated Arcis's holdings to more than 5%, the SEC reporting threshold. The transfer of 1,400,000 shares from Arcis to Torino brought Arcis's holdings to 4.9%.  Weaver then approved the sale of the remaining 237,160 shares and the 3,143,408 shares by Arcis as described below.

(e)  **Torino (Sun).**  As described above, on March 21, 2011, Sun's Torino acquired 1,400,000 shares from Weaver's Arcis.  These shares were in addition to the 3,110,941 shares that Torino previously acquired from Whittle's Nemo in December 2010, nearly all of which had been sold by the time of the March 2011 transfer.  Based on his ownership and control of Torino, the operation of Swiss accounts, his role in comparable transactions (using entities with different officers), and the coordination described above, Sun approved the acquisition of these shares by Torino.

(f)  **Westpark (Sun).**  On March 4, 2011, Sun's Westpark acquired 2,898,317 shares from Donnolis.  The sale was documented by a purchase agreement

36

dated March 2, 2011.  Weaver, who controlled Donnolis at the time, approved the transfer of shares to Westpark.  Sun authorized Berlinger to sign the purchase agreement and acquire the shares for Westpark.  Before this purchase agreement was entered, Sun had been party to correspondence from Weaver to an account representative in late February 2011 and early March 2011 regarding activity in the Cilitz and Donnolis accounts.  One such email dated March 1, 2011 reflected Weaver's anticipated transfer of 2,898,317 shares from Donnolis.  The purchase agreement provided that the agreement was governed by Nevada state law and subjected any dispute to the exclusive jurisdiction of Nevada courts.  Subsequent to the transfer from Donnolis to Westpark, Westpark acquired another 43,000 shares on May 18, 2011 that had been held in the name of GERC Nominees.  After the shares were sent to VP Bank, Berlinger returned the Westpark certificate to the transfer agent for clearance.  Through this process, Berlinger represented in a form corporate resolution that he was the sole owner and officer of Westpark.  In reality, Sun was the sole beneficial owner of Westpark, and Berlinger's resolution was designed to conceal Sun's ownership.  The 43,000 shares, which were received following the collapse in Jammin' Java's share price discussed below, ultimately were not sold by Westpark.

(g)     **Renaival (Al-Barwani).**  On March 14, 2011, Al-Barwani's Renaival acquired 3 million shares nominally held in the name of a GERC Nominee.  Al-Barwani approved Renaival's acquisition of these shares.  As described above, in the discussion of Timotei's acquisition of shares in March 2011, these 3 million shares were acquired at the same time that Weaver's Timotei acquired 1,033,052 shares from the same GERC Nominee.  The letter to the transfer agent requesting the share from the GERC Nominee to Renaival and Timotei represented that the shares had been acquired by two business partners.  Also, as described above in the discussion of Rahela's acquisition of shares in March 2011, Renaival acquired another 3,156,698 shares from Miller's Rahela on May 6, 2011.  Al-Barwani

approved the acquisition of Rahela's shares.  Based on his ownership and control of Rahela, his role in comparable transactions, and the coordination described above, Miller approved the transfer of these shares by Rahela to Renavial.

(h)   **Manitou (Weaver).**  On March 8, 2011, Manitou acquired 2,751,964 shares that had been held in the name of two GERC Nominees.  Whittle directed the transfer of the GERC Nominee shares to Manitou.  The letter asked that the shares be sent to Manitou's account advisor in Switzerland.

(i)   **Calgon (Weaver).**  On March 31, 2011, Weaver's Calgon acquired 3,361,371 shares that had been held in the name of several GERC Nominees.  The share certificates were shipped to Jammin' Java's transfer agent from Vancouver, British Columbia.  Whittle directed the transfer of stock from the GERC Nominees, and Weaver approved Calgon's acquisition of the stock.  On behalf of Calgon and Weaver, Berlinger signed a corporate resolution authorizing the transfer of shares into Calgon's name and account.

(j)   **Petersham (Wheatley).**  Following the sale of 15,000 shares in December 2010, Petersham sold the remaining 3.2 million shares that it had acquired from Nemo in November 2010.  Approximately two months after these sales were complete, on May 5, 2011, Petersham acquired another 3,321,336 shares that were held in the name of several GERC Nominees.  Whittle directed the transfer of nominee stock to Petersham, and Weaver and Wheatley approved the acquisition of shares.  Wheatley also signed a stock power and a corporate resolution facilitating the clearance of the 3,321,336 shares for sale by Petersham.

98.   Figure 4 summarizes the second wave of share transfers that occurred in early 2011.  The percentages are calculated based on the outstanding stock as of the date of the relevant transfer.

**Figure 4. Second Wave of Transfers (Early 2011)**

| Date | Source | Shares | Percentage | Recipient | Beneficial Owner |
|------|--------|--------|------------|-----------|------------------|
| Feb. 22, 2011 | **Tyrone (Whittle)** | 1,639,660 | 2.4% | **Rahela** | Miller |
| Feb. 28, 2011 | **GERC Nominees** | 2,668,930 | 3.9% | **Prospera** | Unknown |
| Mar. 1, 2011 | **GERC Nominees** | 1,033,052 | 1.5% | **Timotei** | Weaver |
| Mar. 2, 2011 | **Donnolis (Weaver)** | 2,898,317 | 4.2% | **Westpark** | Sun |
| Mar. 8, 2011 | **GERC Nominees** | 2,751,964 | 4.0% | **Manitou** | Weaver |
| Mar. 8, 2011 | **Cilitz (Sun)** | 2,072,400 | 3.0% | **Timotei** | Weaver |
| Mar. 9, 2011 | **Luminus (Whittle)** | 237,160 | 0.3% | **Arcis** | Weaver |
| Mar. 9, 2011 | **Arcis (Weaver)** | 1,400,000 | 2.0% | **Torino** | Sun |
| Mar. 14, 2011 | **GERC Nominees** | 3,000,000 | 4.3% | **Renaival** | Al-Barwani |
| Mar. 14, 2011 | **GERC Nominees** | 3,361,371 | 4.9% | **Calgon** | Weaver |
| Mar. 14, 2011 | **GERC Nominees** | 3,143,408 | 4.5% | **Arcis** | Weaver |
| Apr. 4, 2011 | **GERC Nominees** | 3,321,336 | 4.8% | **Las Colinas** | Miller |
| May 5, 2011 | **GERC Nominees** | 3,321,336 | 4.5% | **Petersham** | Wheatley |
| May 6, 2011 | **Rahela (Miller)** | 3,156,698 | 4.6% | **Renaival** | Al-Barwani |
| **Total** | | **34,005,632** | **49%** | | |

99.    In total, approximately 34 million shares were transferred during this second wave, amounting to almost *half* of Jammin' Java's total outstanding stock. Again, no one entity received more than 5% of Jammin' Java's outstanding shares—a threshold that would have triggered SEC disclosure requirements.

