TIMOTHY S. LEIMAN, Ill. Bar No. 6270153
Email: leimant@sec.gov
PAUL M. G. HELMS, Ill. Bar No. 6291623
Email: helmsp@sec.gov
PETER SENECHALLE, Ill. Bar No. 6300822
Email: senechallep@sec.gov

Attorneys for Plaintiff
United States Securities and Exchange Commission
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Facsimile:  (312) 353-7398

<u>LOCAL COUNSEL</u>
Lynn M. Dean, Cal. Bar No. 205562
Email: deanl@sec.gov
United States Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>JAMMIN' JAVA CORP., dba MARLEY COFFEE, SHANE G. WHITTLE, WAYNE S. P. WEAVER, MICHAEL K. SUN, RENE BERLINGER, STEPHEN B. WHEATLEY, KEVIN P. MILLER, MOHAMMED A. AL-BARWANI, ALEXANDER J. HUNTER, and THOMAS E. HUNTER,<br><br>　　　　　Defendants. | Case No. 2:15-CV-08921<br><br>**SEC'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**<br><br><br>Hon. Stephen V. Wilson<br><br>Date: September 29, 2016<br><br>Hearing Date: October 31, 2016 |

**INTRODUCTION**

**Current Litigation Status:**

Much has happened in this case since the Court ruled on Defendants' initial Motions to Dismiss. <u>First</u>, the SEC settled its claims against Defendants Jammin' Java and Stephen Wheatley and reached settlements in principle with Defendants Alexander and Thomas Hunter. (Dkt. #109, 110, 130.) <u>Second</u>, Defendants Wayne Weaver and Kevin Miller answered the SEC's Amended Complaint by asserting their Fifth Amendment right against self-incrimination. (Dkt. #131, 140.) <u>Third</u>, and most critically, Defendant Rene Berlinger answered and admitted that he was hired by his co-Defendants to form offshore entities in the Marshall Islands and that he executed transactions at the direction of the entities' beneficial owners. (Dkt. #138.) Among other things, Berlinger admitted that he (a) incorporated Westpark Ltd. ("Westpark") for its sole beneficial owner, Michael Sun (*id*. ¶¶ 33, 72), (b) incorporated Renavial Ltd. ("Renavial") for its sole beneficial owner, Mohammed Al-Barwani (*id.* ¶¶ 37, 72), (c) opened and managed Swiss bank accounts for those entities at the direction of Sun and Al-Barwani (*id.* ¶¶ 33, 37, 72, 77), and (d) operated those entities "at the direction of their beneficial owners" (*id.* ¶ 72).

In the wake of these developments, Sun and Al-Barwani are the only Defendants with pending challenges to the Court's personal jurisdiction and to the sufficiency of the SEC's allegations. In their latest motions, Sun and Al-Barwani pluck isolated phrases from the Amended Complaint and then claim that those allegations are "conclusory." (*E.g.*, Sun Br. at 1; Al-Barwani Br. at 1.) Yet, they ignore—and sometimes misconstrue—the surrounding 60 pages of factual allegations that (1) establish a *prima facie* basis for personal jurisdiction and (2) if proven, would allow a jury to find that Sun and Al-Barwani owned and controlled offshore shell entities that illegally dumped Jammin' Java stock on the investing public.

Sun and Al-Barwani also ignore the Court's prior ruling. In dismissing the original Complaint as to them for lack of personal jurisdiction, the Court identified

1

several gaps in the SEC's allegations. For example, the Court found the SEC did not attribute to Sun or Al-Barwani any conduct in relation to the formation of their shell entities, the opening of accounts, the trading of shares, or the direction of proceeds from the sale of shares. (Dkt. #118 at 17-18.) The Court also held the SEC did not plead an "alter-ego" theory, noting that the SEC did not allege that Defendants' entities: (a) were <u>solely</u> owned by Sun and Al-Barwani, (b) were effectively shell entities with no operations other than trading stock, (c) hired only nominee officers, and (d) sold all of their Jammin' Java shares. (*Id.* at 19, 21.) By contrast, in denying <u>Weaver's</u> motion to dismiss, the Court emphasized that the SEC <u>had</u> pled facts:

- supporting the inference that Weaver owned and controlled his offshore shell entities (*id.* at 22, 27);
- reflecting Weaver's coordination with his co-Defendants (*id.* at 27, 32); and
- identifying Weaver's receipt of proceeds from Jammin' Java trades (*id.* ¶ 22).

The Amended Complaint addresses each gap the Court identified, and—as with Weaver—pleads extensive facts reflecting Sun's and Al-Barwani's (1) collaboration with their co-Defendants and (2) receipt of proceeds.

**Sun and Al-Barwani Own and Control Offshore Shell Companies Involved in the Illegal Sale of Jammin' Java Stock:**

The Amended Complaint alleges Sun and Al-Barwani were part of a network of intermediaries that took in over 45 million shares of Jammin' Java from Defendant Whittle and then dumped them all on the investing public without registration. (*E.g.*, Am. Compl. ¶ 7-11.) Their "dump" of stock was timed to take advantage of the artificial price "pump" caused by their co-Defendants' misleading promotional activities and Jammin' Java's bogus Straight Path financing agreement. (*Id.* ¶¶ 71, 79, 96-100, 114, 130, 133.) Rather than open accounts and trade in their own names, Sun, Al-Barwani and their co-Defendants used proxy shell entities to obscure their activities. (*Id.* ¶¶ 10, 72-73.) They owned and controlled several such offshore shell companies, used nominee officers to implement their directions, and used their

1  entities to anonymously dump millions of Jammin' Java shares on the U.S. market.
2  (*Id.* ¶¶ 32-34, 37, 71-75, 79-80, 97-98, 130-131.)

3       Sun's and Al-Barwani's entities were mere shells designed to allow them to
4  trade stock anonymously. (*E.g.*, *Id.* ¶¶ 32-34, 37, 72-74.) While nominee officers
5  were retained to implement their will, Sun and Al-Barwani remained in charge. (*E.g.*,
6  *Id.* ¶¶ 10, 32-34, 37, 73, 77, 132(a).) There was a near-complete unity of financial
7  interest between the offshore shells and their beneficial owners. Among other things,
8  (a) Sun and Al-Barwani had <u>sole</u> ownership of and ultimate control over their entities
9  (*id.*); (b) the entities' transactions were conducted according to the beneficial owner's
10 wishes (*id.*); (c) Berlinger and other nominee officers were retained to incorporate
11 and operate the entities at the beneficial owner's direction or approval (*id.* ¶¶ 32-34,
12 37, 72); (d) the entities had no employees and no operations other than trading stock
13 (*id.* ¶¶ 32-34, 37); (e) Sun, Al-Barwani and their co-Defendants selected jurisdictions
14 for their entities—*e.g.*, the Marshall Islands and Panama—to exploit those countries'
15 financial privacy protections and to restrict access by others to beneficial ownership
16 records and other financial information (*id.* ¶¶ 73-74); and (f) although engaging in
17 remarkably similar transactions, the group of collaborating entities included shells
18 formed in different countries with different nominee officers—the common
19 denominator was the group of <u>owners</u> (*e.g.*, Sun and Al-Barwani).[1] (*Id.* ¶ 132.)
20      **Sun's Entities**:
21      Sun was the sole beneficial owner of three shell companies involved in the
22 illegal trading of Jammin' Java stock: Cilitz and Trade, S.A. ("Cilitz"), Westpark Ltd.
23 ("Westpark"), and Torino Invest, S.R.L. ("Torino"). (Am Compl. ¶¶ 32-34.)
24      <u>Cilitz</u> was established in Panama on November 30, 2009. (*Id.* ¶ 32.) Sun

---

[1] Defendants attempt to deflect all blame at Berlinger (and even Weaver) for the misconduct of their entities. (Sun Br. at 8; Al-Barwani Br. at 6.) While Defendants may make such arguments at Summary Judgment or trial, their preferred inferences are improper at this stage as they directly contradict the SEC's allegations and the reasonable inferences from those allegations.

