TIMOTHY S. LEIMAN, Ill. Bar No. 6270153
Email: leimant@sec.gov
PAUL M. G. HELMS, Ill. Bar No. 6291623
Email: helmsp@sec.gov
PETER SENECHALLE, Ill Bar No. 6300822
Email: senechallep@sec.gov

Attorneys for Plaintiff
United States Securities and Exchange Commission
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

LOCAL COUNSEL
Lynn M. Dean, Cal. Bar No. 205562
Email: deanl@sec.gov
United States Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>JAMMIN' JAVA CORP., dba MARLEY COFFEE, SHANE G. WHITTLE, WAYNE S. P. WEAVER, MICHAEL K. SUN, RENE BERLINGER, STEPHEN B. WHEATLEY, KEVIN P. MILLER, MOHAMMED A. AL-BARWANI, ALEXANDER J. HUNTER, and THOMAS E. HUNTER,<br><br>Defendants. | Case No. 2:15-CV-08921-SVW-MRW<br><br>**DECLARATION OF R. KEVIN BARRETT** |

I, R. Kevin Barrett, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct, that this declaration is made on my personal knowledge, and that I am competent to testify as to the matters stated below:

1. I am a Senior Accountant in the Division of Enforcement of the United States Securities and Exchange Commission (the "Commission" or the "SEC") in its office in Chicago, Illinois. I have been employed as an Accountant in the Enforcement Division of the SEC since March 1998.

2. My official duties with the Commission include participating in fact-finding inquiries and investigations to determine whether the federal securities laws have been, are presently, or are about to be violated, and assisting in the Commission's litigation of securities law violations. One of my duties in that position is to obtain for SEC investigations and litigation various kinds of information relating to companies whose securities are publicly traded on national securities markets. As part of my job, I routinely obtain bank records, trading records, and other financial records typically maintained at all varieties of financial institutions, including banks, brokerage firms, and investment adviser firms, and am intimately familiar with the type of records maintained by such entities.

3. I received B.S. and M.S. degrees in Accounting from the University of Illinois and an M.S. degree in Financial Markets & Trading from the Illinois Institute of Technology. I received my certification as a certified public accountant from the state of Illinois in 1976.

4. Prior to my employment with the Commission, I worked in the public accounting profession for three and one-half years, and in the securities industry for nearly seventeen and one-half years in several capacities, including as a controller at a financial services firm and as a

1  trader on the Chicago Stock Exchange ("CSE") and the Chicago Board

2  Options Exchange ("CBOE").

3      5. I have reviewed information relating to the acquisition,

4  transfer, and sale of Jammin' Java Corp. ("Jammin' Java" or "JAMN")

5  stock from 2006 through approximately June 2011.  More specifically, I

6  reviewed trading records, transfer records, account statements, account-

7  opening documents, cash receipt and disbursement records,

8  correspondence, and order and execution files from multiple broker-dealer

9  firms and banks.  In addition, I reviewed information relating to the price

10 and volume history of Jammin' Java stock.  I have reviewed relevant

11 account records and other documents produced in this litigation by Rene

12 Berlinger, the Swiss Financial Market Supervisory Authority ("FINMA"),

13 the Superintendencia del Mercado de Velores – the Panamanian

14 securities regulatory authority (the "SMV"), Jammin Java's transfer agent

15 – Empire Stock Transfer, Inc. ("Empire"), Stephen Wheatley, Michael

16 Sun, Mohammed Al-Barwani, and Jammin Java, publicly available

17 information (including public filings and press releases), promotional

18 broadcasts from various sources, and other documents obtained by the

19 Commission staff.[1] Among other documents, I have reviewed transfer

20 agent and custodial records pertaining to Jammin Java, as well as those

21 pertaining to certain other publicly held entities.

22      6. In connection with that review, I have analyzed and

23 summarized voluminous documents related to (a) the reverse merger of

24 Marley Coffee into Global Electronic Recovery Corp. ("GERC"); (b)

25

26

---

27 [1] While the documents underlying the attached summary exhibits are too voluminous to attach to this declaration, the documents I have reviewed were produced to the Defendants in this litigation

28 or are publicly available. The SEC will make any or all of the documents underlying my calculations available to the Court upon request.

1    transfers and consolidation of Jammin Java stock with offshore

2    companies owned by Defendant Shane Whittle;  (c) the transfer of at least

3    42.7 million shares of Jammin Java common stock (and as many as 45.4

4    million shares) to entities beneficially owned by Defendants Weaver, Sun,

5    Miller, Wheatley, and Al-Barwani; (d) the sale of at least 42.7 million

6    shares of Jammin Java common stock (and as many as 45.4 million

7    shares) by entities beneficially owned[2] by Defendants Weaver, Sun,

8    Miller, Wheatley, and Al-Barwani; and (e) the use of proceeds from the

9    aforementioned sales of Jammin Java stock.

10       A.    **Jammin Java's Reverse Merger Into GERC and Shane Whittle's**

11             **Initial Acquisition of Stock**

12           7. In October 2006, pursuant to a February 2006 registration

13   statement, GERC (the public company that would eventually become

14   Jammin Java through a reverse merger) issued stock certificates to David

15   O'Neill – then-CEO of GERC – and 42 individuals with addresses in

16   Canada and Mexico ("GERC Nominees").

17           8. The 42 GERC Nominees did not hold these share certificates in

18   their own accounts. Instead, GERC's transfer agent, Empire Stock

19   Transfer, Inc. ("Empire"), sent the share certificates to O'Neill.

20           9. Transfer agent records reflect that the GERC Nominees used

21   addresses associated with O'Neil, and (after the merger) addresses

22   associated with Shane Whittle. As shown below (e.g., ¶¶ 34-35) GERC

23   (and then Jammin Java) shares held in the name of GERC Nominees

24   were repeatedly directed to entities owned by Whittle, Weaver and

25   Weaver's co-Defendants for no apparent compensation. As shown below

26

27   _____

     [2] Statements that the Defendants "owned" or "controlled" various entities are based on beneficial
28   ownership disclosures in the available account records and evidence reflecting ownership and
     control set out in the SEC's Statement of Uncontested Facts.

