**EXHIBIT 2**

**In The Matter Of:**

*Securities and Exchange Commission v.*
*Jammin' Java Corp., et al.*

---

*Rene Berlinger*
*February 07, 2017*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94103*
*(415) 597-5600*

Original File 30994Berlinger.txt

Min-U-Script® with Word Index

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3    - - - - - - - - - - - - - - - -

 4    SECURITIES AND EXCHANGE      )

 5    COMMISSION,                  )

 6                    Plaintiff,  )

 7                                 )   CASE NO.

 8    V.                           )   2:15-cv-08921-SVW-MRW

 9                                 )

10    JAMMIN' JAVA CORP, ET AL.,   )

11                    Defendants. )

12    - - - - - - - - - - - - - - - -

13

14

15         VIDEOTAPED DEPOSITION OF RENÉ BERLINGER

16              TUESDAY, FEBRUARY 7, 2017

17

18

19

20            BEHMKE REPORTING AND VIDEO SERVICES, INC.

21                            BY:  JONAH SEARS

22                     160 SPEAR STREET, SUITE 300

23                 SAN FRANCISCO, CALIFORNIA 94105

24                            (415) 597-5600

25
```

Page 2

```
 1

 2

 3

 4

 5

 6

 7

 8         Videotaped Deposition of RENÉ BERLINGER, taken on

 9    behalf of Plaintiff, at 271 Cadman Plaza East, 7th

10    Floor, Brooklyn, New York, commencing at 9:42 A.M.,

11    TUESDAY, FEBRUARY 7, 2017, before Jonah Sears, Shorthand

12    Reporter, pursuant to notice.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS, SECURITIES AND EXCHANGE COMMISSION:

 3       U.S. SECURITIES AND EXCHANGE COMMISSION

 4       BY:  TIMOTHY S. LEIMAN, ATTORNEY AT LAW

 5            PETER SENECHALLE, ATTORNEY AT LAW

 6       175 West Jackson Boulevard, Suite 900

 7       Chicago, Illinois 60604

 8       Telephone:  (312) 353-7390

 9       Email:  leimant@sec.gov

10

11    FOR DEFENDANT, KEVIN P. MILLER:

12       CALDWELL LESLIE AND PROCTOR, PC

13       BY:  ANDREW ESBENSHADE, ATTORNEY AT LAW

14       725 S. Figueroa Streeet, 31st Floor

15       Los Angeles, California 90017

16       Telephone:  (213) 629-9040

17       Email:  esbenshade@caldwell-leslie.com

18

19    FOR DEFENDANT, WAYNE WEAVER:

20       SCHEPER KIM HARRIS

21       BY:  MARC S. HARRIS, ATTORNEY AT LAW

22       601 West Fifth Street, 12th Floor

23       Los Angeles, California 90071

24       Telephone: (213) 613-4690

25       Email: mharris@scheperkim.com
```

Page 4

```
 1    APPEARANCES OF COUNSEL - (CONTINUED):

 2    FOR DEFENDANTS, MICHAEL K. SUN

 3       and MOHAMMED A. AL-BARWANI:

