1  **SCHEPER KIM & HARRIS LLP**
   MARC S. HARRIS (State Bar No. 136647)
2  mharris@scheperkim.com
   MARGARET E. DAYTON (State Bar No. 274353)
3  pdayton@scheperkim.com
   601 West Fifth Street, 12th Floor
4  Los Angeles, California 90071-2025
   Telephone: (213) 613-4655
5  Facsimile:  (213) 613-4656

6  **Attorneys for Defendant Wayne Weaver**

7

8                  **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10

11 SECURITIES AND EXCHANGE          CASE NO. 2:15-cv-08921 SVW (MRWx)
12 COMMISSION,
                                    Hon. Stephen V. Wilson
13          Plaintiff,
                                    **DEFENDANT WAYNE WEAVER'S**
14      v.                          **OPPOSITION TO PLAINTIFF**
                                    **SECURITIES AND EXCHANGE**
15 JAMMIN JAVA CORP., dba           **COMMISSION'S MOTION FOR**
   MARLEY COFFEE, SHANE G.          **PARTIAL SUMMARY JUDGMENT**
16 WHITTLE, WAYNE S. P.             **AS TO LIABILITY AGAINST**
   WEAVER, MICHAEL K. SUN,          **DEFENDANT WAYNE WEAVER**
17 RENE BERLINGER, STEPHEN B.
   WHEATLEY, KEVIN P. MILLER,       *[Filed Concurrently with Statement of*
18 MOHAMMED A. AL-BARWANI,          *Genuine Issues in Opposition to Motion*
   ALEXANDER J. HUNTER, and         *for Partial Summary Judgment and*
19 THOMAS E. HUNTER,                *Declaration of Marc S. Harris in Support*
                                    *of Opposition to Motion for Partial*
20          Defendants.             *Summary Judgment]*

21 _____  Trial Date:        June 27. 2017

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  Introduction ................................................................................................ 1

II.  Argument .................................................................................................... 2

    A.  Summary Judgment On The SEC's Section 5 and Section 13(d) Claims Should Be Denied Because The SEC Offers No Admissible Evidence To Support Essential Elements of Its Claims .................................................................................................. 2

        1.  The SEC May Not Rely on the Declaration of R. Kevin Barrett and the Exhibits Thereto in Support of the Motion .......... 3

            (a)  The Barrett Declaration is Inadmissible Under Federal Rule of Evidence 1006 ........................................ 3

                (i)  The Barrett Declaration and Its Exhibits Are Inadmissible Because They Do Not Specifically Identify the Source Materials ............... 4

                (ii)  The Barrett Declaration and Its Exhibits Are Inadmissible Because The SEC Has Not Shown the Source Material Is Admissible .............. 9

            (b)  The Barrett Declaration and Its Exhibits Are Also Inadmissible Under Federal Rules of Civil Procedure 26(a)(2) and 37 ................................................ 10

        2.  The SEC Fails To Provide Admissible Evidence to Support Essential Elements of Its Section 5 Claim .................... 11

        3.  The SEC Fails To Provide Admissible Evidence to Support An Essential Element of Its Section 13(d) Claim ......... 13

    B.  The SEC Relies on Its Own Allegations to Support Its Section 10(b) and Rule 10b-5 Claims ................................................................ 15

        1.  The Financing Was Not "Bogus" ............................................. 16

        2.  The Straight Path Financing Arrangement Was Fully and Accurately Disclosed to the Investing Public ........................... 19

        3.  The SEC Fails to Establish that Weaver "Engineered" the Straight Path Financing ......................................................... 20

III.  Conclusion ................................................................................................ 21

# TABLE OF AUTHORITIES

**Page**

**<u>Cases</u>**

*Air Safety, Inc. v. Roman Catholic Archbishop of Boston*
  94 F.3d 1 (1st Cir. 1996) ............................................................... 4, 7, 9

*Amarel v. Connell,*
  102 F.3d 1494 (9th Cir. 1996) ............................................................ 4, 9

*Asics Amer. Corp. v. Lutte Licensing Grp. LLC,*
  SACV 13-1993, 2014 WL 12577412 (C.D. Cal. Aug. 19, 2014) ................ 12

*Bannum, Inc. v. United States,*
  59 Fed. Cl. 241 (Fed. Cl. 2003) ............................................................ 12

*Johnson v. Agres,*
  594 F.2d 1253 (9th Cir. 1979) ........................................................... 4, 10

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ....................................................................... 2, 12

*El Dorado Irrigation District v. Traylor Bros., Inc.,*
  No. Civ.S-03-949, 2006 WL 191960 (E.D. Cal. Jan. 24, 2006) .................. 11

*Hardin v. Wal-Mart Stores, Inc.,*
  No. 1:08-cv-00617, 2010 WL 3341897 (E.D. Cal. Aug. 25, 2010) ............. 11

*H-D Michigan Inc. v. Biker's Dream Inc.,*
  No. CV 97-864, 1998 WL 697898 (C.D. Cal. Jul. 28, 1998) .......... 12, 14, 16

*In re Parmalat Securities Litigation,*
  376 F.Supp.2d 472 (S.D.N.Y. 2005) .................................................... 19

*Jade Trading, LLC v. United States,*
  67 Fed. Cl. 608 (Fed. Cl. 2005) ...................................................... 5, 7, 9

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.,*
  210 F.3d 1099 (9th Cir. 2000) ..................................................... 2, 3, 16

*Paddack v. Dave Christensen, Inc.,*
  745 F.2d 1254 (9th Cir. 1984) ..................................................... 4, 8, 10

*Peat, Inc. v. Vanguard Research, Inc.,*
  378 F.3d 1154 (11th Cir. 2004) .......................................................... 10

*SEC v. Boock, No. 09 Civ. 8261,*
  2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011) ......................................... 13

*Bannum, Inc. v. United States,*
  59 Fed. Cl. 241 (Fed. Cl. 2003) ............................................................ 2

*Simpson v. AOL Time Warner, Inc.,*
    452 F.3d 1040 (9th Cir. 2006) ......................................................................... 19

*Stryker Corp. v. XL Ins. Amer.,*
    No. 4:01-cv-157, 2006 WL 3802174 (W.D. Mich. Dec. 21, 2006) ........ 5, 7, 9

