TIMOTHY S. LEIMAN, Ill. Bar No. 6270153
Email: leimant@sec.gov
PAUL M. G. HELMS, Ill. Bar No. 6291623
Email: helmsp@sec.gov
PETER SENECHALLE, Ill Bar No. 6300822
Email: senechallep@sec.gov

175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

LOCAL COUNSEL
Lynn M. Dean, Cal. Bar No. 205562
Email: deanl@sec.gov
United States Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

Attorneys for Plaintiff
United States Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>JAMMIN' JAVA CORP., dba MARLEY COFFEE, SHANE G. WHITTLE, WAYNE S. P. WEAVER, MICHAEL K. SUN, RENE BERLINGER, STEPHEN B. WHEATLEY, KEVIN P. MILLER, MOHAMMED A. AL-BARWANI, ALEXANDER J. HUNTER, and THOMAS E. HUNTER,<br><br>Defendants. | Case No. 2:15-CV-08921 SVW (MRWx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT WAYNE WEAVER**<br><br>Hearing Date: May 22, 2017<br>Time: 1:30 pm<br>Hon. Stephen V. Wilson<br>Courtroom 10A |

Defendant Weaver's response brief greatly narrows the issues at hand and confirms this Court can enter judgment against him as a matter of law. Weaver's response is notable for what it does <u>not</u> contest. For example, Weaver does not contest (a) the testimony of Rene Berlinger, Michael Sun, Stephen Wheatley, and Mohammed Al-Barwani – all of whom testified they acted as Weaver's nominees, (b) the testimony and e-mails confirming Weaver directed his nominees to buy and sell Jammin Java stock, (c) that none of the sales of Jammin Java stock were registered, and (d) that the Court can draw an adverse inference against Weaver for invoking the Fifth Amendment instead of responding to discovery. Weaver largely does not contest the facts that the SEC has presented, does not cite any registration exemptions or offer any affirmative defenses, and offers no material facts of his own demonstrating the existence of a genuine factual dispute. To the contrary, Weaver candidly and repeatedly admits that "[g]iven Weaver's assertion of his Fifth Amendment rights, he is limited in his ability to offer additional evidence" to dispute the facts the SEC has raised. (*E.g.*, Dkt. #177-7, Def. LR 56.1 Resp. ¶¶ 86, 88-91, 94-95.)

Instead, Weaver offers blanket evidentiary objections – matters of law that the SEC can address and the Court can resolve now. Fed. R. Evid. 104(a); *Hexum v. Eli Lilly and Co*., 2015 WL 5008263, *1 (C.D. Cal. Aug. 10, 2015). Weaver argues that the declaration of the SEC's summary witness – SEC Accountant R. Kevin Barrett – is inadmissible and lodges generic authenticity objections as to 47 of the SEC's 92 exhibits. Significantly, Weaver does not question Mr. Barrett's calculations or specifically deny that the SEC's documents are authentic. He merely claims that the SEC did not describe the materials Mr. Barrett used and contends that the SEC must authenticate its exhibits. Weaver's evidentiary objections are unfounded. <u>First</u>, Mr. Barrett's declaration describes the documents he relied on – identifying each entity, account custodian, date range, and the types of documents reviewed. <u>Second</u>, to remove any question on the authentication issue, the SEC is attaching a categorical

schedule of the documents Mr. Barrett used in his calculations and a list of the 47 exhibits that Weaver objected to. Each schedule identifies the reasons that a reasonable juror could find the documents authentic. (S.J. Reply Exs. 1 and 2.)

When the underbrush of Weaver's evidentiary objections is cleared away, only two substantive arguments emerge. <u>First</u>, as to the SEC's Section 5 claim, Weaver argues that the SEC "offers no evidence" that the sales of Jammin Java stock were made using the means of interstate commerce. (Def. Br. at 13.) <u>Second</u>, Weaver makes the remarkable claim that the Straight Path financing agreement was "entirely legitimate." (Def. Br. at 15.) However, the undisputed facts of this case, coupled with Weaver's 5th Amendment assertion, confirm that neither argument has merit. The undisputed evidence shows, among other things, that (a) Weaver was responsible for buying and selling the stock of a U.S. company, (b) he and his nominees used a U.S.-based transfer agent to process and record the share transfers, (c) they sold Jammin Java stock on the U.S. OTC market, (d) they used U.S.-based intermediary brokers to sell the stock; and (e) they wired stock sales proceeds through and to U.S. banks. Moreover, the Straight Path Agreement undeniably was a fraudulent device, in that the purported financing company did not exist at the time of the agreement, had no bank account (let alone funds to provide), and Weaver was able to pay Jammin Java its "financing" only by illegally selling Jammin Java stock in unregistered transactions.

