**EXHIBIT 11**

## In The Matter Of:

*Securities and Exchange Commission v.*
*Jammin' Java Corp., et al.*

---

*Rene Berlinger*
*February 07, 2017*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94103*
*(415) 597-5600*

Original File 30994Berlinger.txt
**Min-U-Script® with Word Index**

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3   - - - - - - - - - - - - - - -
 4   SECURITIES AND EXCHANGE      )
 5   COMMISSION,                  )
 6                    Plaintiff,  )
 7                                )  CASE NO.
 8   v.                           )  2:15-cv-08921-SVW-MRW
 9                                )
10   JAMMIN' JAVA CORP, ET AL.,   )
11                    Defendants. )
12   - - - - - - - - - - - - - - -
13
14
15        VIDEOTAPED DEPOSITION OF RENÉ BERLINGER
16             TUESDAY, FEBRUARY 7, 2017
17
18
19
20
21        BEHMKE REPORTING AND VIDEO SERVICES, INC.
22                     BY:  JONAH SEARS
23              160 SPEAR STREET, SUITE 300
24            SAN FRANCISCO, CALIFORNIA 94105
25                         (415) 597-5600
```

**Page 2**

```
 1
 2
 3
 4
 5
 6
 7
 8       Videotaped Deposition of RENÉ BERLINGER, taken on
 9   behalf of Plaintiff, at 271 Cadman Plaza East, 7th
10   Floor, Brooklyn, New York, commencing at 9:42 A.M.,
11   TUESDAY, FEBRUARY 7, 2017, before Jonah Sears, Shorthand
12   Reporter, pursuant to notice.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS, SECURITIES AND EXCHANGE COMMISSION:
 3     U.S. SECURITIES AND EXCHANGE COMMISSION
 4     BY:  TIMOTHY S. LEIMAN, ATTORNEY AT LAW
 5          PETER SENECHALLE, ATTORNEY AT LAW
 6     175 West Jackson Boulevard, Suite 900
 7     Chicago, Illinois 60604
 8     Telephone:  (312) 353-7390
 9     Email:  leimant@sec.gov
10
11   FOR DEFENDANT, KEVIN P. MILLER:
12     CALDWELL LESLIE AND PROCTOR, PC
13     BY:  ANDREW ESBENSHADE, ATTORNEY AT LAW
14     725 S. Figueroa Streeet, 31st Floor
15     Los Angeles, California 90017
16     Telephone: (213) 629-9040
17     Email:  esbenshade@caldwell-leslie.com
18
19   FOR DEFENDANT, WAYNE WEAVER:
20     SCHEPER KIM HARRIS
21     BY: MARC S. HARRIS, ATTORNEY AT LAW
22     601 West Fifth Street, 12th Floor
23     Los Angeles, California 90071
24     Telephone: (213) 613-4690
25     Email: mharris@scheperkim.com
```

**Page 4**

```
 1   APPEARANCES OF COUNSEL - (CONTINUED):
 2   FOR DEFENDANTS, MICHAEL K. SUN
 3     and MOHAMMED A. AL-BARWANI:
 4     VENABLE LLP
 5     BY:  PATRICK J. BOYLE  ATTORNEY AT LAW
 6          ARIE E. PELED, ATTORNEY AT LAW
 7     1270 Avenue of the Americas, 24th Floor
 8     New York, New York 10020
 9     Telephone:  (212) 307-5500
10     Email:  pboyle@venable.com
11
12   FOR DEFENDANT, RENÉ BERLINGER:
13     BUTZEL LONG PC
14     BY:  THOMAS EARL PATTON, ATTORNEY AT LAW
15     1747 Pennsylvania Avenue NW, Suite 300
16     Washington, DC  20006
17     Telephone:  (202) 454-2800
18     Email:  pattont@butzel.com
19
20   ALSO PRESENT:
21     CHRIS MARTIN, CLVS
22     WAYNE S.P. WEAVER
23     PEGGY DAYTON (TELEPHONICALLY)
24
25
```

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 5

```
 1                         INDEX
 2   TUESDAY, FEBRUARY 7, 2017
 3   RENÉ BERLINGER                           Page
 4     Examination by MR. LEIMAN               15
 5   P.M. SESSION                             124
 6     Examination bt MR. LEIMAN              124
 7     Examination by MR. ESBENSHADE          203
 8     Examination by MR. HARRIS              213
 9     Examination by MR. BOYLE               228
10     Examination by MR. LEIMAN              241
11
12                      -oOo-
13
14   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
15                    PAGE    LINE
16                    225      15
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1                      EXHIBITS
 2                  RENÉ BERLINGER
 3   Number        Description              Page
 4   Exhibit 78  Los Colinas documents; Bates Nos.
 5               FINMA-0000216 through FINMA-0000048
 6               - 38 pages                     16
 7
 8   Exhibit 79  Los Colinas bank statements; Bates
 9               Nos. BER00002928 through
10               SEC-FINMA-P-0000451 - 35 pages  16
11
12   Exhibit 80  Los Colinas asset statements; Bates
13               Nos. BER00002349 thorough
14               SEC-FINMA-P-0000461 - 49 pages  16
15
16   Exhibit 81  Transaction documents; Bates Nos.
17               FINMA-0000254 through BER00002779
18               - 55 pages                     16
19
20   Exhibit 82  Fax transmittal forms; Bates Nos.
21               BER00002389 thorugh BER00000389
22               - 38 pages                     16
23
24
25
```

Page 7

```
 1          EXHIBITS - (CONTINUED)
 2                 RENÉ BERLINGER
 3   Number        Description              Page
 4   Exhibit 83  VP Bank account-opening documents;
 5               Bates Nos. BER00002204 through
 6               BER00002299 - 93 pages          16
 7
 8   Exhibit 84  VP Bank statements for Chilli
 9               Capital; Bates Nos. BER00002273
10               through BER00002337 - 25 pages   16
11
12   Exhibit 85  Chilli Capital transaction documents;
13               Bates Nos. BER00002290 through
14               BER00002239 - 7 pages           16
15
16   Exhibit 86  Faxes; Bates Nos. BER00002240 through
17               BER00002241 - 6 pages           16
18
19   Exhibit 87  Multiple documents; Bates Nos.
20               BER00000828 through SUN_PROD_00000130
21               - 75 pages                      16
22
23   Exhibit 88  Bank statements for Westpark Limited;
24               Bates Nos. BER00000671 through
25               BER00000683 - 22 pages          16
```

Page 8

```
 1          EXHIBITS - (CONTINUED)
 2                 RENÉ BERLINGER
 3   Number        Description              Page
 4   Exhibit 89  Asset statements for Westpark
 5               Limited; Bates Nos. SUN_PROD_00000417
 6               thorough BER00000785 - 96 pages  16
 7
 8   Exhibit 90  Multiple documents; Bates Nos.
 9               BER00002660 through BER00000686
10               - 33 pages                      16
11
12   Exhibit 91  Fax transmittals documents; Bates
13               Nos.  SUN_PROD_00000107 through
14               BER00000693 - 29 pages          16
15
16   Exhibit 92  Multiple documents; Bates Nos.
17               BER00002471 through FINMA-0000314
18               - 18 pages                      16
19
20   Exhibit 93  Bank statements for Renaival; Bates
21               Nos. BER00000555 through
22               SEC-FINMA-P-0000137 - 49 pages   16
23
24
25
```

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

| | Page 9 |
|---|---|
| | EXHIBITS - (CONTINUED) |
| | RENÉ BERLINGER |

| Number | Description | Page |
|---|---|---|
| Exhibit 94 | Transaction confirmations; Bates Nos. BER00000550 through BER00000572 - 58 pages | 16 |
| Exhibit 95 | Fax transmittal documents; Bates Nos. BER00000551 through BER00000630 - 32 pages | 16 |
| Exhibit 96 | Asset statements for Renavial; Bates Nos. AL-BARWANI_00000333 through SEC-FINMA-P-0000144 - 113 pages | 16 |
| Exhibit 97 | Account-opening doucments for Calgon; Bates Nos. CIMA-0000055 through CIMA-00001111 - 58 pages | 16 |
| Exhibit 98 | Bank statements for Calgon; Bates Nos. CIMA-0000184 through CIMA-0000190 - 8 pages | 16 |

| | Page 10 |
|---|---|
| | EXHIBITS - (CONTINUED) |
| | RENÉ BERLINGER |

| Number | Description | Page |
|---|---|---|
| Exhibit 99 | Multiple documents; Bates Nos. BER00000639 through BER00003163 - 50 pages | 16 |
| Exhibit 100 | Diagram; Bates Nos. BER00002186 - 1 page | 27 |
| Exhibit 101 | Exhibit Binder Index - 6 pages | 90 |
| Exhibit 102 | E-mail chain with attachment; Bates Nos. BER00000281 through BER00000283 - 3 pages | 97 |
| Exhibit 103 | Share Purchase Agreement; BER00002332 through BER00002334 - 3 pages | 99 |
| Exhibit 104 | Share Purchase Agreement; Bates Nos. BER00000656 through BER00000658 - 3 pages | 101 |

| | Page 11 |
|---|---|
| | EXHIBITS - (CONTINUED) |
| | RENÉ BERLINGER |

| Number | Description | Page |
|---|---|---|
| Exhibit 105 | E-mail chain with attachment; Bates Nos. BER00000289 through BER00000293 - 5 pages | 109 |
| Exhibit 106 | Multiple documents; Bates Nos. BER00002300 through BER00002304 - 5 pages | 112 |
| Exhibit 107 | Share Issuance Agreement; Bates Nos. JJC001084 though JJC001102 - 9 pages | 115 |
| Exhibit 108 | E-mail chain; Bates Nos. BER00000297 through BER00000298 - 2 pages | 118 |
| Exhibit 109 | Share certificates; Bates Nos. BER00000631 through BER00000639 - 9 pages | 120 |
| Exhibit 110 | Multiple documents; BER00002435 through BER00002438 - 4 pages | 133 |

| | Page 12 |
|---|---|
| | EXHIBITS - (CONTINUED) |
| | RENÉ BERLINGER |

| Number | Description | Page |
|---|---|---|
| Exhibit 111 | E-mail; Bates Nos. BER00001004 - 1 page | 141 |
| Exhibit 112 | E-mail chain; Bates Nos. BR*921 through BER00000922 - 2 pages | 143 |
| Exhibit 113 | Fax; Bates Nos. BER00002389 through BER00002388 - 2 pages | 145 |
| Exhibit 114 | E-mail chain; Bates Nos. BER00000319 through BER00000320 - 2 pages | 148 |
| Exhibit 115 | E-mail chain with attachments; Bates Nos. BER00001182 through BER00001187 - 6 pages | 152 |
| Exhibit 116 | E-mail chain; Bates Nos. BER00000186 through BER00000187 - 2 pages | 156 |
| Exhibit 117 | E-mail chain; BER00000073 through BER00000075 - 3 pages | 159 |

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 13

```
 1                EXHIBITS - (CONTINUED)
 2                   RENÉ BERLINGER
 3   Number           Description              Page
 4   Exhibit 118  E-mail; Bates No. BER00000080
 5                - 1 page                      163
 6
 7   Exhibit 119  E-mail with attachment; Bates Nos.
 8                BER00000067 through BER00000068
 9                - 2 pages                     165
10
11   Exhibit 120  E-mail chain; Bates No. BER00003092
12                - 1 page                      171
13
14   Exhibit 121  E-mail chain with attachment; Bates
15                Nos. BER00000963 through BER00000965
16                - 3 pages                     175
17
18   Exhibit 122  E-mail chain; Bates Nos. BER00001144
19                through BER0000114- 2 pages    177
20
21   Exhibit 123  E-mail chain; Bates Nos. BER00000070
22                through BER00000072 - 7 pages  178
23
24   Exhibit 124  Bank statement; Bates NO. BER00002542
25                - 1 page                      181
```

---

Page 14

```
 1                EXHIBITS - (CONTINUED)
 2                   RENÉ BERLINGER
 3   Number           Description              Page
 4   Exhibit 125  E-mail chain; BER00001014 through
 5                BER00001019 - 6 pages          187
 6
 7   Exhibit 126  E-mail; Bates Nos. BER00000063
 8                through BER00000064 - 2 pages   188
 9
10   Exhibit 127  E-mail chain; Bates Nos.BER*0018
11                through BER00000020 - 3 pages   191
12
13   Exhibit 128  E-mail with attachment; Bates Nos.
14                BER00002647 through BER00002646
15                - 6 pages                      196
16
17   Exhibit 129  Invoices for R. Berlinger; Bates Nos.
18                SEC-FINMA-P-0000263 through
19                SEC-FINMA-P-0000290 - 7 pages   197
20
21   Exhibit 130  Westpark Limited time records; Bates
22                Nos. SEC-FINMA-P-0000446 though
23                SEC-FINMA-P-0000419 - 7 pages   200
24
25
```

---

Page 15

