**EXHIBIT 12**

## Page 1

```
 1      UNITED STATES DISTRICT COURT
 2       CENTRAL DISTRICT OF CALIFORNIA
 3            WESTERN DIVISION
 4
 5   SECURITIES AND EXCHANGE      )
     COMMISSION,                  )
 6                                )
            Plaintiff,            )
 7                                ) Case No.:
        vs.                       ) 2:15-cv-08921
 8                                )
     JAMMIN' JAVA CORP., dba MARLEY )
 9   COFFEE, SHANE G. WHITTLE,    )
     WAYNE S. P. WEAVER, MICHAEL K. )
10   SUN, RENE BERLINGER, STEPHEN B. )
     WHEATLEY, KEVIN P. MILLER,   )
11   MOHAMMED A. AL-BARWANI,      )
     ALEXANDER J. HUNTER, and     )
12   THOMAS E. HUNTER,            )
                                  )
13          Defendants.           )
     _____)
14
15
       VIDEOTAPED DEPOSITION OF STEPHEN WHEATLEY
16
            Tuesday, January 24, 2017
17
                  9:30 a.m.
18
             Marriott County Hall Hotel
19            Westminster Bridge Road
                     London
20                   SE1 7PB
                 United Kingdom
21
22
23   Reported by:
     MISS LEAH M. WILLERSDORF -
24   (ACR, MBIVR, QRR*, International
     Participating Member NCRA)
25   JOB No. 170124LWI
```

## Page 2

```
 1              APPEARANCES
 2   On behalf of Plaintiff:
 3     SECURITIES AND EXCHANGE COMMISSION
 4     175 W. Jackson Blvd
       Suite 900
 5     Chicago, IL 60604
       U.S.A.
 6
       Telephone: (312) 353 1821
 7     Facsimile: (312) 353 7398
 8   BY: MR. PETER SENECHALLE, Esq.
       MR. TIMOTHY S. LEIMAN, Esq.
 9     senechallep@sec.gov
       leimant@sec.gov
10
11   On behalf of Defendant WAYNE WEAVER:
12     SCHEPER, KIM & HARRIS, LLP
13     601 West 5th Street
       12th Floor
14     Los Angeles, CA 90071
       U.S.A.
15
       Telephone: (213) 613 4690
16     Facsimile: (213) 613 4656
17   BY: MR. MARC S. HARRIS, Esq.
       mharris@scheperkim.com
18
19   On behalf of Defendant and Witness STEPHEN WHEATLEY:
20
       12 Marlboro Road
21     West Milford, NJ 07421
       U.S.A.
22
       Telephone: (201) 220 8734
23     Facsimile: (201) 464 7943
24   BY: MR. ROGER L. FIDLER, Esq.
       rfidler0099@aol.com
25
```

## Page 3

```
 1              APPEARANCES
 2
     On behalf of Defendants MICHAEL SUN and
 3   MOHAMMED AL-BARWANI:
 4     VENABLE, LLP
 5     Rockefeller Center
       1270 Avenue of the Americas
 6     New York, NY 10020
       U.S.A.
 7
       Telephone: (212) 808 5678
 8     Facsimile: (212) 307 5598
 9   BY: MR. PATRICK J. BOYLE, Esq.
       MS. JESSIE F. BEEBER, Esq.
10     pboyle@venable.com
       jbeeber@venable.com
11
12   On behalf of Defendant KEVIN MILLER:
13     CALDWELL, LESLIE & PROCTOR, PC
14     725 S. Figueroa Street
15     31st Floor
       Los Angeles, CA 90017
16     U.S.A.
17     Telephone: (213) 629 9040
18   BY: MR. ANDREW ESBENSHADE Esq.
       (via telephone)
19     esbenshade@caldwell-leslie.com
20
21   ALSO PRESENT
22     Mrs. Linda Fleet, videographer
23
24
25
```

## Page 4

```
 1                INDEX
 2   Witness:                                    Page
     STEPHEN WHEATLEY
 3
 4   Examination by Mr. Senechalle               10
 5   Examination by Mr. Harris                   132
 6   Examination by Mr. Boyle                    176
 7   Further examination by Mr. Harris           190
 8   Further examination by Mr. Senechalle       192
 9   Further examination by Mr. Boyle            193
10   Examination by Mr. Fidler                   194
```

**EXHIBITS INDEX**

| No. | Description | Page |
|---|---|---|
| Exhibit 1 | Memorandum of Association and Articles of Association of Petersham Enterprises Limited, incorporated on September 25, 2009 (Bates 0001 - 0023, and 0602) | 24 |
| Exhibit 2 | Email from Wayne Weaver to Stephen Wheatley, dated April 23, 2010, with attachment (Bates 0424, 0448-0452) | 27 |
| Exhibit 3 | Various emails, with the cover page email being from Andrew Golding to Stephen Wheatley, dated September 21, 2010, with attachment (Bates 0033-0034, 0614-0615, 0035) | 36 |
| Exhibit 4 | Fee Sharing Agreement between Wayne Weaver and Petersham Enterprises Limited (Bates 0037 - 0045) | 45 |
| Exhibit 5 | Email string, with the most recent being from Wayne Weaver to Stephen Wheatley, dated December 29, 2010 (Bates 0065) | 50 |
| Exhibit 6 | Fax cover sheet, with a copy of a Share Purchase Agreement attached (Bates 0047 - 0050) | 55 |
| Exhibit 7 | Financials re Petersham Enterpises Ltd, as at December 31, 2010 (Bates CIMA-0000168 - 170) [Confidential pursuant to Securities and Exchange Act s.24(d)] | 63 |

**EXHIBITS INDEX**
(continued)

| No. | Description | Page |
|---|---|---|
| Exhibit 8 | Email string between Andrew Golding and Stephen Wheatley, dated December 22, 2010 (Bates 0059 - 0060) | 69 |
| Exhibit 9 | Bateman financials of Petersham Enterprises Ltd as at March 23, 2011 (Bates 0081, 0085, 0085) | 74 |
| Exhibit 10 | Email string between Andrew Golding and Stephen Wheatley, dated March 2/3, 2011 (Bates 0080) | 78 |
| Exhibit 11 | Email string, with the most recent being from Stephen Wheatley to Wayne Weaver, dated March 23, 2011, with a Bateman Financial Transaction Summary of Petersham Enterprises Ltd's B Account attached (Bates 0083 - 0086) | 79 |
| Exhibit 12 | Bateman financials of Petersham Enterprises Ltd as at July 31, 2011 (Bates CIMA-0000181 - 183) [Confidential pursuant to Securities and Exchange At s.24(d)] | 85 |
| Exhibit 13 | Letter from Stephen Wheatley to Wayne Weaver, dated April 2011 (Bates 0507) | 91 |

