TIMOTHY S. LEIMAN, Ill. Bar No. 6270153
Email: leimant@sec.gov
DANIEL J. HAYES Ill. Bar No. 6243089
Email: hayesdj@sec.gov
PETER SENECHALLE, Ill Bar No. 6300822
Email: senechallep@sec.gov

175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

LOCAL COUNSEL
Lynn M. Dean, Cal. Bar No. 205562
Email: deanl@sec.gov
United States Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

Attorneys for Plaintiff
United States Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>JAMMIN' JAVA CORP., dba MARLEY COFFEE, SHANE G. WHITTLE, WAYNE S. P. WEAVER, MICHAEL K. SUN, RENE BERLINGER, STEPHEN B. WHEATLEY, KEVIN P. MILLER, MOHAMMED A. AL-BARWANI, ALEXANDER J. HUNTER, and THOMAS E. HUNTER,<br><br>Defendants. | Case No. 2:15-CV-08921 SVW (MRWx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF MOTIONS IN LIMINE**<br><br>Pre-Trial Conference: June 26, 2017<br>Time: 3:00 pm<br>Hon. Stephen V. Wilson<br>Courtroom 10A |

In support of its Motions in Limine, Plaintiff U.S. Securities and Exchange Commission (the "SEC" or "Commission") states as follows:

### I. Motion in Limine #1 – Motion for (A) Preclusion Order, Barring Defendant Weaver From Presenting Evidence At Trial and (B) An Adverse Inference Instruction:

Wayne Weaver has refused to: (i) answer the allegations in the SEC's Amended Complaint against him; (ii) answer the SEC's interrogatories; (iii) produce any documents in response to the SEC's document requests; (iv) respond to the SEC's requests for admission; and (v) testify at a deposition. Instead, Weaver has invoked the Fifth Amendment privilege against self-incrimination at every stage of this case. For example, in lieu of appearing for his deposition and asserting the Fifth Amendment, Weaver submitted a declaration stating his intent to assert the Fifth Amendment in response to all questions posed to him at the deposition, including on at least twenty-five specific topics listed in his declaration. (SJ Ex. 92, Dkt. #175-47.) Weaver also asserted the Fifth Amendment in response to 134 requests for admission propounded by the SEC. (*See* SJ Ex. 9, Dkt. #174-10.)

But Weaver has not simply refused to share his knowledge and documents with the SEC, he has been trying to prevent the SEC from obtaining key information from other sources, including from the Swiss Financial Market Supervisory Authority ("FINMA"). Weaver's own e-mails, which the SEC obtained during discovery from Rene Berlinger, show that Weaver directed his agents to hide from FINMA (and ultimately the SEC) the fact that he was the beneficial owner of several entities that traded Jammin Java stock. In those e-mails, Weaver tells his representatives (1) that "the main goal" in responding to FINMA's requests for information is "the release of as little information as possible but definitely not the release of any information pertaining to Michael Sun or myself (i.e., Details of the ultimate beneficial owners);" and (2) "it is Michael Sun (MKS) and my wish that no information is revealed at all but we know this is very doubtful so the next best thing for us is that our names are

not revealed in any way." (Summ. J. Stmt. Of Undisp. Fact ("SOF") ¶¶ 80–81, Dkt. #173; SJ Ex. 14, Dkt. #174-15.)

Having elected to withhold discovery, assert the Fifth Amendment, and engage in affirmative efforts to block the SEC from obtaining relevant information from other sources, Weaver should be barred from presenting evidence at trial. *See Bassett v. City of Burbank*, No. 2:14-cv-01348, 2014 WL 12573395, at *1–2 (C.D. Cal. Nov. 14, 2014) (Wilson, J.) (granting plaintiff's motion *in limine* seeking preclusion order because defendant invoked the Fifth Amendment); *SEC v. Interlink Data Network of L.A., Inc.*, Civ. A. No. 93-3073 R., 1993 WL 603274, at *8 & n.97 (C.D. Cal. Nov. 15, 1993); *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987) ("By his initial obstruction of discovery and his subsequent assertion of the privilege, defendant has forfeited the right to offer evidence disputing the plaintiff's evidence or supporting his own denials"). Where a "party asserts the Fifth Amendment across-the-board in civil litigation to prevent an opponent from obtaining any discovery at all of evidence of the facts at issue and of the position of the party invoking the privilege on those facts, the injustice of allowing that party to put on evidence at a hearing or trial on the same facts is especially manifest." *Interlink Data Network*, 1993 WL 603274, at *8 n.97.

