TIMOTHY S. LEIMAN, Ill. Bar No. 6270153
Email: leimant@sec.gov
DANIEL J. HAYES, Ill. Bar No. 6243089
Email: hayesdj@sec.gov
PETER SENECHALLE, Ill. Bar No. 6300822
Email: senechallep@sec.gov

Attorneys for Plaintiff
United States Securities and Exchange Commission
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Facsimile:  (312) 353-7398

LOCAL COUNSEL
Lynn M. Dean, Cal. Bar No. 205562
Email: deanl@sec.gov
United States Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:15-CV-08921 |
| Plaintiff, | **SEC'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |
| vs. | Hon. Stephen V. Wilson |
| JAMMIN' JAVA CORP., dba MARLEY COFFEE, SHANE G. WHITTLE, WAYNE S. P. WEAVER, MICHAEL K. SUN, RENE BERLINGER, STEPHEN B. WHEATLEY, KEVIN P. MILLER, MOHAMMED A. AL-BARWANI, ALEXANDER J. HUNTER, and THOMAS E. HUNTER, | Final Pre-Trial Conf.:  June 26, 2017 |
| | Trial: July 11, 2017 |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Table of Contents**

I.    Introduction…………………………………………………………….……..…...   1

II.   Factual Summary……………………………………………………………….....   2

III.  Plaintiff's Claims……………………………………………………………….….   3

      A.  Summary Statement of Each Claim……………………………………….….   3
      B.  Elements Required to Establish Each Claim…………………………….…….   4
           1.  Claim 1: Securities Act Sections Section 5(a), (c)…………………………   4
               a.  Substantial participant liability…………………………………….....   4
               b.  Interstate commerce………………………………………………….   4
               c.  Scienter not required…………………………………………………   5
           2.  Claim 2: Exchange Act Section 13(d)(1), includ. Rule 13d-1…………   5
               a.  Beneficial owner………………………………………………………   6
               b.  Acting as part of a group……………………………………………   6
               c.  Scienter not required…………………………………………………   7
           3.  Claim 3: Exchange Act Section 13(d)(2), includ. Rule 13d-2………………   7
               a.  Material…………………………………………………………………   7
               b.  Scienter not required…………………………………………………   8
           4.  Claim 4: Exchange Act Section 10(b), includ. Rule 10b-5(a), (c)………   8
               a.  Device, scheme, or artifice to defraud……………………………….....   8
               b.  Knowingly or recklessly………………………………………………   9
               c.  Interstate commerce……………………………………………….....   9

IV.   Brief Description Of Key Evidence Supporting Each Claim…………………………   10

      A.  Claim 1: Securities Act Sections Section 5(a), (c)…………………………….   10
      B.  Claim 2: Exchange Act Section 13(d)(1), includ. Rule 13d-1………………………   12
      C.  Claim 3: Exchange Act Section 13(d)(2), includ. Rule 13d-2…………………   13
      D.  Claim 4: Exchange Act Section 10(b), includ. Rule 10b-5(a), (c)………………   13

V.    Summary Statement of Counterclaims and Affirmative Defenses………………………   16

VI.   Identification of Anticipated Evidentiary Issues……………………………………   20

      A.  Weaver's Fifth Amendment Assertions………………………………………   20
      B.  Admission of Summary Testimony……………………………………………   21

VII.  Identification of Relevant Issues of Law……………………………………………   21

      A.  Consequences for Fifth Amendment Assertions in Civil Cases…………………   21
      B.  Weaver Violated Sections 5(a) and (c) of the Securities Act…………………………   22
           1.  Substantial participant liability…………………………………………   23
           2.  Interstate commerce…………………………………………….....................   23
      C.  Weaver Violated Sections 13(d)(1) and (2) of the Exchange Act,
           Including Rules 13d-1 and 13d-2 Promulgated Thereunder……………………   24

i

|  |  |  |  |  |
|---|---|---|---|---|
|  | 1. | Beneficial owner…………………………………………………….... | 24 |
|  | 2. | Group……………………………………………………………… | 25 |
|  | 3. | Material…………………………………………………………… | 25 |
| D. | | Weaver Violated Section 10(b) of the Exchange Act, Including Rule 10b-5(a) and (c) Promulgated Thereunder…………………………… | 26 |
| E. | | Requested Relief………………………………………………… | 27 |
|  | 1. | A permanent injunction is appropriate………………………………… | 27 |
|  | 2. | A penny stock bar should be imposed………………………………… | 28 |
|  | 3. | Disgorgement should be ordered…………………………………… | 28 |
|  | 4. | Civil penalties should be imposed…………………………………… | 29 |

VIII. Bifurcation of Issues………………………………………………………    30

IX.   Jury Trial………………………………………………………...........    31

X.    Attorneys' Fees……………………………………………………    31

XI.   Abandonment of Issues……………………………………………………    31

# Table of Authorities

**Cases**

*Aaron v. SEC*,
  446 U.S. 680 (1980) .......................................................................... 5, 18

*Barnes v. AT&T Pension Benefit Plan*,
  718 F. Supp. 2d 1167 (N.D. Cal. 2010) ........................................... 18, 19

*Bassett v. City of Burbank*,
  2014 WL 12573395 (C.D. Cal. Nov. 14, 2014) ................................. 20, 21

*FDIC v. Pelletreau & Pelletreau* ,
  965 F. Supp. 381 (E.D.N.Y. 1997) ................................................... 16, 19

*Herman & Maclean v. Huddleston* ,
  459 U.S. 375 (1983) .............................................................................. 9

*Hollinger v. Titan Capital Corp.*,
  914 F.2d 1564 (9th Cir. 1990) ............................................................. 9

*Koch v. SEC*,
  177 F.3d 784 (9th Cir. 1999) .............................................................. 28

*Nationwide Life Ins. Co. v. Richards*,
  541 F.3d 903 (9th Cir. 2008) .............................................................. 22

*SEC v. Abacus Int'l Holding Corp.*,
  2001 WL 940913 (N.D. Cal. Aug. 16, 2001) ....................................... 30

*SEC v. Alliance Transcription Servs., Inc.*,
  2009 WL 5128565 (D. Ariz. Dec. 18, 2009) ....................................... 28

*SEC v. Benson*,
  657 F. Supp. 1122 (S.D.N.Y. 1987) .................................................. 20, 21

*SEC v. Boock*,
  2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011) ..................................... 5, 23

*SEC v. Burns*,
  816 F.2d 471 (9th Cir. 1987) ............................................................ 8, 26

*SEC v. Capital Cove Bancorp L.L.C.*,
  2015 U.S. Dist. LEXIS 174962 (C.D. Cal. Sept. 1, 2015) ....................... 4

*SEC v. Capital Sol. Monthly Income Fund, LP*,
  818 F.3d 346 (8th Cir. 2016) ........................................................... 30, 31

*SEC v. Colello*,
  139 F.3d 674 (9th Cir. 1998) ........................................................... 20, 22

*SEC v. Drexel Burnham Lambert Inc.*,
  837 F. Supp. 587 (S.D.N.Y. 1993) ....................................................... 6

*SEC v. Eurobond Exch.*,
  13 F.3d 1334 (9th Cir. 1994) ............................................................. 22

*SEC v. Farmer*,
  2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ....................................... 26

*SEC v. First City Fin. Corp.*,
  890 F.2d 1215 (D.C. Cir. 1989) ......................................................... 29

*SEC v. First Pac. Bancorp*,
  142 F.3d 1186 (9th Cir. 1998) ......................................................... 28-29

*SEC v. Holschuh*,
  694 F.2d 130 (7th Cir. 1982) ........................................................... 18, 22

*SEC v. Interlink Data Network of L.A., Inc.*,
  1993 WL 603274 (C.D. Cal. Nov. 15, 1993) ........................................ 20, 21

*SEC v. Jammin Java Corp.*,
  2016 WL 6595133 (C.D. Cal. July 18, 2016) ........................... 4, 7, 23, 25, 26

*SEC v. JT Wallenbrock & Assocs.*,
  440 F.3d 1109 (9th Cir. 2006) ........................................................... 29

*SEC v. Kokesh*,
  834 F.3d 1158, 1164 (10th Cir. 2016), *cert granted* 137 S.Ct. 810 (Jan. 13, 2017) ................. 17

*SEC v. Lee*,
  720 F. Supp. 2d 305 (S.D.N.Y. 2010) ............................................... 26

