TIMOTHY S. LEIMAN, Ill. Bar No. 6270153
Email: leimant@sec.gov
DANIEL J. HAYES Ill. Bar No. 6243089
Email: hayesdj@sec.gov
PETER SENECHALLE, Ill Bar No. 6300822
Email: senechallep@sec.gov

175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Facsimile:  (312) 353-7398

LOCAL COUNSEL
Lynn M. Dean, Cal. Bar No. 205562
Email: deanl@sec.gov
United States Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

Attorneys for Plaintiff
United States Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>JAMMIN' JAVA CORP., dba MARLEY COFFEE, SHANE G. WHITTLE, WAYNE S. P. WEAVER, MICHAEL K. SUN, RENE BERLINGER, STEPHEN B. WHEATLEY, KEVIN P. MILLER, MOHAMMED A. AL-BARWANI, ALEXANDER J. HUNTER, and THOMAS E. HUNTER,<br><br>Defendants. | Case No. 2:15-CV-08921 SVW (MRWx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE AND MONETARY RELIEF**<br><br>Hearing Date: August 28, 2017, 1:30 PM<br>Hon. Stephen V. Wilson<br>Courtroom 10A |

On May 31, 2017, the Court found Defendant Wayne Weaver liable for violating federal securities law in connection with (a) his fraudulent manipulation of the stock of Jammin Java Corp. ("Jammin Java"), (b) his failure to disclose his massive ownership interest in that stock (well in excess of the 5% SEC reporting threshold), and (c) his unregistered dumping of Jammin Java stock into the public market. (Dkt. #215.) As the Court found, Weaver "made millions of dollars in profit" from his fraud. (*Id*. at 7.) Indeed, the undisputed facts establish that Weaver and his co-Defendants reaped over $77.6 million in profits from their illegal sales of Jammin Java stock. (Dkt. #173, SJ SOF ¶¶ 71-72.)[1]

Weaver's violations were egregious both in sheer size and in his persistent efforts to cover up his conduct. The unrebutted evidence shows that, during the fraud, Weaver (a) used a series of offshore shell companies to avoid trading in his own name (*id*. ¶ 2), (b) traded U.S. stocks through Swiss bank accounts to take advantage of additional privacy protections (*id*.), (c) avoided SEC disclosure requirements by spreading his Jammin Java stock among his shell entities (*id*. ¶¶ 64-70), (d) attempted to hide some of his illicit proceeds by buying gold Krugerrand and transferring funds to the Turkish account of a Dubai-based shell company (*id*. ¶¶ 93-95), and (e) told his agents to hide information from law enforcement (*id*. ¶ 80). Weaver's subterfuge comes as no surprise. After all, according to witness testimony, Weaver had considerable professional expertise in creating anonymous offshore shell entities for clients – a job that creates a substantial danger that he will repeat his scheme through

---

[1] To avoid a duplicative factual recitation, this brief refers to the undisputed facts identified in its summary judgment pleadings. Specifically, to avoid inundating the Court with duplicative exhibits, the SEC, where possible, will cite to (a) the undisputed facts submitted in connection with its motion for summary judgment ("Dkt. #173, SJ SOF ¶ __"), to the March 29, 2017 Declaration of SEC Accountant Kevin Barrett ("Dkt. #174-1 and 174-2 3/29/2017 Barret Dec. at __"), and to exhibits submitted in connection with the SEC's Summary Judgment filings. Other than a near-blanket authenticity objection that was overruled, Defendant Weaver has not disputed the accuracy of any of the evidence submitted by the SEC at the summary judgment stage. Additional exhibits in support of the SEC's Motion for Remedies – including a second declaration from Mr. Barrett – will be cited as ("SEC Rem. Ex. __ at __").

other vehicles. (*Id*. ¶ 1.)

There were no *bona fide* factual disputes on the issue of liability. The same is true at the relief stage. The SEC has presented undisputed evidence of Wayne Weaver's conduct and the illicit gains earned by Weaver and his nominees during the scheme. Weaver, meanwhile, has asserted his Fifth Amendment rights – allowing this Court to take an adverse inference against him when evaluating remedies.

Based on the undisputed facts, the SEC respectfully requests that the Court enter a final judgment against Defendant Weaver that (1) permanently enjoins Weaver from violating the statutes identified in the SEC's Amended Complaint, (2) orders Weaver to disgorge $47,442,101.70 in ill-gotten gains from his unregistered (and fraudulent) sales of Jammin Java stock, (3) orders Weaver to pay an additional $9,393,958.48 in prejudgment interest on his ill-gotten gains, and (4) imposes a maximum civil penalty against Weaver equal to the amount of disgorgement.

To be sure, the monetary relief requested is substantial. But, Weaver's conduct was particularly egregious and alarmingly profitable. He conducted a scheme that generated $77.6 million in illegal profits and tried to obscure his conduct using sophisticated financial tools and a complex web of international transactions. Worse, when he learned of a law enforcement investigation, he tried to hide his fraud and safeguard his illegal profits. He has offered no acknowledgment of wrongdoing or assurances that his fraud will not be repeated. Weaver's egregious conduct warrants the full relief authorized by law.

## DISCUSSION

### I.    A Permanent Injunction Is Warranted.

As the Court has found, Defendant Weaver made millions in the course of his blatant "pump and dump" scheme. (Dkt. #215 at 7.) Although he was caught this time, the danger to the investing public remains: Weaver acted with a high degree of cunning and subterfuge, is an expert in obscuring financial transactions through offshore shell companies, has demonstrated a persistent affinity for trading U.S.

