# EXHIBIT 2

# In The Matter Of:
*Securities and Exchange Commission v.*
*Jammin' Java Corp., et al.*

*Rene Berlinger*
*February 07, 2017*

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94103*
*(415) 597-5600*

Original File 30994Berlinger.txt
Min-U-Script® with Word Index

Case 2:15-cv-08921-SVW-MRW Document 222-2 Filed 07/10/17 Page 3 of 11 Page ID #:4006

Securities and Exchange Commission v.  
Jammin' Java Corp., et al.

Rene Berlinger  
February 07, 2017

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3   - - - - - - - - - - - - - - -
 4   SECURITIES AND EXCHANGE       )
 5   COMMISSION,                   )
 6               Plaintiff,        )
 7                                 ) CASE NO.
 8   v.                            ) 2:15-cv-08921-SVW-MRW
 9                                 )
10   JAMMIN' JAVA CORP, ET AL.,    )
11               Defendants.       )
12   - - - - - - - - - - - - - - -
13
14
15        VIDEOTAPED DEPOSITION OF RENÉ BERLINGER
16                TUESDAY, FEBRUARY 7, 2017
17
18
19
20
21         BEHMKE REPORTING AND VIDEO SERVICES, INC.
22                        BY:   JONAH SEARS
23                 160 SPEAR STREET, SUITE 300
24              SAN FRANCISCO, CALIFORNIA 94105
25                        (415) 597-5600
```

Page 2

```
 8        Videotaped Deposition of RENÉ BERLINGER, taken on
 9   behalf of Plaintiff, at 271 Cadman Plaza East, 7th
10   Floor, Brooklyn, New York, commencing at 9:42 A.M.,
11   TUESDAY, FEBRUARY 7, 2017, before Jonah Sears, Shorthand
12   Reporter, pursuant to notice.
```

Page 3

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS, SECURITIES AND EXCHANGE COMMISSION:
 3       U.S. SECURITIES AND EXCHANGE COMMISSION
 4       BY:  TIMOTHY S. LEIMAN, ATTORNEY AT LAW
 5            PETER SENECHALLE, ATTORNEY AT LAW
 6       175 West Jackson Boulevard, Suite 900
 7       Chicago, Illinois 60604
 8       Telephone:  (312) 353-7390
 9       Email: leimant@sec.gov
10
11   FOR DEFENDANT, KEVIN P. MILLER:
12       CALDWELL LESLIE AND PROCTOR, PC
13       BY:  ANDREW ESBENSHADE, ATTORNEY AT LAW
14       725 S. Figueroa Streeet, 31st Floor
15       Los Angeles, California 90017
16       Telephone:  (213) 629-9040
17       Email:  esbenshade@caldwell-leslie.com
18
19   FOR DEFENDANT, WAYNE WEAVER:
20       SCHEPER KIM HARRIS
21       BY: MARC S. HARRIS, ATTORNEY AT LAW
22       601 West Fifth Street, 12th Floor
23       Los Angeles, California 90071
24       Telephone: (213) 613-4690
25       Email: mharris@scheperkim.com
```

Page 4

```
 1   APPEARANCES OF COUNSEL - (CONTINUED):
 2   FOR DEFENDANTS, MICHAEL K. SUN
 3       and MOHAMMED A. AL-BARWANI:
 4       VENABLE LLP
 5       BY:  PATRICK J. BOYLE  ATTORNEY AT LAW
 6            ARIE E. PELED, ATTORNEY AT LAW
 7       1270 Avenue of the Americas, 24th Floor
 8       New York, New York 10020
 9       Telephone:  (212) 307-5500
10       Email:  pboyle@venable.com
11
12   FOR DEFENDANT, RENÉ BERLINGER
13       BUTZEL LONG PC
14       BY:   THOMAS EARL PATTON, ATTORNEY AT LAW
15       1747 Pennsylvania Avenue NW, Suite 300
16       Washington, DC  20006
17       Telephone:  (202) 454-2800
18       Email:  pattont@butzel.com
19
20   ALSO PRESENT:
21       CHRIS MARTIN, CLVS
22       WAYNE S.P. WEAVER
23       PEGGY DAYTON (TELEPHONICALLY)
```

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 149

1  specifically) for the following amounts to be put on the
2  card?"
3       What was Wayne asking you to do?
4  A.  This is a good question. Load the cards.
5  Q.  All right.
6  A.  But --
7  Q.  He's asking you to put -- you said, "Load the
8  card."
9       What do you mean by that?
10 A.  Load the card, but the e-mail doesn't say more.
11 Q.  Okay.
12 A.  It's not accurate.
13 Q.  Let's take this one step at a time.
14      What do you mean by "load the card"?
15 A.  This is a wire instruction to transfer money
16 from one account to another account.
17 Q.  Okay. And this is to wire money to Cornèr
18 Bank; is that correct?
19 A.  Yes.
20 Q.  And to load the money onto Cornèr Bank cards,
21 correct?
22 A.  Yes.
23 Q.  All right. After that, there's an e-mail from
24 Wayne to you that talks about pin information.
25      What does that relate to?

