TIMOTHY S. LEIMAN, Ill. Bar No. 6270153
Email: leimant@sec.gov
DANIEL J. HAYES Ill. Bar No. 6243089
Email: hayesdj@sec.gov
PETER SENECHALLE, Ill Bar No. 6300822
Email: senechallep@sec.gov

175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Facsimile:  (312) 353-7398

LOCAL COUNSEL
Lynn M. Dean, Cal. Bar No. 205562
Email: deanl@sec.gov
United States Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

Attorneys for Plaintiff
United States Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>JAMMIN' JAVA CORP., dba MARLEY COFFEE, SHANE G. WHITTLE, WAYNE S. P. WEAVER, MICHAEL K. SUN, RENE BERLINGER, STEPHEN B. WHEATLEY, KEVIN P. MILLER, MOHAMMED A. AL-BARWANI, ALEXANDER J. HUNTER, and THOMAS E. HUNTER,<br><br>Defendants. | Case No. 2:15-CV-08921 SVW (MRWx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY BRIEF IN SUPPORT OF MOTION FOR INJUNCTIVE AND MONETARY RELIEF**<br><br>Hearing Date: September 11, 2017<br>1:30 PM<br><br>Hon. Stephen V. Wilson<br>Courtroom 10A |

Defendant Wayne Weaver asks this Court for a slap on the wrist. The SEC has established – through undisputed evidence – that Weaver earned massive profits from his fraud and his illegal, unregistered sale of Jammin Java stock. The scheme was immense: Weaver and his co-Defendants earned $77.6 million from their illegal stock sales. Through its accountant, Kevin Barrett, the SEC has shown that Weaver received $26,371,585.20 of those proceeds into his personal and entity accounts and that he controlled or helped dissipate $21,070,516.34 more. Weaver does not dispute Mr. Barrett's calculations or refute the SEC's other evidence. Yet, Weaver asks that the Court allow him to keep all of his gains and order a civil penalty of only $300,000. Weaver (1) argues that a recent Supreme Court decision overrules decades of Ninth Circuit precedent authorizing courts to order disgorgement (despite the Supreme Court's express warning to the contrary), (2) tries to avoid liability by hiding behind the opaque financial structures he helped build, and (3) contends that the SEC's penalty is excessive (even though the penalty is tied to his ill-gotten gains). Weaver's attempt to dodge liability has no merit. The Supreme Court has left Ninth Circuit precedent allowing disgorgement intact, Weaver's profits (including funds he helped dissipate) can be disgorged, and Weaver's egregious conduct warrants a penalty equal to his massive illicit gains.

## DISCUSSION

## I. The Supreme Court's *Kokesh* Opinion Does Not Bar A Disgorgement Remedy.

In finding Weaver liable, this Court held that Weaver's sales of Jammin Java stock were illegal – because they were unregistered and because they were part of his fraudulent scheme. (Dkt. #215 at 5-7.) The Court further found that Weaver "made millions of dollars in profit" from his illegal stock sales. (*Id*. at 7.) Indeed, the SEC has supplied unrefuted evidence that: (a) Weaver's entities reaped over $22.8 million in profits from illegal Jammin Java sales, (b) Weaver received $3.56 million in cash from his nominees derived from <u>their</u> Jammin Java sales, (c) Weaver had a direct role in the transfer of almost $13.3 million into gold Kruggerand and a Dubai shell company to

1

evade law enforcement, and (d) entities owned by Weaver's nominees held almost $7.8 million of Jammin Java profits when the scheme ended. (Dkt. #221 at 11-18.)

For almost 30 years – and as recently as June 7, 2017 – the Ninth Circuit has held that courts can order defendants like Weaver to disgorge profits from their securities law violations. *See, e.g., SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010); *SEC v. Clark,* 915 F.2d 439, 454 (9th Cir. 1990); *SEC v. Fujinaga*, 2017 WL 2462815, *2 (9th Cir. June 7, 2017) (affirming district court's order requiring defendant to pay $442.2 million in disgorgement). That is consistent with the overwhelming weight of authority nationwide.[1] Weaver – hoping to keep his vast illicit gains – asks this Court to be the first to depart from that precedent. He contends that the Supreme Court's recent decision in *Kokesh v. SEC*, 137 S.Ct. 1635 (2017), implicitly overturned decades of case law and bars courts from ordering disgorgement. But, the *Kokesh* Court did no such thing. To the contrary – in a footnote that Weaver quotes (but misapplies) – <u>the Supreme Court expressly refused to address the issue Weaver now raises</u>. And, even if the *Kokesh* Court had not expressly limited its holding, Weaver's argument falls short because *Kokesh's* finding that disgorgement is a "penalty" for purposes of the 28 U.S.C. § 2462 ("Section 2462") statute of limitations does not deprive this Court of the equitable authority to order the return of illicit profits.