100.    These transfers were part of Defendants' pump-and-dump scheme.  As described above, many of these entities were formed in the same jurisdiction on dates that were close in time, and shared common officers, directors, owners, and managers.  For example, both Sun's Westpark and Miller's Las Colinas were formed in the Marshall Islands on the same day.  Defendants formed or opened accounts in the Marshall Islands, Panama, and Switzerland to exploit the financial privacy protections provided in these offshore jurisdictions.  These entities later sold shares close in time to one another, and the sources of those shares overlapped with the selling entities and each other.  These sales were timed to take advantage of the artificial and rapid increase in Jammin' Java's share price.  In addition, several of the share transfers were made to entities that previously had received large blocks of shares from Whittle's entities.

101.   The entities that received stock were controlled by Weaver, Sun, Wheatley, Miller, Al-Barwani, and Berlinger.  Based on their substantial control of Jammin' Java stock and coordinated actions, Weaver, Sun, Wheatley, Miller, Al-Barwani, and Berlinger individually or collectively were control persons or a control group and, consequently, affiliates of Jammin' Java.

102.   Although several of these entities purportedly received their shares from the GERC Nominees, the transactions were, in reality, arranged by Whittle or other individuals working with him.  Among other things:

(a)   Physical certificates for the initial share issuances and subsequent stock splits were mailed not to the GERC Nominees, but to associates of Whittle.

(b)   Several GERC Nominees purportedly sold or transferred shares to multiple, supposedly unrelated offshore entities.  For example, one GERC Nominee transferred his shares to Miller's Las Colinas, Al-Barwani's Renavial, and Weaver's Timotei.  Another GERC Nominee transferred his shares to Weaver's Calgon, Weaver's Manitou, and Sun's Westpark.

(c)   Many of the shares acquired from the GERC Nominees were deposited in and sold from accounts maintained at common broker-dealers or banks, and managed by common advisors.

(d)   There was no actual interaction between the GERC Nominees and other individuals or entities that purportedly purchased shares from them.  For example, Wheatley never communicated with the three GERC Nominees who supposedly sold their shares to Petersham.

(e)   In connection with each of these subsequent transfers, the GERC Nominees never communicated personally with the transfer agent, endorsed the stock certificates, or signed a power of attorney.  Instead, Berlinger and the other individuals who acquired the shares sent the shares to the transfer agent without the involvement of the GERC Nominees.  Moreover, many of the shares were sent from identical or related return addresses, several of which were connected to the

40

Defendants.   For example, a letter from Berlinger to the transfer agent dated March 17, 2011 regarding the transfer of shares into the name of Las Colinas originated from St. Saviour, Jersey.   A letter dated January 14, 2011 asking for the transfer of shares into the name of Renavial originated from the same address. Several letters were sent from individuals who misspelled the names of entities that they purportedly owned—or their own names—and who provided questionable business and contact information.

(f)   In a few instances, the offshore entities who acquired the shares from the GERC Nominees submitted to the transfer agent purported share purchase agreements that had incomplete, vague, and questionable terms.  For example, the March 2, 2011 share purchase agreement purporting to document purchase of 2,898,317 shares by Sun's Westpark from Weaver's Donnolis called for the payment of $1,159,327 to be paid "at a future date as determined by the parties."  (Westpark did not make this payment to Donnolis until September 23, 2011, using the proceeds from the sale of the stock to do so.)  Westpark's implied price per share was $0.40 on a day that the market price for Jammin' Java's shares was approximately $0.93.  As another example, share purchase agreements purporting to document purchases by Miller's Las Colinas were undated.  Another Las Colinas share purchase agreement was dated, but reflected that 3.2 million shares had been purchased at a share price of $0.001, even though the shares closed at $0.96 that day.  Multiple share purchase agreements followed nearly identical forms.

103.   Given the lack of endorsement or other evidence of a legitimate transfer from the GERC Nominees, the Company's transfer agent required indemnification from Jammin' Java prior to transferring shares.  As a result, for multiple transfers from February to April 2011, management submitted on behalf of Jammin' Java a board resolution acknowledging the share transfer and indemnifying the transfer agent.  The resolutions identified each transfer and represented that the indemnification had been approved at a board meeting.

41

**Defendants' Concealment of Beneficial Ownership**

***False Disclosures by Whittle***

104.   To conceal his ownership position and to further the pump-and-dump scheme, Whittle made material misstatements and misleading omissions in public beneficial ownership reports that he filed with the Commission.

105.   Through a Schedule 13D filed on November 23, 2010 and an amended Schedule 13D filed on January 13, 2011, Whittle disclosed his ownership or beneficial control of Jammin' Java stock held directly in his name and through SJ Investments.  However, Whittle did not disclose that, from April 2008 through November 2010, he beneficially owned or controlled at least another 17% of Jammin' Java through Tololo, Nemo, Tyrone, and Luminus, the offshore entities that originally acquired stock in 2008, and Monolosa, which received shares from Tyrone in April 2010.  He also did not disclose the various changes in his position that occurred in late 2010, as he transferred shares to other offshore entities as part of the first wave of transfers.  Further, as described below, from at least April 2010 through May 2011, Whittle participated in a group that collectively consolidated and controlled nearly all of Jammin' Java's outstanding shares, as evidenced by, among other things, the coordinated acquisitions and dispositions of the stock and the consolidation of shares in common accounts or at the same institutions.

106.   In addition, Whittle misleadingly omitted the purpose of his acquisition of Jammin' Java stock, falsely stating that he had "acquired the securities for investment purposes" and other generic disclosures.  In reality, he had acquired securities for the purpose of gaining and exercising control, and to conduct an illegal offering and pump-and-dump scheme.

107.   Whittle also misleadingly omitted from his Schedules 13D a required description of any contracts, loans, arrangements, understandings, or relationships that he had with respect to any securities of Jammin' Java, including his contracts, arrangements, understandings, and relationships with Weaver, Sun, Miller, Wheatley,

Berlinger, their shell companies, and others involved in the scheme.  In the portion of the form calling for the holder to identify such contracts, arrangements, understanding, or relationships, Whittle falsely disclosed "none."  Finally, he failed to disclose material changes in the facts set forth in the Schedule 13D.

108.   The omitted holdings, as well as the extent of Whittle's control, were material.  This information would have been material to a reasonable investor, particularly given that public news articles previously had identified Whittle's role in other pump-and-dump schemes.  Whittle's omissions of the purpose of his acquisitions and his arrangements with others involved in the scheme also would have been significant to a reasonable investor.