3

directed Cilitz's activity. (*Id.*) Cilitz was a shell entity with no employees and no operations beyond trading stock and transferring funds. (*Id.*) Reflecting Sun's coordination with his co-Defendants, Sun used the same lawyers and nominee officers to form Cilitz that were used by Weaver (Sun's business partner) and Whittle (the source of Sun's Jammin' Java stock) for some of their entities. (*Id.* ¶¶ 23, 27, 32.) Sun approved the opening of Cilitz's Swiss bank account. (*Id.* ¶ 32.)

Westpark was formed on August 27, 2010 in the Marshall Islands. (*Id.* ¶ 33.) Berlinger was retained as Westpark's sole officer and director. (*Id.*) Three days after incorporating Westpark, Berlinger (at Sun's direction) opened a Swiss bank account for it at VP Bank.[2] (*Id.*) Sun authorized Berlinger to manage the account on Sun's behalf.  (*Id.*) The Amended Complaint states in no uncertain terms that, in managing the account, Berlinger acted at Sun's direction. (*Id.*) Westpark was nothing more than a shell; it (a) had no employees, (b) had no operations beyond trading penny stock and transferring proceeds, (c) was formed in the Marshall Islands so that Sun could exploit that jurisdiction's privacy protections, and (d) hired one nominee officer (Berlinger) who acted at Sun's direction. (*Id.* ¶¶ 33, 72-74.)

Torino was a Nevis company Sun owned through a trust.[3] (*Id.* ¶ 34.) Again, nominee officers were hired to act on Sun's behalf, and Sun authorized the opening

---

[2] Sun and Al-Barwani complain the SEC did not allege that the identified Swiss bank accounts were their entities' "sole" accounts. (Sun Br. at 5; Al-Barwani Br. at 6.) That argument, however, improperly asks the Court to draw inferences in their favor. The Amended Complaint details the (a) formation of the entities, (b) opening of those entities' Swiss accounts, and (c) illegal transactions that occurred using those accounts. The SEC further alleges the entities had no other operations other than stock trading and that Sun and Al-Barwani authorized the relevant transactions. There is no allegation that there were any accounts or substantive operations beyond Sun's and Al-Barwani's control. And Defendants do not provide contrary evidence. Thus, when the Amended Complaint's allegations are read as a whole, and all inferences are drawn in the SEC's favor, the most plausible conclusion is that these entities were mere proxies for Sun and Al-Barwani.

[3] Sun complains the SEC did not name his trust. (Sun Br. at 4.) He does not cite—and the SEC is unaware of—any authority requiring the SEC to name every entity Sun used in his scheme. The SEC alleges Sun owned and controlled Torino through a trust. (*E.g.*, Am. Compl. ¶¶ 34, 73(g), 97(e), 131(b).) Sun surely knows—or one could reasonably infer he knows—the name of his trust.

4

of the Swiss bank account. (*Id.*) Evincing Defendants' collaboration, Sun used officers that worked for a shell entity owned by Weaver. (*Id.*) Sun authorized the transactions in Torino's account. (*Id.*) Like his other entities, Torino was a shell with no employees and no operations other than trading stock. (*Id.*) From October 2010 through May 2011, almost all of Torino's activity consisted of trades of Jammin' Java stock and the transfer of sale proceeds. (*Id.*) Torino's only other activity further reflects Sun's collaboration with his co-Defendants: Torino traded another penny stock, Lucky Boy, which also was traded by entities owned by Defendants Weaver, Wheatley and Miller. (*Id.* ¶¶ 34, 72-74.)

**Al-Barwani's Entity:**

Al-Barwani was the sole beneficial owner of Renavial, which was formed in the Marshall Islands in September 2010. (*Id.* ¶¶ 37, 72-74.) With Al-Barwani's approval, Berlinger opened an account at VP Bank for Renavial on September 21, 2010. (*Id.*) Al-Barwani authorized Berlinger to open and manage the Renavial account on Al-Barwani's behalf. (*Id.*) In managing the account, Berlinger acted at Al-Barwani's direction. (*Id.*) As with Sun's entities, Renavial was a shell with no employees, no operations (beyond trading stock and transferring proceeds), and only a single officer. (*Id.*) From Renavial's formation through May 2011, the only activity in Renavial's Swiss account consisted of (a) the trading of Jammin' Java stock and (b) the transfer of related proceeds. (*Id.*)

\* \* \* \* \*

Among other critical allegations Defendants ignore: in October 2010, about a month after Westpark and Renavial were formed, <u>Sun and Al-Barwani met with Weaver in Switzerland to discuss Jammin' Java and its stock</u>. (*Id.* ¶ 73(c).) As detailed below, just over a month after that meeting, the unregistered transfers to Defendants' shell entities began. (*Id.* ¶ 80.)

5

**Whittle Transfers Over 15.6 Million Shares of Jammin' Java Stock to Sun and Al-Barwani's Shell Entities in Multiple Waves**:

Coordinated Transfers to Sun and Al-Barwani's Entities:

Further reflecting Al-Barwani's and Sun's control of their shells, their entities received huge blocks of Jammin' Java stock in remarkably similar transfers. (*Id.* ¶¶ 79-80, 96-98, 99.) The transfers came from the same ultimate source (Whittle's shells and nominees), occurred during the same time period, and were each sized to fall just short of the 5% ownership threshold that would have forced Sun and Al-Barwani to file disclosures with the SEC. (*Id.*) Sun's and Al-Barwani's shell entities received the following transfers from Whittle:

| Date | Source | Shares | Percentage | Recipient | Beneficial Owner |
|---|---|---|---|---|---|
| Dec. 13, 2010 | **Nemo (Whittle)** | 3,110,941 | 4.1% | **Torino** | Sun |
| Mar. 2, 2011 | **Whittle via Donnolis (Weaver)** | 2,898,317 | 4.2% | **Westpark** | Sun |
| Mar. 9, 2011 | **Whittle via Arcis (Weaver)** | 1,400,000 | 2.0% | **Torino** | Sun |
| Mar. 14, 2011 | **Whittle's Nominees** | 3,000,000 | 4.3% | **Renavial** | Al-Barwani |
| May 6, 2011 | **Whittle via Rahela (Miller)** | 3,156,698 | 4.6% | **Renavial** | Al-Barwani |

(*Id.* ¶¶ 79(c), 80, 97(e)-(g), 98.) Sun approved Torino's acquisition of these shares and authorized Berlinger to acquire shares for Westpark. (*Id.* ¶¶ 79(c), 97(e)-(f).) Al-Barwani approved Renavial's acquisition of shares. (*Id.* ¶ 97(g).)