3

(¶¶ 34-35) often these transfers mirrored highly similar transfers from entities owned by Whittle to Weaver and his co-Defendants.

10.    On August 22, 2007, Whittle was appointed to GERC's Board of Directors.

11.    On October 22, 2007, Empire issued share certificates to then-existing shareholders as part of a stock split that provided 22.72 additional shares for each share. O'Neill and each of the GERC Nominees were given title to 22.72 additional shares for each share they originally owned. The new share certificates for O'Neill and the GERC Nominees were mailed to O'Neill, not to the individual shareholders.

12.    From December 2007 to March 2008, certain GERC Nominees transferred millions of their GERC shares to several Panamanian entities owned and/or controlled by Shane Whittle. Whittle's Panamanian entities were El Tololo Investment Corp. ("Tololo"), Tyrone Investments, Inc. ("Tyrone"), Nemo Development, S.A. ("Nemo"), and Luminus Real Estate, Inc. ("Luminus").

a.    **Nemo.**  On January 11, 2008, Empire transferred to Nemo 1,596,615 shares of GERC stock that previously had been issued to several GERC Nominees. I have seen no evidence that the shares were paid for.

b.    **Tyrone.**  On January 3, 2008, Empire sent Tyrone a certificate for 1,613,220 shares of GERC stock that previously had been issued to several GERC Nominees. On January 15, 2008, the 1,613,220 shares were deposited in an account held for Tyrone at Verdmont Capital, S.A. ("Verdmont"). I have seen no evidence that the shares were paid for.

c.    **Tololo.**  On December 27, 2007, an account in the name of Tololo held at Bank Sarasin & Cie, A.G. ("Bank Sarasin") received

824,874 shares of GERC stock. On March 14, 2008, the same Tololo account received another 36,300 shares, for a total of 861,174 shares.  The GERC shares received into the Tololo account in December 2007 and March 2008 had previously been issued to several GERC Nominees. I have seen no evidence that the shares were paid for.

d.   **Luminus.**  On February 20, 2008, Empire sent a certificate for 68,000 GERC shares to VP Bank.  These shares were previously held in the name of several GERC Nominees. Later, on March 17, 2008, Empire sent a certificate for 1,545,220 GERC shares to VP Bank. In total, the Luminus account at VP Bank held 1,613,220 shares following these transfers. I have seen no evidence that the shares were paid for. As described below, this same number of shares, after accounting for certain sales and a stock split, subsequently was distributed from Luminus' Finter account. The Luminus account was opened on or about January 30, 2008.

e.   Figure 1 summarizes these transfers.  The percentage identified in Figure 1 is based on the 32,970,198 shares of outstanding stock as of April 28, 2008.  At this time, a 5% ownership stake in what was then known as Marley Coffee (later Jammin Java) amounted to a position size of 1,648,510 shares.

**Figure 1. Acquisitions by Whittle (Dec. 2007 to Mar. 2008)**

| Entity | Jurisdiction | Date Formed | Shares | Date Acquired | Percentage |
|---|---|---|---|---|---|
| Nemo | Panama | June 12, 2007 | 1,596,615 | Jan. 11, 2008 | 4.8% |
| Tyrone | Panama | Sept. 10, 2007 | 1,613,220 | Jan. 3, 2008 | 4.9% |
| Tololo | Panama | Oct. 3, 2007 | 824,874 36,300 | Dec 27, 2007 Mar. 14, 2008 | 2.6% |
| Luminus | Panama | Nov. 19, 2007 | 68,000 1,545,220 | Feb. 20, 2008 Mar. 17, 2008 | 4.9% |

13.     Effective February 25, 2008, Marley Coffee, Inc. ("Marley Coffee") merged into GERC.  After the merger, GERC changed its name to Marley Coffee.

14.     On February 26, 2010, Jammin' Java conducted a three-for-one stock split, issuing two additional shares to each shareholder for each share held.

a. **Nemo.**  As a result of the split, Nemo received 3,190,230 additional shares of Jammin' Java stock, and owned 4,786,845 shares in total.[3] After the split, on April 22, 2010, certain GERC Nominees transferred an additional 3,084,096 shares to Nemo (amounting to an additional 3.1% of Jammin' Java's outstanding stock at the time).  After this transfer, Nemo held a total of 7,870,941 shares.

b. **Tyrone.**  Through the stock split, Tyrone received 3,226,440 additional shares of Jammin' Java stock in its Verdmont account on March 1, 2010.  After the split, Tyrone held a total of 4,839,660 shares.

c. **Tololo.**  At the time of the February 26, 2010 stock split, Tololo held 715,000 shares.[4]  As a result of the stock split, Tololo's holdings of Jammin Java shares increased to 2,145,000 shares on March 4, 2010.  On April 19, 2010, 2,072,400 shares were transferred from Tololo's account at Bank Sarasin to an account held at VP Bank in the name of another entity controlled by Whittle - Monolosa Real Estate, Inc.

---

[3] This sum accounts for the fact that, on February 24, 2010, prior to the split, the Nemo account sold 1,000 shares of Jammin Java.

[4] This sum accounts for the fact that Tololo sold 146,174 shares of Jammin Java stock on December 14, 2009.

("Monolosa"). On April 21, 2010, the remaining 72,600 JAMN shares were transferred out of the Tololo account. The 72,600 shares were eventually delivered into an account for one of Miller's entities on March 4, 2011, and subsequently sold.

d. **Luminus.** At the time of the February 26, 2010 stock split, Luminus had a Jammin Java share balance of 1,611,720 shares. Consequently, it received an additional 3,223,440 shares of Jammin' Java through the stock split. In total, Luminus held 4,835,160 shares after the stock split.