 4       VENABLE LLP

 5       BY:  PATRICK J. BOYLE  ATTORNEY AT LAW

 6            ARIE E. PELED, ATTORNEY AT LAW

 7       1270 Avenue of the Americas, 24th Floor

 8       New York, New York 10020

 9       Telephone:  (212) 307-5500

10       Email:  pboyle@venable.com

11

12    FOR DEFENDANT, RENÉ BERLINGER:

13       BUTZEL LONG PC

14       BY:  THOMAS EARL PATTON, ATTORNEY AT LAW

15       1747 Pennsylvania Avenue NW, Suite 300

16       Washington, DC  20006

17       Telephone:  (202) 454-2800

18       Email:  pattont@butzel.com

19

20    ALSO PRESENT:

21       CHRIS MARTIN, CLVS

22       WAYNE S.P. WEAVER

23       PEGGY DAYTON (TELEPHONICALLY)

24

25
```

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

| | Page 5 |
|---|---|
| 1 | INDEX |
| 2 | TUESDAY, FEBRUARY 7, 2017 |
| 3 | RENÉ BERLINGER                                        Page |
| 4 |    Examination by MR. LEIMAN                          15 |
| 5 | P.M. SESSION                                          124 |
| 6 |    Examination bt MR. LEIMAN                          124 |
| 7 |    Examination by MR. ESBENSHADE                      203 |
| 8 |    Examination by MR. HARRIS                          213 |
| 9 |    Examination by MR. BOYLE                           228 |
| 10 |    Examination by MR. LEIMAN                          241 |
| 11 | |
| 12 |                  -o0o- |
| 13 | |
| 14 |        QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: |
| 15 |                  PAGE    LINE |
| 16 |                   225     15 |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 7 |
|---|---|
| 1 | EXHIBITS - (CONTINUED) |
| 2 | RENÉ BERLINGER |
| 3 | Number            Description                        Page |
| 4 | Exhibit 83   VP Bank account-opening documents; |
| 5 |              Bates Nos. BER00002204 through |
| 6 |              BER00002299 - 93 pages                    16 |
| 7 | |
| 8 | Exhibit 84   VP Bank statements for Chilli |
| 9 |              Capital; Bates Nos. BER00002273 |
| 10 |              through BER00002337 - 25 pages            16 |
| 11 | |
| 12 | Exhibit 85   Chilli Capital transaction documents; |
| 13 |              Bates Nos. BER00002290 through |
| 14 |              BER00002239 - 7 pages                     16 |
| 15 | |
| 16 | Exhibit 86   Faxes; Bates Nos. BER00002240 through |
| 17 |              BER00002241 - 6 pages                     16 |
| 18 | |
| 19 | Exhibit 87   Multiple documents; Bates Nos. |
| 20 |              BER00000828 through SUN_PROD_00000130 |
| 21 |              - 75 pages                                16 |
| 22 | |
| 23 | Exhibit 88   Bank statements for Westpark Limited; |
| 24 |              Bates Nos. BER00000671 through |
| 25 |              BER00000683 - 22 pages                    16 |

| | Page 6 |
|---|---|
| 1 | EXHIBITS |
| 2 | RENÉ BERLINGER |
| 3 | Number            Description                        Page |
| 4 | Exhibit 78   Los Colinas documents; Bates Nos. |
| 5 |              FINMA-0000216 through FINMA-0000048 |
| 6 |              - 38 pages                                16 |
| 7 | |
| 8 | Exhibit 79   Los Colinas bank statements; Bates |
| 9 |              Nos. BER00002928 through |
| 10 |              SEC-FINMA-P-0000451 - 35 pages            16 |
| 11 | |
| 12 | Exhibit 80   Los Colinas asset statements; Bates |
| 13 |              Nos. BER00002349 thorough |
| 14 |              SEC-FINMA-P-0000461 - 49 pages            16 |
| 15 | |
| 16 | Exhibit 81   Transaction documents; Bates Nos. |
| 17 |              FINMA-0000254 through BER00002779 |
| 18 |              - 55 pages                                16 |
| 19 | |
| 20 | Exhibit 82   Fax transmittal forms; Bates Nos. |
| 21 |              BER00002389 thorugh BER00000389 |
| 22 |              - 38 pages                                16 |
| 23 | |
| 24 | |
| 25 | |

| | Page 8 |
|---|---|
| 1 | EXHIBITS - (CONTINUED) |
| 2 | RENÉ BERLINGER |
| 3 | Number            Description                        Page |
| 4 | Exhibit 89   Asset statements for Westpark |
| 5 |              Limited; Bates Nos. SUN_PROD_00000417 |
| 6 |              thorough BER00000785 - 96 pages           16 |
| 7 | |
| 8 | Exhibit 90   Multiple documents; Bates Nos. |
| 9 |              BER00002660 through BER00000686 |
| 10 |              - 33 pages                                16 |
| 11 | |
| 12 | Exhibit 91   Fax transmittals documents; Bates |
| 13 |              Nos.  SUN_PROD_00000107 through |
| 14 |              BER00000693 - 29 pages                    16 |
| 15 | |
| 16 | Exhibit 92   Multiple documents; Bates Nos. |
| 17 |              BER00002471 through FINMA-0000314 |
| 18 |              - 18 pages                                16 |
| 19 | |
| 20 | Exhibit 93   Bank statements for Renavial; Bates |
| 21 |              Nos. BER00000555 through |
| 22 |              SEC-FINMA-P-0000137 - 49 pages            16 |
| 23 | |
| 24 | |
| 25 | |

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 17

1 Miller.

2    **MR. HARRIS:** Marc Harris on behalf of Wayne Weaver.

3 Also attending by phone is Peggy Dayton on behalf of

4 Mr. Weaver.

5    **MR. PELED:** Arie Peled on behalf of Michael Sun and

6 Mohammed Al-Barwani.

7    **MR. BOYLE:** Patrick Boyle, Venable, also on behalf

8 of Michael Sun and Mohammed Al-Barwani.

9    **MR. PATTON:** Thomas Patton, counsel for

10 Mr. Berlinger.

11    **VIDEOTAPE OPERATOR:** Okay.  At this time the court

12 reporter, Jonah Sears, also contracted with Behmke

13 Reporting & Video Services, Inc., will swear in the

14 witness.

15

16          RENÉ BERLINGER,

17 having been first duly sworn, testified as follows:

18

19    **MR. LEIMAN:** Also noting for the record that in

20 addition to Peggy Dayton on behalf of Wayne Weaver,

21 Mr. Weaver is also attending by phone.

22

23         EXAMINATION

24 BY MR. LEIMAN:

25    Q.  Good morning.

---

Page 18

1    A.  Good morning.

2    Q.  Could you spell your last name for the record.

3    A.  B-E-R-L-I-N-G-E-R.

4    Q.  And am I pronouncing it right when I say

5 "Berlinger"?

6    A.  Yeah, that's it.

7    Q.  Okay.  My name is Tim Leiman.  I'm representing

8 the Securities and Exchange Commission.  Before we get

9 into your questions and answers, I'd like to just go

10 through a few of the ground rules for the day, which I'm

11 sure you've already discussed with your attorney.

12      In this deposition my questions and your

13 answers are going to be taken down verbatim, and because

14 of that it's not going to be like a normal conversation,

15 and so there's a few things that both of us are going to

16 have to try to do.

17      The first is if you could give audible answers.

18 So instead of shaking you head or saying uh-huh when I

19 ask a yes or no question, we'll need an audible yes or

20 no.

21    A.  Okay.

22    Q.  It's also important that we try not to talk

23 over one another, so if you can wait until my question

24 is complete before you answer, and when you answer, I'll

25 try not to talk over your answer.

---

Page 19

1    A.  Okay.

2    Q.  It will be a little unnatural, but if we try

3 our best, it will work out.  If there's anything about

4 my questions that you don't understand, please let me

5 know, and I will try to rephrase it.  If you need a

6 break for any reason, let me know; we'll take a break.

7 I only ask that you answer the question that's pending

8 unless your counsel directs you otherwise, and then we

9 can take a break.

10      Before we begin, you're comfortable proceeding

11 in English for this deposition, correct?

12    A.  Yes.

13    Q.  I'd like to talk a little bit about your

14 background first.

15      Did you attend university?

16    A.  It was a technical school, so-called industrial

17 engineer.  That's where I come from.

18    Q.  Your training is as an industrial engineer?

19    A.  Yes.

20    Q.  And after your technical training, what was

21 your occupation?

22    A.  I incorporated my own software company, which

23 has been merged with another software company.  Went

24 bankrupt about ten years later, and then started with

25 this Grivo GmbH, which is offering fiduciary services.

---

Page 20

1    Q.  When did your software company go bankrupt?

2    A.  2007, '8.

3    Q.  So prior to 2008, did you have any experience

4 in the financial sector?

5    A.  That's not my history, no.

6    Q.  Okay.  And then in 2008 you started Grivo; is

7 that correct?  Sorry.  We need an audible answer?

8    A.  Yeah.

9    Q.  Okay.

10    A.  It was my brother-in-law's firm, firstly, but I

11 bought it later on.

12    Q.  So you bought into Grivo?

13    A.  Yes.

14    Q.  And what services did Grivo provide?

15    A.  Fiduciary services.

16    Q.  And does that include acting as a nominee for

17 corporate entities?

18    A.  It includes account openings, incorporation

19 companies, any kind of services, and nominee

20 directorships.

21    Q.  And what kind of companies were you

22 incorporating?

23    A.  It could be any jurisdiction, but 95 percent

24 were offshore, specifically in Marshall Islands.

25    Q.  Is it fair to say that most of the companies

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 21

1  you incorporated were in the Marshall Islands?
2    A.  Yes.
3    Q.  And could you describe in general how these
4  companies operated:  Were they making things, or were
5  they primarily for the financial protection of
6  individuals?  How -- what was the client base?
7      MR. HARRIS:  Objection.  Vague.
8      THE WITNESS:  Sorry?
9    Q.  He'll object, and you can proceed to answer
10  unless you are instructed otherwise by your attorney.
11        If you could generally describe your client
12  base.
13    A.  Client base was usually non-Swiss foreigners
14  and with the intention of having a company which can
15  enter into contracts; doesn't have to pay a lot of tax;
16  no accounting, so low cost; easy to maintain; and
17  another reason, of course, is having nominee
18  directorship, so they don't sign or appear against
19  outside by themselves, and instead they use the nominee
20  director.
21    Q.  And does using the nominee directorship allow
22  the client to be anonymous in their financial dealings?
23    A.  Yes.
24    Q.  And just so we're using the same vocabulary,
25  are you familiar with the term "beneficial owner"?

---

Page 22

1    A.  Yes.
2    Q.  And what -- who is the beneficial owner in a
3  nominee directorship scenario?
4    A.  The beneficial owner is the one we know as the
5  ultimate owner, so we identify him via passport copy,
6  proof of residence, CVs, whatever.  So we need to verify
7  who is effectively the owner.
8    Q.  And just so -- you know, just so we link this
9  up, the nominee directorship and the offshore companies
10  you were forming in the Marshall Islands, that let's the
11  beneficial owner operate his finances with anonymity; is
12  that correct?
13    A.  Uh-huh.  Yes.
14    Q.  What is Volante Advisory AG?
15    A.  Volante is the same company offering the same
16  services, actually, as Grivo, so it's a copy.  Same
17  services, same structure, but different ownership:
18  Grivo was mine, Volante was Victor Gallus' company, so
19  not mine.
20    Q.  And did you operate through the Volante entity?
21    A.  Yes.
22    Q.  I'm sorry?
23    A.  Yeah.  We have agreed that we just use -- we
24  were partners, and we use just one company paying
25  salary, and whenever income was in Grivo or in Volante,

---

Page 23

1  then we just sent invoices between the companies to pay
2  at least salaries out of just one company.
3    Q.  So when you were providing nominee services to
4  clients, you would be paid through Volante?
5    A.  Yes.
6    Q.  And --
7    A.  The salary.
8    Q.  The salary.
9        And when you were providing nominee services to
10  clients, you would be operating through Volante; is that
11  correct?
12    A.  And Grivo.
13    Q.  And Grivo?
14    A.  Both, but Grivo never paid salaries.
15    Q.  Looking at the time period of 2010 to 2011,
16  roughly how many offshore companies were you providing
17  nominee services for?
18    A.  In parallel, I would say 250.
19    Q.  250?
20    A.  Yeah.  So there were a lot more, but they come
21  and go.  But in parallel, 250 companies actively
22  maintained.
23    Q.  Is it fair to say that some of your clients
24  mainly operated these companies through the purchase and
25  selling of penny stocks?

---

Page 24

1    A.  Eighty, 70 percent, yes.
2    Q.  Seventy to 80 percent of your companies?
3    A.  Yes.
4    Q.  And of those 250 clients, about 95 percent had
5  Marshall Islands entities; is that fair to say?
6    A.  That -- yeah, I would say so.
7    Q.  What other entities -- sorry.
8        What other jurisdictions did you use?
9    A.  Jurisdictions.  We had Swiss companies as well,
10  Panama, Belize, BBI.  I'd say that that's about it.
11    Q.  And you went through some of the goals for
12  opening these entities, and I just want to make sure
13  it's the same for Marshall Islands, Panama, BBI.
14        You mentioned tax.
15        Is decreasing tax burden one of the reasons
16  people were seeking Marshall Islands entities?
17    A.  Uh-huh.  Yes.
18    Q.  Okay.  Was seeking a more favorable regulatory
19  environment one of the reasons to seek a company in
20  Marshall Islands?
21    A.  Can you rephrase maybe?  What's "regulatory,"
22  meant with?
23    Q.  Sure.  When it comes to the local regulatory
24  environment for disclosure of ownership, was that a
25  concern when starting companies in the Marshall Islands?

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 25

1     A.  Not really because, I mean, the jurisdiction of
2  the company is irrelevant.  Banking is relevant for
3  disclosing or not disclosing.  That's the jurisdictions
4  where you have the bank account, not where the company
5  had been incorporated.
6     Q.  And did you generally set up bank accounts for
7  the entities that you provided nominee services for?
8     A.  In Switzerland, mainly.
9     Q.  And what protections did Switzerland offer at
10 the time?
11    MR. HARRIS:  Objection.  Vague.
12    Q.  Sorry.  That objection is well taken.
13    So the -- what protections did Switzerland
14 offer in 2010 -- in the 2010 time frame?
15    A.  Bank secrecy, it was one of the top that
16 Switzerland offered.  We didn't just disclose or list
17 the banks.  The secrecy -- the banks were not allowed to
18 disclose any information regarding the ownership behind
19 the bank account except in crime or whatever cases.
20    Q.  And is that one the protections that your
21 clients sought when they came to you for nominee
22 services?
23    MR. HARRIS:  Calls for speculation.
24    A.  Yes, but I would say this was never the
25 intention to go for criminal actions, but whenever

Page 26

1  something happens, they would have a nice protection.
2     Q.  Right.  I'm just talking about anonymity.
3     So the Swiss protections regarding disclosure
4  of the beneficial owner, was that a protection that you
5  offered your clients?
6     A.  Yes.
7     Q.  And could you describe the relationship between
8  the nominee officer, nominee director, and the
9  beneficial owner?
10    A.  Relationship was regulated by law, actually.