*United States for the use and benefit of Maris Equip. Co., Inc. v. Morganti, Inc.*
    163 F. Supp. 2d 174 (E.D.N.Y. 2001) ......................................................... *5, 7, 9*

*Xuan v. Joo Yeon Corp.,*
    No. 1:12-cv-00032, 2015 WL 8483300 (D.C.N.M.I Dec. 9, 2015) ............. 13

## **Rules**

Federal Rules of Civil Procedure 26(a)(2) 10

Federal Rule of Civil Procedure 26(a)(2)(A-B) ..................................................... 11

Federal Rule of Civil Procedure  26(a)(2)(B) ......................................................... 11

Federal Rule of Civil Procedure 37 ....................................................................... 11

Federal Rule of Civil Procedure  56(a) .................................................................... 2

Federal Rule of Civil Procedure  56(c)(2) ............................................................... 2

Federal Rules of Civil Procedure 3710 ................................................................. 10

Federal Rules of Evidence 701, 703, or 705 ......................................................... 11

Federal Rule of Evidence 1006 ....................................................................... 3, 4, 5

I.      Introduction

The Court ruled in connection with defendants' motions to dismiss that, *if proven*, the SEC's allegations against Defendant Wayne Weaver could justify relief.  In its Motion for Summary Judgment ("Motion"), the SEC seeks to skip the "proof" stage of the case.  Although the Motion bears several of the trappings of an evidence-based motion, upon closer examination it becomes clear that the SEC has simply re-packaged the allegations of the First Amended Complaint.  The key to this sleight of hand is the presentation of the declaration of an SEC employee, R. Kevin Barrett, who claims to have analyzed the evidence in the case and reached certain conclusions regarding Wayne Weaver's conduct.  Effectively, the SEC has taken the First Amended Complaint's allegations, slapped its employee's name on the top of them, and presented them to the Court as *evidence* in support of a summary judgment motion.  With respect to the fraud claims, the SEC doesn't even do that much.  It relies on an unsupported contention that is directly contradicted by the undisputed evidence it adduced during its investigation of this case.

The declaration of Mr. Barrett is the lynchpin of the SEC's Motion with respect to the Section 5 and Section 13(d) claims.  Although presented as a "summary witness," Mr. Barrett does not identify the source material upon which he relies, and the SEC does not establish that those materials are admissible.  Accordingly, the declaration is not admissible under Federal Rule of Evidence 1006.  Nor may the SEC present Mr. Barrett as an expert witness, as he was not so designated, and he has not prepared or presented an expert report.  Without the Barrett Declaration, the SEC has no evidence to support its Motion on the Section 5 or Section 13(d) claims.

The SEC's Section 10(b) claim fails for a different reason – the SEC ignores the most relevant evidence.  The SEC's theory is that Mr. Weaver "engineered a sham financing agreement" that was intended to mislead investors.  The SEC breathlessly claims that "everything about [the financing arrangement] was bogus" –

ignoring the undisputed evidence that Jammin Java negotiated the financing agreement, received precisely the financing it bargained for, used the financing for legitimate business purposes, and accurately disclosed the terms of the financing agreement to the investing public. The financing was not "bogus" and there is no evidence that Mr. Weaver intended to deceive investors through his limited involvement in the financing.

At a minimum, the SEC's failure of proof demonstrates triable issues exist regarding the SEC's claims in this case. Mr. Weaver is entitled to a trial regarding the SEC's unproven allegations.

II.    Argument

A.    Summary Judgment On The SEC's Section 5 and Section 13(d) Claims Should Be Denied Because The SEC Offers No Admissible Evidence To Support Essential Elements of Its Claims

A motion for summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Evidence presented by the parties at the summary judgment stage must be admissible. Fed. R. Civ. Proc. 56(c)(2). When the movant fails to meet its initial burden, the non-moving party has no obligation to provide evidence in response. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03, 1107 (9th Cir. 2000).

The SEC's motion for summary judgment must be denied as to its Section 5 and Section 13(d) claims because the SEC has not submitted admissible evidence in support of essential elements of those claims; and therefore, has failed to meet its initial burden of production. *Bannum, Inc. v. United States*, 59 Fed. Cl. 241, 245-46

(Fed. Cl. 2003); *see also Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102-03, 1107.

     1.   <u>The SEC May Not Rely on the Declaration of R. Kevin Barrett</u>
        <u>and the Exhibits Thereto in Support of the Motion</u>

The primary "evidence" proffered by the SEC to support its Motion with respect to the Section 5 and Section 13(d) claims is included within the Declaration of R. Kevin Barrett (Dkt. # 174-1, 174-2) (the "Barrett Declaration") and the exhibits thereto. The Barrett Declaration, which constitutes the critical evidence offered in support of those claims, parrots the allegations of the SEC's First Amended Complaint. Proffered as a "summary witness," Mr. Barrett offers his views and impressions of "voluminous" records he has reviewed in connection with the case. He attaches charts and tables he has prepared based on his review of these unidentified records, and states opinions and conclusions based on his purported analysis. The opinions and conclusions, as set forth in the Barrett Declaration, are relied upon by the SEC in its Statement of Uncontroverted Facts ("SOUF"), which then forms the basis for the allegations upon which the pending Motion is based. The Barrett Declaration is, thus, the mechanism used by the SEC to transmute its *allegations* into "evidence" that can be relied upon in a motion for summary judgment. This is improper.

Although the SEC does not explicitly invoke Federal Rule of Evidence 1006 ("FRE 1006") in connection with the Barrett Declaration, it seems to suggest that Mr. Barrett is a "summary witness." (Weaver's Statement of Genuine Issues In Opposition to Plaintiff's Motion for Partial Summary Judgment and Additional Facts at Weaver's Statement of Additional Facts ("SOAF") ¶ 100.) However, the SEC fails to meet the standard for summary evidence under FRE 1006. Nor is the proffered testimony of Mr. Barrett admissible as expert testimony. The Barrett Declaration and its exhibits must be stricken as inadmissible.

     (a)    The Barrett Declaration is Inadmissible Under Federal
            Rule of Evidence 1006

1    The Barrett Declaration and Exhibits A-G thereto purport to be a summary of

2    (1) an unspecified and unknown subset of all documents produced in this litigation

3    and (2) unidentified (and presumably unproduced) "publicly available" documents.