There are no genuine factual disputes left to try in this case. The evidentiary and substantive issues can be resolved now as a matter of law. The evidence cited by the SEC – including Mr. Barrett's summary of bank and brokerage records – <u>is</u> admissible. This volume of evidence has been met only by Weaver's silence.

**I. Weaver's Brief Ignores The Uncontroverted Testimony of Witnesses and Unchallenged Documents.**

In responding to the SEC's Motion, Defendant Weaver has created a straw man: he claims that "without the Barrett declaration, the SEC has no evidence to

2

support its Motion on the Section 5 or Section 13(d) claims." (Def. Br. at 1.) The admissibility of Mr. Barrett's declaration is addressed below. But, Weaver's underlying premise – that there is no other evidence of his violations – is incorrect. Weaver ignores voluminous evidence presented by the SEC <u>that Weaver does not object to or refute</u>, *e.g.*:

- Testimony from Berlinger that Weaver instructed him to buy and sell Jammin Java stock through entities that Berlinger created for Weaver and Weaver's nominees (Westpark, Renavial, Calgon, and Las Colinas) (SOF ¶¶ 2(e), 95(e), 96(b); Def. Resp. to SOF ¶¶ 2(e), 95(e), 96(b); SJ Ex. 2, Berlinger Tr. 84:11-84:16, 96:22-96:25);

- Testimony from Wheatley that (a) Weaver asked Wheatley to acquire Jammin Java stock through Wheatley's Petersham entity (SOF ¶ 86); (b) Weaver facilitated the transfer of Jammin Java stock into Petersham (*id.*); (c) Weaver instructed Wheatley to sell shares in December 2010 and subsequently asked for control of Petersham's sales of Jammin Java stock (*id.*); (d) at Weaver's direction, Wheatley gave formal trading authority over the Petersham account to Jim Decker (an associate of Weaver, acting at Weaver's direction) (*id.*); (e) Weaver asked Wheatley to take 3.2 million Jammin Java shares into Petersham's account, explaining that he could not own any more shares than he already had (*id.*); (f) in discussing the issue of how much stock Weaver could own, Weaver "focused on the figure of 5%," (*id.*); and (g) Weaver expressed urgency about selling the 3.2 million Jammin Java shares, and – after Weaver's associate sold it all – Weaver demanded the trading profits (*id.*).

- Testimony from Sun confirming that (a) he was Weaver's nominee and he bought and sold Jammin Java stock through Torino and Cilitz at Weaver's direction (SOF ¶¶ 88-89); (b) Weaver instructed Sun to warn Cilitz's account manager of the impending sale of Jammin Java stock out of Cilitz (SOF ¶ 92(a)); and (c) Weaver directed Sun to relay sales orders for Jammin Java stock out of Torino (SOF ¶ 92(c)).

3

- Testimony from Al-Barwani that he acted as Weaver's nominee and took directions from Weaver in transferring proceeds of Jammin Java sales, including the purchase of $2 million of gold bullion. (SOF ¶¶ 93-95(a).)
- Emails reflecting Weaver's instructions to his nominees, including express orders to sell Jammin Java stock (*E.g.*, SJ Exs. 81, 82, 83, 86 and 89);
- The SEC's certification that none of the sales of Jammin Java stock at issue were registered with the SEC (SOF ¶ 85); and
- Weaver's repeated assertion of the Fifth Amendment in response to all discovery requests regarding his transactions in Jammin Java stock (SJ Ex. 9).

These uncontroverted facts establish that (1) Weaver was a "necessary participant" and "substantial factor" in the unregistered sale of Jammin Java stock, and (2) Weaver – by his own admission to Wheatley – used nominees to hide his violation of the Section 13(d) reporting threshold. That said, the admissible evidence the SEC has provided against Weaver is far greater than the foregoing.