```
 1                EXHIBITS - (CONTINUED)
 2                   RENÉ BERLINGER
 3   Number           Description              Page
 4   Exhibit 131  Las Colinas invoices; Bates Nos.
 5                SEC-FINMA-P-0000612 through
 6                SEC-FINMA-P-000580 - 7 pages    201
 7
 8   Exhibit 132  Fax; Bates Nos. BER000002389 through
 9                BER0000002390 - 4 pages         211
10
11   Exhibit 133  E-mail chain; Bates No. BER00000124
12                - 1 page                       212
13
14   Exhibit 134  E-mail chain; BER00000121 - 1 page  214
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 16

```
 1        TUESDAY, FEBRUARY 7, 2017; 9:42 A.M.
 2        (Exhibits Nos. 78 through 99 were marked for
 3    identification.)
 4        VIDEOTAPE OPERATOR: Good morning.  We're on the
 5    record.  This is the beginning of DVD No. 1 in the
 6    deposition of René Berlinger in the matter of United
 7    States Securities and Exchange Commission versus Jammin'
 8    Java Corp., et al., case filed in the U.S. District
 9    Court, Central District of California, Case No.
10    2:15-cv-08921.  Today's date is February 7, 2017, and
11    the time on the video monitor is 9:42 a.m.
12        My name is Chris Martin.  I'm the videographer,
13    contracted with Behmke Reporting & Video Services,
14    160 Spear Street, Suite 300, San Francisco, California.
15    This video deposition is taking place at 271 Cadman
16    Plaza East, Brooklyn, New York, and was noticed by
17    Timothy Leiman of the Securities and Exchange
18    Commission.
19        At this time will counsel around the table
20    please introduce themselves for the record.
21        MR. LEIMAN: Tim Leiman for the Securities and
22    Exchange Commission.
23        MR. SENECHALLE: Peter Senechalle for the Securities
24    and Exchange Commission.
25        MR. ESBENSHADE: Andy Esbenshade on behalf of Kevin
```

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 41

1  brought most of the new clients brought to us because of
2  our level of service, the accuracy, speed, things like
3  that, pricing. So he brought most of the clients to me,
4  not to Victor.
5     Q. And was he generally your point of contact --
6     A. Yes.
7     Q. -- for the companies that had accounts at
8  VP Bank?
9     A. Yes.
10    Q. I'd like to talk about some of the entities
11 that are at issue in this case, and for this I'd like to
12 refer to some of the documents that are in a binder that
13 you have seen before.
14    A. Okay. I'm ready.
15    Q. First of all, you met with the SEC yesterday,
16 correct?
17    A. That's correct.
18    Q. And at that meeting we gave you a copy of the
19 binder that's in front of you right now, correct?
20    A. Yes.
21    Q. I'd like to note for the record that we have
22 premarked group exhibits in a binder that's now in front
23 of Mr. Berlinger, Group Exhibits 78 through 99, and I'll
24 refer to them periodically as we go.
25       First, I want to talk to you about an entity

---

Page 42

1  called Las Colinas.
2        And I think you mentioned that you're familiar
3  with Las Colinas, correct?
4     A. That's correct.
5     Q. How are you familiar with Las Colinas?
6     A. I incorporated the company, opened up a bank
7  account, completed the Know Your Client forms, and
8  that's it.
9     Q. And you served as the nominee officer for Las
10 Colinas, correct?
11    A. That's correct, yes.
12    Q. Were there any other officers at Las Colinas?
13    A. Actually, it was a company called Admita
14 Nominees, which we use -- maybe we come later on to
15 that?
16    Q. No, let's talk about that now.
17       What is Admita Nominees?
18    A. Admita Nominees is -- rather than having -- for
19 our 250 clients, having us as director, we used a
20 director company called Admita Nominees, and this was --
21 in this company my person and Victor Gallus were
22 directors.
23    Q. So Admita Nominees is the nominee for Las
24 Colinas, correct?
25    A. For Las Colinas.

---

Page 43

1     Q. And Admita is you and Victor Gallus?
2     A. Yes.
3     Q. Other than Admita Nominees, were there any
4  other officers for Las Colinas?
5     A. No.
6     Q. Other than Admita Nominees, were there any
7  directors for Las Colinas?
8     A. Just me and Victor.
9     Q. Other than the trading of penny stock and the
10 transmittal of proceeds, did Las Colinas have any
11 business operations?
12       MR. ESBENSHADE: Calls for speculation.
13    A. What does that mean?
14    Q. No, you can answer the question.
15    A. Yeah, okay. They had no employees, no other
16 thing, but just investing.
17    Q. Okay.
18    A. Yeah.
19    Q. And investing in penny stocks, correct?
20    A. Not hundred percent sure that it's only penny
21 stocks, but yes.
22    Q. Okay. And what jurisdiction was Las Colinas
23 formed in?
24    A. That was a Marshall Islands company.
25    Q. And you opened up an account for Las Colinas,

---

Page 44

1  correct?
2     A. That's correct.
3     Q. And are you familiar with that account?
4     A. Yes.
5     Q. And where was the account formed?
6     A. VP Bank.
7     Q. And was Mr. Lacher your point of contact for
8  Las Colinas?
9     A. He was, yes.
10    Q. Looking at the binder, starting with Group
11 Exhibit 78 --
12       MR. HARRIS: Sorry. How do the exhibit numbers
13 correspond to the tabs?
14       MR. LEIMAN: So -- I'm sorry. So each numbered tab
15 will be an exhibit, so you're right, I'll call out the
16 numbered tab too.
17       So we're looking at numbered Tab 1, which is
18 Group Exhibit 78.
19       MS. DAYTON: Is it possible to read the Bates
20 numbers, or are they randomly --
21       MR. LEIMAN: We can provide an index afterwards, but
22 I think providing Bates numbers is going to create sort
23 of a multiple-hour affair, but in general these are what
24 appear to be incorporation documents for Las Colinas.
25       MS. DAYTON: Okay.

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 45

1  BY MR. LEIMAN:
2     Q.  Mr. Berlinger, are you familiar with the
3  documents behind Tab 1, Group Exhibit 78?
4     A.  Yes.
5     Q.  And what are they?
6     A.  These are the company documents:  Articles of
7  incorporation.  What else do we have?  Bylaws.  What
8  else?  Certificate of incorporation.  Yeah, that's it.
9     Q.  Are these typical of the documents that you
10  would receive when you formed a company in the Marshall
11  Islands?
12     A.  Yeah.  In these copies are the certificate --
13  the share certificate of the company.
14     Q.  So normally, you would get a share certificate
15  --
16     A.  Normally, I get the full set, including a fair
17  share certificate.
18     Q.  Okay.  But other than the share certificate,
19  are these the documents you received for Las Colinas?
20     A.  Yeah, that should be complete.  Yeah.
21     Q.  Okay.  And how did you -- did you obtain these
22  documents as the nominee officer and director of Las
23  Colinas?
24     A.  Uh-huh.
25     Q.  I'm sorry.

---

Page 46

1     A.  Yes.
2     Q.  And when you received documents related to Las
3  Colinas, would you typically maintain those?  Would you
4  store them?
5     A.  I'd file them.
6     Q.  And would you maintain files for each company
7  that you formed?
8     A.  Yes.
9     Q.  And looking at Tab B, so 1-B, which appears to
10  be a Declaration of Identity of the Beneficial Owner,
11  are you familiar with that document?
12     A.  Yes.
13     Q.  And is that your signature in the lower right?
14     A.  It is.
15     Q.  And what is this document?
16     A.  This document is an internal document, which
17  defines and declares who is the ultimate beneficial
18  owner.
19     Q.  And from your perspective, who was the
20  beneficial owner of Las Colinas?
21     A.  This was Kevin.
22     Q.  And who is Kevin?
23     A.  Miller.
24     Q.  Kevin Miller.
25        Looking at Tab C, what appears to be

---

Page 47

1  account-opening documents relating to a VP Bank for Las
2  Colinas.
3     A.  Uh-huh.
4     Q.  So this is now still Exhibit 78, still Tab 1,
5  Tab 1-C.
6        And are you familiar with these documents?
7     A.  Yes, this is a set of account opening forms,
8  but not complete, a few documents missing.  In this
9  case, especially also the Form A, I don't find that, and
10  Form A has to be done by the bank as well, not just in
11  my file; the bank must have the same file.
12     Q.  Okay.  So we just saw --
13     A.  And there are other documents.  It's two things
14  -- it's not complete.
15     Q.  Okay.  And just for the record, when you were
16  referring to Form A, what we just saw at Tab 1-B --
17     A.  Uh-huh.
18     Q.  -- so Exhibit 78-B, that was a Form A, correct?
19     A.  That's a Form A which was from out of my file,
20  and VP Bank does their own Form A, but they have to have
21  it as well.
22     Q.  Okay.  So are these documents at Tab 1-C, this
23  is a portion of the documents that you would use to open
24  up an account at VP Bank; is that accurate?
25     A.  Yeah.

---

Page 48

1     Q.  And when you receive these documents, you would
2  store them as nominee officer for Las Colinas?
3     A.  Yes.
4     Q.  And these documents look familiar to you?
5     A.  They are, yes.
6     Q.  I'd like to look at Tab 2, which is Group
7  Exhibit 79.
8        These appear to be a series of monthly
9  statements for Las Colinas?
10     A.  That's correct.
11     Q.  And are you familiar with these documents?
12     A.  Uh-huh.  Yes.
13     Q.  And what are they?
14     A.  Bank statements for a certain period, including
15  just a U.S. dollar account, starting with balances
16  in/out transactions, just over a period all movements
17  within the account.
18     Q.  And what entity are these statements for?
19     A.  I get them regularly, and I have to file them
20  just for audits I have regularly.  So I need to show how
21  much money is in the account, what's been sent in and
22  out, what's the contracts behind.  So we need to
23  document that for internal Swiss regulations.
24     Q.  And for Exhibit 79 which entity do these
25  statements cover?

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 49

1   A.  It covers Las Colinas.
2   Q.  And did you receive these periodically from
3   VP Bank?
4   A.  Yes.
5   Q.  And how often would you receive them, monthly?
6   A.  It could be monthly, it could be quarterly,
7   depending on whatever we wished, first, and secondly
8   when the account was -- there was no movement on it,
9   they just kept it, and extended -- and the bank extended
10  the period.  But I'd say normal, the typical case was a
11  quarter, every quarter.
12  Q.  And you've seen these statements before,
13  correct?
14  A.  Yes.
15  Q.  And are they true and accurate statements of
16  the monthly statements that you would receive from
17  VP Bank?
18  A.  Yeah, yes.
19  Q.  As a general matter, did you find VP Bank's
20  statements for Las Colinas to be accurate?
21  A.  Yes, there was no doubt.  They were
22  electronically [sic], and they get audited, so they have
23  accurate internally as well, so there was no doubt to
24  think there was something wrong with the accounts they
25  do.

---

Page 50

1   Q.  And in your role as the director and officer of
2   Las Colinas, did you find the monthly statements for Las
3   Colinas to be accurate?
4   A.  Yes.
5   Q.  I'd like to look at Tab 3, which we've marked
6   as Exhibit No. 80, and here we've got Tabs 3-A
7   through 3-L, which appear to be a series -- oh, sorry --
8   3-A through 3-G, which appear to be series of asset
9   statements for Las Colinas.
10  A.  That is correct.
11  Q.  Are you familiar with the documents in
12  Exhibit 80 at Tab 3?
13  A.  Yes, I am.
14  Q.  And what are these?
15  A.  This lists all the assets over a certain
16  period, rather than the documents we have before with
17  just the currencies listed.  This is just the assets --
18  Q.  So --
19  A.  -- showing equities broken down to each symbol
20  they had, plus also as a single statement to currency.
21  Q.  And how often were these documents created?
22  A.  Also I would say quarterly.
23  Q.  And who created the documents at Tab 3
24  Exhibit 80?
25  A.  That's VP Bank.

---

Page 51

1   Q.  And did you typically receive these asset
2   statements from VP Bank?
3   A.  Uh-huh, yes.
4   Q.  And how often would you receive them?
5   A.  Also quarterly.
6   Q.  And would you keep a file of the asset
7   statements in your role as the nominee and director of
8   Las Colinas?
9   A.  Yes.
10  Q.  And in your role as director and nominee of Las
11  Colinas, did you generally find VP Bank's statements to
12  be accurate?
13  A.  They were correct.
14  Q.  I'd like to look at Tab 4, which we have marked
15  as Exhibit 81.  This appears to be a series of one-page
16  transaction documents, some called Notice of Receipt,
17  some called Debit Advice, some called Certificates of
18  Receipt.
19      Are you familiar with the documents at Tab 4
20  Exhibit 81?
21  A.  In Section A?
22  Q.  So A through --
23  A.  Oh, okay.
24  Q.  -- through L.
25      Each one appears to be a separate

---

Page 52

1   transaction-specific document.
2   A.  Yes.
3   Q.  Are you familiar with those documents --
4   A.  Yes.
5   Q.  -- A through L.
6      And what are they?
7   A.  Any movement in the account caused the bank to
8   send a statement to us, so it's not just the monthly or
9   the quarterly statements.  We get -- per transaction we
10  get a sheet which says so and so money has left, we have
11  so many shares sold, or -- whatever was changing the
12  account was documented by VP Bank by a single sheet.
13  Q.  And would that include stock trades?
14  A.  Stock trades?  Yes.
15  Q.  Money coming in?
16  A.  Yes.
17  Q.  Money going out?
18  A.  Yes.
19  Q.  And how soon after a transaction would you
20  typically receive one of these transaction-specific
21  documents in Exhibit 81?
22  A.  Between one and three days.
23  Q.  And you're familiar with these, correct?
24  A.  With these?
25  Q.  You're familiar with the documents in No.

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 53

1 Exhibit 81 Tab 4, these documents?
2    A. Yes.
3    Q. And you received them in your role as nominee
4 director, nominee officer; is that correct?
5    A. That's correct.
6    Q. In that role as nominee officer, nominee
7 director, for Las Colinas, did you generally find these
8 transaction-specific statements to be accurate?
9    A. Uh-huh, yes.
10    Q. I'd like to look at Tab 5, which is Exhibit
11 No. 82. It has Tabs A through P, as in "Peter," and
12 appears to be a series of fax transmittal forms from
13 Mr. Berlinger to VP Bank.
14       Are you familiar with these documents?
15    A. Yes, I am.
16    Q. And what are they?
17    A. The first is a fax, saying, "Please wire a
18 million," to whom it goes to from the bank, what
19 companies it is, and the wire instruction where it
20 should go. The typical fax for any transaction.
21    Q. And the Tabs A through P, are those documents
22 similarly fax communications regarding specific
23 transactions?
24    MR. PATTON: Take a look at them.
25    A. These are all standard, typical.