**EXHIBITS INDEX**
(continued)

| No. | Description | Page |
|---|---|---|
| Exhibit 14 | Loan Agreement between Petersham Enterprises Limited and Albion Group Limited, effective July 21, 2011 (Bates 0140 -141) | 99 |
| Exhibit 15 | Email string, with the most recent being from Stephen Wheatley to Stephen Wheatley, dated August 25, 2011 (Bates 0167) | 102 |
| Exhibit 16 | Email string, with the most recent being from Andrew Golding to Stephen Wheatley, dated August 3, 2011 (Bates 0144) | 103 |
| Exhibit 17 | Email from Stephen Wheatley to Andrew Golding, with attachment, dated September 15, 2011 (Bates 0190 - 0191) | 106 |
| Exhibit 18 | Handwritten notes of Mr. Stephen Wheatley (Bates 0156) | 110 |
| Exhibit 19 | Email string, with the most recent being from Stephen Wheatley to rfidler0099@aol.com (Bates 0667 - 0668) | 115 |
| Exhibit 20 | United States of America Securities and Exchange Commission "Cooperation Agreement" (No Bates numbers) | 130 |

**EXHIBITS INDEX**
(continued)

| No. | Description | Page |
|---|---|---|
| Exhibit 21 | Email from Stephen Wheatley to [redacted], dated October 7, 2010 (Bates 0038) | 148 |
| Exhibit 22 | Letter from the Law Offices of Roger L. Fidler to Paul Helms at the SEC, dated May 2, 2014 (No Bates numbers) | 158 |
| Exhibit 23 | Email string, with the most recent being from Stephen Wheatley to rfidler0099@gmail.com, dated Monday, September 29, 2014 (Bates 0397 on the bottom. WHEATLEY_0000000011_093 at the top) | 177 |
| Exhibit 24 | Email string, with the most recent being from Stephen Wheatley to dbcooperny@aol.com, dated Monday, September 29, 2014 (Bates 0255) | 182 |

**Page 25**

1 Limited?
2     A. Yes.
3     Q. Were you involved in incorporating this
4 entity?
5     A. No. This company was, I believe, formed
6 by Centurion and already formed by the time I got
7 involved with it.
8     Q. How did you come to be involved in
9 Petersham?
10    A. It was a company that either Michael Sun
11 or Wayne Weaver had already formed and it was a
12 company established to -- they had various companies
13 but this was formed to assist in the transaction that
14 we did to start with with Aegis Trust.
15    Q. When, approximately, did you become
16 beneficial owner of Petersham Enterprises?
17    A. I think -- I don't know the exact date but
18 between the end of '09 and 2010, I think. First
19 quarter. Maybe sooner.
20    Q. If I could please direct your attention to
21 the last page of Exhibit 1.
22        MR. HARRIS: Is this the one with the
23 out-of-sequence Bates number 602?
24        MR. SENECHALLE: Yes.
25 ///

**Page 26**

1 BY MR. SENECHALLE:
2     Q. What is this document that's
3 Bates-numbered 0602?
4     A. It's a board minute specifying when
5 I became director of the company.
6     Q. Does your signature appear on this
7 document?
8     A. Yes, it does.
9     Q. What is the date of the document?
10    A. It is dated 25 September.
11    Q. Did you sign the document on September 25,
12 2009?
13    A. I think I signed it -- I think I signed it
14 around that period but maybe not specifically on that
15 date. I think it was done for recognition of, you
16 know, to marry up with the formation date, so it was
17 around that time, but I can't recall exactly when.
18    Q. Did Petersham ever enter into an agreement
19 to acquire stock in Big Bear Mining Corp.?
20    A. There was talk of being involved in that
21 but I can't recollect actually signing an agreement
22 for it.
23    Q. Did you ever see an agreement involving
24 Petersham's acquisition of stock in Big Bear Mining
25 Corp.?

**Page 27**

1     A. I think there is an agreement.
2     Q. I'm handing you what's being marked as
3 Exhibit 2.
4        (Exhibit 2 marked for identification.)
5 BY MR. SENECHALLE:
6     Q. Do you recognize Exhibit 2, Mr. Wheatley?
7     A. Yes, I recognize this email.
8     Q. What is it?
9     A. It's an email from Wayne Weaver saying
10 please see attached agreement on Big Bear Mining, also
11 a deal "I am involved in heavily is [Black Hawk
12 Exploration]."
13    Q. When did you receive this email?
14    A. It says 23 April 2010.
15    Q. Do you recall receiving this email around
16 that time?
17    A. I would say that's correct, yes.
18    Q. Do you see in the Subject line, the email
19 says "SPA"?
20    A. Yes.
21    Q. What does "SPA" refer to?
22    A. It refers to a share purchase agreement.
23    Q. Was there an attachment to the email in
24 Exhibit 2?
25    A. I guess there must have been. I don't

**Page 28**

1 recall it, but if -- yes.
2     Q. What was the attachment?
3        MR. HARRIS: Objection; vague.
4        THE WITNESS: The share purchase
5 agreement.
6 BY MR. SENECHALLE:
7     Q. Who were the parties to the share purchase
8 agreement?
9     A. Petersham Enterprises Limited and another
10 company, Monalosa. Monalosa.
11    Q. Do you recall seeing this agreement in
12 April 2010?
13    A. I recall seeing -- I've seen several
14 agreements which are similar, so I would -- yes, if
15 this was attached to the email, then yes.
16    Q. Who is Monalosa?
17    A. I don't know. I've never dealt with
18 Monalosa.
19    Q. Did you ever communicate with anybody from
20 an entity named Monalosa?
21    A. No.
22    Q. If you look at the first page of the
23 email, do you see where it says:
24    "Please see attached the agreement as we
25 discussed"?