So it is here. In his Answer to the Amended Complaint, Weaver asserted sixteen affirmative defenses and requested that the Court treat his Fifth Amendment declaration as a specific denial of the SEC's allegations. (Dkt. #131.) Yet, he has provided no discovery that would allow the SEC to determine the nature of the defenses or the basis for his denials. That choice has consequences. He should not be allowed to offer affirmative evidence of his own.

In addition, the SEC requests that the jury be instructed that it may draw an adverse inference against Weaver based on his assertion of the Fifth Amendment. As the Ninth Circuit has held, "[p]arties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof." *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998); *SEC v. Strategic Global Inv., Inc.*, No. 16-

2

cv-514, 2017 WL 1387187, at *10–11 (S.D. Cal. Apr. 17, 2017) (drawing adverse inference that defendants acted with scienter); *Bassett*, 2014 WL 12573395, at *1 (granting plaintiff's request for adverse inference instruction). Since Weaver has refused to testify or produce evidence on <u>any</u> issue in this case—and there is substantial independent evidence supporting Weaver's active involvement in the scheme alleged by the SEC—an adverse inference instruction is warranted.[1]

## II.     Motion in Limine #2 – Motion to Admit Summary Testimony.

At trial, the SEC intends to offer the testimony of SEC Accountant R. Kevin Barrett who was disclosed to Weaver as a summary witness. As he did in support of the SEC's pending summary judgment motion, Mr. Barrett will summarize and explain voluminous financial records produced by banks and brokerage firms in multiple jurisdictions, which records detail hundreds of individual financial transactions that Weaver and his cohorts executed through a network of offshore shell entities over a six-month period. Mr. Barrett's summary testimony will streamline the presentation of evidence at trial and will assist the jury in understanding the complex web of transactions in this case.

The SEC must meet two requirements for the admission of Mr. Barrett's summary testimony. <u>First</u>, under Rule 1006 of the Federal Rules of Evidence, the SEC must "ma[k]e the [underlying documents] available for examination or copying, or both, at a reasonable time and place." The SEC has done so. All of the documents that Mr. Barrett used in his summary calculations have been produced to Weaver in this litigation (in fully searchable format) or, in a few cases, are publicly available.

---

[1] Ordinarily, Weaver's invocation of the Fifth Amendment could be presented to the jury by placing him on the stand to respond to specific questions. But, Weaver's counsel has informed counsel for the SEC that it is unlikely Weaver will travel to the United States to attend trial. The SEC, therefore, respectfully requests that—if Weaver fails to attend trial—his invocation be evidenced through his response to the SEC's Requests to Admit, (SJ Ex. 9, Dkt. #174-10), and through his July 11, 2016 Declaration, in which he asserted his Fifth Amendment privilege both generally and in connection with specified topics in this litigation, (SJ Ex. 92, Dkt. #175-47).

Mr. Barrett submitted a sworn declaration, which was attached to the SEC's motion for summary judgment, describing the documents he used for his calculations (SJ Ex. 1, Dkt. #174-1.) He identified (a) the specific entities involved, (SJ Ex. 1 at Exhibits B(i) and B(ii), Dkt. #174-2); (b) the productions reviewed, (*id*. at ¶ 5); (c) the types of documents reviewed—"trading records, transfer records, account statements, account opening documents, cash receipt and disbursement records . . . and order and execution files," (*id*.); (d) the name of each custodial bank and broker for each entity; and (e) each relevant transaction by date, amount, and entity, (*id*. at exs. C and F.) In support of its reply brief, the SEC went even further, and provided a 61-page chart that identified (1) each category of documents that Mr. Barrett used; and (2) the production(s) in which Weaver could find the documents. (SJ Reply Ex. 1, Dkt. #187-1.) In short, Weaver has had full access to the documents underlying Mr. Barrett's calculations.[2]

<u>Second</u>, the underlying documents must be admissible. They are. Weaver's evidentiary objections to date have been limited to the issue of authenticity. In the chart submitted with its reply brief, the SEC identified *prima facie* grounds for authenticating each category of documents that Mr. Barrett used for his declaration. (SJ Reply Ex. 1, Dkt. #187-1.) These bases satisfy the standard under Rule 901(a) of the Federal Rules of Evidence, which requires only that "sufficient proof [be] introduced so that a reasonable juror could find in favor of authenticity or identification." *MGM Studios, Inc. v. Grokster, Ltd*., 454 F. Supp. 2d 966, 972 (C.D.