*SEC v. Levy*,
  706 F. Supp. 61 (D.D.C. 1989) ...................................... 7, 8, 18, 24

*SEC v. Murphy*,
  626 F.2d 633 (9th Cir. 1980) ......................................... 4, 23, 27

*SEC v. Murray*,
  2016 WL 6893880 (N.D. Cal. Nov. 23, 2016) ................................. 30

*SEC v. Phan*,
  500 F.3d 895 (9th Cir. 2007) .......................................... 8, 23, 26

*SEC v. Platforms Wireless*,
  617 F.3d 1072 (9th Cir. 2010) ........................................ 9, 28, 29

*SEC v. Rind*,
  991 F.2d 1486 (9th Cir. 1993) .................................... 17, 30, 31

*SEC v. Softpoint, Inc.*,
  958 F. Supp. 846 (S.D.N.Y. 1997) .............................. 5, 23-24

*SEC v. Wilson*,
  1992 WL 207918 (C.D. Cal. July 23, 1992) ................................. 17

*Simpson v. AOL Time Warner, Inc.*,
  452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds by*
  *Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008)………………………… 26

*Swift v. City of Det.*,
  2012 WL 32683 (E.D. Mich. Jan. 6, 2012) ................................ 16, 19

*Tull v. United States*,
  481 U.S. 412 (1987) ......................................................... 30, 31

*United States v. Aubrey*,
  800 F.3d 1115 (9th Cir. 2015) .......................................... 21

*United States v. Dashner*,
  2015 WL 3660331 (N.D. Cal. June 2, 2015) ............................... 21

*United States v. Global Mortgage Funding, Inc.*,
  2008 WL 5264986 (C.D. Cal. May 15, 2008) ......................... 19-20

*United States v. Lay*,
  566 F. Supp. 2d 652 (N.D. Ohio 2008) ...................................... 9

*United States v. Martell*,
  887 F. Supp. 1183 (N.D. Ind. 1995) ..................................... 20

*United States v. Wolfson*,
  405 F.2d 779 (2d Cir. 1968) ............................................. 5, 24

*Vernazza v. SEC*,
  327 F.3d 851 (9th Cir. 2003) ................................................. 9

*Wellman v. Dickinson*,

iv

682 F.2d 355 (2d Cir. 1982) ....................................................................... 7, 25

**Statutes**

15 U.S.C. § 77e(a), (c) [Section 5(a), (c) of the Securities Act] ............................... *passim*
15 U.S.C. § 77t(b) [Section 20(b) of the Securities Act] ....................................... 27
15 U.S.C. § 77t(d) [Section 20(d) of the Securities Act] ..................................... 29, 30
15 U.S.C. § 77v(a) [Section 22(a) of the Securities Act] ...................................... 17
15 U.S.C. § 78j(b) [Section 10(b) of the Exchange Act] ...................................... *passim*
15 U.S.C. § 13(d)(1), (2) [Section 13(d) of the Exchange Act] ................................ *passim*
15 U.S.C. § 78u(d) [Section 21(d) of the Exchange Act] ................................. 27, 29, 30
15 U.S.C. § 78aa [Section 27 of the Exchange Act] ........................................... 17
28 U.S.C. § 2462 ................................................................................ 17

**Other**

17 C.F.R. § 201.1001(a) ......................................................................... 30
17 C.F.R. § 240.10b-5(a) ...................................................................... 1, 4
17 C.F.R. § 240.13d-1 ......................................................................... 3, 6
17 C.F.R. § 240.13d-1(a) ....................................................................... 24
17 C.F.R. § 240.13d-2 ........................................................................... 4
17 C.F.R. § 240.13d-2(a) ..................................................................... 7, 24
17 C.F.R. § 240.13d-3(a) ..................................................................... 6, 24
17 C.F.R. § 240.13d-3(c) ..................................................................... 6, 25
17 C.F.R. § 240.13d-5 ........................................................................ 6, 24
17 C.F.R. § 240.13d-5(b)(1) .................................................................. 7, 25

Fed. R. Civ. P. 15(a) ............................................................................ 20
Fed. R. Evid. 1006 .............................................................................. 21

4-82 Modern Federal Jury Instructions-Civil P ¶ 82.02
    Inst. 82-4 (Fraudulent Act—Classic Fraud) (2017) ..................................... 8, 9
4-82 Modern Federal Jury Instructions-Civil P ¶ 82.02
    Inst. 82-10 (Instrumentality of Interstate Commerce) (2017) ........................... 10
Ninth Circuit Manual of Model Jury Instructions (2007): Civil § 18.0 ................... 5, 9, 23
Ninth Circuit Manual of Model Jury Instructions (2007): Civil § 18.1 ...................... 8
Ninth Circuit Manual of Model Jury Instructions (2007): Civil § 18.3 ...................... 9

Pursuant to C.D. Cal. Local Rule 16-4, Plaintiff U.S. Securities and Exchange Commission ("SEC") hereby submits this Memorandum of Contentions of Fact and Law.

## I.    Introduction

The SEC instituted this enforcement action on November 17, 2015, by filing a Complaint (dkt. no. 1) against Jammin Java Corp., dba Marley Coffee ("Jammin Java") and nine individuals, including Defendant Wayne S.P. Weaver.[1] The SEC's Complaint alleged the individual defendants orchestrated a massive international pump-and-dump scheme involving Jammin Java stock that generated approximately $78 million in illicit profits. The SEC filed an Amended Complaint (dkt. no. 121) on August 8, 2016.

All defendants except Weaver have entered into settlements with the SEC, and the Court has entered final judgments against those defendants in accordance with the settlements. Thus, Weaver, who has invoked the Fifth Amendment privilege against self-incrimination at all stages of the litigation and refused to provide any discovery to the SEC, is the last remaining defendant. The SEC filed a motion for summary judgment as to liability against Weaver (dkt. no. 172) on March 31, 2017, which is currently pending before the Court.

The SEC's Amended Complaint alleges Weaver violated Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a) and (c)] and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m(d), 78j(b)], including SEC Rules 10b-5(a) and (c), 13d-1 and 13d-2 thereunder [17 C.F.R. §§ 240.10b-5(a) and (c), 240.13d-1 and 240.13d-2].

---

[1] The other eight individual defendants are: Shane G. Whittle, Michael K. Sun, Stephen B. Wheatley, Rene Berlinger, Kevin P. Miller, Mohammed A. Al-Barwani, Alexander J. Hunter, and Thomas E. Hunter.

## II.      Factual Summary

Jammin Java, a coffee company, was formed in 2006 by Shane Whittle and Rohan Marley, the son of famed reggae artist Bob Marley. Its stock has been publicly traded and quoted on the over-the-counter market since 2008, when Whittle orchestrated Jammin Java's reverse merger with Global Electronic Recovery Corp. "(GERC"), a publicly traded shell company. Ahead of the reverse merger, Whittle secretly gained control of millions of shares that GERC previously issued to foreign nominees. Whittle secretly controlled this stock for years, during which time he served as Jammin Java's executive officer and director.

In 2010, Whittle exploited his position by participating with Weaver and Weaver's nominees in an illegal offering and fraudulent promotion of Jammin Java's stock. In preparation for this offering, Whittle distributed a portion of the nominee stock through a network of offshore entities controlled by Weaver and Weaver's team of nominees, including Defendants Stephen Wheatley, Michael Sun, Mohammed Al-Barwani, Kevin Miller, and Rene Berlinger. Whittle also arranged for the promotion of Jammin Java stock by the Hunters, two associates of Whittle who were previously charged by the SEC for touting in other internet pump-and-dump schemes. To kick-start the "pump," Weaver introduced to Jammin Java a sham financing arrangement with a purported company named "Straight Path." Weaver ordered Berlinger to create an empty shell company called Straight Path to play the role of third-party financier. In reality, Straight Path had no assets, no bank account, no employees or officers (other than Berlinger), and no legitimate source of funds.

In concert with coordinated trades, the public announcement of Weaver's phony Straight Path financing arrangement prompted an increase in Jammin Java's share price and volume. The share price and volume increased further in March 2011 when fraudulent newsletters promoting Jammin Java stock were disseminated. Consequently, over a six-month period from late 2010 to mid-2011, Jammin Java's share price and volume increased from $0.17 per share and no volume in December

2010 to an intraday high of $6.35 and volume of 20 million shares on May 12, 2011. As the stock price rose, Whittle distributed another large block of Jammin Java stock through Weaver and his network of nominees.