2

penny stocks, has not acknowledged any wrongdoing, and has taken affirmative steps to hide his misconduct. Under such circumstances, a permanent injunction against future securities law violations is warranted.

Injunctive relief of this kind is "the primary statutory remedy for violations of the federal securities laws." *SEC v. Pattison*, 2011 WL 723600, *1 (C.D. Cal. Dec. 23, 2011) (*citing SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984)). This Court has the authority to grant the SEC's request for a permanent injunction pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. To obtain an injunction, the SEC must establish that there is a reasonable likelihood of future violations. *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). Whether a likelihood of future violations exists depends upon the totality of the circumstances. *Id.* In determining whether an injunction is appropriate, Courts consider the following factors: (1) the degree of scienter involved, (2) the isolated or recurrent nature of the misconduct, (3) the defendant's recognition of the wrongful nature of the conduct, (4) the likelihood that, because of the defendant's occupation, future violations may occur, and (5) the sincerity of defendant's assurances (if any) against future violations. *See id*.

Here, all of those factors weigh in favor of a permanent injunction:

- **Degree of Scienter**: The Court already has found that Weaver acted with scienter while playing a critical role in the Jammin Java "pump and dump" scheme. (Dkt. #215 at 6-7.) The undisputed facts demonstrate that Weaver's fraud involved intricate planning: he executed the scheme and avoided detection through a complex web of financial transactions routed through an extensive network of offshore shell entities, Swiss bank accounts, and nominee officers. (*See, e.g.,* Dkt. #173, SJ SOF ¶¶ 2, 7-24, 51, 63-67, 73-84, 86-97.) Weaver's advanced planning (and sophisticated execution) reflects a high degree of scienter. *See, e.g., SEC v. Brandonisio*, 2013 WL 5371626, *6 (D. Nev. Sept. 24, 2013) (entering permanent injunction against defendant for "pump and dump" scheme, holding that defendant acted with a high

degree of scienter as he "was a sophisticated businessman who knew how to establish and control offshore entities by proxy"). Weaver's scienter is further reflected in his conduct <u>after</u> he illegally dumped Jammin Java stock on the public. After learning of the SEC's investigation, Weaver tried to cover his tracks by (a) adopting a pseudonym to obscure his e-mail communications,[2] (b) moving some of Defendants' illegal profits into gold and a Turkish bank account (Dkt. #173, SJ SOF ¶ 95), and (c) instructing his agents to hide information from Swiss regulators regarding the beneficial owners of his web of shell entities (*Id.* ¶ 80; Dkt. #174-15 at 1, 5). Compounding matters, Weaver pled the Fifth and refused to participate in discovery. In sum, the undisputed facts prove that Weaver's violations were committed with considerable sophistication and subterfuge, reflecting an extreme danger that Weaver will apply his skills to repeat his fraud.

- **Isolated/Recurrent Nature of Conduct**: Weaver is not a recidivist; this is the first time he has been caught violating federal securities law in the United States. But, "first offenders are not immune from injunctive relief." *SEC v. Alexander*, 115 F. Supp. 3d 1071, 1086 (N.D. Cal. 2015) (*quoting SEC v. Shapiro*, 494 F.2d 1301, 1308 (2d Cir. 1974). This factor does not hinge exclusively on whether Weaver has prior convictions or civil judgments. The Court also may evaluate the length of Weaver's scheme, the number of illicit transactions and whether Weaver engaged in repeated acts of deception. *See, e.g., Alexander*, 115 F. Supp. 3d at 1086 (finding that a two-year scheme to defraud, impacting dozens of investors weighs in favor of entering an injunction even though defendant was a "first time offender"); *SEC v. Kumar*, 2015 WL 6912006, *9 (N.D. Cal. Oct. 19, 2015). For example, in finding that this factor weighed in favor of an injunction against a first-time offender, the district court in *Kumar* held that "although the allegations reflect

---

[2] Rene Berlinger – Weaver's nominee – testified that Weaver used the alias "John Combray" after learning of the SEC's invstigation. (SEC Rem. Ex. 2, Berlinger Tr. at 152-153; SEC Rem. Ex. 3, Email from "John Combray" to R. Berlinger.)

only one fraudulent scheme, the misconduct at issue is more properly characterized as 'recurrent' rather than 'isolated': [defendant's] scheme extended over a period of years, he engaged in numerous acts of deception both to perpetuate the fraud and to conceal it after the fact, and he failed to meaningfully cooperate with the SEC's administrative investigation." *Kumar*, 2015 WL 6912006 at *9.

So it is here. Weaver's violations do <u>not</u> stem from an isolated instance of misconduct. Rather, as established at summary judgment, Weaver's fraudulent scheme and unlawful stock distribution involved a series of deceptive acts that unfolded over more than 17 months.[3] To complete his scheme (and conceal it), Weaver (1) created numerous offshore shell companies (*e.g.,* Dkt. #173, SJ SOF ¶¶ 2, 7-24, 86-97), (2) amassed a 49% stake in Jammin Java through a series of transactions with Jammin Java's former CEO (*Id*. ¶¶ 51-52, 63-67), (3) spread the shares among entities owned by himself and his nominees to avoid SEC reporting obligations (*Id*. ¶¶ 51-52, 63-70), (4) created a bogus financing company out of whole cloth (*Id*. ¶¶ 53- 61), (5) engaged in a synchronized dumping of Jammin Java stock along with his nominees (*Id*. ¶¶ 71-72), (6) took steps to hide some of the resulting profits (by ordering the purchase of gold coins and the creation of a new Dubai-based shell company) (*Id*. ¶ 95), and (7) instructed his agents to withhold information from Swiss regulators (*Id*. ¶ 80). Those recurrent, deceptive acts weigh heavily in favor of an injunction.