Page 150

1  A.  This is like a receipt card. Whenever you want
2  to get cash out of an ATM, you need your pin.
3  Q.  Uh-huh.
4  A.  And whenever the card is renewed or whatever
5  you need or it's a new card, then you need a pin form,
6  and this is normally not sent together with the card.
7  Q.  For security purposes, correct?
8  A.  Yes. So therefore it's going to be e-mailed
9  later, and obviously Victor didn't relate the pin number
10 and the card number, so nobody knew which pin for what
11 card. That's -- that's what, obviously, Victor, my
12 partner, seemed to have messed up.
13 Q.  And did you correct that oversight by Victor?
14 A.  Yeah, in the e-mail above. "The pin for -- is
15 so-and-so for card ending this, and the pin for this is
16 the card ending that."
17 Q.  Okay. So you relayed to Wayne which pin number
18 goes with which card, correct?
19 A.  Goes with which card, yes.
20 Q.  And then you informed Wayne, "We loaded from
21 Westpark. Cards will be loaded from Westpark again;" is
22 that correct?
23 A.  Yes, but I don't know which card now. That's
24 --
25 Q.  Okay.

Page 151

1  A.  -- because that's really confusing. On the
2  second page, it doesn't say a lot. "Seca, Renavial,
3  same as last time," so I don't know.
4  Q.  Okay. So all you know from that last e-mail
5  from Wayne to you is that he's asking you to load the
6  cards, correct?
7  A.  More or less, that's all I can take out of
8  here, and --
9  Q.  And he's asking for the pin numbers?
10 A.  And asking for the correct pin numbers related
11 to the cards.
12 Q.  Okay.
13 A.  Whether it's the same or not, I don't know.
14 It's pretty confusing.
15 Q.  Okay. To your knowledge, Wayne Weaver had a
16 Cornèr Bank card, correct?
17 A.  Yes.
18 Q.  And he would give you instructions to load it?
19 A.  To load, yes.
20 Q.  And you would follow those instructions,
21 correct?
22 A.  Yeah.
23 Q.  I'm sorry?
24 A.  Yes.
25     MR. LEIMAN: Can we go off the record for a moment.

Page 152

1      VIDEOTAPE OPERATOR: We're off the record. The time
2  is 1:46.
3          (Recess.)
4      VIDEOTAPE OPERATOR: We're back on the record. The
5  time is 1:54. This is the beginning of Tape 4 in the
6  deposition of René Berlinger.
7      MR. LEIMAN: I'd like to mark as Exhibit 115 a copy
8  of an e-mail from John Combray to René Berlinger.
9          (Exhibit No. 115 was marked for
10         identification.)
11         EXAMINATION RESUMED
12 BY MR. LEIMAN:
13 Q.  And are you familiar with this e-mail chain?
14 A.  Yes.
15 Q.  And what does it relate to?
16     MR. PATTON: Give me one second. I just got this.
17 Go ahead.
18 A.  It's related to getting the card details
19 updated with Cornèr card.
20 Q.  Okay. Who is John Combray?
21 A.  This is Wayne's e-mail address.
22 Q.  And why the name John Combray?
23 A.  He said he's going to have a new e-mail address
24 so we can communicate directly using different e-mail
25 addresses, not leaving track, maybe, with the old

| Securities and Exchange Commission v.<br>Jammin' Java Corp., et al. | Rene Berlinger<br>February 07, 2017 |
|---|---|

**Page 153**

1. addresses and things like that. Just go for a new one.
2. Q. Was John Combray a pseudonym that he made up?
3. A. I don't know. It's just the one he used.
4. Q. It's a name that Wayne Weaver used?
5. A. Yes. But whether this John Combray exists or
6. not, I don't know.
7. Q. Okay. But it's an e-mail you understood to be
8. Wayne Weaver, correct?
9. A. Yes.
10.    MR. PATTON: Well, he signs it "Wayne."
11. Q. And it's an address that Wayne used so that he
12. could communicate with you, correct?
13. A. Uh-huh.
14. Q. And was this an e-mail address that Wayne used
15. so that it could not be tracked by people who were
16. familiar with his old e-mail addresses?
17. A. Well, basically the idea was: Since the SEC
18. investigation started, people are afraid that e-mail is
19. copied and tracked, so he was looking for a safer new
20. communication platform to avoid potentially telling too
21. much.
22. Q. In your e-mail, so below that first section, it
23. says, "Hi Wayne. I need to reapply for each card. Not
24. the full process, just my part of KYC. I need the
25. following details/docs: (Kelly, Shane/you).