**A. The *Kokesh* Court Disclaimed Any Intent to Overrule Precedent Regarding District Courts' Authority to Order Disgorgement.**

Weaver's application of *Kokesh* has a fatal flaw: the Supreme Court expressly disclaimed any intent to overrule existing precedent regarding courts' equitable power to order disgorgement. The *Kokesh* Court expressly warned that "[n]othing in this opinion should be interpreted as an opinion on whether courts possess authority to order

---

[1] *See, e.g., SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004); *SEC v. Frohling*, 851 F.3d 132, 139 (2d Cir. 2016); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997); *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985); *SEC v. Lipson*, 278 F.3d 656, 662-63 (7th Cir. 2002); *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990); *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004); *SEC v. Whittemore*, 659 F.3d 1, 11–12 (D.C. Cir. 2011).

disgorgement in SEC enforcement proceedings." *Kokesh*, 137 S. Ct. at 1642 n.3. The Supreme Court further cautioned that it was deciding only "whether disgorgement, as applied in SEC enforcement actions, is subject to § 2462's limitations period." *Id*. The *Kokesh* Court could not have been clearer: it decided only the narrow issue before it.

Courts have taken the Supreme Court at its word, reasoning that "*Kokesh*'s holding cannot be plucked from the statutory context that gives it force." *SEC v. Brooks*, 2017 WL 3315137, *8 (S.D. Fla. Aug. 3, 2017); *see also FTC v. DIRECTV, Inc.*, 2017 WL 3453376, at *5 (N.D. Cal. Aug. 12, 2017) (noting that *Kokesh* "explicitly declined to make any finding whatsoever" regarding courts' authority to order disgorgement, and declining to "apply *Kokesh* to make broad generalizations" regarding requests for equitable relief). Because the Supreme Court declined to disturb existing case law recognizing disgorgement, Ninth Circuit precedent – embodied in cases like *Platforms Wireless* – remains binding on this Court. Weaver's request that the Court deviate from that precedent (and allow him to keep his illicit profits) should be denied.[2]

## B. *Kokesh* Does Not Otherwise Invalidate Ninth Circuit Law On Disgorgement.

Even if the Supreme Court had not expressly limited the scope of its *Kokesh* decision, there is little basis for this Court to extend it. Weaver argues that, when a remedy is deemed a "penalty" for statute of limitations purposes, it cannot be ordered as equitable relief. But, *Kokesh*'s holding that "SEC disgorgement constitutes a penalty within the meaning of Section 2462," 137 S. Ct. at 1643 (emphasis added), should not be understood to mean that disgorgement is a "penalty" for all purposes or that the fundamental, equitable nature of the remedy has suddenly changed.

As the Supreme Court has cautioned: "The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose,

---

[2] As *Kokesh* leaves existing precedent in place, Weaver would be left to argue that this Court should ignore binding Ninth Circuit cases because the Supreme Court may, sometime in the future, eliminate the disgorgement remedy. But, district courts should not deviate from binding authority based on predictions regarding future appellate decisions. *See, e.g., Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 910 (7th Cir. 1994).

1    has, and should have precisely the same scope in all of them runs all through legal

2    discussions. It has all the tenacity of original sin and must constantly be guarded

3    against." *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 328 (1961).

4         In the brief time since *Kokesh*, one court already has applied that warning,

5    holding that the designation of disgorgement as a "penalty" for Section 2462 purposes

6    does not mean that it is a "penalty" for other purposes. In one of the first opinions

7    construing *Kokesh*, the district court in *SEC v. Brooks*, 2017 WL 3315137 (S.D. Fla.