109.   Whittle also acted with scienter.  He knew, or recklessly disregarded, that he beneficially owned more Jammin' Java stock than he reported.  Moreover, Whittle structured several of the transfers just below 5% to avoid SEC reporting obligations.  For example, on December 23, 2010, the day following execution of the Straight Path Agreement, Whittle signed a purchase agreement "selling" 3.2 million shares to Miller's Las Colinas, which amounted to approximately 4.6% of Jammin' Java's outstanding stock.  Three months later, after Las Colinas sold these shares, it received another 4.8% of Jammin' Java's stock.  Whittle also took other steps to conceal his ownership and control of Jammin' Java stock.  Thus, Whittle understood that staying below the 5% threshold, and the concealment of his true ownership and intentions, was important to the success of the scheme.

### *Failure to Report Beneficial Ownership*

110.   In a transparent effort to evade SEC regulators and public scrutiny, the transfers in the first and second waves described above were just below 5%.  Relatedly, as described above, the Defendants sold—permitting them to "reload" their stock inventory—or moved shares to and from each other to avoid exceeding the 5% threshold.

111.    The transfer of shares in this manner was designed to conceal beneficial ownership of certain individuals or the control group and to avoid the disclosures triggered by such ownership.

112.    Whittle, Weaver, Sun, Miller, and Berlinger failed to report their beneficial ownership of Jammin' Java stock, or changes in that position, as well as other information required under the federal securities laws.

(a)    **Whittle.**  When the holdings of his offshore entities (Tololo, Monolosa, Nemo, Tyrone, and Luminus) are combined with the stock held in his name, Whittle held 22% of Jammin' Java's outstanding stock from late 2007 through April 30, 2008; 26% of Jammin' Java's outstanding stock through February 28, 2010; 29% of Jammin' Java's outstanding stock through October 1, 2010; 16% of Jammin' Java's stock through November 23, 2010; and 8% through January 13, 2011.  Whittle also controlled stock nominally held by the GERC Nominees.  As described above, Whittle filed a Schedule 13D on November 23, 2010 and an amended Schedule 13D on January 13, 2011.  Although he disclosed certain holdings, Whittle failed to disclose the totality of stock beneficially held by him.  Specifically, Whittle failed to disclose holdings through offshore entities controlled by him and his control of the stock nominally held by the GERC Nominees, as well as changes in those holdings.  Whittle also misrepresented or failed to disclose other information required to be filed in connection with these reports, such as the purpose of the acquisitions and the relationships or arrangements with others.  Similarly, through Forms 3 and 4 filed with the Commission on May 7, 2008, November 23, 2010, and January 13, 2011, Whittle disclosed only the stock held directly in his name and through SJ Investments, as well as the disposition of that stock in October and December 2010.  However, he failed to disclose his other holdings through offshore entities and changes in these holdings.  Whittle also failed to disclose his control of the stock nominally held by the GERC Nominees and changes in those holdings.

(b)   **Weaver.**  Weaver controlled, and was the sole beneficial owner of, Donnolis, Calgon, Arcis, Timotei, and Manitou.  He also shared control of Petersham through his agreements with Wheatley.  On nearly every day from November 23, 2010 through May 11, 2011, the collective holdings of these entities exceeded 5%.  From March 14, 2011 to the end of April 2011, Weaver's holdings exceeded 10%.  In fact, for a period of time in April 2011, Weaver's holdings rivaled those of Rohan Marley.  Given these holdings, Weaver was required to, but did not, file beneficial ownership reports with the Commission disclosing this ownership position, or material changes in the ownership, and other required information.

(c)   **Sun.**  Sun controlled, and was the sole beneficial owner of, Cilitz, Torino, and Westpark.  With the exception of one day during the time period December 13, 2010 through March 8, 2011, the collective holdings of these entities exceeded 5%.  Given these holdings, Sun was required to, but did not, file beneficial ownership reports with the Commission disclosing this ownership position, or material changes in the ownership, and other required information.

(d)   **Miller.**  Miller controlled, and was the sole beneficial owner of, Rahela and Las Colinas.  With some intermittent exceptions in the time period, the collective holdings of these entities exceeded 5% from December 23, 2010 through April 12, 2011.  Given these holdings, Miller was required to, but did not, file beneficial ownership reports with the Commission disclosing this ownership position, or material changes in the ownership, and other required information.

(e)   **Berlinger.**  From December 2010 to March 2011, Las Colinas, Westpark, and Renavial acquired tranches of shares that, collectively, acquired more than 15 million shares, or over 22% of Jammin' Java's outstanding stock.  As described above, through his formal authority over the account, Berlinger shared control of the holdings of these entities.  Even though the shares controlled by these entities were acquired or disposed at different times, collectively these entities held

45

more than 5% from March to April 2011.  However, Berlinger never filed a Schedule 13D disclosing his beneficial ownership of the shares.

113.   Further, Whittle, Weaver, Sun, Berlinger, Wheatley, Al-Barwani, and Miller acted as part of a group with others that collectively controlled over 5% of Jammin' Java's stock through the share acquisitions and transfers from late 2010 through May 2011.  As members of a control group, Whittle, Weaver, Sun, Miller, Wheatley, Al-Barwani, and Berlinger were required to, but did not, file beneficial ownership reports with the Commission disclosing this ownership position, or material changes in their ownership, and other required information.

114.   Facts reflecting coordinated group activity include the following:

(a)   Whittle, Weaver, Sun, Wheatley, Miller, Al-Barwani, and Berlinger, coordinated with each other regarding transfers and trading between these entities, which were formed and managed in a similar way, and moved money between the different accounts held by them.

(b)   In these circumstances, the timing and source of transfers and the timing and nature of the sales provides reflects the collusion among the Defendants. Eight entities that dumped large quantities of shares during the promotion each received two blocks of shares within a period of months: Wheatley's Petersham acquired shares from Whittle's Nemo and GERC Nominees; Miller's Rahela acquired shares from Whittle's Nemo and Tyrone; Miller's Las Colinas acquired shares from Whittle's Tyrone and GERC Nominees; Sun's Torino acquired shares from Whittle's Nemo and Weaver's Arcis; Sun's Westpark acquired shares from Weaver's Donnolis and GERC Nominees; Weaver's Arcis acquired shares from Whittle's Luminus and GERC Nominees; Weaver's Timotei acquired shares from Sun's Cilitz and GERC Nominees; and Al-Barwani's Renavial acquired shares from GERC Nominees and Miller's Rahela.  The remaining three entities that sold large blocks of stock (Prospera, Calgon, and Manitou) all acquired their shares from GERC Nominees.  All eleven entities that dumped shares did so within weeks or months of each other.  All

of the entities sold all of the shares that they acquired during that time period, and none of these eleven entities purchased shares in the open market.

(c)     Relatedly, entities involved in the illegal distribution received their shares from common sources.  For example, within weeks, Whittle's Nemo transferred shares to three different shell entities controlled by Weaver and Wheatley (Petersham), Miller (Rahela), and Weaver (Arcis), the latter of which would immediately transfer a substantial portion of those shares to Sun's Torino.  Around this same time, Whittle's Tyrone transferred shares to Rahela (Miller) and Las Colinas (Miller).