Coordinated Transfers to Sun's and Al-Barwani's co-Defendants:

In denying Defendant Weaver's motion to dismiss the original Complaint, the Court held Weaver's ownership and control of his shell entities could be inferred from allegations that transfers to and from Weaver's entities coincided "with similarly-timed transfers to offshore entities owned by his co-Defendants." (Dkt. #118 at 27.) The SEC's Amended Complaint adds such allegations as to Sun and Al-Barwani. At the time Sun and Al-Barwani received large blocks of Jammin' Java stock into their shell companies, remarkably similar transfers were received by shell

entities owned by Weaver, Wheatley, and Miller. (*E.g.*, Am. Compl. ¶¶ 79-80, 96-100.) The transfers (a) came in two waves during similar time periods, (b) came from the same ultimate source (Whittle), (c) were timed to coincide with the unlawful promotions surrounding Jammin' Java and the resulting price spike, and (d) were sized to fall just short of the 5% threshold for SEC reporting. (*Id.*) Again, the network of Defendants' shell entities included entities from different jurisdictions and with different nominee officers. (*Id.*) The common denominator was the group of <u>beneficial owners</u>: Sun, Al-Barwani, Weaver, Miller and Wheatley. (*Id.* ¶ 132 (a).)

**<u>Defendants Collaborate and Fail to Report Ownership of Jammin' Java Stock</u>:**

The Amended Complaint adds substantial detail regarding Defendants' coordination of their Jammin' Java transactions. This serves two purposes. <u>First</u>, those allegations are relevant to Sun's violation of SEC reporting requirements. Strictly speaking, a showing of coordinated group activity is not required to establish Sun's violation. He violated the regulation all by himself; except for one day during the time period December 13, 2010 through March 8, 2011, the collective holdings of Sun's entities (Cilitz, Torino, and Westpark) exceeded 5% of Jammin' Java's outstanding shares. (Am. Compl. ¶ 112(c).) But, the allegations of coordinated activity provide an alternative basis for Sun's violation; Sun was part of a group that <u>collectively</u> owned more than 5% of Jammin' Java's shares but that failed to disclose its ownership position. (*Id.* ¶¶ 112-14.) <u>Second</u>, the extensive allegations of coordinated activity show Defendants' activities were not happenstance or the result of rogue nominee officers. Among other facts reflecting Defendants' coordination:

- Whittle, Weaver, Sun, Wheatley, Miller, and Al-Barwani owned and controlled remarkably similar shell entities, most of which were formed in the run-up to the Jammin' Java scheme. These shells were formed in the same obscure jurisdictions (almost all in Panama and the Marshall Islands), opened accounts at the

7

same Swiss banks, and had no employees and no operations other than trading stock. Many shared the same nominee officers. (*Id*. ¶¶ 32-34, 37, 73-74).

- In October 2010, just one month before their entities started to receive shares, Sun and Al-Barwani met with Weaver in Switzerland to discuss Jammin' Java and its stock. (*Id*. ¶ 73(c), 80.)

- As described above (pp. 6-7), Defendants' shell entities (including Westpark, Torino and Renavial) each received large blocks of Jammin' Java stock from the same source, during the same period, and in remarkably similar amounts (designed to skirt the 5% reporting threshold). Some of these transfers from Whittle involved direct transactions between Sun and Al-Barwani and their co-Defendants. For example, Sun's Torino acquired shares through Weaver's Arcis; Sun's Westpark acquired shares through Weaver's Donnolis; and Al-Barwani's Renavial acquired shares through Miller's Rahela. (*Id*. ¶¶ 79-80, 96-102.)

- When Weaver's Arcis entity obtained shares that exceeded 5% within that account, Weaver transferred a sufficient number of shares (1.4 million) to Sun's Torino to bring Arcis's holdings below 5%. Around the same time, Torino transferred a total of $1.4 million to Arcis. (*Id*. ¶¶ 79(d).)

- As shown below, eleven of Defendants' shell entities dumped all of their Jammin' Java stock, most sales occurring within weeks of each other. (*Id*. ¶¶ 130-31.)

- These coordinated activities were implemented by entities owned by different Defendants with different nominee officers (reflecting that the Defendants were responsible for the conduct of their shell entities). (*Id*. ¶ 132.)

Sun and Al-Barwani may try to pass off these facts as coincidence—or to blame their co-Defendants—but the overwhelming allegations of coordination, when viewed in the SEC's favor, place them squarely at the reins of their shell entities.

**Sun and Al-Barwani Illegally Sell Their Jammin' Java Stock To The Public**:

After receiving Jammin' Java stock in multiple waves, Sun's and Al-Barwani's entities rapidly sold them all, in sales that coincided with (1) the price spike caused

by their co-Defendants' promotional activity and (2) the bogus Straight Path financing agreement coordinated by Weaver (Sun's partner) and Whittle (the source of Defendants' shares). (*Id.* ¶¶ 130-31, 133-35.) The sales also were timed to ensure that no entity exceeded the 5% ownership threshold. The SEC alleges the following sales by entities owned and controlled by Sun and Al-Barwani:

| Beneficial Owner | Entity | Date Acquired | Shares Acquired | Date of Sales | Trading Profits |
|---|---|---|---|---|---|
| **Sun** | Torino | Dec. 13, 2010 | 3,110,941 (4.5%) | Jan. 17, 2011- Mar. 30, 2011 | $4,594,843 |
| | | Mar. 21, 2011 | 1,400,000 (2.0%) | | |
| | Westpark | Mar. 4, 2011 | 2,898,317 (4.2%) | Mar. 10, 2011- Mar. 31, 2011 | $3,610,071 |
| **Al-Barwani** | Renavial | Mar. 14, 2011 | 3,000,000 (4.3%) | Mar. 31, 2011-Apr. 7, 2011 | $4,918,520 |
| | | May 6, 2011 | 3,156,698 (4.6%) | May 6, 2011- May 12, 2011 | $10,259,614 |

(*Id.* ¶ 130.)  Notably, Sun's entities—Torino and Westpark—dumped their stock around the same time <u>even though they were incorporated in different jurisdictions, had different account custodians, and retained different nominee officers</u>. (*Id.* ¶¶ 32-34.) In other words, Sun was the common link in these transactions. (*Id.* ¶ 132(a).)

The Amended Complaint expressly alleges Sun and Al-Barwani authorized or approved these sales. (*Id.* ¶ 131.) And, it describes in detail that these sales coincided with nearly identical "dumping" of Jammin' Java stock by their co-Defendants Miller, Weaver, and Wheatley. (*Id.* ¶¶ 132-35.)