15. Whittle and entities he owned continued to hold or control a substantial portion of Jammin' Java's stock through 2010.

a. From April 22, 2010 until October 1, 2010, Whittle held approximately 29% of Jammin' Java's stock in his own name and through entities that he owned. During this time period, he held 9,375,000 shares in his own name; 7,870,941 shares through Nemo; 4,839,660 shares through Tyrone; at least 2,072,400 shares through Monolosa; and 4,835,160 shares through Luminus—a total of at least 28,993,161 shares of 98,910,594 shares outstanding.

b. After Whittle sold 2 million shares in his own name on October 1, 2010, Whittle and his entities held approximately 27% of Jammin' Java's outstanding stock, a total of at least 26,993,161 shares of 98,910,594 shares outstanding. Whittle and entities he owned and / or controlled held this stock until he began transferring additional blocks of shares in late November 2010, as described below.

16. Additional Jammin Java shares were retired on December 13, 2010. As a result, as of that date, outstanding shares of Jammin Java stock were reduced to 75,901,318 shares, and a 5% position

1    in JAMN stock was reduced to 3,795,066 shares from the previous

2    4,945,530 shares.

3        17.    Subsequently, on December 20, 2010, Whittle and

4    another shareholder – Andrew King – returned a portion of their holdings

5    to treasury.  Whittle returned 4,885,144 of the 7,375,000 shares held

6    directly in his personal name, and King returned 2,028,524 shares.

7    Empire retired these shares and then issued new certificates to Whittle

8    (for 2,489,856 shares) and to King. As a result, outstanding shares of

9    Jammin Java stock were further reduced to 68,987,650 shares, and a 5%

10   position in JAMN stock was reduced to 3,449,383 shares. Moreover, a

11   total of 22,007,353 of these shares, held by Whittle, Marley, Anh Tran, K

12   Capital, and 3 other accounts were 'restricted,' thus further reducing the

13   quantity of freely trading Jammin Java shares to 46,980,297 shares.

14   (referred to as "the float").

15       18.    **Exhibit A** is a summary reconciliation that I performed

16   reflecting the overall categorical use and dispersal of GERC Nominee

17   shares (first in GERC stock and then in Jammin Java).

18   **B.**    **First Wave of Stock Transfers From Whittle's Entities to Entities**

19           **Owned by Weaver and Others (Late 2010)**

20       19.    From August to November 2010, multiple offshore

21   entities were formed with Weaver and his co-Defendants designated as

22   beneficial owners. Defendants' entities then opened accounts that

23   ultimately received and sold large blocks of Jammin' Java stock. **Exhibits**

24   **B(i) and B(ii)** summarize information contained in account records

25   regarding the ownership, formation, account opening, and affiliated

26   persons or entities of the Defendants' foreign entities. I created this

27   summary based on my review of voluminous account opening and

28   incorporation records. To show the various relationships between the

entities, **Exhibit B(i)** organizes this information by each beneficial owner and **Exhibit B(ii)** organizes the same information by the bank or brokerage used by the entity for accounts involved in the Jammin Java transactions.

20.     Relevant to the transfer of Jammin Java stock, the following entities were formed that were beneficially owned by Weaver and his co-Defendants:

a. **Las Colinas (Kevin Miller).**  On August 27, 2010, Rene Berlinger ("Berlinger") formed Las Colinas Ltd. ("Las Colinas") in the Marshall Islands.  Days later, on August 30, 2010, Las Colinas opened an account at VP Bank in Switzerland.  According to disclosure forms submitted by Las Colinas to VP Bank, Miller was the named beneficial owner of Las Colinas.

b. **Westpark (Michael Sun).**  On August 27, 2010, Berlinger formed Westpark Ltd. ("Westpark") in the Marshall Islands. Shortly thereafter, on August 30, 2010, Westpark opened an account at VP Bank in Switzerland.  According to disclosure forms submitted by Westpark to VP Bank, Sun was the named beneficial owner of Westpark.

c. **Renavial (Al-Barwani).** On September 14, 2010, Berlinger formed Renavial Ltd. ("Renavial") in the Marshall Islands. Renavial then opened an account at VP Bank on September 21, 2010.  According to disclosure forms submitted by Renavial to VP Bank, Al-Barwani was the named beneficial owner of Renavial.

d. **Timotei (Weaver).**  On September 3, 2010, Timotei Overseas, Inc. ("Timotei") was created in Panama.  On September 28, the Panamanian law firm Gray opened an account for Timotei at

Verdmont.  According to disclosure forms submitted to Verdmont, Weaver was the beneficial owner of Timotei.

e. **Rahela (Miller).**  On September 17, 2010, Rahela International, Inc. ("Rahela") was created in Panama with the assistance of Gray.  On September 28, 2010, Gray opened an account for Rahela at Verdmont.  According to disclosure forms submitted to Verdmont, Miller was the named beneficial owner of Rahela.

f. **Arcis (Weaver).**  On August 20, 2009, Roger Knox formed Arcis Assets, S.A. ("Arcis") in the Marshall Islands. On September 17, 2010, an account was opened at CBH Compagnie Bancaire Helvétique, S.A. ("CBH") for Arcis.  According to disclosure forms submitted to CBH, the Arcis Trust, a Bermuda-based trust entity, was the sole beneficial owner of Arcis, and Weaver was the sole beneficiary of the Trust.

g. **Torino (Sun).**  On January 22, 2010, Torino Invest, S.R.L. ("Torino") was formed in Nevis, a Caribbean island nation. On October 1, 2010, an account was opened at CBH in Torino's name. According to disclosure forms submitted to CBH, a Bermuda-based trust entity, the Torino Trust, was the beneficial owner of Torino, and Sun was the sole beneficiary of the Trust.

h. **Petersham (Wheatley).**  On September 25, 2009, Petersham Enterprises, Ltd. ("Petersham") was formed in the British Virgin Islands. On September 23, 2010, an account was opened for Petersham at B&C Capital, Inc. ("Bateman"), an affiliate of Bateman & Company in Panama City, Panama. Another Bateman account was opened for Petersham on January 26, 2011. Wheatley was the beneficial owner of Petersham.