11 We had to follow whatever the beneficial owner said.  We
12 had to go for instructions, go for signing the
13 contracts.  Whatever the client wished, we had to follow
14 that, except it's not along Swiss law.  Then we would
15 say, "That's not possible.  We cannot execute this kind
16 of contract or transaction," but in all other cases it's
17 the beneficial owner is actually the instructor.
18    Q.  And your job as the nominee would be to follow
19 those instructions, correct?
20    A.  Yes.
21    MR. LEIMAN:  I'd like to show you a document that
22 I'll have marked as Exhibit 100.
23    THE WITNESS:  Is it already here?  This one
24 (indicating)?
25    MR. LEIMAN:  No.

Page 27

1     A copy of what appears to be a --
2     MR. PATTON:  Is that in our tabs?
3     MR. LEIMAN:  It's not in the tabs.  I'm marking it.
4  It's Exhibit 100.  For the record, there's a gap in the
5  sequence because we premarked Exhibits 78 Through 99.
6     MS. DAYTON:  Can I get the Bates number?
7     MR. LEIMAN:  Sure.  The Bates number is BER2186.
8     MS. DAYTON:  Thank you.
9     (Exhibit No. 100 was marked for
10        identification.)
11 BY MR. LEIMAN:
12    Q.  And Mr. Berlinger, do you recognize this
13 document?
14    A.  Yes, I do.
15    Q.  And what is it?
16    A.  It's a diagram or a -- yeah, it's a diagram,
17 kind of, which describes how stock was sold and settled
18 with the bank, including brokers and including us and
19 the client.  So it says there was an agreement between
20 Volante, which is me personally, and Gallus, VP Bank,
21 and the broker.  In this case it was really Capital
22 Lenders.  So there was the possibility given that they
23 can trade overnight without including us.  The broker
24 accepted sales orders, and in the morning, between
25 Volante and VP Bank, we settled who sold what to what

Page 28

1  price, and the bank then corrected, amended whatever in
2  the depository had to be amended.
3     Q.  So let's unpack that for a moment.
4     We've Volante in the you upper left --
5     A.  Uh-huh.
6     Q.  -- of Exhibit 100?
7     A.  Yeah.
8     Q.  And that is you and Victor Gallus, correct?
9     A.  Yes.
10    Q.  The client companies, those are the companies
11 that you formed primarily in the Marshall Islands,
12 correct?
13    A.  Yes.
14    Q.  VP Bank in the upper right?
15    A.  Uh-huh.
16    Q.  That's the bank that has an account for each
17 client company; is that correct?
18    A.  That's correct.
19    Q.  And who is the broker?
20    A.  The broker is Rigi Capital, for instance.
21    Q.  And that's R-I-G-I?
22    A.  R-I-G-I, yes, Capital.
23    Q.  And you mentioned that trading orders would
24 come into Rigi Capital for the trading of stock --
25    A.  Yes.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 29

1   Q.  -- or other assets?
2   A.  Yes.  As far I know.
3   Q.  Okay.  So in this structure that you're
4   portraying in this exhibit, is this the structure that
5   was used for Westpark?
6   A.  Yes.
7   Q.  Are you familiar with the entity Westpark?
8   A.  Yes.
9   Q.  Is this the form that was used for Las Colinas?
10  A.  Yes.
11  Q.  And you're familiar with that entity?
12  A.  No.
13  Q.  Is this the form that was used for Renaval?
14  A.  That's correct.
15  Q.  And are you familiar with that entity?
16  A.  Yes.
17  Q.  So just so I understand correctly, you
18  mentioned that the companies could trade at night
19  without consulting you; is that correct?
20  A.  That's correct.
21  Q.  And then you would confirm the transactions
22  after the fact?
23  A.  Yes, in the morning, the following morning.
24  Q.  And would that generally come in a
25  communication from VP Bank?

Page 30

1   A.  From VP Bank and Rigi.  From Rigi we got the
2   deal description:  So and so many shares at that price.
3   And from VP Bank we got the confirmation what depository
4   it belongs.  This thing we sent back to the bank,
5   saying, "Look, this is the broker confirmation and that
6   relays -- relates to this and this company."
7   Q.  So in this there does not appear to be a direct
8   communication between you and the beneficial owner of
9   the company; is that correct?
10  A.  That's correct.
11  Q.  Were you relying on VP Bank to communicate with
12  the beneficial owner under certain circumstances?
13  A.  Can you rephrase?  I don't know--
14  Q.  Sure.
15      Who in this scenario communicates with the
16  beneficial owner of the company?
17  A.  Either I would say Wayne Weaver or Daniel
18  Lacher.
19  Q.  Okay.  And let's go through those two in a
20  moment.
21      Why did you create this document?
22  A.  To make a clear picture for other -- for you,
23  for instance, or for my lawyers.
24  Q.  Did you create this in connection with this
25  case or did you create it for the clients?

Page 31

1   A.  No, just the diagram.
2   Q.  Okay.
3   A.  This direct agreement, broker agreement, this
4   is an existing form from VP Bank.
5   Q.  Right.  I'm referring to the diagram.
6      Did you create this to give to clients?
7   A.  No.
8   Q.  This was for your own reference?
9   A.  No, for my lawyer's reference, to understand.
10  Q.  Okay.  So this wasn't a document you handed out
11  to clients?
12  A.  No.
13  Q.  Okay.
14  A.  I have to add, I said Daniel Lacher or Wayne.
15  It could also be, of course, the beneficial owner.  I
16  just don't know who gave orders.
17  Q.  They could have provided orders --
18  A.  They would be able to provide orders as well.
19  Q.  Okay.  In addition to the beneficial owner?
20  A.  Yeah.
21  Q.  Okay.  You mentioned the name Wayne Weaver.
22      Are you familiar with Wayne Weaver?
23  A.  Yes.
24  Q.  And how do you know Wayne Weaver?
25  A.  I'm not sure if it was an introduction from

Page 32

1   VP Bank or we met and then introduced him to VP Bank.  I
2   don't exactly remember how we got to know each other.
3   Q.  Was it a business referral?
4   A.  It was definitely a referral.
5   Q.  And either VP Bank or somebody else referred
6   him to you?
7   A.  Yes, yes.
8   Q.  And approximately when did that happen?
9   A.  Ten -- 2010.  Maybe even earlier, '9.
10  Q.  So maybe 2009, maybe 2010?
11  A.  Yeah.
12  Q.  And when the referral took place, what was --
13  well, first of all, was Mr. Weaver seeking services from
14  you?
15  A.  Uh-huh.
16  Q.  I'm sorry.  I need a --
17  A.  I'm sorry.  Yes.
18  Q.  We'll need a yes or no.
19  A.  Yes, yes, yes.  Yes, he said he might have
20  clients for us, "Would you offer this nominee director
21  services," something like that.  "Would you accept
22  clients which I would refer?"
23      And we, of course, said, "Yes, that's a new
24  business for us."
25  Q.  And did he tell you what kind of clients he

Page 33

1  had?
2    A.  No.  They were not in -- in that phase we were
3  not very much in detail.  Just basically a discussion --
4  "I would have clients who would like to move their
5  business, maybe to Zurich in Switzerland.  Would you
6  provide this service for clients of mine I could refer
7  to you?"
8    Q.  Did you have an understanding of what Wayne
9  Weaver's business was?
10    A.  He told me he offers similar services we do,
11  fiduciary services on the one hand, and on the other
12  hand what I know is he has an accounting firm as well.
13    Q.  And what's the accounting firm called?
14    A.  This I don't know.  I don't which one is what.
15    Q.  Do you know --
16    A.  I just can refer to the e-mail addresses I
17  have.  One is Highland and you mentioned the other one.
18    Q.  We'll see those later on today.
19    A.  Yeah.  I don't which one is the accounting and
20  the other one.  I don't know what --
21    Q.  So you knew he had an accounting business and a
22  fiduciary services business, but you can't remember
23  which one --
24    A.  Yeah.
25    Q.  -- which name was which?

Page 34

1    A.  Yeah.
2    Q.  For the fiduciary services business, did he
3  describe, you know, who his clients were for fiduciary
4  services?
5    A.  Say again.
6    Q.  Did he describe who his clients were for
7  fiduciary services, generally?
8    A.  No.
9    Q.  And why was he seeking you out if he already
10  provides those services for people?
11    A.  I know that Switzerland and especially VP Bank
12  had a good solution, especially with overnight trading.
13  That was definitely one of the features -- this VP Bank.
14  And we asked nominee directors who worked very closely
15  with VP Bank together, so whenever they had a client,
16  they named us to be the nominee director.
17        So it was a very close relationship, and we
18  knew that -- others knew that this kind of setup is very
19  useful for the clients, especially when they dealt with
20  Canadian or U.S. securities, due to this overnight
21  trading, together with the broker, who was especially
22  set up to do this overnight trading.  So it was a kind
23  of structure which was unappreciated.
24    Q.  Did you talk to Mr. Weaver about the types of
25  stocks that he would be trading?

Page 35

1    A.  No.
2    Q.  Did you generally talk to him about penny
3  stocks?
4    A.  Generally, maybe yes, but not about these
5  e-mails.
6    Q.  Okay.  But just as a class, did he mention that
7  he traded penny stocks?
8    A.  Yeah, we knew that.
9    Q.  Did --
10    A.  As I said before, about 70 percent were -- of
11  the clients which had nothing to do with Wayne, they
12  were penny stock dealers or traders.
13    Q.  Was there anything special about the services
14  that you were providing that made it particularly
15  well-suited to the trading of penny stocks?
16    A.  Just this overnight trading, yes.  OTC, I mean,
17  everything else you could do online, maybe, or you need
18  a broker.
19    Q.  Uh-huh.
20    A.  But all these penny stocks need a broker, and
21  they usually have their time to call.  And as we are
22  never calling for sales orders or buy orders, they could
23  directly address the broker, which he did the night
24  shift.
25    Q.  So the setup would allow the trader to contact

Page 36

1  the broker overnight --
2    A.  Yeah.
3    Q.  -- rather than going through you?
4    A.  Exactly.
5    Q.  To your knowledge, was VP Bank accustomed to
6  trading of penny stocks?
7    A.  Uh-huh.
8    Q.  I'm sorry.  You have to say yes.
9    A.  Yes, VP Bank was pretty big in this area.
10    Q.  And did all banks, in your experience,
11  encourage the trading of penny stocks, or was that --
12    A.  No, I would say ten banks can do that.
13    Q.  Ten banks in Switzerland?
14    A.  Yeah.
15    Q.  And VP Bank was one of them?
16    A.  Yeah.
17    Q.  Do you know an individual named Michael Sun?
18    A.  Yes.
19    Q.  And how do you know Michael Sun?
20    A.  He was introduced by Wayne Weaver.
21    Q.  And what was he introduced for?  What was Wayne
22  Weaver asking you to do?
23    A.  To offer him fiduciary services, open up a bank
24  account, to incorporate the company.
25    Q.  And that's what Mr. Weaver asked you to do,

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 41

1  brought most of the new clients brought to us because of
2  our level of service, the accuracy, speed, things like
3  that, pricing. So he brought most of the clients to me,
4  not to Victor.
5      Q. And was he generally your point of contact --
6      A. Yes.
7      Q. -- for the companies that had accounts at
8  VP Bank?
9      A. Yes.
10     Q. I'd like to talk about some of the entities
11 that are at issue in this case, and for this I'd like to
12 refer to some of the documents that are in a binder that
13 you have seen before.
14     A. Okay. I'm ready.
15     Q. First of all, you met with the SEC yesterday,
16 correct?
17     A. That's correct.
18     Q. And at that meeting we gave you a copy of the
19 binder that's in front of you right now, correct?
20     A. Yes.
21     Q. I'd like to note for the record that we have
22 premarked group exhibits in a binder that's now in front
23 of Mr. Berlinger, Group Exhibits 78 through 99, and I'll
24 refer to them periodically as we go.
25         First, I want to talk to you about an entity

Page 42

1  called Las Colinas.
2          And I think you mentioned that you're familiar
3  with Las Colinas, correct?
4      A. That's correct.
5      Q. How are you familiar with Las Colinas?
6      A. I incorporated the company, opened up a bank
7  account, completed the Know Your Client forms, and
8  that's it.
9      Q. And you served as the nominee officer for Las
10 Colinas, correct?
11     A. That's correct, yes.
12     Q. Were there any other officers at Las Colinas?
13     A. Actually, it was a company called Admita
14 Nominees, which we use -- maybe we come later on to
15 that?
16     Q. No, let's talk about that now.
17         What is Admita Nominees?
18     A. Admita Nominees is -- rather than having -- for
19 our 250 clients, having us as director, we used a
20 director company called Admita Nominees, and this was --
21 in this company my person and Victor Gallus were
22 directors.
23     Q. So Admita Nominees is the nominee for Las
24 Colinas, correct?
25     A. For Las Colinas.

Page 43

1      Q. And Admita is you and Victor Gallus?
2      A. Yes.
3      Q. Other than Admita Nominees, were there any
4  other officers for Las Colinas?
5      A. No.
6      Q. Other than Admita Nominees, were there any
7  directors for Las Colinas?
8      A. Just me and Victor.
9      Q. Other than the trading of penny stock and the
10 transmittal of proceeds, did Las Colinas have any
11 business operations?
12         MR. ESBENSHADE: Calls for speculation.
13     A. What does that mean?
14     Q. No, you can answer the question.
15     A. Yeah, okay. They had no employees, no other
16 thing, but just investing.
17     Q. Okay.
18     A. Yeah.
19     Q. And investing in penny stocks, correct?
20     A. Not hundred percent sure that it's only penny
21 stocks, but yes.
22     Q. Okay. And what jurisdiction was Las Colinas
23 formed in?
24     A. That was a Marshall Islands company.
25     Q. And you opened up an account for Las Colinas,

Page 44

1  correct?
2      A. That's correct.
3      Q. And are you familiar with that account?
4      A. Yes.
5      Q. And where was the account formed?
6      A. VP Bank.
7      Q. And was Mr. Lacher your point of contact for
8  Las Colinas?
9      A. He was, yes.
10     Q. Looking at the binder, starting with Group
11 Exhibit 78 --
12         MR. HARRIS: Sorry. How do the exhibit numbers
13 correspond to the tabs?
14         MR. LEIMAN: So -- I'm sorry. So each numbered tab
15 will be an exhibit, so you're right, I'll call out the
16 numbered tab too.
17         So we're looking at numbered Tab 1, which is
18 Group Exhibit 78.
19         MS. DAYTON: Is it possible to read the Bates
20 numbers, or are they randomly --
21         MR. LEIMAN: We can provide an index afterwards, but
22 I think providing Bates numbers is going to create sort
23 of a multiple-hour affair, but in general these are what
24 appear to be incorporation documents for Las Colinas.
25         MS. DAYTON: Okay.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 53

1    Exhibit 81 Tab 4, these documents?
2    A.   Yes.
3    Q.   And you received them in your role as nominee
4    director, nominee officer; is that correct?
5    A.   That's correct.