4    (Barrett Decl. ¶ 5, n.1; *see also id.* ¶¶ 18, 19, 21, 24, 25, 39, 40, 42, 55).  FRE 1006

5    governs the admissibility of summary evidence.  *Amarel v. Connell*, 102 F.3d 1494,

6    1516 (9th Cir. 1996).  It provides in relevant part:

7        The proponent may use a summary, chart, or calculation to prove the content
         of voluminous writings, recordings, or photographs that cannot be
8        conveniently examined in court.  The proponent must make the originals or
         duplicates available for examination or copying, or both, by other parties at a
9        reasonable time and place.  And the court may order the proponent to produce
         them in court.

10

11   Fed. R. Evid. 1006.  "The proponent of a summary exhibit must establish a

12   foundation that (1) the underlying materials upon which the summary is based are

13   admissible in evidence; and (2) the underlying documents were made available to

14   the opposing party for inspection."  *Paddack v. Dave Christensen, Inc.*, 745 F.2d

15   1254, 1259 (9th Cir. 1984).  Here, the SEC has not met either requirement, and

16   therefore, the Barrett Declaration is inadmissible.  *See Johnson v. Agres*, 594 F.2d

17   1253, 1256, 1257 (9th Cir. 1979) (holding summary evidence should have been

18   excluded where proponent failed to demonstrate underlying materials were

19   admissible); *Amarel*, 102 F.3d at 1517 (holding admission of summary exhibits was

20   error where proponent failed to make available underlying materials).

21                              (i)      The Barrett Declaration and Its Exhibits Are

22                                       Inadmissible Because They Do Not Specifically

23                                       Identify the Source Materials

24   "The purpose of the availability requirement is 'to give the opposing party an

25   opportunity to verify the reliability and accuracy of the summary . . . .'"  *Amarel*,

26   102 F.3d at 1516.  "Thus, to satisfy the 'made available' requirement a party seeking

27   to use a summary under Rule 1006 must identify its exhibit as such, *provide a list or*

28   *description of the documents supporting the exhibit,* and state when and where they

may be reviewed." *Air Safety, Inc. v. Roman Catholic Archbishop of Boston*, 94 F.3d 1, 8 (1st Cir. 1996) (emphasis added).  "The importance of a list or description is *increased* when the proponent of a summary . . . claims that the underlying documents were all produced during discovery.  In this type of situation, the party against whom the summary is offered has no reference with which to identify the documents the proponent of the summary considers to be the underlying documents."  *Stryker Corp. v. XL Ins. Amer.*, No. 4:01-cv-157, 2006 WL 3802174, at *2 (W.D. Mich. Dec. 21, 2006) (excluding summary evidence) (emphasis added). Indeed, a disclosure that the summary's source documents are contained in a voluminous document production "without specifying which documents were being summarized does not begin to satisfy Rule 1006's 'made available' requirement." *Jade Trading, LLC v. United States*, 67 Fed. Cl. 608, 615 n.12, 612 (Fed. Cl. 2005). It would be a "gross abuse" of FRE 1006 to admit summary evidence where the proponent "never provided a list or description of the documents supporting the proposed 1006 exhibit" even when the documents were produced in discovery. *United States for the use and benefit of Maris Equip. Co., Inc. v. Morganti, Inc.* ("*Maris*"), 163 F. Supp. 2d 174, 200 (E.D.N.Y. 2001) (excluding summary evidence that did not contain "a specific description" of the original documents and noting "it was unfair to require [opponent's] counsel 'to wade through thousands of pieces of paper' in order to find the information referred to" in the summaries).

The Barrett Declaration and its Exhibits neither attach nor specifically identify the documents they purport to summarize.  Instead, the declaration claims it relies on documents that "were produced to the Defendants in this litigation *or* are publicly available," (Barrett Decl. ¶ 5, n.1 (emphasis added)), and then generically describes all documents produced in this case, namely:  "trading records, transfer records, account statements, account-opening documents, cash receipt and disbursement records, correspondence, and order and execution files from multiple broker-dealer firms and banks," "information relating to the price and volume

history of Jammin Java stock," "relevant account records and other documents produced in this litigation by Rene Berlinger, the Swiss Financial Market Supervisory Authority ("FINMA"), the Superintendencia del Mercado de Velores – the Panamanian securities regulatory authority (the "SMV"), Jammin Java's transfer agent Empire Stock Transfer, Inc. ("Empire"), Stephen Wheatley, Michael Sun, Mohammed Al-Barwani, and Jammin Java, publicly available information (including public filings and press releases), promotional broadcasts from various sources, and other documents obtained by the Commission staff." (*Id.* ¶ 5). This general description purports to support 61 paragraphs and 29 pages of detailed, factual narrative on which the SEC's Motion heavily relies. Despite the factual detail, the Barrett Declaration cites *no source material* for any of its claims.

For example, the declaration makes the following factual assertions *with no citation* to source material:

- "**Sales by Donnolis (Weaver):** Starting the day the Straight Path agreement was announced – from December 23, 2010 through December 31, 2010 – Weaver's Donnolis account sold a total of 299,683 JAMN shares, or approximately 9.4% of its JAMN position, generating aggregate proceeds of $156,497. . . ." (*Id.* ¶ 33(a)).

- "Records indicate that of the 42 GERC Nominees for whom GERC issued stock certificates in October 2006, the entire share holdings of 37 of these nominees were transferred to the Defendants' entities and then sold by those entities." (*Id.* ¶ 39).

- "Blue Leaf also received cash inflows from Weaver's Arcis and Miller's Las Colinas. (a). On March 25, 2011, Miller's Las Colinas transferred $1,00,000 to a Blue Leaf account. (b). On March 15, 2011, Weaver's Arcis transferred $700,000 to a Blue Leaf account. (c). On June 24, 2011, Arcis (Weaver) transferred $1,000,000 to a Blue Leaf account. On April 21, 2011, Sun's Torino transferred $700,000 to Arcis. (d) On August 14, 2012, Weaver's Arcis transferred £50,000, or approximately $80,000, to a Blue Leaf account." (*Id.* ¶ 51(a)-(d)).

The declaration's narrative continues with this level of detail, but it does not list, cite to, or otherwise identify the documents on which it relies. Therefore, the narrative

1  "summary" paragraphs of the Barrett Declaration (¶¶ 5-61) are wholly inadmissible

2  for failure to specifically identify the materials upon which they are based.  *See Air*

3  *Safety, Inc.*, 94 F.3d at 8; *Stryker Corp.*, 2006 WL 3802174, at *2; *Jade Trading,*

4  *LLC*, 67 Fed. Cl. at 615 n.12, 612; *Maris*, 163 F. Supp. 2d at 200.