**II. The Declaration of the SEC's Summary Witness Is Admissible**.

Having ignored a hefty slice of the SEC's evidence, Weaver spends most of his brief arguing that the declaration of SEC Accountant Kevin Barrett should be excluded. As Weaver acknowledges, Mr. Barrett has been disclosed as a <u>summary</u> witness; his declaration and exhibits schedule and aggregate hundreds of financial transactions that Weaver orchestrated through his web of offshore shell entities. (SJ Ex. 1 and exs. A-G.) In particular, Mr. Barrett (1) scheduled all sales of Jammin Java stock by Weaver and his nominees from November 2010 through May 2011 and (2) calculated Weaver's ownership percentage of Jammin Java for purposes of the SEC's Section 13 claim. (SJ Ex. 1 at exs. C(i), C(ii) and F.) Although Mr. Barrett was disclosed months before the discovery cutoff, Weaver never tried to depose him, did not propound any discovery requests on the SEC, does not find fault with the calculations in Mr. Barrett's schedules, and does not challenge the propriety of such summary testimony. Instead, Weaver (a) argues that the SEC has not described the

materials that Mr. Barrett used and (b) makes what amounts to a blanket authenticity objection to the bank and brokerage records produced in this case.

Weaver's claim that the SEC does not describe the materials underlying Mr. Barrett's calculations is incorrect. Weaver does not – and cannot – cite any case that requires the SEC to list each of the hundreds of documents supporting Mr. Barrett's declaration and simultaneously addressing every conceivable evidentiary objection Weaver might raise. To the contrary, Weaver's own cases establish that it is sufficient for the SEC to "list ***or describe***" the materials that form the basis of the summary calculation. (Def. Br. at 4-5 (emphasis added).)[1] The SEC has done more than "describe" the materials at issue; Barrett's declaration identifies (a) the specific entities involved (SJ Ex. 1 at exs. B(i) and B(ii)), (b) the productions reviewed (*id*. at ¶ 5), (c) the types of documents reviewed – *i.e.,* "trading records, transfer records, account statements, account opening documents, cash receipt and disbursement records…and order and execution files" (*id*.), (d) the name of each custodial bank and broker for each entity, and (e) each relevant transaction by date, amount, and entity (*id*. at exs. C and F). In short, the documents and transactions at issue are no mystery.

Although the records and relevant accounts are described, Weaver complains that the use of a description (as opposed to an item-by-item list) requires him to perform a purportedly onerous search of the SEC's production. (Def. Br. at 8.) That too is incorrect. The SEC produced the relevant brokerage and transfer agent records in a fully searchable format differentiated by a unique Bates prefix for each producing party.[2] Weaver's protest that he should not have to search for the relevant account

---

[1] Most of Weaver's cited case law is inapposite as it relates to instances where documents underlying summary testimony were never produced. *See, e.g., Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259-61 (9th Cir. 1984) (excluding summary where underlying documents were not produced); *Amarel v. Connell*, 102 F.3d 1494, 1516-17 (9th Cir. 1997)(same); *Air Safety, Inc. v. Roman Catholic Archbishop of Boston*, 94 F.3d 1, 7-8 (1st Cir. 1996)(same). Here, that is not an issue: all of the account and transfer agent records underlying Mr. Barrett's calculations were produced in a searchable format. The remaining records – for example, Yahoo! Finance stock data and company EDGAR filings – are readily available to the public.

[2] While a relatively small percentage of documents were produced to the SEC (and then to Weaver)

records is ironic. The overwhelming evidence reflects that <u>these are records from accounts that Weaver controlled</u>. He was the sole beneficial owner of several of the entities involved (*e.g.*, SOF ¶ 2), he has admitted in an e-mail that he controlled trading out of several of those entities (SJ Ex. 14), and he has not disputed the testimony of Berlinger, Sun, Wheatley and Al-Barwani who each confirm that they acted at Wayne Weaver's direction (*e.g.*, SOF ¶¶ 86, 88-92, 94-95). In short, <u>these records were under Weaver's control</u>. Because Weaver pled the Fifth (*see*, *e.g.*, SJ Ex. 9) and withheld his documents, it is <u>the SEC</u> that has been forced to scour the globe for Weaver's accounts and related trading records. The SEC then produced those records <u>back</u> to Weaver several months ago — although he has had functional control of them for years. Yet, he has no calculations of his own to offer, and has offered no basis to challenge the substance of Mr. Barrett's testimony.