Page 54

1    Q. And under what circumstances would you create
2 these fax sheets?
3    A. On -- based on instructions. It depends where
4 it comes from, but I never execute a transaction on my
5 own.
6    Q. So it would be instructions from someone?
7    A. From -- an instruction from Lacher, from Wayne,
8 from the beneficial owner. These are accepted sources
9 for executing a transaction.
10    Q. So sometimes you would receive an instruction
11 from Daniel Lacher related to Las Colinas; is that
12 correct?
13    A. That's correct.
14    Q. Sometimes you would receive instruction from
15 Wayne Weaver; is that correct?
16    A. Yes.
17    Q. And sometimes you would receive instructions
18 from the beneficial owner?
19    A. Yes.
20    Q. And in this case for Las Colinas, the
21 beneficial owner would be Kevin Miller, correct?
22    MR. ESBENSHADE: Objection. Calls for speculation.
23 Go ahead.
24    A. Yes.
25    Q. And you maintain copies of these fax cover

Page 55

1 sheets in your files?
2    A. Yes.
3    Q. And you maintain them in your role as nominee
4 officer and director of Las Colinas?
5    A. That's correct.
6    Q. And do these accurately reflect your
7 instructions to VP Bank regarding certain transactions
8 and Las Colinas?
9    A. That's correct.
10    Q. For a moment I'd like to move forward to
11 Tab 10, which we had premarked as Exhibit No. 87.
12       Are you familiar with an entity called
13 Westpark?
14    A. Yes, I am.
15    Q. And what was Westpark?
16    A. It was a Marshall Islands company, incorporated
17 by Volante, with a VP Bank account, nominee director
18 services. Yeah, that's it.
19    Q. And did you help form Westpark?
20    A. We sent the information, the incorporation fax
21 to the agency, yes.
22    Q. And were you directed to form Westpark?
23    A. Yes.
24    Q. And you severed as nominee officer and director
25 for Westpark, correct?

Page 56

1    A. That's correct.
2    Q. Were there any other officers at Westpark?
3    A. No. As before I explained was Admita Nominees,
4 not me personally.
5    Q. Other than Admita Nominees, were there any
6 other officers --
7    A. No.
8    Q. -- for Westpark?
9    A. No.
10    Q. And were there any other directors for Westpark
11 other than Admita Nominees?
12    A. No.
13    Q. And did Westpark have any operations other than
14 the trading of stock and the transfer of proceeds?
15    A. As far as I know, no.
16    Q. Did Westpark have any employees?
17    A. No.
18    Q. Did Westpark have a place of business other
19 than where Admita Nominees is based?
20    A. No.
21    Q. Looking at what we've premarked as Exhibit 87,
22 which is Tab 10-A and B. First let's take at look at
23 Tab A.
24       Are you familiar with these documents?
25    A. Yes, these are the account opening forms.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 57

1    Q.  And are these forms that you assisted with in
2  opening an account for Westpark?
3    A.  Yes.
4    Q.  Starting at the beginning, there's what appears
5  to be a tax form that you signed.
6       What is the tax form for?
7    A.  This is -- W-8BEN is a form which forced by the
8  American. So we have to show that there's no
9  relationship between -- there's no U.S. relation. If
10  there would be a U.S. relation, the bank would have to
11  report to the American authorities.
12    Q.  And then -- and by no U.S. connection, you mean
13  that it's a Marshall Islands company, correct?
14    A.  No, the person.
15    Q.  Oh, the person.
16    A.  Of course, it's the company name, but in the
17  end, of course, it goes back to the beneficiary.
18    Q.  Okay. So all the tax form is saying is that
19  the beneficial owner is not connected to the U.S.?
20    A.  Yes.
21    Q.  Okay.
22    A.  No tax liability in the U.S.
23    Q.  After that, there appears to be a Know Your
24  Customer Form.
25       Are you familiar with that?

Page 58

1    A.  Yes.
2    Q.  And what was that for?
3    A.  That was sort of the normal procedure to open
4  up a bank account. We need to explain where's the money
5  coming from, what's the background of the client. These
6  questions you asked me before, here we can find out what
7  he did. That describes professional background, assets,
8  current employment, or whatever: History, family,
9  living address.
10    Q.  And then you mentioned that this overall
11  package at Tab A is for the opening of the VP Bank
12  account; is that correct?
13    A.  That's correct.
14    Q.  And you opened a VP Bank account for Westpark,
15  correct?
16    A.  That's correct.
17    Q.  Were you were directed open up a bank
18  account for Westpark?
19    A.  Yes.
20    Q.  Looking at Tab B, still in Exhibit 87, do you
21  recognize those documents?
22    A.  Tab B?
23    Q.  Tab B.
24    A.  Yeah.
25    Q.  It's what appears to be a series of

Page 59

1  incorporation documents --
2    A.  Yeah.
3    Q.  -- related to Westpark?
4    A.  That's a copy of the company incorporation
5  forms -- docs.
6    Q.  And did you receive these in your capacity as
7  nominee officer and director of Westpark?
8    A.  That's correct.
9    Q.  And this relates to the creation of Westpark,
10  correct?
11    A.  Yes.
12    Q.  And like Las Colinas, you received these from
13  the officials in the Marshall Islands; is that correct?
14    A.  Yes.
15    Q.  And you kept copies in your position --
16    A.  The originals.
17    Q.  Okay -- in your position as nominee officer and
18  director of Westpark, correct?
19    A.  That's correct.
20    Q.  Who was the beneficial owner of Westpark?
21    A.  Michael Sun.
22    Q.  And from time to time did you receive
23  directions on how to proceed with transactions in
24  Westpark?
25    A.  Can you rephrase again, please?

Page 60

1    Q.  Did you sometimes receive instructions to
2  engage in transactions in Westpark?
3    A.  I don't know how many, but definitely not many.
4    Q.  Okay. But from time to time you would receive
5  instructions?
6    A.  Yes. Let's say when the amount was reasonable,
7  an instruction came maybe from Daniel, Daniel Lacher
8  from VP Bank. Then I asked to get the confirmation from
9  the ultimate beneficial owner, just to make sure that
10  the owner knows that a reasonable amount is leaving the
11  account or whatever. So we accepted transactions from
12  Daniel. To make sure it's okay when the amount was
13  above, we asked for additional confirmation.
14    Q.  And above what amount would you ask for
15  additional confirmation from the beneficial owner?
16    A.  I mean, 10,000, 50,000, we believed that the
17  bank has instructions to receive from any source, which
18  is enough for the bank to instruct me. But if I get it
19  up and say, "Look, this weak for my audit. Whenever I
20  have to show the documents, we send you the instruction
21  and it doesn't show that I have a beneficial owner
22  order, that looks bad for my audit at the end of course
23  for me."
24    Q.  In general, would you personally confirm
25  transactions with the beneficial owner?

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 61

1    A. That's the normal way, yes.
2    Q. And did that always happen?
3    A. No.
4    Q. Now, sometimes you would receive instructions
5    from Daniel Lacher; is that correct?
6    A. Yes.
7    Q. Would you also sometimes receive instructions
8    from Wayne Weaver?
9    A. Sometimes, yes.
10   Q. And sometimes you would receive instructions
11   from the beneficial owner; is that correct?
12   A. Yes, at least confirmations.
13   Q. Okay. I'd like to look at the exhibit that has
14   been premarked as 88, which has Tabs A through J. These
15   appear to be monthly statements for the account of --
16   MR. PATTON: I'm sorry. What's the tab number?
17   MR. LEIMAN: Sure. The tab number is 11.
18   MR. PATTON: Okay.
19   MR. LEIMAN: Premarked as 88. Tabs A through J, and
20   these appear to be monthly statements for Westpark
21   Limited.
22   THE WITNESS: That's correct.
23   BY MR. LEIMAN:
24   Q. Are you familiar with these documents?
25   A. Yes, I am.

Page 62

1    Q. And what are they?
2    A. These are statements showing any in and out
3    transactions or sales proceeds from the U.S. dollar
4    account and over different periods.
5    Q. This is for Westpark, correct?
6    A. This is for Westpark.
7    Q. And you received these from VP Bank
8    periodically?
9    A. Yes, I did. Yes.
10   Q. And how often would you receive these from
11   VP Bank?
12   A. This would be quarterly.
13   Q. And you received these in your capacity as the
14   nominee officer and director of Westpark; is that
15   correct?
16   A. Yes.
17   Q. And did you maintain these documents as the
18   officer and director of Westpark?
19   A. Yes, we filed them.
20   Q. And do these appear to be accurate copies of
21   the statements you received from VP Bank?
22   A. Yes.
23   Q. In general, with your familiarity with this
24   account, did you find Westpark monthly statements to be
25   accurate reflections of the transactions in Westpark's

Page 63

1    account?
2    A. Yes.
3    MR. LEIMAN: I'd like to move ahead to Tab 12, which
4    has been premarked as Exhibit 89. This has Tabs A
5    through N, and appears to be a series of monthly asset
6    statements for Westpark Limited. I will note for the
7    record that at Tab 12-C, the statement appears to be
8    missing a cover page.
9    MR. HARRIS: I noticed that.
10   BY MR. LEIMAN:
11   Q. Other than that, are you familiar with the
12   documents at Tab 12 marked as Exhibit 89?
13   A. Yes.
14   Q. And what are they?
15   A. These are asset statements, divided up, in this
16   case for a certain period and per -- no, it's just
17   general as far as I can see. Yeah, it's just asset
18   statements which show buying price and current value
19   over a certain period.
20   Q. And this is for the Westpark account, correct?
21   A. That's for the Westpark account, yes.
22   Q. And did you receive these periodically from
23   VP Bank?
24   A. Correct.
25   Q. And did you receive them in your capacity as

Page 64

1    the nominee officer and director of Westpark?
2    A. That's correct.
3    Q. And did you maintain those records as the
4    nominee officer and director at Westpark?
5    A. Yes.
6    Q. Given your familiarity with Westpark's account,
7    did you generally find VP Bank's asset statements to be
8    an accurate reflection of the assets in Westpark's
9    account?
10   A. Yes.
11   Q. Other than what I mentioned before, which is
12   the pages missing from Tab C, do the documents at
13   Tab 12-A through Tab N appear to be accurate copies of
14   the asset statements for Westpark?
15   A. Yes.
16   Q. I'd like to look at Tab 13, which has been
17   premarked as Exhibit 90, and these seem to be a series
18   of -- as we mentioned before -- one-page
19   transaction-specific documents, sometimes referred to as
20   receipts, contract notes, debit advice memos.
21   A. That's correct.
22   Q. And you've seen these documents before?
23   A. Yes.
24   Q. And you're familiar with them?
25   A. I am.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 65

1  Q. And what are they?
2  A. Any transaction, sale proceeds, whatever has
3  caused a change in the account balance or in the asset
4  is here, documented as a single page.
5  Q. And are these similar to the documents that we
6  previously saw, related to Las Colinas?
7  A. Yes.
8  Q. And would you receive them as transactions
9  occurred in Westpark's account?
10  A. Yes.
11  Q. And did these cover stock trades?
12  A. They do.
13  Q. Money coming into the account?
14  A. Yes.
15  Q. Money going out of the account?
16  A. Yes.
17  Q. Transfers within accounts?
18  A. Yes.
19  Q. And typically, how long would it take for you
20  to receive documents related to Westpark transactions?
21  A. Depending on what it was, but one to three
22  days, within this period, we get.
23  Q. And generally, did you find VP Bank
24  transaction-specific documents to accurately reflect the
25  transactions in Westpark's account?

Page 66

1  A. They did.
2  Q. I'm sorry. Is that a --
3  A. Yes.
4  Q. And are the documents at Tab 13 Exhibit No. 90
5  -- do they appear to you to be accurate copies of these
6  transaction-specific documents for Westpark?
7  A. They do, yes.
8  Q. I'd like to go to Tab 14, which has been
9  premarked as Exhibit No. 91.
10  Looking at the documents from Exhibit 91, Tabs
11  A through K, are you familiar with these documents?
12  A. I am.
13  Q. And what are they?
14  A. This is an instruction sent to VP Bank out of
15  Westpark, saying, "Please send 40,000 to these and these
16  wire details." This is a fax and the page behind is the
17  fax confirmation.
18  MR. PATTON: Which number?
19  THE WITNESS: A, 14-A.
20  MR. PATTON: Which company.
21  THE WITNESS: Westpark.
22  MR. PATTON: Okay.
23  BY MR. LEIMAN:
24  Q. So looking at Tabs A through K, generally, what
25  are those documents?

Page 67

1  A. Instructions, instructions sent to VP Bank.
2  Q. And they're sent from you, correct?
3  A. They are sent from me; that's correct.
4  Q. And do these appear to be accurate copies of
5  the instructions that you sent for certain transactions
6  in Westpark's account?
7  A. Yes.
8  Q. And when you sent an instruction from VP Bank,
9  were you authorized to do it on your own?
10  MR. BOYLE: Object to the form.
11  A. Maybe we should rephrase.
12  Q. Yeah, that makes sense.
13  Did you have the authority to execute
14  transactions --
15  A. No.
16  Q. -- without getting permission from someone
17  else?
18  A. No.
19  Q. And did you receive instructions for certain
20  transactions in Westpark's account from other
21  individuals?
22  A. That's correct.
23  Q. And did you sometimes receive instructions from
24  Daniel Lacher?
25  A. Yes.