**Page 29**

1  A. Yes.
2  Q. Did you discuss the agreement with
3  Mr. Weaver?
4  A. I'm sure we did discuss it and I mean,
5  for me, I would have assumed that Monalosa was
6  Mr. Weaver.
7  Q. What is your basis for assuming that?
8  A. Because he sent it to me. That's it.
9  Q. At a very general level, what is the
10 subject matter of the agreement between Petersham and
11 Monalosa?
12 A. It's an agreement to acquire shares in
13 Big Bear Mining.
14 Q. How many shares?
15 A. 3.4 million shares.
16 Q. Under the agreement, how much was
17 Petersham agreeing to pay for those shares?
18 A. 2.38 million.
19 Q. Did you and Mr. Weaver discuss Big Bear
20 Mining Corp.?
21 A. We did, but I didn't participate in this
22 transaction.
23 Q. In your discussions with Mr. Weaver, what
24 did he say about his involvement in Big Bear?
25 A. He said that this was a company that

**Page 30**

1  he was involved with with his high-net-worth
2  individuals.
3  Q. Did he tell you what the nature of his
4  high-net-worth clients' involvement was in the
5  company?
6  A. Not specifically, other than that they
7  were investors in the company.
8  Q. What, if anything, did Mr. Weaver say to
9  you about why he wanted Petersham to acquire these
10 shares of stock?
11 A. I don't know the answer to that. I don't
12 recall.
13 Q. If I could please direct your attention to
14 the very last page of Exhibit 2 --
15 A. Yes.
16 Q. -- who signed the agreement for Monalosa?
17 A. I -- for Petersham, that looks like
18 Michael Sun's signature, and the Monalosa signature
19 I thought was Wayne Weaver.
20 Q. If you're the beneficial owner of
21 Petersham, why did Michael Sun sign the agreement?
22      MS. BEEBER: Objection.
23      THE WITNESS: I don't know the answer to
24 that.
25 ///

**Page 31**

1  BY MR. SENECHALLE:
2  Q. Were you involved in negotiating the terms
3  of this share purchase agreement?
4  A. No.
5  Q. Did Petersham ever acquire the shares
6  discussed in this share purchase agreement?
7  A. Not to my knowledge. Not with my
8  involvement.
9  Q. Why not?
10 A. It may be Petersham was -- as it was
11 already formed by Michael Sun, maybe it was something
12 that had already occurred prior to me getting
13 involved.
14 Q. Did Mr. Weaver, around the time of this
15 email, discuss an entity named Black Hawk Exploration
16 with you?
17 A. Yes, he mentioned it. Yes.
18 Q. What did he say about Black Hawk?
19 A. As referenced here, that he was involved,
20 heavily involved in it.
21 Q. Did he tell you specifically what his
22 involvement with Black Hawk was?
23 A. Just that he represented -- he always
24 represented it that he was acting on behalf of his
25 clients, so, you know, he was heavily involved in

**Page 32**

1  the deal on behalf of his customers.
2  Q. Did you know whether or not Black Hawk was
3  a publicly-traded entity?
4  A. I did, yes.
5  Q. Was it?
6  A. I think it was, yes, at the time.
7  Q. Do you know -- where were its shares
8  traded?
9  A. On the U.S. market. On the Bulletin
10 Board, I think.
11 Q. I'm just going to make you flip one more
12 time back to the email, the covering email.
13 A. Right.
14 Q. Do you see in the last line where
15 Mr. Weaver wrote:
16      "Spoke to Mike and he is forwarding the M&A to
17 you"?
18 A. Yes.
19 Q. Who is Mike?
20      MR. HARRIS: Objection.
21      MR. SENECHALLE: I'll rephrase.
22 BY MR. SENECHALLE:
23 Q. Did you have an understanding as to who
24 Mike was?
25 A. My understanding? That it would be

**Page 33**

Michael Sun.
Q. What did you understand "M&A" to refer to?
A. Memorandum and Articles. Memorandum of Association.
Q. And Memorandum and Association of an entity in particular?
A. I can't recall if it's specific to Black Hawk or to another company.
Q. Did you become beneficial owner of Petersham around this time?
A. Probably, yes.
Q. Is it possible that Mr. Weaver was referring --
A. Referring --
Q. -- to Petersham's Memorandum and Articles?
A. Yes. Yes.
Q. Do you see in the last line of Exhibit 2 where it also says:
"Look forward to getting the account info"?
A. Yes.
Q. What did you understand that line to mean?
A. I'm not sure, other than maybe opening a broker account.
Q. Did you open a brokerage account for Petersham?

**Page 34**

A. Yes, I did.
Q. When did you open a brokerage account for Petersham?
A. I opened it at a company called Cedrus Investments during 2010. I think it was 2010.
Q. What was Cedrus Investments?
A. It's a broker based in Cayman Islands.
Q. How did you select Cedrus as the broker for Petersham?
A. I was introduced to Cedrus by Wayne Weaver.
Q. Why did you choose a broker based in the Cayman Islands?
A. He said he had a good relationship with a broker there and had worked with him previously and, you know, introduced me.
Q. Did Petersham's brokerage account remain at Cedrus?
A. No, it didn't. It moved from Cedrus to Bateman, a company Bateman.
Q. Why -- excuse me. Why did it move to Bateman?
A. The individual moved from Cedrus to Bateman.
Q. Who was the individual?

**Page 35**

A. Andrew Golding.
Q. Who was Mr. Golding?
A. A stockbroker who -- yes, he was a stockbroker.
Q. Did you testify that Mr. Weaver introduced you to Mr. Golding?
A. Yes, he did.
Q. Did Mr. Weaver tell you why he wanted you to use Mr. Golding as your broker?
A. He mentioned that he had worked with him previously and he had a good relationship, he was a good broker, and that's why, you know, the introduction was made.
Q. At the time, in April 2010 or so, did you and Mr. Weaver have discussions about what you would use Petersham's brokerage account for?
A. It was discussed that Petersham could be used for various transactions, for companies that would potentially list on the American market.
Q. What types of transactions?
A. The businesses that he was involved with, looking to list those businesses.
Q. Would Petersham be taking stock in those businesses?
A. That was the idea, yes.