---

[2] Indeed, the available evidence reflects that the relevant account records have <u>always</u> been under Weaver's control. He was the sole beneficial owner of several of the entities involved, (*e.g*., SOF ¶ 2), he has admitted in an e-mail that he controlled trading out of several of those entities, (SJ Ex. 14), he communicated directly with the entities' bankers, brokers and account managers, (*see e.g.*, SJ Ex. 2 at 91–96, Dkt. #174-2; SJ Ex. 81, Dkt. #175-36; SJ Ex. 84, Dkt. #175-39), and he has not disputed the testimony of Berlinger, Sun, Wheatley and Al-Barwani who each confirm that they acted at Wayne Weaver's direction (*e.g*., SOF ¶¶ 86, 88-92, 94-95). The SEC had to obtain the records from other sources around the globe only because Weaver pled the Fifth and withheld his documents.

Cal. 2006) (*quoting United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000)). For example[3]:

    (1) Most of the documents are standard account statements, trading records, and other business records maintained in the ordinary course of business by the banks and brokerage firms Weaver and his co-defendants used to trade Jammin Java stock and transfer sale proceeds. The Swiss and English banks and brokerage firms submitted business records certifications establishing the admissibility of their business records under Rules 803(6) and 901(12) of the Federal Rules of Evidence, (*e.g.*, SJ Reply Exs. 4–9, Dkt. #187-4–187-9). *See United States v. Miller*, 830 F.2d 1073, 1077 (9th Cir. 1987) ("Banks depend on keeping accurate records and although, as we all know, they err occasionally, their records are among the most common type of business records routinely used in our courts.");

    (2) Many of these same financial records were independently authenticated by witnesses in depositions in this case or (as in the case of Jammin Java's transfer agent records) in sworn testimony taken during the underlying investigation, (*e.g.*, SJ Reply Ex. 1 at 1–21, Dkt. #187-1);

    (3) In response to formal requests submitted by the SEC, multiple foreign government securities regulators obtained the financial records at issue directly from the banks and brokerage firms under their respective jurisdictions and then produced copies of those documents to the SEC (*see, e.g., Melridge, Inc. v. Heublein*, 125 B.R. 825, 829–830 (D. Or. 1991) (receipt of documents by Department of Justice in response to formal treaty request, along with other circumstantial indicia of authenticity "establish strong circumstantial evidence sufficient to constitute a prima facie showing of the authenticity of" Swiss police reports and bank records));

    (4) Copies of many of those same financial records also were produced to the

---

[3] Although Weaver's objections have been limited to authenticity, as noted below, the vast majority of the financial records at issue are supported by business records certifications, which establish their admissibility pursuant to Rules 803(6) and 901(11) or (12) of the Federal Rules of Evidence.

1  SEC in discovery by Weaver's co-Defendant nominees (Sun, Berlinger, Wheatley,
2  and Al-Barwani) (*see, e.g., MGM Studios,* 454 F. Supp. 2d at 972–73 (finding that
3  documents met the authenticity standard because they were produced by non-party
4  P.R. firm and venture capital firm who were "business partners" of the defendant));
5  and

6       (5) Although he is in the position to authenticate his own account records,
7  Weaver has decided to remain silent—a decision which allows the Court to draw an
8  adverse inference.

9       Notably, Weaver has never objected to the substance of Mr. Barrett's
10 calculations. In fact, Weaver never tried to depose Mr. Barrett, did not propound any
11 discovery requests on the SEC, has never contested the calculations in Mr. Barrett's
12 schedules, has never challenged the propriety of such summary testimony, and has
13 never disclosed any summary calculations of his own. The absence of any specific
14 objection by Weaver contesting the actual genuineness or accuracy of the records
15 weighs in favor of admitting them. *See, e.g., McMaster v. M.E. Spearman*, No. 1:10-
16 cv-01407, 2014 WL 4418104, *3 (E.D. Cal. Sept. 5, 2014) (overruling defendant's
17 "bare" evidentiary objection at summary judgment where defendant had not
18 "genuinely disputed" authenticity and the documents, on their face, appeared to be
19 genuine); *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120, 1124 (E.D.
20 Cal. 2006) (overruling authenticity objections, holding that "because defendants do
21 not actually dispute the authenticity of these documents, the court is confident
22 plaintiff *would* be able to authenticate them at trial, which is all that Rule 56(e)
23 demands" and noting that "[w]hether the authentication requirement should be
24 applied to bar evidence when its authenticity is not actually disputed, is . . .
25 questionable").