From February to May 2011, the shell entities owned by Weaver and his team of nominees sold more than 45 million shares into the artificially inflated market, generating at least $70 million in illicit trading profits. The 45 million shares amounted to approximately two-thirds of Jammin Java's outstanding stock and nearly its entire public float. Weaver then transferred $2.5 million in illicit trading profits to Jammin Java under the guise of the sham Straight Path financing agreement. Weaver directed the distribution of the remaining proceeds to his and the other defendants' accounts.

While Weaver and his cohorts profited immensely, the investing public was not as fortunate. Jammin Java's share price and volume began to collapse a few days after the Company disclosed on May 9, 2011 that it had become aware of an unauthorized and unaffiliated internet stock promotion. On May 17, 2011, its share price fell further after Jammin Java released disappointing results in its Form 10-K, which included total "sales revenue of $1,037 for the year ended January 31, 2011." In the process, investors in Jammin' Java stock lost millions of dollars.

**III.   Plaintiff's Claims**

    **A.   Summary Statement of Each Claim**

Claim 1:   Weaver engaged in an unregistered offer and sale of Jammin Java stock, in violation of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c).

Claim 2:   Weaver failed to file a statement with the SEC disclosing his beneficial ownership interest in Jammin Java stock, in violation of Section 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), including Rule 13d-1 thereunder, 17 C.F.R. § 240.13d-1.

Claim 3:   Weaver failed to file a statement with the SEC disclosing material

changes in the amount of Jammin Java stock beneficially owned by him, in violation of Section 13(d)(2) of the Exchange Act, 15 U.S.C. § 78m(d)(2), including Rule 13d-2 thereunder, 17 C.F.R. § 240.13d-2.

Claim 4:      Weaver engaged in fraud in connection with the purchase and sale of Jammin Java stock, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), including Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

## B.      Elements Required to Establish Each Claim

### 1.      Claim 1: Securities Act Sections 5(a) and (c)

For its claim under Sections 5(a) and (c) of the Securities Act, the SEC has the burden of proving each of the following elements by a preponderance of the evidence:

(a)      Weaver directly or indirectly offered or sold Jammin Java stock;

(b)      no registration statement was in effect for the offer or sale; and

(c)      Weaver used interstate transportation, communication, or the mail in connection with the offer or sale.

*SEC v. Capital Cove Bancorp LLC*, 2015 U.S. Dist. LEXIS 174962, at *24-25 (C.D. Cal. Sept. 1, 2015); *SEC v. Jammin Java Corp.*, 2016 WL 6595133, at *15 (C.D. Cal. July 18, 2016).

#### a.      Substantial participant liability

"[L]iability under § 5 is not confined only to the person who passes title to the security." *Jammin Java*, 2016 WL 6595133, at *15 (quoting *SEC v. Murphy*, 626 F.2d 633, 649 (9th Cir. 1980)). Section 5 liability extends to those who were "necessary participants" or "substantial factors" in unregistered sales made by others. *Id*. A defendant is (i) a "necessary participant" if 'but for' his participation in the sale of unregistered securities, the sale would not have taken place, and (ii) a "substantial factor" in the sale if his overall participation is not "*de minimis*." *Id*.

#### b.      Interstate commerce

An instrumentality of interstate commerce includes the postal mails, e-mails,

telephone, telegraph, telefax, interstate highway system, Internet and similar methods of communication and travel from one state to another within the United States. *See* Ninth Circuit Manual of Model Jury Instructions (2007): Civil § 18.0 (modified) (definition of recurring terms).

"The requirement that interstate means … be used to violate Section 5 has been broadly construed." *SEC v. Boock*, 2011 WL 3792819, at *17 (S.D.N.Y. Aug. 25, 2011). The SEC need not show that Weaver directly placed trade orders in the U.S. to satisfy this element. *Id*. at *18. The incidental use of interstate commerce in tangential communications, to transport of securities, or to remit proceeds is enough. *See, e.g.,* S*EC v. Softpoint, Inc.,* 958 F. Supp. 846, 861 (S.D.N.Y. 1997) (granting SEC motion for summary judgment on Section 5 claim, finding that "the wire or mail transfers of funds among [defendant], the brokerage firms, and various banks" "amply satisfied" the interstate means requirement); *United States v. Wolfson*, 405 F.2d 779, 784 (2d Cir. 1968) ("This subsection is violated when . . . the mails are used to…transport the securities after sale, to remit the proceeds to the seller, to send confirmation slips to the buyer, and perhaps even when used in more tangential ways").

### c.    Scienter not required

Scienter is not an element of liability for a Section 5 violation. *See Aaron v. SEC*, 446 U.S. 680, 714 n.5 (1980) ("The prohibition in § 5 of the 1933 Act, 15 U.S.C. § 77e, against selling securities without an effective registration statement has been interpreted to require no showing of scienter.").

### 2.    Claim 2: Exchange Act Section 13(d)(1), including Rule 13d-1

For its claim under Section 13(d)(1), including Rule 13d-1, of the Exchange Act, the SEC has the burden of proving each of the following elements by a preponderance of the evidence:

(a)    Weaver acquired, directly or indirectly, beneficial ownership of more than 5 percent of Jammin Java stock; and

(b)    Weaver failed to file with the SEC within 10 days of acquiring

5

beneficial ownership of more than 5 percent of Jammin Java stock a statement containing the information required by Schedule 13D. *See* 15 U.S.C. §§ 78m(d)(1); 17 C.F.R. § 240.13d-1.

### a.    Beneficial owner

The term "beneficial owner" includes "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) [v]oting power which includes the power to vote, or to direct the voting of, such security; and/or (2) [i]nvestment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3(a). Moreover, "[beneficial ownership] does not turn on who owns legal title to the stock, or who is the registered owner, or in whose name it is held. Instead the inquiry 'focuses on any relationship that, *as a factual matter*, confers on a person a significant ability to affect how voting power or investment power will be exercised, because it is primarily designed to ensure timely disclosure of market-sensitive data about changes in the identity of those who are able, as a practical matter, to influence the use of that power.'" *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993) (quoting 3 Securities Law Techniques § 70.07[2][c] (A.A. Sommer, Jr., ed., 1987) (emph. in orig.)).

Once a person becomes a beneficial owner, that person is deemed to have acquired such securities for the purposes of Section 13(d)(1), whether the acquisition was through a purchase or otherwise. 17 C.F.R. §240.13d-5.

"All securities of the same class beneficially owned by a person, regardless of the form which such beneficial ownership takes, shall be aggregated in calculating the number of shares beneficially owned by such person." 17 C.F.R. § 240.13d-3(c).

### b.    Acting as a part of a group

"When two or more persons agree to act together for the purpose of acquiring, holding, voting, or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of

6

sections 13(d) … of all equity securities of that issuer beneficially owned by such persons." 17 C.F.R. § 240.13d-5(b)(1) (quoted by *Jammin Java Corp.*, 2016 WL 6595133, at *15); *see also* 15 U.S.C. § 78m(d)(3). The definition of "group" is broad; it includes any members who have "combined in furtherance of a common objective." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). This concerted action need not be reflected in writing; the agreement may be "formal or informal." *Id*.

### c.    Scienter not required

Scienter is not an element the SEC must prove under Section 13(d). *SEC v. Levy*, 706 F. Supp. 61, 69 (D.D.C. 1989).

### 3.    Claim 3: Exchange Act Section 13(d)(2), including Rule 13d-2

For its claim under Section 13(d)(2), including Rule 13d-2, of the Exchange Act, the SEC has the burden of proving each of the following elements by a preponderance of the evidence:

(a)    Weaver was required to file with the SEC a Schedule 13D based on his beneficial ownership of Jammin Java stock [*see* Claim 2, *supra*];

(b)    There was a material increase or decrease in the amount of Jammin Java stock beneficially owned, directly or indirectly, by Weaver; and

(c)    Weaver failed to file promptly with the SEC an amendment to Schedule 13D reflecting that change.

*See* 15 U.S.C. § 78m(d)(2) and 17 C.F.R. § 240.13d-2(a)

### a.    Material

"An acquisition or disposition of beneficial ownership of securities in an amount equal to one percent or more … shall be deemed 'material' for purposes of this rule; acquisitions or dispositions of less than those amounts may be material, depending upon the facts and circumstances." 17C.F.R. § 240.13d-2(a).