- **Defendants' Recognition of Wrongdoing**: At no point has Weaver recognized that his conduct was illegal. To the contrary, on the one occasion that Weaver addressed the merits of the case, he professed his innocence. In responding to the SEC's fraud claims, Weaver argued that the bogus Straight Path agreement was

---

[3] The undisputed evidence shows that the scheme began no later than October 2010, when Weaver and his co-Defendants met in Switzerland to discuss Weaver's business "deals" (Dkt. #173, SJ SOF ¶ 11), that Defendants' illicit trading lasted until May 11, 2011 (Dkt. #174-2 at p. 14), and Weaver's movement of illicit proceeds continued until (at least) April 2012 (when Weaver helped create a new Dubai-based shell that housed $11.3 million in Jammin Java profits) (*Id*. at p. 59; Dkt. #173, SJ SOF at ¶ 95(c)-(d)).

1  "entirely legitimate" and denied that he played a significant role in its creation. (Dkt.

2  #177 at 15, 20-21.) As one Court of Appeals noted, "the criminal who in the teeth of

3  the evidence insists that he is innocent . . . demonstrates by his obduracy the

4  likelihood that he will repeat his crime." *See SEC v. Lipson*, 278 F.3d 656, 664 (7th

5  Cir. 2002); s*ee also SEC v. Abernathy*, 2012 WL 7679270, at *5 (W.D. Mich. Nov.

6  30, 2012) ("Defendants have never acknowledged the wrongful nature of their

7  conduct, nor have they provided any assurances against future violations. The

8  absence of such acknowledgments and assurances weighs in favor of a permanent

9  injunction"). Weaver's insistence that Straight Path was "legitimate" – despite

10  overwhelming evidence to the contrary – reflects a danger of future violations.

11       • **Weaver's Occupation**: Weaver's chosen occupation presents an

12  extreme risk of future violations. The undisputed evidence in this case reflects that he

13  had <u>two</u> jobs, each central to the fraud at issue. <u>First</u>, Weaver owned and operated a

14  business that created the very types of shell entities that he used to surreptitiously

15  trade Jammin Java stock. Wheatley, Sun, and Berlinger each testified that Weaver

16  was in the business of forming offshore shell companies, trusts, or "special purpose

17  vehicles" so he could manage client assets with anonymity. (Dkt. #173, SJ SOF at ¶

18  1; Dkt. #174-3, Berlinger Tr. 33-35; Dkt. #174-6, Sun Tr. 13-23; Dkt. #174-44,

19  Wheatley Tr. 19-21.) <u>Second</u>, Wheatley and Al-Barwani each testified that Weaver

20  was in the business of bringing penny stock companies public. (Dkt. #174-44,

21  Wheatley Tr. 21-24; Dkt. #174-21, Al-Barwani Tr. 11-16, 35-36.) The undisputed

22  facts in this case demonstrate that Weaver's apparent business model for "taking

23  companies public" was illegal. He created a public market for Jammin Java by (a)

24  obtaining large blocks of stock from an insider (Dkt. #173, SJ SOF ¶¶ 51-52, 63-67),

25  (b) creating a fake financing agreement to stimulate interest in the stock (*id*. at ¶¶ 53-

26  62), and (c) dumping his shares on the investing public without registration (*id*. at ¶¶

27  71-72, 85; Dkt. #274-1, 3/29/2017 Barrett Dec. at ¶¶ 42-44). In short, Weaver's

28  professional expertise, and skill at obscuring financial transactions puts him in the

perfect position to commit this type of securities fraud again and presents a

significant risk of future violations.

- **<u>Sincerity of Weaver's Assurances Against Future Violations</u>**: Weaver

has offered <u>no</u> assurances against future violations. Rather, Weaver has asserted his

Fifth Amendment rights and refused to participate in discovery.

In sum, each of the relevant factors reflects that – unless enjoined – Weaver

likely will repeat his violations in the future. A permanent injunction is warranted to

guard against that risk.

**II. <u>A Penny Stock Bar Is Warranted</u>**.

In conducting his unregistered offering and "pump and dump" scheme, Weaver

targeted a penny stock company – *i.e.*, a company with stock that trades at less than

five dollars per share on the over-the-counter market. *See* 15 U.S.C. § 78c(a)(51); 17

C.F.R. § 240.3a51-1(a); *Koch v. SEC*, 177 F.3d 784, 785 n.1 (9th Cir. 1999) ("'Penny

stocks are low-priced, highly speculative stocks generally sold in the over-the-counter

(OTC) market and generally not listed on an exchange"). Congress and courts have

long recognized that penny stocks are particularly vulnerable to the type of

manipulative scheme that Weaver executed:

> Penny stocks are often thinly traded and this more readily facilitates control
> and domination by a single market maker. The securities thus become
> attractive vehicles for manipulative, artificial schemes which are intended to
> raise the price or volume of the securities, primarily for the benefit of the
> few anonymous insiders.