**Page 154**

1.    "KYC," is that know-your-customer disclosures?
2. A. Yes.
3. Q. And who is Kelly?
4. A. I don't know her. It's a -- I guess it's a
5. friend of Wayne.
6. Q. Okay.
7. A. Or the friend -- the girlfriend of Shane.
8. Q. Is that --
9. A. These are friends.
10. Q. Okay.
11. A. I don't know exactly, to be honest.
12. Q. And who is Shane?
13. A. Same.
14. Q. A friend or do you not know?
15. A. At least -- no, I do not know them really.
16. Whether they had a business relationship or not, I don't
17. know, but I know that there were in contact. Maybe -- I
18. don't know. I don't want to go for assumptions.
19. Q. Were these people referred to you by Wayne
20. Weaver, or were these people you knew without Wayne?
21. A. Regarding the Cornèr card referrals from Wayne.
22. Q. And in this e-mail, when you say, "I need
23. following details/docs from you," who does that refer
24. to?
25. A. That's Wayne.

**Page 155**

1. Q. And then it appears that there's an attachment
2. to the e-mail.
3.    What is that attachment?
4. A. Where do you see that?
5. Q. So if you look past 1183 to 1184, so one more
6. page, there's an attachment, a form?
7. A. Yes.
8. Q. What is that form?
9. A. That's this KYC data.
10. Q. So is this what you were asking Wayne Weaver to
11. fill out?
12. A. Maybe it's an old one. I don't know if it's
13. the new one, but this is the form he needs for Cornèr
14. Bank.
15. Q. You talked for a moment about a few payments to
16. Kevin Miller.
17.    And just to clarify, a while ago we were
18. talking about a meeting that occurred in the fall of
19. 2010 in Switzerland; do you recall that?
20. A. Can you say again, please?
21. Q. Earlier in this testimony, we were talking
22. about a meeting that you had in Switzerland --
23. A. In the restaurant.
24. Q. In the restaurant, it was lunch?
25. A. Yes.

**Page 156**

1. Q. In the fall of 2010, do you remember talking
2. about that?
3. A. Uh-huh.
4. Q. And we talked about a number of people who
5. attended that meeting?
6. A. Yes.
7. Q. I think you mentioned generally that you
8. weren't sure if you've ever met Kevin Miller.
9.    Do you have any recollection as to whether
10. Kevin Miller was present at meeting in Geneva in 2010?
11. A. In Geneva?
12.    MR. ESBENSHADE: In Zurich.
13. Q. In Zurich. Sorry. In Zurich, Switzerland.
14. A. I can neither confirm nor deny. I don't know.
15. Q. Okay. I just wanted to confirm that.
16. A. Yeah, I don't know.
17.    MR. LEIMAN: All right. I'd like to mark as
18. Exhibit 116 a copy of an e-mail that appears to be from
19. Kevin Miller to René Berlinger.
20.    THE WITNESS: Yes.
21.    MR. HARRIS: BER186?
22.    MR. LEIMAN: Thanks. BER186.
23.    ( Exhibit No. 116 was marked for
24.    identification.)
25. BY MR. LEIMAN:

Securities and Exchange Commission v.  
Jammin' Java Corp., et al.

Rene Berlinger  
February 07, 2017

### Page 165

1  of Exhibit 117?
2   MR. HARRIS: Objection. Calls for speculation.
3   Q. Just reading the documents, was that same
4  template then used in Exhibit 117?
5   MR. HARRIS: Still calls for speculation.
6   Q. It's all right. You can answer.
7   A. Yes.
8   Q. Is that your answer: Yes?
9   A. Yes, it looks the same.
10  Q. Do you recall any other instances where Wayne
11  Weaver would provide template language to a beneficial
12  owner for making a request to you?
13  A. That was not typical.
14  Q. So Exhibit 118, that's not typical for you?
15  A. That he completed e-mails and sent to the
16  beneficial owner and say, "Look, this is to be sent to
17  me"? No, that was not typical.
18  MR. LEIMAN: All right. I'd like to mark as
19  Exhibit 119 a copy of an e-mail that appears to be from
20  Kevin Miller to René Berlinger, and the Bates number is
21  BER67.
22   (Exhibit No. 119 was marked for
23   identification.)
24  MR. PATTON: I think he's getting a little tired.
25  It's hard to concentrate.