8    Aug. 3, 2017) addressed whether disgorgement is "remedial" or "penal" in determining

9    whether a claim can survive the death of a defendant. Much like Weaver, the defendant

10   in *Brooks* argued that *Kokesh's* holding that disgorgement is a "penalty" for purposes of

11   Section 2462 necessarily means that it is a "penalty" in the survivability context. *Id*. at

12   *7. The *Brooks* court rejected that reasoning, holding that *Kokesh* "cannot be plucked

13   from the statutory context that gives it force." *Id*. at *8. The *Brooks* court noted that

14   expanding *Kokesh* beyond its statutory context would require the court to ignore

15   existing precedent and held that disgorgement was sufficiently "remedial" for

16   abatement purposes. *Id*. Significantly, even in the wake of *Kokesh*, the *Brooks* court

17   described disgorgement as "an equitable remedy…imposed not to punish, but to ensure

18   illegal actions do not yield unwarranted enrichment." *Id*. at *6 (emphasis added).

19        Likewise, courts facing similar circumstances have recognized—both before and

20   after *Kokesh*—that the characterization of a remedy for purposes of Section 2462 does

21   not control how that remedy is characterized for other purposes. For example, in *Krull*

22   *v. SEC*, 248 F.3d 907, 914 & n.9 (9th Cir. 2001), the Ninth Circuit addressed whether

23   the SEC's one-year suspension of a registered securities representative was "remedial"

24   or "punitive." Like Weaver, the defendant in *Krull* argued that the remedy was punitive,

25   relying on a case that deemed a similar suspension a "penalty" for purposes of Section

26   2462. *Id*. The Ninth Circuit upheld the suspension, rejected the defendant's reasoning,

27   and noted that the case the defendant cited was "not persuasive" because it "only

28   addressed whether the sanction imposed was a 'penalty' for the purposes of the statute

of limitations defined under [Section 2462]." *Id*. Similarly, the Eighth Circuit has expressed its understanding that the *Kokesh* holding does not change the equitable nature of the disgorgement remedy. In deciding whether injunctive relief is subject to the statute of limitations, the Eighth Circuit indicated that the lesson of *Kokesh* is that although "courts order SEC disgorgement as an exercise of their inherent equity power," "disgorgement's 'equitable' label does not exempt it from being a § 2462 penalty." *SEC v. Collyard*, 2017 WL 2803184, *2 (8th Cir. June 29, 2017).

The reasoning of *Brooks, Krull* and *Collyard* applies here. *Kokesh*'s holding that disgorgement is "a § 2462 penalty," *id.*, does not alter the equitable nature of the relief or this Court's authority to order that a securities violator return his ill-gotten gains. This is especially true where expanding *Kokesh* beyond its statutory context would require this Court to discard decades of precedent. This Court should refuse Weaver's invitation to abandon this well-established remedy.[3]

## II.   The SEC's Approximation of Disgorgement Is Reasonable.

Once the *Kokesh* opinion is returned to its proper context, Weaver's brief narrows the issues in dispute. Critically, Weaver does not dispute the accuracy of <u>any</u> of SEC Accountant Kevin Barrett's calculations of Jammin Java sales proceeds and prejudgment interest. And, Weaver does not contest that: (1) entities he owned garnered $22,812,154.19 from the unregistered (*i.e.*, <u>illegal</u>) sale of Jammin Java stock, and (2) Weaver received $3,559,431 in cash derived from the sale of Jammin Java stock by entities owned by his co-Defendants. In other words, Weaver effectively concedes that

---

[3] The Supreme Court's disclaimer in *Kokesh* is dispositive. Moreover, Weaver's underlying premise – that Congress has not weighed in on the disgorgement remedy – is incorrect. To the contrary, "Congress has expressly endorsed that sanction." *SEC v. Palmisano*, 135 F.3d 860, 865 (2d Cir. 1998). In fact, Congress has repeatedly changed the statutory regime in a way that logically presupposes the existence of that remedy (and in some cases augments it). *See, e.g.,* 15 U.S.C. § 78t-1(b)(2) (providing that defendants in insider trading cases may offset "[t]he total amount of damages" against "the amounts, if any, that such person may be required to disgorge" in enforcement actions); 15 U.S.C. §§ 77t(f), 78u(d)(4) (prohibiting "funds disgorged" in SEC enforcement actions from being used to pay attorney's fees and expenses). Weaver's reading of *Kokesh* would make numerous statutory provisions incoherent and meaningless, in derogation of the rule that a court's role is "to make sense rather than nonsense out of the *corpus juris*." *W. Va. Univ. Hosp., Inc. v. Casey*, 499 U.S. 83, 101 (1991).