(d)     Other interactions provide examples of close collaboration between Defendants.  For instance:

i.     **Weaver and Sun.**  On the same day in November 2010, Weaver's Donnolis and Sun's Cilitz each received a substantial block of shares from two entities controlled by Whittle.  Both Donnolis and Cilitz were opened with a month of each other, shared nominal officers and directors, were formed by the same law firm, lacked any true business apart from the transfer and sale of stock, maintained accounts at the same broker, and were represented by the same account manager.  Moreover, Weaver and Sun communicated with each other about the account, including the movement or sale of Jammin' Java stock.  Then, in March 2011, each of these entities forwarded substantially the same number of shares within days to each other's entities: Weaver's Donnolis transferred shares to Sun's Westpark while Sun's Cilitz transferred shares to Weaver's Timotei.

ii.     **Weaver and Sun.**  As described above, when Weaver's Arcis entity obtained shares that exceeded 5% within that account, Weaver transferred a sufficient number of shares to Sun's Torino entity to bring Arcis's holdings below 5%.  Both Arcis and Torino maintained accounts at the same brokerage firm, which were opened within weeks of each other and managed by the same account advisor.  Arcis and Torino also shared nominal officers and directors.

Before and after the transfer of the 1,400,000 shares from Arcis to Torino, Sun's Torino transferred a total of $1.4 million to Arcis.

        iii.      **Miller, Sun, Al-Barwani, and Berlinger.**  Three entities— Miller's Las Colinas, Sun's Westpark, and Al-Barwani's Renavial—were formed and opened accounts at the same brokerage firm within weeks of each of each other. Berlinger served as the officer and director of all three entities.  Around this same time, Berlinger established a fourth entity at Weaver's direction, Calgon.  All three entities transferred a portion of trading proceeds to entities controlled by Weaver. Similarly, other entities were grouped within the same foreign brokerage firms or banks and managed by common advisors.

        iv.      **Miller, Weaver, and Berlinger.**  Miller's Las Colinas and Rahela entities collectively acquired four blocks of shares within months.  As described below, Miller then worked with Weaver and Berlinger to form an entity that would receive trading proceeds from Las Colinas to be forwarded to Jammin' Java under the guise of the Straight Path Agreement.  Las Colinas also paid fees associated with fourteen offshore entities formed or controlled by Weaver and Berlinger, including Straight Path.

        v.      **Miller and Weaver.**  Rahela was formed within weeks of Weaver's Timotei entity, by the same Panamanian law firm, and then opened accounts on the same day at the same Panamanian brokerage firm.  Weaver was given some authority to trade in both of the Rahela and Timotei accounts.  Miller's Rahela entity also forwarded a large block of shares to Al-Barwani's Renavial entity.

        vi.      **Weaver, Sun, Al-Barwani, and Miller.**  Weaver and Sun coordinated the formation of Al-Barwani's Renavial and the opening of accounts in its name.  As part of this effort, and to coordinate efforts with respect to the receipt and sale of Jammin' Java stock, Weaver and Sun organized meetings with Al-Barwani and others in Switzerland in October 2010 regarding Jammin' Java and its stock.  Following the account opening, Al-Barwani's Renavial entity acquired

1   shares from GERC Nominees—as part of a simultaneous transfer to Weaver's

2   Timotei—and then from Miller's Rahela entity.

3           vii.        **Wheatley and Weaver.**  Wheatley and Weaver operated

4   Petersham pursuant to joint agreements regarding the control and operation of

5   Petersham.  Further, Petersham's account was maintained at the same firm as

6   Calgon's account, and managed by the same account advisor.  Wheatley's permitted

7   Weaver trading authority over the Petersham account.

8           (e)     Nearly all of the account activity in every one of the selling

9   entities' accounts from late 2010 to May 2011 involved the sale of Jammin' Java

10  stock.  However, during this same time period, four entities handled the same stock

11  (Lucky Boy)—Weaver's Timotei, Miller's Rahela, Sun's Torino, and Wheatley's

12  Petersham.  The handling of this single stock by these entities, particularly in the

13  absence of any other stock activity, further reflects coordination between the

14  Defendants.  Similarly, in 2011 and 2012, Northumberland stock was handled by

15  accounts for Donnolis, Timotei, and Manitou (all Weaver) and Las Colinas (Miller).

**Fraudulent Newsletters and Other Promotion**

17  115.   As early as November 2009 and January 2010, Whittle consulted the

18  Hunters about a potential promotion of Jammin' Java.

19  116.   As early as November 2010, the Hunters drafted, approved, and sent

20  emails using false identities encouraging the purchase of Jammin' Java stock.  The

21  Hunters began distributing these emails in November 2010, at the same time that

22  various stock transfers occurred, and continued through May 2011.  The publication

23  of emails coincided with an increase in Jammin' Java's share price and with various

24  stock transfers or sales.

25  117.   In early 2011, the Hunters began to prepare and distribute various stock

26  newsletters touting Jammin' Java's stock.

27  118.   From March 2011 to May 2011, the Hunters used two websites that they

28  controlled, www.hackthestockmarket.com and www.thelautnerletter.com, to publish

information regarding Jammin' Java stock, sent repeated blast emails, and made numerous posts on investor message boards.  To conceal their identity, the Hunters used the false names Marc Lautner and John Bell and fictitious business and email addresses.

119.   In addition, the Hunters posted the newsletters on Yahoo Finance to generate interest in Jammin' Java stock.

120.   The newsletters and postings were broadly distributed.

121.   The Hunters authorized and controlled these promotional efforts.

122.   In addition to the misrepresentations about their own identities—at a time that the Hunters knew that they were being investigated for securities fraud—the newsletters and posts distributed to the public from March to May 2011:

(a)   stated that Jammin' Java farmed its own blue mountain coffee beans, when, in reality, Jammin' Java did not grow its own beans or offer blue mountain beans, beyond small amounts used for tasting profiles;

(b)   claimed that Rohan Marley founded Jammin' Java and was involved in its day-to-day operations when, in reality, he did not become involved in the company until a few years after it was founded and, at the time the newsletters were disseminated, only participated in company operations at a high level;

(c)   asserted that Jammin' Java was engaged in a "rollout of Jammin' Java coffee across North America" that would lead to sales and an "initial explosion in revenue" when, in reality, Jammin' Java was not engaged in a wide-scale rollout and the distribution agreements did not guarantee that sales would be made;

(d)   used company images and likenesses that provided the false impression that Jammin' Java authorized the Hunters' reports and implied that the product was endorsed by entertainer Jay Leno;

(e)   asserted that "Jammin' Java is no longer a development stage company" when the Company's SEC filings stated the opposite;

50

(f)     represented that the Company could "legally use the [Marley] name at no cost"; and

(g)     predicted a share price of $10.00 when the Hunters had no reasonable basis for such a prediction.