**<u>Sun and Al-Barwani Distribute Their Trading Proceeds</u>**:

In its Order on Sun's and Al-Barwani's prior motions, the Court highlighted that the SEC had not alleged that Sun or Al-Barwani benefitted from the illegal stock sales by their entities. (Dkt. #118 at 17-18.) The Amended Complaint remedies that deficiency. It alleges that Sun and Al-Barwani benefitted from and were responsible for the trading profits of their shell entities that were held for their benefit. (*Id.* ¶ 144.) And, the SEC identifies specific transfers involving those Defendants.

<u>Transfers of Proceeds to and from Sun</u>:

The SEC identifies two transfers of Jammin' Java proceeds benefitting Sun. <u>First</u>, on January 25, 2012, Weaver's Timotei transferred approximately $828,000 of its trading proceeds to Sun's Cilitz. (Am. Compl. ¶ 145(f).) <u>Second</u>, on May 30,

2011, Sun's Westpark transferred approximately $40,000 of illicit Jammin' Java sale proceeds to Sun. (*Id*. ¶ 145(g).)[4]

Sun also approved transfers of ill-gotten Jammin' Java proceeds to his co-Defendants. On September 23, 2011, after selling the stock it acquired from Weaver's Donnolis, Westpark "paid" Donnolis $1,159,409 from its ill-gotten proceeds. (*Id*. ¶ 145(d).) Sun approved this transfer. (*Id*.) Across two transfers on March 15, 2011 and April 21, 2011, Sun's Torino transferred approximately $1.4 million of its trading proceeds to Arcis (also controlled by Weaver). (*Id*. ¶ 145(e).)

Transfers to and From Al-Barwani:

The SEC alleges that Al-Barwani was one of the biggest winners in the unregistered sale of Jammin Java stock. With Al-Barwani's approval, Renavial transferred approximately $11,300,000 to the Lebanese bank account of an entity formed to receive, hold, and transfer funds for Al-Barwani's benefit. (*Id*. ¶ 145(i).)[5]

Further reflecting Al-Barwani's coordination with his co-Defendants, on June 16, 2011, Renavial transferred a portion of its Jammin' Java profits to Weaver's Blue Leaf entity. (*Id*.) Blue Leaf then sent some of those funds to Jammin' Java disguised as installment payments under the bogus Straight Path agreement. (*Id*. ¶ 142.)

**Jammin' Java's Price Collapse**:

While Sun and Al-Barwani profited handsomely from their illegal sales of Jammin' Java stock, the investing public was not as fortunate. In May 2011, in the

---

[4] For purposes of Defendant's Rule 12(b)(2) motion, after the SEC filed its Amended Complaint, it received documents in discovery (not from Sun) reflecting that Sun withdrew an additional $660,183.22 from the Westpark account when he closed the account on June 2, 2014. (Ex. A.)

[5] For purposes of Defendant's Rule 12(b)(2) motion, after it filed the Amended Complaint, the SEC received (not from Al-Barwani) documents further confirming this allegation. Al-Barwani used a Panamanian entity operating from the U.A.E.—Tare Finance and Invest Ltd.—to secrete over $11 million of Renavial's proceeds. Al-Barwani was the "mandator," "ultimate shareholder," and "beneficial owner" of Tare Finance, and he retained a Dubai resident, Bünyamin Altun, as Tare Finance's "Trustee." (Ex. B.) During this same period, Renavial also made two additional payments of approximately $160,000 and $150,000 to Al-Barwani. (Am. Compl. ¶ 145(i).)

five days after Jammin' Java disclosed that it was the subject of unauthorized promotions, the company's stock price plummeted more than 50% to $2.30 per share. (*Id*. ¶¶ 148-150.) After Jammin' Java filed a Form 10-K disclosing the company's dire financial condition, the company's stock price cratered, finally settling in between $.40 - $.50 per share. (*Id*.)

## LEGAL ARGUMENT

**A.    The Amended Complaint Establishes A *Prima Facie* Case
of Personal Jurisdiction Over Sun and Al-Barwani.**

As with their prior motion, Defendants do not challenge the Court's personal jurisdiction over their entities. (*See* Dkt. #118 at 11.) Instead, despite 30 pages of new factual allegations, they insist the SEC still does not sufficiently allege their personal involvement in the conduct of their entities. They are wrong. The allegations of the Amended Complaint are more than sufficient to state a *prima facie* case of personal jurisdiction against the Defendants, under both the direct participation and alter ego theories. And, when coupled with Berlinger's admissions in his Answer that he at all times "acted solely as an agent" and "solely as a provider of services requested by others [including Defendants Sun and Al-Barwani]" who "owned, controlled and directed the activities of" their respective entities, there can be no doubt about the Court's jurisdiction over them. (*See* Dkt. #138 ¶¶ 33, 37, 60, 72, 73, 76, 77, 114.)

1.    Applicable Legal Standard

In its prior ruling, the Court set forth the legal principles governing Defendants' jurisdictional challenge. (Dkt. #118. at 2-3, 11-17.) Absent formal discovery or an evidentiary hearing, the plaintiff need only make a *prima facie* showing that jurisdiction exists. (*Id.* at 2-3.) Here, discovery is at a standstill; Sun and Al-Barwani have taken the position that they do not need to respond to the SEC's discovery requests while this motion is pending. The Court accepts as true the factual allegations in the Complaint where, as here, the defendant offers no contrary evidence. (*Id.* at 3.) Although the parties may present additional evidence bearing on

1   the issue of personal jurisdiction, "all factual conflicts must be resolved in plaintiff's
2   favor." *Podobedov v. Living Essentials, LLC*, 2012 WL 2513465, *3 (C.D. Cal. Mar.
3   22, 2012); *Schenk v. Motorcycle Accessory Warehouse, Inc.*, 2007 WL 1138915, *4
4   (D. Idaho Apr. 17, 2007) (court may consider evidence outside the pleadings when
5   resolving Rule 12(b)(2) motion).

6       2.   Sun and Al-Barwani Directly Participated in the Activities
          of the Companies They Owned.
7

8       Although ownership of an entity subject to the Court's jurisdiction is not alone
9   sufficient for the Court to exercise jurisdiction over the owner, the owner may subject
10  himself to jurisdiction if he was a "primary participant[] in the activities forming the
11  basis of jurisdiction over the [entity]." (Dkt. #118 at 14-15 (citing cases).) The
12  plaintiff must allege the defendant-owner personally participated in the activities
13  giving rise to jurisdiction. *Id*. The size of the defendant's entity or the complexity of
14  its operations may affect whether defendant's individual participation or control over
15  the activities can be inferred from the facts alleged. *Id*.

16      Here, the allegations in the SEC's Amended Complaint plug the holes
17  identified by the Court in its earlier ruling and satisfy the direct participant test. In its
18  prior ruling, the Court held the original Complaint primarily alleged only that Sun
19  and Al-Barwani held ownership interests in their entities. *Id.* at 17-18. The Court
20  noted the Complaint lacked allegations "that (1) the defendants were the sole owners
21  of their respective corresponding entities; (2) the entities only retained one officer …
22  (3) the entities had no operations other than trading U.S. penny stock; (4) the entities
23  sold all their stock; or (5) that the entities did not hold any other stocks besides
24  Jammin' Java's." *Id*. at 19.