i. **Calgon (Weaver)**.  On November 18, 2010, Berlinger formed Calgon Invest, S.A. ("Calgon") in the Marshall Islands. Within days, on November 24, 2010, Berlinger opened an account for Calgon at Bateman in Panama City, the same brokerage firm that held an account for Petersham. The Calgon account was managed by the same account representative, Andrew Golding. Records indicate Golding was a 'Vice President, Global Investments' for Bateman Financial Limited in the Cayman Islands. Account opening records identify Weaver as the sole beneficial owner of Calgon.

j. **Manitou** (Weaver).  On February 17, 2011, Manitou, S.A. ("Manitou") was formed in the Marshall Islands.  Within days, on February 21, 2011, an account was opened for Manitou at Bank Gutenberg AG in Zurich, Switzerland. According to new account documents, Weaver was the sole beneficial owner of Manitou.

21.     Between November 22 and December 27, 2010, four of Whittle's Panamanian entities transferred a total of 16,341,341 JAMN shares to six offshore entities that were owned by Weaver, Sun, Miller, and Wheatley. All but 36,300 of these shares were transferred between November 22 and December 23. **Exhibits C(i) and C(ii)** "Transfers and Sales of GERC Nominee Shares" are schedules showing all transfers and sales of Jammin Java stock between November 22, 2010 and May 11, 2011. **Exhibit C(i)** shows all transfers and sales in chronological order and **Exhibit C(ii)** shows the same information organized by the entity that sold and/or transferred the shares. I created these schedules based on a review of voluminous account records for each entity and transfer agent records for Jammin Java.

22.     In total, the 16,341,341 shares distributed by Whittle's
Panamanian entities amounted to nearly 24% of Jammin' Java's
68,987,650 outstanding shares as of December 20, 2010. The following is a
summary of these November and December transfers (beneficial owners
are identified in parentheses):

     a.     **Nemo (Whittle) to Petersham (Wheatley).**  On
November 19, 2010, Nemo's Centrum account delivered
3.2 million shares to Petersham's Bateman account.  The shares
were received into the Petersham account on November 22, 2010.

     b.     **Luminus (Whittle) to Donnolis (Weaver).**  On
November 23, 2010, Luminus transferred 3,198,000 shares to a
Finter account in the name of Donnolis Invest Corp. ("Donnolis").
Weaver was identified as the beneficial owner of Donnolis.

     c.     **Nemo (Whittle) to Rahela (Miller).**  Also on November
19, 2010, Nemo transferred 1,560,000 shares to Rahela's account
at Verdmont. The shares were received into the Rahela account
on November 23, 2010.

     d.     **Monolosa (Whittle) to Cilitz (Sun).**  On November 24,
2010, Whittle's Monolosa account at VP Bank transferred
2,036,100 shares to Sun's Cilitz and Trade, S.A. ("Cilitz") account
at Finter.  On December 27, 2010, Monolosa transferred another
36,300 shares to Cilitz.

     e.     **Nemo (Whittle) to Torino (Sun).**  On December 13,
2010, Nemo's Centrum account delivered 3,110,941 shares to
Sun's Torino.

     f.     **Tyrone (Whittle) to Las Colinas (Miller).**  On
November 16, 2010, Whittle authorized the transfer of 3.2 million
Jammin Java shares from Tyrone to Las Colinas.  On

December 23, 2010, Tyrone's account at Verdmont transferred 3.2 million shares to Las Colinas's account at VP Bank. Although there was no share purchase agreement executed at the time, the transfer was memorialized in a Share Purchase Agreement that was executed over four months later. Tyrone and Las Colinas executed a Share Purchase Agreement dated March 18, 2011 stating that a $3,200 "Purchase Price" "has been paid in full" for the 3.2 million Jammin Java shares that had been transferred.

23.     In total, 16,341,341 Jammin Java shares, amounting to nearly 24% of Jammin' Java's outstanding stock as of the date of the last transfer on December 27, were distributed between mid-November and late December 2010 by Whittle's entities to six offshore shell entities owned by Weaver, Sun, Miller, and Wheatley.

**C.   Increase in Jammin Java's Price and Volume from Late 2010 to Mid-2011**

24.     Over a six-month period from late December 2010 to mid-2011, Jammin' Java's share price and volume increased from $0.17 per share and practically no volume to an intraday high of $6.35 and volume of 20 million shares on May 12, 2011. **Exhibit D** is a true and accurate Historical Price and Volume Summary for Jammin Java stock for the period January 23, 2009 through January 23, 2012. I created this summary using publicly available market data for JAMN (available on numerous publicly available websites, including https://finance.yahoo.com/quote/JAMN/history?p=JAMN.

25.     Figure 2 accurately depicts this increase in share price and volume.

**Figure 2. Jammin' Java Share Price and Volume (Dec. 2010 to Nov. 2011)**



26.      This increase started on December 23, 2010, the same day Jammin Java publicly announced a purported $2.5 million financing arrangement with an entity called Straight Path. On December 23, 2010, Jammin Java stock closed at $.50 / share, up $.33, or 194%, for the day, versus the prior day's close of $.17. The volume was 173,300 shares. Before that date, there was almost no trading activity in JAMN. From June 30, 2010 through December 22, 2010, JAMN traded a total of only 6,000 shares at $.10 - $.17 per share, on four of the 123 trading days.

**D.    Coordinated Trading By Defendants' Entities**

27.      As shown above, before December 23, 2010, Jammin Java had almost no trading volume.

28.     That began to change on December 23, 2010, the day the Straight Path agreement was announced. Between December 23, 2010 and December 31, 2010, aggregate trading volume in JAMN stock was 443,800 shares. During this period, JAMN's closing price ranged from a low of $.50 on December 23 to a high of $.55 on December 31. Trading records reflect coordinated transactions involving Weaver's entities during this period.