6    Q.   In that role as nominee officer, nominee
7    director, for Las Colinas, did you generally find these
8    transaction-specific statements to be accurate?
9    A.   Uh-huh, yes.
10    Q.   I'd like to look at Tab 5, which is Exhibit
11    No. 82.  It has Tabs A through P, as in "Peter," and
12    appears to be a series of fax transmittal forms from
13    Mr. Berlinger to VP Bank.
14         Are you familiar with these documents?
15    A.   Yes, I am.
16    Q.   And what are they?
17    A.   The first is a fax, saying, "Please wire a
18    million," to whom it goes to from the bank, what
19    companies it is, and the wire instruction where it
20    should go.  The typical fax for any transaction.
21    Q.   And the Tabs A through P, are those documents
22    similarly fax communications regarding specific
23    transactions?
24    MR. PATTON:  Take a look at them.
25    A.   These are all standard, typical.

Page 54

1    Q.   And under what circumstances would you create
2    these fax sheets?
3    A.   On -- based on instructions.  It depends where
4    it comes from, but I never execute a transaction on my
5    own.
6    Q.   So it would be instructions from someone?
7    A.   From -- an instruction from Lacher, from Wayne,
8    from the beneficial owner.  These are accepted sources
9    for executing a transaction.
10    Q.   So sometimes you would receive an instruction
11    from Daniel Lacher related to Las Colinas; is that
12    correct?
13    A.   That's correct.
14    Q.   Sometimes you would receive instruction from
15    Wayne Weaver; is that correct?
16    A.   Yes.
17    Q.   And sometimes you would receive instructions
18    from the beneficial owner?
19    A.   Yes.
20    Q.   And in this case for Las Colinas, the
21    beneficial owner would be Kevin Miller, correct?
22    MR. ESBENSHADE:  Objection.  Calls for speculation.
23    Go ahead.
24    A.   Yes.
25    Q.   And you maintain copies of these fax cover

Page 55

1    sheets in your files?
2    A.   Yes.
3    Q.   And you maintain them in your role as nominee
4    officer and director of Las Colinas?
5    A.   That's correct.
6    Q.   And do these accurately reflect your
7    instructions to VP Bank regarding certain transactions
8    and Las Colinas?
9    A.   That's correct.
10    Q.   For a moment I'd like to move forward to
11    Tab 10, which we had premarked as Exhibit No. 87.
12         Are you familiar with an entity called
13    Westpark?
14    A.   Yes, I am.
15    Q.   And what was Westpark?
16    A.   It was a Marshall Islands company, incorporated
17    by Volante, with a VP Bank account, nominee director
18    services.  Yeah, that's it.
19    Q.   And did you help form Westpark?
20    A.   We sent the information, the incorporation fax
21    to the agency, yes.
22    Q.   And were you directed to form Westpark?
23    A.   Yes.
24    Q.   And you severed as nominee officer and director
25    for Westpark, correct?

Page 56

1    A.   That's correct.
2    Q.   Were there any other officers at Westpark?
3    A.   No.  As before I explained was Admita Nominees,
4    not me personally.
5    Q.   Other than Admita Nominees, were there any
6    other officers --
7    A.   No.
8    Q.   -- for Westpark?
9    A.   No.
10    Q.   And were there any other directors for Westpark
11    other than Admita Nominees?
12    A.   No.
13    Q.   And did Westpark have any operations other than
14    the trading of stock and the transfer of proceeds?
15    A.   As far as I know, no.
16    Q.   Did Westpark have any employees?
17    A.   No.
18    Q.   Did Westpark have a place of business other
19    than where Admita Nominees is based?
20    A.   No.
21    Q.   Looking at what we've premarked as Exhibit 87,
22    which is Tab 10-A and B.  First let's take at look at
23    Tab A.
24         Are you familiar with these documents?
25    A.   Yes, these are the account opening forms.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 65

1    Q.   And what are they?
2    A.   Any transaction, sale proceeds, whatever has
3  caused a change in the account balance or in the asset
4  is here, documented as a single page.
5    Q.   And are these similar to the documents that we
6  previously saw, related to Las Colinas?
7    A.   Yes.
8    Q.   And would you receive them as transactions
9  occurred in Westpark's account?
10   A.   Yes.
11   Q.   And did these cover stock trades?
12   A.   They do.
13   Q.   Money coming into the account?
14   A.   Yes.
15   Q.   Money going out of the account?
16   A.   Yes.
17   Q.   Transfers within accounts?
18   A.   Yes.
19   Q.   And typically, how long would it take for you
20 to receive documents related to Westpark transactions?
21   A.   Depending on what it was, but one to three
22 days, within this period, we get.
23   Q.   And generally, did you find VP Bank
24 transaction-specific documents to accurately reflect the
25 transactions in Westpark's account?

Page 66

1    A.   They did.
2    Q.   I'm sorry.  Is that a --
3    A.   Yes.
4    Q.   And are the documents at Tab 13 Exhibit No. 90
5  -- do they appear to you to be accurate copies of these
6  transaction-specific documents for Westpark?
7    A.   They do, yes.
8    Q.   I'd like to go to Tab 14, which has been
9  premarked as Exhibit No. 91.
10       Looking at the documents from Exhibit 91, Tabs
11 A through K, are you familiar with these documents?
12   A.   I am.
13   Q.   And what are they?
14   A.   This is an instruction sent to VP Bank out of
15 Westpark, saying, "Please send 40,000 to these and these
16 wire details."  This is a fax and the page behind is the
17 fax confirmation.
18   MR. PATTON:  Which number?
19   THE WITNESS:  A, 14-A.
20   MR. PATTON:  Which company.
21   THE WITNESS:  Westpark.
22   MR. PATTON:  Okay.
23 BY MR. LEIMAN:
24   Q.   So looking at Tabs A through K, generally, what
25 are those documents?

Page 67

1    A.   Instructions, instructions sent to VP Bank.
2    Q.   And they're sent from you, correct?
3    A.   They are sent from me; that's correct.
4    Q.   And do these appear to be accurate copies of
5  the instructions that you sent for certain transactions
6  in Westpark's account?
7    A.   Yes.
8    Q.   And when you sent an instruction from VP Bank,
9  were you authorized to do it on your own?
10   MR. BOYLE:  Object to the form.
11   A.   Maybe we should rephrase.
12   Q.   Yeah, that makes sense.
13       Did you have the authority to execute
14 transactions --
15   A.   No.
16   Q.   -- without getting permission from someone
17 else?
18   A.   No.
19   Q.   And did you receive instructions for certain
20 transactions in Westpark's account from other
21 individuals?
22   A.   That's correct.
23   Q.   And did you sometimes receive instructions from
24 Daniel Lacher?
25   A.   Yes.

Page 68

1    Q.   And did you sometimes receive instructions from
2  Wayne Weaver?
3    A.   That's correct.
4    Q.   And sometimes receive instructions from the
5  beneficial owner of Westpark?
6    A.   Yes.
7    Q.   I'd like to talk about an entity named
8  Renaival.
9        Are you familiar with the entity named
10 Renaival?
11   A.   Yes.
12   Q.   And what is Renaival?
13   A.   It's a Marshall Islands company.  We are
14 directors with -- nominee directors with Admita
15 Nominees, bank account with VP Bank.  Yeah.
16   Q.   And did someone instruct you to form Renaival?
17   A.   Yes.
18   Q.   And who instructed you to form Renaival?
19   A.   This I don't remember.  Maybe himself, the
20 beneficial himself, or during instruction, "Look, this
21 is René.  This is who's the owner."
22   Q.   Well, I'll ask you, who's the owner for
23 Renaival.
24   A.   Yeah, I always have to go back in the
25 documents.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 69

1   Q.  Okay.
2   A.  But let's say any of them said, "Look, this is
3   your new partner.  René will take care on everything."
4   This is the beneficial owner," and then we proceeded
5   together, collecting passport copies, collecting CVs.
6   So we started to get all the ball rolling, collecting
7   all the information we need to proceed.
8   Q.  And so --
9   A.  It could also be a kind of teamwork.
10  Q.  And in the team you've got Daniel Lacher,
11  correct?
12  A.  Yes.
13  Q.  Was Wayne Weaver part of that team?
14  A.  Yes.  Not team, just sometimes we were -- we
15  did it by ourselves, sometimes it was just right after
16  the meeting or whatever.  Many options.
17  Q.  And of those options, one was Daniel Lacher,
18  correct?
19  A.  That's correct.
20  Q.  And one was Wayne Weaver, correct?
21  A.  Yes.
22  Q.  And one is the beneficial owner; is that
23  correct?
24  A.  Yes.
25  Q.  Okay.  Admita Nominees served as the nominee

---

Page 70

1   officer and director for Renavial, correct?
2   A.  That's right.
3   Q.  And primarily -- you know, we've discussed for
4   these entities that Admita Nominees was the nominee
5   officer and director.
6       Is it fair to say that primarily you did most
7   of the work related to the nominee services for those
8   entities?
9   A.  That's correct.
10  Q.  What role did Victor Gallus have in nominee
11  services?
12  A.  The backup.
13  Q.  He was a backup to you?
14  A.  Yeah.
15  Q.  In case you were not available?
16  A.  Yes.
17  Q.  And you were the primary point of contact; is
18  that fair to say?
19  A.  That's right.
20  Q.  Was Admita Nominees the sole officer of
21  Westpark -- I'm sorry -- of Renavial?  Even I get
22  confused sometimes.
23  A.  Yeah.
24  Q.  Was Admita Nominees the sole director of
25  Renavial?

---

Page 71

1   A.  That's correct.
2   Q.  And was Admita Nominees the sole officer off
3   Renaival?
4   A.  That's correct.
5   Q.  Are you aware of any other employees at
6   Renaival?
7   A.  No.
8   Q.  And are you familiar with Renaival's accounts
9   at VP Bank?
10  A.  Yes.
11  Q.  Are you aware of any activity by Renaival other
12  than the trading of stock and the use of resulting
13  proceeds?
14  A.  I don't know, but I would say no.
15  Q.  And did Renaival have a place of business other
16  than the place of business for Admita Nominees?
17  A.  Not as I know.
18  Q.  And were you responsible for maintaining the
19  records for Admita Nominees -- sorry -- for Renaival?
20  A.  Yes, I was.
21  Q.  And same question for the other entities:  Were
22  you responsible for maintaining the records for Las
23  Colinas?
24  A.  That's correct.
25  Q.  And were you responsible for maintaining the

---

Page 72

1   records for Westpark?
2   A.  That's correct.
3   Q.  And does that include the records that we have
4   seen in Exhibits 78 through 92?
5   A.  Yes.
6   Q.  I'd like to look at Tab 15, which has documents
7   A through D, and this has been premarked as Exhibit
8   No. 92.
9       Are you familiar with the document at Tab 15-A,
10  so 92-A?
11  A.  I am, yes.
12  Q.  And what is that?
13  A.  This is the Form A, which we have for our
14  files, which declares the ultimate beneficial owner of
15  the company Renaival.
16  Q.  And I notice it's unsigned.
17      Would you typically sign the Form As that were
18  internal --
19  A.  Yes.
20  Q.  -- to Admita Nominees?
21  A.  Yes.
22  Q.  Do you know why this one is not signed?
23  A.  I can sign it here.
24  Q.  That's fine.  I'm not asking you to.
25  A.  I don't know why.  Sorry for that.  But, yes,

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 81

1  e-mail, I completed these fax forms, sent them to the
2  bank, and filed a copy.
3     Q.  And do these appear to be accurate copies of
4  certain instructions that you gave to VP Bank related to
5  Renaival?
6     A.  They do, yes.
7     Q.  And you mentioned that you would receive
8  instructions.
9        For Renaival, did you sometimes receive
10  instructions to complete transactions from Daniel
11  Lacher?
12     A.  Correct.
13     Q.  Did you sometimes receive instructions from
14  Wayne Weaver?
15     A.  Correct.
16     Q.  Did you sometimes receive instructions from the
17  beneficial owner of Renaival?
18     A.  This is correct.
19     Q.  I'd like to look at Tab 19, which is marked as
20  Exhibit 96, and it has Tabs A through P, as in "Peter,"
21  and they appear to be a set of asset statements for
22  Renaival's account.
23     A.  It is correct.
24     Q.  And are you familiar with these documents?
25     A.  I am.

---

Page 82

1     Q.  And how are you familiar with them?
2     A.  I get them quarterly, showing the asset
3  statements -- showing the assets in the depository:
4  Valuation, total number of shares, purchase price,
5  things like that.
6     Q.  And you received these from VP Bank in your
7  capacity as the nominee for Renaival; is that correct?
8     A.  Yes, it's correct.
9     Q.  And did you maintain them in your capacity as
10  nominee?
11     A.  Yes.
12     Q.  And noting that some of these appear to what
13  have been produced by other parties, do they still
14  appear to be accurate copies of the asset statements
15  that you received?
16     A.  Yes.
17     Q.  Are you familiar with an entity called Calgon
18  Invest SA?
19     A.  I am.
20     Q.  And what is Calgon?
21     A.  Calgon is a Marshall Islands company.
22     Q.  And did you help form Calgon?
23     A.  I did.
24     Q.  And were you instructed to form Calgon?
25     A.  Yes.

---

Page 83

1     Q.  Who was the beneficial owner of Calgon?
2     A.  This is Wayne Weaver.
3     Q.  And were you instructed by Wayne Weaver to form
4  Calgon?
5     A.  Yes.
6     Q.  And did you open up an account for Calgon?
7     A.  Yes.
8     Q.  And where did you open up an account for
9  Calgon?
10     A.  That was Bateman.
11     Q.  Bateman?
12     A.  Bateman is a bank, Bateman Bank.  I don't know
13  -- BNC Calculi [phonetic], potentially.
14     Q.  And why did you choose Bateman Bank instead of
15  VP Bank for?
16     A.  That was an existing relationship that Wayne
17  already had.  He knew that bank.
18     Q.  And did Wayne Weaver instruct you to open up an
19  account at Bateman?
20     A.  I completed the docs, but he asked me to do so;
21  that's right.
22     Q.  And did you reserve as the nominee for Calgon?
23     A.  Sorry.  I just was confused.  I read "Panama,"
24  in the document, but it's a Marshall Islands company.
25  Sorry.

---

Page 84

1     Q.  Did you act as the nominee officer and director
2  for Calgon?
3     A.  I did.
4     Q.  And when I say "you," I mean Admita Nominees,
5  correct?
6     A.  Yes, yes, yes.
7     Q.  And as the nominee for Calgon, did you receive
8  instructions from time to time to execute transactions
9  for Calgon?
10     A.  Very, very, very infrequently, question.
11     Q.  And who did you receive instructions from?
12     A.  From Wayne.
13     Q.  Were there any other officers of Calgon?
14     A.  No.
15     Q.  Were there any other directors of Calgon?
16     A.  No.
17     Q.  Would you receive account statements from
18  Bateman, periodically?
19     A.  I have two or three pages only from this
20  company.  I have not received bank statements the way we
21  were looking at for the companies before.  I just got a
22  few pages, so they didn't send it regularly or
23  periodically.  They didn't send it to me.
24     Q.  So unlike VP Bank, you were not --
25     A.  Provided with that, no.

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 85