5        The fact that Mr. Barrett has expressed some of his unsupported narrative in

6  tabular format does not render that narrative admissible.  Barrett Declaration

7  Exhibits A-G and Figures 1-3 contained in the Barrett Declaration are similarly

8  inadmissible for failure to specifically identify their source materials.  **Exhibit A**

9  purports to be "a summary reconciliation that [Mr. Barrett] performed reflecting the

10  overall categorical use and disbursal of GERC Nominee shares (first in GERC stock

11  and then in Jammin Java)."  (Barrett Decl. ¶ 18).  Paragraphs 7-17 and Exhibit A

12  purport to describe share transfers of GERC and Jammin Java stock, but do not

13  identify any of the source materials that underlie the summary.  **Exhibits B(i)** and

14  **B(ii)** allegedly "summarize information contained in account records regarding the

15  ownership, formation, account opening, and affiliated persons or entities of the

16  Defendants' foreign entities."  (*Id.* ¶ 19).  However, the declaration only generically

17  states Mr. Barrett "created this summary based on [his] review of voluminous

18  account opening and incorporation records" and Exhibits B(i) and B(ii) fail to

19  specifically list or identify those records.  (*Id.* ¶ 19, Exs. B(i), B(ii)).  Similarly,

20  **Exhibits C(i)** and **C(ii)** claim to be "schedules showing all transfers and sales of

21  Jammin Java stock between November 22, 2010 and May 11, 2011," which were

22  "created . . . based on a review of voluminous account records for each entity and

23  transfer agent records for Jammin Java."  (*Id.* ¶ 21).  Exhibits C(i) and C(ii) again

24  fail to specifically list or identify those records.  (*Id.* ¶ 21, Exs. C(i), C(ii)).[1]

25  _____

26  [1] **Exhibit D** and **Figure 2** are summaries of the "Historical Price and Volume
   Summary for Jammin Java stock for the period January 23, 2009 through January

27  23, 2012," which were "created using publicly available market data for JAMN

28  (available on numerous publicly available websites, including

1  **Exhibits E(i)**, **E(ii)**, and **E(iii)** claim to summarize "the transfers of GERC

2  Nominees' shares to the Defendants' entities," and sort the same data in different

3  ways. (*Id.* ¶ 39). The Barrett Declaration again does not identify the source

4  material, merely stating that "[r]ecords indicate" such transfers and that Mr. Barrett

5  "created these exhibits based on [his] review of voluminous account records for

6  each entity and transfer agent records related to Jammin Java." The exhibits again

7  provide no citations or Bates numbers. (*Id.* ¶¶ 39, 42, Exs. E(i), E(ii), E(iii)).

8  Likewise **Exhibit F** purports to "summarize[] the ownership position of Jammin

9  Java stock held by the various entities owned by Defendants at various points in

10  time . . . [and] includes a calculation of the percentage of Jammin Java's outstanding

11  shares owned by each entity and the overall percentage of outstanding shares owned

12  by the entities grouped by beneficial owner." (*Id.* ¶ 40). Here, no description of any

13  source materials is provided in the declaration or in Exhibit F. (*See id.* ¶ 40, Ex. F).

14  **Exhibit G** claims to contain "[t]ables summarizing the use of sales proceeds by

15  entity . . . created . . . based on a review of voluminous account statements, asset

16  statements and transaction records for each entity." (*Id.* ¶ 55). No specific

17  description or citation to source material is provided. (*Id.* ¶ 55, Ex. G). **Figure 1**

18  and **Figure 3** purport to be chart summaries of the acquisition of shares by

19  Defendant Whittle from December 2007 to March 2008 and the "second wave of

20  share transfers that occurred in early 2011," respectively. (*Id.* ¶¶ 12, 35). Neither

21  the Barrett Declaration or Figures 1 and 3 cite to any underlying source material.

22  (*See id.*)

23        The Barrett Declaration, Exhibits A-C, E-G, and Figures 1 and 3, fail to

24  _____

25  https://finance.yahoo.com/quote/JAMN/history?p=JAMN)." (*Id.* ¶¶ 24, 25.)

26  Although this source description is likely adequate, the SEC has not demonstrated
    that it produced or otherwise made the source material available to Weaver. And, as

27  set forth below, the SEC has not demonstrated that the source material is admissible,
    which independently warrants exclusion of Exhibit D and Figure 2. *See Paddack*,

28  745 F.2d at 1259; section II.A.1.(a)(ii), *infra*.

"provide a list or description of the documents supporting [them]," and are therefore inadmissible. *See Air Safety, Inc.*, 94 F.3d at 8. The generic description that "account statements," "account records," "transfer agent records," "asset statements," and "transaction records" underlie the summaries is insufficient to permit Weaver to "verify the reliability and accuracy of the summary," *Amarel*, 102 F.3d at 1516, and instead leaves Weaver "to wade through thousands of pieces of paper' in order to find the information referred to" in the summaries, *Maris*, 163 F. Supp. 2d at 200. Nor is the SEC's burden to make the source material available alleviated merely because Weaver "may have a general understanding of which documents underlie the summaries." *See Stryker Corp.*, 2006 WL 3802174, at *2. Here, the SEC claims that the source material is contained in the document productions of this case, including in productions by five defendants, three identified non-parties, undisclosed "publicly available information," "promotional broadcasts *from various sources*," and "other documents obtained by the Commission staff." (Barrett Decl. ¶ 5 (emphasis added)). Although the Barrett Declaration does not represent that all underlying source material was produced, (*id.* ¶ 5, n.1), the total volume of documents produced in this case exceeds 29,300 documents and 170,200 pages, (SOAF ¶ 102). These documents were produced in different formats with varying search capabilities. (*Id.*) The SEC has failed to "make available" – by specifically identifying – the source materials for its proposed summary evidence; therefore, the Barrett Declaration should be excluded. *See Jade Trading, LLC*, 67 Fed. Cl. at 615 n.12, 612 (holding proponent's representation that source documents were contained in 15,698-page document production from third parties was inadequate); *see also Air Safety, Inc.*, 94 F.3d at 8.