      Nevertheless, to avoid any doubt on this purely evidentiary issue – and to confirm that judgment as a matter of law is warranted – the SEC is attaching to this reply a chart that includes (a) a categorical index of the documents that Mr. Barrett relied on, (b) identification of the producing party, (c) the Bates prefix used for the relevant production, and (d) identification of both the account holder and (where applicable) the account custodian. (SJ Reply Ex. 1.)

      Further, for each category, the SEC identifies the *prima facie* basis for authenticity. The bases identified in the SEC's chart satisfy the Fed. R. Evid. 901(a) standard, which requires only that "sufficient proof [be] introduced so that a reasonable juror could find in favor of authenticity or identification." *MGM Studios, Inc. v. Grokster, Ltd.*, 454 F.Supp.2d 966, 971-72 (C.D. Cal. 2006)(SVW) (*quoting U.S. v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000)). Courts routinely rely on the methods cited in the SEC's chart to determine that documents are authentic:

      (1) Many of the brokerage and transfer agent records were authenticated by

---

in native format, <u>all</u> account records and transfer agent records Mr. Barrett relied on were produced to the SEC – and reproduced to Weaver – in fully searchable Concordance uploadable format.

1  witnesses in depositions in this case or sworn testimony in the underlying
2  investigation (*e.g.*, SJ Reply Ex. 1 at pp. 1-21);
3          (2) Several of the account custodians used by Weaver and his nominees have
4  submitted business record certifications, confirming that the documents they
5  produced to the SEC through the Swiss Financial Market Supervisory Authority
6  ("FINMA") and United Kingdom Financial Conduct Authority ("FCA") are genuine
7  (*e.g.*, SJ Reply Exs. 4-9);
8          (3) Almost all of the records which Mr. Barrett used were produced either by
9  Weaver's co-Defendant nominees (Sun, Berlinger, Wheatley, and Al-Barwani), or
10 through foreign regulators by the banks and brokerages that Weaver selected for his
11 shell entities (*see, e.g., MGM Studios,* 454 F.Supp.2d at 972-73 (finding that
12 documents met the authenticity standard because they were produced by non-party
13 P.R. firm and venture capital firm who were "business partners" of the defendant));
14         (4) Most of the bank and brokerage records at issue also were produced in
15 response to formal requests by the SEC to the relevant securities regulator in the
16 governing jurisdiction (*see, e.g., Melridge, Inc. v. Heublein*, 125 B.R. 825, 829-830
17 (D. Or. 1991)(receipt of documents by Department of Justice in response to formal
18 treaty request, along with other circumstantial indicia of authenticity "establish strong
19 circumstantial evidence sufficient to constitute a prima facie showing of the
20 authenticity of" Swiss police reports and bank records)); and
21         (5) Weaver's silence speaks volumes on this issue. Although he is in the
22 position to authenticate his own account records, he has decided to remain silent – a
23 decision which allows the Court to draw an adverse inference.
24         In short, Weaver's objections are unfounded. Mr. Barrett's declaration is
25 admissible under FRE 1006, and it confirms that summary judgment is warranted.
26     **III.   The 47 Exhibits Weaver Has Challenged Are Admissible**.
27         Without material facts of his own to cite, Weaver objects to the authenticity of
28 47 of the SEC's 92 exhibits. Significantly, Weaver does not <u>deny</u> that the documents

7

are authentic; he does not argue that the SEC's exhibits are anything other than what they appear to be. The lack of a specific dispute can be weighed in the Court's determination of authenticity. *See, e.g., McMaster v. M.E. Spearman*, 2014 WL 4418104, *2-*3 (E.D. Cal. Sept. 5, 2014) (overruling defendant's "bare" evidentiary objection where defendant had not "genuinely disputed" authenticity and the documents, on their face, appeared to be genuine); *Burch v. Regents of University of California*, 433 F.Supp.2d 1110, 1120-24 (E.D. Cal. 2006) (holding that "because defendants do not actually dispute the authenticity of these documents, the court is confident plaintiff *would* be able to authenticate them at trial, which is all that Rule 56(e) demands" and questioning "[w]hether the authentication requirement should be applied to bar evidence when its authenticity is not actually disputed").