Page 68

1  Q. And did you sometimes receive instructions from
2  Wayne Weaver?
3  A. That's correct.
4  Q. And sometimes receive instructions from the
5  beneficial owner of Westpark?
6  A. Yes.
7  Q. I'd like to talk about an entity named
8  Renaival.
9  Are you familiar with the entity named
10  Renaival?
11  A. Yes.
12  Q. And what is Renaival?
13  A. It's a Marshall Islands company. We are
14  directors with -- nominee directors with Admita
15  Nominees, bank account with VP Bank. Yeah.
16  Q. And did someone instruct you to form Renaival?
17  A. Yes.
18  Q. And who instructed you to form Renaival?
19  A. This I don't remember. Maybe himself, the
20  beneficial himself, or during instruction, "Look, this
21  is René. This is who's the owner."
22  Q. Well, I'll ask you, who's the owner for
23  Renaival.
24  A. Yeah, I always have to go back in the
25  documents.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 69

1    Q.  Okay.
2    A.  But let's say any of them said, "Look, this is
3    your new partner.  René will take care on everything."
4    This is the beneficial owner," and then we proceeded
5    together, collecting passport copies, collecting CVs.
6    So we started to get all the ball rolling, collecting
7    all the information we need to proceed.
8    Q.  And so --
9    A.  It could also be a kind of teamwork.
10   Q.  And in the team you've got Daniel Lacher,
11   correct?
12   A.  Yes.
13   Q.  Was Wayne Weaver part of that team?
14   A.  Yes.  Not team, just sometimes we were -- we
15   did it by ourselves, sometimes it was just right after
16   the meeting or whatever.  Many options.
17   Q.  And of those options, one was Daniel Lacher,
18   correct?
19   A.  That's correct.
20   Q.  And one was Wayne Weaver, correct?
21   A.  Yes.
22   Q.  And one is the beneficial owner; is that
23   correct?
24   A.  Yes.
25   Q.  Okay.  Admita Nominees served as the nominee

Page 70

1    officer and director for Renaival, correct?
2    A.  That's right.
3    Q.  And primarily -- you know, we've discussed for
4    these entities that Admita Nominees was the nominee
5    officer and director.
6        Is it fair to say that primarily you did most
7    of the work related to the nominee services for those
8    entities?
9    A.  That's correct.
10   Q.  What role did Victor Gallus have in nominee
11   services?
12   A.  The backup.
13   Q.  He was a backup to you?
14   A.  Yeah.
15   Q.  In case you were not available?
16   A.  Yes.
17   Q.  And you were the primary point of contact; is
18   that fair to say?
19   A.  That's right.
20   Q.  Was Admita Nominees the sole officer of
21   Westpark -- I'm sorry -- of Renaival?  Even I get
22   confused sometimes.
23   A.  Yeah.
24   Q.  Was Admita Nominees the sole director of
25   Renaival?

Page 71

1    A.  That's correct.
2    Q.  And was Admita Nominees the sole officer off
3    Renaival?
4    A.  That's correct.
5    Q.  Are you aware of any other employees at
6    Renaival?
7    A.  No.
8    Q.  And are you familiar with Renaival's accounts
9    at VP Bank?
10   A.  Yes.
11   Q.  Are you aware of any activity by Renaival other
12   than the trading of stock and the use of resulting
13   proceeds?
14   A.  I don't know, but I would say no.
15   Q.  And did Renaival have a place of business other
16   than the place of business for Admita Nominees?
17   A.  Not as I know.
18   Q.  And were you responsible for maintaining the
19   records for Admita Nominees -- sorry -- for Renaival?
20   A.  Yes, I was.
21   Q.  And same question for the other entities:  Were
22   you responsible for maintaining the records for Las
23   Colinas?
24   A.  That's correct.
25   Q.  And were you responsible for maintaining the

Page 72

1    records for Westpark?
2    A.  That's correct.
3    Q.  And does that include the records that we have
4    seen in Exhibits 78 through 92?
5    A.  Yes.
6    Q.  I'd like to look at Tab 15, which has documents
7    A through D, and this has been premarked as Exhibit
8    No. 92.
9        Are you familiar with the document at Tab 15-A,
10   so 92-A?
11   A.  I am, yes.
12   Q.  And what is that?
13   A.  This is the Form A, which we have for our
14   files, which declares the ultimate beneficial owner of
15   the company Renaival.
16   Q.  And I notice it's unsigned.
17       Would you typically sign the Form As that were
18   internal --
19   A.  Yes.
20   Q.  -- to Admita Nominees?
21   A.  Yes.
22   Q.  Do you know why this one is not signed?
23   A.  I can sign it here.
24   Q.  That's fine.  I'm not asking you to.
25   A.  I don't know why.  Sorry for that.  But, yes,

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

**Page 73**

1  of course we do.  I don't know why it's not signed here.
2  Q.  Okay.  Looking at Tab B, so 92-B, there's
3  another Form A.
4  A.  Yes.
5  Q.  And this one is signed by you, correct?
6  A.  Yeah, that's correct.
7  Q.  What is the difference between the Form As that
8  were at Tab 15-A -- 92-A and the Form A at Tab B?
9  A.  Yeah, that's -- the first page is our internal
10  form, and the other one is from the VP Bank.
11  Q.  So Exhibit 92-A, that's your internal form?
12  A.  Yes.
13  Q.  And 92-B, that's for VP Bank?
14  A.  Yes.
15  Q.  And is that your signature in the lower right?
16  A.  It is.
17  Q.  It's dated September 21, 2010.
18  Is that around when you incorporated Renavial?
19  A.  It should be very close.  It doesn't have to be
20  exactly the same time, but yes.
21  Q.  Looking at Tab C, there is what appears to be
22  --
23  A.  A bad copy.
24  Q.  -- a bad copy of a Consent of Incorporator and
25  other documents related to Renavial.

**Page 74**

1  Are you familiar with these documents?
2  A.  Yes.
3  Q.  And is this part of the incorporation package
4  of documents for Renavial?
5  A.  Yeah, that's very, very little documents.  The
6  main documents are missing, but we have that complete in
7  our file.
8  Q.  And so this is a portion of what you would
9  receive when you incorporated Renavial, correct?
10  A.  It is correct, yeah.
11  Q.  And does this look like an accurate copy of the
12  Consent of Incorporator related to Renavial?
13  A.  Yes.
14  Q.  Looking at Tab D, so Exhibit 92-D, are you
15  familiar with these documents?
16  A.  Yeah, account-opening forms.  It's not a
17  complete set.  Forms we sent to VP Bank for opening the
18  account.
19  Q.  So are these accurate copies of some of the
20  documents --
21  A.  Some of the documents, yes.
22  Q.  -- that you would send to VP Bank in connection
23  with opening an account for Renavial?
24  A.  Yes.
25  Q.  What appears -- what documents are not in this

**Page 75**

1  group that would typically be part of the account
2  opening?
3  A.  First the W-8BEN, for instance, is obviously
4  missing.  I don't know what's missing.  These and these
5  -- I don't know.  I can't list.
6  Q.  Okay.
7  A.  Ten different documents, usually they send.
8  Q.  Is it fair to say --
9  A.  Resolution, do you have resolution?  Yeah, It's
10  definitely not complete.
11  Q.  Is it fair to say that first we have got an
12  application form, correct?
13  A.  This is an application form, yeah.
14  Q.  Okay.  Then --
15  A.  Also there you can see on the first page.  Do
16  you see this quarterly, monthly, quarterly (indicating)?
17  Can you see that?
18  Q.  Yes.
19  A.  This is the way which these statements would
20  then arrive.
21  Q.  That denotes when you would receive statements,
22  correct?
23  A.  Yes.
24  Q.  And turning to the third page of Tab D, which
25  is Bates labeled 310, is that your signature?  The first

**Page 76**

1  signature, that's yours?
2  A.  Yeah, yeah, it's mine.
3  Q.  And do you know who the second signature is
4  for?
5  A.  This is Puccino Tallarini.  This is deputy of
6  Lacher -- Daniel.
7  Q.  This is an associate of Daniel Lacher?
8  A.  Yes, his secretary, actually.  Was.
9  Q.  And then following that, you have the
10  legally-bonding signatures?
11  A.  Uh-huh.
12  Q.  And did you sign that form as well?
13  A.  That is correct.
14  Q.  And did you maintain copies of these
15  account-opening documents?
16  A.  Yes.
17  Q.  And do those appear to be accurate copies of
18  some of the account-opening documents that you sent to
19  VP Bank?
20  A.  Yes.
21  Q.  And were you instructed to open up the account
22  at VP Bank?
23  A.  Yes.
24  Q.  And again, you didn't have the authority on
25  your own to open up an account, correct?

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 77

1    A.  Exactly.
2    Q.  Looking at Tab 16, which we've marked as
3    Exhibit 93, this has Tabs A through S, as in "Sam," and
4    they appear to be monthly statements for Renavial
5    Limited.
6        Are you familiar with these documents?
7    A.  Yes, I am.
8    Q.  And what are they?
9    A.  These are statements showing all -- any
10   movement in the accounts over a certain period, divided
11   up into currencies, or at least per currency and per
12   period, and it shows all the movements during a certain
13   period.
14   Q.  And did you receive these documents in
15   connection with your services as the nominee officer and
16   director of Renavial?
17   A.  That's correct.
18   Q.  And how often would you receive these
19   documents?
20   A.  In this case it looks like quarterly -- no,
21   that's -- yes, quarterly.
22   Q.  And do these appear to be accurate copies of
23   the monthly statements for Renavial that you received
24   from VP Bank?
25   A.  They do.

---

Page 78

1    Q.  Recognizing that it's not a complete set --
2    A.  Yes.
3    Q.  -- from the opening of the account to the
4    closing of the account?
5    A.  Yeah, but they do.
6    Q.  And did you generally find in your familiarity
7    with this account that VP Bank provided accurate monthly
8    statements to you?
9    A.  They did.
10   Q.  And did you maintain these in your capacity as
11   nominee officer and director of Renavial?
12   A.  Yes.
13      MR. LEIMAN:  Let's go off the record to take a quick
14   break for the changing of the tape.
15      VIDEOTAPE OPERATOR:  We're off the record.  The time
16   is 10:59.  This is the end of Tape 1.
17      (Recess.)
18      VIDEOTAPE OPERATOR:  We're back the on the record.
19   The time is 11:09.  This is the beginning of Tape 2 in
20   the deposition of René Berlinger.
21
22      EXAMINATION RESUMED
23   BY MR. LEIMAN:
24   Q.  Mr. Berlinger, we were looking at documents
25   related to Renavial, and I'd like to move to what we've

---

Page 79

1    premarked as Exhibit 94, which appear to be another
2    series, this time Tab A through BB.
3        MR. PELED:  I'm sorry.  Is this Tab 17?
4        MR. LEIMAN:  Yes, so this is Tab 17, Exhibit No. 94.
5    BY MR. LEIMAN:
6    Q.  This appears to be another series of one- to
7    two-page transaction-specific confirmations from
8    VP Bank.
9    A.  That's correct.
10   Q.  And are you familiar with these documents?
11   A.  Yes, I am.
12   Q.  And what are these documents?
13   A.  Any transaction which caused any positive or
14   negative valuation of the account has been shown in a
15   single sheet, per transaction, and same to us.
16   Q.  And this includes stock trades?
17   A.  This includes stock trades, yes.
18   Q.  Money coming in?
19   A.  Yes.
20   Q.  Money going out?
21   A.  Yes.
22   Q.  And then you would receive a confirmation from
23   VP Bank for Renavial?
24   A.  Exactly.
25   Q.  And did you receive these in your capacity as

---

Page 80

1    nominee for Renavial?
2    A.  This is correct.
3    Q.  And did you maintain them as you received them?
4    A.  I filed them, yes.
5    Q.  And in your experience with being the nominee
6    officer and director of Renavial, did you find these
7    confirmations from VP Bank to be accurate?
8    A.  They're accurate.  Not complete, of course, but
9    accurate.
10   Q.  And by "not complete," you mean that not every
11   single transaction is reflected in No. Exhibit 94,
12   correct?
13   A.  Yes.
14   Q.  But for the transactions that have been
15   included in Exhibit 94, do those appear to be accurate?
16   A.  Yes.
17   Q.  I'd like to go to Exhibit No. 95, which is
18   Tab 18, and this has Tabs A through M, and they appear
19   to be fax instructions from René Berlinger to VP Bank
20   for Renavial.
21   A.  That's correct.
22   Q.  And are you familiar with these documents?
23   A.  Yes.
24   Q.  And what are they?
25   A.  Based on an instruction, at least by phone or

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 81

1  e-mail, I completed these fax forms, sent them to the
2  bank, and filed a copy.
3      Q.  And do these appear to be accurate copies of
4  certain instructions that you gave to VP Bank related to
5  Renaival?
6      A.  They do, yes.
7      Q.  And you mentioned that you would receive
8  instructions.
9          For Renaival, did you sometimes receive
10  instructions to complete transactions from Daniel
11  Lacher?
12      A.  Correct.
13      Q.  Did you sometimes receive instructions from
14  Wayne Weaver?
15      A.  Correct.
16      Q.  Did you sometimes receive instructions from the
17  beneficial owner of Renaival?
18      A.  This is correct.
19      Q.  I'd like to look at Tab 19, which is marked as
20  Exhibit 96, and it has Tabs A through P, as in "Peter,"
21  and they appear to be a set of asset statements for
22  Renaival's account.
23      A.  It is correct.
24      Q.  And are you familiar with these documents?
25      A.  I am.