**Page 36**

Q. Do you recall when, approximately, Petersham moved its account to Bateman?
A. It was during 2010. I think second half of the year.
Q. Did you communicate directly with Mr. Golding?
A. Yes, I did. Yes.
Q. As a general matter, how did you communicate with Mr. Golding?
A. A combination of phone and email.
   (Exhibit 3 marked for identification.)
BY MR. SENECHALLE:
Q. I'm handing you what's been marked as Exhibit 3.
A. Thank you.
Q. Do you recognize Exhibit 3, Mr. Wheatley?
A. Yes.
Q. What is it?
A. It's an email from Andrew Golding, dated 21 September 2010, confirming the account has been established at Bateman, pending the original signed copies of the documentation.
Q. Did Mr. Golding inform you what Petersham's account number was?
A. Yes, he did. Yes.

**Page 53**

regarding those particular share certificates?
A. I don't recall.
MR. SENECHALLE: Shall we take a quick break? A five-minute break?
THE WITNESS: Sure.
THE VIDEOGRAPHER: Going off the record. The time is 10:39.
(Off the record.)
THE VIDEOGRAPHER: Back on the record. The time is 10:53.
BY MR. SENECHALLE:
Q. Mr. Wheatley, before we broke we were discussing Petersham Enterprises. Who were the officers of Petersham Enterprises?
A. I was the director and beneficial owner.
Q. Were there any other officers?
A. There was a company secretary.
Q. Who was the company secretary?
A. Michael Holt.
Q. Who is Michael Holt?
A. He is someone who works with me, or did work with me.
Q. Did Petersham have any employees?
A. No.
Q. Did it have any business operations?

**Page 54**

A. Other than myself, not really, no.
Q. Did Petersham have an office?
A. It -- well, my office.
Q. Did it have -- did Petersham have any operations besides trading stock?
A. No. I mean, it looked at one or two transactions but it only traded stock.
Q. Aside from the GERC shares that we discussed earlier, did Petersham acquire any other shares of Jammin' Java Corp. stock?
A. It did. It received shares in April 2011.
Q. Was April 2011 the first time Petersham received shares of Jammin' Java?
A. No. It received shares, I think, in December 2010.
Q. So is it fair to say Petersham received two tranches of Jammin' Java stock?
A. That's correct, yes.
Q. With regard to the first tranche of Jammin' Java stock --
A. Yes.
Q. -- did Petersham enter into a share purchase agreement governing that transaction?
A. Yes, I think it did.
Q. From whom did Petersham acquire the first

**Page 55**

tranche of Jammin' Java stock?
A. From Wayne Weaver. Or I believe Wayne Weaver.
Q. Okay. I'm handing you a document that's marked as Exhibit 6.
(Exhibit 6 marked for identification.)
BY MR. SENECHALLE:
Q. Do you recognize Exhibit 6, Mr. Wheatley?
A. Yes, I do.
Q. What is it?
A. It is a fax from Petersham to Wayne Weaver.
Q. Who sent this fax on Petersham's behalf?
A. I did.
Q. Where did you send the fax to?
A. I sent it to a hotel in Vancouver.
Q. Did you understand that Mr. Weaver was in Canada, in Vancouver, Canada, at the time?
A. Yes. He phoned me saying he's in Vancouver and he was going to send this agreement which should have been signed earlier and that, you know, could I sign it and send it to him, and he would sign it and send it back to me.
Q. After Mr. Weaver phoned you, did you receive a copy of a share purchase agreement?

**Page 56**

A. Yes. Well, I received this document, signed it and sent it over, and I believe he signed it and sent it back.
Q. Did Mr. Weaver send you this document by fax?
A. Yes, by fax.
Q. If you would please turn to the last page of the document --
A. Yes.
Q. -- Bates number 0050.
A. Yes.
Q. Is that your signature on the last page?
A. Yes, it is.
Q. Did you sign the document on behalf of Petersham Enterprises?
A. Yes.
Q. Who was the counterparty to this particular share purchase agreement?
A. I believe that was Wayne Weaver.
Q. Do you see where, on the last page, it lists an entity named Nemo Development SA?
A. Yes.
Q. What is Nemo Development SA?
A. I don't know where the company's registered but I believed it to be another corporate

## Page 57

1 entity that belonged to Wayne Weaver.
2 Q. What was the basis for your belief that
3 Nemo belonged to Wayne Weaver?
4 A. Because this, again, was the conversation
5 and these were the shares that should have been
6 credited to the account. I think the first batch
7 never arrived, and so I think by this stage -- what's
8 the date of this? November. Around that period the
9 company became Jammin' Java and so I think this is for
10 the Jammin' Java shares, the first batch of shares.
11 Q. When you received this fax, did you
12 recognize the signature that appears under the Nemo
13 Development line?
14 A. At that point, I'd never seen it before,
15 but I believed I was faxing it to Wayne to sign and
16 return to me.
17 Q. Did you and Mr. Weaver discuss what
18 the nature of his business was in Canada at that time?
19 A. Not on that call specifically. He, if
20 anything, just said he was meeting his group of
21 people, high-net-worth individuals, he was in Canada
22 seeing people in relation to the transaction.
23 Q. You said not on this call. Did you have
24 another discussion with Mr. Weaver about his trip to
25 Canada?