26      In sum, the SEC has met the requirements of Rule 1006 of the Federal Rules of
27 Evidence. It therefore respectfully requests that the Court allow it to present the
28 summary testimony of Mr. Barrett at trial.

### III. Motion in Limine #3 – Motion for Permission to Ask Leading Questions to Defendants Sun and Al-Barwani.

It is uncertain at this point whether Weaver's former co-Defendants—Michael Sun and Mohammed Al-Barwani—will appear in person as witnesses at trial. They both reside in foreign countries—Sun in the Bailiwick of Jersey and Al-Barwani in Oman. If they do not attend, the SEC intends to present excerpts of their videotaped depositions to the jury. However, if Sun and Al-Barwani appear in person, the SEC respectfully requests that the Court grant the SEC leave to ask leading questions to those witnesses on direct examination.

Rule 611(c) of the Federal Rules of Evidence provides that a district court "[o]rdinarily . . . should allow leading questions . . . when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Before Rule 611(c) was adopted, counsel could not use leading questions until it had "shown that the witness was actually hostile or was an adverse party, officer, director or managing agent of such adverse party." *Haney v. Mizell Mem'l Hosp.,* 744 F.2d 1467, 1477 (11th Cir. 1984). These restrictions, however, were deemed to be an "unduly narrow concept of those who may safely be regarded as hostile without further demonstration." *Ellis v. City of Chi.,* 667 F.2d 606, 612 (7th Cir. 1981) (quoting the advisory committee's comment to Fed. R. Evid. 611(c)). Accordingly, Rule 611(c), and particularly its addition of the phrase "witness identified with an adverse party," was written and adopted in order to expand the category of individuals that could be asked leading questions on direct examination. Fed. R. Evid. 611 advisory committee's note (1972); *see Haney*, 744 F.2d at 1477–79 (stating that Rule 611(c) "significantly enlarged" the variety of witnesses that could be examined using leading questions but without having to demonstrate actual hostility).

Leading questions on direct examination generally are prohibited because of the "risk of improper suggestion inherent in examining" witnesses that are friendly. *Ellis,* 667 F.2d at 612. Not surprisingly, the "risks of suggestion are reduced where

7

the witness has an interest in promoting a version of the facts contrary to that suggested." Charles A. Wright and Victor J. Gold, 28 *Fed. Prac. & Proc. Evid.* § 6168 (2013). "[W]itness identified with an adverse party" within the meaning of Rule 611(c) thus should be interpreted broadly to include "in general, an employee, agent, friend or relative of an adverse party." *Ratliff v. City of Chi.,* No. 10-c-739, 2012 WL 7993412, at *1 (N.D. Ill. Nov. 20, 2012); *United States v. McLaughlin,* No. 95-cr-0113, 1998 WL 966014, at *1 (E.D. Pa. Nov. 19, 1998) ("[t]he term 'witness identified with an adverse party' is intended to apply broadly to an identification based upon employment by the party or by virtue of a demonstrated connection to an opposing party" (internal citations omitted)).

Courts accordingly have allowed leading questions when witnesses share a current or former employment or agency relationship with a party. In *United States v. McLaughlin,* the government's counsel was allowed to ask leading questions during the examination of the accountant that had prepared the defendant's tax returns. The Court noted that the accountant and the defendant had "worked together" for a number of years on matters including but not limited to the tax returns at issue. *McLaughlin,* 1998 WL 966014, at *1. The Court held that although the defendant and witness might not be "in cahoots, they were, at the very least, cohorts." *Id*. This same rationale was recognized in *Stahl v. Sun Microsystems, Inc.,* 775 F. Supp. 1397 (D. Colo. 1991), in which the court allowed the plaintiff in an employment discrimination case to use leading questions during the direct examination of a former employee. The court held that the witness remained "clearly identified" with the defendant, even though she was not a current employee, both because of that employment and an ongoing relationship with her former boss, who attended the trial on behalf of the defendant. *Id.* at 1398. The justification for treating former employees and agents as witnesses "identified with an adverse party" is even stronger when, as here, the witnesses are participants in the events giving rise to the litigation. *See McLaughlin,* 1998 WL 966014, at *2 (the witness in question had prepared the tax returns at issue

in the case for the defendant and his corporation).