### b. Scienter not required

Scienter is not an element the SEC must prove under Section 13(d). *Levy*, 706 F. Supp. at 69.

### 4. Claim 4: Exchange Act Section 10(b), including Rule 10b-5

For its claim under Section 10(b), including Rules 10b-5(a) and (c), of the Exchange Act, the SEC has the burden of proving each of the following elements by a preponderance of the evidence:

    a.    Weaver

        (i)    employed a device, scheme, or artifice to defraud, <u>or</u>

        (ii)    engaged in an act, practice, or course of business that operated as a fraud or deceit;

    b.    in connection with the purchase or sale of securities;

    c.    Weaver acted knowingly or with reckless disregard for the truth; and

    d.    Weaver used, or caused to be used, an instrumentality of interstate commerce or facility of national securities exchange, in furtherance of the fraud.

*See* Ninth Circuit Manual of Model Jury Instructions (2007): Civil § 18.1 Securities—Rule 10b-5 Claim (modified); 4-82 Modern Federal Jury Instructions-Civil P ¶ 82.02, Inst. 82-4 (Fraudulent Act—Classic Fraud) (2017) (modified); *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007); *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987).

### a. Device, scheme, or artifice to defraud

A device, scheme or artifice is merely a plan for the accomplishment of an object. A scheme or artifice to defraud is any plan, device, or course of action to obtain money or property by means of false or fraudulent pretenses, representations or promises reasonably calculated to deceive persons of average prudence. It is not defined according to a technical standard, but a standard that is a reflection of moral uprightness, fundamental honesty, fair play and right dealing. A "scheme or artifice to

defraud" is limited only by a man's ingenuity in devising new methods to defraud the community. "Fraud" is a general term which embraces all the various that individuals devise to take advantage of others. Thus a "scheme to defraud" is merely a plan to deprive another of money or property by trick, deceit, deception or swindle. *See United States v. Lay*, 566 F. Supp. 2d 652, 696-97 (N.D Ohio 2008); 4-82 Modern Federal Jury Instructions-Civil P ¶ 82.02, Inst. 82-4 (Fraudulent Act—Classic Fraud) (2017) (modified).

### b.     Knowingly or recklessly

A defendant acts with scienter if he acts knowingly or recklessly. Scienter is proven with "'knowing or reckless conduct,' without a showing of 'willful intent to defraud.'" *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990). Recklessness means highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of misleading investors, which is either known to the defendant or is so obvious that the defendant must have been aware of it. Ninth Circuit Manual of Model Jury Instructions (2007): Civil § 18.3 (definition of "knowingly"); *SEC v. Platforms Wireless*, 617 F.3d 1072, 1092 (9th Cir. 2010); *Herman & Maclean v. Huddleston, 45*9 U.S. 375, 390-91 n.30 (1983).

### c.     Interstate commerce

An instrumentality of interstate commerce includes the postal mails, e-mails, telephone, telegraph, telefax, interstate highway system, Internet and similar methods of communication and travel from one state to another within the United States. *See* Ninth Circuit Manual of Model Jury Instructions (2007): Civil § 18.0 (modified) (definition of recurring terms).

It is not necessary that a defendant be directly or personally involved in any mailing. It is sufficient if the defendant was an active participant in the scheme and took steps or engaged in conduct which he knew or could reasonably foresee would naturally and probably result in the use of the mails or interstate wires. When one

does an act with the knowledge that the use of interstate means of communication will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he causes such means to be used. 4-82 Modern Federal Jury Instructions-Civil P ¶ 82.02, Inst. 82-10 (Instrumentality of Interstate Commerce) (2017) (modified).

Nor is it necessary that the items sent through the mails contain the fraudulent material, or anything objectionable. The matter mailed may be entirely innocent. The use of the mails need not be central to the execution of the scheme, and may even be incidental to it. All that is required is that the use of the mails bear some relation to the object of the scheme or fraudulent conduct. *Id*. (modified).

## IV.   Brief Description of Key Evidence Supporting Each Claim

### A.   Claim 1: Securities Act Sections 5(a) and (c)

There is no dispute that the various companies identified in the SEC's Amended Complaint acquired and sold millions of shares of Jammin Java stock and that those sales were not registered with the SEC. And Weaver has not asserted that any offer or sale was exempt from Section 5's registration requirements.

The undisputed evidence further establishes that Defendant Weaver is responsible for those sales. The key evidence includes:

- Defendants Berlinger, Sun, Wheatley, and Al-Barwani testified they acted as Weaver's nominees and purchased and sold Jammin Java stock through various shell companies at Weaver's direction, which testimony is unrebutted;
- Emails between Weaver and the above nominees demonstrating that Weaver directed the nominees to buy and sell Jammin Java stock;
- Bank and brokerage records confirming that Weaver was the beneficial owner of five offshore shell companies that sold almost 12.9 million shares of Jammin Java stock to the public;
- Weaver's own emails admitting he was the beneficial owner of several of

10

his shell companies and that he directed their purchases and sales of Jammin Java stock;

- Emails reflecting Weaver's attempt to hide his ownership and control of shell entities that sold Jammin Java stock;

- Brokerage account records showing that Weaver and entities he controlled received millions of dollars in proceeds from the sales of Jammin Java stock by the shell companies; and

- Weaver's across-the-board invocation of the Fifth Amendment throughout the litigation, including in response to the allegations in the SEC's Amended Complaint and all discovery requests.

Moreover, the undisputed evidence proves Weaver used, and caused to be used the mails, emails, wires and other instruments of interstate commerce in connection with the illegal offers and sales of Jammin Java stock. That evidence includes, but is not limited to, the following:

- Empire Stock Transfer, Inc., Jammin Java's Nevada-based transfer agent, routinely exchanged Jammin Java share certificates and other related documents with Weaver's and his nominees' shell companies and their foreign banks using U.S. mail couriers like Federal Express.

- The Straight Path agreement was negotiated through emails between "Raymond Hall," purportedly on behalf of Straight Path (an entity Berlinger created at Weaver's direction) and Ahn Tran on behalf of U.S.-based Jammin Java. Tran sent Jammin Java share certificates to Berlinger at Hall's request.

- In at least one instance, Weaver transferred his illicit profits through U.S. banks. For example, on September 22, 2011, Weaver instructed VP Bank to transfer stock sales proceeds from Westpark to Donnolis through the Stamford, CT branch of UBS Bank (as purported payment under a Jammin Java Share Purchase Agreement between those entities).

- Weaver directed the transfer of proceeds from the sales of Jammin Java stock to the U.S. bank account of David Loev, Jammin Java's Texas-based lawyer (as purported payment under sham Straight Path financing agreement between those entities).

- Brokerage records confirm that sales of Jammin Java stock by Weaver's entities were routed through U.S.-based intermediate brokers.

- Brokerage records for entities that Weaver controlled confirm that sales of Jammin Java stock by those entities were executed through OTC Markets Group in New York.

**B.      Claim 2: Exchange Act Section 13(d)(1), including Rule 13d-1**

The unrebutted testimony of Weaver's co-defendants, the various brokerage records, and Weaver's own emails show that Weaver was the beneficial owner of numerous shell entities, including Timotei, Arcis, Calgon, Manitou, and Donnolis ("Weaver's Entities"). Brokerage records for accounts held in the names of these companies establish that on every day from at least March 8, 2011 through at least April 27, 2011, the collective holdings of Weaver's Entities exceeded 5% of Jammin Java's stock.

Weaver's co-defendants and nominees also testified that Weaver was the ultimate beneficial owner of at least Renaval, Petersham, and Westpark. Emails confirm that Weaver directed the purchase and sale of stock by these entities and the use of sale proceeds. When the holdings of these entities, as demonstrated by the brokerage records, are added to the holdings of Weaver's Entities, the percentage of Jammin Java stock beneficially owned by Weaver through this "group" is increased substantially.

Weaver has repeatedly invoked the Fifth Amendment in response to the SEC's request for discovery about Weaver's ownership of, control over, and coordination with these entities.

It is undisputed that no one, including Weaver, ever filed a Schedule 13D with the SEC disclosing Weaver's beneficial ownership of Jammin Java stock.

### C.    Claim 3: Exchange Act Section 13(d)(2), including Rule 13d-2

The evidence outlined in Claim 2, above, establishes that Weaver was required to file a Schedule 13D with the SEC disclosing his beneficial ownership of Jammin Java stock.