*SEC v. Children's Internet, Inc*., 2008 WL 4452340, *6-*7 (N.D. Cal. Oct. 3,

2008) (*quoting* H.R. Rep. No. 101-617 (1990)).

To address that vulnerability, Congress gave courts statutory authority to bar a

defendant from participating in penny stock offerings. 15 U.S.C. § 78u(d)(6)(A); *SEC

v. Alliance Transcription Services, Inc.*, 2009 WL 5128565, at *10 (D. Ariz. Dec. 18,

2009). To obtain a penny stock bar, the SEC must show that the defendant was participating in such an offering at the time he was violating the securities laws. A person is considered to be "participating in an offering of penny stock" if he was "engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of [] any penny stock." 15 U.S.C. § 78u(d)(6)(B).

In deciding whether to impose a penny stock bar, Courts weigh factors similar to those used when considering a permanent injunction: (1) the egregiousness of the underlying securities violation; (2) the defendant's "repeat offender" status; (3) the defendant's role when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur. *Alliance Transcription,* 2009 WL 5128565, at *10.

Here, there is no doubt that Weaver engaged in a penny stock offering when he violated federal securities law. At all relevant times, Jammin Java shares met the statutory definition of "penny stock." Every day of the "pump and dump" scheme, Jammin Java (1) was quoted on the NASD Over-the-Counter Bulletin Board ("OTCBB") under the ticker symbol ("JAMN") (Dkt. #173, SJ SOF ¶ 38), and (2) traded exclusively at less than $5.00 per share (Dkt. #174-2, 3/29/2017 Barrett Dec. at Ex. D).[4] And, as shown above, save for the fact that Weaver is not a "repeat offender," all of the relevant criteria weigh strongly in favor of a penny stock bar. Weaver: (a) committed an egregious fraud, (b) was at the center of the scheme (in that he directed illicit trades and the creation of the Straight Path shell), (c) acted with a high degree of scienter, (d) reaped millions from his misconduct, and (e) has displayed a persistent affinity (and talent) for financial subterfuge. Thus, a permanent penny stock bar is warranted.

---

[4] Jammin Java's share price briefly exceeded $5.00 per share on three trading days between May 12 and May 16, 2011. (Dkt. #174-2 at p. 30.) But, by then, Weaver and his nominees had dumped their stock. (*Id.* at pp. 9-14.) And, by the close of trading on May 16, 2011, Jammin Java's share price once again sunk below $5.00 per share (a benchmark it has never hit since). (*Id.* at pp. 30-33.)

### III.        Weaver Should Disgorge His Ill-Gotten Gains.

Weaver's scheme to manipulate Jammin Java's share price – and his unregistered dumping of Jammin Java stock – was immensely profitable. In total, shell entities owned by Weaver – and by his co-Defendants – realized $77.6 million in illicit gains through their unregistered sale of Jammin Java stock to the public. (Dkt. #173, SJ SOF ¶ 71.) The bulk of that profit went to shell companies that Weaver owned or controlled through nominees acting at his direction. (Dkt. #174-2, 3/29/2017 Barrett Dec. at Ex. C(i) and C(ii).) At summary judgment, the SEC established Weaver's ill-gotten gains through the financial summaries of its Enforcement Accountant, Kevin Barrett. Weaver has never disputed Mr. Barrett's calculations and the Court has ruled that his calculations and summary testimony are admissible. (Dkt. #215 at 4-5.) Mr. Barrett's declaration and supporting schedules confirm that Weaver realized over $47.4 million in ill-gotten gains. (*Id.*; SEC Rem. Ex. 1, 7/10/2017 Barrett Dec. at ¶¶ 7-13.) That amount should be disgorged.

Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making their violations unprofitable. Courts have broad power to order disgorgement of ill-gotten gains. *SEC v. Platforms Wireless,* 617 F.3d 1072, 1096 (9th Cir. 2010); *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998). "The amount of disgorgement should include all gains flowing from the illegal activities." *Platforms Wireless*, 617 F.3d at 1096, *quoting SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1114 (9th Cir. 2006) (emphasis added).[5]

The SEC does not need to prove Weaver's gains with complete precision; it need only present a "reasonable approximation" of his ill-gotten gains. *See Id.* at

---

[5] Recently, the Supreme Court held that SEC disgorgement claims are subject to the five-year statute of limitations of 28 U.S.C. § 2462. *See SEC v. Kokesh*, __ S.Ct. __, 2017 WL 2407471, *1 (2017). That holding does not affect the SEC's disgorgement claim here. All of the illicit proceeds identified herein came from illegal trading in Jammin Java stock executed between December 23, 2010 and May 2011. (Dkt. #174-2, 3/29/2017 Barrett Dec. at Ex. C(i) and C(ii).) All of those trades were within five years of the SEC's November 17, 2015 Complaint. (Dkt. #1.)