### Page 166

1  MR. LEIMAN: Why don't we take a break then?
2  MR. PATTON: Let's take a break.
3  MR. LEIMAN: Okay. Can we go off the record.
4  VIDEOTAPE OPERATOR: We're off the record. The time
5  is 2:13.
6   (Recess.)
7  VIDEOTAPE OPERATOR: We're back on the record. The
8  time is 2:26.
9       EXAMINATION RESUMED
10 BY MR. LEIMAN:
11  Q. Before we went to break, I handed out
12 Exhibit 119.
13    And do you recognize this e-mail?
14  A. Yes.
15  Q. And this was sent to you, correct?
16  A. This was sent to me, yes.
17  Q. And who was it sent from?
18  A. From Kevin Miller.
19  Q. And what does this e-mail relate to?
20  A. It relates to an instruction, "Please convert
21 three and a half million U.S. into GBP. Then wire out
22 converted amount to the attached bank details from my
23 Las Colinas account and confirm."
24  Q. That "Los C" --
25  A. Las Colinas.

### Page 167

1  Q. That to you means Las Colinas?
2  A. Yes.
3  Q. Was it common in discussing Las Colinas with
4 various people --
5  A. Using short forms, yes.
6  Q. Okay. Using the short form "Los C," that was
7 --
8  A. No, actually it was "Las C," but yes.
9  Q. Okay. Earlier you mentioned an entity called
10 Rigi Capital, R-I-G-I; do you recall that?
11  A. Yes.
12  Q. And what is Rigi Capital?
13  A. That's a broker.
14  Q. And do you know where that broker is located?
15  A. In Zurich or close. No, it could be Zurich,
16 but in Switzerland.
17  Q. In Switzerland?
18  A. Yes.
19  Q. And did Rigi Capital serve as a broker for any
20 of the entities that you were the nominee for?
21  A. Yes.
22  Q. Which ones?
23  A. Loads of, but the ones that we are discussing,
24 all of them.
25  Q. So --

### Page 168

1  A. Las Colinas, Renavial --
2  Q. And Westpark?
3  A. Westpark.
4  Q. But not Calgon, correct?
5  A. Yes.
6  Q. All right. Calgon used Bateman, correct?
7  A. Yes, yes.
8  Q. Do you recall an instance where Renavial
9 purchased approximately $2 million worth of gold?
10  A. Yes.
11  Q. And what do you recall about that transaction?
12  A. Can you say again?
13  Q. What do you recall about that transaction?
14  A. I received an instruction to buy gold.
15  Q. And who gave you the instruction?
16  A. Difficult to answer. I don't have any written
17 document or at least cannot recall. Could be Weaver. I
18 remember that we discussed this kind of having a
19 differentiated -- rather than just having cash, buying
20 gold.
21  Q. Do you recall having instructions with Wayne
22 Weaver about buying gold?
23  A. If we have an e-mail, yes; otherwise, it's
24 little a bit speculating.
25  Q. Okay. Just sitting here right now though, do

| Securities and Exchange Commission v.<br>Jammin' Java Corp., et al. | Rene Berlinger<br>February 07, 2017 |
|---|---|

Page 169

1  you recall having any discussions with Wayne Weaver
2  about gold?
3    A.  I had any [sic] discussions, yes.
4    Q.  Yes?
5        And what were those discussions?
6    A.  About buying gold.
7    Q.  And I think you mentioned to sort of diversify
8  assets.
9        For what reasons was Wayne Weaver discussing
10 buying gold with you?
11   A.  Diversifying.
12   Q.  Were there any other reasons?
13   A.  Getting, maybe, funds out of the banking
14 system.
15   Q.  And why did Wayne Weaver want to get funds out
16 of the banking system?
17   MR. PATTON: Well, he can't say what Wayne Weaver
18 wanted to do.
19       Unless you know.
20   Q.  Well, in discussing this with Wayne Weaver, did
21 you have any discussions about why Wayne Weaver wanted
22 to get money out of the banking system?
23   A.  Yes, but I cannot recall in detail what we
24 really discussed and what we said and why and what. I'm
25 pretty sure it was verbally.