1  he received $26,371,585.20 from the illegal, unregistered sale of Jammin Java stock. He
2  thereby sets that amount as the floor for any disgorgement remedy.

3      While Weaver does not contest that he earned $26 million from Jammin Java
4  stock sales, he tries to chip away at <u>other</u> aspects of the SEC's approximation of his ill-
5  gotten gains. Weaver argues that (a) the SEC's approximation includes purported
6  "legitimate" profits, (b) he should not be held liable for amounts that he helped hide
7  from regulators, and (c) cash balances for entities owned by his nominees should not be
8  attributed to him. As the SEC has established, Weaver went to great lengths to obscure
9  the money flow from his misconduct by using offshore shell companies, Swiss bank
10  accounts, and nominees. (*See, e.g.,* Dkt. #173, SJ SOF ¶¶ 2, 7-24, 51, 63-67, 73-84, 86-
11  97.) Weaver then perpetuated this ambiguity by (a) refusing to participate in discovery,
12  (b) asserting his Fifth Amendment privilege, (c) using a pseudonym to avoid detection,
13  and (d) instructing his agents to hide critical information from law enforcement. (*See,
14  e.g., Id.* at ¶¶ 80, 95; Dkt. #174-15 at 1, 5; Dkt. #222-2 at 152-153; Dkt. #222-3.) Now,
15  he attempts to hide behind the very ambiguity <u>he created</u>. This Court is not required to
16  indulge such a maneuver. Under the applicable standard, <u>Weaver</u> – not the SEC – must
17  bear the risk of the uncertainty that springs from his misconduct.

18  **A. <u>All</u> of Weaver's Sale Proceeds Are Illicit Gains And Should Be Disgorged**.

19      Weaver argues that an undefined portion of his profits from Jammin Java trades
20  were "legally…obtained" and, therefore, are not "wrongful gains." (Def. Br. at 12-13.)
21  But, <u>Weaver has no legitimate gains</u>. Weaver ignores that the SEC prevailed on its
22  claim that Weaver violated Securities Act Section 5. The SEC claimed – and this Court
23  held – that Weaver's Jammin Java sales were unregistered (*i.e.*, <u>illegal</u>). (Dkt. #172 at
24  17-19; Dkt. #215 at 5-6.) In other words, <u>all</u> of Weaver's profits from the unregistered
25  sale of Jammin Java stock were derived from violations of federal securities law. Even
26  without a finding of fraud, the proper remedy for Weaver's Section 5 violation is to
27  disgorge the profits he earned from the illegal stock sales. *See, e.g., Platforms Wireless*,
28  617 F.3d at 1096-1098 (affirming disgorgement of all proceeds from defendants'

6

unregistered stock sales in violation of Section 5); *SEC v. M&A West, Inc.*, 538 F.3d 1043, 1054 (9th Cir. 2008)(affirming district court order disgorging all profits related to Section 5 violation, including cash payments and "profits from [defendant's] stock sales"); *SEC v. Schooler*, 106 F. Supp. 3d 1157, 1168-1169 (S.D. Cal. 2016)(holding that defendant violated Section 5 and – even without resolving the SEC's fraud claim – disgorging $136,654,250 of defendant's profits from the unregistered sales). In short, the Section 5 charge <u>alone</u> warrants the requested disgorgement.