123.   These statements were material.  In making an investment decision, a reasonable investor would have found these representations important because Jammin' Java's value was connected in significant part to its branding efforts and its connections to the Marley name.  The representations provided the illusion that Marley Coffee already was an operating business, when it fact it was not.  The true costs of Jammin' Java's license to use the Marley brand name also would have been significant to a reasonable investor.  The $10.00 share price prediction appeared to reflect an actual analysis of the Company when, in reality, there was no basis for the price prediction.  In addition, a reasonable investor would have found it important that the purported recommendations were being issued by promoters operating under fake names—apparently to conceal involvement with other pump-and-dump activity or to facilitate the Hunters' ability to conduct other pump-and-dump schemes.

124.   The newsletters also misrepresented the source, nature, and amount of their compensation.  The newsletters represented that a purported third-party shareholder, Centurion Ventures, had paid for the marketing campaign when, in reality, there was no shareholder by that name.  Moreover, the Hunters had been engaged by Whittle or others working with him to promote Jammin' Java stock in connection with a pump-and-dump scheme.  Investors would have considered this fact important to their investment decision.

125.   At the time the newsletters and posts were published, the Hunters knew or recklessly disregarded that the representations were false.  The Hunters issued these statements in connection with a promotional campaign designed to inflate the price of Jammin' Java's stock artificially so that participants in the scheme could dump shares following the price increase.

51

126.    At the time of the newsletters, the Hunters also knew that they had been charged in the UK and were being investigated by the SEC for their involvement in separate penny stock schemes.  In July 2010, the Crown Prosecution Services charged the Hunters with conspiracy and violation of Section 2 of the United Kingdom Fraud Act (fraud by false representation), as well as with regulatory offenses under the United Kingdom Financial Services and Markets Act.  Subsequently, in November 2011, Alexander Hunter pled guilty to carrying out regulated activity when not authorized to do so by the Financial Services and Markets Act.  The UK charges were dropped against Thomas Hunter.  On April 12, 2012, the SEC charged the Hunters with defrauding investors through an internet-based pump-and-dump scheme in which they touted a fake "stock picking robot" that purportedly identified penny stocks set to double in price.  Instead, the brothers were merely touting stock that they were being paid separately to promote.  Without admitting or denying the allegations, the Hunters settled the action on March 12, 2013, consenting to an order permanently enjoining them from future violations of the antifraud provisions of the federal securities laws and imposing a $100,000 penalty on Alexander Hunter and a $75,000 penalty on Thomas Hunter.

### Stock Price Movement

127.    The plan to pump the price of Jammin' Java stock worked as intended. The announcement of the Straight Path Agreement, the coordinated trading activity, the company announcements, and the misleading touting activity led to a dramatic increase in Jammin' Java's share price and volume from December 2010 to May 2011.

128.    In December 2010, Jammin' Java common stock was trading at $0.17 per share.  Over the next six months, Jammin' Java's share price rose to an intraday high of $6.35 on May 12, 2011.  During this same time period, Jammin' Java's trading volume rose from no shares during most of December 2010 and

January 2011 to 20 million shares on May 12, 2011, the peak of the promotion, when Jammin' Java shares traded between $4.15 and $6.35.

129.  The promotion and movement in the share price, as well as multiple significant steps in the distribution of stock through the offshore network, occurred between Jammin' Java's public filing of its Form 10-Q with the Commission on December 20, 2010 and the public filing of its Form 10-K on May 17, 2011.  As described below, in the Form 10-K, Jammin' Java disclosed multiple negative facts about its business prospects and financial condition.

## **Dumping of Shares on the Public Market**

130.  During this period of heightened price and volume activity, multiple Defendants generated approximately $78 million in trading profits by selling shares of Jammin' Java received from Whittle or others working with him less than six months earlier.  During a six-month period, these entities, and the individuals who owned and controlled them—Weaver, Sun, Miller, Al-Barwani, and Wheatley—sold over 45 million shares.  In the aggregate, the shares that were sold amounted to approximately two thirds of Jammin' Java's outstanding stock and nearly its entire public float.  Figure 5 summarizes these sales.  The percentages are calculated based on the outstanding stock as of the date of the relevant transfer.

**Figure 5. Sales of Jammin' Java Stock by Weaver,
Sun, Miller, Al-Barwani, and Wheatley (2011)**

| Beneficial Owner | Entity | Date Acquired | Shares Acquired | Date of Sales | Trading Profits |
|---|---|---|---|---|---|
| **Weaver** | Arcis | Mar. 9, 2011<br>Mar. 14, 2011 | 237,160 (0.3%)<br>3,143,408 (4.5%) | Mar. 18, 2011-Mar. 23, 2011<br>Apr. 15, 2011-May 3, 2011 | $292,211<br>$6,014,713 |
| | Timotei | Mar. 4, 2011<br>Mar. 8, 2011 | 1,033,052 (1.5%)<br>2,072,400 (3.0%) | Mar. 9, 2011-Apr. 27, 2011 | $4,686,332 |
| | Calgon | Mar. 31, 2011 | 3,361,371 (4.9%) | Mar. 29, 2011-Apr. 25, 2011 | $5,807,227 |
| | Manitou | Apr. 4, 2011 | 2,751,964 (4.0%) | Apr. 29, 2011-May 3, 2011 | $5,855,175 |
| **Sun** | Torino | Dec. 13, 2010<br>Mar. 21, 2011 | 3,110,941 (4.5%)<br>1,400,000 (2.0%) | Jan. 17, 2011- Mar. 30, 2011 | $4,594,843 |
| | Westpark | Mar. 4, 2011 | 2,898,317 (4.2%) | Mar. 10, 2011- Mar. 31, 2011 | $3,610,071 |
| **Miller** | Rahela | Nov. 23, 2010<br>Feb. 22, 2011 | 1,560,000 (2.3%)<br>1,639,660 (2.4%) | Feb. 3, 2011-Feb. 18, 2011<br>Feb. 23, 2011-Mar. 2, 2011 | $1,169,622<br>$1,471,171 |
| | Las Colinas | Dec. 23, 2010<br>Apr. 4, 2011 | 3,200,000 (4.6%)<br>3,321,336 (4.8%) | Feb. 8, 2011-Mar. 10, 2011<br>Apr. 7, 2011-Apr. 15, 2011 | $3,040,600<br>$5,999,468 |
| **Al-Barwani** | Renavial | Mar. 14, 2011<br>May 6, 2011 | 3,000,000 (4.3%)<br>3,156,698 (4.6%) | Mar. 31, 2011-Apr. 7, 2011<br>May 6, 2011- May 12, 2011 | $4,918,520<br>$10,259,614 |
| **Wheatley** | Petersham | Nov. 18, 2010<br>Apr. 20, 2011 | 3,200,000 (4.6%)<br>3,321,336 (4.8%) | Feb. 11, 2011-Mar. 3, 2011<br>May 2, 2011-May 11, 2011 | $2,613,280<br>$10,889,240 |
| **Unknown** | Prospera | Feb. 28, 2011 | 2,668,930 (3.9%) | May 3, 2011-May 10, 2011 | $6,275,677 |
| **Total** | | | **45,076,753 (65.2%)** | | **$77,712,700** |

131.   Several of the Defendants authorized or approved the offer and sale of stock identified in Figure 5.

(a)   Weaver authorized or approved the acquisition and sale of Jammin' Java stock by Arcis, Timotei, Calgon, and Manitou summarized in Figure 5. Weaver also authorized the sale of 299,683 shares by Donnolis in December 2010 and the transfer of 2,898,317 shares from Donnolis to Westpark that were sold by Westpark in March 2011.