25      The Amended Complaint, which pleads nearly 30 pages of additional facts,
26  now alleges what was missing from the original Complaint. It alleges:

27      •   Sun and Al-Barwani were the "sole beneficial owners" of their entities;
28

- Sun's Westpark and Al-Barwani's Renavial hired only one nominal officer and director—Berlinger—while Sun's Cilitz and Torino hired just two and three nominal officers, respectively;

- Each company's nominal officer(s) acted at the direction of its sole beneficial owner, Sun or Al-Barwani;

- None of the companies had any employees or substantive operations beyond trading penny stock and distributing the sale proceeds;

- Sun and Al-Barwani approved the opening of Swiss bank accounts their entities used almost solely to trade Jammin' Java stock and to distribute the proceeds;

- Sun and Al-Barwani approved their entities' illegal trades. (*Supra* pp. 2-8.)

Further, the SEC pleads extensive facts reflecting coordination between the shell entities owned by Sun, Al-Barwani and their co-Defendants. (*Supra* pp. 7-8.) These allegations, taken as true, are more than sufficient to state a *prima facie* case that Sun and Al-Barwani personally participated in the misconduct of their entities.

But, there is more. Berlinger, Defendants' co-conspirator who personally interacted with Sun, Al-Barwani and other Defendants, has made key admissions (which may be considered in a 12(b)(2) motion). On August 31, over a week before Sun and Al-Barwani filed their latest motions to dismiss, Berlinger filed his Answer, admitting to his detriment that (a) he was hired as the nominal officer for Westpark and Renavial; (b) Sun and Al-Barwani were the sole beneficial owners of those companies; and (c) he took actions on behalf of Sun's Westpark and Al-Barwani's Renavial—including opening and managing the Swiss bank accounts, purchasing Jammin' Java stock, and distributing proceeds—at their direction and with their approval. (*See*, *e.g.*, Dkt. #138 ¶¶ 33, 37, 60, 72, 73, 76, 77, 114.) Tellingly, Sun and Al-Barwani ignore Berlinger's admissions. With Sun and Al-Barwani presenting no contrary evidence, the Court, in determining its personal jurisdiction, is left only with the SEC's well-pled allegations, the reasonable inferences from those allegations, and Berlinger's admissions—all of which reflect that Sun and Al-Barwani personally

controlled the conduct of their respective companies.

Struggling beneath the weight of the new allegations in the Amended Complaint, and turning a blind eye to Berlinger's corroborating Answer, Defendants cherry-pick isolated words from the Amended Complaint—like "directed" and "approved"—and declare them to be "conclusory." In doing so, Defendants point to the Supreme Court's decision in *Iqbal v. Ashcroft.* According to Defendants, the Supreme Court in *Iqbal* held that allegations that the defendants "directed" and "approved" the FBI's allegedly unconstitutional detainment policies were "conclusory and not entitled to be assumed to be true." (Al-Barwani Br. at 10; Sun Br. at 8-9.) The *Iqbal* Court held no such thing. To the contrary, in construing plaintiff's Complaint, the *Iqbal* Court ruled that allegations that specific actions were taken "under the direction of [the FBI Director]" and an allegedly unconstitutional policy was "approved by [the FBI Director and U.S. Attorney General]" were "factual allegations" that <u>were</u> "to be taken as true":

> **We next consider the factual allegations** in respondent's complaint to determine if they plausibly suggest an entitlement to relief. **The complaint alleges** that [1] "the [FBI], **under the direction of Defendant MUELLER**, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." **It further claims** [2] that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI **was approved by Defendants ASHCROFT and MUELLER** in discussions in the weeks after September 11, 2001." Taken as true, these allegations are consistent with petitioners' purposefully designating detainees "of high interest" because of their race, religion, or national origin. But given more likely explanations, they do not plausibly establish this purpose.

*Iqbal*, 556 U.S. at 681 (emph. added; internal cites omitted). Contrary to Defendants' briefs, the Supreme Court did not hold that the terms "direct" or "approve" render everything that comes after "conclusory." In fact, it held that the allegations in question were "factual" and must be accepted as true. *Id*. The Supreme Court

1  ultimately upheld dismissal of Iqbal's claims because Iqbal failed to plead supporting

2  facts showing that defendants acted with discriminatory purpose. *Id*. at 682.[6]

3  　　　　Here, the basis for taking the SEC's allegations at face value is <u>more</u> acute for

4  two reasons. <u>First</u>, unlike in *Iqbal*, the SEC does not just allege Sun and Al-Barwani

5  generally "directed" or "approved" broad categories of misconduct by their entities.

6  Rather, it outlines specific transactions that Sun and Al-Barwani "directed" and

7  "approved" that were executed by their companies' nominal officers. <u>Second</u>, the size

8  of the entities at issue affects the reasonable inferences to be drawn in this case. In

9  *Iqbal*, the plaintiff sued the U.S. Attorney General and the FBI Director, leaders of

10  massive federal agencies with thousands of employees. By contrast, Sun and Al-

11  Barwani are the sole beneficial owners of shell companies with no employees, one to

12  three nominal officers, and no operations other than trading U.S. penny stocks. In

13  short, the SEC alleges that Sun and Al-Barwani have no one else to blame: they were

14  the sole owners of hollow companies where the nominee officers were tasked with

15  implementing their instructions. Under such circumstances an inference of control is

16  warranted. *See* Dkt.#118. at 15 (the size of the defendant's entity or the complexity of

17  its operations may affect whether defendant's individual participation or control over

18  the activities can be inferred from the facts alleged).[7]

19

20  [6] The Supreme Court rejected <u>other</u> allegations as conclusory. (*Id*. at 680 (finding plaintiff's bare
21  assertion that defendants "knew of, condoned, and willfully and maliciously agreed to subject
respondent [Iqbal]" to unconstitutionally harsh conditions of confinement was conclusory).) Here,
22  unlike the plaintiff in *Iqbal*, the SEC alleges specific transactions which Defendants directed and
approved and pleads extensive facts from which the Court can infer that Sun and Al-Barwani
23  controlled their tiny operations.