29.     During this period, two entities – Donnolis (owned by Weaver) and Petersham (owned by Wheatley) – began to sell blocks of Jammin Java stock into the market.

30.     The overwhelming majority of those sales coincided with purchases from four separate accounts held at Verdmont, the same Panamanian brokerage firm used by Tyrone (Whittle), Timotei (Weaver), and Rahela (Miller).

31.     Those four Verdmont accounts bought a total of 341,950 JAMN shares between December 23, 2010 and December 31, 2010 (more than 77% of the total volume for the period).  From December 28 through December 31, two of these four accounts bought a total of 200,000, or 94%, of the 212,700 JAMN shares that traded, and at least matched the closing price of JAMN on each day when their 50,000 share limit orders were executed, with the final two being executed at $.55 on December 31.

32.     Three of the four Verdmont accounts involved in these purchases were affiliated with individuals acquainted with Weaver:

a. The beneficial owner of two of these Verdmont accounts was identified in account opening records as Donald John Petkau ("Petkau"), a Canadian citizen and a broker / sales trader at Verdmont. Account records reflect that Weaver knew Petkau. For example, order records for Timotei indicate Weaver called Petkau on

15

multiple occasions on each of March 9, 10, and 29, 2011 for the purpose of placing sell orders in JAMN stock. In addition, in a 01/13/11 email to Gray & Co. (which provided nominee services to several of Defendants' entities) Weaver asked Gray & Co. to place a sell order with "Don at Verdmont" "to sell 85,000 shares of Jammin Java at $.66/share and this is Good til cancelled." Weaver indicated that the sale should come from "Rahelia or Timotei" – the former entity (Rahela) nominally owned by Miller and the latter (Timotei) owned by Weaver. Gray & Co. then e-mailed Petkau and a colleague to find out which account held the shares and was informed that the shares were in Rahela's account.[5] In response to Weaver, Verdmont placed a sell order out of Rahela's account at $.66 per share (then above the market price of $.61 per share and above any previous price for Jammin Java during this period). Within three weeks – on the first trading day that the share price rose to $.66 per share – Rahela's limit order (which was placed by Weaver) was filled.

 b. The beneficial owner of a third Verdmont account involved in these transactions was Glynn David Fisher, Verdmont's President and Owner. But, Petkau had trading authority for the account. As described directly above, Weaver knew – and conducted business with – Petkau.

 c. The relationship between Weaver and the owner of the fourth Verdmont account is unknown. But, the activity and transactions in the fourth account closely resemble that in the three accounts owned and/or controlled by Don Petkau.

---

[5] As described herein, Timotei would not receive shares until March of 2011 – two months after Weaver was asking Don Petkau to place the order.

33.     The coordinated trades involving Weaver took place as follows:

(a)     **Sales by Donnolis (Weaver):** Starting the day the Straight Path agreement was announced – from December 23, 2010 through December 31, 2010 – Weaver's Donnolis account sold a total of 299,683 JAMN shares, or approximately 9.4% of its JAMN position, generating aggregate proceeds of $156,497. The shares were liquidated on the same five days the four Verdmont accounts were buying. And, records indicate that 198,700 of the 200,000 shares purchased by the Verdmont accounts between December 28 and December 31, 2010 were directly supplied by Weaver's Donnolis account.

(b)     **Sale by Petersham:** Similarly, 15,000 JAMN shares were sold from Petersham's account on December 23, 2010 – the day the Straight Path agreement was announced.  During the afternoon of December 22, 2010, Wheatley (for Petersham) placed a good-til-cancel ("GTC") order to sell 15,000 shares of JAMN stock at $.40. Before Petersham's order was placed there was almost no activity in JAMN stock. At the time Petersham's order was placed, only two JAMN sales had taken place in the previous two months – for 200 shares each at $.17 per share. The 15,000 shares were sold on December 23, 2010 for an average price of $0.433 per share. Of those 15,000 shares, 14,000 of them were bought by one of the Verdmont accounts controlled by Don Petkau (pursuant to his $.40 bid for 20,000 shares). After this single sale, Petersham did not sell any additional shares of Jammin' Java stock until February 11, 2011.

E.   **Second Wave of Stock Transfers to Entities Owned By Weaver and His Associates (2011)**

34.      From February 22 through to May 6, 2011, and primarily in March 2011, additional blocks of Jammin' Java stock were moved (or re-distributed) from Whittle's Panamanian entities and GERC Nominees to a total of nine entities owned by Weaver and his co-Defendants.  In total, 29,034,915 JAMN shares were distributed during this period. In addition, a total of 4,970,717 JAMN shares were re-distributed from Weaver's Donnolis and Sun's Cilitz accounts:

a. **Rahela (Miller).**  As described above (¶ 22(c)), Rahela received 1,560,000 Jammin Java shares from Whittle's Nemo on November 23, 2010 as part of the "first wave" of transfers. Rahela sold all of those shares by February 18, 2011. Four days later, Rahela received a second block of Jammin Java shares: on February 22, 2011, Miller's Rahela received 1,639,660 shares from Whittle's Tyrone. Those shares would all be sold as well. Later, on March 4, 2011, Rahela received a <u>third</u> block of Jammin Java stock: 3,156,698 shares that were previously held in the name of several GERC Nominees. Rahela did not sell this third block of 3,156,698 shares, but instead transferred them to Renavial's (Al-Barwani's) account at VP Bank.

b. **Timotei (Weaver).**  On March 4, 2011, Timotei acquired 1,033,052 shares of stock that had been held in the name of a GERC Nominee. The stock was deposited in Timotei's Verdmont account on March 4, 2011.  In addition, days later, on March 8, 2011, Timotei's Verdmont account received a second block of Jammin Java shares: 2,072,400 shares transferred from Sun's Cilitz account at Finter.