```
 1    Q.  You were provided with these?
 2    A.  No.
 3    Q.  Not regularly, at least?
 4    A.  At least, yes.
 5    Q.  Are you generally familiar with the
 6  transactions for Calgon?
 7    A.  Based on the missing documents, no.
 8    Q.  How about based on the instructions you were
 9  given, are you generally familiar with --
10    A.  With that, yes.
11    Q.  -- that?
12        Based on the instructions that you were given,
13  are you aware of any activity for Calgon other than the
14  trading of stocks and the use of resulting proceeds?
15    A.  Buying Coca Cola was an instruction.
16    Q.  A stock, correct?
17    A.  Yeah.
18    Q.  So are you familiar with any activities other
19  than the buying and selling of stock and the use of
20  proceeds?
21    A.  No, except maybe liquidation and things like
22  that, but not transferring money.
23    Q.  And by "liquidation," you mean liquidation of
24  the account?
25    A.  Yeah.
```

Page 86

```
 1    Q.  I'd like to look at Tab 20, which is premarked
 2  as Exhibit 97, what appears to be a series of documents
 3  related to account opening and incorporation of Calgon.
 4        Now, looking at these, starting with the
 5  account-opening documents, are you familiar with those?
 6    A.  Yes.
 7    Q.  And starting with Bates number CIMA56 through
 8  CIMA64, are those documents related to the opening of an
 9  account at Bateman for Calgon?
10    A.  Uh-huh.  Sixty-four, right?  Yeah.
11    Q.  And is that your signature on page CIMA56?
12    A.  It is.
13    Q.  And again, CIMA58?
14    A.  Uh-huh, yes.
15    Q.  CIMA59?
16    A.  Yes.
17    Q.  And CIMA60?
18    A.  Yes.
19    Q.  And did someone direct you to fill out this
20  information on behalf of Calgon?
21    A.  "Please open a bank account with Bateman," yes.
22    Q.  And who instructed you to do that?
23    A.  This was Wayne.
24    Q.  After those documents starting on page CIMA65
25  through CIMA67, there's a series of passports?
```

Page 87