(ii) The Barrett Declaration and Its Exhibits Are Inadmissible Because The SEC Has Not Shown the Source Material Is Admissible

Under FRE 1006, "[t]he proponent of the summary must establish that the

1   underlying materials upon which the summary is based are admissible in evidence."

2   *Johnson*, 594 F.2d at 1255.  To do so, the proponent must establish "an exception to

3   the hearsay rule for each source in order for the [summary evidence] to be

4   admissible."  *Paddack*, 745 F.2d at 1258, 1259 (rejecting proposed hearsay

5   exceptions and concluding summaries inadmissible); *Johnson*, 594 F.2d at 1255

6   (holding admission of summary evidence error where proponent failed to

7   demonstrate source documents fell within business records exception to the hearsay

8   rule).  Because summary proof is offered as "evidence" – in particular in cases

9   where the underlying material is not itself admitted – "it is especially important to

10  ensure that the summary *rests entirely* upon admissible evidence."  *Paddack*, 745

11  F.2d at 1260 (emphasis original, citation omitted).  "In other words, Rule 1006 is not

12  a back-door vehicle for the introduction of evidence which is otherwise

13  inadmissible."  *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th

14  Cir. 2004) (remanding for a new trial where the district court erroneously admitted

15  summary evidence based on hearsay to which an exception did not apply).  "[A]

16  summary of both inadmissible and admissible hearsay should not be admitted under

17  Rule 1006."  *Paddack*, 745 F.2d at 1260.

18      The SEC has made no effort to demonstrate that the source material

19  underlying the Barrett Declaration, Exhibits A-G, and Figures 1-3 is admissible.

20  Indeed, where, as here, the proponent has not even identified the specific source

21  material, the court cannot determine its admissibility, and the evidence must be

22  excluded.  *Paddack*, 745 F. 2d at 1260-61.  Because the SEC has not specifically

23  identified the documents its summary relies upon, it also has not – and cannot –

24  show that the underlying documents are admissible; therefore, the Barrett

25  Declaration and the exhibits thereto, are inadmissible.  *Id.*

26          (b)      The Barrett Declaration and Its Exhibits Are Also

27                   Inadmissible Under Federal Rules of Civil Procedure

28                   26(a)(2) and 37

1  Nor may the SEC salvage the Barrett Declaration and its exhibits by

2  retroactively designating Mr. Barrett as an expert witness.  Federal Rule of Civil

3  Procedure 26(a)(2)(A-B) governs the disclosure of expert testimony.  Rule

4  26(a)(2)(A) requires that a party disclose the identity of any person who may be

5  used at trial to present evidence under Federal Rules of Evidence 701, 703, or 705.

6  Fed. R. Civ. Proc. 26(a)(2)(A).  Rule of Civil Procedure 26(a)(2)(B) provides that,

7  "[u]nless otherwise stipulated or ordered by the court, this disclosure must be

8  accompanied by a written report – prepared and signed by the witness . . . ."  Fed. R.

9  Civ. Proc. 26(a)(2)(B).  Under Federal Rule of Civil Procedure 37, a party who fails

10  to properly disclose its expert witnesses and their reports may be barred from using

11  that witness's testimony on a motion, at a hearing, or at trial unless the party can

12  show there was a "substantial justification" for the failure to disclose or that the

13  failure was "harmless."  *Hardin v. Wal-Mart Stores, Inc.*, No. 1:08-cv-00617, 2010

14  WL 3341897, at *8 (E.D. Cal. Aug. 25, 2010) (precluding certain testimony because

15  expert report was not provided); *see also El Dorado Irrigation District v. Traylor

16  Bros., Inc.*, No. Civ.S-03-949, 2006 WL 191960, at *2 (E.D. Cal. Jan. 24, 2006)

17  (same).

18  The SEC did not designate Mr. Barrett as an expert, and did not disclose an

19  expert report prepared and signed by him.  (SOAF ¶ 101).  Accordingly, his

20  opinions and conclusions may not be admitted as expert testimony.

21  2.  The SEC Fails To Provide Admissible Evidence to Support

22  Essential Elements of Its Section 5 Claim

23  Without the Barrett Declaration and its exhibits, the SEC cannot establish the

24  elements of its Section 5 claim.  To prevail on its Section 5 claim, "the SEC must

25  show that: (1) Weaver, directly or indirectly, sold or offered to sell securities; (2) no

26  registration statement was in effect for the offer or sale; and (3) the offer or sale was

27  made through interstate commerce."  (Mot. (Dkt. # 172) at 17 (citations omitted)).

28  In support of the first element of its claim, that Weaver directly or indirectly, sold or

1    offered to sell securities, the SEC relies *entirely* on the Barrett Declaration.2  The

2    SEC argues, without citation, that "[f]rom at least December 23, 2010 through May

3    2, 2011, Weaver's companies sold millions of shares of Jammin Java" and that

4    Weaver "bears liability, both as a direct and indirect seller."  (Mot. (Dkt. # 172) at

5    18).  To show the alleged sales, the SEC provides a portion of Figure 5 from page

6    13 of its Motion, (*id.* at 13, Figure 5, 18), which relies on SOUF ¶¶ 71-72.  SOUF ¶¶

7    71-72 in turn rely on Barrett Declaration ¶¶ 41, 42, 43 and Exhibits C(i) and C(ii).

8    (SOUF (Dkt. #173) ¶¶ 71, 72, ns. 220-222).3  As discussed above, the Barrett

9    Declaration and Exhibits C(i) and C(ii) are inadmissible; therefore, they cannot

10   support the SEC's motion for summary judgment.  *See H-D Michigan Inc. v. Biker's*

11   *Dream Inc.*, No. CV 97-864, 1998 WL 697898, at *6-*10 (C.D. Cal. Jul. 28, 1998)

12   (Wilson, J.) (declining to consider summary evidence submitted in connection with

13   motion for summary judgment that was inadmissible under FRE 1006); *Asics Amer.*

14   *Corp. v. Lutte Licensing Grp. LLC*, SACV 13-1993, 2014 WL 12577412, at *4

15   (C.D. Cal. Aug. 19, 2014) (same).  Because the SEC has provided no admissible

16   evidence of stock sales by Weaver (or any entity allegedly connected to Weaver), its

17   motion for summary judgment on its Section 5 claim must be denied.  *See Bannum*,

18   59 Fed. Cl. at 243-45 (holding summary judgment was properly denied where

19   _____

20   2 The SEC's Motion does not cite to any evidence in its argument section; and

21   therefore, improperly requires the Court, and Weaver, to tie its arguments to its
     "evidence."  (*See, e.g.*, Mot. (Dkt. # 172) at 18 (providing no citations to its

22   SOUF)).  This alone warrants denial of its motion for summary judgment.  *See*

23   *Celotex*, 477 U.S. at 323 (movant bears the initial burden of identifying those
     portions of the record that demonstrate the absence of a genuine issue of material

24   fact).  Nonetheless, combing through the SEC's SOUF for the relevant citations

25   reveals that its evidence to support its claims is inadmissible, and therefore, its
     motion must be denied.