      In any event, Weaver's objections have no merit. The SEC is hereby attaching a chart (SJ Reply Ex. 2), identifying each exhibit that has been challenged and the bases for finding the document authentic. In all instances, the documents are authenticated by the permissible methods described in Section II above (*i.e.,* witness testimony, bank declaration, production by a party in this case, and production by foreign regulator through a treaty request). And, the exhibits can be authenticated by their appearance: they bear the characteristics of commonplace bank and brokerage records, incorporation documents, and genuine e-mails. *See Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533-34 (9th Cir. 2011) (documents can be authenticated by review of their contents if they appear to be genuine).

      Amid Weaver's blanket authenticity objections, there is one document worth highlighting. Weaver objects to a devastating e-mail in which he <u>admits</u> he traded Jammin Java stock for three of his shell companies. (SJ Ex. 14.) In that e-mail, Weaver explains why he bought and sold Jammin Java stock through Manitou, Arcis, and Donnolis. In doing so, he admits he was responsible for the trading. (*Id*.) Understandably, Weaver seeks to exclude this critical admission and objects that the e-mail is not authentic. (Dkt. #177-7, Def. 56-1 Resp. ¶¶ 80-84.) That is incorrect.

8

The evidence supporting the email's authenticity is extensive and unrefuted:

- The e-mail (which was marked as Deposition Ex. 125) was authenticated by Berlinger at his deposition. (SJ Reply Ex. 11, Berlinger Tr. 187.) He confirmed that he received the e-mail from Weaver. (*Id.*)

- Weaver's use of the e-mail address – Wayne@highlandcapital.org – was independently confirmed by Sun. (SJ Ex. 5, Sun Tr. 124:24-125:24.)

- Several other e-mails where Weaver used the same e-mail address have been submitted as exhibits, were authenticated by witnesses, and drew no objection from Weaver. (*See, e.g.,* SJ Exs. 74, 82, 83, 85, 91.)

- The document was produced by Defendant Berlinger.[3]

- Weaver – the author of the e-mail – refuses to testify.

In sum, a reasonable juror could find that SJ Ex. 14 is exactly what it purports to be: an e-mail from Weaver admitting he controlled the trading of Jammin Java stock through his shell entities.

### IV. This Court Can Find As A Matter of Law That Weaver's Scheme Used The Instrumentalities of Interstate Commerce.

Weaver's only substantive argument against the SEC's Section 5 claim is to dispute that his sales of Jammin Java stock used the means of interstate commerce. (Def. Br. at 43.) This, even though (a) the relevant sales were in Jammin Java – a U.S.-based company, listed on the NASD Over-The-Counter Bulletin Board ("OTCBB") in the U.S. (SOF ¶ 38), (b) it is undisputed that Weaver used others as nominees to effect trades in Jammin Java stock (SOF ¶¶ 86, 88-92, 94-95), (c) Empire Stock Transfer – Jammin Java's SEC-registered transfer agent which processes all Jammin Java share transfers – is a Nevada corporation based in

---

[3] In support of his objection to SJ Ex. 14, Weaver points to an apparent date error in the header e-mail (*i.e.,* the header e-mail to Berlinger is dated January 21, 2011 – before the other e-mails in the chain). (Def. Resp. to SOF ¶ 80.) But, Berlinger – who produced the entire e-mail chain – received it and is in a position to authenticate. And, the e-mail chain clearly refers to events in 2011 – including a 2011 price chart for JAMN. (SJ Ex. 14 at 1015-1016, 1019.) While the date on the header e-mail is obviously incorrect, Weaver cites no basis for disregarding the <u>contents</u> of his admissions and no basis for determining that the e-mail is anything other than what it appears to be.

9

Henderson, Nevada, (SEC Reply Ex. 14), and (d) Weaver directed Berlinger to obtain share certificates from Empire on at least one occasion. (SJ Ex. 91.)