Page 82

1      Q.  And how are you familiar with them?
2      A.  I get them quarterly, showing the asset
3  statements -- showing the assets in the depository:
4  Valuation, total number of shares, purchase price,
5  things like that.
6      Q.  And you received these from VP Bank in your
7  capacity as the nominee for Renaival; is that correct?
8      A.  Yes, it's correct.
9      Q.  And did you maintain them in your capacity as
10  nominee?
11      A.  Yes.
12      Q.  And noting that some of these appear to what
13  have been produced by other parties, do they still
14  appear to be accurate copies of the asset statements
15  that you received?
16      A.  Yes.
17      Q.  Are you familiar with an entity called Calgon
18  Invest SA?
19      A.  I am.
20      Q.  And what is Calgon?
21      A.  Calgon is a Marshall Islands company.
22      Q.  And did you help form Calgon?
23      A.  I did.
24      Q.  And were you instructed to form Calgon?
25      A.  Yes.

Page 83

1      Q.  Who was the beneficial owner of Calgon?
2      A.  This is Wayne Weaver.
3      Q.  And were you instructed by Wayne Weaver to form
4  Calgon?
5      A.  Yes.
6      Q.  And did you open up an account for Calgon?
7      A.  Yes.
8      Q.  And where did you open up an account for
9  Calgon?
10      A.  That was Bateman.
11      Q.  Bateman?
12      A.  Bateman is a bank, Bateman Bank.  I don't know
13  -- BNC Calculi [phonetic], potentially.
14      Q.  And why did you choose Bateman Bank instead of
15  VP Bank for?
16      A.  That was an existing relationship that Wayne
17  already had.  He knew that bank.
18      Q.  And did Wayne Weaver instruct you to open up an
19  account at Bateman?
20      A.  I completed the docs, but he asked me to do so;
21  that's right.
22      Q.  And did you reserve as the nominee for Calgon?
23      A.  Sorry.  I just was confused.  I read "Panama,"
24  in the document, but it's a Marshall Islands company.
25  Sorry.

Page 84

1      Q.  Did you act as the nominee officer and director
2  for Calgon?
3      A.  I did.
4      Q.  And when I say "you," I mean Admita Nominees,
5  correct?
6      A.  Yes, yes, yes.
7      Q.  And as the nominee for Calgon, did you receive
8  instructions from time to time to execute transactions
9  for Calgon?
10      A.  Very, very, very infrequently, question.
11      Q.  And who did you receive instructions from?
12      A.  From Wayne.
13      Q.  Were there any other officers of Calgon?
14      A.  No.
15      Q.  Were there any other directors of Calgon?
16      A.  No.
17      Q.  Would you receive account statements from
18  Bateman, periodically?
19      A.  I have two or three pages only from this
20  company.  I have not received bank statements the way we
21  were looking at for the companies before.  I just got a
22  few pages, so they didn't send it regularly or
23  periodically.  They didn't send it to me.
24      Q.  So unlike VP Bank, you were not --
25      A.  Provided with that, no.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 85

1  Q.  You were provided with these?
2  A.  No.
3  Q.  Not regularly, at least?
4  A.  At least, yes.
5  Q.  Are you generally familiar with the
6  transactions for Calgon?
7  A.  Based on the missing documents, no.
8  Q.  How about based on the instructions you were
9  given, are you generally familiar with --
10  A.  With that, yes.
11  Q.  -- that?
12     Based on the instructions that you were given,
13  are you aware of any activity for Calgon other than the
14  trading of stocks and the use of resulting proceeds?
15  A.  Buying Coca Cola was an instruction.
16  Q.  A stock, correct?
17  A.  Yeah.
18  Q.  So are you familiar with any activities other
19  than the buying and selling of stock and the use of
20  proceeds?
21  A.  No, except maybe liquidation and things like
22  that, but not transferring money.
23  Q.  And by "liquidation," you mean liquidation of
24  the account?
25  A.  Yeah.

Page 86

1  Q.  I'd like to look at Tab 20, which is premarked
2  as Exhibit 97, what appears to be a series of documents
3  related to account opening and incorporation of Calgon.
4     Now, looking at these, starting with the
5  account-opening documents, are you familiar with those?
6  A.  Yes.
7  Q.  And starting with Bates number CIMA56 through
8  CIMA64, are those documents related to the opening of an
9  account at Bateman for Calgon?
10  A.  Uh-huh.  Sixty-four, right?  Yeah.
11  Q.  And is that your signature on page CIMA56?
12  A.  It is.
13  Q.  And again, CIMA58?
14  A.  Uh-huh, yes.
15  Q.  CIMA59?
16  A.  Yes.
17  Q.  And CIMA60?
18  A.  Yes.
19  Q.  And did someone direct you to fill out this
20  information on behalf of Calgon?
21  A.  "Please open a bank account with Bateman," yes.
22  Q.  And who instructed you to do that?
23  A.  This was Wayne.
24  Q.  After those documents starting on page CIMA65
25  through CIMA67, there's a series of passports?

Page 87

1  A.  Yes.
2  Q.  Pages 65 and 67, are those copies of your
3  passport?
4  A.  This is correct.
5  Q.  And in the middle of page 66, there's a copy o
6  what appears to be Wayne Weaver's passport; is that
7  correct?
8  A.  That's correct.
9  Q.  Did Wayne Weaver provide you with a copy of his
10  passport?
11  A.  Yes.
12  Q.  And that was in connection with Calgon?
13  A.  Yes.
14  Q.  Looking at pages CIMA68 through 70, what are
15  those?
16  A.  I mean, 68 is proof of residence from me.  I
17  had to show to the bank -- I had to show to confirm my
18  home address with any insurance company, electricity
19  bill, phone bill.
20  Q.  And that's what this is, right?  It's a bill?
21  A.  Yeah.
22  Q.  Okay.
23  A.  And 69, to be honest, I don't know what it is.
24  Q.  Okay.  Well, looking at pages CIMA72 and on,
25  these appear to be a series of documents related to the

Page 88

1  incorporation of Calgon?
2  A.  Uh-huh.
3  Q.  Are those documents familiar to you?
4  A.  I don't remember, actually, but yes, that's
5  part of the --
6  Q.  I'm sorry.  The next page.
7  A.  Oh, this one?
8  Q.  Right.  So starting with the Articles of
9  Incorporation --
10  A.  Yeah.  Yeah, yeah, yeah.
11  Q.  -- to the end of Tab 20, are you familiar with
12  those documents?
13  A.  Yes, those are the normal company documents.
14  Q.  And these documents are related to the
15  incorporation of Calgon?
16  A.  Yes.
17  Q.  And you received them in your role as nominee
18  for Calgon?
19  A.  That's right.
20  Q.  And do they appear to be accurate copies of
21  what you received in connection with the incorporation
22  of Calgon?
23  A.  Yes.
24  Q.  Moving to Tab 21, which we have marked as
25  Exhibit 98, are you familiar with this document?

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 97

1    MR. LEIMAN: I'd like to look at a document that I
2  will label as Exhibit 102.
3    MS. DAYTON: Is it one you can read the Bates number
4  on?
5    MR. LEIMAN: Sure. It's BAR281.
6    MS. DAYTON: Thank you.
7        (Exhibit No. 102 was marked for
8        identification.)
9  BY MR. LEIMAN:
10   Q.  These appear to be e-mails between
11 Mr. Berlinger and Mr. Weaver.
12       Do you recognize Exhibit 102?
13   A.  Yes.
14   Q.  And what do these e-mails relate to?
15   A.  This is a letter to the transfer agent to get
16 the list of share certificate. Attached and enclosed
17 are certificates to be transferred to -- what is it --
18 Las Colinas. Yes.
19   Q.  And looking at the e-mail from Wayne to you, so
20 at the bottom of page 1, it says, "Attached is the form
21 of a cover letter from Las Colinas in connection with
22 additional certs it has in Jammin' Java. Can you please
23 put into a Las Colinas letterhead, and then amend as you
24 see fit, but then sign and courier to me."
25       What was Wayne Weaver asking you to do?

Page 98

1    A.  Just to complete the form and send it to him.
2    Q.  And the form is on page 3 of the document?
3    A.  Yeah. Yes.
4    Q.  And does this relate to the purchase of Jammin'
5  Java stock by Las Colinas from the people named on the
6  third page --
7    A.  Yes.
8    Q.  -- of Exhibit 102?
9    A.  Yes.
10   Q.  And did you follow Wayne's instructions?
11   A.  Yes, I did, through e-mail.
12   Q.  You put the letter on Los Colinas letterhead,
13 and then sent it to Wayne, correct?
14   A.  Yes.
15   Q.  And did you believe that Wayne Weaver had the
16 authority to give you instructions for the purchase of
17 shares in Las Colinas?
18   A.  Yes.
19   Q.  And was that based on your prior dealings with
20 Wayne Weaver?
21   A.  This was based on -- this is super-difficult to
22 explain. Due to the relationship they had and due to
23 the fiduciary service he offered, I just said, "It will
24 be discussed with the ultimate beneficial owner, or he
25 has kind of power to do so."

Page 99

1    So I didn't ask, "Do you have the power," and
2  in this case I didn't ask the beneficial -- this
3  beneficial owner, "Is that correct when I do that?"
4    Q.  You just got the instruction from Wayne and you
5  followed that, correct?
6    A.  And I accepted that as given.
7    Q.  Okay.
8    A.  Or confirmed by the owner.
9    MR. LEIMAN: I'd like to mark as Exhibit 103 a copy
10 of the document where the Bates Number is BER2332, and
11 it appears to be a share purchase agreement between
12 Tyrone Investments and Las Colinas Limited.
13       (Exhibit No. 103 was marked for
14       identification.)
15 BY MR. LEIMAN:
16   Q.  And do you recognize this document?
17   A.  Yes.
18   Q.  And what is it?
19   A.  It's a share purchase agreement between Tyrone
20 and Las Colinas. It's about 3.2 million shares of
21 Jammin' Java.
22   Q.  And do you know what Tyrone Investments is?
23   A.  I don't know this company.
24   Q.  And did you know at the time?
25   A.  I mean at the time. Meanwhile, I got some more

Page 100

1  details, but I didn't know the company then.
2    Q.  Other than reviewing the SEC's complaint in
3  this case, do you have knowledge as to what Tyrone
4  Investments is?
5    A.  No.
6    Q.  Okay. Looking on the third page of the
7  document, page 2334 of Exhibit 103, is that your
8  signature on behalf of Las Colinas?
9    A.  Yes.
10   Q.  And you signed that as the nominee, correct?
11   A.  That's right.
12   Q.  Who created this document?
13   A.  I don't know.
14   Q.  Who sent it to you?
15   A.  I cannot verify.
16   Q.  You can't remember who sent it to you?
17   A.  Yes.
18   Q.  In general, when you were signing share
19 purchase agreements, who would instruct you to execute
20 --
21   A.  Usually I got it from Wayne.
22   Q.  So generally, from Wayne, but for this specific
23 document, you can't recall; is that fair?
24   A.  Well, I don't -- I mean, yes, I have it, but I
25 don't know where -- who sent it.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 101

1  Q. Did you frequently receive share purchase
2  agreements from Wayne Weaver?
3  A. Yes.
4  Q. In those share purchase agreements, would you
5  decide how many shares to buy?
6  A. No.
7  Q. Who would?
8  A. It was part of the agreement.
9  Q. That you received from Wayne, correct?
10  A. That I received, yes.
11  Q. What about the price: Did you decide what the
12  price would be --
13  A. No.
14  Q. -- in the share purchase agreement?
15  A. No.
16  Q. Was that just part of the agreement that Wayne
17  sent you?
18  A. Yes.
19  MR. LEIMAN: I'd like to mark as Exhibit 104 a copy
20  of another share purchase agreement.
21  MS. DAYTON: Could you read the Bates number?
22  MR. LEIMAN: Yep. BER656.
23  MS. DAYTON: Thank you.
24  (Exhibit No. 104 was marked for
25  identification.)

Page 102

1  BY MR. LEIMAN:
2  Q. And are you familiar with this document?
3  A. Yes.
4  Q. And what is it?
5  A. It's again a share purchase agreement between
6  Donnolis and Westpark over 2.8 million Jammin' Java
7  shares.
8  Q. And did you sign this document?
9  A. I did.
10  Q. And who did you receive this document from?
11  A. Same here.
12  Q. Probably Wayne, but you're not sure?
13  A. Yes.
14  Q. And did you decide the number of shares that
15  would be part of this agreement?
16  A. No.
17  Q. Was it just part of the agreement as it was
18  sent to you?
19  A. Exactly.
20  Q. And what about the price: Did you select the
21  price to be paid for this stock?
22  A. No.
23  Q. And was it just part of the document that was
24  sent to you?
25  A. Yes.

Page 103

1  Q. So you received instructions to sign this, and
2  you followed those instructions, correct?
3  A. Correct.
4  Q. If this -- you mentioned that frequently these
5  documents, these share purchase agreements, would be
6  sent to you by Wayne.
7  Did you sometimes receive share purchase
8  agreements from other people?
9  A. Daniel, Daniel Lacher.
10  Q. So is it fair to say that you either received
11  this document from Wayne or from Daniel?
12  A. I mean, Daniel was in a similar situation as I
13  was: The number of shares and the price of the shares
14  was not in his ability or knowledge. So whenever I got
15  it from Daniel, it might have been from the beneficial
16  owner or from Wayne, being forwarded from Daniel.
17  Q. Did you ever receive share purchase agreements
18  directly from a beneficial owner?
19  A. I don't think so. Not as I recall. Whenever
20  they had something to be changed or done, they were more
21  addressed to go to Daniel. There was very few contact
22  with these beneficial owners.
23  Q. So we've talked about a few entities here:
24  We've talked about Westpark, we've talked about Las
25  Colinas, we've talked about Renaval.