## Page 58

1 A. Difficult to -- I mean, we had a lot of
2 short calls, so it may have been that period, it may
3 have been soon after, it may even have been before but
4 I can't recollect exactly if it was at that time.
5 Q. During those one or any of those calls
6 with Mr. Weaver, did he tell you what transaction he
7 was pursuing in Canada?
8 A. I think around this time was -- he
9 mentioned the transaction Jammin' Java, mentioned the
10 Marley Coffee brand and discussed it broadly,
11 generally.
12 Q. When you say "transaction," can you be a
13 little more specific about what type of transaction
14 Mr. Weaver was talking about?
15 A. He was talking about using the vehicle,
16 the listed vehicle, to do an acquisition with Jammin'
17 Java, with the coffee company.
18 Q. Was the listed vehicle GERC?
19 A. Yes. I believe it was, yes.
20 Q. Did Mr. Weaver tell you what his
21 involvement was in this particular transaction?
22 A. Not specifically. I mean, Wayne Weaver
23 always said that he was representing high-net-worth
24 clients and he said that he had -- sort of now was
25 participating in deals and, you know, was part of

## Page 59

1 the transaction himself, and, because he had done
2 quite a few deals, that quite a lot of the individuals
3 trusted him to structure the transaction.
4 Q. Is it fair to say that Mr. Weaver
5 communicated to you that he was personally involved in
6 the transaction involving GERC and Jammin' Java?
7 A. Yes.
8     MR. HARRIS: Objection; vague.
9 BY MR. SENECHALLE:
10 Q. Turning back to this share purchase
11 agreement, at a general level what were the terms of
12 this share purchase agreement?
13 A. From my recollection, this was for a -- it
14 was for -- it's for 3.2 million shares. The purchase
15 and sale, the price was 50,000 dollars and that was
16 the transaction for the Aegis Trust.
17 Q. Did you have an understanding or an
18 awareness at the time, in November of 2010, what
19 shares of Jammin' Java were trading for?
20 A. No, not at that point. I don't think
21 I was watching it; so not specifically then, but
22 around that period, yes, there was.
23 Q. Did you have a sense at any time around
24 this period as to whether the 50,000 dollars that
25 Petersham would pay under this agreement for

## Page 60

1 3.2 million shares of Jammin' Java was more or less
2 than the --
3 A. Around that period --
4 Q. -- share price?
5 A. I mean, it's difficult to recollect
6 exactly during that period, but these shares were
7 worth more than the 50,000 dollars.
8 Q. Did you ever communicate with anybody at
9 Nemo Development in connection with this share
10 purchase agreement?
11 A. I only spoke with Wayne Weaver.
12 Q. Did Mr. Weaver tell you how he came into
13 possession or control of these particular shares of
14 Jammin' Java?
15 A. No, he didn't. He just -- I believed they
16 were his shares.
17 Q. What was the basis for your belief that
18 they were his shares?
19 A. Because the transaction that we were
20 doing, that was being substantiated and he inferred
21 that they were his shares. It never dawned on me that
22 they were anyone else's.
23 Q. Did you and Mr. Weaver discuss why he
24 wanted Petersham to acquire these particular shares?
25 A. Could you...

**Page 61**

1  Q. Did Mr. Weaver ever give you a reason why
2  he was transferring shares, or why he was arranging
3  the transfer of shares to Petersham?
4  A. Well, these shares were being transferred
5  because my recollection is the other shares didn't
6  arrive in the account, so these were being credited in
7  place of those other shares.
8  Q. When you refer to "the other shares,"
9  you're talking about the shares of GERC?
10  A. Yes.
11  Q. Was it your understanding, then, that
12  Mr. Weaver was arranging this transfer to compensate
13  you for the Aegis transaction?
14  A. Correct.
15  Q. Did you and Mr. Weaver discuss a plan to
16  dispose of the Jammin' Java stock?
17  A. No, not at that point.
18  Q. Did you plan to sell the stock?
19  A. I planned to sell some of the stock, yes.
20  Q. Did you and Mr. Weaver discuss the share
21  price of Jammin' Java?
22  A. No, we didn't discuss the share price of
23  Jammin' Java.
24  During this period, Mr. Weaver implied he was
25  to close the transaction and he wanted to control

**Page 62**

1  the sale of the shares. So there was a couple of
2  transactions, I think towards the end of that year, in
3  December, a sale of shares, which he phoned and asked
4  me to place an order with Bateman, and that was
5  executed.
6  And we had discussed the idea that he would
7  have a Power of Attorney on the account, or he would
8  introduce someone who would have Power of Attorney on
9  the account who was used to trading the markets.
10  Q. Did you agree to allow Mr. Weaver to
11  control the sale of these shares?
12  A. Mr. Weaver definitely had a relationship
13  with Andrew Golding and, I'm sure, spoke on this
14  account, but he appointed someone -- or recommended
15  someone called Jim Decker to be appointed, to have
16  Power of Attorney to trade the account.
17  MR. HARRIS: Objection; nonresponsive.
18  BY MR. SENECHALLE:
19  Q. When did Mr. Weaver appoint Jim Decker to
20  trade this account?
21  A. I think that was around January of 2011.
22  Q. So before January 2011, in November 2010
23  did you agree to allow Mr. Weaver to participate in
24  the sale of these shares?
25  A. He instructed me and I put the orders

**Page 63**

1  through to Bateman myself, via -- I think I confirmed
2  it by email as well.
3  Q. Just to backtrack a little bit, after this
4  share purchase agreement did Petersham receive shares
5  of Jammin' Java in its account at Bateman?
6  A. Yes. Yes, it did. I think it received
7  3.2 million shares.
8  Q. Did you receive statements periodically
9  from Bateman showing activity in its account?
10  A. Yes. Mr. Golding would email me a
11  statement.
12  Q. I'm handing you what's being marked as
13  Exhibit 7.
14  (Exhibit 7 marked for identification.)
15  BY MR. SENECHALLE:
16  Q. Do you recognize Exhibit 7, Mr. Wheatley?
17  A. Yes.
18  Q. What is it?
19  A. It's a statement from Bateman for -- on
20  Petersham's account.
21  Q. Is this a statement concerning the account
22  you opened in approximately September 2010 at Bateman?
23  A. Yes.
24  Q. Is the transfer of Jammin' Java shares
25  from the Nemo transaction reflected in Exhibit 7?

**Page 64**

1  A. Yes. Yes, it is.
2  Q. Where is that, if you can point it out to
3  us?
4  A. On page 3 of 3, CIMA-170 there's a
5  reference to the transfer of 3.2 million shares
6  received from Centrum Bank.
7  Q. Was it your understanding that Centrum
8  Bank was a -- that Nemo had an account at Centrum
9  Bank?
10  A. Yes. That's what I would have assumed and
11  I wouldn't have looked at it -- I wouldn't have looked
12  at that carefully at the time.
13  Q. Did you have any basis for knowing that
14  Nemo had an account at Centrum Bank?
15  A. No.
16  Q. When were the shares delivered and
17  credited to Petersham's account? What date?
18  A. I think 22 November.
19  Q. Did Petersham pay Nemo for these
20  3.2 million shares of Jammin' Java?
21  A. It didn't pay in cash, no. It paid the
22  Aegis transaction.
23  Q. Is it fair to say that your understanding
24  was the payment for these shares was your transfer of
25  your interests in Aegis to Mr. Weaver?