Here, Defendants Sun and Al-Barwani have testified that they served as Weaver's nominees in 2010 and 2011; they were paid by Weaver to act on his behalf. (*See* SOF ¶¶ 87–95.) More significantly, they acted as Weaver's nominees in relation to the very facts underlying this case. Weaver paid them to relay instructions regarding the purchase and sale of Jammin Java stock and the distribution of proceeds from those sales. (*See id.*) Weaver has not refuted that testimony. While Sun and Al-Barwani may no longer be in Weaver's employ, and have implicated Weaver in misconduct, they (a) have been "identified with the Defendant;" (b) were adverse to the SEC in this litigation; and (c) unlike two of their fellow defendants, did not enter into cooperation agreements with the SEC. Consequently, the "risk of suggestion" is not present and the SEC respectfully requests that it be allowed to ask leading questions on direct examination of Sun and Al-Barwani.

### IV. Motion in Limine #4 – Motion to Admit Evidence that Weaver's co-Defendants Have Asserted Their Fifth Amendment Rights and to Allow A Corresponding Adverse Inference Against Weaver.

Wayne Weaver did not act alone when he participated in the effort to manipulate the stock of Jammin Java. He had lots of help. In addition to Weaver, the SEC sued eight other individuals in connection with the "pump and dump" scheme. Some have testified about their role and how Weaver directed them to buy and sell Jammin Java stock. (*e.g.*, SOF ¶¶ 86-95, Dkt. #173.) But two of Weaver's co-Defendants, Shane Whittle and Kevin Miller, adopted Weaver's strategy and asserted their Fifth Amendment privilege against self-incrimination. The SEC respectfully requests that the Court (1) allow the SEC to introduce evidence that Whittle and Miller, both of whom reside in foreign countries, have asserted the Fifth Amendment; and (2) allow the jury to draw an adverse inference against Weaver based on the Fifth Amendment assertions of his co-Defendants.

In civil cases, courts retain broad discretion both to admit evidence of a witness's invocation of the Fifth Amendment and to allow the jury to draw an adverse inference against a defendant based on a co-defendant's or a non-party witness's Fifth Amendment assertion. *See, e.g., Schoenmann v. Salevouris*, No. 3:15-cv-05193, 2016 U.S. Dist. LEXIS 147089, at *7–9 (N.D. Cal. Oct. 24, 2016) ("Plaintiff should thus be permitted to introduce evidence of [defendant] Lembi's prior invocation of the Fifth Amendment and/or call Lembi at trial so the jury can hear him invoke the Fifth Amendment. Otherwise, the jury may be left to wonder why Plaintiff did not call Lembi to establish facts of the case."); *LiButti v. United States*, 107 F.3d 110, 120–25 (2d Cir. 1997) (reversing and remanding for further proceedings, holding that non-party's invocation of the Fifth Amendment was admissible and that a corresponding adverse inference against the defendant was permissible); *Willingham v. County of Albany*, 593 F. Supp. 2d 446, 452–53 (N.D.N.Y. 2006) (permitting adverse inference to be drawn against one defendant based on his co-defendant's invocation of the Fifth Amendment because their interests were "intertwined"); *United States v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 634–36 (E.D. Va. 2006)(finding that one defendant's assertion of the Fifth Amendment privilege was admissible and supported a jury instruction allowing an adverse inference against his co-defendants).

In deciding whether to allow an adverse inference against a defendant based on another witness's assertion of the Fifth Amendment privilege, the Second Circuit in *LiButti* articulated several non-exclusive factors to consider, including (1) the relationship between the parties; (2) whether the defendant exercised any control or influence over the witness asserting the Fifth Amendment; (3) whether the interests of the party and witness overlap; and (4) whether the witness was a "key figure" in the litigation. *See LiButti*, 107 F.3d at 123–24. In balancing those factors, the *LiButti* court concluded that "the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for truth." *LiButti*, 107 F.3d at 124.