The brokerage records for the accounts held in the names of the various Weaver' Entities and those of his nominees show that these companies, on many occasions, acquired or disposed of stock equaling 1% or more of Jammin Java's outstanding stock. In fact, the entities controlled by Weaver sold almost <u>all</u> of their Jammin Java holdings (nearly two-thirds of Jammin Java's total outstanding stock).

It is undisputed that no one, including Weaver, ever filed a statement with the SEC disclosing those material changes in Weaver's beneficial ownership of Jammin Java stock.

### D.    Claim 4: Exchange Act Section 10(b), including Rule 10b-5(a) and (c)

Key evidence showing Weaver participated in a scheme to defraud the investing public includes:

- Witness testimony (*e.g.*, Berlinger) and bank records establish that Weaver directed the creation of numerous shell entities in offshore jurisdictions such as the Marshall Islands and Panama. SEC Expert witness, Jaco Sadie, has testified that these are jurisdictions known for secrecy.

- Similarly, witness testimony (e.g., Berlinger, Wheatley, Al-Barwani, and Sun) and bank records establish that shell entities controlled by Weaver and his nominees opened accounts in Switzerland and Panama, which also are known for strict financial secrecy.

- Witness testimony (e.g., Berlinger, Wheatley, Al-Barwani, and Sun) and emails further establishes that Weaver retained Berlinger, Wheatley, Al-Barwani, Sun, Miller, and others to serve as his nominees. As Weaver's

nominees, these individuals acted as beneficial owners of the various shell entities but took and followed Weaver's instructions about the acquisition and sale of Jammin Java stock and the distribution of money.

- Records show that soon after acquiring millions of shares of Jammin Java stock, Weaver and his nominees' transferred the stock among the various shell entities. SEC expert testimony establishes that these transfers had no economic purpose, except to ensure that no one company accumulated 5% or more of Jammin Java's outstanding stock.

- The defendants' stock sales coincided with a promotional campaign about Jammin Java. Websites and emails promoting Jammin' Java stock began to appear March 17, 2011 and ended in May 2011. Bank and brokerage records show that Weaver's entities sold the bulk of their Jammin' Java shares (65%) from March 17 to May 11, 2011.

- Following the sale of nearly all their Jammin Java stock, bank records and witness testimony (e.g., Berlinger, Wheatley, Sun, and Al-Barwani) establish that the shell entities controlled by Weaver and his nominees began transferring the trading profits to accounts controlled by Weaver or his nominees in other jurisdictions, including Lebanon, Dubai, and the Cayman Islands.

- Weaver also ordered the conversion of some sales proceeds into forms that would be hard to trace, such as gold coins and cash cards with daily withdrawal limits as high as $100,000.  Berlinger testified that Weaver took these steps because he was worried that FINMA, the Swiss financial regulator, might freeze assets in the Swiss bank and brokerage accounts.

- The evidence shows Weaver also took other steps to thwart the SEC's investigation of the scheme. Emails show Weaver used a fake name to communicate with Berlinger about responding to SEC inquiries, which were being made through FINMA. He submitted false statements to

regulators. He drafted a letter stating, for example that his company, Manitou SA, "acquired [Jammin Java stock] before the corporation was publicly traded." He then disseminated this and other false statements to Berlinger and others to coordinate their stories.

- Weaver's across-the-board invocation of the Fifth Amendment throughout the litigation, including in response to the allegations in the SEC's Amended Complaint and all discovery requests.

The evidence also demonstrates that Weaver orchestrated the sham Straight Path financing agreement as part of his scheme to manipulate the market for Jammin Java stock. Ahn Tran, who was Jammin Java's CEO in late 2010, testified he negotiated the financing agreement with "Straight Path" in November and December 2010, after being contacted by "Raymond Hall," who claimed to be a representative of Straight Path. Tran testified that Hall agreed to provide Jammin Java up to $2.5 million in financing even though Straight Path conducted no due diligence on Jammin Java, Tran could find no website for Straight Path, and Hall and Tran communicated only a few times by email and on the phone. Moreover, at the time, Straight Path and Jammin Java entered into the multi-million dollar financing agreement, Jammin Java's financial statements show that it had generated only about $1,000 in annual sales revenue.

Jammin Java and Straight Path executed the financing agreement on December 22, 2010. Berlinger testified that, at that time, Straight Path did not exist and had no money or even a bank account. Berlinger did not create Straight Path until May 20, 2011, when (at Weaver's direction) he changed the name of an existing defunct entity named Beauty Water to Straight Path. Berlinger testified that Weaver directed him to create Straight Path using a pre-existing "aged" company. The advantage of using an aged company like Beauty Water, with an incorporation date of October 21, 2008, and then changing its name to "Straight Path" is that it creates the appearance that Straight Path was incorporated prior to the date the financing agreement was signed.

Berlinger testified that he was the sole director and officer of Straight Path and that it had no employees when Berlinger created it on May 20, 2011. Berlinger never heard of Raymond Hall, until Weaver sent him an email on July 4, 2011 advising him to be on the lookout for Jammin Java share certificates for Straight Path that were being sent to "Raymond Hall" at Berlinger's address.

Berlinger also testified that he created Chili Capital on May 3, 2011, at Weaver's direction. Chili Capital's sole activity was funneling Jammin Java sales proceeds from defendants' shell companies to Jammin Java.

Bank records and emails also show that Weaver used a company called Blue Leaf Capital, which Weaver admitted was "my main investment account," to pass three separate $40,000 payments to Jammin Java (through the U.S. bank account of its Texas lawyer, David Love) under the Straight Path financing agreement.

**IV.    Summary Statement of Counterclaims and Affirmative Defenses**

Weaver has not asserted any counterclaims.

In his Answer to the Amended Complaint, Weaver asserted 16 "affirmative defenses." (Dkt. no. 131 at 52.) He subsequently filed a Notice of Withdrawal of Affirmative Defenses 9-12 (*id*. no. 144), leaving 12 defenses asserted in his Answer.

First Affirmative Defense: Failure to State a Claim

The Court rejected this defense when it denied Weaver's motion to dismiss the complaint on this ground (dkt. no. 118). *Swift v. City of Detroit*, No. 10-12911, 2012 WL 32683, at *2 (E.D. Mich. Jan. 6, 2012) (striking failure-to-state-a-claim affirmative defense that was previously rejected on motion to dismiss); *see also FDIC v. Pelletreau & Pelletreau, 965* F. Supp. 381, 390 (E.D.N.Y. 1997) ("An affirmative defense which previously has been rejected on a defendant's motion to dismiss is thereupon insufficient as a matter of law and must be stricken.").

Second Affirmative Defense: Failure to Plead with Particularity

The Court rejected this defense when it denied Weaver's motion to dismiss the complaint on this ground (dkt. no. 118).

16

<u>Third Affirmative Defense</u>: Lack of Personal Jurisdiction

The Court rejected this defense when it denied Weaver's motion to dismiss the complaint on this ground (*Id. .)* The key facts supporting the Court exercise of personal jurisdiction are set forth in the Court's opinion (*Id. .)*, as well as in Section III, *supra*.

<u>Fourth Affirmative Defense</u>: Lack of Venue

Venue is appropriate in this District, pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act (15 U.S.C. § 78aa), because it involves a market manipulation scheme involving Defendant Jammin Java, which is headquartered in Beverly Hills, California. Also, Defendant Whittle, who worked with Weaver and others to carry out the scheme, resided in Los Angeles from 2009 through 2011. Moreover, a substantial part of the scheme involved acts that occurred in this District, for example, the negotiation and execution of the sham Straight Path financing agreement in 2012 by email and phone calls with Ahn Trahn, who was the then-CEO of Jammin Java working out of its headquarters in Los Angeles.

<u>Fifth Affirmative Defense</u>: Statute of Limitations

The only statute of limitation potentially applicable to any of the SEC's claims, is 28 U.S.C. § 2462.  That statute sets forth a five year limitations period for "an action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise."