1096. The burden then shifts to Weaver to "demonstrate that the disgorgement figure
was not a reasonable approximation." *Id.*, *quoting SEC v. First City Financial Corp.,
Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989). And, Weaver must bear the risk of any
ambiguity in calculating disgorgement; as long as the SEC's measure of
disgorgement is reasonable, "any risk of uncertainty should fall on the wrongdoer
whose illegal conduct created the uncertainty." *Id*. Further – and of particular
relevance in <u>this</u> scheme – a "person who controls the distribution of illegally
obtained funds is liable for the funds he or she dissipated as well as the funds he or
she retained." *Id*. at 1098. In addition to ordering disgorgement, this Court has broad
discretion to order that Weaver pay prejudgment interest on his ill-gotten gains to
make sure that he does not receive the equivalent of an interest-free loan on the fruits
of his fraud. *See Id.* at 1099. The Court may assess prejudgment interest at the rate
applied by the IRS for the underpayment of taxes under 26 U.S.C. § 6621. *See id*.
(holding that the IRS underpayment rate is a more appropriate measure of
prejudgment interest in SEC enforcement cases than the Treasury bill rate).

Here, Weaver went to great lengths to obscure his transactions and hide his
profits. The undisputed evidence reflects that Weaver used offshore shell companies
in multiple jurisdictions, traded through a series of Swiss bank accounts, hired a
group of nominees so that he did not have to trade in his own name, avoided
discovery by pleading the Fifth, and instructed intermediaries to hide information
from foreign regulators. All of those activities were designed to throw law
enforcement agencies off Weaver's scent. Now, Weaver must bear the risk of any
uncertainty that he created. Despite Weaver's best efforts to avoid detection and
create uncertainty, the SEC has been able to identify a large portion of his illicit
profits. Mr. Barrett's summary schedules provide a reasonable approximation of
Weaver's gains. There are <u>four</u> categories of illicit profits that should be disgorged
from Weaver: (1) profits from illegal sales of Jammin Java stock made by offshore
shells that Weaver owned; (2) additional cash transferred to Weaver from entities

owned by Weaver's nominees; (3) amounts that Weaver tried to hide from regulators (*i.e.*, $2 million of gold Kruggerrand and $11.3 million transferred to a Dubai shell entity's bank account in Turkey), and (4) balances in bank and brokerage accounts that Weaver controlled through his nominees. In total, the SEC requests that Weaver be ordered to pay $47,442,101.70 in disgorgement and $9,393,958.48 in prejudgment interest (a total of $56,836,060.18).

### A. Disgorgement Of Ill-Gotten Gains of Weaver's Shell Companies.

In its summary judgment ruling, the Court highlighted an e-mail chain containing a September 12, 2011 e-mail in which Weaver admitted that he traded Jammin Java stock out of his wholly-owned shell companies. (Dkt. #215 at 5 (citing Dkt. #174-15).) Indeed, the undisputed evidence submitted at summary judgment has proven that Weaver illegally sold Jammin Java stock through five of his wholly-owned offshore shell entities. (Dkt. #173, SJ SOF ¶¶ 2, 71-72, 80-84; Dkt. #174-2, 3/29/2017 Barrett Dec. at Ex. C(i) and C(ii); Dkt. #174-15.) Any measurement of Weaver's ill-gotten gains must start with the trading profits that those companies garnered when they dumped their Jammin Java shares on the public. As reflected in Mr. Barrett's analysis, Weaver's entities profited from those illegal trades as follows:

| Entity | Gains From The Illegal Sale of Jammin Java Stock |
|---|---|
| Arcis | $ 6,306,924.44 |
| Donnolis | $ 156,497.46 |
| Manitou | $ 5,855,174.87 |
| Timotei | $ 4,686,330.77 |
| Calgon | $ 5,807,226.65 |
| **TOTAL:** | **$ 22,812,154.19** |

(SEC Rem. Ex. 1, 7/10/2017 Barrett Dec. at ¶¶ 6-7.) That $22,812,154.19 in illicit trading profits should be disgorged. In addition, Weaver should pay prejudgment

interest on those profits. Using the IRS underpayment rate measured from May 2, 2011 [6] through the end of June 2017, prejudgment interest for Weaver's wholly-owned entities is $4,980,373.15. (*Id*. at ¶¶ 14-17.) Consequently, for just the entities he owned, Weaver should be ordered to pay $27,792,527.34  in disgorgement and prejudgment interest.

**B. Disgorgement of $3.5 Million In Cash Sent To Weaver By His Nominees.**

In addition to his own trading profits, Weaver received cash transfers – totaling over $3.5 million – from entities owned by Weaver's nominees. Those transfers were the direct proceeds of illegal, unregistered sales of Jammin Java stock during Weaver's fraud and are, therefore, subject to disgorgement. During the scheme, Weaver received four such cash transfers:

- On March 15 and April 21, 2011, Weaver's Arcis entity received cash transfers from Sun's Torino of $700,000 each ($1.4 million total). (Dkt. #174-2 at pp. 53, 56.) Those payments to Weaver came out of proceeds from Torino's unregistered sales of Jammin Java stock. (*Id*. at p. 53.)

- On March 25, 2011, Defendant Kevin Miller's shell company – Las Colinas Ltd. – transferred $1,000,022.09 to a Barclay's account in the name of Blue Leaf Capital Ltd. (*Id*. at p. 51.) These funds came from Las Colinas' unregistered sales of Jammin Java stock. (*Id*. at pp. 16, 51; SEC Rem. Ex. 1, 7/10/2017 Barrett Dec. at ¶ 10.) As the Court found in its summary judgment ruling, Blue Leaf Capital was Weaver's entity. (Dkt. #215 at 7.) Indeed, Weaver described Blue Leaf as "my main investment account." (Dkt. #173, SJ SOF ¶ 77.)