Page 170

1    Q.  How about generally? You said you couldn't
2  remember specifically.
3        Generally, what do you recall about discussing
4  with Wayne Weaver getting money out of the banking
5  system?
6    A.  Yes.
7    Q.  Only that you had those discussions?
8    A.  I don't understand.
9    Q.  Okay.
10   MR. PATTON: I think he told you everything he
11 recalls.
12   MR. LEIMAN: Well, I mean, that's what I'm trying to
13 get from him.
14   MR. PATTON: Have you told him everything you
15 recall?
16   THE WITNESS: Have I told him?
17   MR. PATTON: Have you told him everything you recall
18 about your discussions?
19 BY MR. LEIMAN:
20   Q.  So you talked to Wayne Weaver about getting
21 money out of the banking system, correct? Did you
22 discuss that issue -- is there anything else that you
23 recall discussing about that issue with Wayne Weaver?
24   A.  I don't remember on that, no.
25   Q.  Okay. That's all I'm asking for is your

Page 171

1  recollection.
2    MR. PATTON: Tim, I'm getting concerned that
3  Mr. Berlinger is getting pretty tired and it's difficult
4  to think through your questions, so --
5    MR. LEIMAN: Okay. Well, I'm trying to stick to the
6  documents, and I don't have much left, so I think we can
7  get through it.
8        I'd like to mark as Exhibit 120 a copy of an
9  e-mail chain --
10       (Electronic device interruption.)
11   MR. LEIMAN: -- from Muhammad Al-Barwani to Daniel
12 Lacher.
13   MR. PATTON: It's an Amber alert. Did you all get
14 one?
15   MS. DAYTON: Can I have the Bates number on that,
16 please?
17   MR. LEIMAN: Sure. BER892.
18   MS. DAYTON: Thank you.
19       (Exhibit No. 120 was marked for
20       identification.)
21 BY MR. LEIMAN:
22   Q.  And do you recognize Exhibit 120?
23   A.  That's an e-mail to me, yes.
24   Q.  And who is the e-mail from?
25   A.  From Mohammed Al-Barwani.

Page 172

1    Q.  And you received this e-mail?
2    A.  Yes.
3    Q.  And was this in connection with you providing
4  nominee services to --
5    A.  Actually, it was sent to Daniel.
6    Q.  Yes.
7    A.  Cc'd to René.
8    Q.  And this relates to your nominee services for
9  Renaval, correct?
10   A.  Yes.
11   Q.  And earlier we discussed that you retained your
12 e-mails electronically; is that correct?
13   A.  Yes.
14   Q.  Is this one of the e-mails that you retained
15 electronically and then produced to the SEC?
16   A.  I would find it, yes.
17   Q.  Are you familiar with an entity called Tare
18 Finance, T-A-R-E?
19   A.  Yes.
20   Q.  And what is Tare Finance?
21   A.  I don't know what jurisdiction, but it's an --
22 I guess an offshore entity.
23   Q.  Did you set up Tare Finance?
24   A.  No.
25   Q.  Who did?

Securities and Exchange Commission v.  
Jammin' Java Corp., et al.

Rene Berlinger  
February 07, 2017

Page 173

1  A. This is under Benjamin Altun's bidding.
2  Q. Okay. And who is Benjamin Altun?
3  A. He's a fiduciary as well.
4  Q. We're done with that document. You don't need
5  that.
6      And are you familiar with the circumstances
7  that led to the creation of Tare Finance?
8  A. The idea is -- it's quite common. Switzerland
9  changed the rules. There was an SEC investigation
10 ongoing. Of course, you start to get money out of that
11 jurisdiction because whenever the account is frozen,
12 whether the SEC would be right or not, it would be
13 frozen for maybe years. So there was, of course, the
14 intention to get away from Switzerland.
15 Q. Whose intention?
16 A. The owner's intention.
17 Q. Okay. Did you communicate with the owners
18 about Tare Finance?
19 A. Now it's a question of recall, who said and who
20 did.
21 Q. Did you communicate with Wayne Weaver about
22 Tare Finance?
23 A. With Wayne for sure.
24 Q. And did you discuss getting money out of
25 Switzerland with Wayne Weaver?

Page 174

1  A. Yes.
2  Q. And you mentioned two reasons: You mentioned
3  that the rules in Switzerland had changed, and you
4  mentioned the SEC investigation, correct?
5  A. Yes.
6  Q. And were those reasons that you discussed with
7  Wayne Weaver?
8  A. Yes.
9  Q. What changed in the rules for Switzerland?
10 A. All with regard to tax compliance. The
11 regulations were stronger and stronger, and the bank
12 actually started to get us kicked out. They didn't want
13 these penny stock deals anymore.
14 Q. And why --
15 A. Maybe not at that time. I'm not sure.
16 Q. Okay. And you mentioned the SEC investigation
17 --
18 A. Yes.
19 Q. -- and the concern of account --
20 A. We knew that --
21 Q. I'm sorry. You've got to wait for my question.
22 A. Sorry.
23 Q. The SEC investigation and the concern about an
24 account being frozen; is that correct?
25 A. Yes.