Contrary to Weaver's suggestion, the SEC's fraud claim provides a <u>second</u> basis for disgorgement of all of Weaver's trading proceeds. The SEC successfully proved that Weaver participated in a fraudulent scheme to deceive investors into buying the huge (and otherwise unmarketable) blocks of Jammin Java stock that Weaver and his co-Defendants had amassed. As the Court found, Weaver "made millions of dollars in profit" by dumping his blocks of stock into the market that he helped artificially stoke with the fake Straight Path agreement.[4] (Dkt. #215 at 7.) Weaver implies that the SEC is required to parse the market effects of intervening promotional activity – effectively requiring the SEC to prove that Weaver's contribution to the scheme was the proximate cause of <u>all</u> of his profits. (Def. Br. at 13.) That gets the standard backwards. The SEC need only make a reasonable approximation of Weaver's gains and establish "but-for" causation between Weaver's conduct and his profits. *See, e.g., SEC v. Teo*, 746 F.3d 90, 101-107 (3d Cir. 2014). It is then <u>Weaver's</u> burden to establish that intervening events should lessen his liability. *Teo*, 746 F.3d at 107. Even then, "evidence of an intervening cause…is not dispositive." *Id.* "The policies underlying the disgorgement remedy – deterrence and preventing unjust enrichment – must always weigh heavily in a court's consideration of whether particular profits are legally attributable to the wrongdoing."

---

[4] Weaver's reliance on the SEC's expert report is unavailing. The SEC's expert was <u>not</u> retained to identify Weaver's gains. Rather, the SEC's expert was hired to opine on whether Weaver's contribution to the scheme – the fake Straight Path agreement – could be considered material by a reasonable investor in deciding to buy "an extremely small, thinly traded and not widely followed" stock like Jammin Java. (Dkt. #226-5 at 4, "Scope of Assignment.") The SEC's expert – and, later, the Court – concluded that Weaver's conduct <u>was</u> significant enough to deceive investors.

*Id.* Here, the SEC has shown – through undisputed evidence – that the market for Jammin Java stock <u>did not exist</u> until Weaver engineered the fake Straight Path agreement. (*See, e.g.*, Dkt. #173, SJ SOF ¶ 62.) But for Weaver's fraud, there was no way for him (and his nominees) to dump their shares on the unsuspecting public. Having participated in a scheme to manipulate Jammin Java stock, Weaver should not be allowed to retain any of the resulting profits.

**B. Weaver Should Be Held Liable For Proceeds That He Helped Hide From Law Enforcement and That Were Held By Nominee-owned Entities**.

Weaver's attempts to chip away at the SEC's approximation of his ill-gotten gains are divorced from the applicable standard. Tellingly, Weaver fails to mention that, in determining disgorgement (1) "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty" and (2) a "person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained." *Platforms Wireless,* 617 F.3d at 1096-1098. Turning that standard on its head, Weaver effectively argues that remaining ambiguities and unanswered questions regarding the disposition of some of the illicit Jammin Java profits should be resolved in <u>his</u> favor. He also disregards that his assertion of the Fifth Amendment privilege warrants an adverse inference against him.

Critically, Weaver has never refuted the SEC's evidence that (1) he directed Defendant Al-Barwani to transfer $2 million of Jammin Java proceeds into gold Kruggerrand (and decided the amount and timing of the transfer); (2) Weaver directed Al-Barwani to execute documents creating the Tare Finance entity that received $11.3 million of illicit profits, (3) Weaver was referred by Berlinger (his nominee) to Benjamin Altun – the fiduciary who formed Tare Finance in Dubai, (4) Berlinger (Weaver's nominee) transferred the $11.3 million (although he cannot identify who gave the instruction), (5) Berlinger testified that Weaver was concerned that Swiss regulators would freeze profits, wanted to get money out of the Swiss banking system, and participated in the formation of Dubai-based Tare Finance to "get out of

8

Switzerland," and (6) Al-Barwani, Sun, and Berlinger acted as Weaver's nominees and followed his directions.[5] (Dkt. #221 at 13-17.) In short, while the ultimate disposition of some of the Jammin Java profits is unclear, the SEC has provided unrefuted evidence that Weaver helped orchestrate the transfer of $13.3 million in illegal profits out of the Swiss banking system and that he exercised control over his nominees.