(b)   Sun authorized or approved the acquisition and sale of Jammin' Java stock by Westpark and, based on his ownership and control of the entity, Torino summarized in Figure 5.  Sun also authorized the transfer of 2,072,400 shares from Cilitz to Timotei that were sold by Timotei in March and April 2011.

(c)   Coordinating with Weaver, Wheatley authorized or approved the acquisition and sale of Jammin' Java stock by Petersham summarized in Figure 5.

(d)   Miller authorized or approved the acquisition and sale of Jammin'

54

Java stock by Las Colinas and, based on his control over the entity, Rahela summarized in Figure 5.  Based on his control over Rahela, Miller also authorized the transfer of 3,156,698 shares from Rahela to Renavial that were sold in May 2011.

       (e)     Al-Barwani authorized or approved the acquisition and sale of Jammin' Java stock by Renavial summarized in Figure 5.

       (f)     As described in more detail above, Berlinger facilitated the acquisition and sale of stock by Las Colinas, Renavial, Westpark, and Calgon summarized in Figure 5.  Without Berlinger's actions and assistance, those transfers and sales would not have taken place.  However, the sale of stock by entities not managed by Berlinger reflects that he was not exclusively responsible for all sales in Figure 5.

132.   In addition, each of the entities identified in Figure 5, as well as Cilitz and Donnolis, above served as the corporate alter ego for its beneficial owner.

       (a)     As described in more detail above, there was a near-complete unity of financial interest and ownership between those offshore entities and their respective beneficial owners—Weaver, Sun, Miller, Al-Barwani, and Wheatley.  Among other things:

         i.     For each entity, the respective beneficial owner had sole ownership and ultimate control over the transactions of the entity and the entity's transactions were conducted according to the beneficial owner's wishes.

         ii.     Each entity had no employees and no operations other than trading stock for the benefit of its beneficial owner and his co-Defendants.

         iii.     Each entity was formed and operated to obscure the beneficial owner's control of his respective entity.

         iv.     Weaver, Sun, Miller, Al-Barwani, and Wheatley owned entities with various nominee officers.  The common denominator amongst these collaborating entities was not any particular nominee officer.  The common denominator was the beneficial owner.

55

1         v.     The formation and operation of each entity reflects an intent

2    by the respective beneficial owner to conceal participation in the pump-and-dump

3    scheme.  Many of the entities were formed between August and November 2010, just

4    before Whittle's first distribution of Jammin Java stock in November and

5    December 2010, and just before the December 2010 consummation of the sham

6    Straight Path Agreement.  In addition, each entity collaborated with Whittle, and

7    several with each other, to ensure that its ownership of Jammin Java stock did not

8    exceed the 5% ownership threshold for SEC reporting.

9         (b)     An inequity would result if the misconduct described in this

10   Amended Complaint is attributed to the Defendants' entities alone.  The offshore

11   shell entities identified in Figure 5, as well as Cilitz and Donnolis, were formed and

12   operated to conceal the respective beneficial owner's identity and avoid liability.

13   Each entity was created to give the appearance that the nominee officer controlled, or

14   even owned the entity, while providing the true beneficial owner anonymity.  The

15   respective beneficial owners exploited the features of these entities and the legal

16   protections of the relevant jurisdictions to conduct illegal financial transactions

17   secretly and to coordinate a scheme that depended on anonymity.  Moreover, several

18   Defendants transferred trading profits to themselves and others, leaving empty shells

19   from which collection may be impossible.

20       133.   These sales were coordinated with each other and deliberately timed to

21   coincide with the promotion and the artificial increase in Jammin' Java's share price.

22       134.   The shares acquired by these offshore entities were consolidated with a

23   small number of foreign broker-dealers and sold without registration into the U.S.

24   public market through various domestic broker-dealers.  These sales were made

25   primarily to investors in the public over-the-counter market in the United States.

26       135.   As summarized in Figure 5, the acquisition and resale of Jammin' Java

27   stock was almost immediate.  These entities acquired the shares from December 2010

28   through May 2011, predominantly in March 2011.  Nearly all the sales were

completed from February to May 2011, within six months of their respective acquisitions.

136.   The extraordinary profits generated by these individuals did not correspond to any true investment value.  Jammin' Java's public filings at the time reflected no sales revenue for the Company up to that point in time.  The filings also showed no employees or cash and only nominal operations.

137.   No registration statement was filed in connection with any of these offers or sales of Jammin' Java stock to the public.

**Defendants' Transfer of Trading Profits to Jammin' Java**

138.   A portion of the trading proceeds generated from the unregistered public sale of Jammin' Java stock by Las Colinas (Miller) and Renavial (Al-Barwani) ultimately was used to make the payments to Jammin' Java under the Straight Path Agreement.

139.   On three dates from January to March 2011, Jammin' Java received three $40,000 payments that were purportedly installments of funding under the Straight Path Agreement.  These payments did not come from Straight Path, which did not exist at the time, but from Blue Leaf, an entity controlled by Weaver.   Blue Leaf received substantial cash inflows from several entities that had sold Jammin' Java stock during the promotional period, including Miller's Las Colinas, Al-Barwani's Renavial, and Weaver's Arcis.

140.   Similarly, on May 18, 2011, $2.38 million of the trading profits generated by Miller's Las Colinas was transferred to Jammin' Java under the guise of the Straight Path Agreement.  Again, the funds did not come from Straight Path, but from another entity, Chilli Capital Ltd. ("Chilli Capital").  The entity received the $2.38 million that it transferred to Jammin' Java from Las Colinas, which had obtained the funds by selling Jammin' Java stock supplied by Whittle.