24  [7] Defendants cite two other plainly distinguishable cases. In *Mendez v. Beacher*, 2013 WL 449808
(N.D. Cal. Feb. 5, 2013), the plaintiff alleged, without further specificity, that Chief Becher
25  "approved, ratified, condoned, encouraged and/or tacitly authorized" the actions of various known
and unknown officers. *Id*. at *1. In a two-page opinion, the district court held those allegations,
26  standing alone, were insufficient. In *Fasugbe v. Willms*, 2011 WL 3667440 (E.D. Cal. Aug. 22,
2011), the plaintiff merely "track[ed] the language from [two cases on personal jurisdiction] with
27  conclusory statements that [the individual] was the 'guiding spirit' and 'central figure' and made all
final decisions." *Id*., at *3. The SEC's allegations—corroborated by Berlinger—are far more

28

15

In addition to clearing the *Iqbal* hurdle, the SEC's allegations against Sun and Al-Barwani are now at least as strong as the allegations the Court sustained against Weaver. *See* Dkt. #118 at 22 (holding Complaint's allegations against Weaver were sufficient to demonstrate his personal participation). Three major modifications carry the allegations against Sun and Al-Barwani beyond those pled against Weaver. First, the SEC now alleges Sun and Al-Barwani were directly involved in the alleged misconduct. The SEC alleges that (a) Sun and Al-Barwani were the "sole beneficial owners" of their respective companies, and directed the companies' activities, (b) about one month after their shell entities were formed in the Marshall Islands, Sun and Al-Barwani travelled to Switzerland to meet with Weaver to discuss Jammin' Java and its stock, (c) shortly after the meeting, Whittle and Weaver began transferring millions of Jammin' Java shares to Sun's companies and to Al-Barwani's Renavial in remarkably similar transactions, (d) Sun and Al-Barwani personally approved the transfers to their entities (transfers identified by date, source, number of shares, and recipient), and (e) after receiving the shares, Sun and Al-Barwani personally approved the sale of their entities' Jammin' Java shares (in sales identified by date, number of shares and selling entitiy).[8]

Second, as with Weaver, the SEC now pleads extensive facts reflecting

---

detailed than the bare statements in either *Beacher* or *Fasugbe*.

[8] The facts alleged here in no way resemble the allegations in *SEC v. Alexander* ("*Alexander I*"), or *SEC v. Sharef*, cited by Defendants. *Alexander I*, 160 F. Supp. 2d 642, (S.D.N.Y. 2001) (Italian resident did not "purposefully avail herself of the privilege of conducting activities in the United States" where *her unrebutted affidavit established* "her only relevant act was to sell shares of Luxottica, an Italian company, through her bank in Italy" and "she did not know that that the sale of stock would be accomplished by sale of Luxottica ADRs on the [NYSE]"); *Sharef*, 924 F. Supp. 2d 539, 544-45 (S.D.N.Y. 2013) (defendant, a German citizen and CEO of an Argentinian subsidiary of Siemens (a German corporation headquartered in Munich), did not purposefully direct activities at U.S. by urging other non-U.S. Siemens' personnel to bribe officials in Argentina, where he did not authorize the bribes and played no role in in the preparation of the false filings Siemens subsequently made with the SEC). Unlike these cases, the SEC here alleges facts showing Defendants personally directed and approved manipulative trading in the stock of a U.S. company. Defendants offered no evidence to rebut those allegations.

coordination between Sun, Al-Barwani, and their co-Defendants. Among other things, (a) Sun, Al-Barwani, and their co-Defendants owned and controlled near identical shell entities, formed in the same obscure jurisdictions, with accounts in the same Swiss banks and overlapping nominee officers, (b) Defendants' shell entities (including Westpark, Torino and Renaval) each received large blocks of Jammin' Java stock from the same source, during the same period, and in remarkably similar amounts (designed to skirt the 5% reporting threshold), (c) Sun's and Al-Barwani's entities enaged in direct transactions with entities owned by their co-Defendants (including stock transfers from entities owned by Weaver and Miller), (d) eleven of Defendants' shell entities (including Sun's and Al-Barwani's entities) dumped all of their Jammin' Java stock within weeks or months of each other, and (e) these coordinated activities were implemented by entities owned by different Defendants with different nominee officers (reflecting that the beneficial owners were responsible for the conduct of their shell entities).

Third, as with Weaver, the SEC alleges Sun and Al-Barwani personally profited from their entities' illegal sale of Jammin Java stock. From the Jammin' Java sale proceeds, Sun transferred about $40,000 to himself on May 30, 2011.[9] Al-Barwani raked in much more. In the largest transfer, Renavial paid $11.3 million to a U.A.E.-based entity that Al-Barwani owns and controls. The SEC further alleges that Al-Barwani's Renavial transferred a portion of its trading proceeds to Weaver's Blue Leaf, which, in turn, sent funds to Jammin' Java disguised as "installment payments" under the bogus Straight Path financing agreement. (*Supra*, pp. 9-11)[10]

---

[9] For personal jurisdiction purposes, recently obtained documents further reflect that Sun received another $660,000 when he closed the Westpark account on June 2, 2014. (Ex. A.)

[10] Defendants' reliance on *SEC v. Alexander* ("*Alexander II*") is misplaced. 2003 WL 21196852, *3 (S.D.N.Y. May 20, 2003) (finding jurisdiction over Greek resident who used a brokerage account held in his wife's name to commit insider trading, but not over wife because there was no allegation she had any role in the trading in that account). Here, the SEC alleges Defendants had a role: they directed Berlinger to open the accounts and approved all stock trades and sales made in them.

3. <u>Sun and Al-Barwani Are The Alter Egos Of Their Companies.</u>

The Court may also exercise personal jurisdiction over Sun and Al-Barwani under the alter ego doctrine. Personal jurisdiction exists over an individual where the individual is the alter ego of a corporation subject to the court's jurisdiction. *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1393-94 (9th Cir. 1984); *Wheaton Farm Co. v. Franmar, Inc.*, 2009 WL 464337, *15 (D. Idaho 2009).

To invoke the alter ego doctrine of personal jurisdiction, the plaintiff must allege two elements: "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist"; and "[s]econd, there must be an inequitable result if the acts in question are treated as those of the corporation alone." (Dkt. #118. at 16 (citing cases).) "The standard for <u>personal jurisdiction</u> under an alter ego theory is lower than the standard for <u>liability</u> under an alter ego theory." *Television Events & Marketing, Inc. v. Amcon Distrib. Co.*, 416 F. Supp. 2d 948, 962 (D. Hawaii 2006)(emph. added); *SEC v. Aimsi Tech., Inc.*, 650 F. Supp. 2d 296, 301-02 (S.D.N.Y. 2009). Personal jurisdiction exists if the plaintiff "makes a non-frivolous allegation that the defendants controlled a person liable for fraud." *San Mateo Cty. Trans. Dist. v. Dearman, Fitzgerald, & Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir. 1992). The SEC meets both elements.

<u>First</u>, the Amended Complaint—with or without Berlinger's admissions—confirms that Cilitz, Westpark, Torino, and Renavial were mere corporate proxies for Sun and Al-Barwani. <u>First</u>, as shown above (pp.2-7, 9-11), the SEC pleads extensive facts reflecting a unity of interest between Sun and Al-Barwani and their entities. Sun and Al-Barwani were the sole beneficial owners of the companies. Each company hired nominal officers to conceal the identities and involvement of Sun and Al-Barwani as the true owners. They directed and approved all actions taken by the nominal officers. The entities were mere shells with no other officers or employees, and no operations other than trading stock and transferring the sale proceeds.