c. **Arcis (Weaver).** On March 8, 2011, Arcis' account at CBH received a block of 1,637,160 shares from the Finter account of Luminus (Whittle). Just over a week later, on March 16, 2011, Arcis sold 120,000 of those JAMN shares. The following day, March 17, 2011, Arcis received a second block of Jammin Java stock – this time 3,143,408 shares that had been held in the name of several GERC Nominees. In total, as of March 17, 2011, Arcis held 4,660,568 JAMN shares in its account. On March 21, 2011, Arcis transferred 1,400,000 of these shares to another CBH account held in the name of Sun's Torino. Prior to this transfer from Arcis to Torino, Arcis's holdings amounted to 6.73% of Jammin' Java's outstanding stock. The transfer of 1,400,000 shares from Arcis to Torino – and Arcis' sale of 117,160 shares – brought Arcis's holdings down to 4.54%.

d. **Torino (Sun).** As described above, on March 21, 2011, Sun's Torino account at CBH received 1,400,000 shares from Weaver's Arcis account at CBH. Previously, the same account had received 3,110,941 shares acquired from Nemo's Centrum Bank account on December 13, 2010. All but 1,126 of these shares had been sold by the time of the March 21, 2011 transfer.

e. **Westpark (Sun).** On March 4, 2011, Sun's Westpark account at VP Bank received 2,898,317 shares from Weaver's Donnolis account at Finter. On May 18, 2011, Westpark acquired another 43,000 shares that had been held in the name of a GERC Nominee. It does not appear that the 43,000 shares, which were received in Westpark's VP Bank account on June 6, 2011, were sold by Westpark through December 31, 2012.

f. **Renaival (Al-Barwani).** On March 14, 2011, Al-Barwani's Renaival account at VP Bank received 3 million shares

held in the name of a GERC Nominee. As described above in the discussion of Rahela's acquisition of shares in March 2011, Renavial received another 3,156,698 shares from Miller's Rahela on May 6, 2011 through the same VP Bank account.

g. **Manitou (Weaver).** On March 8, 2011, Manitou received 2,751,964 shares that had been held in the name of two GERC Nominees. After clearing, the shares were deposited in Manitou's Bank Gutenberg account on April 8, 2011.

h. **Calgon (Weaver).** On March 31, 2011, Weaver's Calgon account at Bateman received 3,361,371 shares that had been held in the name of six GERC Nominees.

i. **Petersham (Wheatley).** By March 3, 2011, Petersham had sold the 3.2 million shares that it had acquired from Nemo in November 2010. Approximately two months after these sales were complete, on May 5, 2011, Petersham's account at Bateman received another 3,321,336 shares that previously were held in the name of three GERC Nominees.

35.     Figure 3 summarizes the second wave of share transfers that occurred in early 2011. The percentages are calculated based on the outstanding stock as of the date of the relevant transfer. As of January 28, 2011, Jammin' Java had 69,297,650 shares outstanding (following the issuance of 310,000 restricted shares in January 2011) and, 70,680,150 shares outstanding as of April 8, 2011 (following the issuance of 1,382,500 restricted shares in April 2011, including 300,000 to Straight Path Capital pursuant to the December financing agreement).

**Figure 3. Second Wave of Transfers and Re-Distributions (Early 2011)**

| Date Received | Source | Shares | Percentage | Recipient | Beneficial Owner |
|---|---|---|---|---|---|
| Feb. 22, 2011 | Tyrone (Whittle) | 1,639,660 | 2.4% | Rahela | Miller |
| Mar. 4, 2011 | GERC Nominees | 1,033,052 | 1.5% | Timotei | Weaver |
| Mar. 4, 2011 | Donnolis (Weaver) (Re-Distributed) | 2,898,317 | 4.2% | Westpark | Sun |
| Mar 4, 2011 | GERC Nominees (Transferred to Renavial on May 6, 2011) | 3,156,698 | 4.6% | Rahela | Miller |
| Mar. 8, 2011 | Cilitz (Sun) (Re-Distributed) | 2,072,400 | 3.0% | Timotei | Weaver |
| Mar. 8, 2011 | Luminus (Whittle) | 237,160 | 2.3% | Arcis | Weaver |
| Mar. 14, 2011 | GERC Nominees | 3,000,000 | 4.3% | Renavial | Al-Barwani |
| Mar. 19, 2011 | GERC Nominees | 3,143,408 | 4.5% | Arcis | Weaver |
| Mar. 21, 2011 | Arcis (Weaver) | 1,400,000 | 2.0% | Torino | Sun |
| Mar. 31, 2011 | GERC Nominees | 3,361,371 | 4.9% | Calgon | Weaver |
| Apr. 4, 2011 | GERC Nominees | 3,321,336 | 4.8% | Las Colinas | Miller |
| April 6, 2011 | GERC Nominees | 2,668,930 | 3.9% | Prospera | Unknown |
| April 8, 2011 | GERC Nominees | 2,751,964 | 4.0% | Manitou | Weaver |
| May 5, 2011 | GERC Nominees | 3,321,336 | 4.7% | Petersham | Wheatley |
| Total | | 34,005,632 | 49.1% | | |

36.     In total, more than 34 million shares were transferred or re-distributed during this second wave, amounting to almost half of Jammin' Java's total outstanding stock.

37.     The 34 million shares accounted for more than 49 % of outstanding shares and 72% of Jammin' Java's "float," or freely trading shares. From the time of the split in February 2010 through May 10, 2011, Jammin' Java's freely trading share balance was 46,980,297 shares.

38.     Combined, the first and second wave of transfers described herein resulted in 45,376,256 Jammin Java shares distributed to the Defendants' entities. Of this total, 26,807,911 shares were transferred between November 22, 2010 and March 16, 2011, and an additional 18,568,345 shares were transferred from March 17, 2011 through May 5, 2011.