```
 1    A.  Yes.
 2    Q.  Pages 65 and 67, are those copies of your
 3  passport?
 4    A.  This is correct.
 5    Q.  And in the middle of page 66, there's a copy o
 6  what appears to be Wayne Weaver's passport; is that
 7  correct?
 8    A.  That's correct.
 9    Q.  Did Wayne Weaver provide you with a copy of his
10  passport?
11    A.  Yes.
12    Q.  And that was in connection with Calgon?
13    A.  Yes.
14    Q.  Looking at pages CIMA68 through 70, what are
15  those?
16    A.  I mean, 68 is proof of residence from me.  I
17  had to show to the bank -- I had to show to confirm my
18  home address with any insurance company, electricity
19  bill, phone bill.
20    Q.  And that's what this is, right?  It's a bill?
21    A.  Yeah.
22    Q.  Okay.
23    A.  And 69, to be honest, I don't know what it is.
24    Q.  Okay.  Well, looking at pages CIMA72 and on,
25  these appear to be a series of documents related to the
```

Page 88

```
 1  incorporation of Calgon?
 2    A.  Uh-huh.
 3    Q.  Are those documents familiar to you?
 4    A.  I don't remember, actually, but yes, that's
 5  part of the --
 6    Q.  I'm sorry.  The next page.
 7    A.  Oh, this one?
 8    Q.  Right.  So starting with the Articles of
 9  Incorporation --
10    A.  Yeah.  Yeah, yeah, yeah.
11    Q.  -- to the end of Tab 20, are you familiar with
12  those documents?
13    A.  Yes, those are the normal company documents.
14    Q.  And these documents are related to the
15  incorporation of Calgon?
16    A.  Yes.
17    Q.  And you received them in your role as nominee
18  for Calgon?
19    A.  That's right.
20    Q.  And do they appear to be accurate copies of
21  what you received in connection with the incorporation
22  of Calgon?
23    A.  Yes.
24    Q.  Moving to Tab 21, which we have marked as
25  Exhibit 98, are you familiar with this document?
```

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 89

1  A. I don't know. I had mentioned that I got very
2  few documents. It might be that -- the first two pages,
3  might be that I have copies of that.
4  **Q. Okay. I'll note that this wasn't produced by**
5  **you.**
6  A. But anyway, that's what I probably, as a max,
7  had.
8  **Q. Does it look like the statement that you**
9  **received from Bateman?**
10  A. This (indicating), yes, but this (indicating) I
11  don't know.
12  **MR. PATTON:** You're referring to which page? So the
13  record is clear.
14  **MR. LEIMAN:** Yeah.
15  **THE WITNESS:** From 187 up to 190. I was not in
16  possession of such statements.
17  **BY MR. LEIMAN:**
18  **Q. Okay. So you're familiar with pages 185 and**
19  **186?**
20  A. It looks like, at least. I got something else,
21  maybe an account opening or closing; I don't remember.
22  **Q. Okay. It looks familiar --**
23  A. It looks like a -- it is a bank statement from
24  Bateman.
25  **Q. Okay. But unlike the previous documents we**

Page 90

1  **have seen in this binder, you're not sure that is what**
2  **you now --**
3  A. No, this is --
4  **Q. Then I'm not going to ask you anymore questions**
5  **about it.**
6  **Looking at Tab 90 -- well, you know what?**
7  **Let's hold off on that.**
8  **MR. LEIMAN:** Okay. For the time being, we can put
9  away the binder.
10  For the record, so that people can access these
11  documents with ease, I'd like to mark as Exhibit 101 a
12  copy of the index to the binder that we've all been
13  looking at that, which will identify the Bates numbers
14  of the documents that are inside of it.
15  (Exhibit No. 101 was marked for
16  identification.)
17  **BY MR. LEIMAN:**
18  **Q. All right. Previously you mentioned meeting**
19  **Mr. Weaver, Mr. Sun, Mr. Al-Barwani.**
20  **Did you ever meet all three of them at the same**
21  **time?**
22  A. Together with Daniel Lacher, we had lunch.
23  **Q. And where was the lunch?**
24  A. I don't remember the restaurant name. In
25  Zurich.

Page 91

1  **Q. Okay. And so you were there, correct?**
2  **MR. PATTON:** You have to say yes.
3  A. Yes.
4  **Q. Was Wayne Weaver there?**
5  A. Yes.
6  **Q. Was Michael Sun there?**
7  A. Pretty sure, yes.
8  **Q. And Mr. Al-Barwani, was he there?**
9  A. Pretty sure.
10  **Q. And Mr. Lacher, was he there?**
11  A. Yes.
12  **Q. And was this meeting before or after the**
13  **incorporation of Westpark, Las Colinas, and Renavial?**
14  A. As far as I remember, after.
15  **Q. Okay. So sometime in the fall of 2010; is that**
16  **accurate?**
17  A. Yes.
18  **Q. And what was discussed at that meeting in**
19  **Zurich?**
20  A. It was Daniel phoned me up, "Look, we've got
21  these and these guys here. Let's go for lunch, and then
22  you have a face-to-face. So we can go for introduction,
23  talk to each other just during lunch, you'll get to know
24  all the beneficial owners personally."
25  **Q. Was it more of a personal discussion, or did**

Page 92

1  **you talk business as well?**
2  A. Mixed. Basically it was kind of, "Where are
3  you with these companies? What are you doing?" It was
4  just lunch as it goes on. It's not just focused on
5  specific areas.
6  **Q. Did you have an understanding of Wayne Weaver's**
7  **relationship to Mr. Sun and Mr. Al-Barwani?**
8  A. That they had a -- please say again.
9  **Q. So, you know, there are a number of contexts**
10  **that could have existed at the time.**
11  **Did you have an understanding of what the**
12  **business relationship was, if any, between Weaver and**
13  **Sun and Weaver and Al-Barwani?**
14  A. It looked like friendship. They -- to me, it
15  appeared like they knew each other for a certain period
16  of time.
17  **Q. And did it appear, based on your discussion,**
18  **that there was a business relationship between those**
19  **three?**
20  **MR. BOYLE:** Objection to form.
21  **Q. And I'm sorry. For "those three," I mean**
22  **Mr. Weaver, Mr. Sun, and Mr. Al-Barwani.**
23  **MR. BOYLE:** Objection to form.
24  A. Yes.
25  **Q. Did Mr. Weaver appear to have a fiduciary**

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 93

1  relationship with Mr. Sun and Mr. Al-Barwani?
2      MR. BOYLE: Objection to form. Vague.
3      MR. HARRIS: Objection.
4      Q.  It's a lot of objections, but you can still
5  answer.
6      A.  Potentially, yes.
7      Q.  Do you know if Mr. Weaver was acting as a
8  nominee for Mr. Sun or Mr. Al-Barwani or vice versa?
9      A.  This I don't know.
10     Q.  Okay.
11     A.  This I don't know. I know he offers fiduciary
12  services, but not for who.
13     Q.  As time went on through 2010 and 2011, did it
14  appear to you that Mr. Weaver was giving instruction to
15  you on behalf of other people?
16     MR. BOYLE: Objection to form.
17     A.  Let me get the question again.
18     Q.  Sure.
19         So you mentioned that sometimes you would
20  receive instructions from Mr. Weaver?
21     A.  Yes.
22     Q.  Did that become more frequent as time went on?
23     MR. HARRIS: Objection. Vague.
24     A.  I'd say that was always the same.
25     Q.  Always -- you would always receive

Page 94

1  instructions?
2      A.  Constantly. Lacher, Weaver and very, very,
3  seldom from the beneficial owners.
4      Q.  Is it fair to say you would more often receive
5  instructions from Mr. Weaver than the beneficial owners?
6      A.  From Mr. Weaver and Lacher.
7      Q.  Okay.
8      A.  I would say even Lacher sent me more
9  instructions than Wayne.
10     Q.  Okay. So between Mr. Lacher and Mr. Weaver,
11  you would receive more instructions from them as opposed
12  to the beneficial owner?
13     A.  That's correct.
14     Q.  Was the topic of Jammin' Java spoken of at the
15  meeting in Zurich?
16     A.  We didn't discuss Jammin' Java.
17     Q.  Did you discuss, in general, the types of
18  stocks that would be traded out of Westpark, Las
19  Colinas, and Renaval?
20     A.  I don't limit it down to we were talking about
21  that's their business, but not specific symbols.
22     Q.  But in general, were you discussing the trading
23  of stock through Westpark, Las Colinas, and Renaval?
24     A.  Not during the meeting. That was -- in my
25  opinion, that was already discussed with Daniel Lacher,

Page 95

1  because he said we have this triangle relationship,
2  trading overnight. That was not to be discussed
3  anymore.
4      Q.  And when you say "not to be discussed anymore,"
5  do you mean that you wouldn't ask any more questions
6  about that to them?
7      A.  No.
8      Q.  And they didn't give you more answers about
9  that?
10     A.  No answers, no.
11     Q.  Okay.
12     A.  Yeah.
13     Q.  Did you ever discuss with Wayne Weaver, before
14  that period, that there would be trading in stocks out
15  of Las Colinas, Renavial, and Westpark?
16     A.  What do you mean "outside" [sic]?
17     Q.  So you said there's a certain point when there
18  were no more questions and no more answers, right?
19     A.  Uh-huh.
20     Q.  Before that period of time period of time, did
21  you have any discussions with Wayne Weaver about the
22  trading of stock --
23     A.  No.
24     Q.  -- in Renavial, Las Colinas, and Westpark?
25     A.  No. I knew the type of client through Daniel's

Page 96

1  introduction or Wayne's introduction. I knew it was
2  going to be a stock-trading entity.
3      Q.  Okay. And does that include Calgon as well:
4  That that would be a stock-trading entity?
5      A.  Yes, but it wasn't -- not the same setup.
6      Q.  Because of the account at Bateman?
7      A.  Bateman was the bank, so who did the trade over
8  there, I don't know.
9      Q.  The -- at some point you became aware of the
10  purchase of Jammin' Java stock for Westpark, Las
11  Colinas, and Renavial, correct?
12     A.  Yes.
13     Q.  And were you involved in the purchase of
14  Jammin' Java stock for those entities?
15     A.  Purchase agreements, yes.
16     Q.  And also, would you sometimes have
17  conversations with transfer agents in connection with
18  the purchase of stock for Las Colinas, Renavial, and
19  Westpark?
20     A.  I don't know which ones, but we sent physical
21  share certificates to this transfer agent, yes.
22     Q.  And did you sometimes receive instructions from
23  Wayne regarding the purchase of Jammin' Java stock for
24  Westpark, Las Colinas, and Renavial?
25     A.  Yes.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 105

1    MR. PATTON: Role.
2    THE WITNESS: Yeah, my role. It's not my role to do
3 so.
4 BY MR. LEIMAN:
5    Q. You relied on Wayne to figure that out?
6    A. Yeah.
7    Q. And by -- let me rephrase my question.
8       You relied on Wayne to figure out how to
9 navigate the five-percent limitation on ownership?
10    A. I would say so, yes.
11    Q. You formed -- other than the companies that
12 we've talked about today, you formed other company for
13 Wayne Weaver; is that correct?
14    A. Yes.
15    Q. And you've seen accounts for those companies
16 trade other stocks other than Jammin' Java, correct?
17    A. That's correct.
18    Q. What is the maximum number of companies that
19 you've formed for Wayne that traded in the same stock?
20    A. In the same stock?
21    Q. Yes.
22    A. Four.
23    Q. Would you say that the formation of companies
24 for Jammin' Java was the maximum?
25    A. Maybe five, another one, but I don't think so.

---

Page 106

1    Q. Okay.
2    A. I would -- I cannot hundred percent guarantee
3 that the number is correct, but I would say four is the
4 max.
5    Q. Did you ever discuss with Wayne Weaver why you
6 remember forming four different entities that were going
7 to trade in the same stock?
8    A. I understood it these other three beneficiaries
9 were kind of friends or in any kind of relationship. "I
10 have a nice product which could be sold, which has a
11 nice future," whatever. Do we want to join? That's the
12 way I understood the relationship was built up.
13    Q. But did you ever talk to Wayne as to why -- why
14 not just form one entity and have him figure things out?
15    A. No.
16    Q. Are you familiar with a company called Straight
17 Path?
18    A. Yes.
19    Q. And what is Straight Path?
20    A. Straight Path is a Marshall Islands company,
21 never had a bank account, and actually nor a beneficial
22 owner. So we never had a Form A and a bank account. So
23 it was more or less an umbrella, which has been
24 incorporated for Wayne.
25    Q. And did Wayne direct you to start Straight

---

Page 107

1 Path?
2    A. Yes.
3    Q. And are you familiar with the term "aged
4 entity"?
5    A. Yes.
6    Q. What does "aged entity," mean?
7    A. "Aged entity," means whenever you need a
8 company and you're looking for a company which has an
9 incorporation date before today, then we call it "aged
10 company."
11    Q. So is this a company that exists before,
12 correct?
13    A. Before you need it.
14    Q. And then you change the name, correct?
15    A. You could change the name. You could change
16 the board. Whatever you want.
17    Q. Is the company that you change the name of, is
18 that typically an empty shell?
19    A. Yes.
20    Q. Have you ever heard the term "shelf entity,"
21 S-H-E-L-F?
22    A. Yes.
23    Q. And what's a shelf entity?
24    A. A self entity is just whenever you need a
25 company immediately, you take it off the shelf. These

---

Page 108

1 companies may be a week old or two, just feeding the
2 stock, whatever these companies can feed.
3    Q. Uh-huh.
4    A. Not the same as an aged company; that goes
5 further back.
6    Q. Okay. So in an aged-company transaction, you
7 get the shell company from the bank; is that correct?
8    A. No, from the agency.
9    Q. From the agency.
10       What agency?
11    A. Yeah.
12    Q. What agency is it?
13    A. Marshall Islands agency.
14    Q. Okay. And do you have to purchase the shell
15 entity?
16    A. Yes.
17    Q. And then change the name?
18    A. The aged company, yes.
19    Q. And in this case, the name was changed to
20 Straight Path; is that correct?
21    A. Yes, that's correct.
22    Q. And that was -- that name change and the
23 acquisition, that was all at the direction of Wayne
24 Weaver, correct?
25    A. Yes.

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 109

1    MR. LEIMAN: I'd like to mark as Exhibit 105 a copy
2  of an e-mail from Mr. Berlinger to Wayne Weaver.
3    MS. DAYTON: What's the Bates number?
4    MR. LEIMAN: 289, BER289.
5    (Exhibit No. 105 was marked for
6    identification.)
7  BY MR. LEIMAN:
8    Q.   And are you familiar with this e-mail and the
9  attachments?
10   A.   Yes.
11   Q.   Looking at the e-mail on the first page from
12 you to Wayne Weaver, the subject line says "aged," and
13 then a typo, "company."
14       First of all, is my reading of that correct?
15   A.   No.  I don't know where you are.
16   Q.   So the top e-mail from you --
17   A.   Ah.
18   Q.   -- to Wayne Weaver, with the subject line "aged
19 company."  It appears to have a typo in it.
20       Is that a correct reading of the subject line?
21       So just the top e-mail.
22   A.   Yes.  Oh.
23   Q.   And so what does that subject line refer to?
24   A.   I cannot really verify the PDF here, but is
25 that -- the invoice is behind it.

---

Page 110

1    Q.   That's how it was produced to us.  So if you
2  look at the subject, it says "aged company," and then
3  the first attachment appears to be an invoice related to
4  Straight Path.
5    A.   Yeah, it's just a type mismatch.
6    Q.   Okay.  That term "aged company," is that what
7  we were just talking about?
8    A.   Yes.  I mean, it's also the invoice for
9  Straight Path.
10   Q.   Right.
11       And then are you familiar with that invoice?
12 So at page 291, are you familiar with that invoice to
13 Straight Path?
14   A.   Yeah.
15   Q.   And what does this invoice relate to?
16   A.   This is a director fee, in -- not
17 incorporation, renaming fee.  Aged companies, you need
18 to pay back -- firstly, you pay a fine because taxes
19 haven't been paid for a while.  So taxes have to be paid
20 plus a fine, and that makes the company a little bit
21 more expensive, and that's why the invoice is a little
22 bit higher than the other typical incorporation costs we
23 had.
24   Q.   Did Wayne Weaver tell you what Straight Path
25 was for?

---

Page 111

1    A.   No, we didn't discuss that.
2    Q.   He just asked you to form it, and you formed
3  it?
4    A.   We had -- the way we discussed, we incorporated
5  lots of companies, and also just having maybe ten
6  companies ready for whatever new client comes up or
7  needs one.  So we had kind of companies on stock, and so
8  was, in my opinion, Straight Path; we didn't know what
9  it is for.
10   Q.   So we've talked about how Straight Path was an
11 aged company, correct?
12   A.   Yes.
13   Q.   Were any of the other entities that you formed
14 for Wayne Weaver an aged company?
15   A.   No.
16   Q.   This is the only one, right?
17   A.   Shelved company, yes, but not aged.
18   Q.   Not aged?
19   A.   No.
20   Q.   And is it fair to say that one of the
21 advantages of using an aged company is that it provides
22 an incorporation date earlier than the date that you're
23 changing the name of the company?
24   A.   Yes.
25   Q.   And to an outside observer, it would appear

---

Page 112

1  that the incorporation date for the aged company is much
2  earlier than the date that you changed the name; is that
3  fair to say?
4    MR. HARRIS: Objection.
5    A.   It's correct.  The only thing is, if you look
6  at the incorporation date, if you find it on an official
7  document, it says all the old names.
8    Q.   If you go digging around in the documents --
9    A.   Yes.
10   Q.   -- you would find out?
11   A.   Yes, yes.
12   MR. LEIMAN: I'd like to mark as Exhibit 106 a copy
13 of a document Bates stamped BER2300.  It appears to be a
14 Certificate of Incumbency for Straight Path.
15   (Exhibit No. 106 was marked for
16   identification.)
17 BY MR. LEIMAN:
18   Q.   And are you familiar with these documents?
19   A.   Yes.
20   Q.   And what are they?
21   A.   Certificate of Incumbency confirms the company
22 is in good standing.  It also says that -- or confirms
23 the directors.  The second page is just a Certificate of
24 Good Standing, and the following page is -- yeah, they
25 were not amended, but the last page is the resolution to

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 113

1  change the company name.
2      Q.  And did you receive these documents in the
3  context of setting up Straight Path for Wayne Weaver?
4      A.  Yes.  To be correct, we just ordered it and we
5  got it kind of on stock.  So IRI, the -- which is the
6  agent of Marshall Islands in Zurich, they sent us these
7  docs and we kept it on file.
8      Q.  And then you changed the name of the company,
9  correct?
10     A.  No, that was the same procedure we had.  We
11  never had the Beauty Water company in our house --
12     Q.  Okay.  So this is all done --
13     A.  -- as far as I know.  We just asked the agent,
14  "Do you have an aged company?  How much does it cost?"
15  And then we ordered and renamed the director chain and
16  renamed company name.
17     Q.  Okay.  You mentioned Beauty Water.
18         Beauty Water --
19     A.  Yeah, that was aged --
20     Q.  What is that?
21     A.  That's the former company name.
22     Q.  So that's the former company that you then
23  changed the name into Straight Path?
24     A.  Into Straight Path, yes.  So we actually -- we
25  bought this Beauty Water.

Page 114

1      Q.  And what was the incorporation date of Beauty
2  Water?
3      A.  21st of October 2008.
4      Q.  And after the name change, that became the
5  incorporation date for Straight Path, correct?
6      A.  Yes.
7      Q.  You mentioned that Wayne Weaver instructed you
8  to form Straight Path.
9         Did he ask you to find an aged company for
10  Straight Path?
11     A.  Uh-huh.
12     Q.  I'm sorry.  The --
13     A.  Yes.
14     Q.  And did you ask Wayne whether he wanted a bank
15  account for Straight Path?
16     A.  No.  I remember he said, "Just wait.  Leave
17  it."  There was no activity.
18     Q.  At the time that you were forming Straight Path
19  for Wayne Weaver, were you aware of a financing
20  agreement between the entity called Straight Path and
21  Jammin' Java?
22     A.  No.
23     MR. LEIMAN:  I'd like to mark as Exhibit 107 a copy
24  of a document called Share Issuance Agreement, and the
25  Bates number is JJC001094.

Page 115

1         (Exhibit No. 107 was marked for
2         identification.)
3      MR. PELED:  Is there one more copy of this?
4      MR. LEIMAN:  That's all I've got.
5  BY MR. LEIMAN:
6      Q.  So this appears to be a Share Issuance
7  Agreement between Straight Path and Jammin' Java Corp.
8         Before the litigation in this case, had you
9  ever seen this agreement?
10     A.  No, I can't recall them.  I never saw that.
11     Q.  Did Wayne Weaver ever mention to you the
12  existence of a Share Issuance Agreement between Straight
13  Path and Jammin' Java?
14     A.  Not that I know.  Not before your investigation
15  started.
16     Q.  Okay.  So not before the litigation.
17         Looking at page JJC001101, so the
18  second-to-the-last page of Exhibit 107, there's a
19  signature there on the left that purports to be from a
20  Raymond Hall, vice president business development for
21  Straight Path Capital.
22         Prior to this litigation, had you ever heard of
23  Raymond Hall?
24     A.  Not at the time.
25     Q.  When you formed Straight Path, were you aware

Page 116

1  of Straight Path having any employees?
2      A.  There were no employees.
3      Q.  Were you aware of Straight Path having any
4  directors?
5      A.  Admita Nominees.
6      Q.  Just you, right?
7      A.  Yes.
8      Q.  How about officers:  Were you aware of Straight
9  Path having any officer?
10     A.  No -- yeah, me, Admita.
11     Q.  Uh-huh.
12         Had you ever had a conversation with Wayne
13  Weaver about Raymond Hall?
14     A.  I don't know this guy.
15     Q.  In your dealings with Wayne, did you become
16  familiar with some of Wayne's employees?
17     A.  His secretaries, yes.
18     Q.  And did you ever hear Wayne Weaver talk about a
19  Raymond Hall?
20     A.  No.
21     Q.  Looking at the date of the agreement,
22  December 22, 2010, by using a shelf entity, was Straight
23  Path able to obtain an incorporation date that comes
24  before this Share Issuance Agreement?
25     A.  Can you ask again?  Sorry.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 117