26   3 The SEC also argues that "Weaver is also liable for the sales made by Petersham,

27   Renavial, and Sun's entities," and again relies on Figure 5 (which relies on the
     Barrett Declaration) as evidence of these sales.  (Mot. (Dkt. # 172) at 19.)  Because

28   there is no admissible evidence offered to show the sales, the SEC's claim fails.

proponent failed to meet its initial burden of production because summary evidence offered in support of motion was inadmissible under FRE 1006); *Xuan v. Joo Yeon Corp.*, No. 1:12-cv-00032, 2015 WL 8483300, at *5 (D.C.N.M.I Dec. 9, 2015) (declining to consider summary chart as inadmissible under FRE 1006 and denying proponent's cross-motion for summary judgment).

The SEC likewise offers no evidence to support the third element of its claim, that the alleged sales of Jammin Java stock were made using the means of interstate commerce.  Instead, the SEC provides argument (without citation) stating:  "The sales of Jammin Java stock were made using the means of interstate commerce. Here, Weaver (a Jersey resident), traded the common stock of Jammin Java (a U.S. company trading over the counter in the United States) through orders placed by email and telephone to financial institutions located in Switzerland, the BVI and Panama."  (Mot. (Dkt. # 172) at 19).  The SEC cites to no *evidence* that the orders were "placed by email and telephone" and identifies no communication to or from the United States by Weaver.  (*See id.*)  And, the mere fact that Jammin Java was traded on the over the counter bulletin board, without evidence that *Weaver* executed trades on the over the counter bulletin board, is insufficient evidence to meet the SEC's burden on summary judgment.  *See SEC v. Boock*, No. 09 Civ. 8261, 2011 WL 3792819, at *18-*19 (S.D.N.Y. Aug. 25, 2011) (material issue of fact existed as to the use of interstate commerce where SEC failed to offer evidence that defendant "actually offered or sold his securities through this United States over-the-counter market, or if there is any other basis to find [defendant] sold his securities through interstate means or to purchasers in the United States" where SEC merely alleged that some offers to buy or sell were made through the OTC Pink Sheets).

       3.    The SEC Fails To Provide Admissible Evidence to Support An Essential Element of Its Section 13(d) Claim

To prevail on its claims under Section 13(d) and Rules 13d-1 and 13d-2

1   thereunder, the SEC must show that Weaver "acquire[d], directly or indirectly,

2   beneficial ownership of more than 5% of a class of registered securities" and failed

3   to "file a Schedule 13D disclosure statement with the SEC." (Mot. (Dkt. # 172) at

4   19-20).  The SEC argues that "Weaver was required to file a Section 13(d)

5   disclosure because he beneficially owned more than 5% of Jammin Java's stock,

6   both individually and as part of a 'group.'"  (*Id.* at 20).  In support, the SEC argues

7   (again without citation):

8       In this case, Weaver and his shell companies, of which he was the sole
        beneficial owner, owned more than 5% of Jammin Java's outstanding stock.
9       For example, on March 8, 2011, Weaver's entities Manitou and Timotei
        acquired 2,751,964 (4.0%) and 2,072,400 (3.0%) shares of Jammin Java
10      respectively.  As another example, on March 14, 2011, Weaver's Calgon and
        Arcis acquired 3,321,336 (4.8%) and 3,143,048 (4.5%) of Jammin Java stock.
11      In fact, on nearly every day from November 23, 2010 through May 11, 2011,
        the collective holdings of Weaver's companies exceeded 5%.  And from
12      March 14, 2011 thru April 2011, the collective holdings of these entities
        exceeded 10%.

13   (Mot. (Dkt. # 172) at 21).  The ostensible support for these allegations is, once

14   again, the Barrett Declaration and its exhibits.

15       For the alleged acquisition by Timotei on March 8, 2011 and the alleged

16   acquisition of Arcis on March 14, 2011, the SEC appears to rely on the data set forth

17   in Figure 5 on page 13 of the Motion, which cites to SOUF ¶¶ 71-72.  SOUF ¶¶ 71-

18   72, in turn, rely on Barrett Declaration ¶¶ 41, 42, 43 and Exhibits C(i) and C(ii).

19   (SOUF (Dkt. # 173) ¶¶ 71, 72, ns. 220-222).  As discussed above, the Barrett

20   Declaration and Exhibits C(i) and C(ii) are inadmissible and cannot be considered.

21   *See H-D Michigan Inc.*, 1998 WL 697898, at *6-*10.

22       For the alleged acquisition by Manitou on March 8, 2011, the SEC appears to

23   rely on point (g) on page 12 of its Motion, which in turn cites to SOUF ¶ 63(g).

24   (Mot. (Dkt # 172) at 12).  SOUF ¶ 63(g) cites to Barrett Declaration ¶ 34(g) and

25   Exhibit C(ii) at 4.  (SOUF (Dkt. # 173) ¶ 63(g), n.206).  Thus, the underlying

26   evidence is inadmissible.

27       Indeed, it appears that *all* of the SEC's "evidence" regarding Jammin Java

28

1   stock acquisitions, ownership, and sales by any of the entities allegedly associated

2   with Defendants relies on the inadmissible Barrett Declaration.  (SOUF (Dkt. # 173)

3   ¶¶ 51-52 ns. 158-164, 63-70 ns. 188-219 (all citing the Barrett Declaration and

4   Barrett Decl. Exs.)).[4]  Because, the Barrett Declaration and its exhibits are

5   inadmissible, the SEC has failed to offer any admissible evidence showing any

6   entity allegedly associated with Defendants "acquire[d], directly or indirectly,

7   beneficial ownership of more than 5%" of Jammin Java stock.  The SEC has failed

8   to meet its burden and its motion for summary judgment should be denied as to its

9   claims under Section 13(d) and Rules 13d-1 and 13d-2 thereunder.