The only case cited by Weaver on this issue confirms that the threshold for the "interstate commerce" element is low. *SEC v. Boock*, 2011 WL 3792819, *17-*18 (S.D.N.Y. Aug. 25, 2011) (granting SEC's motion for summary judgment in part, finding that defendant's "other interstate activities" related to stock sales were sufficient for a finding of liability). "The requirement that interstate means …or a facility of a national securities exchange be used to violate Section 5 has been broadly construed." *Id*. at *17. The SEC need not show that Weaver directly placed trade orders in the U.S. to satisfy this element. *Id*. at *18. The incidental use of interstate commerce in tangential communications, to transport of securities, or to remit proceeds is enough. *See, e.g., SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 861 (S.D.N.Y. 1997) (granting SEC motion for summary judgment on Section 5 claim, finding that "the wire or mail transfers of funds among [defendant], the brokerage firms, and various banks" "amply satisfied" the interstate means requirement); *U.S. v. Wolfson*, 405 F.2d 779, 784 (2d Cir. 1968)( "This subsection is violated when . . . the mails are used to…transport the securities after sale, to remit the proceeds to the seller, to send confirmation slips to the buyer, and perhaps even <u>when used in more tangential ways</u>"). The evidence here – unchallenged by any material facts from Weaver – meets the standard. In addition to the facts above:

- The share certificates for Weaver's entities – Manitou, Donnolis, Arcis, Timotei and Calgon – were acquired from Empire Stock Transfer, Jammin Java's U.S.-based transfer agent. (*E.g*., SJ Reply Exs. 13, 15.)

- In that effort, nominee officers for Weaver's entities communicated with Empire <u>at Weaver's direction.</u> (*E.g*., SJ Ex. 2, Berlinger Tr. 96:9-96:25.) For example, as shown in SJ Ex. 91, Weaver expressly directed Berlinger to send a letter to Empire to obtain stock certificates for Las Colinas. (SJ Ex. 91.) And Berlinger did as he was told; his letter is found in Empire's files. (SJ Reply Exs. 13, 15D, at 56-59.)

10

- Empire routinely exchanged Jammin Java share certificates and other related documents with Weaver's and his nominees' shell companies and their foreign banks using mail couriers like Federal Express. (*See* SJ Reply Exs. 13, 15 at 37-39, 49-51, 58, 66-69.) [4]

- The Straight Path agreement was negotiated through emails between "Raymond Hall," purportedly on behalf of Straight Path (an entity Berlinger created at Weaver's direction) and Ahn Tran on behalf of U.S.-based Jammin Java. (SJ Ex.48 at 23.)

- Bank records for entities that Weaver controlled confirm that sales of Jammin Java stock by those entities were executed through OTC Markets Group in New York. For example, confirmations from Manitou's account at Bank Gutenburg reflect sales of Jammin Java stock with the "Place of Trade" identified as the "Nasdaq OTC Bulletin Board" (SJ Reply Ex. 16), and VP Bank records for Westpark and Renavial confirm sales "at the OTC Markets Group," (SJ Reply Ex. 17).

- In at least one instance, Weaver transferred his illicit profits through U.S. banks. For example, on September 22, 2011, Weaver instructed VP Bank to transfer funds from Westpark to Donnolis through the Stamford, CT branch of UBS Bank (as purported payment under a Jammin Java Share Purchase Agreement between those entities). (SOF ¶ 92(f); SJ Ex. 84.)

- Weaver directed the transfer of proceeds from the sales of Jammin Java stock through Miller's Chilli Capital and Weaver's Blue Leaf to the U.S. bank account of David Loev, Jammin Java's Texas-based lawyer. (SOF ¶¶ 73-78.)

- Brokerage records confirm that sales of Jammin Java stock by Weaver's entities were routed through U.S.-based intermediate brokers.[5]

---

[4] Empire's records contain numerous other examples of documents and stock certificates being mailed to and from Weaver's and his nominees' companies and banks.

[5] For example, Calgon's Bateman account statement shows that Calgon sold 65,000 shares of Jammin Java stock at $1.539 per share on March 30, 2011, and another 24,667 shares at $1.574 on March 31, 2011, respectively. (SJ Reply Ex. 18 at CIMA-0000187.) Those sales were routed

11

In sum, Weaver's transactions in Jammin Java stock indisputably involved the means of interstate commerce.[6]

### V. Weaver's Use of A Fake Financing Company and the Misleading Straight Path Agreement Constitutes A Fraudulent Device.