Page 104

1  Did you have any knowledge at the time about
2  any legal requirements related to the percentage of
3  ownership of a public company that would trigger a
4  reporting obligation?
5  A. I know that this five-percent limit exists, and
6  I have no knowledge how many shares has been issued in
7  the name of Jammin', so there was no control for me, and
8  I didn't really look at, firstly, but just wasn't much
9  interested and just didn't look at. And secondly, I
10  couldn't even control it. I didn't know how many shares
11  they had.
12  Q. Did you know if Wayne Weaver had an
13  understanding regarding the five-percent limit?
14  A. He knows that, yes.
15  Q. And have you generally discussed that with
16  Weaver?
17  A. Not really.
18  Q. But based on your --
19  A. I know that he takes care about the fact -- he
20  knows that and he takes care of that.
21  Q. Is that --
22  A. But it was not a point to discuss because I
23  thought it was not my issue to find out how many shares
24  can be in the depository or not. I didn't see it as my
25  -- what is it called -- I forgot whatever you call it.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 121

1      (Exhibit No. 109 was marked for
2      identification.)
3  BY MR. LEIMAN:
4      Q.  Looking at the first two pages -- and these are
5  documents that you produced to the SEC -- does that
6  refresh your recollection --
7      A.  Yeah.
8      Q.  -- as to the stock certificates that came in
9  for Straight Path Capital?
10     A.  Yeah.
11     Q.  And what are these first two pages of
12  Exhibit 10 --
13     A.  Nine.
14     Q.  -- 9?
15     A.  It confirms 5.95 million shares of Jammin' Java
16  in the name of Straight Path Capital, and the second one
17  is a share certificate confirming 300,000 shares of
18  Jammin' Java in the name of Straight Capital -- Straight
19  Path Capital.
20     Q.  The following page in Exhibit 109, so page 633,
21  do you recognize that document?
22     A.  Well, that's an invoice yeah.
23     Q.  And what is it an invoice for?
24     A.  For services.
25     Q.  And for services relating to what?

Page 122

1      A.  Obtaining aged company.  Just services
2  regarding Straight Path.  Yeah, especially that.  The
3  rest is filing copies and holding forms.
4      Q.  When you provided services related to Straight
5  Path, who did you invoice?
6      A.  We -- as I said before, we had many companies
7  being ordered, just to be ready whenever we need
8  companies, and then whenever was time to get them
9  invoiced, we asked Wayne, "Where can we get money from
10  to pay these invoices?"
11     Q.  So you would send the invoices to Wayne?
12     A.  To Daniel and to Wayne.
13     Q.  And for Straight Path, who paid the invoices?
14     A.  This is not easy to find.  It could be any of
15  the companies.
16     Q.  You don't recall right now?
17     A.  Could be Calgon, could be -- yeah, I cannot
18  recall.
19     Q.  And by "any of the companies," do you mean any
20  of Calgon, Renavial, Las Colinas, Westpark?
21     A.  Yeah.
22     Q.  Could be one of them?
23     A.  Yes.
24     MR. LEIMAN:  Can we go off the record.
25     VIDEOTAPE OPERATOR:  We're off the record.  The time

Page 123

1  is 12:10 p.m.
2      (At 12:10 P.M., a lunch recess was taken
3      until 1:06 P.M. of the same day.)
4  (Nothing omitted nor deleted.  See next page.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 124

1      TUESDAY, FEBRUARY 7, 2017; P.M. SESSION
2
3      VIDEOTAPE OPERATOR:  We're back on the record.  The
4  time is 1:06.  This is the beginning of Tape 3 in the
5  deposition of René Berlinger.
6
7      EXAMINATION RESUMED
8  BY MR. LEIMAN:
9      Q.  Mr. Berlinger, when we left off we were talking
10  about stock certificates that came into Straight Path,
11  and they were Jammin' Java stock certificates.  Now I
12  want to talk about money that goes back into Jammin'
13  Java, and I would like to start with a company called
14  Chilli Capital.
15      Are you familiar with Chilli Capital?
16     A.  Yes.
17     Q.  And how are you familiar with Chilli Capital?
18     A.  It's a Marshall Islands company, comparable to
19  others we discussed.  Directorship:  Admita Nominees.
20  Beneficial owner:  We know Kevin.  Bank account with
21  VP Bank.  The same as the other companies, actually.
22     Q.  Did you talk with Kevin Miller about forming
23  Chilli Capital?
24     A.  Probably not.
25     Q.  Who did you talk to in forming Chilli Capital?

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 125

```
 1   A.  Mainly with the bank.  There are e-mails which
 2   look like it's instruction coming from the bank.
 3   Q.  Did you ever talk with Wayne Weaver about
 4   Chilli Capital?
 5   A.  Yes.
 6   Q.  I'd like you to just take a look at a couple of
 7   exhibits we skipped in our binder of group exhibits, and
 8   I want to start with the exhibit that's been premarked
 9   as 83, and take at look at Tab A.
10       And these documents at Tab A appear to be a
11   series of documents related to the opening of an account
12   at VP Bank.
13   A.  Yes.
14   Q.  And are you familiar with these documents?
15   A.  Yes.
16   Q.  And what are they?
17   A.  This is all about account opening.  Typical
18   forms with VP Bank, defining signature power.  Only the
19   forms plus the Form A, which I advise the owner.
20   Q.  And are these the forms that you submitted to
21   VP Bank in order to open up a bank account for Chilli
22   Capital?
23   A.  Yes.
24   Q.  And You did that in your capacity as nominee
25   for Chilli Capital?
```

Page 126

```
 1   A.  Exactly.
 2   Q.  What was the purpose behind Chilli Capital?
 3   A.  That was not clear at the moment.
 4   Q.  Looking at Tab B, it appears that there are
 5   some additional documents related to — it appears to be
 6   documents related to know-your-customer requirements?
 7   A.  Yes.
 8   Q.  Are you familiar with those documents at Tab B?
 9   A.  Yes.
10   Q.  What are they?
11   A.  These are KYC documents, passport copies, Form
12   A, and know-your-client documents from the bank, which
13   actually is a copy of the company he had, Las Colinas.
14   It's one to one, same beneficiary.
15   Q.  So they already had know-your-customer
16   documents from Las Colinas?
17   A.  Yes.
18   Q.  And provided them to you in connection with
19   opening Chilli Capital?
20   A.  They didn't have to provide it.  I had it as
21   well, yes.
22   Q.  Okay.  You had them as well?
23   A.  I had -- I'm advised to have them as well.
24   Q.  And you had them because you were the nominee
25   for Las Colinas as well, correct?
```

Page 127

```
 1   A.  Yeah.
 2   Q.  To your knowledge, did the bank discuss this
 3   with Kevin Miller?
 4       MR. ESBENSHADE:  Calls for speculation.
 5   A.  Potentially.
 6   Q.  By "potentially," do you know whether they
 7   talked to Kevin Miller, or are you speculating?
 8   A.  I'm speculating.  There are e-mails somewhere
 9   which -- I'm not sure of incorporation, but all others
10   are definitely coming from the bank, so I don't know
11   whether it's also including the incorporation.
12   Q.  Okay.  Looking at Tab C, there are what appear
13   to be documents related to the incorporation of Chilli
14   Capital; do you see those documents?
15   A.  Yes.
16   Q.  And do you recognize the documents?
17   A.  This is all about the incorporation.  It asks
18   additional lawyer-client information, which is actually
19   not needed for getting a company incorporated.
20   Q.  But these are documents you're familiar with?
21   A.  Absolutely.
22   Q.  And they are documents that you received in
23   connection with the incorporation of Chilli Capital?
24   A.  Yes.
25   Q.  And do these appear to be accurate copies of
```

Page 128

```
 1   the documents you received in connection with the
 2   incorporation of Chilli Capital?
 3   A.  Yes.
 4   Q.  I'd like to move to Tab 7, which has been
 5   marked as Exhibit 84, and these appear to be statements
 6   from VP Bank related to Chilli Capital.  It's tabbed A
 7   through L.
 8       Are you familiar with these documents?
 9   A.  Yes.
10   Q.  And what are they?
11   A.  These are bank statements.  No, actually these
12   are account statements over a period, a three-month
13   period.  Yes.
14   Q.  And who created these documents?
15   A.  That's an extract of the bank account coming
16   from VP Bank.
17   Q.  And did VP Bank provide these statements for
18   you that are at Tab 7 Exhibit 84?
19   A.  I didn't understand.
20   Q.  Did VP Bank provide these documents to you?
21   A.  Yes.
22   Q.  And you're familiar with them, correct?
23   A.  Yes.
24   Q.  And did you receive them in your capacity as
25   the nominee for Chilli Capital?
```

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 129

1    A.  Yes.
2    Q.  And do these appear to be true-and accurate
3    copies of the monthly statements or at least some of the
4    monthly statements that you received for Chilli Capital?
5    A.  Yes.
6    Q.  Looking at Tab 8, there are three of these
7    transaction-specific documents, and Tab 8 has been
8    marked as Exhibit 85, and it has Tabs A through C.
9         Do you recognize these documents?
10   A.  Yes.
11   Q.  And what are they?
12   A.  It's a transaction, credit advice and debit
13   advice from Chilli Capital.  The incoming statement
14   says, "From: Las Colinas," and the outgoing statement
15   says from a law firm.
16   Q.  And are you familiar with the transactions
17   described in Exhibit No. 85, Tabs A and B?  Are you
18   familiar with the document?
19   A.  Yes.
20   Q.  And are you familiar with the transaction?
21   A.  Yes.
22   Q.  And what was the transaction?
23   A.  The reason?
24   Q.  Well, first of all, just what was the
25   transaction:  What was actually happening?

Page 130

1    A.  From Las Colinas, 2.4 million has been
2    transferred to Chilli Capital.  That was no question
3    because it's the same beneficial owner.  There's no
4    contract.  It's from one pocket to the other.  The
5    outgoing statement, 2.3 million to Mr. Lorv -- Loev,
6    whatever, being sent out of Chilli Capital to his bank
7    account.
8    Q.  And who is Mr. David Loev?
9    A.  I didn't know him.  It must have been the law
10   firm.  I got some notes on this statement then.  That
11   was for financing Jammin' Java.
12   Q.  Are those your notes?
13   A.  These are my notes, yes (indicating).
14   Q.  And does that first note say, "Financing of
15   Jammin' Java Corporation"?
16   A.  Yes, but that's later on, the note is, because
17   we will maybe look at e-mails where you can see that
18   instruction and explanation came from the bank.
19   Q.  So you later found out that this was related --
20   A.  Yes.
21   Q.  -- to the financing of Jammin' Java?
22   A.  Yes.
23   Q.  All right.
24   A.  I didn't know this guy.
25   Q.  Okay.  Looking at Tab 9, which we've premarked

Page 131

1    as Exhibit No. 86, and we've got A and B, do you see
2    those documents?
3    A.  Yes.
4    Q.  And are you familiar with them?
5    A.  Yes.
6    Q.  What are they?
7    A.  These are the instructions for the 2.38 million
8    which we saw in the statement before.  That's the fax to
9    the bank.
10   Q.  And what day did you instruct the bank to send
11   2.38 million to David Loev?
12   A.  That was Daniel's secretary, as far as I
13   remember, who said, "Please send immediately, and then I
14   should be there before three o'clock or whatever."  That
15   was an e-mail instruction from the bank.
16   Q.  And what day did you send the fax instruction
17   to VP Bank related to the 2.38 million?
18   A.  What did it say?
19   Q.  So --
20   MR. PATTON:  The date.
21   Q.  Right.  On page A --
22   A.  Yes.
23   Q.  Right.
24        Your fax instruction to VP Bank?
25   A.  Yes.

Page 132

1    Q.  Is that right?
2    A.  That's right.
3    Q.  And this is a fax instruction to send money
4    David Loev, correct?
5    A.  Yes.
6    Q.  What day did you send that?
7    A.  What day?
8    Q.  Yeah, what day.
9    A.  Same day, 17th of May.
10   Q.  Okay.  And then if you look at B -- well, I'm
11   sorry.  Let's go back for a second.
12        If you look at 8-A, so Exhibit No. 85-A, that
13   was for the original transfer from Las Colinas to Chilli
14   Capital, correct?
15   A.  Yes.
16   Q.  And what day did that happen?
17   A.  Same day, 17th of May.
18   Q.  And your fax instruction, that came because you
19   were instructed by somebody else to execute the
20   transaction?
21   A.  From VP Bank.
22        MR. LEIMAN:  I'd like to mark as Exhibit 110 a copy
23   of a Debit Advice Memo that has an e-mail attached to
24   it, and the Bates number for it is BER2435.
25        (Exhibit No. 110 was marked for

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

**Page 141**

1    MS. DAYTON: Thank you.
2    (Exhibit No. 111 was marked for
3    identification.)
4  BY MR. LEIMAN:
5    Q.  And are you familiar with this e-mail?
6    A.  Not as I recall, but it's sent -- been sent to
7  me.
8    Q.  Okay.
9    A.  And I received it.
10    Q.  You recognize Wayne Weaver's address?
11    A.  Yes.
12    Q.  And this was sent to you, correct?
13    A.  Yes.
14    Q.  And did you maintain this e-mail after you
15  received it, kept a copy of it?
16    A.  This I don't remember.
17    Q.  And I can represent to you that, based on the
18  Bates number on the lower right, that you produced it to
19  us.
20    A.  Say again.  Sorry.
21    Q.  In the lower right-hand corner, the Bates
22  number indicates that you produced this to us.
23    Did you maintain e-mails for your clients?
24    A.  Yes, but not filed by client.
25    Q.  Uh-huh.