**Page 65**

1  A. Yes.
2  Q. Did Petersham ever pay any money to an
3  entity named Nemo?
4  A. No.
5  Q. Did Petersham receive any other shares of
6  stock around the same time in November 2010?
7  A. It received another block in a company
8  called Global Industries and a company called Lucky
9  Boy Silver.
10 Q. What is Global Industries?
11 A. I think it's just another listed company.
12 Q. Where did Petersham acquire the shares of
13 Global Industries?
14 A. Petersham didn't acquire; this was a
15 bundle of shares and they had no value at the time.
16 Q. Did someone or some entity transfer these
17 shares to Petersham?
18 A. Yes.
19 Q. Who?
20 A. Again, Wayne Weaver.
21 Q. So the shares of Global Industries came
22 from Wayne Weaver?
23 A. Well, I believe so, yes.
24 Q. What is Lucky Boy Silver?
25 A. It was a company, again, which, at the

**Page 66**

1  time, I didn't look at. It was a number of shares and
2  had no value.
3  Q. Was Lucky Boy another company in which
4  Mr. Weaver was involved?
5  A. Yes.
6  Q. Where were the shares of these two
7  entities traded?
8  A. They were traded on the Bulletin Board.
9  Q. Why do you believe that these two batches
10 of shares, Lucky Boy and Global Industries, came from
11 Wayne Weaver?
12 A. Because that was the conversation we had.
13 They were a block. These blocks of shares were
14 delivered by Wayne and, as you can see, at the time
15 they had no value.
16 Q. Did Mr. Weaver give you any detail about
17 what types of businesses Lucky Boy was involved in?
18 A. No.
19 Q. What about Global Industries Corp.?
20 A. No.
21 Q. Were there share purchase agreements
22 governing these two transfers of stock?
23 A. I don't recall but -- I don't recall right
24 now.
25 Q. Did you and Mr. Weaver discuss a plan to

**Page 67**

1  sell the shares of Global Industries and Lucky Boy?
2  A. Not at that point. These were companies
3  that were, you know, part of his portfolio and they
4  were, to my mind, inactive.
5  Q. Did you -- let me rephrase that.
6  Similar to your agreement regarding Jammin'
7  Java, did you and Mr. Weaver agree to share control of
8  the sale of these shares of stock?
9  A. Yes.
10 Q. Did you agree that Mr. Weaver could direct
11 trading in these particular companies?
12 A. Well, he had trading -- he had Power of
13 Attorney on that account. The account actually got
14 split.
15 Q. When did the account get split?
16 A. I think during -- I think first quarter
17 2011.
18 Q. Okay.
19 After Petersham received this first tranche of
20 Jammin' Java stock, the 3.2 million shares, when
21 did -- when was the first time you sold any shares?
22 A. It would have been around this period.
23 On this statement, on page 3 of 3, CIMA-170,
24 there's a sale of shares on 23 December for
25 15,000 shares in Jammin' Java at 43 cents.

**Page 68**

1  Q. Who placed the sell order?
2  A. I did.
3  Q. How did you decide to sell 15,000 shares
4  of Jammin' Java on December 23?
5  A. I was contacted by Wayne Weaver and asked
6  to put that instruction in the market.
7  Q. Who did you give the instruction to?
8  A. I gave it to Andrew Golding.
9  Q. How did you communicate the instruction to
10 Mr. Golding?
11 A. I think initially I phoned him and emailed
12 confirmation of it as well.
13 Q. Who decided the timing of this particular
14 sale?
15 A. Wayne Weaver.
16 Q. Who decided how many shares to sell at
17 the time?
18 A. Wayne Weaver.
19 Q. Who decided what price to ask in the
20 market?
21 A. Wayne Weaver.
22 Q. Did you and Mr. Weaver discuss how the
23 price, the asking price, for these shares was
24 determined?
25 A. No.

**Page 69**

1  Q. Is it fair to say that when you placed
2  the sell order for 15,000 shares of Jammin' Java stock
3  on December 22 that you were carrying out Mr. Weaver's
4  directions?
5  A. Yes.
6  Q. Did you testify that he gave you those
7  instructions by telephone?
8  A. Yes, he gave them by telephone. If
9  there's not an email -- he may have even sent an email
10  but definitely by telephone.
11  Q. When you sent the sell order to
12  Mr. Golding --
13  A. Yes.
14  Q. -- did you know about any transactions
15  involving Jammin' Java --
16  A. No.
17  Q. -- that were taking place at the time?
18  A. No.
19  Q. What date did you send the sell order to
20  Mr. Golding?
21  A. I guess it would have been the same day,
22  or around that period.
23  Q. I'm handing you what's being marked as
24  Exhibit 8.
25  (Exhibit 8 marked for identification.)

**Page 70**

1  THE WITNESS: Yes.
2  BY MR. SENECHALLE:
3  Q. Do you recognize Exhibit 8?
4  A. Yes.
5  Q. What is it?
6  A. It's an email from me to Andrew Golding on
7  22 December to sell 15,000 Jammin' Java shares at
8  40 cents.
9  Q. Is this the sell order that you've just
10  been testifying about?
11  A. Yes.
12  Q. Is it your recollection that you issued
13  the sell order on December 22, 2010?
14  A. Yes.
15  Q. When did Mr. Weaver communicate his
16  instructions to you?
17  A. I would assume the same day; not long
18  before that email.
19  Q. Did you learn, around this time or on
20  December 23, that Jammin' Java had entered into a
21  financing agreement?
22  A. Not at that time, no. I don't...
23  Q. Did you learn about a financing agreement
24  at some point in time?
25  A. Yes. In one of my conversations with