Each of those factors supports an adverse inference in this instance. Both Whittle and Miller worked closely with Weaver in conducting the fraudulent scheme. As shown in detail in support of the SEC's motion for summary judgment, Whittle was the principal source of Jammin Java stock for Weaver's team. (SOF ¶¶ 39–51, 63–64.) Between November 22 and December 27, 2010, Whittle—Jammin Java's de facto CEO—funneled more than 16.3 million Jammin Java shares (nearly 24% of all outstanding shares) to entities owned by Weaver, Sun, Miller, and Wheatley. (*Id*. at ¶ 51-52.)

Although Weaver and Whittle have refused to testify or respond to any of the SEC's discovery requests, the other evidence in this case strongly suggests that they worked hand-in-hand during the fraud. They both used offshore shell entities incorporated in the same jurisdictions; they used the same nominee officers to operate those companies; and they opened accounts at the same Swiss banks and the same Panamanian broker. (SOF ¶¶ 2, 39–44; SJ Ex. 1 at Ex. B(i), B(ii), Dkt. #174-2.) Whittle signed Share Purchase Agreements transmitting shares at almost no cost to entities owned by Weaver. (SOF ¶¶ 52.) And, when Weaver's illegal stock sales were complete, he arranged for $2.5 million to be transmitted to Whittle's company (Jammin Java) under the guise of the Straight Path agreement. (*Id*. at ¶¶ 73–77.)

Moreover, Miller's shell companies bought and sold Jammin Java stock at Weaver's direction. For example, Weaver (a) directed his nominee Rene Berlinger to send a letter on Las Colinas letterhead (the content of which Weaver drafted) to Jammin Java's transfer agent regarding the transfer of 3.3 million shares of Jammin Java stock into Miller's Las Colinas entity, (SJ Ex. 91, Dkt. #175-46); (b) instructed Berlinger to buy Jammin Java stock out of that entity, (SOF ¶ 96(b)); and (c) placed orders to sell Jammin Java stock out of Rahela (another Miller entity), (*e.g.*, SOF ¶ 96(a)). In addition, Miller was the nominal owner of Chilli Capital, which Berlinger created at Weaver's direction and which was used to funnel $2.38 million to Jammin Java under Weaver's sham Straight Path agreement. (*Id*. at ¶¶ 73–77.) That $2.38

million came from Miller's Las Colinas, which sold millions of Jammin Java shares that it previously obtained from Whittle's entity (Tyrone) and from nominees acting at Whittle's direction. (*Id.* ¶ 74.)

In sum, the interests of Weaver, Whittle, and Miller were intertwined. They worked together in the same scheme, sharing and transferring stock and sales proceeds among their various shell entities. But, rather than point the finger at each other, they presented a united front—each refused to provide <u>any</u> discovery and refused to answer <u>any</u> questions. And, Whittle and Miller were undeniably key figures in this litigation: Whittle provided the shares and Miller provided a conduit for the subsequent sales.

All of the *Libutti* factors weigh strongly in favor of both permitting the SEC to introduce evidence of Whittle's and Miller's assertions of the Fifth Amendment and permitting the jury to draw an adverse inference against Weaver from those assertions. No doubt, the assertion of the Fifth Amendment by Weaver's co-Defendants may be harmful to Weaver's case. But it is not unduly prejudicial on the facts present here. As courts have pointed out in similar circumstances: "such evidence is not prejudicial in the sense of being inflammatory, but, rather is prejudicial in the sense of giving support to a party's position, *i.e.*, it is damning." *Custer Battles*, 415 F. Supp. 2d at 636 (*quoting Brink's, Inc. v. City of N.Y.*, 539 F.Supp. 1139, 1142 (S.D.N.Y. 1982); *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54 (1923) ("Silence is often evidence of the most persuasive character."). Here, the silence of Weaver's co-Defendants concerning their involvement in the pump-and-dump scheme speaks volumes.

The SEC respectfully requests that Whittle's and Miller's declarations asserting the Fifth Amendment privilege be admitted and that the jury be instructed that they may draw an adverse inference against Weaver based on his former co-Defendants' refusals to testify.

Dated:  May 26, 2017

Respectfully submitted,

*/s/Peter Senechalle*
Peter Senechalle
U.S. Securities and Exchange Commission
Chicago Regional Office
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois  60604
Telephone:  (312) 353-1821
Fax:  (312) 353-7398
senechallep@sec.gov

**CERTIFICATE OF SERVICE**

Peter Senechalle hereby certifies that he caused the foregoing document to be filed through the Court's CM/ECF system on May 26, 2017, which automatically sends an electronic copy of the document to all counsel of record.

*/s/ Peter Senechalle*