Section 2462 is not a bar to any of the SEC's claims or requests for relief in this case. That statute does not apply to the SEC's claims for equitable relief. *See SEC v. Wilson*, 1992 WL 207918, at *2 (C.D. Cal. July 23, 1992) (SEC actions seeking injunctive relief "are not subject to a statute of limitations defense"); *SEC v. Rind*, 991 F.2d 1486, 1492 (9th Cir. 1993); *cf. SEC v. Kokesh*, 834 F.3d 1158, 1164 (10th Cir. 2016) (disgorgement not subject to statute of limitations), *cert granted* 137 S.Ct. 810 (Jan. 13, 2017). Moreover, the SEC filed its complaint on November 17,

2015 (dkt. no. 1). The violative conduct at issue (*i.e.*, unregistered stock sales, failure to file beneficial ownership disclosures, and market manipulation involving Jammin Java stock), all occurred less than five years before the SEC filed its complaint.

Sixth Affirmative Defense: Good Faith

This is not a viable affirmative defense. Good faith is not a defense to the SEC's Section 5 and Section 13(d) claims. *See Aaron v. SEC,* 446 U.S. 680, 714 n.5 (1980); *SEC v. Holschuh*, 694 F.2d 130, 137 n.10 (7th Cir. 1982) ("good faith is not relevant to whether there has been a primary violation of the registration requirements"); *SEC v. Levy*, 706 F. Supp. 61, 69 (D.D.C. 1989). At most, Weaver's alleged good faith is a factor to consider in determining whether he acted with scienter, which is an element of the SEC's Section 10(b) fraud claim. The evidence summarized above (Section III), however, demonstrates that Weaver did not act in good faith. Moreover, Weaver is barred from introducing evidence of his supposed good faith because he has asserted the Fifth Amendment throughout this case and refused to provide any discovery or documents to the SEC.

Seventh Affirmative Defense: No Causation

This is not a viable affirmative defense. At most, this is an argument that the SEC cannot prove, by a preponderance of the evidence, that Weaver violated the federal securities laws. *See Barnes v. AT&T Pension Benefit Plan, 71*8 F. Supp. 2d 1167, 1174-75 (N.D. Cal. 2010) ("An affirmative defense, under the meaning of Fed.R.Civ.P. 8(c), is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven." (internal quote and cite omitted)).

Eighth Affirmative Defense: No Scienter

This is not a viable affirmative defense. Lack of scienter is not a defense to the SEC's Section 5 and Section 13(d) claims. *See Aaron,* 446 U.S. at 714 n.5; *Holschuh*, 694 F.2d at 137 n.10 (7th Cir. 1982); *Levy*, 706 F. Supp. 61 at 69. At most, this is a mere denial of the SEC's allegation that Weaver acted with scienter in

connection with its Section 10(b) fraud claim. *See Barnes,* 718 F. Supp. 2d 1at 1174-75. However, Weaver is barred from introducing evidence in support of this denial because he has asserted the Fifth Amendment throughout this case and refused to provide any discovery or documents to the SEC.

Ninth through Twelfth Affirmative Defenses: Withdrawn (Dkt. no. 144).

Thirteenth Affirmative Defense: Compliance with Statute

This is not a viable affirmative defense. At most, this is an argument that the SEC cannot prove, by a preponderance of the evidence, that Weaver violated the federal securities laws. *See Barnes*, 718 F. Supp. 2d at 1174-75. Moreover, Weaver is barred from introducing evidence of his supposed compliance with the federal securities laws because he has asserted the Fifth Amendment throughout this case and refused to provide any discovery or documents to the SEC.

Fourteenth Affirmative Defense: Uncertainty

This is not a viable affirmative defense. The Court rejected this defense when it denied Weaver's motion to dismiss the complaint (dkt. no. 118). *Swift v. City of Detroit*, 2012 WL 32683, at *2 (E.D.  Mich. Jan. 6, 2012) (striking failure-to-state-a-claim affirmative defense that was previously rejected on motion to dismiss); *see also FDIC*, 965 F. Supp. at 390 ("An affirmative defense which previously has been rejected on a defendant's motion to dismiss is thereupon insufficient as a matter of law and must be stricken.").

Fifteenth Affirmative Defense: Law Inapplicable to Weaver

Weaver asserts the Securities Act is not applicable to him. He, however, has never alleged, pled, or otherwise explained why the Securities Act does not apply to him. The argument has been waived. Moreover, Weaver is barred from introducing evidence supporting this assertion because he has asserted the Fifth Amendment throughout this case and refused to provide any discovery or documents to the SEC.

Sixteenth Affirmative Defense: Right to Assert Additional Defenses

This is not a proper affirmative defense. *See United States v. Global Mortgage*

19

1    *Funding, Inc.*, 2008 WL 5264986, at *5 (C.D. Cal. May 15, 2008) (striking

2    affirmative defense asserting a right to bring other defenses); *United States v. Martell*,

3    887 F. Supp. 1183, 1193 (N.D. Ind. 1995) (same). Weaver has never sought leave to

4    add affirmative defenses in accordance with Fed. R. Civ. P. 15(a). Moreover, Weaver

5    is barred from introducing evidence supporting any defenses because he has asserted

6    the Fifth Amendment throughout this case and refused to provide any discovery or

7    documents to the SEC.

8    **V.    Identification of Anticipated Evidentiary Issues**

9        **A.    Weaver's Fifth Amendment Assertions**

10         Weaver declined to answer the Amended Complaint or produce any

11   information or testimony in discovery, choosing instead to assert the Fifth

12   Amendment privilege against self-incrimination. The SEC, therefore, has moved *in*

13   *limine*: (i) to preclude Weaver from offering evidence on subjects where he has

14   asserted the Fifth Amendment and (ii) to instruct the jury it may draw adverse

15   inferences from his assertions. *Bassett v. City of Burbank*, 2014 WL 12573395, at *1-

16   2 (C.D. Cal. Nov. 14, 2014) (Wilson, J.) (granting plaintiff's motion in limine seeking

17   preclusion order because defendant invoked the Fifth Amendment during discovery);

18   *SEC v. Interlink Data Network of L.A., Inc.*, 1993 WL 603274, at *8 & n.97 (C.D.

19   Cal. Nov. 15, 1993); *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987)

20   (holding that "by his initial obstruction of discovery and his subsequent assertion of

21   the privilege, defendant has forfeited the right to offer evidence disputing the

22   plaintiff's evidence or supporting his own denials"); *see also SEC v. Colello*, 139

23   F.3d 674, 677 (9th Cir. 1998) ("Parties are free to invoke the Fifth Amendment in

24   civil cases, but the court is equally free to draw adverse inferences from their failure

25   of proof."); *Bassett*, 2014 WL 12573395, at *1 (granting plaintiff's request for

26   adverse inference instruction).

27       **B.    Admission of Summary Witness Testimony**

28         The SEC intends to call SEC accountant R. Kevin Barrett, as a summary

witness, to summarize the voluminous trading records, bank records, and transfer agent records showing the purchase and sale of Jammin Java stock by the shell companies created by Weaver and his nominees. All of these records were produced to Weaver during discovery and described in the declaration of R. Kevin Barrett submitted with the SEC's motion for summary judgment. (Dkt. 174-1, 174-2.) Moreover, many of these documents are trading and bank records for accounts Weaver controlled. The testimony and summary charts prepared by Mr. Barrett are admissible under Federal Rule of Evidence 1006. Fed. R. Evid. 1006 (permitting use of "a summary, chart, or calculation to prove the content of voluminous writings"); *United States v. Aubrey*, 800 F.3d 1115, 1129-31 (9th Cir. 2015) (affirming district court's admission of summary evidence, which summarized "multiple bankers' boxes worth of documents concerning deposits and withdrawals from [defendant's] bank accounts"); *United States v. Dashner*, 2015 WL 3660331, at *6 (N.D. Cal. June 2, 2015) (government allowed to call summary witnesses to summarize voluminous IRS and financial records, where government represented that all records upon which summary testimony and exhibits would be based had been produced to defendant).

## VI.   <u>Identification of Relevant Issues of Law</u>

### A.   **Consequences For Fifth Amendment Assertions In Civil Cases**

Weaver should be precluded from testifying or introducing evidence on all subjects he refused to permit the SEC to take discovery on. Where a "party asserts the Fifth Amendment across-the-board in civil litigation to prevent an opponent from obtaining any discovery at all of evidence of the facts at issue and of the position of the party invoking the privilege on those facts, it would be manifestly unjust to allow that party to put on evidence at a hearing or trial on the same facts." *Interlink Data Network of L.A.,* 1993 WL 603274, at *8 & n.97; *Benson*, 657 F. Supp. 1 at 1129. Weaver asserted the Fifth Amendment on every subject and question that the SEC sought to take discovery on. He produced no documents in discovery. He should be barred from testifying at trial. *Bassett*, 2014 WL 12573395, at *1.