- On September 23, 2011, Weaver's Donnolis shell received a $1,159,409.08 cash payment from Westpark (controlled by Weaver's nominee, Sun).

---

[6] The illegal, unregistered Jammin Java sales by these entities took place between December 23, 2010 and May 2, 2011. The Court <u>could</u> order that prejudgment interest be measured for each individual sale based on the date of the specific transaction. That would result in a larger interest obligation than requested here. But, in an abundance of caution – and for ease of calculation – the SEC requests prejudgment interest starting on the date of the <u>last</u> illegal sale.

(*Id*. ¶ 79(d).) This payment to Weaver was part of the unregistered offering and illegal "pump and dump" scheme – the cash (a) was transferred pursuant to a "share purchase agreement" which transferred over 2.8 million shares of Jammin Java stock from Donnolis to Westpark (stock which was then dumped on the market without registration) (*Id*. ¶ 63(e); Dkt. #174-1 at ¶ 34(e), 52(d)), and (b) came from the proceeds of Westpark's unregistered sale of Jammin Java stock (*Id*.; Dkt. #174-2 at p. 54; SEC Rem. Ex. 1, 7/10/2017 Barrett Dec. at ¶ 10).

In sum – in addition to the illicit profits of his own shell companies – Weaver received $3,559,431.17 in cash from entities owned by his nominees in connection with the unregistered offering of Jammin Java stock and Defendants' "pump and dump" scheme. That amount should be disgorged along with $772,310.36 in prejudgment interest.[7] (SEC Rem. Ex. 1, 7/10/2017 Barrett Dec. at ¶¶ 9-10.)

**C. Disgorgement of Amounts Hidden By Weaver.**

When Weaver learned that the SEC was investigating his fraud, he tried to hide some of the profits from Defendants' illegal Jammin Java sales. Weaver's nominee – Rene Berlinger – testified that, after Weaver discovered the SEC's investigation, he feared that the Swiss authorities would freeze accounts belonging to Weaver's network of shell entities. (SEC Rem. Br. Ex. 2, Berlinger Tr. 168-169, 173-175.) Weaver then took steps to "get[] money out of the banking system" and to "get away from Switzerland." (*Id*.)

Weaver should be held liable for the amounts that he tried to hide. <u>First</u>, the undisputed evidence establishes that on December 16, 2011, Weaver directed his nominee (Mohammed Al-Barwani) to transfer $2 million from Al-Barwani's Renavial shell entity into gold coins (specifically, South African Kruggerrand). (Dkt. #173, SJ SOF ¶ 95(a).) Al-Barwani followed Weaver's instructions and bought $1,974,282.55 of gold using proceeds from Renavial's dumping of Jammin Java

---

[7] Calculated using the IRS underpayment rate from the date the cash was received through the end of June 2017.

stock. (Dkt. #174-2 at p. 59; SEC Rem. Ex. 1, 7/10/2017 Barrett Dec. at ¶ 11.) Al-Barwani testified that he has no idea where the gold went after the order was placed, but that his understanding was that the gold belonged to "Wayne." (Dkt. #174-21, Al-Barwani Tr. 47-48.) Berlinger's testimony shines some light on the gold's fate. Berlinger has testified that – after Al-Barwani followed Weaver's purchase instruction – the gold was transferred out of Renavial's account to a storage facility. (SEC Rem. Ex. 2, Berlinger Dep. at 176.) According to Berlinger, Weaver knows where the gold is located. (*Id*. at 177.) Because Weaver has pled the Fifth, the ultimate fate of the $2 million in gold Kruggerrand is unknown. But, disgorgement equal to the amount of the gold purchase is warranted because the undisputed evidence reflects that the gold was under his control. After all, Weaver (a) made the decision to buy the gold, (b) decided the amount and timing of the purchase, (c) executed the transaction to get illicit profits out of the Swiss banking system, and (d) is one of the only people who knows where the gold is. (Dkt. #174-21, Al-Barwani Tr. 40-48; SEC Rem. Ex. 2, Berlinger Tr. 168-169, 173-177.)

Weaver also should be held liable for $11.3 million of Jammin Java sales proceeds sent to the Turkish bank account of Tare Finance – a Dubai-based shell entity that Weaver formed. Again, Berlinger provides the context: he testified that Weaver was worried that his proceeds could be frozen by Swiss regulators and that Tare Finance was created to help "get away from Switzerland." (*Id*. at 173-177.) To execute that plan, Berlinger referred Weaver to Benjamin Altun, a Dubai-based "fiduciary" who helped set up the Tare Finance shell. (*Id*.) Weaver then instructed Al-Barwani to sign on as the "mandator" of Tare finance. Al-Barwani followed Weaver's instruction and Berlinger (Weaver's nominee) executed a transfer of $11.3 million of Jammin Java proceeds from Renavial to Tare Finance's bank account in Turkey. (*Id*. at 173-182; Dkt. #174-21, Al-Barwani Tr. 53-59; Dkt. #174-2 at p. 59.)

True, the ultimate distribution of the assets that Weaver hid is uncertain. Fortunately, the Court does not need to navigate the thicket that Weaver built. Rather,

the onus is on Weaver to provide clarity as (a) <u>Weaver</u> must bear the risk of the uncertainty that he created, and (b) as the "person who controls the distribution of illegally obtained funds," Weaver "is liable for the funds he [] dissipated as well as the funds he [] retained." *See Platforms Wireless*, 617 F.3d at 1096, 1098.[8] As such, disgorgement of the $13.3 million that Weaver hid is warranted.