Page 175

1  Q. And did you discuss that issue with Wayne
2  Weaver?
3  A. At least partially, yes.
4  Q. Okay. Which part did you discuss with Wayne
5  Weaver?
6  A. I mean, I don't know whether the beneficial
7  owner was part of the discussions or not. Was it just
8  Wayne or not.
9  Q. Okay.
10 A. This is what I can't recall.
11 Q. But you know it was at least Wayne; is that
12 fair to say?
13 A. Wayne was definitely involved in these
14 discussions.
15 Q. Okay.
16 A. Yes.
17     MR. LEIMAN: I'd like to walk you through some of
18 the documents for Tare Finance. Marking as Exhibit 121
19 a copy of an e-mail chain, starting with an e-mail from
20 Benjamin Altun to René Berlinger, and the Bates number
21 is BER963, and this appears to be an e-mail with an
22 attached fiduciary agreement.
23     (Exhibit No. 121 was marked for
24     identification.)
25 BY MR. LEIMAN:

Page 176

1  Q. Do you recognize this document?
2  A. Yes.
3  Q. And does this relate to Tare Finance?
4  A. Yes.
5  Q. And was this an e-mail that you received?
6  A. From Benjamin Altun, yes.
7  Q. And what did Benjamin Altun send you?
8  A. He said, "The Dubai company is ready. The
9  account will be opened soon. Please find attached the
10 agreement. We need a signature. Please send it back."
11 Q. And then he sent you the attached unsigned
12 version of the fiduciary agreement, correct?
13 A. Yes, correct.
14 Q. Incidentally, one last follow-up question
15 related to the gold: Do you know where that gold is
16 now?
17 A. I know where it is.
18 Q. And where is it?
19 A. It's in the former bank safe, which a friend of
20 mine has rented. So it's not a bank, it's just a rental
21 agreement to have a box.
22 Q. But it's not being held for you, correct?
23 A. No, no. It's not under my control.
24 Q. Okay.
25 A. Yes.

Securities and Exchange Commission v.  
Jammin' Java Corp., et al.

Rene Berlinger  
February 07, 2017

Page 177

1  Q. The -- did you ever have a conversation with
2  Wayne Weaver about where the gold is located?
3  A. He knows where it is, yes.
4  Q. And you told him where it is?
5  A. Yes.
6      MR. LEIMAN: All right. I apologize. Back to Tare
7  Finance. I'd like to mark as Exhibit 122 a copy of
8  another e-mail from Benjamin Altun to René Berlinger.
9      MS. DAYTON: Can I have the Bates number?
10     MR. HARRIS: BER1444.
11         (Exhibit No. 122 was marked for
12         identification.)
13 BY MR. LEIMAN:
14 Q. How did Benjamin Altun get involved in creating
15 Tare Finance?
16 A. I know Benjamin since several years, and I know
17 that he offers these fiduciary services, and I know that
18 he has offices in Dubai. So I introduced these parties,
19 and they started to set up the company and the bank
20 account.
21 Q. And who did you refer Benjamin Altun to?
22 A. Who did you to? I don't understand. Say
23 again, please.
24 Q. Okay. So you said you introduced Benjamin
25 Altun?

Page 178

1  A. Yes.
2  Q. Who did you introduce him to?
3  A. To Wayne.
4  Q. Okay. Looking at this e-mail, Exhibit 122, do
5  you recognize this e-mail?
6  A. Yes.
7  Q. And this is to you, correct?
8  A. This is to me.
9  Q. And from Benjamin Altun?
10 A. Exactly.
11 Q. And what does this e-mail relate to?
12 A. Now he sent the wire details for this Tare
13 Finance.
14 Q. And was this in anticipation of a transfer to
15 Tare Finance?
16 A. Yes.
17    MR. LEIMAN: And I'd like to mark as Exhibit 123 a
18 copy of a May 12, 2012, e-mail from Mohammed Al-Barwani
19 to René Berlinger.
20       (Exhibit No. 123 was marked for
21       identification.)
22    MS. DAYTON: And the Bates number on 123?
23    MR. LEIMAN: It's BER70.
24 BY MR. LEIMAN:
25 Q. I'd like to look at the e-mail that comes