Unable to deny his involvement, Weaver relies on the ambiguity regarding the ultimate recipient, citing the fact that Weaver's nominees (Berlinger and Al-Barwani) are not sure where the gold and Tare Finance funds went. (Def. Br. at 10-11.) In other words, Weaver tries to dodge liability by hiding behind the opaque financial structures that he helped build using multiple layers of shell companies, Swiss bank accounts and nominees. He used this structure to mask the true owner of Jammin Java proceeds, refused to provide any information during litigation regarding the flow of funds, actively hid information from Swiss regulators and now, incredibly, faults the SEC for not tracing all of the illicit Jammin Java profits into his hands. But, in the face of evidence of Weaver's role in his nominees' transactions, it was Weaver's burden to address the uncertainty stemming from his conduct. Critically, Weaver does nothing to actually shed light on where this money went or address the ambiguities created by his web of offshore shells and nominees. Consequently, he should be held liable for the money that he helped hide and the net balances held by the nominee-owned shell companies that the SEC has identified.[6]

## III.   A Maximum Civil Penalty Equal To Disgorgement Is Warranted.

In addition to chipping away at the SEC's approximation of his gains, Weaver

---

[5] Weaver does dispute that he controlled transactions for one of Defendant Miller's entities – Las Colinas. (Def. Br. at 11.) Unlike his co-Defendants – who implicated Weaver – Miller pled the Fifth and did not produce documents. Even so, the SEC presented evidence that Weaver directed Jammin Java transactions out of Miller's entities. (Dkt. #173, SJ SOF ¶ 96.)

[6] Weaver suggests that the SEC seeks disgorgement of profits that Defendant Sun claims to own and control. (Def. Br. at 11.) That is incorrect. As explained in the SEC's initial brief, all profits sent to the personal accounts of Weaver's nominees were excluded from the calculation of Weaver's gains. (Dkt. #221 at 16.) Specifically, the SEC excluded the Lebanese account that Sun identified in his deposition.

argues that he should pay a civil penalty on a "per-violation" basis – resulting in a penalty of only $300,000. (Def. Br. at 4, 6-8.) On its face, Weaver's proposed penalty is absurd given the severity of his misconduct and the massive profits he derived from it. As described in detail in the SEC's opening brief, (Dkt. #221 at 3-4), Weaver's violations were egregious in sheer size and were executed with sophistication and a high level of subterfuge (including deliberate efforts to hide his fraud from law enforcement after the fact). Weaver has not acknowledged wrongdoing or given any assurances that his misconduct will stop. In sum, as shown in the SEC's initial brief, all applicable factors weigh in favor of a substantial civil penalty.[7] (Dkt. #221 at 3-7, 18.)

The "per violation" approach is particularly ill-fitting in this case given Weaver's position that he should pay no disgorgement. Weaver argues that he should be allowed to keep his ill-gotten profits – including $26 million that he does not contest went to his entities and personal accounts. Yet, he simultaneously argues that a civil penalty pegged to those gains is inappropriate. Distilled to its essence, Weaver's brief asks the Court to allow him to keep tens of millions of dollars that he reaped from violating federal securities law and limit a penalty to $300,000 – a veritable rounding error in this context. Such an approach is grossly inadequate. The SEC respectfully requests that the Court enter a civil penalty that reflects the severity of Weaver's conduct. Here, the "per-violation" approach does not qualify.

**IV. The SEC's Proposed Civil Penalty Does Not Violate The Eighth Amendment**.

Confronted with overwhelming, unrefuted evidence of his fraud and his massive unregistered sale of Jammin Java stock, Weaver gamely tries to use the sheer size of the Jammin Java scheme to his advantage. He claims that the proposed penalty – tied to his ill-gotten gains – is an "excessive fine" within the meaning of the Eighth Amendment. (Def. Br. at 15.) At the outset, Weaver tries to lump the SEC's proposed disgorgement into his Eighth Amendment argument, citing the SEC's request for $104 million in

---

[7] For the same reasons, the SEC has met the standard for a permanent injunction and permanent penny stock bar. (*See* Dkt #221 at 3-8.)

1   "disgorgement, penalties and prejudgment interest." (Def. Br. at 16.) But, disgorgement

2   is not "punishment" within the meaning of the Eighth Amendment. *See, e.g., SEC v.*

3   *Spongetech Delivery Sys., Inc.*, 2015 WL 5793303, *5 (E.D.N.Y. Sept. 30, 2015).