141.   Several Defendants participated in the Chilli Capital transfer.  At Weaver's direction, Berlinger created Chilli Capital on May 3, 2011, apparently for

the sole purpose of transferring funds to Jammin' Java, and opened an account for the
entity on May 11, 2011.  The Chilli Capital account was opened at VP Bank, the
same Swiss bank that held accounts for Las Colinas (Miller), Renavial (Al-Barwani),
and Westpark (Sun).  Miller was the sole beneficial owner of Chilli Capital and
approved its formation and the opening of accounts in its name.  Miller also approved
the transfer of $2.38 million from Las Colinas to Chilli Capital.  Chilli Capital had no
operations or employees and only effectuated the receipt and transfer of proceeds
from the sale of Jammin' Java stock.

142.   The flow of shares from Jammin' Java and the return of trading profits to
the company are depicted in Figure 6.

**Figure 6. Flow of Shares and Trading Profits (December 2010 to May 2011)**



**<u>Other Transfers of Trading Profits</u>**

143.   Multiple Defendants benefitted from the transfer of trading profits from
the sale of Jammin' Java stock that occurred from December 2010 to May 2011.

144.   The Defendants benefitted from the sale of stock for the account of entities that they solely owned and controlled.  Defendants are responsible for the trading profits by the shell entities held for their benefit.

145.   In addition, certain Defendants transferred funds to their co-Defendants. Examples of particular transfers follow:

### *Weaver*

(a)   **Arcis (Weaver).**  From November 2010 to August 2012, Weaver's Arcis transferred approximately $1.8 million of trading proceeds to Blue Leaf, which also was controlled by Weaver.  Arcis also transferred approximately $1.5 million of trading proceeds to Weaver in his personal name, and approximately $2 million to an account controlled by Weaver or held for his benefit.  Weaver approved these transfers.

(b)   **Timotei (Weaver).**  On October 2, 2012, Timotei transferred approximately $3,760,263 of trading proceeds to an account controlled by Weaver or held for his benefit.

(c)   **Manitou (Weaver).**  On May 2, 2012, Weaver's Manitou transferred approximately $3,722,000, which amounted to nearly all of the proceeds from its sale of Jammin' Java stock, to Weaver.

(d)   **Westpark (Sun).**  On September 23, 2011, after the sale of the stock it acquired from Donnolis, Westpark "paid" Donnolis (controlled by Weaver) $1,159,409.  Sun approved this transfer.

(e)   **Torino (Sun).**  Across two transfers on March 15, 2011 and April 21, 2011, Sun's Torino transferred approximately $1.4 million of trading proceeds to Arcis, which was controlled by Weaver and delivered 1.4 million shares on March 21, 2011.

### *Sun*

(f)   **Timotei (Weaver).**  On January 25, 2012, Weaver's Timotei transferred approximately $828,000 of trading proceeds to Sun's Cilitz.  On behalf of

59

1  Timotei, Weaver approved the transfer to Sun's entity.

2      (g)    **Westpark (Sun).**  On May 30, 2011, Sun's Westpark transferred

3  approximately $40,000 of the trading proceeds from the sale of Jammin' Java stock to

4  Sun.

5  *Miller*

6      (h)    **Las Colinas (Miller).**  Across five transfers, from approximately

7  March 2012 to August 2012, Las Colinas transferred a total of approximately

8  $4 million to Miller.

9  *Al-Barwani*

10      (i)    **Renavial (Al-Barwani).**  From May 2011 to November 2011,

11  Renavial transferred approximately $160,000 to Al-Barwani.  On June 16, 2011,

12  Renavial transferred approximately $90,000 to Weaver's Blue Leaf entity.  On

13  March 21, 2012, at Al-Barwani's direction, Berlinger used the proceeds from

14  Renavial's sale of Jammin' Java stock to purchase shares of U.S. stock at an

15  approximate cost of $247,434.  In April 2012, with Al-Barwani's approval, Berlinger

16  arranged to transfer approximately $11,300,000 from Renavial to the Lebanese bank

17  account of an entity established to receive, hold, and transfer funds for Al-Barwani's

18  benefit.  On May 24, 2012, Renavial transferred another $150,000 to Al-Barwani.

19  *Wheatley*

20      (j)    **Petersham (Wheatley).**  Petersham transferred the proceeds from

21  its sale of Jammin' Java stock to Wheatley.  Wheatley approved this transfer.

22  *Berlinger*

23      (k)    **Las Colinas (Miller), Renavial (Al-Barwani), Westpark (Sun),**

24  **and Calgon (Weaver).**  Berlinger received compensation for his role in the

25  management of Las Colinas, Renavial, Westpark, and Calgon and for facilitating

26  aspects of the scheme.  Further, in addition to the transfer to Chilli Capital described

27  above, on September 27, 2011, Miller's Las Colinas transferred $31,270 to

28  Berlinger's Volante, which compensated or reimbursed Volante for services or fees

related to fourteen offshore entities formed or controlled by Weaver and Berlinger, including Straight Path.

146.   Given efforts to conceal the recipient of trading profits, Defendants also may have benefitted from other fund transfers from the selling entities not specifically identified above.

147.   In addition to the transfers above, substantial additional amounts remained in the accounts of the offshore shell entities as of late 2012.

**Price Collapse**

148.   Beginning on May 13, 2011, Jammin' Java's share price began to fall following Jammin' Java's disclosure of an unauthorized stock promotion.

149.   In a Form 8-K filed on May 9, 2011, the Company stated that it had become aware of various unauthorized and unaffiliated internet stock promoters who were promoting short-term investments in its common stock in their "stock reports" and on their websites.  After an initial rise, Jammin' Java's closing share price fell from a high of $5.42 on May 12, 2011 to $2.30 on May 17, 2011.  Whittle resisted this filing and any disclosure related to unauthorized promotion.

150.   On May 17, 2011, Jammin' Java filed an annual report on Form 10-K disclosing negative information about the company, including the following: (a) Jammin' Java had revenues of only $1,037 for the fiscal year ending January 31, 2011; (b) between February 1, 2011 and May 17, 2011, Jammin' Java had generated only $42,000 in sales; (c) Jammin' Java's auditor raised substantial doubt about Jammin' Java's ability to continue as a going concern; and (d) Jammin' Java continued to be a developmental stage, shell company.  Following the release of the Form 10-K, the share price dropped further and settled at a price between $0.40 and $0.50 per share.

151.   In days, investors who had purchased at the height of the promotion together lost millions of dollars.

## FIRST CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and (c) of the Securities Act

### [15 U.S.C. § 77e(a) and (c)]

### (Against Defendants Whittle, Weaver, Sun, Berlinger, Miller, and Al-Barwani)

152.   Paragraphs 1 through 151 are realleged and incorporated herein by reference.

153.   By their conduct, Defendants Whittle, Weaver, Sun, Berlinger, Miller, and Al-Barwani directly or indirectly:

(a)   made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect;

(b)   for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and

(c)   made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

154.   Among other things, Defendants Whittle, Weaver, Sun, Berlinger, Miller, and Al-Barwani directly and indirectly sold Jammin' Java stock:

(a)   by personally directing and participating in the offer and sale of Jammin' Java stock in the name of the offshore shell entities;

(b)   through the offshore shell entities owned and controlled by them or through the actions of individuals acting on their behalf or at their direction; or

(c)   by acting as necessary participants or substantial factors in the unregistered offering.