1    <u>Second</u>, it would be inequitable if Defendants were able to avoid having to

2    appear in a U.S. district court to account for the conduct of their companies. The SEC

3    expressly alleges that Sun, Al-Barwani and their co-Defendants engaged in massive

4    illegal sales of the stock of a U.S. company. They set up foreign shell entities in

5    jurisdictions known for their strong secrecy laws, opened up Swiss bank accounts,

6    and appointed nominal officers, all in an effort to conceal their involvement. Even

7    though they were the sole beneficial owners of these entities and acted together, they

8    refused to file with the SEC the required disclosures regarding their ownership

9    interests and identities. And, they personally profited from the alleged misconduct,

10   distributing large amounts from the sales proceeds to themselves or entities they

11   control. If Defendants are able to evade the reach of U.S. courts, this scheme will

12   provide a playbook for future fraudsters. That certainly would be an inequitable

13   result. *Podobedov*, 2012 WL 2513465, *4 ("'[W]hen the corporate form is used to

14   perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or

15   inequitable purpose, the courts will ignore the corporate entity and deem the

16   corporation's acts to be those of the person or organization actually controlling the

17   corporation, in most instances the equitable owners.'") (quoting *Sonora Diamond*

18   *Corp. v. Super. Ct.*, 99 Cal.App.4th 523, 538 (2000)).

19
20       4.  <u>Sun and Al-Barwani Fail To Present Compelling Proof That The Court's Exercise of Personal Jurisdiction Is Unfair.</u>

21   Once plaintiff has set forth a *prima facie* case, the burden shifts to the

22   defendant. (Dkt. #118 at 23.) "'[H]e must present a compelling case that the presence

23   of some other considerations would render jurisdiction unreasonable in order to

24   defeat personal jurisdiction.'" *Id*. (*quoting Dole Food Co., Inc. v. Watts*, 303 F.3d

25   1104, 1114 (9th Cir. 2002)). There are seven factors courts consider when weighing

26   whether the defendant has carried his burden. *Id*. (citing seven factors).

27   Sun and Al-Barwani address only one factor: the burden on defendant of

28   litigating in the forum. Devoting only two-sentences to the argument, Sun claims that

litigating here would be unfair because he is a 60 year-old Indian citizen residing in the Channel Islands, and has no ties to the United States. (Sun Br. at 17.) Al-Barwani makes the same plea. (Al-Barwani Br. at 20-21.)

When Defendant Weaver made an identical argument, it was properly rejected by the Court.  The Court noted that (1) Weaver ignored the other six factors, and (2) the SEC has a substantial interest in adjudicating this case here to protect American investors and the integrity of U.S. markets. (Dkt. #118. at 23-24.) The Court's reasoning applies with full force here. Moreover, Defendant's pleas of inconvenience ring hollow. Sun, residing in the Bailiwick of Jersey, and Al-Barwani, residing in Oman, were the sole beneficial owners of companies formed in the Marshall Islands, Panama, and Nevis, with bank accounts in Switzerland, that traded stock in a U.S. company over the U.S. OTCBB. They had no difficulty running their "businesses" in numerous countries around the globe; defending a lawsuit in the U.S. should not be a logistical challenge for them.

Defendants' Rule 12(b)(2) motion should be denied.

**B.    The SEC Has Adequately Pled Securities Law Violations By Sun and Al-Barwani.**

At this stage, the Court must accept as true all factual allegations in the Amended Complaint, as well as all reasonable inferences to be drawn from them, construing the allegations in the light most favorable to the SEC. *See, e.g., In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). The Amended Complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).

1.    The SEC Properly Alleges Sun and Al-Barwani Violated Section 5.

To plead a violation of Section 5 of the Securities Act, the SEC need only allege: (1) Defendants directly or indirectly sold securities, (2) without registration, (3) in interstate commerce. (*See* Dkt. #118 at 24); *SEC v. Ritchie*, 2008 WL 2938678,

1    *7-8 (C.D. Cal. May 9, 2008). At this stage, Defendants do not challenge either the

2    second or third elements. The only issue is whether the SEC sufficiently alleges

3    Defendants "directly or indirectly" sold Jammin' Java securities.

4          As the Court noted in its prior opinion, Section 5 liability is not limited to

5    direct sellers—*i.e.,* persons who actually pass title to the securities. (Dkt. #118 at 24.)

6    The statute includes indirect sellers too—*i.e.*, persons who are "necessary

7    participants" and "substantial factors" in sales made by others. *Id*. "A defendant is a

8    necessary participant if 'but for' his participation in the distribution of unregistered

9    securities, the sale transaction would not have taken place. Further, a defendant is a

10   substantial factor in the distribution of unregistered securities if his overall conduct

11   and participation is not 'de minimus'." *Id*. at 25 (citing cases).

12         In dismissing the SEC's prior Section 5 claim, the Court found the SEC had

13   not sufficiently alleged alter ego liability or any other basis to disregard the corporate

14   form. *Id*. at 26. As discussed above, the SEC now alleges extensive facts

15   demonstrating—*i.e.*, raising a plausible inference—that Cilitz, Westpark, Torino, and

16   Renavial were mere proxies for their owners. (*Supra*, pp. 2-7.) Defendants' motion to

17   dismiss the Section 5 claims should be denied on this basis alone.

18         Moreover, even if the corporate form is not disregarded, the SEC now pleads

19   facts raising a plausible inference that Defendants are liable as <u>indirect</u> sellers. In its

20   prior ruling as to Weaver, the Court held that the SEC alleged sufficient facts to state

21   a "plausible claim that Weaver exerted control over Calgon, Donnolis, and

22   Petersham" and that Weaver was a "necessary participant and substantial factor" in

23   his entities' trades. *Id*. at 27-28. The Court highlighted the SEC's allegations that

24   Weaver controlled the entities, that his entities engaged in transfers of Jammin' Java

25   stock, and the transfers coincided with each other and with similarly-timed transfers

26   to entities owned by Weaver's co-Defendants. *Id*. at 27. The SEC has pled similar

27   factual allegations—and much more—as to Sun and Al-Barwani. (*Supra* pp. 7-9.)

28         Al-Barwani argues "that it was Berlinger—not Al-Barwani—who was a

21

'necessary participant' and 'substantial factor' in Renavial's transactions." (Al-Barwani Br. at 23-24.) He essentially claims there can be only one "necessary participant" at a time. The Court previously rejected the same argument made by Weaver. (Dkt. #118 at 27-28.) There is nothing in the Amended Complaint or in any case cited by Defendants suggesting only one person can be liable as an indirect seller. *See id*. at 28 (finding the Complaint likely pleads necessary participant and substantial factor liability against <u>both</u> Weaver and Berlinger). Although nominal officers like Berlinger may have carried out their wishes, Sun and Al-Barwani called the shots; they were the sole beneficial owners of these companies and directed and approved the transfers and sales alleged in the Complaint. Their participation in the sales by their companies was both necessary and substantial (*i.e.*, not "de minimis"). Defendant's motion to dismiss the Section 5 claims must be denied.