39.     Records indicate that of the 42 GERC Nominees for whom GERC issued stock certificates in October 2006, the entire share holdings of 37 of these nominees were transferred to the Defendants' entities and then sold by those entities.[6] The other five nominees retained a portion of their holdings and transferred the rest to Defendants' entities. Trading records do not reflect any additional sales from those five GERC Nominees through June 2011. **Exhibit E(i)** summarizes the transfers of the GERC Nominees' shares to the Defendants' entities, sorted by stock certificate number.  **Exhibit E(ii)** reflects the same summary, sorted by the GERC Nominees' names, and **Exhibit E(iii)** sorts these transfers by the beneficial owners of those entities receiving shares.

**F.     Beneficial Ownership**

40.     **Exhibit F** summarizes the ownership position of Jammin Java stock held by various entities owned by the Defendants at various points in time. This summary includes a calculation of the percentage of Jammin Java's outstanding shares owned by each entity and the overall percentage of outstanding shares owned by the entities grouped by beneficial owner. The highlighted portions of this exhibit identify instances where the combined holdings of a beneficial owner's entities exceeded the 5% ownership threshold for SEC reporting.

41.     The Commission's public EDGAR system does not contain any filings by Weaver, Sun, Berlinger, Wheatley, Miller, or Al-Barwani, either individually or as members of a group, reporting ownership or changes in ownership of Jammin' Java stock for at least the time period November 1, 2010 to May 31, 2011.

---

[6] With the exception of 43,000 shares that remained in Westpark's account.

**G.     Stock Sales from December 2010 to May 2011**

42.     From December 2010 to May 2011, Defendants' entities generated more than $77.6 million in proceeds by selling more than 45 million shares of Jammin' Java into the public market. **Exhibit C(i)** summarizes these sales for all entities and **Exhibit C(ii)** summarizes these sales organized by the selling entity. I created these exhibits based on my review of voluminous account records for each entity and transfer agent records related to Jammin Java.

43.     In the aggregate, the shares that were sold amounted to approximately two thirds of Jammin' Java's outstanding stock and more than 96% of Jammin's entire public float of 46,980,297 shares.

44.     Between March 17, 2011 and May 11, 2011 a total of 29,718,238 JAMN shares were sold by Westpark, Torino, Arcis, Calgon, Timotei, Renavial, Las Colinas, Manitou, Petersham, and Prospera.  The sales of these shares generated $63,447,000 in proceeds.  The shares liquidated during this period represent approximately 65.5% of the more than 45 million shares that were distributed to the Defendants' entities and Prospera, and account for nearly 82% of the total sales proceeds of more than $77.6 million. (**Exhibits C(i) and C(ii)**)

**H.     Transfers of Trading Profits**

45.     A portion of the trading proceeds generated from the sale of Jammin' Java stock by Las Colinas (Miller) was used as the financing source for the May 2011 payment to Jammin' Java under the Straight Path Agreement.

46.     On May 17, 2011, $2,400,000 of JAMN sales proceeds generated by Miller's Las Colinas were transferred to another Miller account held at VP Bank in the name of Chilli Capital Ltd. ("Chilli

Capital"). Las Colinas had obtained these funds by selling 3.2 million shares of Jammin' Java stock supplied by Whittle's Tyrone, and an additional 3,321,336 shares supplied by four GERC nominees.

47.     On May 18, 2011, $2.38 million was transferred from the Chilli Capital account to attorney David Loev's Chase bank account for the "Jammin Escrow." The funds were equal to the balance of the previously announced $2.5 million investment from Straight Path, but Straight Path did not provide the financing.

48.     Incorporation documents for Straight Path reflect that, on or about May 20, 2011, Straight Path was formed and converted from an existing Marshall Islands defunct entity named Blue Water, Inc. that originally had been formed on October 21, 2008.

49.     Account records reflect that several of the Defendants' entities participated in the Chilli Capital transfer. Berlinger created a new entity -- Chilli Capital -- on May 3, 2011. Chilli Capital's sole activity was taking in Jammin Java sales proceeds from the Defendants and transferring those funds to Jammin' Java. Berlinger opened an account for Chilli Capital on May 11, 2011. The Chilli Capital account was opened at VP Bank, the same Swiss bank that held accounts for Monolosa (Whittle), Las Colinas (Miller), Renavial (Al-Barwani), and Westpark (Sun). According to account opening records, Miller was the named beneficial owner of Chilli Capital.

50.     In addition, on three earlier dates in January, February, and March 2011, Jammin' Java received three $40,000 payments. These payments did not come from Straight Path, but from Blue Leaf Capital Ltd. ("Blue Leaf"), an entity owned by Weaver. In an August 10, 2011 email to Berlinger concerning the subject "Blue Leaf Purchase," Weaver referred to Blue Leaf Capital as "my main investment account." The Blue

Leaf account was maintained at Barclays Bank, P.LC. ("Barclays") in London, England.

    a. On January 4, 2011, Blue Leaf (Weaver) transferred $40,000 to the Chase account of Jammin' Java's lawyer David Loev ("Loev").

    b. On February 11, 2011, Blue Leaf (Weaver) transferred $40,000 to Loev's Chase account.

    c. On March 22, 2011, Blue Leaf (Weaver) transferred approximately $40,000 to Loev's Chase account.

    51.    Blue Leaf also received cash inflows from Weaver's Arcis and Miller's Las Colinas.

    a. On March 25, 2011, Miller's Las Colinas transferred $1,000,000 to a Blue Leaf account.

    b. On March 15, 2011, Weaver's Arcis transferred $700,000 to a Blue Leaf account. On that same day, Sun's Torino transferred $700,000 to Arcis.

    c. On June 24, 2011, Arcis (Weaver) transferred $1,000,000 to a Blue Leaf account. On April 21, 2011, Sun's Torino transferred $700,000 to Arcis.

    d. On August 14, 2012, Weaver's Arcis transferred £50,000, or approximately $80,000, to a Blue Leaf account.