```
 1    Q.  Sure.
 2        By using a shelf entity instead of just
 3  creating a company from scratch --
 4    A.  Yes.
 5    Q.  Straight Path by doing it that way was Straight
 6  Path able to obtain a Share Issuance Agreement date
 7  before?
 8    A.  It could be done, yes.  I would amend the
 9  agreement a little and Straight Path admitted not a UK
10  company.
11    Q.  Because Straight Path was a Marshall Islands
12  company, correct?
13    A.  Yeah it was a Marshall Islands company.
14    Q.  In December of 2010, you hadn't created
15  Straight Path yet, correct?
16    A.  No.
17    Q.  And Straight Path never had a bank account,
18  correct?
19    A.  That's correct.
20    Q.  Did Straight Path receive stock certificates in
21  Jammin' Java?
22    A.  There was -- I have seen a copy, yes.  There
23  were shares issued, but I don't know was it the correct
24  name or -- I don't remember it, to be honest, but I saw
25  a certificate.
```

---

Page 118

```
 1      MR. LEIMAN:  Okay.  Let's go through some of the
 2  transactions.  I'd like to mark as Exhibit 108 a copy of
 3  an e-mail chain between Wayne Weaver and Mr. Berlinger.
 4      MS. DAYTON:  Can you provide the Bates number on
 5  that, please?
 6      MR. LEIMAN:  BER297.
 7      (Exhibit No. 108 was marked for
 8      identification.)
 9  BY MR. LEIMAN:
10    Q.  And are you familiar with these e-mails?
11    A.  Uh-huh.
12    Q.  I'm sorry?
13    A.  Yes.
14    Q.  Up there at the top, it says
15  "berlinger@grivo.ch."
16        Was that one of your e-mail addresses?
17    A.  Yes.
18    Q.  And the e-mail in the second e-mail on the
19  first page it says "Wayne@aegisfinancial.org."
20        Were you familiar with that e-mail address?
21    A.  I remember this, yes.
22    Q.  And that's Wayne Weaver's address?
23    A.  Yes.
24    Q.  Do you have an understanding of what Aegis
25  Financial is?
```

---

Page 119