10         B.      The SEC Relies on Its Own Allegations to Support Its Section 10(b)

11                 and Rule 10b-5 Claims

12         The ostensible basis for the SEC's Section 10(b) and Rule 10b-5 claims

13   against Weaver is that he engaged in fraud when he "engineered a sham financing

14   agreement between Jammin Java and a phony 'financing company' called Straight

15   Path."  (Mot. (Dkt. # 172) at 22).  In its Motion, the SEC seeks summary judgment

16   on these claims by relying primarily on its own hyperbolic allegations, not

17   undisputed evidence.  Indeed, the SEC completely ignores the substantial evidence

18   that the financing arrangement it calls a "sham" was entirely legitimate and puts

19   forward no evidence that Weaver "engineered" the Straight Path financing

20   agreement.

21

22   _____

23   [4] Those allegations that cannot be traced back to the Barrett Declaration or exhibits
     appear to have no factual support whatsoever.  Weaver's counsel could find no fact
24   offered in the SEC's Motion supporting the statement, "on March 14, 2011,
     Weaver's Calgon . . . acquired 3,321,336 (4.8%) [of Jammin Java stock]."
25   Weaver's counsel also could not find a fact offered to support the statements:  "In
     fact, on nearly every day from November 23, 2010 through May 11, 2011, the
26   collective holdings of Weaver's companies exceeded 5%.  And from March 14,
27   2011 thru April 2011, the collective holdings of these entities exceeded 10%."
28

1.     The Financing Was Not "Bogus"

The gravamen of the SEC's fraud claim is that Weaver deceived the investing public regarding the financing that Jammin Java received in January 2011.  (Mot. (Dkt. # 172) at 22-23).  The entirety of the SEC's analysis on this critical allegation is contained in one paragraph on page 23 of its Motion.[5]  The lynchpin of the SEC's claim is its contention that "everything about [the financing] was bogus." (*Id.* at 23). This contention is belied by the evidence.

The SEC contends that the financing arrangement was a "sham" because (1) the entity that participated in the financing was not incorporated until five months after it signed the financing agreement; (2) the funds provided to Jammin Java under the financing agreement flowed through entities that Weaver helped to incorporate; and (3) the funds were generated by the sale of Jammin Java stock.  (*Id.*)  Even assuming the SEC could establish each of these points,[6] they do not render the financing a "sham."  More importantly, the SEC simply ignores the substantial evidence that the financing agreement (1) was entered into by Jammin Java for completely legitimate reasons; (2) was negotiated at arms' length; (3) was accurately described to the investing public; and (4) resulted in Jammin Java getting exactly the funding it bargained for.  The SEC's contention that "everything" about the financing was "bogus" is clearly unsustainable.

---

[5] As noted above, the SEC's Motion does not tie the assertions made in the fact section of its brief to the legal arguments in the latter portion of the brief.

[6] The SEC has not established these points in its Motion.  In support of its allegations that the funds provided to Jammin Java under the financing agreement flowed through entities that Weaver helped to incorporate and the funds were generated by the sale of Jammin Java stock, the SEC again relies on the inadmissible Barrett Declaration.  (Mot. (Dkt. # 172) at 13-14 (citing SOUF (Dkt. # 173) at ¶¶ 73-78, ns. 223-243 (citing the Barrett Declaration and Exhibits)).  The SEC's failure of proof independently warrants denial of its motion for summary judgment on its fraud claim.  *See Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102-03, 1107.

1      Contrary to the narrative posited by the SEC (without supporting or

2  admissible evidence), the actual evidence regarding the Straight Path financing

3  arrangement demonstrates its substance.  During its investigation, the SEC took

4  sworn testimony from Ahn Tran, the former CEO of Jammin Java.  (SOAF ¶ 103).

5  Mr. Tran, who was responsible for negotiating and executing the financing

6  agreement on behalf of Jammin Java, testified at length as to the company's

7  objectives in entering into the deal, its implementation, and the circumstances

8  surrounding the public release of information regarding the arrangement.  (*Id.*)  This

9  testimony makes clear that the financing agreement was not "bogus" or a "sham"

10  but rather that Jammin Java got exactly what it bargained for (and disclosed to the

11  investing public) in the deal.

12      Most importantly, under the deal Jammin Java obtained the financing that its

13  executives decided was necessary to move the company forward.  Tran testified that

14  in 2010 the company was in need of working capital, and had approached several

15  potential investors about providing that capital.  (*Id.* ¶ 104).  Tran testified that the

16  company was willing to offer stock in the fledgling company in return for a capital

17  investment.  (*Id.*)  In April 2010, the executives of Jammin Java (Tran, Rohan

18  Marley, and Shane Whittle) met with a representative of Straight Path Capital,

19  Raymond Hall, regarding a possible investment.  (*Id.* ¶ 105).  In November 2010,

20  Tran and Hall engaged in a series of phone calls and emails regarding the terms of a

21  possible financing arrangement.  (*Id.* ¶ 106).  Straight Path proposed a capital

22  investment in Jammin Java based on a valuation of 40 cents/share.  (*Id.*)  Tran and

23  the other members of Jammin Java executive leadership discussed this proposal, and

24  decided that 40 cents/share was a fair price.  (*Id.*)[7]  In December, Straight Path

25  provided Jammin Java with a draft Share Issuance Agreement, which Jammin Java's

26

27  _____

28  [7] Tran also testified that the Jammin Java executives used this same 40 cents/share
     valuation to price their own options.  (*Id.* ¶ 107).

1   attorneys reviewed and revised.  (*Id.* ¶ 108).  The financing agreement was entered

2   into on December 22, 2010.  (*Id.*)

3        The terms of the financing agreement were straightforward and customary.

4   The arrangement provided that Jammin Java could request from Straight Path up to

5   $2.5 million in funding to be used for operating expenses, acquisitions, working

6   capital, and general corporate activities.  (*Id*. ¶ 109).  The agreement further

7   provided that Straight Path had the right to refuse a request for funding, and could

8   terminate the agreement if it was not satisfied with the business affairs of Jammin

9   Java.  (*Id*.)  The agreement also gave Straight Path the option of providing an

10  additional $500,000 in funding at its discretion.  (*Id*.)