In responding to the SEC's fraud claim, Weaver disregards the now undisputed evidence confirming his role in the sham Straight Path agreement, his *post hoc* creation of an empty shell company that played the role of venerable financier, and the fact that there were no funds available to "finance" Jammin Java until Weaver's team dumped the company's stock on the public. The facts Weaver chose to ignore are as follows:

- The purported financing agreement represented that Straight Path was a "United Kingdom company formed under the Companies Act 2006." (SJ Ex. 48 at 23.) In reality, Straight Path <u>did not exist</u> in December 2010 when the agreement was signed and announced. Straight Path was an empty shell created by Berlinger <u>at Weaver's direction</u> in May 2011, more than five months <u>after</u> the Straight Path Agreement was signed (SOF ¶ 58; SJ Ex. 2, Berlinger Tr. at 106:16–108:25.);

- Weaver directed Berlinger to create Straight Path by acquiring and changing the name of an existing shell – Beauty Water – giving Straight Path the outward appearance of being older than it really was. (SOF ¶¶ 58-59; SJ Ex. 2, Berlinger Tr. at 111:10–114:13.)

---

through Spartan Securities Group ("SSG"), a U.S. broker in St. Petersburg, Florida. (*See* SJ Reply Ex. 19 [SSG Mar. 2011 Stmt.] at 3.) Similarly, Calgon sold Jammin Java stock through SSG on April 1 (123,618 shares), April 4 (120,000 shares), April 5 (610,007 shares), and April 6, 2011 (161,055 shares). (*Compare* SJ Reply Ex. 18 at CIMA-0000190 with SJ Reply Ex. 19 [SSG Apr. 2011 Stmt.] at 3-4.) As another example, Weaver's Arcis sold 430,000 shares of Jammin Java stock on 4/15/11, 250,000 shares on 4/18/11, 20,000 shares on 4/21/11, and 105,000 shares on 4/26/11 through Seven Points Capital in New York. (*Compare* SJ Reply Ex. 20 at SEC-FINMA-P-0000621-22 with SJ Reply Ex. 21 [SPC Apr. 2011 Stmt.] at 43, 45, 50 and 51.)

[6] Although Weaver challenges the SEC's proof, he does not claim that the instrumentalities of interstate commerce were <u>not</u> in fact used. Indeed, it is impossible to imagine <u>any</u> scenario where Weaver and his nominees could acquire and sell two-thirds of a U.S. public company's total outstanding shares, which shares are traded on the U.S. OTC markets, without the use of interstate commerce.

- At the time of the agreement, Straight Path did not have <u>any</u> funds – or source of funds – to offer Jammin Java. Berlinger testified that Straight Path was just an empty "umbrella" that had "no activity," and never had a bank account. (SOF ¶ 60; SJ Ex. 2, Berlinger Tr. at 106:20–106:24, 114:14–114:17, 117:17–117:19.)
- The Straight Path agreement was signed by a "Raymond Hall," who identified himself as Straight Path's "Vice Pres. Business Dev." (SJ Ex. 48 at 30.) In reality, (a) Straight Path had no officers or employees other than Berlinger and (b) Berlinger never met or even heard of "Raymond Hall." (SOF ¶¶ 60-61; SJ Ex. 2, Berlinger Tr. at 115:16–116:20.)
- Almost all of the money that was paid to Jammin Java came from another shell entity (Chilli Capital) that was funded exclusively with proceeds from dumping Java stock on the public.[7] (SJ Ex. 1 at ¶¶ 45-47, ex. G at 2-3.) In other words, the "financing" Straight Path provided did not come from Straight Path and was secretly contingent on the unregistered sale of Jammin Java stock <u>after the fact</u> (rather than coming from a legitimate source of funds that existed at the time of the agreement).
- On June 15, 2011, Wayne Weaver sent an e-mail to Berlinger asking Berlinger to "let me know when you receive the Jammin Java share cert for Straight Path Capital. It might have been sent for attn.: Raymond Hall." (SOF ¶ 61; SJ Ex. 72.) Indeed, the stock certificates for Straight Path were not sent to "Raymond Hall" or any other purported employee of Straight Path. They were sent to Berlinger – <u>Weaver's nominee</u>. (*Id*.)
- Weaver has refused to testify about this or any other subject.

These facts are uncontroverted, and – notwithstanding his meritless objection to the Barrett declaration – Weaver does not challenge the core underlying proof (*i.e.*, Berlinger's testimony, the Straight Path incorporation documents, and e-mails between Weaver and Berlinger). Weaver, incredibly, argues that his after-the-fact

---

[7] The remaining funds came from Blue Leaf Capital – which Weaver described as "my 100% owned" entity and which received proceeds from JAMN sales. (SOF ¶ 77; SJ Ex. 74-75.)