---

**Page 142**

1    A.  I've just got one folder, done.
2    Q.  You have a one-client folder?
3    A.  No.  E-mails, no.
4    Q.  Okay.
5    A.  It's just whenever I search for something, it's
6  a search over all the e-mails.
7    Q.  Okay.  You maintained electronic copies of your
8  e-mails?
9    A.  Yes, yes.
10    Q.  And in connection with this case, you searched
11  for e-mails, correct?
12    A.  Yes.
13    Q.  And is this one of the e-mails that you
14  produced to us?
15    A.  That is, yeah.
16    Q.  Okay.  Looking at the document, it says, "I am
17  trying to effect transfer into and then out off Sinecure
18  from one of my company's [sic] then to Blue Leaf Capital
19  (my main investment account).  If it proceeds then I
20  will provide you with full documentation.  Thx Wayne."
21    Do you recognize the name Sinecure?
22    A.  Yes, that was a company we had.
23    Q.  And what is Sinecure?
24    A.  I don't remember.
25    Q.  Was it a company you formed?

---

**Page 143**

1    A.  A Marshall Islands company, obviously having
2  already a bank account, but I don't remember who was
3  behind there.
4    Q.  Was it a company you formed for Wayne?
5    A.  Yes.
6    Q.  But Blue Leaf Capital, that's not a company
7  that you formed, correct?
8    A.  No, no.
9    Q.  But you recall transferring money into Blue
10  Leaf Capital; is that correct?
11    A.  Yes.
12    MR. LEIMAN: I'd like to mark as Exhibit 112 a copy
13  of an e-mail from wayne@highlandcapital to Renè
14  Berlinger, and the Bates number is BER921.
15    (Exhibit No. 112 was marked for
16    identification.)
17  BY MR. LEIMAN:
18    Q.  And do you recognize this exhibit?
19    A.  Yes.
20    Q.  And what is it?
21    A.  I have no idea what is about at the moment.
22    Q.  Okay.  But you recognize Wayne's e-mail
23  address, correct?
24    A.  Yes.
25    Q.  And you recognize your e-mail address,

---

**Page 144**

1  berlinger@volante-advisory.ch?
2    A.  Yes.
3    Q.  These are e-mails that you received, correct?
4    A.  Yes.
5    Q.  There's an e-mail to an Enzo Caputo from Wayne
6  that says, "PS Blue Leaf Capital is my 100% owned
7  holding company."
8    Did you talk to Wayne about that?
9    A.  No.
10    Q.  And do you know who Enzo Caputo is?
11    A.  Yes, he's the lawyer.
12    Q.  And does this relate to --
13    A.  With regard to this closing documents from
14  FINMA to the SEC.
15    Q.  So this is after the investigation from FINMA
16  gets exposed to you; is that correct?  That's a bad
17  question.  Let me re-ask your.
18    This is in relation to a FINMA investigation,
19  correct?
20    A.  Yes, that's what it is.
21    Q.  And you're familiar with the organization
22  FINMA?
23    A.  Yes.
24    Q.  And what is FINMA?
25    A.  FINMA is the Swiss SEC.

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 165

1    of Exhibit 117?
2        MR. HARRIS: Objection. Calls for speculation.
3        Q.  Just reading the documents, was that same
4    template then used in Exhibit 117?
5        MR. HARRIS: Still calls for speculation.
6        Q.  It's all right. You can answer.
7        A.  Yes.
8        Q.  Is that your answer: Yes?
9        A.  Yes, it looks the same.
10       Q.  Do you recall any other instances where Wayne
11   Weaver would provide template language to a beneficial
12   owner for making a request to you?
13       A.  That was not typical.
14       Q.  So Exhibit 118, that's not typical for you?
15       A.  That he completed e-mails and sent to the
16   beneficial owner and say, "Look, this is to be sent to
17   me"? No, that was not typical.
18       MR. LEIMAN: All right. I'd like to mark as
19   Exhibit 119 a copy of an e-mail that appears to be from
20   Kevin Miller to René Berlinger, and the Bates number is
21   BER67.
22       (Exhibit No. 119 was marked for
23       identification.)
24       MR. PATTON: I think he's getting a little tired.
25   It's hard to concentrate.

Page 166

1        MR. LEIMAN: Why don't we take a break then?
2        MR. PATTON: Let's take a break.
3        MR. LEIMAN: Okay. Can we go off the record.
4        VIDEOTAPE OPERATOR: We're off the record. The time
5    is 2:13.
6        (Recess.)
7        VIDEOTAPE OPERATOR: We're back on the record. The
8    time is 2:26.
9            EXAMINATION RESUMED
10   BY MR. LEIMAN:
11       Q.  Before we went to break, I handed out
12   Exhibit 119.
13           And do you recognize this e-mail?
14       A.  Yes.
15       Q.  And this was sent to you, correct?
16       A.  This was sent to me, yes.
17       Q.  And who was it sent from?
18       A.  From Kevin Miller.
19       Q.  And what does this e-mail relate to?
20       A.  It relates to an instruction, "Please convert
21   three and a half million U.S. into GBP. Then wire out
22   converted amount to the attached bank details from my
23   Las Colinas account and confirm."
24       Q.  That "Los C" --
25       A.  Las Colinas.

Page 167

1        Q.  That to you means Las Colinas?
2        A.  Yes.
3        Q.  Was it common in discussing Las Colinas with
4    various people --
5        A.  Using short forms, yes.
6        Q.  Okay. Using the short form "Los C," that was
7    --
8        A.  No, actually it was "Las C," but yes.
9        Q.  Okay. Earlier you mentioned an entity called
10   Rigi Capital, R-I-G-I; do you recall that?
11       A.  Yes.
12       Q.  And what is Rigi Capital?
13       A.  That's a broker.
14       Q.  And do you know where that broker is located?
15       A.  In Zurich or close. No, it could be Zurich,
16   but in Switzerland.
17       Q.  In Switzerland?
18       A.  Yes.
19       Q.  And did Rigi Capital serve as a broker for any
20   of the entities that you were the nominee for?
21       A.  Yes.
22       Q.  Which ones?
23       A.  Loads of, but the ones that we are discussing,
24   all of them.
25       Q.  So --

Page 168

1        A.  Las Colinas, Renavial --
2        Q.  And Westpark?
3        A.  Westpark.
4        Q.  But not Calgon, correct?
5        A.  Yes.
6        Q.  All right. Calgon used Bateman, correct?
7        A.  Yes, yes.
8        Q.  Do you recall an instance where Renavial
9    purchased approximately $2 million worth of gold?
10       A.  Yes.
11       Q.  And what do you recall about that transaction?
12       A.  Can you say again?
13       Q.  What do you recall about that transaction?
14       A.  I received an instruction to buy gold.
15       Q.  And who gave you the instruction?
16       A.  Difficult to answer. I don't have any written
17   document or at least cannot recall. Could be Weaver. I
18   remember that we discussed this kind of having a
19   differentiated -- rather than just having cash, buying
20   gold.
21       Q.  Do you recall having instructions with Wayne
22   Weaver about buying gold?
23       A.  If we have an e-mail, yes; otherwise, it's
24   little a bit speculating.
25       Q.  Okay. Just sitting here right now though, do

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 169

1 you recall having any discussions with Wayne Weaver
2 about gold?
3    A.  I had any [sic] discussions, yes.
4    Q.  Yes?
5       And what were those discussions?
6    A.  About buying gold.
7    Q.  And I think you mentioned to sort of diversify
8 assets.
9       For what reasons was Wayne Weaver discussing
10 buying gold with you?
11   A.  Diversifying.
12   Q.  Were there any other reasons?
13   A.  Getting, maybe, funds out of the banking
14 system.
15   Q.  And why did Wayne Weaver want to get funds out
16 of the banking system?
17      MR. PATTON: Well, he can't say what Wayne Weaver
18 wanted to do.
19      Unless you know.
20   Q.  Well, in discussing this with Wayne Weaver, did
21 you have any discussions about why Wayne Weaver wanted
22 to get money out of the banking system?
23   A.  Yes, but I cannot recall in detail what we
24 really discussed and what we said and why and what.  I'm
25 pretty sure it was verbally.

Page 170

1    Q.  How about generally?  You said you couldn't
2 remember specifically.
3       Generally, what do you recall about discussing
4 with Wayne Weaver getting money out of the banking
5 system?
6    A.  Yes.
7    Q.  Only that you had those discussions?
8    A.  I don't understand.
9    Q.  Okay.
10      MR. PATTON: I think he told you everything he
11 recalls.
12      MR. LEIMAN: Well, I mean, that's what I'm trying to
13 get from him.
14      MR. PATTON: Have you told him everything you
15 recall?
16      THE WITNESS: Have I told him?
17      MR. PATTON: Have you told him everything you recall
18 about your discussions?
19 BY MR. LEIMAN:
20   Q.  So you talked to Wayne Weaver about getting
21 money out of the banking system, correct?  Did you
22 discuss that issue -- is there anything else that you
23 recall discussing about that issue with Wayne Weaver?
24   A.  I don't remember on that, no.
25   Q.  Okay.  That's all I'm asking for is your

Page 171

1 recollection.
2    MR. PATTON: Tim, I'm getting concerned that
3 Mr. Berlinger is getting pretty tired and it's difficult
4 to think through your questions, so --
5    MR. LEIMAN: Okay.  Well, I'm trying to stick to the
6 documents, and I don't have much left, so I think we can
7 get through it.
8    I'd like to mark as Exhibit 120 a copy of an
9 e-mail chain --
10      (Electronic device interruption.)
11   MR. LEIMAN: -- from Muhammad Al-Barwani to Daniel
12 Lacher.
13   MR. PATTON: It's an Amber alert.  Did you all get
14 one?
15   MS. DAYTON: Can I have the Bates number on that,
16 please?
17   MR. LEIMAN: Sure.  BER892.
18   MS. DAYTON: Thank you.
19      (Exhibit No. 120 was marked for
20      identification.)
21 BY MR. LEIMAN:
22   Q.  And do you recognize Exhibit 120?
23   A.  That's an e-mail to me, yes.
24   Q.  And who is the e-mail from?
25   A.  From Mohammed Al-Barwani.

Page 172

1    Q.  And you received this e-mail?
2    A.  Yes.
3    Q.  And was this in connection with you providing
4 nominee services to --
5    A.  Actually, it was sent to Daniel.
6    Q.  Yes.
7    A.  Cc'd to René.
8    Q.  And this relates to your nominee services for
9 Renavial, correct?
10   A.  Yes.
11   Q.  And earlier we discussed that you retained your
12 e-mails electronically; is that correct?
13   A.  Yes.
14   Q.  Is this one of the e-mails that you retained
15 electronically and then produced to the SEC?
16   A.  I would find it, yes.
17   Q.  Are you familiar with an entity called Tare
18 Finance, T-A-R-E?
19   A.  Yes.
20   Q.  And what is Tare Finance?
21   A.  I don't know what jurisdiction, but it's an --
22 I guess an offshore entity.
23   Q.  Did you set up Tare Finance?
24   A.  No.
25   Q.  Who did?

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 185

1  other than Jammin' Java in Westpark, Las Colinas, and
2  Renaival?
3  A. Yes.
4  Q. Are you familiar with a company called Soefl,
5  Inc., S-O-E-F-L?
6  A. Soefl, does not say much maybe has it been a
7  renamed company or --
8  Q. Possibly. I'll give you some names and you
9  tell me what they mean.
10 A. Yes.
11 Q. How about Sherpier, Inc.?
12 A. Yes.
13 Q. And what is Sherpier, Inc.?
14 A. One of these symbols. One of these companies
15 which can be traded.
16 Q. So that was a stock that was traded in these
17 accounts?
18 A. Yes.
19 Q. What about Lucky Boy Silver Corporation?
20 A. The same.
21 Q. Also a stock traded in these accounts?
22 A. Yes.
23 Q. Were you asked to execute transactions related
24 to Sherpier and Lucky Boy?
25 A. No.

Page 186

1  Q. Even for the purchase of stock?
2  A. For the purchase, yes.
3  Q. Okay. But not for the sales?
4  A. Not for the trade.
5  Q. Okay. What about Sinora Resources?
6  A. Same, yes.
7  Q. Also a stock traded in Westpark, Renaival, Las
8  Colinas?
9  A. In any of these maybe. Not all of them. I
10 don't know. Yes.
11 Q. How about North Umberland Resources?
12 A. As well.
13 Q. Also a company that's traded?
14 A. Yes.
15 Q. Kore Nutrition, are you familiar with that?
16 A. What is it?
17 Q. K-O-R-E?
18 A. Yes.
19 Q. Is that also a stock that was traded --
20 A. Yes.
21 Q. By Renaival, Las Colinas, and Westpark?
22 A. Yes.
23 Q. I'd like to talk briefly about the FINMA
24 investigation that we talked about earlier.
25     At some point did you become aware of a FINMA

Page 187

1  investigation related to the trading of Jammin' Java?
2  A. Yeah.
3     MR. LEIMAN: I'd like to mark as Exhibit 125 a copy
4  of an e-mail. The Bates number will be BER1014.
5     (Exhibit No. 125 was marked for
6     identification.)
7  BY MR. LEIMAN:
8  Q. And are you familiar with this e-mail chain?
9  A. Yes.
10 Q. And was this sent to you?
11 A. It was sent to me.
12 Q. And who sent it to you?
13 A. Wayne Weaver.
14 Q. I'd like to look at the e-mail that starts sort
15 of midway on page 1. It's from Wayne Weaver to a group
16 of individuals, subject "FINMA," and it starts, "Just to
17 state the obvious, it is Michael Sun (MKS) and my wish
18 that no information is revealed at all, but we know this
19 is very doubtful, so the next best things for us is that
20 our names are not revealed in any way."
21     Do you recall communicating with Wayne Weaver
22 about the preference that no names be revealed to FINMA
23 as part of the FINMA investigation?
24 A. Yes.
25 Q. And did he discuss that with you?