**Page 71**

1  Wayne Weaver, he told me the company was doing a
2  financing and I assumed he was doing that through his
3  network, high-net-worth clients, to invest in the
4  company.
5  Q. Did Mr. Weaver tell you that he was
6  involved in the financing agreement?
7  A. Yes. He implied that he was arranging the
8  financing and organizing it.
9  Q. Did Mr. Weaver tell you how much financing
10  was being provided to the company?
11  A. My recollection is he was looking to raise
12  somewhere between 2.5 to 3 million dollars.
13  Q. What price did Petersham receive for the
14  shares it sold in December, the Jammin' Java shares it
15  sold in December 2010?
16  A. I think it's 43 cents per share.
17  Q. When compared to the sale price in the
18  share purchase agreement, was Petersham earning a
19  profit on a per-share basis?
20  A. Yes.
21  Q. Did you and Mr. Weaver discuss liquidating
22  your position at this point in time, or selling
23  additional shares to take advantage of price?
24  A. I think we did discuss it, but Mr. Weaver
25  was keen to have -- not have me sell shares into

**Page 72**

1  the market and was keen to have someone else have
2  Power of Attorney to trade the account.
3  Q. Did Mr. Weaver indicate at this time
4  whether he planned to sell shares immediately or have
5  his associates sell shares?
6  A. I didn't get the impression he wanted to
7  sell the shares immediately and, you know, it's around
8  Christmas, so a lot of trading activity. Sort of
9  markets tend to quieten down, so not specifically
10  around that period.
11  Q. Did you and Mr. Weaver discuss
12  expectations regarding the price of the shares?
13  A. No.
14  Q. Around the time of this particular
15  sell order in December of 2010, did Mr. Weaver tell
16  you that others were selling shares of Jammin' Java
17  at the same time?
18  A. No, he didn't.
19  Q. You said that you opened a second account
20  for Petersham at Bateman, right?
21  A. Yes.
22  Q. When did you open that account
23  approximately?
24  A. I believe that was in first quarter 2011.
25  Q. Why did you decide to open a second

## Page 85

1 ownership of any more shares than he already had?
2     A. Yes, he did.
3     Q. Did Weaver tell you there was a particular
4 number or percentage of the company's shares that he
5 was allowed to own?
6     A. We did discuss that. The actual period of
7 when we discussed that, I don't actually, you know,
8 factually recall, but over this period, it's a long
9 time, and, you know, we definitely spoke about it
10 definitely towards the end and he focused on the
11 figure of 5 percent.
12     Q. Where were the shares in this second
13 tranche of Jammin' Java stock deposited?
14     A. In the Bateman account.
15     Q. Was that the A or the B Account?
16     A. The B Account, the same account where
17 the other Jammin' Java shares were traded, I believe.
18     Q. Was that share delivery reflected in an
19 account statement that you would have received?
20     A. Yes.
21     Q. I'm handing you a document that's been
22 marked as Exhibit 12.
23     (Exhibit 12 marked for identification.)
24     THE WITNESS: Thank you.
25 ///

## Page 86

1 BY MR. SENECHALLE:
2     Q. Do you recognize Exhibit 12, Mr. Wheatley?
3     A. Yes. This is another Bateman statement to
4 Petersham Enterprises' B Account, dated 31 July 2011.
5     Q. Would you have seen this statement or a
6 statement similar to this at around that time?
7     A. Yes.
8     Q. Does the statement in Exhibit 13 reflect
9 the delivery of the second tranche of Jammin' Java
10 shares?
11     A. Yes, it does, on 5 May. It's 3.321336
12 million shares credited to the account.
13     Q. Did Mr. Weaver tell you where he acquired
14 this tranche of Jammin' Java stock?
15     A. No, he didn't.
16     Q. Did he tell you he owned this tranche of
17 Jammin' Java stock?
18     A. I took it that he owned the shares.
19     Q. What was the basis of you taking it that
20 way?
21     A. Purely that he was arranging the transfer
22 to me, the transaction was being done with him and he
23 implied he couldn't hold any more, so I took them into
24 the Petersham account.
25     Q. Did you ever communicate with anyone named

## Page 87

1 Justin Sawatsky regarding transfer of these particular
2 shares?
3     A. No.
4     Q. Did you ever communicate with anyone named
5 Chad Horton regarding this transfer?
6     A. No.
7     Q. What about someone named Zerabi Kara?
8     A. No.
9     Q. Have you ever heard those names before?
10     A. No.
11     Q. Did you or Petersham ever make any payment
12 to any of those three individuals in connection with
13 this acquisition?
14     A. Never.
15     Q. Did Petersham pay anyone for this tranche
16 of shares?
17     A. No.
18     Q. Did you and Mr. Weaver discuss the sale or
19 how you planned to sell these shares?
20     A. We had a conversation about the shares,
21 the ownership, the profit, and it was, I recall, just
22 a fairly busy time. I was busy anyway but there was a
23 sense of urgency to deliver the shares, so we had a
24 discussion about agreement and had a share on the
25 upside and, you know, that, I think, is reflected in

## Page 88

1 a document.
2     So -- and, again, these shares were sold by
3 Jim Decker.
4     Q. What was the source of the sense of
5 urgency that you described?
6     A. Just, you know, the company appeared to be
7 doing well. You know, as he said, it was very liquid
8 at the moment and, you know, you never know how long
9 these situations are going to last and so, you know,
10 strike while the iron's hot.
11     Q. Who expressed an urgency to sell the
12 shares?
13     A. Wayne Weaver did.
14     Q. Did you have any involvement in the sale
15 of Jammin' Java stock from this second tranche?
16     A. No.
17     Q. With regard to the proceeds from any such
18 sales, what was your understanding about how those
19 proceeds would be distributed?
20     A. We had a few conversations over the phone.
21 There was an agreement to share the proceeds, share on
22 the upside. Wayne said we'll talk about it when we
23 meet face to face; so we formulated an agreement -- or
24 I thought we formulated an agreement but I would say
25 that was contentious.