1    Also, the Court should instruct the jury that it may draw adverse inferences

2    based on Weaver's invocation of the Fifth Amendment. "Parties are free to invoke the

3    Fifth Amendment in civil cases, but the court is equally free to draw adverse

4    inferences from their failure of proof." *Colello*, 139 F.3d at 677. Where a party

5    asserts the Fifth Amendment during discovery, "[a] decision not to draw the inference

6    poses substantial problems for [his adversary] who is deprived of a source of

7    information that might conceivably be determinative in a search for truth."

8    *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911-12 (9th Cir. 2000) (internal

9    quote and cite omitted). The adverse inference may be drawn if "there is substantial

10   need for the information and there is not another less burdensome way of obtaining

11   that information." *Id*. at 912. (internal quote and cite omitted).

12   Here, Weaver invoked the Fifth Amendment at all stages of the litigation on

13   every topic related to the SEC's claims, refusing to disclose any facts or produce any

14   documents in discovery. The SEC had a substantial need for him to disclose and

15   explain the full scope of his knowledge of and role in a $70 million international

16   pump-and-dump scheme involving Jammin Java's stock. He has, therefore, deprived

17   the SEC of critical evidence that goes to the heart of its case against him. Moreover,

18   the evidence the SEC has adduced from third parties confirms that Weaver was the

19   mastermind behind the scheme and that he is using the Fifth Amendment to hide

20   inculpatory evidence from the SEC.

21   **B.    Weaver Violated Sections 5(a) and (c) of the Securities Act**

22   Sections 5(a) and 5(c) of the Securities Act. *See* 15 U.S.C. § 77e(a), (c). These

23   provisions prohibit the unregistered offer or sale of securities in interstate commerce,

24   unless an exemption from registration applies. *See SEC v. Eurobond Exch.*, 13 F.3d

25   1334, 1338 (9th Cir. 1994). Section 5 operates as a strict liability statute; no proof of

26   scienter is required. *See SEC v. Holschuh*, 694 F.2d 130, 137 n.10 (7th Cir. 1982)

27   ("good faith is not relevant to whether there has been a primary violation of the

28   registration requirements"). To prove a violation, the SEC need only show that: (1)

22

1  defendants, directly or indirectly, offered or sold securities; (2) no registration was in

2  effect or filed with the SEC for those securities; and (3) interstate transportation or

3  communication or the mails were used in connection with the offer and sale. *See* 15

4  U.S.C. §§ 77e(a), 77e(c); *SEC v. Phan,* 500 F.3d 895, 902 (9th Cir. 2007). By his

5  offer and sale of Jammin Java stock through his shell companies and those of his

6  nominees, Weaver violated Sections 5(a) and 5(c) of the Securities Act.

### 1.    Substantial participant liability

8  Moreover, Section 5 liability extends to those who were "necessary

9  participants" or "substantial factors" in unregistered sales made by others. *Id*. A

10  defendant is (i) a "necessary participant" if 'but for' his participation in the sale of

11  unregistered securities, the sale would not have taken place, and (ii) a "substantial

12  factor" in the sale if his overall participation is not "*de minimis*." *SEC v. Jammin Java*

13  *Corp.*, 2016 WL 6595133, at *15 (C.D. Cal. July 18, 2016) (quoting *SEC v. Murphy*,

14  626 F.2d 633, 649 (9th Cir. 1980)). Weaver was a substantial participant in the offer

15  and sales of Jammin Java stock made by his and his nominees' shell companies.

### 2.    Interstate commerce

17  An instrumentality of interstate commerce includes the postal mails, e-mails,

18  telephone, telegraph, telefax, interstate highway system, Internet and similar methods

19  of communication and travel from one state to another within the United States. *See*

20  Ninth Circuit Manual of Model Jury Instructions (2007): Civil § 18.0 (modified)

21  (definition of recurring terms).

22  "The requirement that interstate means … be used to violate Section 5 has been

23  broadly construed." *SEC v. Boock*, 2011 WL 3792819, at *17 (S.D.N.Y. Aug. 25,

24  2011). The SEC need not show that Weaver directly placed trade orders in the U.S. to

25  satisfy this element. *Id*. at *18. The incidental use of interstate commerce in tangential

26  communications, to transport of securities, or to remit proceeds is enough. *See, e.g.,*

27  *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 861 (S.D.N.Y. 1997) (granting SEC motion

28  for summary judgment on Section 5 claim, finding that "the wire or mail transfers of

funds among [defendant], the brokerage firms, and various banks" "amply satisfied" the interstate means requirement); *U.S. v. Wolfson*, 405 F.2d 779, 784 (2d Cir. 1968) ("This subsection is violated when . . . the mails are used to…transport the securities after sale, to remit the proceeds to the seller, to send confirmation slips to the buyer, and perhaps even when used in more tangential ways").

Weaver used, or caused to be used, the mails, emails, wires and other instruments of interstate commerce in connection with the offer and sale of Jammin Java stock by his and his nominees' shell companies, which sales took place over the OTC Bulletin Board in the United States.

## C. Weaver Violated Sections 13(d)(1) and (2) of the Exchange Act, Including Rules 13d-1 and 13d-2 Promulgated Thereunder.

15 U.S.C. § 13(d) of the Exchange Act and SEC Rule 13d-1(a) require persons who acquire, directly or indirectly, beneficial ownership of more than 5% of a class of registered equity securities to file a Schedule 13D disclosure statement with the SEC. 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d-1(a). Section 13(d)(2) and Rule 13d-2(a) require reporting of material changes in ownership, such as selling shares equaling 1% of the total shares outstanding, in an amended Schedule 13D. 15 U.S.C. § 78m(d)(1) and 17 C.F.R. § 240.13d-2(a). Moreover, "scienter is not an element [the Commission] must prove under Section 13(d)." *SEC v. Levy*, 706 F. Supp. 61, 69 (D.D.C. 1989).

### 1. Beneficial owner

Rule 13d-3 defines "beneficial owner" as "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) [v]oting power which includes the power to vote, or to direct the voting of, such security; and/or (2) [i]nvestment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3(a). Once a person becomes a beneficial owner, that person is deemed to have acquired such securities for the purposes of Section 13(d)(1), whether the acquisition was through a purchase or otherwise. 17 C.F.R. §240.13d-5. "All securities of the same class beneficially owned by

a person, regardless of the form which such beneficial ownership takes, shall be aggregated in calculating the number of shares beneficially owned by such person." 17 C.F.R. § 240.13d-3(c). Weaver was the beneficial owner of more than 5% of Jammin Java stock because he had, and exercised, investment power over the Jammin Java stock held in the name of his and his nominees' shell entities.

### 2.   Group

Even if a person beneficially owns less than 5% of a class of securities, he will have a reporting obligation if he is part of a "group" which in the aggregate owns 5% or more. "When two or more persons agree to act together for the purpose of acquiring, holding, voting, or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) … of all equity securities of that issuer beneficially owned by such persons." 17 C.F.R. § 240.13d-5(b)(1) (quoted by *Jammin Java Corp.*, 2016 WL 6595133, at *15). The definition of "group" is broad; it includes any members who have "combined in furtherance of a common objective." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). This concerted action need not be reflected in writing; the agreement may be "formal or informal." *Id.,* 682 F.2d at 363.

In this case, Weaver also was part of a "group." He controlled his entities and shared control of shell entities with Wheatley, Al-Barwani, Sun, and Berlinger who served as his nominees and followed his instructions about buying and selling stock.

### 3.   Material

"An acquisition or disposition of beneficial ownership of securities in an amount equal to one percent or more … shall be deemed 'material' for purposes of [Rule 13d-2]; acquisitions or dispositions of less than those amounts may be material, depending upon the facts and circumstances." 17C.F.R. § 240.13d-2(a). Weaver, through his and his nominees' shell companies, acquired and disposed of beneficial ownership of Jammin Java stock in amounts exceeding 1%.

1

2

**D.     Weaver Violated Section 10(b) of the Exchange Act, Including Rule 10b-5 Thereunder.**

3

4

5

6

7

In addition to his registration violations, Weaver also committed fraud in violation of Exchange Act Section 10(b) and Rule10b-5(a) and (c) through his participation in a massive pump-and-dump scheme, including by engineering a sham financing agreement between Jammin Java and a phony "financing company" called Straight Path.