Again, the Court should order that Weaver pay prejudgment interest on the amounts he hid. Using the IRS underpayment rate starting on the date of the transfers, prejudgment interest on this portion of Weaver's disgorgement obligation would be $2,431,910.38. (SEC Rem. Ex. 1, 7/10/2017 Barrett Dec. at ¶¶ 14-17.)

**D. Disgorgement of Ill-Gotten Gains Of Entities Weaver Controlled Through His Nominees (Al-Barwani, Sun, and Miller):**

In addition to the ill-gotten gains described above, Weaver also should be held liable for the balances in bank and brokerage accounts that he controlled through his nominees (Sun, Al-Barwani, and Miller). At summary judgment, the SEC showed through uncontroverted evidence that Weaver controlled financial transactions for entities nominally owned by his co-Defendants – Michael Sun, Mohammed Al-Barwani, and Kevin Miller. (*See, e.g.,* Dkt. #173, SJ SOF ¶¶ 86-96.) While Miller asserted his Fifth Amendment rights, both Al-Barwani and Sun testified that they acted as Weaver's nominees; they were paid to follow Weaver's directions regarding financial transactions. (*See id.* ¶¶ 88-95.) By December 31, 2012 – after the illegal Jammin Java sales were complete and Weaver's nominees were paid for their services – each of the nominee-owned shell entities still had large cash balances (and some stock) left over from their illegal trading:

| Entity | Cash Balance At End of Scheme |
|---|---|
| Torino (Sun) | $ 3,069,736.68 |

---

[8] And, once again, Weaver's invocation of the Fifth Amendment allows the Court to infer that – had Weaver told the truth about the money he hid – the answers would hurt him.

| Westpark (Sun) | $ 1,506,396.38 |
| Las Colinas (Miller) | $ 1,599,038.22 |
| Renavial (Al-Barwani) | $ 1,621,040.64 |
| **TOTAL:** | **$ 7,796,211.92** |

(SEC Rem. Ex. 1, 7/10/2017 Barrett Dec. at ¶¶ 12-13.)

These amounts should be included in Weaver's disgorgement calculation. He controlled these entities, directed stock sales and the transfer of proceeds through these entities, and paid nominees to serve as his proxies and follow his instructions. (*See, e.g.*, Dkt. #173, SJ SOF ¶¶ 86-96.) Since Weaver controlled the distribution of the ill-gotten profits of those entities, he should be held liable for the balances in these entities' accounts (whether he dissipated them or retained them).

By measuring this portion of disgorgement by the December 31, 2012 account balances – as opposed to the gross profits earned by each shell entity – the SEC is taking a reasonable, conservative approach. This "year-end balance method" actually excludes large portions of the proceeds of Weaver's scheme, including: (a) a series of transfers to Lebanese bank accounts in the name of Weaver's nominees (even though there is some evidence that Weaver controlled these funds as well) (Dkt. #174-2 at pp. 52-54, 56, 61), (b) transfers to the personal accounts of Sun, Miller and Al-Barwani (although the transfers arguably reflect Weaver's "business expenses," *i.e.*, payment to nominees for services rendered) (*Id*. at pp. 52, 54, 59-60), (c) $2.5 million transferred to Jammin Java in connection with the bogus Straight Path agreement, and (d) other cash transfers that the SEC is unable to properly identify (even though Weaver bears the risk of uncertainty).[9]

---

[9] This method also avoids double-counting proceeds that formed the basis of monetary settlements between the SEC and Weaver's co-Defendants.

16

The SEC also has been conservative in selecting which entities to include in its calculation. In an abundance of caution, the SEC has excluded two entities despite evidence of their involvement in Weaver's scheme. <u>First</u>, the SEC has excluded over $13.5 million in gains attributable to Petersham which was owned by Defendant Stephen Wheatley. Arguably, Weaver could be held jointly and severally liable for Petersham's gains. After all, the undisputed evidence reflects that Weaver controlled the illicit trading out of Petersham's accounts. (Dkt. #173, SJ SOF ¶ 86.) That said, the SEC does <u>not</u> seek to recover these amounts because Wheatley admitted that he had a falling out with Weaver and retained Petersham's gains against Weaver's wishes. The SEC also is not including gains attributable to a shell called Prospera. While Prospera traded Jammin Java stock in lock-step with Weaver's entities, the SEC has been unable to identify the beneficial owner of that entity and, therefore, it is difficult to determine the extent of Weaver's control of related proceeds. While any ambiguity should be resolved against Weaver, the SEC – in an abundance of caution – is excluding from its calculation Prospera's $6.2 million in gains from the illegal, unregistered sale of Jammin Java stock. (Dkt. #174-2, Barrett Dec. at p. 19.)

Using the IRS's underpayment rate from December 31, 2012 through June 30, 2017, prejudgment interest for the other entities in Weaver's scheme is $1,209,364.59. (SEC Rem. Ex.1, 7/10/2017 Barrett Dec. at ¶ 15.) Consequently, in addition to the amounts described above, Weaver should also be ordered to pay additional disgorgement and prejudgment interest of $9,005,576.51 attributable to the other entities involved in Weaver's "pump and dump" scheme.