Page 179

1  second, so the April 10, 2012, e-mail from you to
2  Mohammed Al-Barwani, cc'ing Wayne Weaver.
3       Do you see that e-mail?
4  A. Yes.
5  Q. And what does that e-mail relate to?
6  A. It relates to the agreement to be
7  countersigned. I sent it to him to get his signature on
8  that agreement.
9  Q. And you sent it to Mohammed Al-Barwani for his
10 signature?
11 A. Uh-huh, yes.
12 Q. You cc'd Wayne Weaver on this.
13     Why did you cc Wayne Weaver?
14 A. Because of the relationship. We worked very
15 close together, and he initiated this relationship. He
16 got introduced to Benjamin Altun, and he then obviously
17 let them know you could use Benjamin's services to get
18 it into a different jurisdiction, just updated it.
19 Q. And did you execute a transfer of funds from
20 Renavial to Tare Finance?
21 A. Yes.
22 Q. And who directed you to make that transfer?
23 A. I can't recall. I don't know. Probably Kevin.
24 Q. Probably who?
25 A. Probably the beneficial owner.

Page 180

1  Q. Okay. And the beneficial --
2  A. Because that's a huge amount, and --
3  Q. Did you have a conversation with Mohammed
4  Al-Barwani about this transfer?
5  A. We had this conversation with the contract,
6  setting up the company and everything else, so I'm
7  expecting I had clear instructions: Please wire it.
8  Q. Okay. So I just want to clarify because you
9  say you were expecting to have that transaction -- or
10 that instruction.
11     Do you recall actually have having a
12 conversation with Mohammed Al-Barwani or an e-mail with
13 Mohammed Al-Barwani about transferring money from
14 Renavial to Tare Finance?
15 A. There must be something. I wouldn't have
16 executed it.
17 Q. I know you said you must be, but I'm asking for
18 your recollection right now.
19 A. I cannot recall was it an e-mail, a phone call,
20 a fax. I don't remember.
21 Q. Okay. But do you recall having a
22 communication?
23 A. There must be a communication, otherwise I
24 wouldn't have executed that.
25 Q. Okay.

Securities and Exchange Commission v.
Jammin' Java Corp., et al.

Rene Berlinger
February 07, 2017

Page 181

1  A. Because it's a huge amount.
2  Q. All right. I just want to clarify because
3  we're saying two different things. You're saying there
4  must be a communication.
5     What I'm asking is: Do you actually remember a
6  communication?
7  A. I don't remember a communication, but there's
8  no doubt there was a communication.
9  Q. Okay. You said there must be a communication
10 because you did it?
11 MR. PATTON: I think he's answered that twice.
12 A. Yes.
13 MR. LEIMAN: Okay. I'm just trying to distinguish
14 between memory and --
15 MR. PATTON: He's done that.
16 MR. LEIMAN: I think we just did it, but just now,
17 I'd like to mark as Exhibit 124 a copy of a statement
18 related to Renavial.
19    (Exhibit No. 124 was marked for
20    identification.)
21 MR. ESBENSHADE: BER2542.
22 MS. DAYTON: Thank you.
23 BY MR. LEIMAN:
24 Q. And do you recognize this document?
25 A. Yes.

Page 182

1  Q. And what is it?
2  A. It's an account statement.
3  Q. And what entity is the account statement for?
4  A. For Renavial, showing the transfer of 11
5  million -- was it dollars -- yes, dollars, $11,300,000
6  to Tare.
7  Q. And is this the transfer that you were
8  describing?
9  A. Yes.
10 Q. And do you know what happened to that
11 $11.3 million after the transfer?
12 A. No. This is not under my control anymore.
13 It's a new fiduciary taking care.
14 Q. Benjamin Altun?
15 A. Yes.
16 Q. Okay.
17 A. Yes.
18 Q. Okay. Are you familiar with an individual
19 named Andrew King?
20 A. This name says anything to me, but I cannot
21 allocate it to a project, a company, or whatever. I
22 know this name.
23 Q. But not sure what it means to --
24 A. I cannot allocate it to any project or company.
25 Q. Okay. I'll do a little bit of a lightening

Page 183

1  round here. I want to give you some entity names, and
2  ask you if you're familiar --
3  A. Okay.
4  Q. -- with those.
5     We covered an entity called Sinecure.
6     How about Ideal World Trading Limited, are you
7  familiar with that entity?
8  A. Yes.
9  Q. And what is Ideal World Trading Limited?
10 A. I don't know.
11 Q. You just heard the name before?
12 A. Yes, it was a -- no, let's do it differently.
13 Whenever I say yes, that means we had a company
14 incorporated, but not for sure an account opened or
15 transactions or beneficial owner hat. It was one of
16 these -- potentially one of these shelf -- potentially
17 one of these shelf companies we were talking about
18 before.
19 Q. Okay. So it's an entity you formed but you
20 don't recall what happens after?
21 A. Yes.
22 Q. And who did you form this entity for?
23 A. This was me.
24 Q. Just for you?
25 A. No, not for me. I never form companies fort