4          More to the point, Weaver does not – and cannot – cite a single case involving an

5   SEC enforcement action where a penalty equal to the defendant's pecuniary gain was

6   deemed to violate the Eighth Amendment. A civil penalty violates the Excessive Fine

7   Clause only if it is "grossly disproportional" to the gravity of the violation. *U.S. v.*

8   *Bajakajian*, 524 U.S. 321, 336-37 (1998). "[J]udgments about the appropriate

9   punishment for an offense belong in the first instance to the legislature." *Id.* Here, the

10  SEC's proposed penalty is permitted by statute, 15 U.S.C. § 78u(3)(B)(iii). And, that

11  statute <u>ensures</u> proportional relief by tying the penalty to Weaver's pecuniary gain. *See,*

12  *e.g., SEC v. Brookstreet Sec. Corp.*, 664 Fed. Appx. 654, 657 (9th Cir. 2016)(finding a

13  $5.88 million penalty does not violate the Excessive Fines Clause "[e]ven if we

14  assume" that the security at issue caused only $2 million in investor losses); *SEC v. Bic*

15  *Real Estate Dev. Corp.*, 2017 WL 1740136, *7 (N.D. Cal. May 4, 2017)(holding that

16  penalty equal to defendant's profit did not violate the Eighth Amendment). To be sure,

17  the penalty requested by the SEC is substantial. But, the penalty is high because

18  Weaver's misconduct was so immensely profitable. The manipulation at issue resulted

19  in over $77.6 million in profits for Weaver and his co-Defendants. Even Weaver does

20  not contest that $26 million of those sales proceeds went to his entities and personal

21  accounts. That money did not come from thin air. It was taken from investors on the

22  other side of the illegal Jammin Java sales. Had Weaver pilfered less money from the

23  investing public, the penalty would be lower.[8] Weaver has only himself to blame for the

24  size of the available statutory remedy.

25         Perhaps realizing this, Weaver attacks the amount of the requested penalty as

26  violating the Excessive Fines Clause by pointing the finger at <u>other</u> Defendants and

27  _____

28  [8] Contrary to Weaver's suggestion, the SEC does not seek a civil penalty that exceeds his gains. The SEC is seeking a statutory penalty <u>equal</u> to the amount this Court orders in disgorgement.

comparing the proposed financial relief to prior settlements in this case. But, the SEC's settlements with other Defendants have no relation to the question at hand: what is the appropriate relief given <u>Weaver's</u> conduct and <u>Weaver's</u> gains? The answer to that question should be tied to the facts and evidence submitted in this litigation; Weaver's analysis of the SEC's settlements with other parties is irrelevant. *U.S. v. Emerson*, 107 F.3d 77, 81 n.9 (1st Cir. 1997) ("the proportionality concern in an excessive fines case is generally considered to be a question of whether the fine imposed is disproportionate to the crime committed…not whether a given fine is disproportionate to other fines imposed on other defendants") (internal quotation omitted). Even so, such an analysis would not benefit Weaver. In deciding to compromise its claims, the SEC weighed several factors that undermine Weaver's request for equal treatment. For example, (a) documentary evidence confirmed that Weaver profited from the illegal sales to a far greater extent than his co-Defendants, (b) aside from Miller and Whittle, Weaver's co-Defendants participated in discovery and testified under oath, (c) the documents they produced and testimony they provided implicated Weaver, (d) extensive evidence indicated that Weaver's co-Defendants were acting at Weaver's direction, and (e) two of Weaver's co-Defendants entered into formal cooperation agreements with the SEC. The requested remedies against Weaver reflect the undisputed evidence of Weaver's conduct, his central role in the scheme, and the enormous profits he reaped. His attempt to point the finger at his co-Defendants does not change any of that.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant the SEC's motion for injunctive and monetary relief.


Dated:  August 24, 2017                    Respectfully submitted,

                                           */s/ Timothy S. Leiman*
                                           Timothy S. Leiman

12

U.S. Securities and Exchange Commission
Chicago Regional Office
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois  60604
Telephone:  (312) 353-5213
Fax:  (312) 353-7398
leimant@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

Timothy S. Leiman hereby certifies that he caused the foregoing document to be filed through the Court's CM/ECF system on August 24, 2017, which automatically sends an electronic copy of the document to all counsel of record.

*<u>/s/ Timothy S. Leiman</u>*