155.   By reason of the foregoing, Defendants Whittle, Weaver, Sun, Berlinger, Miller, and Al-Barwani violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

## SECOND CLAIM FOR RELIEF

### Failure to File Beneficial Ownership Reports

### Violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 Thereunder (17 C.F.R. § 240.13d-1, 13d-2)

### (Against Defendants Whittle, Weaver, Sun, and Berlinger)

156.   Paragraphs 1 through 151 are realleged and incorporated herein by reference.

157.   Defendants Whittle, Weaver, Sun, and Berlinger, after acquiring directly or indirectly the beneficial ownership of more than 5% of a class of equity securities registered pursuant to Section 12 of the Exchange Act (15 U.S.C. § 78l), failed to file with the Commission a statement on Schedule 13D (17 C.F.R. § 240.13d-101) or, after a material increase or decrease in the percentage of the class beneficially owned, failed to file with the Commission an amendment disclosing this material change, in accordance with the requirements of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 (17 C.F.R. §§ 240.13d-1 and 240.13d-2).

158.   By reason of the foregoing, Defendants Whittle, Weaver, Sun, and Berlinger violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 (17 C.F.R. §§ 240.13d-1 and 240.13d-2).

## THIRD CLAIM FOR RELIEF

### Failure to File Beneficial Ownership Reports

### Violations of Section 16(a) of the Exchange Act (15 U.S.C. § 78p) and Rule 16a-3 Thereunder (17 C.F.R. § 240.16a-3)

### (Against Defendant Whittle)

159.   Paragraphs 1 through 151 are realleged and incorporated herein by reference.

160.   Defendant Whittle, as a person who was directly or indirectly the beneficial owner of more than 10% of any class of any equity security which was registered pursuant to Section 12 of the Exchange Act, or as a director or an officer of the issuer of such security, failed to report his beneficial ownership of such securities, or changes in his beneficial ownership, on filings with the Commission on Forms 4 or 5 in accordance with the requirements of Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3].

161.   By reason of the foregoing, Defendant Whittle violated Section 16(a) of the Exchange Act (15 U.S.C. § 78p) and Rule 16a-3 Thereunder (17 C.F.R. § 240.16a-3).

## FOURTH CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]**

**and Rules 10b-5(a) and 10b-5(c) Thereunder [17 C.F.R. § 240.10b-5(a), (c)]**

**(Against Defendants Whittle, Weaver, Sun, and Berlinger)**

162.   Paragraphs 1 through 151 are realleged and incorporated herein by reference.

163.   By their conduct, Defendants Whittle, Weaver, Sun, and Berlinger, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly,

(a)   employed devices, schemes, and artifices to defraud, and

(b)   engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

164.   Defendants Whittle, Weaver, Sun, and Berlinger intentionally or recklessly engaged in the fraudulent conduct described above.

1   165.   By reason of the foregoing, Defendants Whittle, Weaver, Sun, and

2   Berlinger violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules

3   10b-5(a) and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5(a), (c)].

4   **FIFTH CLAIM FOR RELIEF**

5   **Fraud in Connection with the Purchase or Sale of Securities**

6   **Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule**

7   **10b-5(b) Thereunder [17 C.F.R. § 240.10b-5(b)]**

8   **(Against Defendants Whittle, A. Hunter, and T. Hunter)**

9   166.   Paragraphs 1 through 151 are realleged and incorporated herein by

10   reference.

11   167.   By their conduct, Defendants Whittle, A. Hunter, and T. Hunter, in

12   connection with the purchase or sale of securities, by the use of means or

13   instrumentalities of interstate commerce or by the use of the mails, directly or

14   indirectly, made untrue statements of material fact or omitted to state material facts

15   necessary in order to make the statements made, in the light of the circumstances

16   under which they were made, not misleading.

17   168.   Defendants Whittle, A. Hunter, and T. Hunter made the untrue

18   statements and omissions of material fact.

19   169.   Defendants Whittle, A. Hunter, and T. Hunter intentionally or recklessly

20   engaged in the fraudulent conduct described above.

21   170.   By reason of the foregoing, Defendants Whittle, A. Hunter, and T.

22   Hunter violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule

23   10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

24

25

26

27

28

65

## SIXTH CLAIM FOR RELIEF

**Touting Securities for Compensation Without Disclosure**

**Violations of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]**

**(Against Defendants A. Hunter and T. Hunter)**

171.   Paragraphs 1 through 151 are realleged and incorporated herein by reference.

172.   By their conduct, Defendants A. Hunter and T. Hunter used the means or instruments of interstate transportation, or communication in interstate commerce, or the mails, to publish or circulate communications which described securities for a consideration received or to be received, directly or indirectly from the issuers, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

173.   By reason of the foregoing, Defendants A. Hunter and T. Hunter violated Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## PRAYER FOR RELIEF

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Find that Defendants committed the violations alleged herein.

### II.

Issue orders of permanent injunction restraining and enjoining Defendants Whittle, Weaver, Sun, Berlinger, Miller, and Al-Barwani, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 5 of the Securities Act (15 U.S.C. § 77e).

### III.

Issue orders of permanent injunction restraining and enjoining Defendants Whittle, Weaver, Sun, and Berlinger, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 13(d)

of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 (17 C.F.R. §§ 240.13d-1 and 240.13d-2).

## IV.

Issue orders of permanent injunction restraining and enjoining Defendant Whittle, his agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 16(a) of the Exchange Act (15 U.S.C. § 78p) and Rule 16a-3 Thereunder (17 C.F.R. § 240.16a-3).

## V.

Issue orders of permanent injunction restraining and enjoining Defendants Whittle, Weaver, Sun, Berlinger, A. Hunter, and T. Hunter, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5).

## VI.

Issue orders of permanent injunction restraining and enjoining Defendants A. Hunter and T. Hunter, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## VII.

Order Defendants to pay disgorgement of ill-gotten gains, derived directly or indirectly from the misconduct alleged, together with prejudgment interest thereon.

## VIII.

Order Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IX.

Pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], bar Defendants Whittle,

Weaver, Sun, Berlinger, Miller, Al-Barwani, A. Hunter, and T. Hunter, from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

## X.

Pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibit Defendant Whittle from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act (15 U.S.C. § 78*l*) or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## XI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## XII.

Grant such other and further relief as the Court may determine to be just and necessary.

## **JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable pursuant to the Federal Rules of Civil Procedure.

Dated:  August 8, 2016

/s/ Timothy S. Leiman
Timothy S. Leiman
Attorney for Plaintiff
Securities and Exchange Commission