### 2. The Amended Complaint States A Claim Against Sun for Violating Section 13(d) of the Exchange Act.

Pursuant to Section 13(d) of the Exchange Act, anyone who acquires ownership of 5% or more of a company's stock must disclose his ownership to the SEC. (Dkt. #118 at 29.) (citing 17 C.F.R § 240.13d-1(a)). Section 13(d) also requires that the stockholder amend his beneficial ownership report promptly whenever there is a "material change" in ownership. *Id*. (citing 17 C.F.R. § 240.13d-2(a)). Like Section 5, Section 13(d) is a strict liability statute. *Id*. (citing cases).

The term "beneficial owner" is interpreted broadly. The inquiry "'focuses on any relationship that, as a factual matter, confers on a person a significant ability to affect how voting power or investment power will be exercised, because it is primarily designed to ensure timely disclosure of market-sensitive data about changes in the identity of those who are able, as a practical matter, to influence the use of power." *Id*. at 29-30 (*quoting SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993)). Additionally, the statute applies to persons who beneficially own securities as a "group," broadly construed as two or more persons

1  who have "formed a combination in support of a common objective." Dkt. # 118 at

2  30 (citing cases; internal quotes omitted). The relationship can be informal, and it

3  may be shown through circumstantial evidence. *Id*. (citing cases).

4      As shown above, the SEC pleads numerous facts raising a plausible inference

5  that Sun owned and controlled Cilitz, Westpark and Torino, and that he had

6  significant ability to affect how the investment power of those entities would be

7  exercised. Sun (a) was the sole beneficial owner of these entities; (b) directed the

8  activities of their nominee officers; (c) approved transactions in Jammin' Java stock;

9  (d) owned and controlled entities that engaged in nearly identical transactions despite

10 having different nominee officers (reflecting his control of those entities); and (e)

11 personally profited from the sales. In denying Weaver's motion to dismiss, the Court

12 found substantially identical allegations sufficient to "plausibly allege that Weaver

13 had control over his entities and exercised that control with the regard to the very

14 securities at issue." (Dkt. #118 at 31.)

15     Sun does not deny that Cilitz, Westpark, and Torino owned more than 5% of

16 Jammin' Java stock. (*See* Am. Compl.¶¶ 80, 98, 112 (c).) Indeed, the SEC's

17 allegations demonstrate Sun violated Section 13 on his own. (*Id*. ¶ 112(c)) ("With the

18 exception of one day during the time period December 13, 2010 through March 8,

19 2011, the collective holdings of these entities exceeded 5%"). As an alternative basis,

20 the extensive allegations of coordination between Sun and his co-Defendants show

21 that Sun was part of a group that breached the 5% ownership threshold. While Sun

22 prefers to blame Berlinger and the other nominee officers for the actions of his

23 entities, the SEC's allegations, taken as true along with all favorable inferences, meet

24 the threshold for pleading his liability for violations of Section 13(d).

25     3.  The Amended Complaint Sufficiently Alleges Sun Violated Section 10(b).

26     The Court dismissed the SEC's Section 10(b) claim against Sun "for the same

27 reason its other claims against Sun" were dismissed. (Dkt. #118 at 36) (holding

28 Complaint did not "allege sufficient facts for the Court to infer that the actions of

23

1    Sun's entities should be attributed to Sun"). In contrast, the Court ruled the

2    Complaint sufficiently pled "with particularity Weaver's role in the fraudulent

3    scheme culminating in the sale of Jammin' Java stock." *Id*. Specifically, the Court

4    ruled that the SEC is entitled "to an inference that Weaver controlled Donnolis and

5    Calgon" and "Weaver, through Donnolis and Calgon," took actions in furtherance of

6    the fraudulent pump-and-dump scheme. *Id*.

7           The SEC's allegations against Sun are now as detailed as the prior pleading's

8    allegations against Weaver. Most notably, the SEC plugged the hole in its prior claim

9    with factual allegations that Sun was the <u>sole</u> beneficial owner of and controlled

10   Cilitz, Westpark and Torino, shell entities with only nominee officers, no employees

11   and no operations other than trading penny stock. Moreover, the SEC alleges with

12   specificity the actions Sun took, through his entities, to further the scheme. It alleges:

13   (a) exactly which of Weaver's entities (Donnolis, Arcis) and Whittle's entities

14   (Nemo, Monolosa) transferred Jammin' Java stock to Sun's Torino, Cilitz and

15   Westpark; (b) the precise dates when those transactions occurred; (c) the precise dates

16   when Sun's entities, Torino and Westpark, sold their shares to the public; (d) the

17   exact amount of shares they sold to the public; (e) the precise details for each of the

18   similarly-timed transfers and sales of Jammin' Java stock between and by Sun's co-

19   Defendants; (f) Sun's motive—to conceal his involvement with and ownership of

20   Cilitz, Westpark and Torino—for failing to file the required SEC disclosures; (g) the

21   transfer of illicit sales proceeds to Sun; and (h) most importantly, specifies that Sun

22   directed and approved specific transactions by his entities in the course of the

23   scheme. The SEC pleads Sun's fraud with more than enough specificity to satisfy

24   Rule 9(b). *See FTC v. ELH Consulting, LLC*, 2013 WL 4759267, *1-2 (D. Ariz. Sept.

25   4, 2013) (FTC's 22-page complaint—which identified the defendants and their roles

26   in the scheme; listed specific representations made by defendants; thoroughly

27   described the nature of the scheme and how it was carried out; and identified when

28   and where the deceptive conduct took place—contained sufficiently detailed

1    allegations allowing defendants to prepare an answer).

2        Sun makes a cursory argument that the SEC fails to allege scienter, arguing the

3    Amended Complaint "fails to allege facts demonstrating Sun's knowing and

4    conscious decision to join the alleged scheme." (Sun Br. at 22.) This is the same

5    argument Weaver made and the Court rejected in the last round of briefing. (Dkt.

6    #118 at 37) ("Weaver next argues that the Complaint fails to allege scienter, as it does

7    not allege any specific facts demonstrating his knowing and conscious decision to

8    join the alleged pump-and-dump scheme"). As the Court held, "knowledge can be

9    alleged generally." *Id.* Moreover, the same allegations that describe the circumstances

10   of Sun's participation in the scheme create the inference that he acted with scienter.

11   *Id*. (*citing Cooper v. Pickett*, 137 F.3d 616, 628 (9th Cir. 1997) ("[W]hen a complaint

12   alleges with particularity the circumstances constituting fraud, as required by [Rule

13   9(b)], then generally it will also have set forth facts from which an inference of

14   scienter can be drawn.")). Here, the SEC has expressly alleged that Sun "intentionally

15   and recklessly engaged in the fraudulent conduct described" in the Amended

16   Complaint. (Am. Compl. para. 164.) It also alleges detailed facts laying it his

17   participation in the fraud, all of which support the inference he acted with scienter.

18       For all the foregoing reasons, the Court should deny Sun' and Al-Barwani's

19   motions to dismiss in their entirety.

20

21                              UNITED STATES SECURITIES AND
                                EXCHANGE COMMISSION
22                              *s/Timothy S. Leiman*
                                _____
23                              Timothy S. Leiman

24
                                Dated; September 29, 2016
25

26

27

28