**I.**    **Payment of Jammin Java Proceeds to Wayne Weaver**

    52.    In addition to the payment of proceeds to Blue Leaf (and sales proceeds that remained in accounts for other entities Weaver owned), Weaver received several additional cash transfers from the entities that traded in Jammin Java. For example:

    a. **Arcis (Weaver).** Arcis transferred $1.5 million of sales proceeds to an account at Near East Commercial Bank, S.A.L.,

Beirut, Lebanon ("NECB") in Weaver's name on March 20, 2012, and £1.25 million to an account at Cayman Institutional Bank in the name of Legacy Global Markets on May 2, 2012.

b. **Timotei (Weaver).** On September 25, 2012, Timotei transferred CAD\$3,760,263 of sales proceeds from its Verdmont account to an account at Cayman Institutional Bank in the name of Legacy Global Markets for further credit to an account in the name of Weaver's Timotei.

c. **Manitou (Weaver).** On May 2, 2012, Weaver's Manitou account transferred £2.4 million (approximately \$3.8 million), to an account at NECB in Weaver's name.

d. **Westpark (Sun).** On September 23, 2011, after the sale of the stock it acquired from Weaver's Donnolis, Westpark's VP Bank account transferred \$1,159,409 to Weaver's Donnolis account at Finter. As of December 31, 2012, the USD cash balance in the Donnolis account was \$1,129,407.

J.     **Weaver's Transfer of Funds to Offshore Locations**

53.     On December 21, 2011, Renavial (Al-Barwani) used \$2 million of Jammin Java proceeds to buy gold (in the form of Krugerrand) which, at the time, was to be stored at VP Bank.

54.     In April 2012, with Al-Barwani's approval, Berlinger arranged to transfer approximately \$11.3 million from Renavial's VP Bank account to an account at Aktif Yatirim Bankasi, A.S. in the name of Tare Finance and Invest Ltd. ("Tare Finance"). According to a trust agreement dated April 5, 2012, Tare Finance was a trust established for the benefit of Al-Barwani, and bsb & Consulco, represented by Bunyamin Altun, was the designated trustee.

55.     Tables summarizing the use of sales proceeds by entity are provided in **Exhibit G**. I created this summary based on a review of voluminous account statements, asset statements and transaction records for each entity.

56.     In addition to the transfers above, substantial additional assets remained in the accounts of the offshore shell entities as of late 2012 (or as of the last date for which documents were produced).

a.  As of November 15, 2011, Calgon's Bateman account held approximately $5,751,133 generated from the sale of Jammin' Java stock and 3,260,000 shares of Lucky Boy Silver Corp. ("Lucky Boy").

b.  As of December 31, 2012, Las Colinas' VP Bank account held 1,000 shares of Apple Computer (valued at $532,170); had cash balances of $60,984 and CAD$999,919; and had other penny stock holdings.

c.  As of December 31, 2012, Westpark's VP Bank account had a cash balance of CAD$1,499,919.

d.  As of 12/31/12, Torino's CBH account held two $1.5 million 'fiduciary on demand deposits' (1 denominated in USD and the other in CAD) and had cash balances of $54,634 and CAD$7,594.

e.  Sun's Cilitz account at Finter Bank held 3,195,000 shares of Lucky Boy and 3,450,000 shares of Big Bear Mining Corp ("Big Bear") as of February 28, 2011.

f.  In addition to the physical gold previously noted, the VP Bank account of Renavial also held 2 shares of Berkshire Hathaway stock and had cash balances of $22,294 and CAD$1,345,502.

g.  As of December 31, 2012, Weaver's Manitou account at Bank Gutenberg had cash balances of CAD$974,116 and $2,980.

h.  As of December 31, 2012, Arcis's CBH account held three 'fiduciary on demand deposit' instruments valued at $2,209,884 and had cash balances aggregating approximately $18,988.

57.   Based on my review of the bank, brokerage and transfer agent records (as well as other records I have reviewed in connection with this case), I have seen no evidence of any of the Jammin Java sales proceeds from any of the Defendants' entities being paid to any of the 42 GERC Nominees.

**K.   Price Collapse and Investor Losses**

58.   Beginning on May 13, 2011, Jammin' Java's share price began to fall following Jammin' Java's disclosure of an unauthorized stock promotion.

59.   In a Form 8-K filed on May 9, 2011, the Company stated that it had become aware of various unauthorized and unaffiliated internet stock promoters who were promoting short-term investments in its common stock in their "stock reports" and on their websites.  After an initial rise, Jammin' Java's closing share price fell from a high of $5.42 on May 12, 2011 to $2.30 on May 17, 2011.

60.   On May 17, 2011, Jammin' Java filed an annual report on Form 10-K disclosing negative information about the company, including the following: (a) Jammin' Java had revenues of only $1,037 for the fiscal year ending January 31, 2011; (b) between February 1, 2011 and May 17, 2011, Jammin' Java had generated only $42,000 in sales; (c) Jammin' Java's auditor raised substantial doubt about Jammin' Java's ability to continue as a going concern; and (d) Jammin' Java continued to be a developmental stage, shell company.  Following the release of the Form 10-K, the share price dropped further, with the stock closing at $1.52 on May 18, 2011.

61.     In a Form 8-K filed on May 18, 2011, Jammin Java announced that Straight Path Capital, "a company incorporated in the Republic of the Marshall Islands," had invested $2,380,000 on May 5, 2011 in Jammin Java pursuant to the $2.5 million financing arrangement, and the Company "received" the funds on May 19, 2011.  On May 19, 2011, JAMN shares closed at $2.30, up $.78 for the day, or more than 51%. After closing as high as $2.44 on June 8, 2011, JAMN stock continued to fall, closing at $1.15 on June 30, 2011, $.51 on September 30, 2011, and $.27 on December 30, 2011.  Thus, in the approximate 7 ½ month period from the May 12, 2011 close of $5.42 to the December 30 close of $.27, JAMN shares lost 95% of their value.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 29, 2017, at Chicago, Illinois.

R. Kevin Barrett
_____
R. Kevin Barrett