```
 1    A.  Potentially, it's this accounting firm.
 2    Q.  When you say "potentially," do you know one way
 3  or the other?
 4    A.  No, I don't know which one is what.  You
 5  remember in the beginning?
 6    Q.  Right.
 7        You mentioned an accounting firm --
 8    A.  Yes.
 9    Q.  -- and a financial services provider, correct?
10    A.  Again, I don't know exactly what they're doing,
11  but --
12      MR. PATTON:  Well, don't guess.
13      THE WITNESS:  Don't guess.
14  BY MR. LEIMAN:
15    Q.  Do you recognize it as being a company that
16  Wayne Weaver was affiliated with?
17    A.  Yeah, I got several e-mails from there.
18    Q.  Looking at the last e-mail on the first page
19  from Wayne Weaver to you, have you seen that e-mail
20  before?  It's on the first page.
21    A.  The delivery.
22    Q.  You recognize that e-mail?
23    A.  Uh-huh.
24    Q.  I'm sorry?
25    A.  Yes, but --
```

---

Page 120

```
 1    Q.  Okay.  So the e-mail says, "Can you also let me
 2  know when you receive the Jammin' Java share certificate
 3  for Straight Path Capital?"
 4    A.  Uh-huh.
 5    Q.  "It might have been sent for attention Raymond
 6  Hall."
 7    A.  Yeah.
 8    Q.  Is that the first time that you had ever heard
 9  the name Raymond Hall?
10    A.  Yes.  I don't know him.  I -- there's no
11  relation.
12    Q.  And did you eventually let Wayne Weaver know
13  when the share certificates for Straight Path came in?
14    A.  Yes.  It's a long time ago, and I don't really
15  know exactly what was when, but yes, whenever it
16  arrived, I would have sent it.
17      MR. HARRIS:  I'm sorry.  What was that last answer?
18      THE WITNESS:  If the certificate would have arrived,
19  I would have sent it to him, if he would have asked for
20  it.
21      MR. HARRIS:  Thank you.
22      MR. LEIMAN:  Let's take a look at a document that I
23  will mark as Exhibit 109, a copy of what appears to be
24  share certificates for Straight Path Capital for Jammin'
25  Java Corp.
```

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 121

1      (Exhibit No. 109 was marked for
2      identification.)
3  BY MR. LEIMAN:
4      Q.  Looking at the first two pages -- and these are
5  documents that you produced to the SEC -- does that
6  refresh your recollection --
7      A.  Yeah.
8      Q.  -- as to the stock certificates that came in
9  for Straight Path Capital?
10     A.  Yeah.
11     Q.  And what are these first two pages of
12 Exhibit 10 --
13     A.  Nine.
14     Q.  -- 9?
15     A.  It confirms 5.95 million shares of Jammin' Java
16 in the name of Straight Path Capital, and the second one
17 is a share certificate confirming 300,000 shares of
18 Jammin' Java in the name of Straight Capital -- Straight
19 Path Capital.
20     Q.  The following page in Exhibit 109, so page 633,
21 do you recognize that document?
22     A.  Well, that's an invoice yeah.
23     Q.  And what is it an invoice for?
24     A.  For services.
25     Q.  And for services relating to what?

---

Page 122

1      A.  Obtaining aged company.  Just services
2  regarding Straight Path.  Yeah, especially that.  The
3  rest is filing copies and holding forms.
4      Q.  When you provided services related to Straight
5  Path, who did you invoice?
6      A.  We -- as I said before, we had many companies
7  being ordered, just to be ready whenever we need
8  companies, and then whenever was time to get them
9  invoiced, we asked Wayne, "Where can we get money from
10 to pay these invoices?"
11     Q.  So you would send the invoices to Wayne?
12     A.  To Daniel and to Wayne.
13     Q.  And for Straight Path, who paid the invoices?
14     A.  This is not easy to find.  It could be any of
15 the companies.
16     Q.  You don't recall right now?
17     A.  Could be Calgon, could be -- yeah, I cannot
18 recall.
19     Q.  And by "any of the companies," do you mean any
20 of Calgon, Renavial, Las Colinas, Westpark?
21     A.  Yeah.
22     Q.  Could be one of them?
23     A.  Yes.
24     MR. LEIMAN:  Can we go off the record.
25     VIDEOTAPE OPERATOR:  We're off the record.  The time

---

Page 123

1  is 12:10 p.m.
2      (At 12:10 P.M., a lunch recess was taken
3      until 1:06 P.M. of the same day.)
4  (Nothing omitted nor deleted.  See next page.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 124

1      TUESDAY, FEBRUARY 7, 2017; P.M. SESSION
2
3      VIDEOTAPE OPERATOR:  We're back on the record.  The
4  time is 1:06.  This is the beginning of Tape 3 in the
5  deposition of René Berlinger.
6
7      EXAMINATION RESUMED
8  BY MR. LEIMAN:
9      Q.  Mr. Berlinger, when we left off we were talking
10 about stock certificates that came into Straight Path,
11 and they were Jammin' Java stock certificates.  Now I
12 want to talk about money that goes back into Jammin'
13 Java, and I would like to start with a company called
14 Chilli Capital.
15     Are you familiar with Chilli Capital?
16     A.  Yes.
17     Q.  And how are you familiar with Chilli Capital?
18     A.  It's a Marshall Islands company, comparable to
19 others we discussed.  Directorship:  Admita Nominees.
20 Beneficial owner:  We know Kevin.  Bank account with
21 VP Bank.  The same as the other companies, actually.
22     Q.  Did you talk with Kevin Miller about forming
23 Chilli Capital?
24     A.  Probably not.
25     Q.  Who did you talk to in forming Chilli Capital?

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 125

1    A.  Mainly with the bank.  There are e-mails which
2  look like it's instruction coming from the bank.
3    Q.  Did you ever talk with Wayne Weaver about
4  Chilli Capital?
5    A.  Yes.
6    Q.  I'd like you to just take a look at a couple of
7  exhibits we skipped in our binder of group exhibits, and
8  I want to start with the exhibit that's been premarked
9  as 83, and take at look at Tab A.
10       And these documents at Tab A appear to be a
11  series of documents related to the opening of an account
12  at VP Bank.
13    A.  Yes.
14    Q.  And are you familiar with these documents?
15    A.  Yes.
16    Q.  And what are they?
17    A.  This is all about account opening.  Typical
18  forms with VP Bank, defining signature power.  Only the
19  forms plus the Form A, which I advise the owner.
20    Q.  And are these the forms that you submitted to
21  VP Bank in order to open up a bank account for Chilli
22  Capital?
23    A.  Yes.
24    Q.  And You did that in your capacity as nominee
25  for Chilli Capital?

---

Page 126

1    A.  Exactly.
2    Q.  What was the purpose behind Chilli Capital?
3    A.  That was not clear at the moment.
4    Q.  Looking at Tab B, it appears that there are
5  some additional documents related to -- it appears to be
6  documents related to know-your-customer requirements?
7    A.  Yes.
8    Q.  Are you familiar with those documents at Tab B?
9    A.  Yes.
10    Q.  What are they?
11    A.  These are KYC documents, passport copies, Form
12  A, and know-your-client documents from the bank, which
13  actually is a copy of the company he had, Las Colinas.
14  It's one to one, same beneficiary.
15    Q.  So they already had know-your-customer
16  documents from Las Colinas?
17    A.  Yes.
18    Q.  And provided them to you in connection with
19  opening Chilli Capital?
20    A.  They didn't have to provide it.  I had it as
21  well, yes.
22    Q.  Okay.  You had them as well?
23    A.  I had -- I'm advised to have them as well.
24    Q.  And you had them because you were the nominee
25  for Las Colinas as well, correct?

---

Page 127

1    A.  Yeah.
2    Q.  To your knowledge, did the bank discuss this
3  with Kevin Miller?
4    MR. ESBENSHADE:  Calls for speculation.
5    A.  Potentially.
6    Q.  By "potentially," do you know whether they
7  talked to Kevin Miller, or are you speculating?
8    A.  I'm speculating.  There are e-mails somewhere
9  which -- I'm not sure of incorporation, but all others
10  are definitely coming from the bank, so I don't know
11  whether it's also including the incorporation.
12    Q.  Okay.  Looking at Tab C, there are what appear
13  to be documents related to the incorporation of Chilli
14  Capital; do you see those documents?
15    A.  Yes.
16    Q.  And do you recognize the documents?
17    A.  This is all about the incorporation.  It asks
18  additional lawyer-client information, which is actually
19  not needed for getting a company incorporated.
20    Q.  But these are documents you're familiar with?
21    A.  Absolutely.
22    Q.  And they are documents that you received in
23  connection with the incorporation of Chilli Capital?
24    A.  Yes.
25    Q.  And do these appear to be accurate copies of

---

Page 128

1  the documents you received in connection with the
2  incorporation of Chilli Capital?
3    A.  Yes.
4    Q.  I'd like to move to Tab 7, which has been
5  marked as Exhibit 84, and these appear to be statements
6  from VP Bank related to Chilli Capital.  It's tabbed A
7  through L.
8       Are you familiar with these documents?
9    A.  Yes.
10    Q.  And what are they?
11    A.  These are bank statements.  No, actually these
12  are account statements over a period, a three-month
13  period.  Yes.
14    Q.  And who created these documents?
15    A.  That's an extract of the bank account coming
16  from VP Bank.
17    Q.  And did VP Bank provide these statements for
18  you that are at Tab 7 Exhibit 84?
19    A.  I didn't understand.
20    Q.  Did VP Bank provide these documents to you?
21    A.  Yes.
22    Q.  And you're familiar with them, correct?
23    A.  Yes.
24    Q.  And did you receive them in your capacity as
25  the nominee for Chilli Capital?

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 137

1    Q.  Okay.
2    A.  Which says it doesn't come from there.
3    Q.  And I'm sorry.
4        What was that last part?
5    A.  You do not have to verify with the UBO if it
6    comes from the UBO.
7    Q.  Okay.
8    MR. ESBENSHADE: I think he said, "It shows it
9    didn't come from there," or something to --
10   MR. LEIMAN:  Okay.
11   THE WITNESS:  Yes, that's what I meant.
12   BY MR. LEIMAN:
13   Q.  Okay.  So you don't think that came from the
14   beneficial owner of Chilli Capital?
15   A.  Exactly.
16   Q.  And you don't think that came from Daniel?
17   A.  Probably not, no.
18   Q.  Okay.
19   A.  No, it starts with, "Hi Daniel."
20   Q.  Right.
21       And then that is forwarded to you by VP Bank;
22   is that correct?
23   A.  That's been forwarded to VP Bank and then
24   forwarded to me.
25   Q.  Okay.  And then is that the instruction to you

---

Page 138

1    on how to execute the transaction?
2    A.  Yes.
3    Q.  And then in reaction to that, what did you do?
4    A.  It says, "We urgently need a fax instruction."
5    This is the chairman board [sic] text.  "We need to
6    personally fax instruction to Chilli Capital, and then
7    from there 2.38 to the account's wire details below."
8    That's what it says in the German.
9    Q.  And then the following page, is that the fax
10   direction that you then gave back to VP Bank?
11   A.  Yes.  Yes.
12   Q.  At the time, did you have any understanding of
13   what that $2.38 million transfer was for?
14   A.  No.  This is a situation where we usually ask
15   for -- "Let me have a contract or any supporting
16   document to make sure the wire which has been executed
17   can be explained for any audit."
18   Q.  And did you receive any contract?
19   A.  No.  No.  That's the gap.  We never have
20   received any clear supporting document.  That's why I
21   wrote, "It's financing."  That's handwritten, being
22   explained that was for financing Jammin' Java.
23   Q.  And where did you get that understanding?
24   A.  That I don't know.
25   Q.  Okay.  Someone told you that it was related to

---

Page 139

1    Jammin' Java?
2    A.  Maybe that's this Stockwatch copy I got from
3    Daniel.  Maybe that was kind of input for this
4    2.38 million to this lawyer.  That matches with that.
5    Q.  And you're referring -- I'm sorry.
6        Just to clarify, you're referring to something
7    that Daniel Lacher gave you?
8    A.  Yes.
9    Q.  And so Daniel Lacher gave you something that
10   made you think that it was a Jammin' Java transaction?
11   A.  Yeah, it might be sufficient for me to get it
12   documented.
13   Q.  I'd like to talk about a little bit about the
14   sales of Jammin' Java stock.
15       Did you have any role in executing sales of
16   Jammin' Java stock for Westpark, Las Colinas, and
17   Renaival?
18   A.  No.
19   Q.  Did that occur sort of outside of your
20   authority?
21   A.  No, not authority.  I could have done it, but I
22   was not involved.
23   Q.  Okay.  So I want to talk about the disposition
24   of proceeds from the sales of the stock.
25       First of all, you became aware that there was

---

Page 140

1    trading in Jammin' Java, correct?
2    A.  Yes.
3    Q.  And did you become aware because you were
4    getting these periodic monthly statements?
5    A.  Yes.
6    Q.  You were getting Debit Advice Memos, correct?
7    A.  Yes.
8    Q.  And those show that Las Colinas, Westpark, and
9    Renaival were all selling Jammin' Java stock, correct?
10   A.  Yes.
11   Q.  I want to talk a little bit about the
12   disposition of proceeds.
13       Are you familiar with a company called Blue
14   Leaf Capital?
15   A.  We send money to this company, yes.
16   Q.  And what is Blue Leaf Capital?
17   A.  A company, which as far as I remember, was used
18   for new investments, other investments.  I may now know
19   who it is, but at the time, it was not clear.
20   MR. LEIMAN:  I'd like to mark as Exhibit 111 a copy
21   of an e-mail from Wayne Weaver to Mr. Berlinger.
22   MS. DAYTON:  I'm sorry.  What's that Bates number?
23   MR. LEIMAN:  Sorry.  I didn't give it.
24   MS. DAYTON:  Oh.
25   MR. LEIMAN:  It's BER1004.  Thanks for reminding me.

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 141

1    MS. DAYTON: Thank you.
2        (Exhibit No. 111 was marked for
3        identification.)
4    BY MR. LEIMAN:
5    Q. And are you familiar with this e-mail?
6    A. Not as I recall, but it's sent -- been sent to
7    me.
8    Q. Okay.
9    A. And I received it.
10   Q. You recognize Wayne Weaver's address?
11   A. Yes.
12   Q. And this was sent to you, correct?
13   A. Yes.
14   Q. And did you maintain this e-mail after you
15   received it, kept a copy of it?
16   A. This I don't remember.
17   Q. And I can represent to you that, based on the
18   Bates number on the lower right, that you produced it to
19   us.
20   A. Say again.  Sorry.
21   Q. In the lower right-hand corner, the Bates
22   number indicates that you produced this to us.
23       Did you maintain e-mails for your clients?
24   A. Yes, but not filed by client.
25   Q. Uh-huh.

---

Page 142

1    A. I've just got one folder, done.
2    Q. You have a one-client folder?
3    A. No.  E-mails, no.
4    Q. Okay.
5    A. It's just whenever I search for something, it's
6    a search over all the e-mails.
7    Q. Okay.  You maintained electronic copies of your
8    e-mails?
9    A. Yes, yes.
10   Q. And in connection with this case, you searched
11   for e-mails, correct?
12   A. Yes.
13   Q. And is this one of the e-mails that you
14   produced to us?
15   A. That is, yeah.
16   Q. Okay.  Looking at the document, it says, "I am
17   trying to effect transfer into and then out off Sinecure
18   from one of my company's [sic] then to Blue Leaf Capital
19   (my main investment account).  If it proceeds then I
20   will provide you with full documentation.  Thx Wayne."
21       Do you recognize the name Sinecure?
22   A. Yes, that was a company we had.
23   Q. And what is Sinecure?
24   A. I don't remember.
25   Q. Was it a company you formed?

---

Page 143

1    A. A Marshall Islands company, obviously having
2    already a bank account, but I don't remember who was
3    behind there.
4    Q. Was it a company you formed for Wayne?
5    A. Yes.
6    Q. But Blue Leaf Capital, that's not a company
7    that you formed, correct?
8    A. No, no.
9    Q. And you recall transferring money into Blue
10   Leaf Capital; is that correct?
11   A. Yes.
12       MR. LEIMAN: I'd like to mark as Exhibit 112 a copy
13   of an e-mail from wayne@highlandcapital to René
14   Berlinger, and the Bates number is BER921.
15       (Exhibit No. 112 was marked for
16       identification.)
17   BY MR. LEIMAN:
18   Q. And do you recognize this exhibit?
19   A. Yes.
20   Q. And what is it?
21   A. I have no idea what is about at the moment.
22   Q. Okay.  But you recognize Wayne's e-mail
23   address, correct?
24   A. Yes.
25   Q. And you recognize your e-mail address,

---

Page 144

1    berlinger@volante-advisory.ch?
2    A. Yes.
3    Q. These are e-mails that you received, correct?
4    A. Yes.
5    Q. There's an e-mail to an Enzo Caputo from Wayne
6    that says, "PS Blue Leaf Capital is my 100% owned
7    holding company."
8        Did you talk to Wayne about that?
9    A. No.
10   Q. And do you know who Enzo Caputo is?
11   A. Yes, he's the lawyer.
12   Q. And does this relate to --
13   A. With regard to this closing documents from
14   FINMA to the SEC.
15   Q. So this is after the investigation from FINMA
16   gets exposed to you; is that correct?  That's a bad
17   question.  Let me re-ask your.
18       This is in relation to a FINMA investigation,
19   correct?
20   A. Yes, that's what it is.
21   Q. And you're familiar with the organization
22   FINMA?
23   A. Yes.
24   Q. And what is FINMA?
25   A. FINMA is the Swiss SEC.

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 173

1    A. This is under Benjamin Altun's bidding.
2    Q. Okay. And who is Benjamin Altun?
3    A. He's a fiduciary as well.
4    Q. We're done with that document. You don't need
5  that.
6        And are you familiar with the circumstances
7  that led to the creation of Tare Finance?
8    A. The idea is -- it's quite common. Switzerland
9  changed the rules. There was an SEC investigation
10 ongoing. Of course, you start to get money out of that
11 jurisdiction because whenever the account is frozen,
12 whether the SEC would be right or not, it would be
13 frozen for maybe years. So there was, of course, the
14 intention to get away from Switzerland.
15   Q. Whose intention?
16   A. The owner's intention.
17   Q. Okay. Did you communicate with the owners
18 about Tare Finance?
19   A. Now it's a question of recall, who said and who
20 did.
21   Q. Did you communicate with Wayne Weaver about
22 Tare Finance?
23   A. With Wayne for sure.
24   Q. And did you discuss getting money out of
25 Switzerland with Wayne Weaver?

Page 174

1    A. Yes.
2    Q. And you mentioned two reasons: You mentioned
3  that the rules in Switzerland had changed, and you
4  mentioned the SEC investigation, correct?
5    A. Yes.
6    Q. And were those reasons that you discussed with
7  Wayne Weaver?
8    A. Yes.
9    Q. What changed in the rules for Switzerland?
10   A. All with regard to tax compliance. The
11 regulations were stronger and stronger, and the bank
12 actually started to get us kicked out. They didn't want
13 these penny stock deals anymore.
14   Q. And why --
15   A. Maybe not at that time. I'm not sure.
16   Q. Okay. And you mentioned the SEC investigation
17 --
18   A. Yes.
19   Q. -- and the concern of account --
20   A. We knew that --
21   Q. I'm sorry. You've got to wait for my question.
22   A. Sorry.
23   Q. The SEC investigation and the concern about an
24 account being frozen; is that correct?
25   A. Yes.

Page 175

1    Q. And did you discuss that issue with Wayne
2  Weaver?
3    A. At least partially, yes.
4    Q. Okay. Which part did you discuss with Wayne
5  Weaver?
6    A. I mean, I don't know whether the beneficial
7  owner was part of the discussions or not. Was it just
8  Wayne or not.
9    Q. Okay.
10   A. This is what I can't recall.
11   Q. But you know it was at least Wayne; is that
12 fair to say?
13   A. Wayne was definitely involved in these
14 discussions.
15   Q. Okay.
16   A. Yes.
17   MR. LEIMAN: I'd like to walk you through some of
18 the documents for Tare Finance. Marking as Exhibit 121
19 a copy of an e-mail chain, starting with an e-mail from
20 Benjamin Altun to René Berlinger, and the Bates number
21 is BER963, and this appears to be an e-mail with an
22 attached fiduciary agreement.
23       (Exhibit No. 121 was marked for
24       identification.)
25 BY MR. LEIMAN:

Page 176

1    Q. Do you recognize this document?
2    A. Yes.
3    Q. And does this relate to Tare Finance?
4    A. Yes.
5    Q. And was this an e-mail that you received?
6    A. From Benjamin Altun, yes.
7    Q. And what did Benjamin Altun send you?
8    A. He said, "The Dubai company is ready. The
9  account will be opened soon. Please find attached the
10 agreement. We need a signature. Please send it back."
11   Q. And then he sent you the attached unsigned
12 version of the fiduciary agreement, correct?
13   A. Yes, correct.
14   Q. Incidentally, one last follow-up question
15 related to the gold: Do you know where that gold is
16 now?
17   A. I know where it is.
18   Q. And where is it?
19   A. It's in the former bank safe, which a friend of
20 mine has rented. So it's not a bank, it's just a rental
21 agreement to have a box.
22   Q. But it's not being held for you, correct?
23   A. No, no. It's not under my control.
24   Q. Okay.
25   A. Yes.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 245

1    A.  Yeah.

2    Q.  And you're not an expert on U.S. securities

3  law; is that fair to say?

4    A.  Same, yes.

5    Q.  And at the time, did you have any knowledge of

6  the financing agreement between Straight Path and

7  Jammin' Java?

8    A.  Try again.  I didn't understand the question.

9    Q.  At the time --

10    A.  Yeah.

11    Q.  -- so beginning of the FINMA investigation, at

12  the time when you thought that nothing wrong had

13  happened, did you have any knowledge about a financing

14  agreement between Straight Path and Jammin' Java?

15    A.  No.  I remember when we went for this payment,

16  2.3 million, have been told it's for an investment and

17  we will get a contract.  That's what I have in mind, but

18  I never got the contract, and you saw the notice I made.

19  It's for later.  That's when I got to know what it was.

20  That was an investment for Jammin' Java.

21    Q.  But you had not seen the contract; is that

22  correct?

23    A.  Yes, I don't remember that.  Definitely.

24    MR. LEIMAN:  That's all I have.

25    MR. ESBENSHADE:  I have one follow-up question.

Page 246

1          EXAMINATION RESUMED

2  BY MR. ESBENSHADE:

3    Q.  Mr. Harris asked you a few questions about your

4  meeting with the government, and focusing just on I

5  thinks you said around ten minutes of questioning from

6  the woman from the DOJ, Department of Justice, just that

7  part, not the time that Mr. Leiman or people from the

8  SEC.

9        Do you recall any discussion or mention of

10  Mr. Miller during the questioning from the woman from

11  the Department of Justice?  If you don't -- either way.

12  I'm just asking if you recall.

13    A.  It was late as well, so I don't remember the

14  questions.  What I remember is we were more or less

15  talking in general how this works:  How Swiss laws are,

16  what's the way to open up accounts.  It was more about

17  these topics, but not, "Did this guy -- did" --maybe my

18  lawyer will remember, but I think it was not the topic.

19    MR. ESBENSHADE:  That's fine.  I appreciate it.

20  Thank you.

21    VIDEOTAPE OPERATOR:  Anybody else?

22    MR. HARRIS:  Nothing further.

23    MR. PATTON:  I have no questions.

24    MR. LEIMAN:  You can close out.

25    VIDEOTAPE OPERATOR:  This is the end of today's

Page 247

1  deposition of René Berlinger.  We used five tapes.  The

2  time is 4:26, and we're off the record.

3        (At 4:26 P.M., the deposition proceedings

4        concluded.)

5

6

7        ------------------------------

8            RENÉ BERLINGER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 248

1  STATE OF NEW YORK        )

2                 )  ss.

3  COUNTY OF NEW YORK       )

4        I hereby certify that the witness in the

5  foregoing deposition, RENÉ BERLINGER, was by me duly

6  sworn to testify to the truth, the whole truth, and

7  nothing but the truth, in the within-entitled cause;

8  that said deposition was taken at the time and place

9  herein named; that the deposition is a true record of

10  the witness's testimony as reported by me, a shorthand

11  reporter and a disinterested person, and was thereafter

12  transcribed into typewriting by computer.

13  the outcome of the said action, nor connected with, nor

14  related to any of the parties in said action, nor to

15  their respective counsel.

16        IN WITNESS WHEREOF, I have hereunto set my hand

17  this 14th day of February, 2017.

18  Reading and Signing was:

19  ___ requested  ___ waived  _X__ not requested

20

21

22

23

24      JONAH SEARS

25      STATE OF NEW YORK