11       Significantly, Jammin Java received (and used) the financing contemplated by

12  the financing agreement.  Between January 2011 and March 2011, Jammin Java

13  received three $40,000 payments under the Straight Path agreement.  (*Id.* ¶ 110).  In

14  May 2011, Straight Path exercised its option to invest the additional capital

15  contemplated by the agreement at the agreed upon share price of 40 cents.  (*Id.* ¶

16  111).  Tran testified that each of the "draw-downs" under the financing arrangement

17  was initiated by Jammin Java based on financial needs of the company at the time:

18  "The [Jammin Java management] group would make the decision in the sense we

19  didn't have money, the draw-downs were pretty much associated with the depletion

20  in our bank accounts."  (*Id.* ¶ 112).  In total, Jammin Java received $2,500,000 in

21  capital investment as a result of the Straight Path financing arrangement.  (*Id.* ¶

22  113).  Thus, the "sham financing" arrangement worked out exactly as the parties

23  contemplated – Jammin Java got the capital that it needed, and the investor acquired

24  Jammin Java stock at the agreed upon price of 40 cents/share.

25       The SEC takes issue with the fact that Straight Path did not incorporate until

26  May 2011, and that the initial $40,000 investment came from another entity's bank

27  account.  But neither of these facts alter the underlying nature of the transaction, nor

28  render the transaction "bogus."  Certainly, the SEC has not established that the

financing arrangement was designed or intended to deceive investors.

In *In re Parmalat Securities Litigation*, the defendant banks made loans allegedly disguised as equity investments or assets. 376 F.Supp.2d 472, 484-85 (S.D.N.Y. 2005). The court dismissed this portion of the complaint notwithstanding the allegations of deception:

> In each of these cases, what remains when the bluster is stripped away are financings and investments. These transactions were not shams. Nor did they depend on any fictions. There is no suggestion that Citigroup did not own the equity stakes in the relevant Parmalat entities that it purported to buy. The same is true of the investments made by the purchasers of the Parmalat Administracao debt privately placed by BoA. . . . These arrangements therefore were not inventions, projects, or schemes with the tendency to deceive.

*Id.* at 505.

Likewise, in this case, the financing was what it purported to be, and there was no tendency to deceive.

### 2.   The Straight Path Financing Arrangement Was Fully and Accurately Disclosed to the Investing Public

The next critical aspect of the SEC's fraud claim is its assertion that Weaver somehow deceived the investing public with respect to the financing. Indeed, the SEC bears the burden of proving that the "principal purpose and effect" of the financing arrangement was to deceive the public. *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds* by *Simpson v. Homestore.com, Inc.*, 519 F.3d 1041, 1041-41 (9th Cir. 2008). Tran's testimony makes clear that the purpose of the financing arrangement was to provide working capital in exchange for Jammin Java shares. That is exactly what happened. Moreover, the terms and conditions of the financing arrangement were fully and accurately disclosed to the investing public.

The Straight Path financing was disclosed to the public in two ways. (SOAF ¶ 114). First, in conjunction with the execution of the agreement, Jammin Java issued a press release announcing that it had "entered into an equity investment

1   agreement with certain institutional investors for the purchase of the Company's

2   common stock at $0.40 per share." (*Id.*)8  The terms of the financing set forth in the

3   press release are entirely consistent with the terms of the Straight Path agreement

4   and the manner in which the financing ultimately played out.

5           Second, Jammin Java disclosed the terms of the financing agreement in a

6   Form 8-K filing on January 5, 2011. (*Id.* ¶ 114).  The Form 8-K, which was signed

7   by Tran, accurately describes the agreement with Straight Path. (*Id.* ¶ 115).  The

8   filing describes the fact that Jammin Java had the right to request Straight Path to

9   purchase up to $2,500,000 in stock at a price of 40 cents/share. (*Id.*)  It also

10  disclosed the uses to which Jammin Java would put the financing, and that Straight

11  Path maintained complete discretion as to whether to make the investments allowed

12  for under the agreement. (*Id.*)

13          Nowhere in its Motion does the SEC explain what aspect of the press release

14  or Form 8-K filing was false, nor how the investing public was deceived with

15  respect to the transaction.  The press release simply stated that the financing

16  agreement had been entered into.  The Form 8-K also accurately describes the terms

17  of the financing agreement.  The SEC has failed entirely to establish that the

18  primary purpose of the financing agreement, or the announcement thereof, was

19  designed to deceive the public.

20                  3.      The SEC Fails to Establish that Weaver "Engineered" the

21                          Straight Path Financing

22          While the SEC asserts that Weaver "engineered" the financing agreement, the

23  evidence cited by the SEC regarding Weaver's actual role tells a different story.

24  ────────────────

25  8 Tran testified that Jammin Java press releases were drafted by IRG, an investor
    relations firm, and that he and Rohan Marley approved the press releases before they
26  went out. (SOAF ¶ 116).  Tran was not certain that IRG had been retained at the
    time of the December 23, 2010 press release regarding the financing agreement.
27  (*Id.*)  Mr. Marley testified that he believed that IRG was hired shortly after Jammin
    Java was formed. (*Id.*)
28

1  Tran testified that he never met or talked with Weaver in connection with the

2  financing.  (SOAF ¶ 117).  Even according to the SEC's Motion,  Weaver's

3  connection to Straight Path was limited to directing Rene Berlinger to incorporate

4  the company, and funding the first $40,000 of the financing in May 2011.  There is

5  no evidence that he arranged the financing, negotiated its terms, directed the use of

6  funds, or directed any aspect of the public disclosures.

7       Because, at a minimum, the evidence demonstrates there is a question of fact

8  as to the legitimacy of the financing arrangement, its disclosure, and Weaver's role

9  in it, the SEC's motion for summary judgment on its Section 10(b) and Rule 10b-5

10  claims against Weaver must be denied.

11  III.   Conclusion

12       For the foregoing reasons, Weaver respectfully requests the Court deny the

13  SEC's Motion in its entirety.

14

15

16  DATED:  April 21, 2017          SCHEPER KIM & HARRIS LLP

17                                  MARC S. HARRIS
                                    MARGARET E. DAYTON
18

19

20                                  By:      /s/ Marc S. Harris
                                    _____
21                                      Marc S. Harris
                                        Attorneys for Defendant Wayne Weaver
22

23

24

25

26

27

28