13

creation and use of a fake financing company was "entirely legitimate." (Def. Br. at 15.) He claims that – setting aside that Straight Path did not exist and was penniless – there was no fraud because Jammin Java got what it bargained for.

But, Weaver's argument has a fatal flaw: it misconstrues the nature of the SEC's claim. The SEC's claim does not hinge on whether <u>Jammin Java</u> was defrauded[8]; the SEC claims that <u>the investing public</u> was misled by the Straight Path agreement, which was a core part of Weaver's "pump and dump" scheme. Exchange Act Section 10(b) is a broad, "catch-all" clause that prohibits "the multitude of deceptive and manipulative devices which continually appear in the securities markets, including activities directed…toward the manipulation of securities prices for personal gain." *U.S. v. Charnay*, 537 F.2d 341, 348 (9th Cir. 1976). The Straight Path agreement surely qualifies as such a device. It was designed to portray the appearance of legitimate third-party investor interest. Yet, nothing in the agreement even remotely suggested that (a) the "financing company" did not exist, (b) the "financing company" had no money (or even a bank account), or (c) the "financing" would come from another entity contingent on its illegal, unregistered sale of Jammin Java stock. *SEC v. Farmer*, 2015 WL 5838867, at *14 (S.D. Tex. Oct. 7, 2015) ("Sham transactions" are "deceptive devices because they create[] an appearance of substance where substance is lacking.") (internal quote and cite omitted).

Weaver glosses over the fact that the payments that Jammin Java received <u>were from the proceeds of the illegal, unregistered stock sales</u>. The payments helped hide Weaver's deception: after the price of Jammin Java stock went up following the public announcement of the Straight Path deal, Weaver and his team were able to dump their shares and he was able to funnel a portion of his illicit profits back to Jammin Java. That maneuver does not absolve Weaver from misleading investors in the first place and it does not change the fact that, at the time of the Straight Path

---

[8] In fact, the SEC <u>sued</u> Jammin Java's former CEO (Whittle) for his complicity in the misconduct.

14

agreement, there was, in reality, no financing company, no Vice President of Development, no bank account, and no legitimate source of financing. It was a sham deal designed to create a market for Weaver and his cronies to sell their Jammin Java stock to unsuspecting investors at inflated prices.

* * * * *

No matter how hard he attempted to hide his conduct through far-flung shell companies and Swiss bank accounts, Weaver's responsibility for the illegal Jammin Java trades has been established as a matter of law. The undisputed facts – based on admissible documents and uncontroverted testimony – reflect that (1) Weaver was the sole owner of a series of offshore shell entities, (2) Weaver hired intermediaries to buy and sell Jammin Java stock, (3) they accumulated over 45 million shares of Jammin Java stock, including 12.9 million for Weaver's wholly-owned entities, (4) Weaver misled investors through the fraudulent Straight Path agreement – an agreement designed to make it appear that Jammin Java had attracted the attention of a legitimate financier, (5) entities that Weaver and his nominees owned and controlled dumped all of their Jammin Java stock on the public for total profits of over $71.3 million, and (6) Weaver failed to file the disclosures required under Section 5 or Section 13 of the Securities Act.

The SEC has offered a mountain of evidence – including the unrebutted testimony of numerous witnesses who directly participated with Weaver in the scheme; dozens of exhibits; the admissible declaration of Kevin Barrett based on his review of voluminous bank, brokerage and transfer agent records; and Weaver's Fifth Amendment assertions. Weaver responds primarily by raising generic evidentiary challenges to the SEC's exhibits, even though he does not actually dispute the authenticity of the documents.

The Court should enter summary judgment against Weaver.

| | |
|---|---|
| Dated:  May 11, 2017 | Respectfully submitted, |
| | */s/ Peter Senechalle* |
| | Peter Senechalle |
| | U.S. Securities and Exchange Commission |
| | Chicago Regional Office |
| | 175 W. Jackson Blvd., Suite 1450 |
| | Chicago, Illinois  60604 |
| | Telephone:  (312) 353-1821 |
| | Fax:  (312) 353-7398 |
| | senechallep@sec.gov |

## CERTIFICATE OF SERVICE

Peter Senechalle hereby certifies that he caused the foregoing document to be filed through the Court's CM/ECF system on May 11, 2017, which automatically sends an electronic copy of the document to all counsel of record.

*/s/ Peter Senechalle*