Page 188

1  A. Actually, we discussed that with him, whether
2  this can be an option to mark out the names because
3  there's a lot of other transactions involved rather than
4  just Jammin' Java. Because FINMA just would deliver
5  everything, and of course nobody wanted to release all
6  the documents to the SEC.
7  Q. And what about the names?
8  A. And the names actually is to make sure if the
9  SEC wrongly investigated in a pump and dump operation,
10 you cannot delete it or get back. You cannot roll it
11 back. So if once it's given to the SEC, it's done. So
12 the opinion is it's not a pump and dump operation, and
13 therefore the SEC is on the wrong way to investigate,
14 and therefore we said, "Look, you can mark it black.
15 Maybe FINMA accepts that.
16 Q. Okay. But that's not what happened, right?
17 A. That's not what happened.
18 Q. But that's what Wayne wanted, correct?
19 A. Yes.
20 Q. Looking at the names of entities, so starting
21 on 1015, going to 1016, before this e-mail, we had seen
22 a share purchase agreement involving Donnolis?
23 A. Yes.
24 Q. Before this e-mail, did you have any indication
25 that Donnolis was in any way affiliated with Wayne

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

Page 189

1  Weaver?
2  A.  No.
3  Q.  How about Arsis:  Prior to this e-mail, did you
4  have --
5  A.  Same.
6  Q.  -- any indication that Arsis was affiliated
7  with Wayne Weaver?
8  A.  No.
9  Q.  How about Manitou:  Had you even heard of
10  Manitou prior to this e-mail?
11  A.  No.
12  Q.  Did you have any information prior to this
13  e-mail that Manitou was in any way affiliated with Wayne
14  Weaver?
15  A.  No.
16  MR. LEIMAN: I'd like to mark as 180 -- excuse me
17  126 -- feels like 186 -- 126 a copy of a December 27,
18  2012, e-mail from Wayne Weaver to a group of
19  individuals, including René Berlinger, Bates labeled
20  BER63.
21  (Exhibit No. 126 was marked for
22  identification.)
23  BY MR. LEIMAN:
24  Q.  And do you recognize this e-mail?
25  A.  Yes.

---

Page 190

1  Q.  And was this sent to you among others?
2  A.  Yes.
3  Q.  And who sent it to you?
4  A.  Wayne Weaver.
5  Q.  And was this an e-mail that you retained as
6  part of your nominee services?
7  A.  Yes.
8  Q.  And then produced to the SEC?
9  A.  Yes.
10  Q.  And it says in several places, "We have to
11  ensure that these payments are not revealed, as then the
12  SEC would have the names of the UBOs."
13  That's the fourth bullet point under the
14  section called "My Thoughts on Cash Statements."
15  Do you see that?
16  A.  My concern is this one (indicating)?
17  Q.  Yes.
18  Did you ever have any conversations with Wayne
19  Weaver about not revealing the name of the underlying
20  beneficial owners as part of the FINMA investigation?
21  A.  Yes.
22  Q.  And that tern UBOs, is that familiar to you?
23  A.  Yes.
24  Q.  And what is that?
25  A.  That's ultimate beneficial owner.

---

Page 191

1  MR. LEIMAN: I'd like to mark as Exhibit 127 a copy
2  of an e-mail from Wayne Weaver to René Berlinger and the
3  Bates number is BER18.
4  (Exhibit No. 127 was marked for
5  identification.)
6  BY MR. LEIMAN:
7  Q.  And do you recognize this e-mail?
8  A.  Yes.
9  Q.  And this is to you, correct?
10  A.  It is.  This is to me, yes.
11  Q.  Who is it from?
12  A.  From Wayne Weaver.
13  Q.  And what do these e-mails relate to?
14  A.  It relates to getting an LGT account opened,
15  and LGT is asking for a tax compliance confirmation.
16  Q.  And -- I'm sorry?
17  A.  LGT doesn't accept just a confirmation in
18  writing.  They needed something from official places,
19  and you cannot get this confirmation from any
20  jurisdiction.  Some just don't have that and LGT was
21  expecting that otherwise they won't open an account.
22  Q.  Did someone ask you to open an account at LGT?
23  A.  It was the intention from Wayne.
24  Q.  And why did he want to open an account at LGT,
25  if you know?

---

Page 192

1  A.  I'm not sure whether it was because bank didn't
2  want us anymore, so we were looking for other accounts,
3  other banks.
4  Q.  And looking at the second e-mail on page 1, so
5  the e-mail from you to Wayne Weaver on March 12, 2014,
6  looking at the second paragraph, "Maybe we can force
7  Bateman to move the balance to Helvetic."
8  What balance were you talking about there?
9  A.  Roughly 5 million.
10  Q.  And where did that 5 million come from?
11  A.  That was from Bateman.
12  Q.  And which entity was that related to?
13  A.  That's Calgon.
14  Q.  So this was a $5 million balance in the account
15  of Calgon?
16  A.  Right.
17  Q.  Looking at the e-mail from Wayne Weaver to you,
18  the first e-mail, it says, "Hi René.  I don't, but I
19  used to live in Jersey so can't get this letter from
20  Jersey and don't want to give my Nevis address as I'm
21  sure our friends will track the money and ask lots of
22  questions, and the bank in Lichtenstein will roll and
23  provide them with all the details."
24  Did you ever have any discussions with Wayne
25  Weaver about him not wanting to give his Nevis address

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

---

**Page 209**

1  written directive from Kevin Miller for either the
2  purchase or sale of any Jammin' Java shares?
3      A.  Purchase and sale, no.
4      Q.  If you could look at Exhibit 110, which is
5  BER2435 through 2438, this is a set of documents that
6  relate to the transfer of $2.38 million from Las Colinas
7  to Chilli Capital and then from Chilli Capital to David
8  Loev at the Loev Firm.
9          Do you recall that, generally?
10     A.  This was an instruction from the bank, and I
11  have no -- I cannot recall that he sent or didn't find
12  anything which says he instructed this.
13     Q.  And he being Mr. Miller?
14     A.  Yes.
15     Q.  And I just want to clarify one prior part of
16  your testimony. If you could look at the second page of
17  Exhibit 110, in the middle of the page there are two
18  lines that say, "Hi Daniel. Here are the wire details
19  for the 2.38 million PP in Jammin. Please send out
20  today, call UBO if necessary."
21          You were asked about that earlier, and I just
22  want to make sure I heard your testimony. The "call UBO
23  to confirm if necessary," that indicates to you that you
24  hadn't spoken to the beneficial owner of Las Colinas
25  prior to this being sent, correct?

---

**Page 210**

1      A.  Yes.
2      Q.  If you could look at Exhibit 114?
3      A.  May I add something to this question?
4      Q.  The prior question? Yes.
5      A.  This question goes Daniel /KA*L, not to me.
6  Build Daniel did, that's another option.
7      MR. PATTON: That's all he wants to know is you.
8      Q.  Thank you for that sir. When you say you
9  didn't, you mean you didn't have any conversations with
10  Miller regarding --
11     A.  Transfer.
12     Q.  The transfer of the 2.38 million; is that
13  correct?
14     A.  That's correct.
15     Q.  Exhibit 114 --
16     A.  114.
17     Q.  This relates to a million-dollar transfer from
18  Las Colinas to Blue Leaf Capital Limites. I'm sorry.
19  The Bates number is BER2389.
20     MR. LEIMAN: I think that's 113.
21     MR. ESBENSHADE: Is it 113. Apologies.
22     MR. PATTON: What is the document?
23     MR. ESBENSHADE: It's a one-page fax transmission.
24  Thank you. I got my numbering off. 113, and I'm
25  actually going to mark as Exhibit 132. The first page,

---

**Page 211**

1  this is BER2389 to 2390, so the first page of 132 is
2  actually the same as Exhibit 113.
3      (Exhibit No. 132 was marked for
4      identification.)
5  BY MR. ESBENSHADE:
6      Q.  And if you would look at the second page, the
7  top e-mail on the second page is an e-mail from Daniel
8  Lacher to you, and it says, "Hi René," and is in German.
9          Do you recognize that as an e-mail you
10  received?
11     A.  Yes.
12     Q.  And that e-mail forwarded an e-mail below that
13  appears to be from Mr. Weaver to Mr. Lacher that then
14  relates to the million-dollar transfer; is that correct?
15     A.  That's correct. But the German part says,
16  "This is call for a million transfer and the instruction
17  has been confirmed by the UBO, by the telephone." That
18  relates then to Kevin.
19     Q.  And that's an e-mail --
20     A.  I know this is German, but it's for an
21  investment in a new deal.
22     Q.  It's a different deal, correct?
23     A.  Yes. And the instruction from Wayne, "Daniel
24  says was confirmed by the UBO of Las Colinas."
25     Q.  That's not a confirmation that you had with

---

**Page 212**

1  Mr. Miller, correct? You didn't speak to Mr. Miller
2  regarding this?
3      A.  No, Daniel just confirms he just verified.
4      Q.  And he didn't say Mr. Miller's name?
5      A.  No, he didn't. This is normal. We don't
6  communicate with name, usually.
7      Q.  And if you could look at Exhibit 131.
8          If you look at the third page Exhibit 131 near
9  the top -- or actually the first entry, "RBE, is --
10     A.  Is me.
11     Q.  -- is you?
12     A.  Yeah.
13     Q.  And it says, "Meeting BO. Discuss new
14  companies, discuss Jammin VIP.," correct?
15     A.  Can't find that. Where is that?
16     Q.  The third page of Exhibit 131.
17     A.  Oh, the third page.
18     MR. ESBENSHADE: Okay. I'm going to mark
19  Exhibit 133.
20     (Exhibit No. 133 was marked for
21     identification.)
22  BY MR. ESBENSHADE:
23     Q.  If you could just look at the date of that
24  meeting, the first entry.
25     A.  Yes, August 2011.

---

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 245

1   A. Yeah.
2   Q. And you're not an expert on U.S. securities
3   law; is that fair to say?
4   A. Same, yes.
5   Q. And at the time, did you have any knowledge of
6   the financing agreement between Straight Path and
7   Jammin' Java?
8   A. Try again. I didn't understand the question.
9   Q. At the time --
10  A. Yeah.
11  Q. -- so beginning of the FINMA investigation, at
12  the time when you thought that nothing wrong had
13  happened, did you have any knowledge about a financing
14  agreement between Straight Path and Jammin' Java?
15  A. No. I remember when we went for this payment,
16  2.3 million, have been told it's for an investment and
17  we will get a contract. That's what I have in mind, but
18  I never got the contract, and you saw the notice I made.
19  It's for later. That's when I got to know what it was.
20  That was an investment for Jammin' Java.
21  Q. But you had not seen the contract; is that
22  correct?
23  A. Yes, I don't remember that. Definitely.
24  MR. LEIMAN: That's all I have.
25  MR. ESBENSHADE: I have one follow-up question.

Page 246

1           EXAMINATION RESUMED
2   BY MR. ESBENSHADE:
3   Q. Mr. Harris asked you a few questions about your
4   meeting with the government, and focusing just on I
5   thinks you said around ten minutes of questioning from
6   the woman from the DOJ, Department of Justice, just that
7   part, not the time that Mr. Leiman or people from the
8   SEC.
9       Do you recall any discussion or mention of
10  Mr. Miller during the questioning from the woman from
11  the Department of Justice? If you don't -- either way.
12  I'm just asking if you recall.
13  A. It was late as well, so I don't remember the
14  questions. What I remember is we were more or less
15  talking in general how this works: How Swiss laws are,
16  what's the way to open up accounts. It was more about
17  these topics, but not, "Did this guy -- did" --maybe my
18  lawyer will remember, but I think it was not the topic.
19  MR. ESBENSHADE: That's fine. I appreciate it.
20  Thank you.
21  VIDEOTAPE OPERATOR: Anybody else?
22  MR. HARRIS: Nothing further.
23  MR. PATTON: I have no questions.
24  MR. LEIMAN: You can close out.
25  VIDEOTAPE OPERATOR: This is the end of today's

Page 247

1   deposition of René Berlinger. We used five tapes. The
2   time is 4:26, and we're off the record.
3       (At 4:26 P.M., the deposition proceedings
4       concluded.)
5
6
7       --------------------------
8           RENÉ BERLINGER
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 248

1   STATE OF NEW YORK      )
2                          ) ss.
3   COUNTY OF NEW YORK     )
4       I hereby certify that the witness in the
5   foregoing deposition, RENÉ BERLINGER, was by me duly
6   sworn to testify to the truth, the whole truth, and
7   nothing but the truth, in the within-entitled cause;
8   that said deposition was taken at the time and place
9   herein named; that the deposition is a true record of
10  the witness's testimony as reported by me, a shorthand
11  reporter and a disinterested person, and was thereafter
12  transcribed into typewriting by computer.
13  the outcome of the said action, nor connected with, nor
14  related to any of the parties in said action, nor to
15  their respective counsel.
16      IN WITNESS WHEREOF, I have hereunto set my hand
17  this 14th day of February, 2017.
18  Reading and Signing was:
19  ___ requested ___ waived _X_ not requested
20
21
22
23
24      JONAH SEARS
25      STATE OF NEW YORK