**Page 125**

```
 1   held in bearer-share form, so it was basically
 2   nondisclosure.
 3        Q.  In your experience with these types of
 4   corporate structures, why did you choose Switzerland
 5   as a place to locate them?
 6           MR. BOYLE:  Objection.
 7           THE WITNESS:  Me personally?
 8   BY MR. SENECHALLE:
 9        Q.  Yes.
10        A.  Because I lived there. I operated a
11   business there.
12        Q.  Did you ever discuss with Mr. Weaver why
13   he was setting up or using corporate structures in
14   Switzerland?
15        A.  I didn't really -- no, I didn't discuss
16   with him per se. He's, you know, a person in the
17   offshore trust arena and I would think would have a
18   lot of relationships globally who conduct that type of
19   business.
20        Q.  Who was Mr. Berlinger serving as a
21   fiduciary for?
22           MR. HARRIS:  Objection.
23           THE WITNESS:  I don't know the answer to
24   that at the time. I don't know the answer at that
25   period.
```

**Page 126**

```
 1   BY MR. SENECHALLE:
 2        Q.  You testified earlier today that when you
 3   first met Michael Sun he had issues with the Jersey
 4   regulators, didn't you?
 5        A.  I did mention that, yes.
 6        Q.  How did you learn about -- well, let me
 7   ask a different question.
 8        What issues were you referring to?
 9        A.  Michael told me about them himself. In
10   conjunction with this, he'd lent money, I think, into
11   a transaction, which was client money which he
12   couldn't replace so I think it had an impact on his
13   licensing in Jersey.
14        Q.  So did the issue involve a regulatory
15   action against Mr. Sun?
16        A.  Yes, I believe so. Yes.
17        Q.  And he discussed this action with you?
18        A.  Yes, during that period, before there were
19   any, you know, penalties against him, that's when he
20   was seeking -- I introduced him to a law firm in the
21   U.K. to try and help recover the money.
22        Q.  When you refer to "that period," are you
23   talking about the 2008 to '09 --
24        A.  Yes.
25        Q.  -- time frame?
```

**Page 127**

```
 1        A.  Yes.
 2        Q.  You also discussed earlier -- or I asked
 3   you a question regarding Mr. Weaver's residence. Did
 4   you know where Mr. Weaver lived?
 5        A.  I believed he lived in Jersey.
 6        Q.  And did you understand him to live in
 7   Jersey in approximately the 2010/2011 time frame?
 8        A.  Yes.
 9        Q.  What was the basis for your understanding?
10        A.  That's where his business was largely
11   conducted. That's where he ran his company, Pantrust,
12   which I believe was regulated as a trustee based in
13   Jersey.
14        Q.  If I can refer you back to Exhibit 2
15   I believe it is, I have a couple of follow-up
16   questions.
17        A.  Yes.
18        Q.  If I can direct your attention to the last
19   page of that exhibit.
20        A.  Yes.
21        Q.  Did you testify that when you received
22   this share purchase agreement you believed that this
23   was Wayne Weaver's signature?
24        A.  Yes.
25        Q.  Have you ever been familiar with an
```

**Page 128**

```
 1   individual named Shane Whittle?
 2        A.  Not at this period, no.
 3        Q.  When Mr. Weaver was organizing the
 4   transfer of Jammin' Java shares to Petersham, did he
 5   tell you anything about an individual named Shane
 6   Whittle being involved?
 7        A.  Never mentioned his name to me, no.
 8        Q.  Did Mr. Weaver ever mention the name
 9   Kevin Miller?
10        A.  No.
11        Q.  Did you ever speak to anybody named Kevin
12   Miller in connection with Jammin' Java?
13        A.  No.
14        Q.  Did Mr. Weaver ever mention the name
15   Mohammed Al-Barwani?
16        A.  No.
17        Q.  Did Mr. Sun ever talk to you about
18   Mohammed Al-Barwani?
19        A.  No, I don't believe so.
20        Q.  Over the course of your involvement with
21   the Jammin' Java transactions, was Mr. Weaver your
22   only point of contact?
23           MR. HARRIS:  Objection.
24           THE WITNESS:  Yes.
25   ///
```

```
 1            ERRATA SHEET
              PAGE LINE
 2
              ____  ____ CHANGE: _____
 3            REASON: _____
 4            ____  ____ CHANGE: _____
              REASON: _____
 5
              ____  ____ CHANGE: _____
 6            REASON: _____
 7            ____  ____ CHANGE: _____
              REASON: _____
 8
              ____  ____ CHANGE: _____
 9            REASON: _____
10            ____  ____ CHANGE: _____
              REASON: _____
11
              ____  ____ CHANGE: _____
12            REASON: _____
13            ____  ____ CHANGE: _____
              REASON: _____
14
              ____  ____ CHANGE: _____
15            REASON: _____
16            ____  ____ CHANGE: _____
              REASON: _____
17
              ____  ____ CHANGE: _____
18            REASON: _____
19            ____  ____ CHANGE: _____
              REASON: _____
20
              ____  ____ CHANGE: _____
21            REASON: _____
22            ____  ____ CHANGE: _____
              REASON: _____
23
24            Signed _____ (Stephen Wheatley)
25            Dated  _____
```

197

```
 1              REPORTER CERTIFICATE
 2      I, LEAH WILLERSDORF, Accredited Court Reporter, Member
 3      of the British Institute of Verbatim Reporters and
 4      Qualified Realtime Reporter, International
 5      Participating Member NCRA (United States), do hereby
 6      certify that:  STEPHEN WHEATLEY appeared before me on
 7      Tuesday, January 24, 2017, was sworn by me, and was
 8      thereupon examined by counsel; that the foregoing is
 9      true and accurate to the best of my knowledge, skill
10      and ability; that the testimony of said witness was
11      taken and reduced to stenotype writing before me; that
12      the said transcript is a true and accurate record of
13      the testimony given by said witness; that I am neither
14      counsel for, related to, nor employed by any of the
15      parties to the action in which this deposition was
16      taken; and further, that I am not a relative or
17      employee of any attorney or counsel employed by the
18      parties thereto; nor financially or otherwise
19      interested in the outcome of the action.
20           IN WITNESS WHEREOF I have hereunto set my hand
21      this 30th day of January 2017.
22      _____
        LEAH M. WILLERSDORF
23      Accredited Court Reporter,
        Member of the British Institute
24      of Verbatim Reporters,
        Qualified Realtime Reporter,
25      International Participating Member NCRA.
```

198