8

9

10

11

12

13

14

15

16

17

18

19

"Section 10(b) and Rule 10b-5 impose primary liability on any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (such as the creation or financing of a sham entity) intended to mislead investors …" *Jammin Java*, 2016 WL 6595133, at *20 (quoting *SEC v. Lee, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010)*). Liability exists where the defendant "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Simpson v. AOL Time Warner, Inc.,* 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds by Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008); *SEC v. Farmer*, 2015 WL 5838867, at *14 (S.D. Tex. Oct. 7, 2015) (granting summary judgment to SEC where defendant financed straw stock purchases because the "sham transactions … created the appearance of *bona fide* purchases of [the company's] shares").

20

21

22

23

24

To state a claim under Rules 10b-5(a) or (c), the Commission must allege (1) a device, scheme or artifice to defraud, or an act, practice or course of business that operates as fraud; (2) in connection with the purchase or sale of securities; (3) scienter; and (4) the use of interstate commerce. *Phan,* 500 F.3d at 907-08; Scienter is satisfied by showing that the defendant acted recklessly. *Burns*, 816 F.2d at 474.

25

26

27

Here, Weaver and his nominees illegally acquired and sold massive amounts of Jammin Java stock without registering any of the sales with the SEC and without disclosing his substantial ownership interest. To hide his involvement in the scheme,

28

Weaver and his nominees created shell companies in offshore jurisdictions known for financial secrecy and used those shells to carry out the trades. To increase the scheme's illicit profits, Weaver fabricated a phony financing transaction that was designed to mislead investors into thinking that an independent company was making a substantial financial investment in Jammin Java. After the market for and price of Jammin Java's stock spiked, Weaver directed the shell companies to dump their Jammin Java stock on unsuspecting investors at inflated prices, generating at least $70 million in illicit profits for Weaver and his nominees.

### E.    Requested Relief

In its Amended Complaint, the SEC requests the following types of relief against Weaver: (1) permanent injunctions barring Weaver from committing future violations of the securities laws; (2) a penny stock bar; (3) disgorgement of ill-gotten gains, including prejudgment interest; and (4) civil penalties.

### 1.    A permanent injunction is appropriate

Courts have authority to grant the SEC's request for a permanent injunction pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. To obtain an injunction, the SEC must establish that there is a reasonable likelihood of future violations. *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). Whether a likelihood of future violations exists depends upon the totality of the circumstances. *Id.* The existence of past violations may give rise to an inference that there will be future violations. *Id.* Courts also consider factors such as the degree of scienter involved, the isolated or recurrent nature of the violative conduct, the defendant's recognition of the wrongful nature of the conduct, the likelihood that, because of the defendant's occupation, future violations may occur, and the sincerity of defendant's assurances (if any) against future violations. *See id*, 626 F.2d at 655. For all of the reasons set forth above, permanent injunctions are appropriate.

### 2.    A penny stock bar should be imposed

A court may bar a defendant from participating in future penny stock offerings if he was participating in such an offering at the time he was violating the securities laws. 15 U.S.C. § 78u(d)(6)(A); *SEC v. Alliance Transcription Services, Inc.*, 2009 WL 5128565, at \*10 (D. Ariz. Dec. 18, 2009). A person is considered to be "participating in an offering of penny stock" if he was "engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of [] any penny stock." 15 U.S.C. § 78u(d)(6)(B). The definition of "penny stock" generally includes equity securities bearing a price of less than five dollars that are traded in the over-the-counter market. *See* 15 U.S.C. § 78c(a)(51) (defining "penny stock"); 17 C.F.R. § 240.3a51-1(a)(setting forth criteria to be met for security to be exempted from definition of penny stock); *Koch v. SEC,* 177 F.3d 784, 785 n.1 (9th Cir. 1999) ("'Penny stocks are low-priced, highly speculative stocks generally sold in the over-the-counter (OTC) market and generally not listed on an exchange.").

Courts consider the following factors when determining whether to impose a penny stock bar: (1) the egregiousness of the underlying securities violation; (2) the defendant's "repeat offender" status; (3) the defendant's role or provision when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur. *Alliance Transcription,* 2009 WL 5128565, at \*10.

Here, Weaver violated the federal securities laws while participating in an offering of Jammin Java's penny stock. For all the reasons set forth above, a permanent penny stock bar should be imposed against him.

### 3.    Disgorgement should be ordered

Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable; a district court has broad equity powers to order the disgorgement of ill-gotten gains

obtained through violation of the securities laws. *SEC v. Platforms Wireless, 617 F.3d 1072, 1096 (9th Cir. 2010)*; *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998). "The amount of disgorgement should include all gains flowing from the illegal activities." *Platforms Wireless*, 617 F.3d at 1096, *quoting SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1114 (9th Cir. 2006).

The SEC need only present evidence of a "reasonable approximation" of the defendant's ill-gotten gains. *Platforms Wireless*, 617 F.3d at 1096. The burden then shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *Platforms Wireless*, 617 F.3d at 1096, *quoting SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989).

Additionally, disgorgement normally includes prejudgment interest to insure that wrongdoers do not profit from their illegal conduct, which may be calculated based on the rate provided in 26 U.S.C. § 6621 for tax underpayments. *See Platforms Wireless*, 617 F.3d at 1099.

### 4. Civil penalties should be imposed

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] provide U.S. District Courts with the authority to impose civil penalties for federal securities laws violations. Those statutes establish the following three tiers of penalties, to be determined in light of the facts and circumstances of each case.

    a.   <u>First Tier.</u> For each violation, the amount of penalty shall not exceed the greater of (i) $5,000 for a natural person or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.

    b.   <u>Second Tier.</u> The amount of penalty for each such violation shall not exceed the greater of (i) $50,000 for a natural person or $250,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.

   c.   <u>Third Tier.</u> The amount of penalty for each such violation shall not exceed the greater of (i) $100,000 for a natural person or $500,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.

Third tier penalties, which are the most severe of the civil penalties, are available when securities law violations (1) involve "fraud, deceit, manipulation, or reckless disregard for a regulatory requirement" and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id*. The penalty amounts are periodically adjusted for inflation. *See SEC v. Murray,* 2016 WL 6893880, at *8 (N.D. Cal. Nov. 23, 2016). During the time period at issue in the Amended Complaint, the Court may impose, for each violation of the securities laws, a third tier penalty not to exceed the greater of $150,000 for a natural person or the "gross amount of pecuniary gain." 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 17 C.F.R. § 201.1001(a) (2017) (Table I, Mar. 4 2009-Mar. 5, 2013). The factors courts use to determine the appropriateness of an injunction are helpful when assessing penalties. See *SEC v. Abacus Int'l Holding Corp.*, 2001 WL 940913, at *5 (N.D. Cal. August 16, 2001).

Here, the SEC seeks, and the evidence justifies, the imposition of third tier penalties against Weaver for his fraudulent conduct.

## VII.   <u>Bifurcation of Issues</u>

All relief is to be determined by the Court. *See SEC v. Capital Solutions Monthly Income Fund, LP*, 818 F.3d 346, 355 (8th Cir. 2016) (holding defendant was not entitled to have the jury decide remedies); *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993) (no right to jury trial in SEC action seeking injunctive and disgorgement relief); *Tull v. United States*, 481 U.S. 412, 427 (1987) (the court, not a jury, determines the amount of civil penalty).

To the extent that evidence necessary for the SEC to prove its entitlement to the relief is not presented to the jury, the SEC requests that it be allowed to introduce

additional facts and law in support of its remedies following trial on Weaver's liability.

## VIII.  <u>Jury Trial</u>

The SEC made a timely jury demand. (Dkt. no. 1.) In an SEC enforcement action, issues of liability are tried by a jury; however, remedies are determined by the Court. *See Capital Solutions Monthly Income Fund,* 818 F.3d at 355(holding defendant was not entitled to have the jury decide remedies); *Rind*, 991 F.2d at 1493 (no right to jury trial in SEC action seeking injunctive and disgorgement relief); *Tull*, 481 U.S. at 427 (the court, not a jury, determines the amount of civil penalty).

## VIII.  <u>Attorneys' Fees</u>

The SEC does not seek attorneys' fees in this action.

## IX.     <u>Abandonment of Issues</u>

The SEC is not abandoning any of the claims pleaded in its Amended Complaint.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
*s/Timothy S. Leiman*

Timothy S. Leiman

Dated: May 30, 2017