**E. Weaver's Total Disgorgement and Prejudgment Interest**:

After tallying all four sources of Weaver's profits from illegal Jammin Java sales – and calculating prejudgment interest on those amounts – the SEC's reasonable approximation of Weaver's disgorgement liability is as follows:

| CATEGORY | AMOUNT |
| --- | --- |
| Ill-Gotten Gains For Weaver's Wholly-Owned Entities | $22,812,154.19 |
| Cash Transfers to Weaver From His Nominees | $3,559,431.17 |
| Ill-Gotten Gains That Weaver Tried to Hide | $13,274,304.42 |
| Balance of Illicit Proceeds for Entities Owned By Weaver's Nominees | $7,796,211.92 |
| Total Pre-Judgment Interest | $9,393,958.48 |
| **TOTAL DISGORGEMENT AND PREJUDGEMENT INTEREST**: | $56,836,060.18 |

(*Id*. at ¶¶ 14-17.)

## IV. A Maximum Third-Tier Civil Penalty – Equal to Weaver's Ill-Gotten Gains – Is Warranted:

Weaver's egregious fraud – and his subsequent cover-up – warrants a severe civil penalty. Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] provide district courts with the authority to impose civil penalties for federal securities laws violations. Those statutes establish the three tiers of penalties, to be determined based on the facts of each case. A third tier penalty – the most severe civil penalty – is available when securities law violations (1) involve "fraud, deceit, manipulation, or reckless disregard for a regulatory requirement" and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id*. Here, the Court may impose, for each violation, a third tier penalty up to the greater of $150,000 or the "gross amount of pecuniary gain." 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 17 C.F.R. § 201.1001(a) (2017) (Table I, Mar. 4 2009-Mar. 5, 2013). The factors courts use to determine the appropriateness of an injunction are helpful when assessing penalties. *See SEC v. Abacus Int'l Holding Corp.*,

2001 WL 940913, at *5 (N.D. Cal. August 16, 2001).

There are many ways to calculate a maximum civil penalty. For example, the Court would be within its discretion to order a $150,000 third-tier civil penalty for each one of Weaver's illegal, unregistered trades. However, when confronted with a severe fraud – involving hundreds of illegal trades, and a high level of scienter, and repeated deceptive conduct over a prolonged period of time – Courts often measure the maximum penalty by the pecuniary gain to the defendant (*i.e.*, the amount of illicit profits subject to disgorgement). *See, e.g., SEC v. Interlink Data Network, Inc.,* 1993 WL 603274, *13 (C.D. Cal. Nov. 15, 1993) (ordering $12.2 million civil penalty equal to defendant's illicit gains, selecting that method over other available methods for calculating civil penalty); *SEC v. CMKM Diamonds, Inc.,* 635 F. Supp. 2d 1185, 1192-93 (D. Nev. 2009) (in penny stock manipulation case, imposing penalty equal to each defendant's gross pecuniary gain rather than a penalty for each illegal trade, noting that a maximum penalty was warranted, among other reasons, because the defendant "operated five companies, which sold shares of the fraudulent stock and perpetuated the scheme"); *SEC v. Luna*, 2014 WL 2960451, *12 (D. Nev. June 27, 2014) (imposing civil penalty equal to disgorgement in penny stock fraud); *SEC v. Razmilovic*, 738 F.3d 14, 38-39 (2d Cir. 2013 (affirming $20 million civil penalty – half of defendant's ill-gotten gains – where the defendant "was a direct participant in the pervasive fraud scheme,…fled the country, continues to refuse to admit any wrongdoing, and has never expressed any remorse")(emphasis omitted).

Here, Weaver's egregious fraud – and his attempt to hide that fraud from law enforcement – warrants the maximum civil penalty available: a third-tier penalty equal to his pecuniary gain. As the Court has found, Weaver's violation involved fraud and manipulation. (Dkt. #215 at 6-7.) As shown above, Weaver's scheme involved a high degree of scienter and a wide array of deceptive conduct. Also, the scheme was almost unprecedented in size, generating illicit profits for Weaver and his co-Defendants in excess of $77 million – amounts effectively stolen from the

public market that was duped into paying an inflated price for a stock that shortly became worthless.[10] In addition, there are no mitigating factors here. Weaver was a central figure in the fraud, has refused to admit wrongdoing, has never expressed remorse, and deliberately sought to hide his misconduct from law enforcement agencies. The SEC, therefore, respectfully requests that a substantial civil penalty be imposed: an amount equal to the Court's disgorgement order.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court award the relief requested herein and enter Final Judgment against Defendant Wayne Weaver in the form of the proposed judgment attached as Ex. 4 and submitted to the Court through ECF.

Dated:  July 10, 2017                    Respectfully submitted,

*/s/ Timothy S. Leiman*
Timothy S. Leiman
U.S. Securities and Exchange Commission
Chicago Regional Office
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois  60604
Telephone:  (312) 353-5213
Fax:  (312) 353-7398
leimant@sec.gov

## CERTIFICATE OF SERVICE

Timothy S. Leiman hereby certifies that he caused the foregoing document to be filed through the Court's CM/ECF system on July 10, 2017, which automatically sends an electronic copy of the document to all counsel of record.

*/s/ Timothy S. Leiman*

---

[10] In a review of published judgments in SEC enforcement cases involving penny stock "pump and dump" schemes, counsel for the SEC has been unable to find cases where a defendant generated illegal proceeds matching the overall profits reaped in the Jammin Java scheme.