Page 184

1  the shelf for myself.
2  Q. Okay.
3  A. So if somebody said, "Look, give me some
4  names." We keep them for whatever reason. It could be
5  a new project, a new beneficiary, whatever. We have
6  them ready.
7  Q. And who asked you to form Ideal World Trading
8  Limited?
9  A. There's a list which might be somewhere which
10 contain all the company names we had ordered, instructed
11 from Wayne, but whether these you're going to tell me
12 now are Wayne's or others, this I cannot hundred percent
13 confirm.
14 Q. Okay. What about Intes Invest Limited?
15 A. That was a corporation from us.
16 Q. And similarly, that was one that you may have
17 formed for Wayne, but you're not sure?
18 A. Yes.
19 Q. How about Fundecta Capital?
20 A. If you Fundecta, same.
21 Q. You formed it?
22 A. Yes.
23 Q. And maybe for Wayne, but not sure?
24 A. Not sure, yeah.
25 Q. Were you aware of other stocks being traded

Securities and Exchange Commission v.  
Jammin' Java Corp., et al.

Rene Berlinger  
February 07, 2017

Page 245

1  A. Yeah.
2  Q. And you're not an expert on U.S. securities
3  law; is that fair to say?
4  A. Same, yes.
5  Q. And at the time, did you have any knowledge of
6  the financing agreement between Straight Path and
7  Jammin' Java?
8  A. Try again. I didn't understand the question.
9  Q. At the time --
10  A. Yeah.
11  Q. -- so beginning of the FINMA investigation, at
12  the time when you thought that nothing wrong had
13  happened, did you have any knowledge about a financing
14  agreement between Straight Path and Jammin' Java?
15  A. No. I remember when we went for this payment,
16  2.3 million, have been told it's for an investment and
17  we will get a contract. That's what I have in mind, but
18  I never got the contract, and you saw the notice I made.
19  It's for later. That's when I got to know what it was.
20  That was an investment for Jammin' Java.
21  Q. But you had not seen the contract; is that
22  correct?
23  A. Yes, I don't remember that. Definitely.
24  MR. LEIMAN: That's all I have.
25  MR. ESBENSHADE: I have one follow-up question.

Page 246

1  EXAMINATION RESUMED
2  BY MR. ESBENSHADE:
3  Q. Mr. Harris asked you a few questions about your
4  meeting with the government, and focusing just on I
5  thinks you said around ten minutes of questioning from
6  the woman from the DOJ, Department of Justice, just that
7  part, not the time that Mr. Leiman or people from the
8  SEC.
9  Do you recall any discussion or mention of
10  Mr. Miller during the questioning from the woman from
11  the Department of Justice? If you don't -- either way.
12  I'm just asking if you recall.
13  A. It was late as well, so I don't remember the
14  questions. What I remember is we were more or less
15  talking in general how this works: How Swiss laws are,
16  what's the way to open up accounts. It was more about
17  these topics, but not, "Did this guy -- did" --maybe my
18  lawyer will remember, but I think it was not the topic.
19  MR. ESBENSHADE: That's fine. I appreciate it.
20  Thank you.
21  VIDEOTAPE OPERATOR: Anybody else?
22  MR. HARRIS: Nothing further.
23  MR. PATTON: I have no questions.
24  MR. LEIMAN: You can close out.
25  VIDEOTAPE OPERATOR: This is the end of today's

Page 247

1  deposition of René Berlinger. We used five tapes. The
2  time is 4:26, and we're off the record.
3  (At 4:26 P.M., the deposition proceedings
4  concluded.)
5
6
7  -----------------------------
8  RENÉ BERLINGER

Page 248

1  STATE OF NEW YORK      )
2                          ) ss.
3  COUNTY OF NEW YORK     )
4      I hereby certify that the witness in the
5  foregoing deposition, RENÉ BERLINGER, was by me duly
6  sworn to testify to the truth, the whole truth, and
7  nothing but the truth, in the within-entitled cause;
8  that said deposition was taken at the time and place
9  herein named; that the deposition is a true record of
10  the witness's testimony as reported by me, a shorthand
11  reporter and a disinterested person, and was thereafter
12  transcribed into typewriting by computer.
13  the outcome of the said action, nor connected with, nor
14  related to any of the parties in said action, nor to
15  their respective counsel.
16      IN WITNESS WHEREOF, I have hereunto set my hand
17  this 14th day of February, 2017.
18  Reading and Signing was:
19  ___ requested  ___ waived  _X_ not requested
20
21
22       [signature]
23
24       JONAH SEARS
25       STATE OF NEW YORK